**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS—HARVARD FACULTY CHAPTER, and AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, | Case No. _____ |
| Plaintiffs, | |
| v. | |
| UNITED STATES DEPARTMENT OF JUSTICE; PAMELA BONDI, in her official capacity as the U.S. Attorney General; LEO TERRELL, in his official capacity as Senior Counsel to the Assistant Attorney General for Civil Rights and head of the DOJ Task Force to Combat Anti-Semitism; U.S. DEPARTMENT OF EDUCATION; LINDA MCMAHON, in her official capacity as the U.S. Secretary of Education; CRAIG TRAINOR in his official capacity as Acting Assistant Secretary for the Office for Civil Rights, U.S. Department of Education; THOMAS E. WHEELER, in his official capacity as Acting General Counsel of the U.S. Department of Education; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in his official capacity as the U.S. Secretary of Health and Human Services; SEAN R. KEVENEY, in his official capacity as Acting General Counsel of the U.S. Department of Health and Human Services; NATIONAL INSTITUTES OF HEALTH; JAYANTA BHATTACHARYA,, in his official capacity as the Director of the National Institutes of Health; U.S. GENERAL SERVICES ADMINISTRATION; STEPHEN EHIKIAN, in his official capacity as Acting Administrator of the U.S. General Services Administration; JOSH GRUENBAUM, in his official capacity as Commissioner of the Federal Acquisition Service, | |
| Defendants. | |

## COMPLAINT

Plaintiffs American Association of University Professors—Harvard Faculty Chapter ("AAUP-Harvard") and American Association of University Professors ("AAUP") (collectively, "Plaintiffs"), through their attorneys, Selendy Gay PLLC and Cohen Milstein Sellers & Toll PLLC, for their complaint against the United States Department of Justice ("DOJ"); Pamela Bondi, in her official capacity as the Attorney General; Leo Terrell, in his official capacity as Senior Counsel to the Assistant Attorney General for Civil Rights and head of the DOJ Task Force to Combat Anti-Semitism; the United States Department of Education ("ED"); Linda McMahon, in her official capacity as the Secretary of Education; Craig Trainor, in his official capacity as Acting Assistant Secretary for the Office for Civil Rights, ED; Thomas E. Wheeler, in his official capacity as Acting General Counsel of the ED; the United States Department of Health and Human Services ("HHS"); Robert F. Kennedy, Jr., in his official capacity as the Secretary of HHS; Sean R. Keveney, in his official capacity as Acting General Counsel of HHS; National Institutes of Health ("NIH"); Jayanta Bhattacharya, in his official capacity as the Director of NIH; the United States General Services Administration ("GSA"); Stephen Ehikian, in his official capacity as Acting Administrator of GSA; and Josh Gruenbaum, in his official capacity as Commissioner of the Federal Acquisition Service (collectively, "Defendants"), allege as follows:

## NATURE OF ACTION

1.    This action challenges the Trump administration's unlawful and unprecedented misuse of federal funding and civil rights enforcement authority to undermine academic freedom and free speech on a university campus.

2.    On March 31, 2025, Defendants announced an investigation of Harvard University for asserted but unspecified failures to address antisemitism. Three days later, on April 3, Defendants concluded from that investigation that Harvard must adopt a list of vague yet sweeping

2

programmatic and structural changes to university management, operations, and curriculum. Defendants described these changes as "non-exhaustive" preconditions for Harvard "to remain a responsible recipient of federal taxpayer dollars" valued at approximately $9 billion.

3.    Harvard, like all American universities, depends on federal funding to conduct its academic research. Threats like these are an existential "gun to the head" for a university. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012). They also hold hostage billions of dollars in congressional appropriations that are crucial to ensuring the American university system remains a global leader in scientific, medical, and technological research.

4.    Defendants claim they are enforcing Title VI of the Civil Rights Act—the anti-discrimination law covering institutions that receive federal funds—but their disregard for the statute's requirements belie that claim. Under Title VI and its implementing regulations, the government may accelerate an investigation to the stage of terminating funding only after complying with several specific steps: issuing findings of noncompliance; making an effort to obtain voluntary compliance and determining that voluntary compliance is impossible; giving notice to both the university and Congress; providing a hearing; and ensuring that any changes demanded as a condition of avoiding termination are tailored to the findings of noncompliance. 42 U.S.C. § 2000d *et seq.* These procedures exist because Congress recognized that allowing federal agencies to hold funding hostage, or to cancel it cavalierly, would give them dangerously broad power in a system in which institutions depend so heavily upon federal funding.

5.    Defendants have not followed any of these procedures. Instead, Defendants summarily threatened to terminate at least $255.6 million in federal funding between Harvard University, its affiliates, and the federal government and to hold over $8.7 billion in multi-year grant commitments to Harvard University and its affiliates under review, all without any meaningful process

or any specific finding of wrongdoing, unless Harvard immediately agrees to implement the Trump administration's demands to overhaul the University's governance and leadership, academic programs, admissions system, hiring process, and discipline system—with the promise of more demands to come. These sweeping yet indeterminate demands are not remedies targeting the causes of any determination of noncompliance with federal law. Instead, they overtly seek to impose on Harvard University political views and policy preferences advanced by the Trump administration and commit the University to punishing disfavored speech.

6.      These tactics amount to exploiting Title VI to coerce universities into undermining free speech and academic inquiry in service of the government's political or policy preferences. Just last year the Supreme Court unanimously held such coercion to be unconstitutional. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024).

7.      Their actions against Harvard follow a playbook that has already succeeded in undermining free speech and academic freedom in America. Last month, Defendants launched a similar investigation into Columbia University and, shortly thereafter, summarily terminated over $400 million in federal contracts while threatening billions more. Under immense financial pressure, Columbia acceded to the Trump administration's demands. A remarkable component of that concession was Columbia's agreement to "[e]xpand[] … intellectual diversity" as defined by the Trump administration, alter its procedures for hiring faculty and disciplining students according to the administration's policy preference, and place an entire academic department under the control of a receiver without any formal finding of misconduct. Despite its voluntary cooperation, as of April 10, the Trump administration has been reported to be seeking further demands from Columbia in the form of a consent decree and the NIH has further frozen all Columbia's grant funding without any notice. In recent days, the Trump administration has also frozen over $1 billion in funding for

Cornell University and $790 million for Northwestern University, with an even more shocking lack of process, not even purporting to issue communications providing notice under Title VI or any other legal authority.

8.      Defendants' unlawful actions have already caused severe and irreparable harm by halting academic research and inquiry at Harvard, including in areas that have no relation whatsoever to charges of antisemitism or other civil rights violations. Defendants' actions also create, by design, a pervasive climate of fear and self-censorship for Plaintiffs and their members.

9.      "Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and ... is therefore a special concern of the First Amendment." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967). "To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). Our country's greatness depends in meaningful part upon the continued independence and intellectual freedom of its universities and colleges. The Court should act to ensure free speech and academic freedom by enjoining Defendants' acts and declaring them unlawful.

## THE PARTIES

### A.    Plaintiffs

10.     Plaintiff American Association of University Professors—Harvard Faculty Chapter, founded in April 2024, is a nonprofit membership association of faculty across Harvard University's many departments and schools and a chapter of the AAUP. AAUP-Harvard advocates for meaningful and democratic shared governance, academic freedom, and the economic security of those who perform the institution's core instructional work. AAUP-Harvard is headquartered in Cambridge, Massachusetts.

5

11.     Plaintiff American Association of University Professors is a membership association and labor union of faculty and academic professionals throughout the country organized under Section 501(c)(6) of the Internal Revenue Code. AAUP is headquartered in Washington, D.C. Founded in 1915, AAUP remains the nation's leading organization primarily dedicated to protecting academic freedom and shared governance in higher education. AAUP has approximately 44,000 members on college and university campuses across the country, including a large number of faculty members who rely on federal grants to support their work across a range of academic disciplines.

12.     AAUP's mission is to advance academic freedom and shared governance of higher education institutions; to define fundamental professional values and standards for higher education; to promote the economic security of faculty, academic professionals, graduate students, postdoctoral fellows, and all those engaged in teaching and research in higher education; to help the higher education community organize to make its goals a reality; and to ensure higher education's contribution to the common good. AAUP has helped to shape American higher education by developing the standards and procedures that maintain quality in education and academic freedom in this country's colleges and universities.

### B.     Defendants

13.     Defendant the United States Department of Justice is a federal agency headquartered in Washington, D.C. The DOJ is an agency within the meaning of the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 551(1), 701(b)(1).

14.     Defendant Pamela Bondi is sued in her official capacity as the United States Attorney General.

15.     Defendant Leo Terrell is sued in his official capacity as Senior Counsel to the Assistant Attorney General for Civil Rights and head of the DOJ Task Force to Combat Anti-Semitism.

16.     Defendant the United States Department of Health and Human Services is a federal agency headquartered in Washington, D.C. HHS is an agency within the meaning of the APA. 5 U.S.C. §§ 551(1), 701(b)(1).

17.     Defendant Robert F. Kennedy, Jr. is sued in his official capacity as the United States Secretary of HHS.

18.     Defendant Sean R. Keveney is sued in his official capacity as the Acting General Counsel of HHS.

19.     Defendant the National Institutes of Health is a federal agency within HHS and is headquartered in Bethesda, Maryland. NIH is an agency within the meaning of the APA. 5 U.S.C. §§ 551(1), 701(b)(1).

20.     Defendant Jayanta Bhattacharya is sued in his official capacity as the Director of the NIH.

21.     Defendant the United States Department of Education ("ED") is a federal agency headquartered in Washington, D.C. ED is an agency within the meaning of the APA. 5 U.S.C. §§ 551(1), 701(b)(1).

22.     Defendant Linda McMahon is sued in her official capacity as the United States Secretary of Education.

23.     Defendant Thomas E. Wheeler is sued in his official capacity as Acting General Counsel of the ED.

24.    Defendant Craig Trainor is sued in his official capacity as Acting Assistant Secretary for the Office for Civil Rights, United States Department of Education.

25.    Defendant the United States General Services Administration is a federal agency headquartered in Washington, D.C. GSA is an agency within the meaning of the APA. 5 U.S.C. §§ 551(1), 701(b)(1).

26.    Defendant Stephen Ehikian is sued in his official capacity as Acting Administrator of the GSA.

27.    Defendant Josh Gruenbaum is sued in his official capacity as Commissioner of the Federal Acquisition Service within the GSA.

## JURISDICTION AND VENUE

28.    This action arises under the United States Constitution, 42 U.S.C. § 2000d-2, 42 U.S.C. § 1988, and 5 U.S.C. §§ 702, 706.

29.    This Court has subject matter jurisdiction pursuant to Article III of the United States Constitution and 28 U.S.C. §§ 1331.

30.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTUAL ALLEGATIONS

I.    **Defendants' Campaign to Undermine Free Speech and Academic Freedom**

31.    President Trump expressly campaigned on a promise to undermine free speech and academic freedom by using federal power to control universities.

32.    President Trump's 2024 campaign website included numerous statements describing his intention to curtail academic freedom and control the viewpoints expressed on campuses.

33.     That website included President Trump's plan "to reclaim our once great educational institutions from the radical Left and Marxist maniacs."[1]

34.     It expressly identified threats to withhold federal funding and extract financial penalties from private universities, specifically "at Harvard," as a means of such control, stating "we will take the billions and billions of dollars that we will collect by taxing, fining, and suing excessively large private university endowments, and we will then use that money to endow a new institution called the American Academy."[2]

35.     The President's campaign website also pledged to suppress views contrary to (1) its preferred narrative with respect to the Israeli-Palestinian conflict, and (2) its preferred narratives with respect to race and gender—what it refers to as "diversity, equity, and inclusion," or "DEI," or sometimes "wokeness."

36.     President Trump's campaign website highlighted that such viewpoints would be prohibited at the American Academy, stating that "there will be no wokeness or jihadism allowed—none of that's going to be allowed."[3]

37.     Prior to his appointment as Senior Counsel to the Assistant Attorney General for Civil Rights and head of the DOJ Task Force to Combat Anti-Semitism, Defendant Terrell promised that "Harvard will lose much more [funding] effective January 2025" because "America will

---

[1] *Agenda47: Protecting Students from the Radical Left and Marxist Maniacs Infecting Educational Institutions*, DonaldJTrump.com (July 17, 2023), https://www.donaldjtrump.com/agenda47/agenda47-protecting-students-from-the-radical-left-and-marxist-maniacs-infecting-educational-institutions.

[2] *Agenda47: The American Academy*, DonaldJTrump.com (Nov. 1, 2023), https://www.donaldjtrump.com/agenda47/agenda47-the-american-academy.

[3] *Id.*

no longer fund Jew Hating Schools!"[4] In connection with news reports that President Trump had

tapped Terrell for his federal position, Terrell threatened, "Harvard, I start work next week!"[5]

38.      Prior to his election as Vice President, JD Vance stated that "the professors are the

enemy"[6] and that "the universities are the enemy."[7] Since becoming Vice President he has praised

Hungarian President Victor Orbán's aggressive strategy to make Hungarian universities better re-

flect Orbán's own ideology.[8]

39.      Hungary[9]—along with its authoritarian counterparts in Turkey[10] and Brazil[11]— has

attempted to place universities under the control of the central government.

40.      On January 20, 2025, President Trump signed Executive Order 14151, titled "End-

ing Radical and Wasteful Government DEI Programs and Preferencing."[12]

41.      Executive Order 14151 states that "'diversity, equity, inclusion, and accessibility'

(DEIA)" programs are "illegal and immoral discrimination programs." The order directs "[e]ach

---

[4] Leo Terrell (@TheLeoTerrell), X (Oct. 20, 2024, 3:33PM), https://x.com/TheLeoTerrell /status/1848085166297686207.

[5] Leo Terrell (@TheLeoTerrell), X (Jan. 14, 2025, 11:19PM), https://x.com/TheLeoTerrell /status/1879382847511052551.

[6] JD Vance, *Nat'l Conservatism Conf., Keynote Address: The Professors Are the Enemy* (Nov. 2, 2021), available at https://www.youtube.com/watch ?v=0FR65Cifnhw&embeds_referring_euri=https%3A%2F%2Fnationalconservatism.org%2F&s ource_ve_path=MjM4NTE.

[7] *Id.*

[8] Rob Dreher, *"I would like to see European elites actually listen to their people for a change": An Interview with J.D. Vance*, The European Conservative (Feb. 22, 2024), https://europeanconservative.com/articles/dreher/i-would-like-to-see-european-elites-actually-listen-to-their-people-for-a-change-an-interview-with-j-d-vance/.

[9] Lydia Gall, *Hungary Continues Attacks on Academic Freedom*, Human Rights Watch (Sept. 3, 2020), https://www.hrw.org/news/2020/09/03/hungary-continues-attacks-academic-freedom.

[10] Muzaffer Kaya, *Turkey's Purge of Critical Academia*, Middle East Rsch. & Info. Project (2018), https://merip.org/2018/12/turkeys-purge-of-critical-academia.

[11] Pedro Salgado, *The Crisis of Brazilian Universities: Higher Education Under Bolsonaro*, Int'l Rsch. Grp. on Authoritarianism & Counter-Strategies (July 21, 2021), https://irgac.org/articles/the-crisis-of-brazilian-universities-higher-education-under-bolsonaro/.

[12] Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025).

agency, department, or commission head" to "terminate, to the maximum extent allowed by law, all . . . 'equity-related' grants or contracts."[13]

42.    On January 21, 2025, President Trump signed Executive Order No. 14173 "Ending Illegal Discrimination and Restoring Merit-Based Opportunity."[14]

43.    Executive Order 14173 states that "'diversity, equity, and inclusion' (DEI)," and "'diversity, equity, inclusion, and accessibility' (DEIA)" policies are "illegal," "dangerous," and "immoral" and can violate federal civil rights laws. It directs federal agencies to take action "[h]olding Federal contractors and subcontractors responsible for taking 'affirmative action'" against DEI and DEIA policies and directs the heads of all agencies to "take all appropriate action with respect to the operations of their agencies to advance in the private sector the policy of individual initiative, excellence, and hard work," which the Executive Order asserts is inconsistent with "DEIA."[15]

44.    Executive Order 14173 further directs the Attorney General to submit a report "containing recommendations for enforcing Federal civil-rights laws and taking other appropriate measures to encourage the private sector to end illegal discrimination and preferences, including DEI." In addition, the Order states that the Attorney General's report must "contain a proposed strategic enforcement plan" that, relevant here, includes "up to nine potential civil compliance investigations" of institutions including "institutions of higher education with endowments over 1 billion dollars."[16]

---

[13] *Id.*
[14] Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025).
[15] *Id.*
[16] *Id.*

45.     Neither Executive Order 14151 nor Executive Order 14173 define the terms "DEI," "DEIA," "diversity," "equity," "inclusion," or "accessibility."

46.     On January 27, 2025, the Office of Management and Budget ("OMB") issued a memorandum requiring all agencies to "temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal."[17]

47.     On January 28, 2025, Harvard University announced that the OMB guidance "require[s] a pause on a subset of federally funded research activities implicated in an evolving set of executive orders or through stop work orders or other guidance issued by federal agencies" and promised that "member[s] of our research community" would "receive additional direction."[18]

48.     On January 29, 2025, President Trump signed Executive Order 14188, titled "Additional Measures to Combat Anti-Semitism."[19]

49.     Executive Order 14188 requires the heads of all executive agencies or departments to submit reports identifying all civil and criminal authorities or actions within their jurisdictions "that might be used to curb or combat anti-Semitism, and containing an inventory and analysis of all pending administrative complaints, as of the date of the report, against or involving institutions

---

[17] *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance*, Off. of Mgmt. & Budget (Jan. 27, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/03/M-25-13-Temporary-Pause-to-Review-Agency-Grant-Loan-and-Other-Financial-Assistance-Programs.pdf.

[18] Letter from Alan M. Garber, John F. Manning, & Meredith Weenick, Emerging Regulations and Legislation (Jan. 28, 2025), https://www.harvard.edu/president/news/2025/emerging-regulations-and-legislation/.

[19] Exec. Order No. 14188, 90 Fed. Reg. 8847 (Jan. 29, 2025).

of higher education alleging civil-rights violations related to or arising from post-October 7, 2023, campus anti-Semitism."[20]

50.     Executive Order 14188 makes no mention of the First Amendment or the need to protect free speech alongside efforts to eradicate illegal discrimination and harassment.

51.     On February 3, 2025, DOJ announced the creation of a multi-agency "Task Force to Combat Anti-Semitism" ("DOJ Task Force"), led by Defendant Terrell, to carry out the mandate of Executive Order 14188.[21] The DOJ Task Force includes representatives from DOJ, ED, and HHS.

52.     That same day, ED announced Title VI investigations into five private and state universities (Columbia, Northwestern University, Portland State University, the University of California at Berkeley, and the University of Minnesota, Twin Cities) where ED stated that "widespread antisemitic harassment has been reported."[22]

53.     The announcement did not point to any specific allegations of antisemitic harassment.

54.     On February 17, 2025, Acting United States Attorney for the District of Columbia Edward Martin sent a letter to Georgetown University Law Center stating that it was "unacceptable" for the private Jesuit university to "teach and promote" diversity, equity, and inclusion, and seeking

---

[20] *Id.*

[21] Press Release, Off. of Pub. Affs., *Justice Dep't Announces Formation of Task Force to Combat Anti-Semitism*, U.S. Dept. of Justice (Feb. 3, 2025), https://www.justice.gov/opa/pr/justice-department-announces-formation-task-force-combat-anti-semitism.

[22] Press Release, U.S. Dep't of Educ., *U.S. Dep't of Educ. Probes Cases of Antisemitism at Five Univs.*, (Feb. 3, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-probes-cases-of-antisemitism-five-universities.

to pressure the institution to remove such content from its "curriculum," "courses," and "teaching."[23]

55.    On March 3, 2025, HHS, ED, and GSA announced a "comprehensive review of Columbia University's federal contracts and grants in light of ongoing investigations for potential violations of Title VI of the Civil Rights Act."[24]

56.    The announcement did not point to any specific allegations of antisemitic harassment.

57.    On March 4, 2025, President Trump posted on Truth Social, "All Federal Funding will STOP for any College, School, or University that allows illegal protests. Agitators will be imprisoned/or permanently sent back to the country from which they came. American students will be permanently expelled or, depending on the crime, arrested. NO MASKS! Thank you for your attention to this matter."[25]

58.    The post did not say how federal officials would distinguish "illegal protests" from protests protected by the First Amendment or how they would identify "agitators" for purposes of implementing the President's policy, nor did it otherwise provide guidance to faculty, students, or administrators seeking to exercise (or to allow others to exercise) First Amendment rights while avoiding the risk of imprisonment, deportation, expulsion, arrest, or loss of "[a]ll" federal funding.

---

[23] Letter from Edward R. Martin, United States Attorney for the District of Columbia, to William M. Treanor, Dean , Georgetown Law Center, (Feb. 17, 2025), https://www.ncronline.org/files/2025-03/3.7.24%20Ed%20Martin%20letter%20%20to%20Georgetown%20law.pdf.
[24] *HHS, ED, and GSA announce additional measures to end anti-Semitic harassment on college campuses*, U.S. General Services Administration (Mar. 3, 2025), https://www.gsa.gov/about-us/newsroom/news-releases/hhs-ed-and-gsa-announce-additional-measures-to-end-antisemitic-harassment-03032025.
[25] Donald Trump (@realDonaldTrump), Truth Social (Mar. 4, 2025, 7:30AM), https://truthsocial.com/@realDonaldTrump/posts/114104167452161158.

59.    On March 7, 2025—only four days after announcing its review of Columbia's federal funding—DOJ, HHS, ED, and GSA announced the "immediate cancellation of approximately $400 million in federal grants and contracts to Columbia University due to the school's continued inaction in the face of persistent harassment of Jewish students."[26] The announcement stated that these cuts "represent the first round of action and additional cancellations are expected to follow."[27]

60.    Defendants' press release announcing this action stated in no uncertain terms that the measure was intended to send a message "to Columbia and other universities."[28]  The March 7 press release stated, "decisive action by the DOJ, HHS, ED, and GSA to cancel Columbia's grants and contracts serves as a notice to every school and university that receives federal dollars that this Administration will use all the tools at its disposal to protect Jewish students and end anti-Semitism on college campuses."[29]

61.    On or about March 9, 2025, Defendant Terrell stated on Fox News that "The academic system in this country has been hijacked by the left, has been hijacked by the Marxists. They have controlled the mindset of our young people … and we have to put an end to it."[30]

---

[26] Press Release, *DOJ, HHS, ED, and GSA announce initial cancellation of grants and contracts to Columbia University worth $400 million*, U.S. General Services Administration (Mar. 7, 2025), https://www.gsa.gov/about-us/newsroom/news-releases/doj-hhs-ed-and-gsa-announce-initial-cancellation-of-grants-and-contracts-03072025.
[27] *Id.*
[28] U.S. Department of Health and Human Services, *DOJ, HHS, ED, and GSA Announce Initial Cancellation of Grants and Contracts to Columbia University Worth $400 Million,* (Mar. 7, 2025), https://www.hhs.gov/about/news/2025/03/07/doj-hhs-ed-gsa-announce-initial-cancellation-grants-contracts-columbia-university-worth-400-million.html.
[29] *Id.*
[30] Mark McMillan, *Leo Terrell with Mark Levin- How we'll defeat antisemitism in the USA*, YouTube (Mar. 9, 2025) https://www.youtube.com/watch?v=NOFIKRr2Sco.

62.     He further stated, "We're going to bankrupt these universities. We're going to take away every single federal dollar. … If these universities do not play ball, lawyer up, because the federal government is coming after you."[31]

63.     On March 10, Defendants sent letters to Harvard and 59 other universities "warning them of potential enforcement actions if they do not fulfill their obligations under Title VI of the Civil Rights Act to protect Jewish students on campus."[32] The targeted universities include a mix of private and public universities in a total of 24 states and Washington DC.

64.     Defendants also issued a press release to ensure publicity concerning these letters. The press release explicitly stated that Defendants had "announced the immediate cancellation of $400 million in federal grants and contracts to Columbia University due to the school's continued inaction to protect Jewish students from discrimination."[33]

65.     The clear import of the press release was to threaten Harvard and the other universities who received the letter that they, too, might be subject to "immediate cancelation" of federal grants and contracts, outside of the required Title VI procedures.

66.     On March 10, Harvard issued a public statement acknowledging the "substantial financial uncertainties driven by rapidly shifting federal policies" and instituting "a temporary pause on staff and faculty hiring across the University."[34]

---

[31] *Id.*

[32] Press Release, *U.S. Department of Education's Office for Civil Rights Sends Letters to 60 Universities Under Investigation for Antisemitic Discrimination and Harassment*, U.S. Dept. of Educ. (Mar. 10, 2025), https://www.ed.gov/about/news/press-release/us-department-of-educations-office-civil-rights-sends-letters-60-universities-under-investigation-antisemitic-discrimination-and-harassment.

[33] *Id.*

[34] *Financial Stewardship*, Harvard University Office of the President (Mar. 10, 2025), https://www.harvard.edu/president/news/2025/financial-stewardship/.

67.    On March 13, 2025, HHS, ED, and GSA sent another letter to Columbia "out-lin[ing] immediate next steps that we regard as a precondition for formal negotiations regarding Columbia University's continued financial relationship with the United States government."[35] The letter listed nine demands, including *inter alia* that Columbia impose specific forms of discipline (including "expulsion or multi-year suspension") on students involved in particular protests, re-structure its entire student disciplinary system in a centralized manner dictated by the federal government, institute a "mask ban," place the Middle East, South Asian, and African Studies department into receivership, and overhaul its "undergraduate admissions, international recruiting, and graduate admissions practices."[36]

68.    In a March 19, 2025 interview, Defendant Terrell was asked if it was his "intention" to "get a consent decree where Columbia gets a new law school dean, they get a new president, a new board, a new department of history, a new set of reasonable time, place, and manner regulations for a [sic] speech on campus that ban masks." Terrell answered, "Yes, yes, and yes."[37]

69.    On March 21, 2025, Columbia shared updated policies appearing to give in to nearly all of Defendants' demands.[38]

---

[35] *Id.*

[36] Letter from J. Gruenbaum to K. Armstrong (Mar. 13, 2025), https://static01.nyt.com/newsgraphics/documenttools/6d3c124d8e20212d/85dec154-full.pdf. The March 13, 2025 Letter did not say what federal "policy" requires over and above federal law, nor did it allege any specific violations of federal law.

[37] *On Crushing Anti-Semitism on Campus*, Hughniverse Podcast (Mar. 19, 2025), https://hughhewitt.com/leo-terrell-senior-counsel-to-the-attorney-general-for-civil-rights-on-crushing-anti-semitism-on-campus.

[38] *Advancing Our Work to Combat Discrimination, Harassment, and Antisemitism at Columbia*, Columbia Office of the President (Mar. 21, 2025), https://president.columbia.edu/sites/default/files/content/03.21.2025%20Columbia%20-%20FINAL.pdf.

70.    For example, Defendants demanded that Columbia abolish its independent body responsible for discipline decisions and centralize discipline proceedings. Columbia stated that it would relocate the disciplinary body within the Office of the Provost (who reports to the President), restrict participation to faculty and administrators, institute "rigorous vetting and conflict review process to ensure objectivity, impartiality, and commitment to following and enforcing our community's rules and policies,"[39] and give the Provost final approval over all panel members and appellate Deans.

71.    Defendants demanded that Columbia "empower internal law enforcement," including ensuring officers have full authority to arrest and remove "agitators who foster an unsafe or hostile work or study environment or otherwise interfere with classroom instruction or the functioning of the university."[40] Columbia announced that it has hired 36 "special officers"—it is unclear whether this is in addition to the 117 public safety officers the University had already hired in the past 16 months—who will "have the ability to remove individuals from campus and/or arrest."[41]

72.    Defendants demanded that Columbia place the Middle East, South Asian, and African Studies department in an "academic receivership" for a "minimum of five years."[42] It is very rare for a university to decide to place an academic department under receivership, and a demand by the federal government that a university place an academic department in receivership is entirely unprecedented. Nevertheless, in response to Defendants' demands, Columbia announced the

---

[39] *Id.*

[40]    Letter    from    J.    Gruenbaum    to    K.    Armstrong    (Mar.    13,    2025), https://static01.nyt.com/newsgraphics/documenttools/6d3c124d8e20212d/85dec154-full.pdf.

[41] Advancing Our Work to Combat Discrimination, Harassment, and Antisemitism at Columbia, Columbia    Office    of    the    President    (Mar.    21,    2025), https://president.columbia.edu/sites/default/files/content/03.21.2025%20Columbia%20-%20FINAL.pdf.

[42]    Letter    from    J.    Gruenbaum    to    K.    Armstrong    (Mar.    13,    2025), https://static01.nyt.com/newsgraphics/documenttools/6d3c124d8e20212d/85dec154-full.pdf.

appointment of a new Senior Vice Provost who will "conduct a thorough review of the portfolio of programs in regional areas across the University, starting immediately with the Middle East. This review will include the Center for Palestine Studies; the Institute for Israel and Jewish Studies; Middle Eastern, South Asian, and African Studies; the Middle East Institute; the Tel Aviv and Amman global hubs; the School of International and Public Affairs Middle East Policy major; and other University programs focused on the Middle East (together, the 'Middle East Programs')."[43] The new Senior Vice Provost will take steps including "ensur[ing] the educational offerings are comprehensive and balanced," reviewing "leadership and curriculum," creating a new process for hiring faculty in these programs, reviewing the process for "approving curricular changes," and making recommendations about "necessary changes" and "academic restructuring" to "ensure academic excellence and complementarity" in Columbia's Middle East programs.[44]

73.     Columbia made explicit that it will engineer the ideological balance of speech on campus in response to the federal government's demands. Columbia stated that it will expand "intellectual diversity among faculty."[45] It explained, "Faculty searches have begun and will be expanded to ensure intellectual diversity across our course offerings and scholarship."[46]

74.     Despite all this, Defendants have not stated that Columbia's federal funding will be restored. To the contrary, Defendants stated that "Columbia's compliance with the Task Force's preconditions is only the first step in rehabilitating its relationship with the government, and more

---

[43] *Advancing Our Work to Combat Discrimination, Harassment, and Antisemitism at Columbia* 3, Columbia University Office of the President (Mar. 24, 2025), https://president.columbia.edu/sites/default/files/content/03.21.2025%20Columbia%20-%20FINAL.pdf.
[44] *Id.*
[45] *Id.*
[46] *Id.*

importantly, its students and faculty" and only the "first step in the university maintaining a finan-

cial relationship with the United States government."[47]

75.      As of the time of filing of this Complaint, Defendants have not reinstated or restored

the $400 million in terminated funding and in fact have only continued to take additional coercive

actions towards Columbia. The Trump administration is reportedly seeking a consent decree that

could extract further concessions and impose active oversight over Columbia's implementation of

the wide-ranging commitments the university has already made.[48] Defendants have also escalated

Columbia's funding freezes, despite its concessions: the NIH has frozen all of Columbia's grants

indefinitely and will no longer pay any investigators working on existing NIH projects: researchers

will need NIH approval to draw from existing disbursements.[49] The Trump administration failed to

provide Columbia with any notice of these additional cancellations.[50]

76.      On April 3, *The New York Times* reported that the Trump administration had frozen

over $1 billion in funding for Cornell University and $790 million for Northwestern University,

including federal grants and contracts with the Departments of Agriculture, Defense, Education,

---

[47] Press Release, *HHS, ED, and GSA Respond to Columbia University's Actions to Comply with Joint Task Force Pre-Conditions*, Dep't of Health and Hum. Serv. (Mar. 24, 2025), https://www.hhs.gov/press-room/columbia-comply-anti-semitism-task-force-preconditions-met.html.

[48] Jonah E. Bromwich, Michael S. Schmidt, and Devlin Barrett, *Trump May Seek Judicial Oversight of Columbia, Potentially for Years*, N.Y. Times (Apr. 10, 2025), https://www.nytimes.com/2025/04/10/nyregion/columbia-trump-consent-decree.html.

[49] Sara Reardon, *Exclusive: NIH freezes all research grants to Columbia University*, Science (Apr. 9, 2025), https://www.science.org/content/article/nih-freezes-all-research-grants-columbia-university.

[50] *Id.*

and Health and Human Services.[51] This reporting came less than one month after Cornell and North-western had been "warn[ed]" in Defendants' March 10 letter "of potential enforcement actions" if they did not fulfill their obligations under Title VI.[52] The information was leaked by U.S. officials, who spoke anonymously about the "unannounced decision."[53]

77.    Cornell confirmed that it "ha[d] not received information that would confirm this figure" but nonetheless "received more than 75 stop work orders from the Department of Defense related to research that is profoundly significant to American national defense, cybersecurity, and health" and was "actively seeking information about federal officials to learn more about the basis for these decisions."[54]

78.    Northwestern officials also first learned of the Trump administration's funding freeze through media reports.[55] Northwestern was unable to confirm the veracity of that reporting until two days after the initial reports,[56] on April 10, when an HHS "spokesperson" confirmed to a local media site that Northwestern's freeze was "underway" because of "federal antisemitism

---

[51]Michael C. Bender & Sheryl Gay Stolberg, *Trump Administration Freezes $1 Billion for Cornell and $790 Million for Northwestern, Officials Say*, N. Y. Times (Apr. 8, 2025), https://www.nytimes.com/2025/04/08/us/politics/cornell-northwestern-university-funds-trump.html?smid=nytcore-ios-share&referringSource=articleShare.

[52] *Id.*

[53] *Id.*

[54] Michael I. Kotlikoff et al., *Federal research funding*, Cornell University (Apr. 8, 2025), https://statements.cornell.edu/2025/20250408-federal-research-funding.cfm.

[55]Michael Schill et al., *Reports on Federal Funding Freeze*, Northwestern University (Apr. 8, 2025), https://www.northwestern.edu/leadership-notes/2025/reports-on-federal-funding-freeze.html.

[56] Michael Schill et al., *Update on Federal Funding*, Northwestern University (Apr. 10, 2025), https://www.northwestern.edu/leadership-notes/2025/update-on-federal-funding.html.

*investigations* into the University."[57] Northwestern "has not received any official notification from the federal government about a large-scale freeze or rationale for such a move."[58]

79.    Shortly after summarily cancelling Columbia University's funding, Defendant Terrell appeared on a podcast in which he stated, "what we did was we basically gave them noticed [sic], and we stopped providing the funding. And I've got news for you. To Harvard, to NYU, to Michigan, same thing's happening to them. It's going to happen, because we're going to look at the numbers of federal dollars, and Hugh, it totals in the hundreds of millions of dollars. And we're going after them."[59]

80.    The interviewer later asked, "Who's the next target? I want it to be Harvard, and I want it to be Michigan, and I want it to be UCLA, but I don't get to pick the targets . . . . Who's the next target?" Defendant Terrell answered, "It's one of those three schools. I can't disclose it right now, because I'll get in trouble. But one of those three schools. I just gave you some breaking news."[60]

81.    Less than two weeks later, Defendants confirmed that the next target was Harvard.

---

[57]Isaiah Steinberg and Nineth Kanieski Koso, *HHS cites incidents of antisemitism in confirmation of Northwestern funding freeze while experts question legality*, The Daily Northwestern (Apr. 10, 2025), https://dailynorthwestern.com/2025/04/10/campus/hhs-cites-incidents-of-antisemitism-in-confirmation-of-northwestern-funding-freeze-while-experts-question-legality/ (emphasis added).
[58] Michael Schill et al., *Update on Federal Funding*, Northwestern University (Apr. 10, 2025), https://www.northwestern.edu/leadership-notes/2025/update-on-federal-funding.html.
[59] *On Crushing Anti-Semitism on Campus*, Hughniverse Podcast (Mar. 19, 2025), https://hughhewitt.com/leo-terrell-senior-counsel-to-the-attorney-general-for-civil-rights-on-crushing-anti-semitism-on-campus.
[60] *Id.*

II.    **Defendants' Pretextual Investigation and Unlawful Threat to Withhold Federal Funding from Harvard**

A.    **Defendants' March 31 Announcement and April 3 Letter, and Harvard's Response**

82.    On March 31, 2025, Defendants HSS, ED, and GSA announced "a comprehensive review of federal contracts and grants at Harvard University and its affiliates" as "part of the ongoing efforts of the Join Task Force to Combat Anti-Semitism."[61]

83.    The announcement (the "March 31 Announcement") referred to "Harvard's failure to protect students on campus from anti-Semitic discrimination" and stated that the Task Force would "review the more than $255.6 million in grants between Harvard University, its affiliates and the Federal Government" as well as "more than $8.7 billion in multi-year grant commitments to Harvard University and its affiliates to ensure the university is in compliance with federal regulations, including its civil rights responsibilities."[62]

84.    The announcement further criticized Harvard for "promoting divisive ideologies over free inquiry."[63]

85.    The announcement did not specify what it meant by "divisive ideologies" or provide any specific allegations of promoting such ideologies. It was not even clear whether this statement was intended to refer to some aspect of the scope of Defendants' investigation and review.

86.    The announcement did not point to any specific allegations of antisemitic discrimination, nor did it request or advise Harvard of any steps to deter or remedy such discrimination.

---

[61] Press Release, *HHS, ED, and GSA Initiate Federal Contract and Grant Review of Harvard University*, Dep't of Health and Hum. Servs. (Mar. 31, 2025), https://www.hhs.gov/press-room/task-force-antisemitism-harvard-contracts-grants.html.
[62] *Id.*
[63] *Id.*

87.    Weeks earlier, on February 3, 2025, HHS launched a Title VI investigation into Harvard, relating to allegations of pro-Palestine messaging worn by some Harvard Medical School students at graduation ceremonies. In a letter notifying Harvard of the investigation, HHS Associate Deputy Director Daniel Shieh wrote that the department initiated the proceedings because of a January 27, 2025 New York Post article that showed students wearing keffiyehs and stoles displaying the Palestinian flag.[64]

88.    HHS gave Harvard Medical School thirty days to provide their account of the protest and actions they took in preparation to prevent discrimination. An HMS spokesperson confirmed that the school had submitted a response addressing "all requests from the Feb. 3 letter" and was "cooperating with the compliance review."[65]

89.    According to the website of ED's Office of Civil Rights ("OCR"), there are two open investigations into Harvard University on the basis of race and national origin discrimination. One of the investigations was opened on July 24, 2023, and the other was opened on February 6, 2024.[66] One of those claims is for national origin discrimination involving religion, and one is for admissions. This data was last updated on January 14, 2025.

90.    Upon information and belief, both of those investigations remain open.

---

[64] Dhruv T. Patel & Grace E. Yoon, *Health and Human Services Dept. to Investigate Harvard Medical School over Commencement Protests*, Harvard Crimson (Feb. 5, 2025), https://www.thecrimson.com/article/2025/2/5/hhs-investigation-hms-commencement/.

[65] Graham W. Lee & Elise A. Spenner, *Harvard Medical School Submits Documents in Antisemitism Investigation*, Harvard Crimson (Apr. 8, 2025), https://www.thecrimson.com/article/2025/4/8/hms-investigation-docs/.

[66] *Pending Cases Currently Under Investigation at Elementary-Secondary and Post-Secondary Schools*, U.S. Dept. of Educ., Off. for Civil Rights (last updated Jan. 14, 2025), https://ocrcas.ed.gov/open-investigations?field_ois_state=All&field_ois_discrimination_statute=700&field_ois_type_of_dis crimination=All&items_per_page=1000&field_ois_institution=Harvard+University&field_ois_i nstitution_type=All&field_open_investigation_date_1=&field_open_investigation_date_2=&fiel d_open_investigation_date=&field_open_investigation_date_3=.

91.    Defendants' March 31 Announcement did not reference these investigations. It is not clear whether or how Defendants' March 31 action or any of the subsequent actions alleged herein relate to any open investigations.

92.    The same day of Defendants March 31 Announcement, Harvard publicly acknowledged "the important goal of combatting antisemitism," and stated that "[u]rgent action and deep resolve are needed to address this serious problem that is growing across America and around the world."[67]

93.    Harvard stated that, over the past fifteen months, it had "devoted considerable effort to addressing antisemitism," including that the University had:

- "[S]trengthened our rules and our approach to discipling those who violate them."

- "[E]nhanced training and education on antisemitism across our campus and introduced measures to support our Jewish community and ensure student safety and security."

- "[L]aunched programs to promote civil dialogue and respectful disagreement inside and outside the classroom."

- "[A]dopted many other reforms" to "combat antisemitism and to foster a campus culture that includes and supports every member of our community."[68]

94.    Three days later, on April 3, 2025, the Task Force sent a letter to Harvard outlining "immediate next steps that we regard as necessary for Harvard University's continued financial relationship with the United States government" and listing nine demands "that the government views as necessary for Harvard to implement to remain a responsible recipient of federal taxpayer dollars." ("the April 3 Letter").[69]

---

[67] *Our Resolve*, Harvard University Office of the President (Mar. 31, 2025), https://www.harvard.edu/president/news/2025/our-resolve/.
[68] *Id.*
[69] Letter from Josh Gruenbaum to Alan M. Garber (Apr. 3, 2025), https://s3.documentcloud.org/documents/25879226/april-3-harvard-preconditions-letter.pdf.

95.    The list constituted a broad and eclectic range of vaguely defined provisions, only some of which had any apparent connection to combating antisemitism, including demands to:

- review and make "necessary changes" to unspecified "[p]rograms and departments that fuel antisemitic harassment";

- make unspecified programmatic changes "to address bias, improve viewpoint diversity, and end ideological capture";

- overhaul student discipline, among other things to ensure that "senior administrative leaders are responsible for final decisions";

- enact a "mask ban";

- hold student groups accountable for unspecified "violations of Harvard policy"

- undertake sweeping "[g]overnance and leadership reforms" described only as "meaningful" and designed to "empower faculty and administrative leaders who are committed to implementing the changes indicated in this letter";

- adopt "merit-based admissions policies" and "[m]erit-based hiring reform" without any description of what those polices entail other than an additional demand to "cease all preferences based on race, color, or national origin";

- "shutter" all "DEI programs," which Defendants allege "teach students, faculty, staff, and leadership to make snap judgments about each other based on crude race and identity stereotypes, which fuels division and hatred based on race, color, national origin, and other protected identity characteristics" without specifying what programs constitute "DEI programs";

- "cooperate with law enforcement to ensure student safety" without further elaboration; and

- "commit to full cooperation with DHS," and "make organizational changes as necessary to enable full compliance."

96.    The April 3 Letter stated that "Harvard University, however, has fundamentally failed to protect American students and faculty from antisemitic violence and harassment in addition to other alleged violations of Title VI and Title VII of the Civil Rights Act of 1964."

97.    The letter did not point to any specific allegations of antisemitic violence or harassment and made no findings relating to any such allegations.

98.    The April 3 Letter did not provide any constitutional, statutory, or regulatory authority for the government's imposition of its specified conditions on a private university. It did not issue any factual findings or explain whether or how implementation of any of the demanded actions would deter or remedy antisemitic harassment or any "other alleged violations" of Title VI or Title VII. Nor did it address whether there were less intrusive means of ensuring compliance with those laws.

99.    The letter did not reference the HHS investigation opened on February 4 or any other OCR investigation. Nor did it purpose to make any findings related to that investigation or explain whether or how any of the letter's nine demands related to any allegations or findings of that investigation.

100.    The letter made no mention of the First Amendment or the need to protect free speech alongside the imperative to eradicate illegal discrimination and harassment.

101.    The demands in the letter are not even internally consistent. The DOJ Task Force demands that Harvard take steps to "improve viewpoint diversity" while simultaneously demanding that it cease hiring and admission initiatives that Harvard instituted to accomplish that very task.

**B.    Defendants' Failure to Follow Title VI Statutory and Regulatory Requirements Governing Title VI Investigations and Threats to Terminate Federal Funding**

102.    Section 602 of Title VI sets out specific procedural requirements that federal agencies must follow before taking "any action terminating, or refusing to grant or continue, [federal financial] assistance because of failure to comply with [Section 601]." 42 U.S.C. § 2000d-1.

103.    Further procedural requirements are laid out in binding federal regulations. Section 602 "direct[s]" federal agencies to "issu[e] rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." 42 U.S.C. § 2000d-1. Agencies are

27

required to seek approval of those regulations from the President, *id.*, who has delegated that authority to the Attorney General, who then oversees and coordinates enforcement of Title VI among federal agencies. *See, e.g.*, Exec. Order No. 12250 (1980) at §§ 1–2; Exec. Order 11764, 3A C.F.R. § 124 (1974 Comp.); Exec. Order 11247, 3 C.F.R. 1964–1965 Comp. 348 (Sept. 24, 1965).

104.    Pursuant to Section 602, and consistent with this legislative intent, each of the defendant agencies has promulgated regulations imposing additional procedural requirements on the termination of federal funding for alleged noncompliance with Section 601.

105.    These regulations, which are effectively the same across the defendant agencies, provide that "[n]o order suspending, terminating or refusing to grant or continue Federal financial assistance shall become effective until (1) the responsible Department official has advised the applicant or recipient of his failure to comply and has determined that compliance cannot be secured by voluntary means, (2) there has been an express finding on the record, after opportunity for hearing, of a failure by the applicant or recipient to comply with a requirement imposed by or pursuant to this part, (3) the expiration of 30 days after the Secretary has filed with the committee of the House and the committee of the Senate having legislative jurisdiction over the program involved, a full written report of the circumstances and the grounds for such action." 34 C.F.R. § 100.8(c) (ED); *see* 45 C.F.R. § 80.8(c) (HHS); 28 C.F.R. § 42.108(c) (DOJ); 41 C.F.R. § 101-6.211-3 (GSA).

106.    OCR, which has responsibility for enforcing Title VI with respect to educational institutions like Harvard, has developed a Case Processing Manual ("CPM") laying out the proper procedures for handling discrimination cases, including Title VI cases, which further describe the relevant procedures.[70]

---

[70] *Case Processing Manual*, U.S. Dept. of Educ., Off. for Civil Rights (Feb. 19, 2025), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm.pdf.

107.    Defendants' actions targeting Harvard deviate drastically from OCR's procedures and do not comply with the statutory or regulatory requirements.

108.    The CPM states that "[w]hen OCR opens a complaint for investigation, it will issue letters of notification to the complainant and the recipient" containing details about the allegations and information about mediation options. *Id*. art. 1, § 111.

109.    This process implements Defendants' binding regulations stating that where the evidence "indicates a failure to comply with [Section 601], the responsible Department official or his designee will so inform the recipient and the matter will be resolved by informal means whenever possible." 34 C.F.R. § 100.7(d) (ED); *see* 45 C.F.R. § 80.7(d) (HHS); 28 C.F.R. § 42.107(d) (DOJ); 41 C.F.R. § 101–6.210–4(a) (GSA).

110.    Upon information and belief, no such letter of notification has been sent.

111.    To the extent that the March 31 Announcement or April 3 Letter are intended to function as this letter of notification, they do not contain the level of specificity regarding the allegations or the information required by OCR procedures.

112.    Federal regulations further require that any Title VI investigation include "a review of the pertinent practices and policies of the recipient, the circumstances under which the possible noncompliance with this part occurred, and other factors relevant to a determination as to whether the recipient has failed to comply with this part." 34 C.F.R. § 100.7(c).

113.    Upon information and belief, the investigation that Defendants have invoked as the basis for threatening Harvard's federal funding has not complied with this regulation. Indeed, there are no indications that Defendants undertook *any* review of Harvard's pertinent practices and policies, the circumstances surrounding any noncompliance with Title VI, or any other relevant factor.

114.    On February 28, 2025, the DOJ Task Force announced that it intended to visit ten university campuses that had allegedly "experienced antisemitic incidents since October 2023" including Harvard, as well as Columbia and Northwestern University.[71]

115.    Public reporting indicates that representatives of the DOJ Task Force visited Boston, Massachusetts on April 9, 2025, to meet with city officials,[72] but there is no record that the DOJ Task Force visited Harvard or met with officials there. In any case, that visit occurred *after* Defendants took enforcement action against Harvard.

116.    If, after the investigatory process, OCR determines that an educational institution is not in compliance with Title VI based upon the preponderance of the evidence, the OCR Case Processing Manual ("CPM") states that OCR will "negotiate a resolution agreement and issue a letter of finding(s)." Case Processing Manual, art. III, § 303(b). The letter of findings should "explain[] the reason(s) for its decision to both the recipient and the complainant." *Id*., art. III, § 303(e).

117.    Upon information and belief, Defendants have not issued a letter of findings or any determination or investigatory findings to support their actions.

118.    The resolution agreement that should accompany the letter of findings functions like proposed settlement terms, laying out "action steps that, when implemented, will remedy both the individual discrimination at issue and any similar instances where future violative conduct may recur." *Id*., art. III, § 303(b).

---

[71] *Federal Task Force to Combat Antisemitism Announces Visits to 10 College Campuses that Experienced Incidents of Antisemitism*, Dep't of Just. (Feb. 28, 2025), https://www.justice.gov/opa/pr/federal-task-force-combat-antisemitism-announces-visits-10-college-campuses-experienced.

[72] Tonya Alanez, *DOJ Officials Visit Boston City Hall in Advance of Antisemitism Taskforce's Proposed Meeting with Wu*, Boston Globe (Apr. 9, 2025), https://www.bostonglobe.com/2025/04/09/metro/federal-antisemitism-task-force-pre-visit-to-boston/.

119.    OCR and the non-compliant education institution then have 90 calendar days to negotiate a final agreement. *Id*., art. III, § 303(f).

120.    Upon information and belief, Defendants have not proposed a resolution agreement, nor have mediation or negotiations been offered.

121.    The forgoing actions, governed by regulation and agency procedure, constitute a process intended to precede any movement toward enforcement actions including the termination of federal funding. That process exists to effectuate governing laws and rules mandating that voluntary compliance and negotiated resolutions are the enforcement norm. Section 602 requires that *no action* to terminate or revoke funding may be taken "until the department or agency concerned *has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means*." 42 U.S.C. § 2000d-1 (emphasis added).

122.    Codified Department of Justice guidelines reiterate the importance of voluntary compliance, as well as the importance of clear communication about the specific nature of any alleged noncompliance. "Title VI requires that a concerted effort be made to persuade any noncomplying applicant or recipient voluntarily to comply with title VI. Efforts to secure voluntary compliance should be undertaken at the outset in every noncompliance situation and should be pursued through each stage of enforcement action. Similarly, where an applicant fails to file an adequate assurance or apparently breaches its terms, notice should be promptly given of the nature of the noncompliance problem and of the possible consequences thereof, and an immediate effort made to secure voluntary compliance." 28 C.F.R. § 50.3. *See also* 34 C.F.R. § 100.7(d) (ED); 45 C.F.R. § 80.7(d) (HHS); 28 C.F.R. § 42.107(d) (DOJ); 41 C.F.R. § 101–6.210–4(a) (OMB) (Only where

"it has been determined that the matter cannot be resolved by informal means" shall terminating "action . . . be taken.").

123.    Resolution agreements are common. According to OCR's public database, OCR resolved eight Title VI investigations specifically related to national-origin discrimination claims involving religion in January 2025 and twenty-six in 2024.[73]

124.    Only where these efforts fail has Congress authorized threats to federal funding.

125.    Section 602 provides that terminating or refusing to grant or to continue assistance may be done only after "an express finding on the record, after opportunity for hearing, of a failure to comply with [Section 601]." 42 U.S.C. § 2000d-1.

126.    To that end, if negotiations have reached an impasse and/or the 90 day window has elapsed, OCR issues a formal "Impasse Letter" that includes a description of the unsuccessful attempts to resolve the complaint and "informs the recipient that OCR will issue a letter of impending enforcement action in 10 calendar days if a resolution agreement is not reached within that 10-day period."[74] The case processing manual includes specific details and language about what must be included in the letter of impending enforcement action.[75] If, following negotiation and an impasse letter, voluntary compliance proved unattainable, only then could OCR even begin enforcement proceedings that might include threats to federal funding.[76]

---

[73] *Office for Civil Rights Recent Resolution Search*, U.S. Dept. of Educ., Off. of Civil Rights, https://ocrcas.ed.gov/ocr-search?race_and_national_discrimination%5B%5D=549&title_vi=526&sort_order=DESC&sort_by=field_resolved (last visited Mar. 24, 2025).

[74] *Case Processing Manual* 18-19, U.S. Dept. of Educ., Off. for Civil Rights (Feb. 19, 2025), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm.pdf.

[75] *Id.* at 19.

[76] *Id.* at 23.

127.    Upon information and belief, Defendants have not issued an Impasse Letter or made any determination that voluntary compliance is unattainable.

128.    Following an Impasse Letter and determination that voluntary compliance is unattainable, Department of Education regulations and the CPM require OCR to provide institutions with specific notice of the proposed enforcement action and the opportunity for a hearing on the record with counsel. 34 C.F.R. §§ 100.8–9.

129.    Upon information and belief, no such communication has occurred and no such hearing has been offered or occurred.[77]

130.    After a determination of noncompliance on the record, OCR is then required to submit a report to the relevant House and Senate committees detailing the circumstances giving rise to the enforcement action and grounds for the revocation of funds. Section 602 states that "the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action[,]" and that "[n]o [terminating] action shall become effective until thirty days have elapsed after the filing of such report." 42 U.S.C. § 2000d-1.; *see also* 34 C.F.R. § 100.8(c). OCR must then wait 30 calendar days after the submission of the Congressional reports before any enforcement action begins.

131.    Upon information and belief, no such reports have been submitted.

---

[77]Agency regulations further set out detailed provisions governing these hearings, 34 C.F.R. § 100.9(a); *see* 45 C.F.R. § 80.9(a); 28 C.F.R. § 42.109(a); 41 C.F.R. § 101–6.212–1, including that they comply with certain APA requirements, 34 C.F.R. § 100.9(d)(1)-(2); *see* 45 C.F.R. § 80.9(d)(1)-(2); 28 C.F.R. § 42.109(d)(1)-(2); 41 C.F.R. § 101–6.212–4(a)-(b). The defendant agencies' regulations also impose requirements regarding post-hearing termination decisions and notices. 34 C.F.R. § 100.10(a)-(d); *see* 45 C.F.R. § 80.10(a)-(d); 28 C.F.R. § 42.110(a)-(d); 41 C.F.R. § 101–6.213–1-4.

132.    Section 602 further provides that any "termination or refusal [to grant or to continue assistance under Title VI] shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made and, *shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found.*" 42 U.S.C. § 2000d-1 (emphasis added); *see also* 34 C.F.R. § 100.8(c); 45 C.F.R. § 80.8(c); 28 C.F.R. § 42.108(c); 41 C.F.R. § 101–6.211–3.

133.    Despite this requirement, Defendants' actions imminently and indiscriminately threaten hundreds of millions, possibly billions, of dollars in federal grants untethered to any finding of noncompliance in any particular program.

134.    These stringent procedural requirements for termination or refusal to grant or continue assistance reflect congressional intent to safeguard against the potential exploitation of Title VI funding leverage as a "vindictive or punitive" measure against federal funding recipients.[78] From the very inception of the Civil Rights Act of 1964, lawmakers were aware of and concerned about the far-reaching authority Title VI grants the federal government over programs receiving federal funds. The congressional notice requirement, presidential approval of agency regulations implementing Title VI (discussed below), and requirement for a hearing on the record were all introduced as amendments to the original bill and were expressly aimed at preventing abuses of power.[79]

135.    Senator John Pastore from Rhode Island, who was the floor manager in the Senate for the Civil Rights Act of 1964, explained that "Failure of a recipient to comply with a rule, regulation, or order issued by an agency may ultimately lead to a termination or refusal of Federal assistance. Cutoff of assistance is not the object of title VI, however. I wish to repeat: Cutoff of

---

[78] *See* 88 Cong. Rec. S7062 (statement of Sen. John Pastore).
[79] *See* 88 Cong. Rec. H2498 (statement of Rep. Edwin Willis); 88 Cong. Rec. H2499 (statement of Rep. John Lindsay).

assistance is not the objective of title VI. Fund cutoff is a last resort, to be used only if all else fails to achieve the real objective—the elimination of discrimination in the use and receipt of Federal funds."[80]

136.    Senator Pastore further elaborated on the importance of the statutory and regulatory safeguards in ensuring that revocation of funding was "a last resort" rather than a "punitive or vindictive measure," noting that "cutoff of funds would not be consistent with the objective of the Federal assistance statutes if other effective means of ending discrimination are available."[81]

137.    Until the Trump administration's unlawful pattern of threatening federal funding, Congress' effort to ensure that Title VI be enforced through nonpunitive means had been a success. As of January 14, 2025, OCR had at least 3,281 open Title VI investigations into educational institutions, 649 of which are focused on post-secondary institutions.[82] Eighty of those specifically focus on discrimination on the basis of national origin involving religion.[83]

138.    Claims of religious discrimination, including antisemitism, fall within Title VI where they overlap with race or national origin discrimination and are investigated as discrimination on the basis of national origin involving religion.[84]

139.    Despite the number of open Title VI investigations, there is no record of any cancelation or revocation of funding to educational institutions due to Title VI noncompliance, with

---

[80] 88 Cong. Rec. S7059, 7059 (statement of Sen. John Pastore).

[81] *Id.*

[82] *Pending Cases Currently Under Investigation at Elementary-Secondary and Post-Secondary Schools*, U.S. Dept. of Educ., Off. for Civil Rights, https://ocrcas.ed.gov/open-investigations?field_ois_state=All&field_ois_discrimination_statute=700&field_ois_type_of_dis crimination=All&items_per_page=20&field_ois_institution=&field_ois_institution_type=752&f ield_open_investigation_date_1=&field_open_investigation_date_2=&field_open_investigation _date=&field_open_investigation_date_3= (last updated Jan. 14, 2025).

[83] *Id.*

[84] Abigail A. Graber, Cong. Rsch. Serv., LSB11129, Religious Discrimination at School: Application of Title VI of the Civil Rights Act of 1964 (2024).

the possible exception of the Trump administration's recent actions toward Columbia and other universities.

140.    A 2019 Congressional Research Service analysis could not find any termination orders issued under Title VI by OCR in the prior 25 years.[85]

### C.    Defendants' Failure to Provide a Reasoned Decision for Their Actions

141.    Defendants failed to provide any reasoned basis for their actions. Defendants' March 31 and April 3 letter do not identify any specific evidence of any antisemitic harassment to which the University was deliberately indifferent, or any other evidence of wrongdoing.

142.    Defendants have not acknowledged the efforts that Harvard is already taking to address any alleged antisemitism and racial discrimination in admissions. Harvard has issued a number of statements, studies, reports, and policy changes in response to complaints of antisemitism and discrimination on campus.

143.    On January 10, 2024, Students Against Antisemitism ("SAA") filed a lawsuit against Harvard College, claiming that Harvard had subjected Jewish students to discrimination and a hostile environment in violation of Title VI of the Civil Rights Act.[86]

144.    On May 22, 2024, the Louis D. Brandeis Center for Human Rights Under Law and Jewish Americans for Fairness in Education filed another lawsuit against Harvard College, also alleging violations of Title VI of the Civil Rights Act based on alleged antisemitic discrimination, a hostile environment, and retaliation.[87]

---

[85] Jared Cole, Cong. Rsch. Serv., R45665, Civil Rights at School: Agency Enforcement of Title VI of the Civil Rights Act of 1964 19 n. 154 (2019).
[86] Complaint, *Kestenbaum v. President and Fellows of Harvard College*, 24-cv-10092 (D. Mass. Jan. 10, 2024), ECF No. 1.
[87] Complaint, *Louis D. Brandeis Center for Human Rights Under Law v. President and Fellows of Harvard College*, 24-11354 (D. Mass. May 22, 2024), ECF No. 1.

145.    On January 21, 2025, Harvard announced that it had settled both lawsuits. As part

of the settlement, Harvard agreed to take numerous actions to combat antisemitism on campus in-

cluding, *inter alia*, (1) adopting the more expansive definition of antisemitism propounded by the

International Holocaust Remembrance Alliance ("IHRA"), which includes an acknowledgement

that Zionism is a part of many Jewish people's religious identity; (2) preparing a public annual

report for the next five years covering Harvard's response to discrimination or harassment based

on Title VI-protected traits; (3) providing transparency regarding discipline outcomes in Title VI

matters; (4) providing additional resources to support the study of antisemitism, including hosting

an annual academic symposium on the topic of antisemitism; (5) reaffirming annually that antisem-

itism will not be tolerated at Harvard; (6) providing expert training on combating antisemitism for

staff involved in reviewing complaints of discrimination; (7) broadly promoting annual training for

the University community focused on recognizing and combating antisemitism; and (8) ensuring

that Title VI and Harvard's Non-Discrimination policies are enforced equally, applying a single

standard for all students, including Jewish and Israeli students.[88]

146.    Moreover, in June 2023, the Supreme Court struck down the use of race-based af-

firmative action in college admissions and ordered Harvard to stop using race as a factor in their

admissions process.[89] Harvard immediately took several steps in response, including (1) ensuring

that admissions readers do not have access to applicants' self-reported answers to questions about

---

[88] *Harvard and Students Against Antisemitism Announce Settlement of Lawsuit*, Harvard University (Jan. 21, 2025), https://www.harvard.edu/media-relations/2025/01/21/press-release-settlement-harvard-saa/; *The Brandeis Center and Jewish Americans for Fairness in Education Agree with Harvard to Settle Title VI Litigation*, Harvard University (Jan. 21, 2025), https://www.harvard.edu/media-relations/2025/01/21/press-release-settlement-harvard-brandeis-ctr-jafe/.

[89] *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181, 230 (2023).

race and ethnicity; (2) reviewing and updating application reader and alumni interviewer training; (3) revising its application supplement to require students to answer five short-answer questions designed to help reviewers better understand an applicant's life experiences; and (4) expanding its admissions recruiting efforts to reach more diverse potential applicants.[90]

147.    On information and belief, Defendants have not made a reasoned determination whether Harvard's responses to complaints of antisemitism and discrimination on campus were or were not sufficient under Title VI, and did not make any such determination prior to sending either the March 31 Announcement or April 3 Letter. Rather, upon information and belief, any investigation into any such complaints were still ongoing at the time of those letters.

148.    Defendants also have provided no basis for the breadth of their threats to Harvard's federal funding. For example, Defendants have not explained what grants have been selected for review and potential termination and on what basis, or whether these grants have any connection to any alleged Title VI violation.

149.    Defendants also have not acknowledged or considered the enormous reliance interests implicated by their imminent cancelation of hundreds of millions, possibly billions, of dollars supporting critical research and other activities. The summary press releases and letters released by Defendants make no mention of the incalculable damage that Defendants' threatened action would cause—to patients whose clinical trials will end, faculty whose careers will be derailed, employees around the world whose livelihoods are in jeopardy, and the public who will no longer benefit from the research those federal grants supported.

---

[90] *Weighing the Future of Harvard Admissions*, Harvard Gazette, (Oct. 3, 2023), https://news.harvard.edu/gazette/story/2023/10/weighing-the-future-of-harvard-admissions/.

150.    Defendants also have failed to explain the basis for any of the many conditions they have imposed on Harvard, nor have they explained how those demands would bring Harvard into compliance with Title VI.

## III.    Impact of Defendants' Actions on Plaintiffs

### A.    Federally Funded Research and Scholarship at Harvard

151.    There is no comprehensive public accounting of the more than $255.6 million in grants and $8.7 billion in multi-year grant commitments that Defendants have threatened, but the publicly available information about those commitments underscores the devastating impact of any widespread cuts.

152.    In 2024, Harvard University received $686 million in federal funding, accounting for nearly 70 percent of its total sponsored research expenditure and approximately 11 percent of its total operating revenue.[91]

153.    The National Institute of Health ("NIH")—a division of the Department of Health and Human Services—is by far Harvard's largest government funding source, accounting for more than 70 percent of all federal funding in 2024, or $488 million.[92]

154.    The NIH is the primary driver of biomedical research at Harvard, supporting a vast network of laboratories and research centers. Numerous institutes within the NIH, such as the National Cancer Institute, the National Institute of Mental Health, and the National Institute of Allergy and Infectious Diseases, provide funding for dozens of research centers affiliated with Harvard. Some of the largest Harvard-affiliated recipients of NIH funding include the Harvard University

---

[91]    FY 2024 Financial Report, Harvard University 9, (Oct. 2024), https://finance.harvard.edu/files/fad/files/fy24_harvard_financial_report.pdf; *Harvard's Federal Funding Is Under Fire. Here's What's at Risk.*, Harvard Crimson (Jan. 31, 2025), https://www.thecrimson.com/article/2025/1/31/harvard-funding-threat.

[92]    *Harvard's Federal Funding Is Under Fire. Here's What's at Risk.*, Harvard Crimson (Jan. 31, 2025), https://www.thecrimson.com/article/2025/1/31/harvard-funding-threat.

Center for AIDS Research, the M.D.-Ph.D. physician scientist program, which trains the next generation of medical researchers, and a large clinical research center focused on diagnosing rare conditions.[93]

155.    The National Science Foundation ("NSF") provided approximately $56 million in federal funding to Harvard in 2024, accounting for approximately 8 percent of Harvard's total federal funding.[94]

156.    The NSF supports a wide spectrum of cutting-edge, practically applied research across the natural and social sciences at Harvard. NSF grants fund projects in diverse fields such as ecology, political science, physics, computer science, and engineering. Examples of NSF-funded projects at Harvard include basic scientific research on powdery mildews—a primary cause of disease for important agricultural crops,[95] the creation of intelligent nature-inspired olfactory sensors to accurately identify dangerous volatile compounds in the air,[96] the support of advanced cyberinfrastructure for research computing,[97] and the development biodegradable, living materials for use in advanced robotics.[98]

---

[93] *Id.*

[94] *Senate Committee Targets $3 Million in Harvard NSF Research Grants for 'Far-Left Ideology'*, Harvard Crimson (Feb. 19, 2025), https://www.thecrimson.com/article/2025/2/19/senate-report-grants/.

[95] *Pfister and Bradshaw Receive NSF Grant*, Harvard University (July 10, 2023), https://www.huh.harvard.edu/news/pfister-and-bradshaw-receive-nsf-grant.

[96] *Holly Samuelson Awarded Starter Grant Funding from the National Science Foundation*, Harvard University (Mar. 22, 2024), https://www.gsd.harvard.edu/2024/03/holly-samuelson-awarded-starter-grant-funding-from-the-national-science-foundation/.

[97] *Research Computing Part of $5.3M NSF Award for Advanced Cyberinfrastructure*, Harvard University (Mar. 4, 2014), https://science.fas.harvard.edu/news/research-computing-part-53m-nsf-award-advanced-cyberinfrastructure.

[98] *Award Abstract # 2421461*, NSF, https://www.nsf.gov/awardsearch/showAward?AWD_ID=2421461.

157.    The Department of Defense ("DOD") provides approximately $55 million in federal funding to Harvard, accounting for approximately 8 percent of Harvard's total federal funding.[99]

158.    DOD funding supports diverse research, including projects working to develop integrated human organ-on-chip microphysiological systems,[100] biologically inspired soft smart exosuit for injury prevention and performance augmentation,[101] and a portable device to treat sepsis and clean blood of harmful agents.[102]

159.    Over a third of sponsored expenditures go toward salaries. More than 6,200 Harvard employees, including 1,673 faculty members, relied on sponsored expenditures for at least part of their salaries in 2024.[103]

160.    In addition to the direct funding impact on Plaintiffs' members and other members of the Harvard community, Defendants' threatened withdrawal of research grants will also impact the five independent Boston-area hospitals affiliated with Harvard Medical School, including Massachusetts General Hospital, Brigham and Women's Hospital, Boston Children's Hospital, Dana-Farber Cancer Institute, and Beth Israel Deaconess Medical Center, which collectively received

---

[99] *Harvard's Federal Funding Is Under Fire. Here's What's at Risk.*, Harvard Crimson (Jan. 31, 2025), https://www.thecrimson.com/article/2025/1/31/harvard-funding-threat.
[100]        *Grant        Summary*,        USA        Spending, https://www.usaspending.gov/award/ASST_NON_W911NF1220036_2100.
[101]        *Contract        Summary*,        USA        Spending, https://www.usaspending.gov/award/CONT_AWD_W911NF14C0051_9700_-NONE-_-NONE-.
[102]        *Contract        Summary*,        USA        Spending, https://www.usaspending.gov/award/CONT_AWD_HR001113C0025_9700_-NONE-_-NONE-.
[103] *Harvard's Federal Funding Is Under Fire. Here's What's at Risk.*, Harvard Crimson (Jan. 31, 2025), https://www.thecrimson.com/article/2025/1/31/harvard-funding-threat/.

more than $1.56 billion in NIH funding in 2024. This is more than double the approximately $686 million that Harvard University received from the entire federal government in the same year.[104]

161.    The hospitals depend on NIH support to fund thousands of active research programs, including everything from molecular biology wet labs to late-stage clinical trials.[105]

162.    The Greater Boston Chamber of Commerce has recognized the importance of this federal funding to the community, noting that "[e]ach dollar invested in research at medical schools and teaching hospitals generates $2.60 in economic activity."[106]

163.    On April 4, 2024, the Boston Globe reported that Defendants sent a memorandum to Harvard University on March 31 identifying more than $255 million in grants included in the review.[107] The following are some examples of contracts included in the review:

164.    A contract between the Harvard T.H. Chan School of Public Health and the NIH to provide nearly $60 million in funding for research on tuberculosis vaccine development at 14 laboratories across the country.[108]

165.    A contract between Boston Children's Hospital and the Centers for Disease Control and Prevention ("CDC") to provide $36 million in funding for an online vaccination site locator.[109]

---

[104] *Trump Admin's $9 Billion Review of Harvard's Grants Could Hit Boston's Hospitals Hardest*, Harvard Crimson (Apr. 4, 2025), https://www.thecrimson.com/article/2025/4/4/funding-review-hospitals/.

[105] *Id.*

[106] *With Federal Funds, Harvard Helps Drive Local Economy*, Harvard Gazette (Mar. 1, 2020), https://news.harvard.edu/gazette/story/2020/03/harvard-attracts-federal-funding-supports-economy/.

[107] Mike Damiano and Liz Kowalczyk, *Trump Administration Did Not Say Which Research Projects Were Targeted in Harvard Review. A Government Memo Has Answers*, Boston Globe (Apr. 4, 2025), https://www.bostonglobe.com/2025/04/04/metro/harvard-memo-research-contracts/?p1=Article_Inline_Text_Link.

[108] *Id.*

[109] *Id.*

166.    A contract between Mass General Brigham and U.S. Special Operations Command to provide research and technical support related to traumatic brain injuries.[110]

167.    In total, more than $122 million in contracts with Boston Children's Hospital are under review, including contracts supporting studies on whether the COVID vaccine reduces Multisystem Inflammatory Syndrome in children, and development of a vaccine to prevent opioid addiction.[111]

### B.    Impacts of Threats to Withdraw Funding

168.    Plaintiffs have experienced and are experiencing significant harms as a result of Defendants' actions.

169.    Defendants' March 31 Announcement and April 3 Letter have already caused Plaintiffs' members' significant harm because "[b]efore any budget cuts have even been made, academic leaders [at Harvard University] have stalled hiring, stalled expansions, stalled research conferences and graduate student admissions. … Stated differently, [Harvard's] academic leaders are following the White House in cutting research opportunities."[112]

170.    Members of AAUP and AAUP-Harvard have already been impacted by Defendants' actions. For example, one member is on the faculty of Harvard T.H. Chan School of Public Health. This faculty member's research focuses on policies to improve affordability and access to healthcare in the United States. The hiring freeze Harvard instituted in response to threats by Defendants has impacted their team directly because they have been unable to extend the employment

---

[110] *Id.*

[111] *Id.*

[112] Saketh Sundar, *Trump Admin's $9 Billion Review of Harvard's Grants Could Hit Boston's Hospitals Hardest*, Harvard Crimson (Apr. 4, 2025) (quoting Statement of Jonathan Kagan, Director of Basic Research, Chair of Gastroenterology, Boston Children's Hospital), https://www.thecrimson.com/article/2025/4/4/funding-review-hospitals/.

of a research colleague whose work is instrumental to the team's research. This faculty member has also been unable to hire research assistants needed to help with the study's daily work.

171.    The President of the Harvard AAUP Chapter has also been impacted by the hiring freeze because it includes a freeze on hiring new research assistants, which slows the pace of faculty research, as well as a freeze on new tenure-track hiring, leaving critical teaching gaps.

172.    An anonymous AAUP member attests that the University has already halted seed grants that are fundamental to initiating new projects and scientific collaborations. Harvard is encouraging faculty to pursue philanthropic funding for their work, but this faculty member's research is unlikely to garner private funding.

173.    Many more members are at risk of losing federal funding as a result of Defendants' actions. This complaint provides a few examples.

174.    The same School of Public Health faculty member is at risk of losing their NIH funding. About sixty percent of this faculty member's salary comes from research grants, including those funded by the NIH. They understand that their current grant, as well as any future federal grants for which they may apply, are within the funding the Trump administration has threatened to withhold from Harvard.

175.    A loss of federal funding would be devastating for their health policy research. Without federal funding, they would likely have to stop their study without reaching its conclusion, wasting all of the resources that have been spent to this point. This faculty member would also have to let go of some of their staff if NIH rescinds their grant money, including graduate student summer research staff.

176.    A loss of federal funds would make collaboration across institutions much more challenging for this faculty member. Ambitious, large-scale programs that foster academic

discourse and innovation, like the one this faculty member currently conducts research under, would disappear.

177.    This faculty member's team has been working overtime to squeeze in as much work as possible while they still have grant funding, but they will not be able to finish their research before the grants are up for renewal. This rush to squeeze in work under threat of funding termination could affect the quality of their research. The President of the AAUP – Harvard Faculty Chapter reports that cutting $8.7 billion dollars in federal funding would leave no part of the University untouched. They similarly report that the School of Public Health is particularly vulnerable because 60% of its operating budget comes from sponsored support, including federal grants.

178.    Numerous AAUP members are biomedical researchers and have explained the implications of threatened funding cuts for their work to the President of the Harvard Faculty Chapter.

179.    Biomedical research funded by federal grants requires planning years in advance because of the technical expertise required and the need to prepare human samples that are obtained at significant cost and effort. Part of this long-term planning requires having additional fundable projects lined up to provide continuous resources for long-term research initiatives.  If Defendants withdraw federal funding as threatened, this could put at risk years' worth of researchers' future grants which would disrupt their life work.

180.    An anonymous AAUP member is on the faculty at Harvard Medical School and an internationally recognized scholar in their field. They remain anonymous because if they lose federal funding, they will need to seek bridge funding and fear their actions may influence the ability to receive this alternative funding.

181.    This faculty member reports that, as a result of Defendants current threat to withdraw promised federal funding, they have seen administrative staff who are responsible for tasks,

such as grant administration and human studies review, seek employment elsewhere. Early career scientists who have completed multiple years of postgraduate training are seeking career opportunities outside of research. Scientists with unique and advanced skills are seeking positions outside of academia. Projects that require the recruitment of human study participants are being reduced out of concern that the associated research project will not be continued to completion.

182.    This faculty member further reports that foundational scientific research that has taken many years of human effort and institutional investment to reach its current stage is being paused in a manner that may preclude the possibility of future research.

### C.    Impacts of Threat to Academic Freedom and Free Speech

183.    Plaintiffs' members have experienced and are experiencing significant harms to their First Amendment rights to free speech and academic freedom as a result of Defendants' actions.

184.    Defendants' March 31 Announcement and April 3 Letter have chilled the speech of Plaintiffs' members and infringed upon their academic freedom in scholarship and speech, inside and outside of the classroom. Now, Plaintiffs' members are fearful that their scholarship and teaching, if not aligned with the views or priorities of the Trump administration, could lead to even further incursions on the academic freedom of their own departments. As a result, some are engaging and will engage in self-censorship on topics they perceive to be in tension with Defendants' preferred viewpoint.

185.    All members of the Harvard AAUP chapter are employed by a university that will host less speech, and less diverse speech, as a result of Defendant's actions. AAUP members' speech and academic freedom have been chilled in a variety of ways. This complaint provides a few examples.

186.    One AAUP member is a professor in Women, Gender, and Sexuality Studies ("WGS"). Their research explores the ways in which race, gender, and region have shaped collective memory and archival silence, they teach undergraduate courses on labor history, immigration, and gun violence, and they advise undergraduate students pursuing independent research on topics related to gender, sexuality, and power.

187.    This faculty member is concerned that Harvard University may accede to Defendants' demands in the face of immense financial pressure. They are concerned about the future of their research. Their research and teaching concerns gender and sexuality studies, ethnic studies, African American studies, and critical race theory—all fields disfavored by Defendants..

188.    If Harvard's leadership makes concessions to comply with Defendants' demands, this faculty member believes Women, Gender, and Sexuality studies could become a target, with enhanced scrutiny on its curricular offerings and research.

189.    This member does not have tenure, which makes them particularly vulnerable to Defendants' demands for budget cuts.

190.    The President of the AAUP Faculty Chapter is similarly fearful that colleagues will be denied tenure if their research falls under the broad areas for "reform" listed in the Demand Letter.

191.    The WGS faculty member has also witnessed a chilling effect on scholarly and pedagogical innovation as a direct result of Defendants' attacks on higher education. Their colleagues who teach courses related to gender and sexuality have been targeted and doxxed based on the titles and intellectual foci of their courses. They believe these attacks are likely to increase if institutions like Harvard feel forced to comply with Defendants' demands.

192.    The President of the AAUP Harvard Faculty Chapter similarly reports that the de-
mand concerning DEI programs will be interpreted, especially among non-tenure-track and other
contingent faculty who do not have the protections of tenure, as implying that any kind of teaching
and research related to race, ethnicity, racial equity, and identity in a U.S. or global context could
lead to career-damaging consequences.

193.    The WGS faculty member has witnessed a chilling impact on the academic envi-
ronment at Harvard. They have witnessed that their students are becoming fearful about sharing
their perspectives in public.

194.    This faculty member's speech has also been chilled. They are Jewish and have con-
ducted significant research on Jewish history in the United States. They wear a keffiyeh on campus
as a reminder of their obligation as a Jew to use their relative privilege to participate in *tikkun olam*,
or healing the world. They do not believe it is antisemitic to care about and respond to the suffering
of others and express care for and solidarity with the Palestinian people.

195.    Nonetheless, they have become more cautious about sharing their thoughts related
to Palestine and Israel in the classroom and on campus. They also worry now that if they wear their
keffiyeh in public, they may be inviting physical harm or violence.

196.    An anonymous AAUP member reports that they had been vocal in support of pro-
Palestine student protestors in the past but adjusted their speech and teaching as a result of this latest
chilling wave of threats from Defendants.

197.    This same anonymous member reports that they changed their teaching plans for
next semester because they fear harassment. They had planned to teach a course that would have
dealt with topics including settler colonialism, slavery, Indian removal, and the U.S.-Mexico War,

all of which could be covered by the Defendants' ill-defined demand that anything related to DEI be eliminated.

198.    The AAUP President reports that two colleagues have changed their plans for courses they intend to teach next fall to avoid topics explicitly disfavored by the Trump administration—one changed their curricular offerings to no longer be explicitly about transgender issues and another to no longer be explicitly about race.

199.    Numerous AAUP members also report on the chilling effect Defendants' threats and demands have had on students.

200.    The Public Health AAUP member reports having heartbreaking conversations with graduate students about the risks associated with pursuing certain questions and topics disfavored by Defendants' political agenda for fear that it will inhibit their ability to receive federal grants and find academic jobs. The Harvard AAUP Chapter President reports that students have changed their senior research topics, as well as their behavior, as a result of Defendants' demands.

201.    In one of the AAUP Harvard Faculty Chapter President's classes, students were recently speaking about setting up a mutual support Signal group after the detention of Rumeysa Ozturk at Tufts University. One student said they were too scared to have Signal on their phone out of fear border agents would think they had something to hide. This prevents the student from fully participating in the scholarly community.

202.    Another student was walking through the Harvard Yard when they saw a protest with cameras. They pulled up their hoodie and fled in the opposition direction because they were afraid of the repercussions of being photographed at a protest in which they were not even involved.

203.    All members of the Harvard AAUP chapter are employed by Harvard, and as a result are directly impacted by the threatened imposition of new policies and procedures demanded in the April 3 Letter.

204.    AAUP members report that Harvard University has made changes to policies and procedures in response to Defendants' threats and in anticipation of threats to its federal funding. This complaint provides a few examples.

205.    One AAUP member reports that during the spring admissions cycle, the Public Health School admitted fewer students, and the Global Health program admitted no new students at all, due to the vulnerable state of its federal funding. The President of the AAUP Harvard chapter testifies that the shrinking of admissions to the School of Public Health will have lasting effects on future scientific research.

206.    The President of the AAUP Harvard chapter reports that after Defendants sent the March 10, 2025 warning letter, Harvard removed both the Director and Associate Director of the Center for Middle Eastern Studies from their positions. Harvard also declined to renew a long-standing partnership between the Harvard School of Public Health's François-Xavier Bagnoud Center for Health and Human Rights and Birzeit University in the West Bank.

207.    Around the same time, the AAUP President reports that Harvard declined to renew the annual contract of a colleague who had served as Associate Director for the Religion, Conflict, and Peace Initiative at Harvard Divinity School. That colleague had led programming in Middle East Studies at Harvard for over two decades and was the only Palestinian-American employed at the Harvard Divinity School. Harvard also suspended the Religion, Conflict, and Peace Initiative.

208.    These were all programs criticized by the congressional Committee on Education & the Workforce as being antisemitic. The fact they were all shut down around the same time raises

grave concerns that Harvard is suppressing legitimate inquiry regarding Israel and Palestine in response to Defendants' threats.

### D.    Harms to AAUP and AAUP-Harvard

209.    Plaintiffs have themselves suffered harm as a result of the March 31 Announcement and April 3 Letter and the threats of both cuts to federal funding and imposition of policy and procedure changes demanded by Defendants.

210.    As part of their core organizational activities, Plaintiff AAUP regularly consults, works with, and represents local chapters and individual members regarding academic freedom, faculty governance, and other issues involving the employment relationship between university employees and their employers, including but not limited to collective bargaining. Through its local chapters, AAUP also provides for the representation of individual members regarding academic freedom, shared governance, and due process issues in proceedings before their university employers. Investigations of individual complaints of institutions violating academic freedom principles in relationship to AAUP members are authorized by the Executive Director and conducted by a subcommittee appointed by the Executive Director.

211.    AAUP also maintains a standing committee, known as Committee A on Academic Freedom and Tenure, which "[p]romotes principles of academic freedom, tenure, and due process in higher education through the development of policy documents and reports relating to these subjects and the application of those principles to particular situations that are brought to its attention."

212.    Defendants' actions have directly impaired these and other activities of AAUP..

213.    Plaintiff AAUP-Harvard has also suffered harm as a result of Defendants actions. Defendants' actions have impeded AAUP-Harvard's ability to recruit members into its Harvard chapter as some potential members fear that membership in the group may be perceived negatively

by Defendants and the Trump administration, which may in turn imperil their access to grants and their job security.

214.    AAUP-Harvard has also had to spend time responding to the fallout from Defendants' actions, including putting people in touch with needed resources and sponsoring trainings and workshops for faculty, instead of doing the internal governance work that is its core mission.

215.    Defendants' actions have undermined and eroded the longstanding principles of academic freedom, shared governance, and due process that Plaintiffs previously helped secure at Harvard and other institutions where their members are employed.

216.    Defendants' actions have made it more difficult and resource-intensive for Plaintiffs to carry out their advocacy on behalf of and representation of individual members. Because Defendants have pressured Harvard and other universities to abandon their commitment to academic freedom, shared governance, and due process principles, Plaintiffs must now expend more time and money to ensure that their members' rights in these regards are adequately protected.

217.    Defendants' actions have also made it more difficult and resource-intensive for Plaintiff AAUP to provide accurate and effective guidance to its chapters and members regarding these principles. Plaintiffs have had to divert staff and financial resources to address the significant influx of inquiries from chapter leaders and members regarding the effect of such actions on members' academic freedom, shared governance, and due process rights, and to ensure that individual members are adequately represented before their university employers. In addition to responding to such individual requests, staff for Plaintiffs have had to conduct nationwide calls and virtual meetings with chapter leaders regarding Defendants' actions and how to represent individual members in the face of such actions.

218.    Defendants' actions have also caused a pervasive sense of fear and intimidation among Defendants' members. Because of Defendants' actions and the threats of further cuts to research funding, some AAUP members no longer feel comfortable participating in and supporting the AAUP's activities, or asserting their academic freedom, shared governance, and due process rights.

## CAUSES OF ACTION

### COUNT I

### APA (5 U.S.C. §§ 702, 704, 706) – Contrary to Procedure and Contrary to Law (Title VI and related law and procedure)

219.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

220.    The APA directs courts to hold unlawful and set aside agency actions that are "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). The APA further directs courts to hold unlawful and set aside agency actions that are found to be "[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C).

221.    Section 602 of Title VI and binding regulations with the force of law, as well as the Department of Education Office of Civil Rights' Case Processing Manual, establish procedural requirements that must be followed in order to escalate an investigation to a threat to terminate federal funding for alleged noncompliance with Title VI of the Civil Rights Act. *See, e.g.*, 42 U.S.C. § 2000d-1; 34 C.F.R. §§ 100.6-100.11 (ED); 45 C.F.R. §§ 80.6–80.11 (HHS); 28 C.F.R. §§ 42.106–111 (DOJ); 41 C.F.R. §§ 101–6.209-214 (GSA).

222.    Defendants' failure to follow these requirements renders their actions alleged herein without observance of procedure required by law and contrary to law.

223.    Nothing in Title VI, Title VII, or any other law authorizes Defendants' actions as alleged herein taken outside the scope of these governing requirements.

224.    No lawful grant or contract condition authorizes Defendants' actions as alleged herein taken outside the scope of these governing requirements.

225.    Defendants' actions alleged herein constitute "[a]gency action made reviewable by statute," 5 U.S.C. § 704; 42 U.S.C. § 2000d-2, as well as "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704, and is therefore subject to judicial review. 5 U.S.C. §§ 702, 704.

226.    Plaintiffs and their members have suffered a legal wrong as a result of, and have been adversely affected or aggrieved by, Defendants' actions alleged herein for purposes of 5 U.S.C. § 702 and 42 U.S.C. § 2000d-2, including by chilling their speech, including their teaching, and imminently threatening their ongoing scientific research as well as their ability to support that research by making appropriate hiring decisions.

## COUNT II

### APA (5 U.S.C. §§ 702, 704, 706) – Arbitrary and Capricious

227.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

228.    The APA directs courts to hold unlawful and set aside agency actions that are found to be "[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

229.    Agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quotation omitted). This standard requires that agencies provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted). An action is also arbitrary and capricious

54

if the agency "failed to consider . . . important aspect[s] of the problem." *Dep't of Homeland Sec.*

*v. Regents of the Univ. of Calif.*, 591 U.S. 1, 25 (2020) (quotation omitted) (alterations in original).

230.    Defendants' actions alleged herein are arbitrary and capricious because the decision

to undertake them was not objectively reasonable and Defendants failed to provide a reasoned ex-

planation for that decision.

231.    Defendants have failed to provide any reasoned explanation regarding whether or

in what particular manner Harvard has failed to comply with any specific requirement of Title VI,

Title VII or its implementing regulations.

232.    Defendants have failed to provide any reasoned explanation for whether the grants

and contracts it has specified for review have any relation to the programs (or parts of programs) in

which the unidentified Title VI or Title VII violation or violations occurred, or of why those grants

and contracts in particular were targeted for review.

233.    Defendants have failed to provide any reasoned explanation for the imposition of

any of the demands listed in the April 3 Letter. Defendants failed to link any of the demands to any

specific violation of federal law or any specific contractual term or requirement. Defendants failed

to provide any reasoned explanation for why any of the requirements were necessary or sufficient

to remedy any violation of federal law or any contractual term. Defendants failed to consider or

even acknowledge any of the steps Harvard University has already undertaken that resemble, or

obviate the need for, Defendants' demands.

234.    The conditions imposed by the April 3 Letter are also arbitrary and capricious be-

cause they are vague and indiscernible and fail to provide a sufficiently reasoned basis to guide

compliance.

235.    Defendants' actions alleged herein constitute "[a]gency action made reviewable by statute," 5 U.S.C. § 704, as well as "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704, and is therefore subject to judicial review. 5 U.S.C. §§ 702, 704.

236.    Plaintiffs and their members have suffered a legal wrong as a result of, and have been adversely affected or aggrieved by, Defendants' actions alleged herein for purposes of 5 U.S.C. § 702, including by chilling their speech, including their teaching, and imminently threatening their ongoing scientific research as well as their ability to support that research by making appropriate hiring decisions.

### COUNT III

### First Amendment: Freedom of Speech

237.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

238.    The First Amendment protects Plaintiffs' and Plaintiffs' members' right to free speech and academic freedom, including the right to pursue research and express different viewpoints and political beliefs without retaliation, punishment or deterrence based on the subject matter of that research, or those viewpoints and beliefs.

239.    Defendants' actions alleged herein violate the First Amendment because they constitute coercion, persuasion, and/or intimidation that is intended to and has the effect of inhibiting the free exchange of ideas and promoting a government orthodoxy.

240.    Defendants' actions alleged herein further violate the First Amendment by interfering with Harvard University's curriculum and decisions concerning who may teach and/or areas of research.

241.    Defendants' actions alleged herein further violate the First Amendment by targeting for retaliation specific areas or topics of research, scholarship, and other forms of expression based

on content and viewpoint, and by seeking to punish Harvard University, its faculty and its students for engaging in speech disfavored by the government.

242.    Defendants' actions alleged herein further violate the First Amendment by infringing upon the right of Plaintiffs and their members to make expressive choices about what third-party speech to host and provide a forum for in the pursuit of intellectual and academic inquiry and debate.

243.    Defendants' actions alleged herein further violate the First Amendment because they constitute threats of legal sanction and other means of coercion to achieve the suppression of disfavored speech and academic freedom, including by coercing a private party to punish, suppress, or control speech on the government's behalf.

244.    Defendants' actions alleged herein have the purpose and effect of direct and indirect censorship and both content-based and viewpoint-based discrimination against faculty and students at Harvard University, including Plaintiffs' members.

245.    Defendants' actions alleged herein further violate the First Amendment because they constitute funding conditions that place an unconstitutional burden on the First Amendment rights set forth above and leverage funding to regulate unrelated matters outside the contours of any discrete federal program.

246.    Each of these actions standing alone constitutes an independent First Amendment violation.

247.    Defendants' actions alleged herein have already and will continue to chill the speech and academic freedom of Plaintiffs, Plaintiffs' members, and other faculty and students whose freedoms are integral to the mission and work of Plaintiffs and their members.

248.    Defendants' actions alleged herein are not justified by any substantial or compelling government interest and are not narrowly tailored to serve any such interest.

249.    Federal courts have the equitable power to enjoin unlawful actions by executive officials. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015). This Court can and should exercise its equitable power to enter appropriate declaratory and injunctive relief.

## COUNT IV

### APA (5 U.S.C. §§ 702, 704, 706) – Contrary to Law (First Amendment)

250.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

251.    The APA directs courts to hold unlawful and set aside agency actions that are contrary to constitutional rights. 5 U.S.C. § 706(2)(B).

252.    Defendants' actions alleged herein are contrary to constitutional rights for the reasons set forth in Count III of this Complaint.

253.    Defendants' actions alleged herein constitute "[a]gency action made reviewable by statute," 5 U.S.C. § 704, as well as "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704, and is therefore subject to judicial review. 5 U.S.C. §§ 702, 704.

254.    Plaintiffs and their members have suffered a legal wrong as a result of, and have been adversely affected or aggrieved by, Defendants' actions alleged herein for purposes of 5 U.S.C. § 702.

## COUNT V

### Separation of Powers / Spending Clause (U.S. Const., art I) / *Ultra Vires* Action

255.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

256.    The Constitution vests the legislative power, including the spending power and the authority to place conditions on federal spending, in Congress. U.S. Const., art. I. Federal legislation

must be passed by both chambers of Congress before it may be presented to the President, and, if signed, become law. *Id.*; *I.N.S. v. Chadha*, 462 U.S. 919, 951 (1983).

257.    The Constitution vests executive power in the President, U.S. Const., art. II, and imposes on the President a duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

258.    Congress exercised its Article I legislative and spending authority to authorize the federal grants and contracts Defendants have placed under review and threatened to—and imminently will—cancel and/or withdraw.

259.    None of the funds received by Harvard University have a congressionally authorized condition requiring them to comply with any of the demands in the April 3 Letter or that subject them to review in the manner Defendants have undertaken as alleged herein. Defendants' imminent cancelation of federal grants and contracts thus is not authorized by statute and will unlawfully override the direct Congressional authorization of federal funding. No Article II constitutional power authorizes Defendants to cancel duly authorized federal funding on grounds not authorized by statute.

260.    No law or statute, including Title VI and Title VII, requires Harvard to comply with the demands in the April 3 Letter. The demands in the April 3 Letter are not necessary to ensure compliance with Title VI or any other federal civil rights law. Even if they were, as alleged above, Defendants failed to follow statutory, regulatory, and other binding procedural requirements for the exercise of powers under these statutes.

261.    No provision of the Constitution authorizes the Executive Branch to enact, amend, or repeal statutes, including both Title VI and appropriations approved and signed into law.

262.     Defendants' actions alleged herein are, therefore, an unconstitutional usurpation of the spending power of Congress, an unconstitutional effort to amend Congressional appropriations by attaching conditions not contemplated by Congress, and a violation of the separation of powers. They are therefore *ultra vires*.

263.     Federal courts have the equitable power to enjoin unlawful actions by executive officials. *See, e.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). This Court can and should exercise its equitable power to enter appropriate declaratory and injunctive relief.

## COUNT VI

## APA (5 U.S.C. §§ 702, 704, 706) – Contrary to Law (Separation of Powers / Spending Clause /*Ultra Vires*)

264.     Plaintiffs incorporate the above paragraphs as if fully set forth herein.

265.     The APA directs courts to hold unlawful and set aside agency actions that are found to be "not in accordance with law," 5 U.S.C. § 706(2)(A) or "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B).

266.     Defendants' actions alleged herein are contrary to Article I of the Constitution for the reasons set forth in Count V of this Complaint.

267.     Defendants' actions alleged herein constitute "[a]gency action made reviewable by statute," 5 U.S.C. § 704, as well as "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704, and is therefore subject to judicial review. 5 U.S.C. §§ 702, 704.

268.     Plaintiffs and their members have suffered a legal wrong as a result of, and have been adversely affected or aggrieved by, Defendants' actions alleged herein for purposes of 5 U.S.C. § 702.

## COUNT VII

### Fifth Amendment Due Process Clause (U.S. Const. amend. V)

269.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

270.    The Due Process Clause of the Fifth Amendment to the United States Constitution requires due process of law before the deprivation of a constitutionally protected interest.

271.    Plaintiffs' members have constitutionally protected property interests in grant and contract funding that supports their salaries and stipends, as well as in their ongoing research. Plaintiffs' members have relied on this funding, and the protections of federal law governing this funding, in pursuing their research, hiring staff, making commitments to research partners, and in many other ways. Plaintiffs' members also have constitutionally protected liberty interests in their freedom of speech and expression, including academic freedom, and in pursuing their livelihoods.

272.    Defendants' threatened and imminent cancellation of federal grant and contract funding does not provide the university or Plaintiffs' members fair notice or a reasonable opportunity to be heard.

273.    The Due Process Clause also prohibits government actions that fail to give fair notice of what conduct is forbidden or required.

274.    Defendants' actions alleged herein establish unconstitutionally vague standards for determining whether federal grants and contracts will be terminated and do not tie the cancelation of grants and contracts to specific alleged acts or omissions, much less specific conduct reasonably related to the grants and contracts at issue. Nor did the announcement provide any adequate notice to Plaintiffs' members or to Harvard regarding what conduct was forbidden or required to avoid such consequences.

275. Federal courts have the equitable power to enjoin unlawful actions by executive officials. *See, e.g.*, *Armstrong*, 575 U.S. at 326-27. This Court can and should exercise its equitable power to enter appropriate declaratory and injunctive relief.

## COUNT VIII

### APA (5 U.S.C. §§ 702, 704, 706) – Contrary to Law (Fifth Amendment Due Process)

276. Plaintiffs incorporate the above paragraphs as if fully set forth herein.

277. The APA directs courts to hold unlawful and set aside agency actions that are found to be "not in accordance with law." 5 U.S.C. § 706(2)(A). The APA also directs courts to hold unlawful and set aside agency actions that are contrary to constitutional rights. 5 U.S.C. § 706(2)(B).

278. Defendants' actions alleged herein are contrary to constitutional rights for the reasons set forth in Count VII of this Complaint.

279. Defendants' actions alleged herein constitute "[a]gency action made reviewable by statute," 5 U.S.C. § 704, as well as "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704, and is therefore subject to judicial review. 5 U.S.C. §§ 702, 704.

280. Plaintiffs and their members have suffered a legal wrong as a result of, and have been adversely affected or aggrieved by, Defendants' actions alleged herein for purposes of 5 U.S.C. § 702.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that this Court:

    A. Declare unlawful and set aside the pending investigation and review of Harvard University's federal funds, including the threatened and imminent withdrawal or cancellation of federal funds set out in the March 31 Announcement and April 3 Letter and the conditions imposed in the April 3 Letter, as undertaken in the absence of constitutional and statutory authority, not in compliance with applicable law and procedure, unlawfully coercive, and unconstitutionally intended to target protected speech;

B.  Preliminarily and permanently enjoin any further investigation or review of
Harvard University's federal funding, including any threat to withdraw or can-
cel federal funding or actual withdrawal or cancelation of such funding from
Harvard University, in the absence of constitutional and statutory authority
and in compliance with applicable law and procedure;

C.  Preliminarily and permanently enjoin Defendants from using the withdrawal
of federal funds or the threat of withdrawal of federal funds to coerce Harvard
University to suppress viewpoints or speech of Plaintiffs and their members,
including by specifically enjoining the conditions imposed in the April 3 Let-
ter;

D.  Preliminarily and permanently enjoin Defendants from using the power of the
government to target and punish Harvard University for the viewpoints and
speech of Plaintiffs and their members;

E.  Award Plaintiffs their reasonable attorneys' fees and costs in accordance with
law including but not limited to 42 U.S.C. § 1988; and

F.  Award such other relief as the Court deems just and proper.

Dated:   April 11, 2025

Respectfully submitted,

By:    /s/ Daniel H. Silverman

Philippe Z. Selendy*
Sean P. Baldwin*
Corey Stoughton*
Julie Singer*
Hannah R. Miles*
SELENDY GAY PLLC
1290 Avenue of the Americas 20th Floor
New York, NY  10104
Tel: 212-390-9000
pselendy@selendygay.com
sbaldwin@selendygay.com
cstoughton@selendygay.com
jsinger@selendygay.com
hmiles@selendygay.com

*  PHV Application Forthcoming

Daniel H. Silverman (BBO# 704387)
COHEN MILSTEIN SELLERS & TOLL PLLC
769 Centre Street
Suite 207
Boston, MA 02130
(617) 858-1990
dsilverman@cohenmilstein.com

Joseph M. Sellers
Benjamin D. Brown
Phoebe M. Wolfe
Margaret (Emmy) Wydman
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave NW, 8th Floor
Washington, DC 20005
(202) 408-4600
jsellers@cohenmilstein.com
bbrown@cohenmilstein.com
pwolfe@cohenmilstein.com
ewydman@cohenmilstein.com

*Attorneys for Plaintiffs*