# Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS—HARVARD FACULTY CHAPTER, and AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS,<br><br>             Plaintiffs,<br><br>       v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE, et al.<br><br>             Defendants. | Case No. 25-10910 |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

Date:  April 11, 2025

Philippe Z. Selendy
Sean P. Baldwin
Corey Stoughton
Julie Singer
Hannah R. Miles
SELENDY GAY PLLC
1290 Avenue of the Americas 20th Floor
New York, NY 10104
Tel: 212-390-9000
pselendy@selendygay.com
sbaldwin@selendygay.com
cstoughton@selendygay.com
jsinger@selendygay.com
hmiles@selendygay.com

Daniel H. Silverman (BBO# 704387)
COHEN MILSTEIN SELLERS & TOLL PLLC
769 Centre Street
Suite 207
Boston, MA 02130
(617) 858-1990
dsilverman@cohenmilstein.com

Joseph M. Sellers
Benjamin D. Brown
Phoebe M. Wolfe
Margaret (Emmy) Wydman
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave NW, 8th Floor
Washington, DC 20005
(202) 408-4600
jsellers@cohenmilstein.com
bbrown@cohenmilstein.com
pwolfe@cohenmilstein.com
ewydman@cohenmilstein.com

*Attorneys for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

<u>Pages</u>

PRELIMINARY STATEMENT ....................................................................................................1

FACTUAL BACKGROUND ........................................................................................................3

    A.    Defendants' Pattern of Using Summary Federal Funding Cuts to
Undermine Free Speech and Academic Freedom....................................................3

    B.    Defendants Launch an Unprecedented and Unlawful Investigation and
Hold Hostage Harvard's Federal Funding ...............................................................5

    C.    Defendants Attempt to Coerce Harvard to Comply With a Series of
Unlawful "Preconditions" and Other Unspecified Demands....................................6

    D.    Harvard Depends Upon Federal Funding For Critical Research in the
Public Interest ..........................................................................................................8

LEGAL STANDARD....................................................................................................................9

ARGUMENT .................................................................................................................................9

I.    This Court Has Jurisdiction to Issue a Temporary Restraining Order................................9

    A.    Each Plaintiff Has Associational Standing on Behalf of its Members ....................9

    B.    Each Plaintiff Has Standing Because It Is Suffering and Will Suffer Direct
Harm .......................................................................................................................12

    C.    The Relief Plaintiffs Seek is Not Subject to the Tucker Act and There is
No Other Jurisdictional Barrier to the Relief Plaintiffs' Seek ...............................13

II.    Plaintiffs Have a Strong Likelihood of Success on the Merits .........................................13

    A.    Defendants' Actions Violate the APA.....................................................................13

        1.    Defendants Failed to Follow Any of the Procedures Required by
Title VI, the APA and Defendants' Own Regulations and Rules.............13

        2.    Defendants' Actions Are Arbitrary and Capricious in Violation of
the APA Because They Have Provided No Reasoned Explanation
for Their Actions.......................................................................................17

        3.    Defendants' Actions Are Final Agency Action .........................................20

    B.    Defendants' Actions Violate the Separation of Powers and the Spending
Clause and Are *Ultra Vires*....................................................................................21

C.     Defendants' Actions Violate the First Amendment ............................................... 24

     1.     Defendants' Coercion of Harvard to Suppress the Speech, Association, and Academic Freedom of Others Is Unconstitutional ......... 24

     2.     Defendants' April 3 Demands Unconstitutionally Condition Federal Funding on the Forfeiture of First Amendment Rights ............... 27

     3.     Defendants' Actions Unconstitutionally Target Protected Expression Based on Viewpoint ................................................................ 28

D.     Defendants' Actions Violate Due Process ........................................................... 29

III.     Defendants' Actions Are Already Causing Irreparable Harm and the Imminent Cancellation of Harvard's Federal Funding Risks Even Deeper Harm ............................ 29

IV.     The Balance of Equities and Public Interest Support a TRO ............................................. 31

CONCLUSION ............................................................................................................................. 32

CERTIFICATE OF SERVICE ...................................................................................................... 33

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott Lab'ys v. Gardner,*
387 U.S. 136 (1967).............................................................................................21

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
570 U.S. 205 (2013)......................................................................................27, 28

*Alexander v. Sandoval,*
532 U.S. 275 (2001).............................................................................................14

*Am. Ass'n of Colleges for Tchr. Educ. v. McMahon,*
2025 WL 833917 (D. Md. Mar. 17, 2025)...........................................................19

*Am. C.L. Union Fund of Michigan v. Livingston Cnty.,*
796 F.3d 636 (6th Cir. 2015) ..............................................................................30

*Armstrong v. Exceptional Child Ctr., Inc.,*
575 U.S. 320 (2015).............................................................................................24

*Bantam Books, Inc. v. Sullivan*
372 U.S. 58 (1963)........................................................................................26, 27

*Barnes v. Gorman,*
536 U.S. 181 (2002).............................................................................................23

*Bd. of Pub. Instruction v. Finch,*
414 F.2d 1068 (5th Cir. 1969) ............................................................................17

*Bennett v. Spear,*
520 U.S. 154 (1997).............................................................................................21

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for Bos.,*
89 F.4th 46 (1st Cir. 2023)...................................................................................11

*Bowen v. Massachusetts,*
487 U.S. 879 (1988).............................................................................................13

*California v. U.S. Dep't of Educ.,*
132 F.4th 92 (1st Cir. 2025).................................................................................19

*Chamber of Com. of U.S. v. Reich,*
74 F.3d 1322 (D.C. Cir. 1996).............................................................................24

*Chaplaincy of Full Gospel Churches v. England,*
    454 F.3d 290 (D.C. Cir. 2006) .........................................................................30

*Ciba-Geigy Corp. v. U.S.E.P.A.,*
    801 F.2d 430 (D.C. Cir. 1986) .........................................................................21

*City & Cnty. of San Francisco v. Trump,*
    897 F.3d 1225 (9th Cir. 2018) .........................................................................22

*City of Taunton, v. U.S. Env't Prot. Agency,*
    895 F.3d 120 (1st Cir. 2018) ...........................................................................16

*Climate United Fund v. Citibank, N.A.,*
    2025 WL 842360 (D.D.C. Mar. 18, 2025)......................................................18

*Clinton v. City of New York,*
    524 U.S. 417 (1998)........................................................................................22

*Cummings v. Premier Rehab Keller, P.L.L.C.,*
    596 U.S. 212 (2022)........................................................................................23

*D.V.D., et al. v. U.S. Dep't of Homeland Sec., et al.,*
    2025 WL 953074 (D. Mass. Mar. 29, 2025).....................................................9

*Dep't of Ed. V. Calif.,*
    604 U.S. ---, 2025 WL 1008354 (Apr. 4, 2025) (per curiam) .................13

*Dep't of Homeland Sec. v. Regents of the Univ. of California,*
    591 U.S. 1 (2020)...........................................................................14, 18, 19

*Doe v. Trump,*
    2025 WL 485070 (D. Mass. Feb. 13, 2025) ...............................................9, 31

*Dube v. State Univ. of New York,*
    900 F.2d 587 (2d Cir. 1990)...........................................................................25

*Elrod v. Burns,*
    427 U.S. 347 (1976)........................................................................................30

*F.C.C. v. Fox Television Stations,*
    567 U.S. 239 (2012)........................................................................................29

*First Nat'l Bank v. Bellotti,*
    435 U.S. 765 (1978)...........................................................................10, 18, 28

*Food & Drug Admin. v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024)...........................................................................12, 25

*Gerber v. Norton*,
    294 F.3d 173 (D.C. Cir. 2002) ...................................................................16

*Glazer Const. Co. v. United States*,
    50 F. Supp. 2d 85 (D. Mass. 1999) ...........................................................22

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ....................................................................................29

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ....................................................................................12

*Heim v. Daniel*,
    81 F.4th 212 (2d Cir. 2023) ......................................................................26

*Housatonic River Initiative v. United States Env't Prot. Agency, New England Region*,
    75 F.4th 248 (1st Cir. 2023) ......................................................................10

*Kendall v. United States ex rel. Stokes*,
    37 U.S. 524 (1838) ......................................................................................22

*Kestenbaum v. President and Fellows of Harvard Coll.*,
    743 F. Supp. 3d 297 (D. Mass. 2024) .......................................................11

*Keyishian v. Bd. of Regents of Univ. of N.Y.*,
    385 U.S. 589 (1967) ..............................................................................24, 25

*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986) ....................................................................................22

*Massachusetts v. Nat'l Insts. of Health*,
    2025 WL 702163 (D. Mass. Mar. 5, 2025) .............................................31

*Me. Forest Prods. Council v. Cormier*,
    586 F. Supp. 3d 22 (D. Me. 2022) ............................................................30

*Moody v. NetChoice LLC*,
    603 U.S. 707 (2024) ....................................................................................27

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ......................................................................................18

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ..........................................................................3, 23, 24

*Nat'l Rifle Ass'n of Am. v. Vullo*,
    602 U.S. 175 (2024) ..............................................................................2, 24

*New York Times Co. v. United States*,
    403 U.S. 713 (1971)..................................................................30

*New York v. United States Dep't of Homeland Sec.*,
    969 F.3d 42 (2d Cir. 2020)........................................................31

*Nken v. Holder*,
    556 U.S. 418 (2009)..................................................................9

*Ohio v. EPA*,
    603 U.S. 279 (2024)..................................................................18

*Perry v. Sindermann*,
    408 U.S. 593 (1972)..................................................................27

*Pharm. Care Mgmt. Ass'n v. Rowe*,
    429 F.3d 294 (1st Cir. 2005)......................................................11

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992)..................................................................28

*RFE/RL, Inc. v. Lake*,
    2025 WL 900481 (D.D.C. Mar. 25, 2025).................................19

*Rosenberger v. Rectors & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995)..................................................................28

*Ryan v. U.S. Immigr. & Customs Enf't*,
    974 F.3d 9 (1st Cir. 2020).........................................................9

*Safari Club Int'l v. Jewell*,
    842 F.3d 1280 (D.C. Cir. 2016).................................................21

*Schlafly v. Volpe*,
    495 F.2d 273 (7th Cir. 1974) ....................................................14

*Snyder v. Phelps*,
    562 U.S. 443 (2011)..................................................................28

*Spokeo Inc. v. Robins*,
    578 U.S. 330 (2016)..................................................................10

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*,
    600 U.S. 181 (2023)..............................................................9, 20

*Sweezy v. New Hampshire*,
    354 U.S. 234 (1957)..................................................................26

*TikTok Inc. v. Trump*,
    507 F.Supp.3d 92 (D.D.C. 2020) ................................................................31

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ................................................................................11

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
    578 U.S. 590 (2016) ................................................................................21

*W. Va. Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ..................................................................................2

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..............................................................................9, 30

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ................................................................30

**Statutes and Rules**

28 C.F.R. § 42.106 ................................................................................4, 14, 15

28 C.F.R. § 42.107 ................................................................................15

28 C.F.R. § 42.108 ................................................................................14, 17

28 C.F.R. § 42.110 ................................................................................16

28 C.F.R. § 50.3 ................................................................................15, 19

34 C.F.R. § 100.6 ................................................................................14, 15

34 C.F.R. § 100.7 ................................................................................15

34 C.F.R. § 100.8 ................................................................................14, 17

34 C.F.R. § 100.10 ................................................................................16

41 C.F.R. § 101-6.210 ................................................................................15

41 C.F.R. § 101-6.211 ................................................................................14, 17

41 C.F.R. § 101-6.212 ................................................................................14

41 C.F.R. § 101-6.213 ................................................................................14

41 C.F.R. § 101-6.213 ................................................................................16

41 C.F.R. § 101-6.214 ................................................................................14

45 C.F.R. § 80.6 ...................................................................................................................14

45 C.F.R. § 80.7 ...................................................................................................................15

45 C.F.R. § 80.8 .............................................................................................................14, 17

45 C.F.R. § 80.10 .................................................................................................................16

45 C.F.R. § 80.10 .................................................................................................................20

5 U.S.C. §§ 554-557 ............................................................................................................16

5 U.S.C. § 704 ......................................................................................................................20

5 U.S.C. § 706 ...........................................................................................................1, 14, 18

42 U.S.C. § 2000d-1 .........................................................................................14, 15, 17, 18

42 U.S.C. § 2000d-2 ............................................................................................................21

28 U.S.C. § 1491(a)(1).........................................................................................................13

U.S. Const., art. I............................................................................................................21, 22

U.S. Const., art. II § 3 ..........................................................................................................22

**Other Authorities**

Executive Order 14188 ..........................................................................................................4

## PRELIMINARY STATEMENT

This case involves an unprecedented threat from the Trump administration to withhold nearly nine billion dollars in federal funding to one of our nation's leading universities unless it accedes to changes that fundamentally compromise the university's independence and the free speech rights of its faculty and students. On March 31, 2025, Defendants[1] announced an investigation into federal grants that support critical research projects at Harvard University. On April 3, as a result of that investigation, Defendants made clear that funding would be terminated if Harvard did not "immediate[ly]" implement a litany of sweeping but vaguely-worded demands for changes to university operations, governance, hiring, admissions, curriculum, and student discipline. There is no doubt that, absent Harvard's capitulation to these demands, the cancellation of federal funding is imminent: Defendants have already cancelled or frozen hundreds of millions of dollars in funding for other universities that have been similarly targeted, with further cuts still threatened.

Defendants' actions violate the law in numerous ways. Notwithstanding that Defendants rely on Title VI of the Civil Rights Act of 1964 to authorize their actions, they have made no effort to comply with Title VI's statutory requirements or Defendants' own regulations and procedures, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2)(A), (C), (D). Defendants have never specified the grounds for investigating Harvard so that the University might have an opportunity to come into voluntary compliance with Title VI. They have not issued findings of noncompliance or provided any opportunity for the University to respond to or rebut those findings. Nor have they explained how their demands or the programs targeted for funding

---

[1] Capitalized terms not defined herein have the same meaning as in the concurrently filed Complaint.

cuts are linked to any noncompliance. These actions are in brazen defiance of legal constraints on the exercise of Title VI authority that Congress put in place precisely to safeguard against the potential exploitation of federal funding to arbitrarily or punitively coerce recipients. For this same reason, Defendants' actions violate the separation of powers and the Spending Clause and are *ultra vires*, as they exceed executive authority to set conditions on the receipt of congressional appropriations.

Defendants' actions also violate the First Amendment. The administrative and policy changes Defendants seek to coerce Harvard to undertake by holding hostage federal funding are stunning in their breadth, intrusiveness, and disregard for the one "fixed star in our constitutional constellation … that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion…." *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Defendants have declared that entire "[p]rograms and departments" must alter their curriculum and research agendas to shift toward the government's preferred "viewpoint" and "ideolog[y]"; certain programs that fall outside that preferred ideology must be "shutter[ed]"; student groups and individual students must be punished for disfavored speech in a manner deemed sufficiently punitive by the government, and certain (government-disapproved) political protests on its property must not be tolerated; the university's admissions and hiring practices must be overhauled to conform with the executive branch's preferred "policies"; and the "[g]overnance and leadership" of the private university must be overhauled to ensure that individual "faculty and administrative leaders" faithful to the government's agenda are "empower[ed]."

Executive branch officials cannot coerce a private university into suppressing academic freedom and free speech, *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024), by leveraging the vast financial power of the federal government to effectively put "a gun to the head" of a private

university, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012). Yet that is unquestionably what Defendants are doing, not only to Harvard but to at least 60 public and private universities, part of a profoundly undemocratic agenda to impose prevailing political orthodoxy on campuses across the country. The Constitution forbids it.

The imminent loss of hundreds of millions—possibly billions—of dollars and the chilling effect of Defendants' aggressive and frighteningly unprecedented actions are causing severe irreparable harm to Plaintiffs and their members and disrupting a wide array of ongoing research that is critical to American economic competitiveness, public health, and global leadership. Defendants' unlawful actions should be immediately temporarily restrained as this litigation proceeds.

## **FACTUAL BACKGROUND**

### A.  **Defendants' Pattern of Using Summary Federal Funding Cuts to Undermine Free Speech and Academic Freedom**

Understanding the imminent threat of irreparable harm hanging over the Harvard campus requires understanding the Trump administration's broader pattern of targeting universities' federal funding and independence. The administration's explicit threats began as early as President Trump's 2024 campaign, during which the President promised to curtail academic independence, shut down disfavored protest, and control the viewpoints expressed on campuses "to reclaim our once great educational institutions from the radical Left and Marxist maniacs." Compl. ¶¶ 31-33; Ex. 1. The President particularly focused on two issues where, in his view, viewpoints expressed on campus did not align with his own: (1) the Israeli-Palestinian conflict and (2) issues relating to race and gender that President Trump referred to as "diversity, equity and inclusion," "DEI," or sometimes "wokeness." Compl. ¶¶ 35-36; Ex. 24.

Upon taking office, President Trump implemented several executive orders in furtherance of this agenda. Most relevant for this motion is Executive Order 14188, entitled "Additional measures to Combat Anti-Semitism," which set an agenda to address "civil-rights violations related to or arising from post-October 7, 2023, campus anti-Semitism," and the subsequent establishment of a multi-agency "Task Force to Combat Anti-Semitism" ("DOJ Task Force"), led by Defendant Leo Terrell, to carry out the mandate of Executive Order 14188. Compl. ¶¶ 48-51; Exs. 2-3.

Under the auspices of this DOJ Task Force, Defendants are pursuing "investigations" into more than 60 public and private universities spanning 24 states and Washington, D.C. Compl. ¶ 63 & n.32; Ex. 4. If these investigations followed established federal law and procedure and were designed to address the serious problem of antisemitism that continues to plague many college campuses, there would be no cause for alarm. But they do not. Instead, Defendants have uniformly ignored binding federal law and procedure and, in several cases, summarily enacted devastating cuts to federal funding that have already caused enormous harm or coerced radical concessions that undermine university independence, academic freedom, and the constitutional rights of students and faculty. In some cases, they have done both.

Earlier in March, Defendants' "investigation" of Columbia University resulted in summary termination of over $400 million in federal contracts while threatening billions more. Compl. ¶¶ 59, 64; Exs. 4, 19. Under immense financial pressure, Columbia acceded to the Trump administration's demands. Compl. ¶¶ 69-73. Despite its voluntary cooperation, as of April 10, the Trump administration is demanding further concessions in the form of a consent decree and the NIH has additionally frozen all Columbia's grant funding without any notice. Compl. ¶ 75. The Trump administration has also frozen over $1 billion in funding for Cornell University and $790

million for Northwestern University, with an even more shocking lack of process, not even purporting to issue communications providing notice under Title VI or any other legal authority. Compl. ¶ 76. Rather, these universities learned of the funding freeze from the media, at the same time as the rest of the public. Compl. ¶¶ 77-78.

### B. Defendants Launch an Unprecedented and Unlawful Investigation and Hold Hostage Harvard's Federal Funding

The signs that Harvard would be similarly targeted began soon after President Trump took office and immediately began having significant effects on Harvard's community, including Plaintiffs and their members. Compl. ¶¶ 32-34, 37, 40-54; Exs. 2-3. In a letter sent on March 10, 2025, the Trump administration warned members of the Harvard community of "potential enforcement actions" if they did not "fulfill their obligations under Title VI of the Civil Rights Act to protect Jewish students on campus." Compl. ¶ 63; Ex. 4. Coming in the wake of cancelling hundreds of millions of funding for Columbia—and by expressly referencing that action—the letter was a clear threat that Harvard, too, would soon be subject to summary cancellation of federal funding and the type of unlawful conditions Defendants had imposed on Columbia. Despite bearing this clear threat, the letter did not contain any specific allegations of failures to protect Jewish students on campus or any other alleged violations of law. Nor did it reference any previously opened Title VI investigation or purport to make any findings pursuant to those investigations. Compl. ¶¶ 63-64, 87-90; Ex. 4.

Following that letter, Defendants announced on March 31, 2025, that they would be investigating Harvard for purported failures to address antisemitism on campus and for "promoting divisive ideologies over free inquiry." Compl. ¶ 84; Ex. 5. As with the March 10 letter, this announcement did not contain any specific allegations, nor did it reference or offer any findings related to any open Title VI investigation. Compl. ¶ 84; Ex. 5.

On that same day, Harvard issued a public statement acknowledging "the important goal of combatting antisemitism," and stating that "[u]rgent action and deep resolve are needed to address this serious problem that is growing across America and around the world," as well as Harvard's "considerable effort to addressing antisemitism" over the fifteen months leading up to the March 31 Announcement, including several specific steps to strengthen university rules and discipline procedures, enhance training an education on antisemitism, improve student safety and security, promote civil dialogue and respectful disagreement, and further reforms. Compl. ¶¶ 92-93; Ex. 6.

## C.    Defendants Attempt to Coerce Harvard to Comply With a Series of Unlawful "Preconditions" and Other Unspecified Demands

This response appeared to have no effect. Just three days after announcing its new "investigation," on April 3, 2025, Defendants sent Harvard a notice threatening to withhold more than nine billion dollars in current and future grants if it failed to comply with a "non-exhaustive" list of nine preconditions that must be satisfied for Harvard to "remain a responsible recipient of federal taxpayer dollars." Compl. ¶¶ 2, 94-96, 111; Ex. 7. These wide-ranging and vaguely worded preconditions demanded changes to fundamental features of the University. They included, among other things, demands that Harvard review and make "necessary changes" to unspecified "programs and departments that fuel antisemitic harassment"; make unspecified programmatic changes "to address bias, improve viewpoint diversity, and end ideological capture"; undertake sweeping "governance and leadership reforms" described only as "meaningful" and designed to "empower faculty and administrative leaders who are committed to implementing the changes indicated in this letter"; and adopt a plan for comprehensive "admissions reform" and "hiring reform" without explaining what manner of "reform" would be required. Compl. ¶ 95; Ex. 7. The breadth and vagueness of these demands constitute an unprecedented attack on the rights to free

speech of members of the University community and to the fundamental prerogatives of the University to govern its operations and formulate its academic programs.

Like its predecessor communications of March 10 and 31, the April 3 Letter did not identify or make findings with respect to any specific incidents of antisemitic discrimination, harassment, or violence, or of Harvard's failure to prevent or address any such incidents. Compl. ¶¶ 96-101; Ex. 7. The April 3 Letter further did not: (1) provide any constitutional, statutory, or regulatory authority for the government's imposition of its specified conditions on a private university; (2) issue any factual findings or explain whether or how implementation of any of the demanded actions would deter or remedy antisemitic harassment or any "other alleged violations" of Title VI or Title VII; (3) address whether there were less intrusive means of ensuring compliance with those laws; or (4) make any mention of the First Amendment or the need to consider the protection of free speech alongside the imperative to eradicate illegal discrimination and harassment. Compl. ¶¶ 4, 97-101; Ex. 7.

Thus, as of the filing of this motion, Harvard faces an impossible choice: either commit to "reforms" that sacrifice the university's independence to government control, punish disfavored speech in deference to government orthodoxy, and turn over hiring and admissions systems to the policy preferences of the Trump administration; or face the immediate loss of up to nine billion dollars in federal funding. Worse, this may be no choice at all: as Columbia's experience demonstrates, capitulating to the Trump administration's demands is no guarantee of avoiding devastating punitive funding cuts. Under any scenario, the livelihoods and the constitutional rights of Plaintiffs and their members are at stake absent the Court's immediate intervention.

### D.    Harvard Depends Upon Federal Funding For Critical Research in the Public Interest

Harvard's dilemma is stark because it, like all American universities, relies heavily on federal funding, including to engage in cutting-edge academic research across disciplines that have profound effects on the American economy and the public interest. In 2024, Harvard University received $686 million in federal funding, accounting for nearly 70 percent of its total sponsored research expenditures, and approximately 11 percent of its total operating revenue. Ex. 8. These funds are the primary driver behind Harvard's biomedical research, including dozens of Harvard-affiliated research centers researching AIDS, infectious diseases, and cancer, as well as the diagnosis of rare conditions, Ex. 9; cutting-edge research in the natural and social sciences, Exs. 10-13, and so much more, *see, e.g.,* Ex. 14; Compl. ¶ 151-167. According to *The Boston Globe*, Defendants are specifically threatening more than $255 million in contract grants, including those that fund research on the tuberculosis vaccine, traumatic brain injuries, and opioid addiction prevention. Ex. 14. Threatened funding cuts also impact the five independent Boston-area hospitals affiliated with Harvard Medical School, which separately received more than $1.56 billion in federal funding in 2024. Ex. 15.

Harvard's federal funding supports hundreds of millions in salaries and wages for Massachusetts residents, as well as purchases from local businesses, with more than $21 million directed to companies in Harvard's host communities of Boston and Cambridge. Ex. 16. Each dollar of federal funding invested in research "generates $2.60 in economic activity" as a result of investment in medical schools and teaching hospitals. Ex. 16.

Both to avoid these disastrous consequences and to prevent the irreparable harms to Plaintiffs and their members set out in the argument below, the Court should immediately issue the temporary restraining order.

## LEGAL STANDARD

"The standard for issuing a TRO is the same as for a preliminary injunction." *D.V.D., et al. v. U.S. Dep't of Homeland Sec., et al.*, 2025 WL 953074, at *2 n.7 (D. Mass. Mar. 29, 2025) (cleaned up). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Of these, likelihood of success on the merits is considered the most important of the four elements and the "sine qua non" of the calculus. *See Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020). The last two factors "merge when the Government is the party opposing the [TRO]." *Doe v. Trump*, No. CV 25-10135-LTS, 2025 WL 485070, at *7 (D. Mass. Feb. 13, 2025) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

## ARGUMENT

### I.    This Court Has Jurisdiction to Issue a Temporary Restraining Order

The Court has jurisdiction to issue a temporary restraining order. Plaintiffs establish Article III standing in each of the two ways available to organizational plaintiffs: "the organization can claim that it suffered an injury in its own right or, alternatively, it can assert standing solely as the representative of its members." *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (cleaned up). Moreover, the Court has jurisdiction to issue declaratory and injunctive relief from a course of executive agency conduct that violates well-established constitutional and statutory law.

### A.    Each Plaintiff Has Associational Standing on Behalf of its Members

Each Plaintiff has associational standing because (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the

organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation in the lawsuit of each of the individual members. *Housatonic River Initiative v. United States Env't Prot. Agency, New England Region*, 75 F.4th 248, 265 (1st Cir. 2023).

*First*, Plaintiffs' members would otherwise have standing to sue in their own right because they have suffered and will continue to suffer concrete and particularized injuries, traceable to Defendants' conduct, that are likely to be redressed by the declaratory and injunctive Plaintiffs seek here. *See Spokeo Inc. v. Robins*, 578 U.S. 330, 338 (2016). Defendants' actions directly target the speech of Plaintiffs' members and infringe on their academic freedom, including demanding that Harvard "shutter" undefined DEI programs that could sweep in a wide variety of academic disciplines; make "necessary changes" to unnamed programs and departments that allegedly fuel antisemitism; and threaten changes to hiring and discipline policies that reasonably appear to be designed to target disfavored viewpoints. Because Defendants' actions directly target certain viewpoints and expressive activities, Plaintiffs' members reasonably fear that if their speech or scholarship are not aligned with the Trump administration, they could lose research funding have their programs terminated if Harvard accedes to Defendants' demands.

They have already begun to self-censor. For example, multiple professors have changed the topics of courses they intend to teach next fall to avoid subjects disfavored by Defendants— one changed their curricular offerings to no longer explicitly mention transgender issues, and another to avoid mentioning race. Ex. 17 ¶ 23. Others have had to advise their graduate students about the risks of pursuing research topics disfavored by Defendants for fear that their projects will not be funded and the students will be unable to find academic jobs. Ex. 28 ¶ 22. Another professor, who is Jewish and has conducted significant research on Jewish history in the United States, has become more cautious about sharing her views about Palestine and Israel. Ex. 26 ¶ 17.

The threat that Plaintiffs' members will be stripped of their federal funds, or that they will suffer harm if Harvard accedes to Defendants' demands, is "sufficiently imminent and substantial." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021). Defendants launched a similar investigation into Columbia University last month, and shortly thereafter, summarily terminated more than $400 million in federal grants, threatening to revoke billions more, even after Columbia acceded to Defendants' demands. Compl. ¶ 59, 74-75. Just this week, the Trump administration froze over $1 billion and $790 million in research funds from Cornell University and Northwestern University, respectively. Compl. ¶ 76.

*Second*, through this suit, Plaintiffs seek to protect members' academic freedom, speech and due process rights, and professional interests against Defendants' actions—interests that are plainly germane to Plaintiffs' organizational purposes. "AAUP has three guiding principles: academic freedom, governance, and economic security. These are the core objectives of the Harvard AAUP chapter that track the priorities of AAUP national." Ex. 17 ¶ 17; Ex. 18 ¶¶ 7, 15-16.

*Third*, the claims that Plaintiffs assert and the relief requested do not require the participation of each individual member in the lawsuit. The generalized and sweeping nature of Defendants' threats and actions distinguish this case from one where distinctions among individual members require individualized resolution. Plaintiffs' claims turn solely on the lawfulness of Defendants' conduct, and do not require the participation of individual members to prove. *See Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 307 (1st Cir. 2005); *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for Bos.*, 89 F.4th 46, 55 (1st Cir. 2023). Injunctive relief, like that which Plaintiffs seek here, "has generally been held particularly suited to group representation" because "relief will inure to the benefit of those members of the association actually injured." *Kestenbaum v. President and Fellows of Harvard Coll.*, 743 F. Supp. 3d 297, 306-07 (D. Mass. 2024) (quotation

omitted) (permitting organization to seek injunctive relief on behalf of members for Title VI claims).

**B.** **Each Plaintiff Has Standing Because It Is Suffering and Will Suffer Direct Harm**

Each Plaintiff organization independently has standing because Defendants' actions have "directly affected and interfered with [Plaintiffs'] core business activities," not merely their "abstract social interests," and required Plaintiffs to divert resources from other activities. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394-95 (2024).

The protection of academic freedom and the participation of faculty in effective University governance are both central to the missions of both Plaintiffs, Compl. ¶¶ 10-12, and both concerns are squarely implicated by the challenged conduct here. Defendants' actions have forced Plaintiffs to divert resources to assist members responding to Defendants' demands, respond to a surge of inquiries from chapter leaders and members at Harvard and across the country, and connecting members with needed resources. Ex. 17 ¶¶ 16, 23-25, 27. For example, Plaintiff Harvard-AAUP has had to sponsor training on digital surveillance and information security for members and is in the process of planning a Know Your Rights workshop aimed specifically for faculty. Ex. 17 ¶ 16. Plaintiff AAUP has had to conduct nationwide calls and virtual meetings with chapter leaders and others regarding the government's actions and how to represent individual members in the face of such action. Ex. 18 ¶ 25. Because of government pressure at Harvard and other universities to abandon their commitment to academic freedom, shared governance, and due process principles, the AAUP and AAUP-Harvard must now expend more time and money to ensure that their members' rights are protected. Plaintiffs provide valuable counseling and information services to their members, like the plaintiff in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 368 (1982). *Cf. Alliance for Hippocratic Medicine*, 602 U.S. at 395 (finding that plaintiff organization could not

claim injury to itself from challenged action because it failed to provide services that would be impaired).

### C.   The Relief Plaintiffs Seek is Not Subject to the Tucker Act and There is No Other Jurisdictional Barrier to the Relief Plaintiffs' Seek

Plaintiffs do not seek money damages. Compl. at 64. Nor do Plaintiffs bring any claims sounding in contract or otherwise seek an order to enforce a contractual obligation to pay money. Compl. ¶¶ 219-280. Plaintiffs' claims are constitutional and statutory challenges to executive agency action—a range of action that includes but is not limited to specific threats to federal funding, encompassing a broader abuse of federal civil rights enforcement authority and an attempt to coerce Harvard into acquiescing to irrational and unlawful conditions that will directly harm Plaintiffs and their members. For these reasons, the Tucker Act, 28 U.S.C. § 1491(a)(1), which grants the Court of Federal Claims jurisdiction over suits against the United States sounding in contract, does not apply here, and the exclusion of claims seeking "money damages" from the APA is of no relevance. *Cf. Dep't of Ed. V. Calif.*, 604 U.S. --- , 2025 WL 1008354, at *1(Apr. 4, 2025) (per curiam). The fact that one *effect* of granting Plaintiffs' relief may be to preserve contractual entitlements does not alter this conclusion. *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988).

## II.   Plaintiffs Have a Strong Likelihood of Success on the Merits

Plaintiffs are likely to succeed on all of their claims. A likelihood of success on any one of those claims is sufficient to support preliminary injunctive relief.

### A.   Defendants' Actions Violate the APA

#### 1.   Defendants Failed to Follow Any of the Procedures Required by Title VI, the APA and Defendants' Own Regulations and Rules

The sole authority Defendants have cited for their investigation and review of Harvard—and, thus, the only legal basis for their threats to Harvard's federal funding and their demand for sweeping institutional policy changes—is Title VI. Congress incorporated into Title VI detailed

13

procedural requirements for action under the statute and certainly before federal funds could be withheld. 42 U.S.C. § 2000d-1; *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001) (Title VI places "elaborate restrictions" on agency enforcement). Regulations promulgated by Defendants DOJ, HHS, ED, and GSA set further procedural requirements for Title VI enforcement. *See, e.g.*, 45 C.F.R. §§ 80.6 to 11 (HHS); 34 C.F.R. §§ 100.6 to 11 (ED); 28 C.F.R. §§ 42.106 to 111 (DOJ); 41 C.F.R. §§ 101-6.211-3, 101-6.212-1 to -4, 101-6.213-1 to -7, 101-6.214 (GSA).

Defendants' actions here are remarkable for having failed to adhere to *any* of these procedures. Plaintiffs are therefore overwhelmingly likely to succeed on their claim that Defendants' actions violate the APA—including its prohibitions on agency actions taken "without observance of procedure required by law," actions "not in accordance with law," actions "in excess of statutory … limitations," and "arbitrary [or] capricious" actions. 5 U.S.C. § 706(2)(A), (C), (D); *see, e.g.*, *Schlafly v. Volpe*, 495 F.2d 273, 276 (7th Cir. 1974) (plaintiff stated claim under APA where agency froze funding under Title VI without following procedures in 42 U.S.C. § 2000d-1); *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020) (DHS termination of DACA violated the APA).

a. *Notice and voluntary compliance.* Title VI provides that no move toward terminating federal funding "shall be taken until the department or agency concerned [1] has advised the appropriate person or persons of the failure to comply with [Title VI], and [2] has determined that compliance cannot be secured by voluntary means." 42 U.S.C. §2000d-1. Defendants' regulations confirm these requirements. 45 C.F.R. § 80.8(c) (HHS); 34 C.F.R. § 100.8(c); 28 C.F.R. § 42.108(c) (ED); 41 C.F.R. §101-6.211-3. Agencies must make every effort to secure voluntary compliance rather than terminate funding. 45 C.F.R. § 80.6(a) (agency "shall to the fullest extent practicable seek the cooperation of recipients in obtaining compliance … and shall provide

assistance and guidance to recipients to help them comply voluntarily"); *id.* §80.7(d)(1); 34 C.F.R. §§ 100.6(a), 100.7(d)(1); 28 C.F.R. §§ 42.106(a), 42.107(d)(1); 41 C.F.R. §§ 101-6.209-1, 101-6.210-4 (GSA). Title VI "requires that a concerted effort be made to persuade any … recipient voluntarily to comply," and such efforts "should be undertaken at the outset" and "pursued through each stage of enforcement." 28 C.F.R. § 50.3 (DOJ).

Agency rules and regulations require that the scope and basis of any Title VI investigation be stated clearly from the outset in order to ensure that funding recipients have a fair chance to voluntarily remedy the alleged violations of law. 42 U.S.C. § 2000d-1; 28 C.F.R. § 50.3 (DOJ); 34 C.F.R. § 100.7(d) (ED); 45 C.F.R. § 80.7(d) (HHS); 28 C.F.R. § 42.107(d) (DOJ); 41 C.F.R. § 101-6.210-4(a) (OMB); *see also* Compl. ¶¶ 121-22. Defendants' vague communications do not come close to satisfying this requirement. *See* Exs. 5-6. Neither communication contains the specificity required by law to provide the required notice or to facilitate voluntary compliance.

Moreover, the imposition of specific remedial measures on April 3, and the clear conditioning of continued federal funding on those conditions, makes clear that Defendants failed to give Harvard an opportunity to come into voluntary compliance—a process that necessarily would take more than three days and not resemble a gun-to-the-head demand to "immediately" implement a dictated set of demands before threatening and imminently terminating federal funding.

b. *Formal Procedural Prerequisites to Any Threat to Federal Funding.* Even if Defendants had reasonably determined that voluntary compliance was unattainable, prior to imminently threatening federal funding or conditioning it on specific remedies, they would have been required to provide Harvard with an "opportunity for hearing," followed, if supported by the record, by an "express finding on the record … of a failure to comply" with Title VI. 42 U.S.C. § 2000d-1. The

statute's reference to a finding "on the record" after a hearing triggers the agency's obligation to comply with the formal adjudication requirements of the APA. *City of Taunton, v. U.S. Env't Prot. Agency*, 895 F.3d 120, 129 (1st Cir. 2018). Under the APA, the record must "show the ruling on each finding, conclusion, or exception presented" by the parties, including "findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record," and "the appropriate rule, order, sanction, relief, or denial thereof." 5 U.S.C. § 557(c); *see also generally* 5 U.S.C. §§ 554-557 (requirements for formal adjudication under APA). Defendants' regulations further specify that the agency must "identify the requirement or requirements imposed by or pursuant to [Title VI] with which it is found that the … recipient has failed to comply." 45 C.F.R. § 80.10(d); 34 C.F.R. § 100.10(d); 28 C.F.R. § 42.110(d); 41 C.F.R. § 101-6.213-4. Defendants have made no express findings on the record of Harvard's failure to comply with Title VI. Defendants have not provided any hearing, nor have they made any such findings, and there is every indication they do not intend to. *See, e.g.,* Ex. 23 (Defendant Leo Terrell stating, with respect to Columbia, "what we did was we basically gave them notice[], and we stopped providing the funding. And I've got news for you. To Harvard … same thing's happening to them. It's going to happen, because we're going to look at the numbers of federal dollars, and … it totals in the hundreds of millions of dollars. And we're going after them."). That alone warrants an immediate court order to prevent Defendants' imminent failure to comply with these statutory requirements. *See Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002) ("When a statute requires an agency to make a finding as a prerequisite to action, it must do so.").[2]

---

[2] Title VI further provides that to terminate federal funding, "the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction

c. _Tailoring of sanction._ Title VI places substantive limits on an agency's authority to terminate federal funding: termination (1) must be "limited to the particular political entity, or part thereof, or other recipient as to whom such a finding [of noncompliance] has been made," and (2) must also be "limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found." 42 U.S.C. § 2000d-1; _accord_ 45 C.F.R. § 80.8(c); 34 C.F.R. § 100.8(c); 28 C.F.R. § 42.108(c); 41 C.F.R. § 101-6.211-3. Because Defendants have never explained the nature of any Title VI violation or made any on-the-record finding of noncompliance, they necessarily are not limiting their threat of termination of funding to the particular entities (whether Harvard as a whole, or some subcomponent of the university) that are out of compliance, nor limiting the termination "in its effect" to the particular program, "or part thereof," in which such noncompliance was found. 42 U.S.C. § 2000d-1; _see Bd. of Pub. Instruction v. Finch_, 414 F.2d 1068, 1078 (5th Cir. 1969).

As these myriad failures demonstrate, this is not a close question. Defendants' course of conduct is unlawful for its failure to abide by binding procedural rules, and therefore Plaintiffs are likely to succeed on their APA claim.

## 2. Defendants' Actions Are Arbitrary and Capricious in Violation of the APA Because They Have Provided No Reasoned Explanation for Their Actions

Defendants' failure to describe any allegations of unlawful conduct sufficient to warrant their actions, as well as their imposition of vague and arbitrary mandates as a condition of avoiding

---

over the program or activity involved a full written report of the circumstances and the grounds for such action." 42 U.S.C. § 2000d-1. Furthermore, "[n]o such action shall become effective until thirty days have elapsed after the filing of such report." _Id._; _accord_ 45 C.F.R. § 80.8(c); 34 C.F.R. § 100.8(c); 28 C.F.R. § 42.108(c); 41 C.F.R. § 101-6.211-3. Defendants have taken none of these steps with regard to Harvard and past behavior regarding other universities indicates they have no intent to do so.

such termination, violate the cornerstone rule of administrative law that agencies must "engage in 'reasoned decisionmaking.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020). Decisions that are not "reasonable and reasonably explained" must be set aside as "arbitrary" and "capricious" under the APA. 5 U.S.C. § 706(2)(A); *Ohio v. EPA*, 603 U.S. 279, 292-93 (2024).

*First*, Defendants have not provided any specific evidence of any antisemitic harassment to which the University was deliberately indifferent, nor any other evidence of wrongdoing. They therefore fail to explain how any events or conduct constitute noncompliance with Title VI. *Cf. Climate United Fund v. Citibank, N.A.*, 2025 WL 842360, at *7-8 (D.D.C. Mar. 18, 2025) (termination of grants improper where agency "Defendants did not and have not identified a violation of any applicable regulation or any of the grant's terms" and only "vaguely reference[d] 'multiple ongoing investigations'"). Whether or not Harvard has acted in violation of any requirements of Title VI, the Defendants failed to give them notice of the bases for their action and to afford the University the opportunity to respond.

*Second*, Defendants have provided no basis for the breadth of their threats to Harvard's federal funding. The APA requires agencies to "articulate a satisfactory explanation for [their] action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Defendants have never explained what grants have been selected for review and potential termination and on what basis, or whether those grants have any connection to the (as-yet unspecified) Title VI violation. These explanatory failures are particularly significant in light of Title VI's requirement, discussed above, that termination of funding be "limited in its effect to the particular program, *or part thereof*, in which such noncompliance has been so found." 42 U.S.C.

§ 2000d-1 (emphasis added). This is textbook arbitrary and capricious action under the APA. *Cf. Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, 2025 WL 833917, at *21 (D. Md. Mar. 17, 2025) (holding "likelihood of success on … APA claim because the Termination Letters fail to provide Grant Recipients any workable, sensible, or meaningful reason or basis for the termination of their awards"); *RFE/RL, Inc. v. Lake*, 2025 WL 900481, at *3 (D.D.C. Mar. 25, 2025).

*Third*, Defendants have demonstrated that they are not considering the enormous reliance interests implicated by their imminent cancelation of hundreds of millions, possibly billions, of dollars supporting critical research and other activities. DOJ's guidelines state that "in each case" of Title VI enforcement, the objective is to secure compliance "so that needed Federal assistance may commence or continue." 28 C.F.R. § 50.3(a). The Supreme Court has repeatedly emphasized the significance of considering reliance interests when an agency changes course, as Defendants threaten to do by putting the University's grants at risk. *See Regents of the Univ. of California*, 591 U.S. at 30-31 (citing cases). Nonetheless, Defendants are taking their action without any regard for the incalculable damage they would cause—to patients whose clinical trials are ending, faculty whose careers will be derailed, employees around the world whose livelihoods are in jeopardy, and the public who will no longer benefit from the research those federal grants supported. *Cf. California v. U.S. Dep't of Educ.*, 132 F.4th 92, 99 (1st Cir. 2025) (agency failed to consider "reliance interests of grant recipients and program participants" or "account[] for all relevant impacts of cutting off funding to programs already in place"). Indeed, Defendants appear to be acting in order to accomplish, not avoid, that damage. *See* Exs. 1, 24.

*Fourth,* Defendants also have failed to explain any basis for the particular conditions they have imposed on Harvard, nor have they provided any basis for their extraordinary sweep. The April 3 Letter listed nine broad demands for "immediate" compliance but did not provide a factual

or evidentiary basis to support *any* of those demands. Ex. 10. Nor did the letter even attempt to explain how those demands would bring Harvard into compliance with Title VI—or whether the demands had any connection to Title VI compliance at all. *Cf.* 45 C.F.R. § 80.10(f) (*after* full Title VI hearing procedure is completed, agencies can condition future federal funding on the recipient having "correct[ed] its noncompliance" through means "consistent with," and that "will effectuate the purposes of," Title VI).

For instance, Defendants' April 3 Letter demanded that Harvard "adopt and implement merit-based admissions policies," but explained neither what changes were required, nor how such reform would address any issues under Title VI. Ex. 5. The letter also failed to acknowledge Harvard's recent actions following the Supreme Court's decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023), including ensuring that those who review admissions applications do not have access to applicants' answers to questions about race and ethnicity. The letter demanded "necessary changes" to "[p]rograms and departments that fuel antisemitic harassment" to "improve viewpoint diversity," Ex. 7. at 1, but did not explain which programs or departments it took issue with, nor did it acknowledge Harvard's recent actions following the settlement of two lawsuits alleging antisemitism, including providing additional resources to support the study of antisemitism and hosting an annual academic symposium on the topic. The letter demanded Harvard "shutter" its "DEI programs" without any explanation of which programs qualify as "DEI" or any reasoning for why Harvard must shutter them. *Id.* at 2. The same criticism applies to each and every one of the demanded actions. This is not reasoned decision-making; it is arbitrary abuse of the government's power.

### 3.    Defendants' Actions Are Final Agency Action

Defendants' actions constitute final agency action pursuant to 5 U.S.C. § 704 because their investigation and review of Harvard's federal funding marks the culmination of Defendants'

decision-making process that Harvard's funding must be discontinued unless the preconditions listed in their April 3 Letter are met. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (establishing the APA's test for finality). Moreover, the April 3 Letter is an action "refusing to … continue financial assistance" upon a finding of Title VI noncompliance, 42 U.S.C. § 2000d-2, unless Harvard acquiesces to Defendants' demands. Defendants have already summarily cut hundreds of millions of dollars to Columbia and other universities and are threatening, in Defendant Terrell's words, to "bankrupt" Harvard in exactly the same manner, Compl. ¶¶ 61-62, if it does not comply with Defendants' conditions. Defendants' letter demanded "immediate" compliance. *Cf. Ciba-Geigy Corp. v. U.S.E.P.A.*, 801 F.2d 430, 437 (D.C. Cir. 1986) (letter that "emphatically required … 'immediate compliance'" was final agency action); *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149-51 (1967) (similar). *See also U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 599-600 (2016) (emphasizing the Court's "pragmatic" approach to finality, and holding that finality is satisfied even if the agency order lacks legal authority where it warns regulated parties that they risk significant legal penalties if they do not comply); *cf. Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1289-90 (D.C. Cir. 2016) (finding finality where the "writing is on the wall" because the agency "made abundantly clear" what its permitting practice would be).

### B.  Defendants' Actions Violate the Separation of Powers and the Spending Clause and Are *Ultra Vires*

Defendants' actions also violate the Constitution's separation of powers and are *ultra vires*. Congress exercised its Article I legislative and spending authority to authorize the federal grants and contracts that Defendants imminently will cancel if Harvard does not comply with Defendants' sweeping demands. None of the funds received by Harvard have a congressionally authorized condition requiring them to comply with any of those demands, and Defendants failure to follow

the procedures set out in Title VI, as set out in Arg.II.A.1 *supra*, mean they cannot justify their actions as an exercise of authority under that statute.

The Constitution vests the spending power, including the authority to place conditions on federal spending, in Congress. U.S. Const., art. I. The Executive branch has no constitutional power to unilaterally enact, amend, or repeal parts of duly enacted statutes, including spending statutes. *Clinton v. City of New York*, 524 U.S. 417, 438-39 (1998). Rather, the President must "take Care that the Laws be faithfully executed." U.S. Const., art. II § 3; *cf. Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 613 (1838). An "agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

Thus, Defendants may not withhold funds in a manner, or to an extent, unauthorized by Congress. *See City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) ("Absent congressional authorization, [an agency] may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals [without violating the separation of powers]."); *cf. Glazer Const. Co. v. United States*, 50 F. Supp. 2d 85, 95 (D. Mass. 1999) ("There would be serious separation of powers concerns if an executive official … promulgated regulations affording discretion where Congress intended that there be none."). Congress exercised its spending power to authorize the federal grants and contracts that Defendants imminently will cancel. Congress also exercised its authority to adopt Title VI's procedural and substantive requirements for termination of federal financial assistance. *Supra* Arg.II.A.1. No other statute or provision of the Constitution authorizes any funding withdrawal.

Defendants similarly lack any statutory or constitutional authority to dictate that federal funding will be canceled or not renewed if Harvard does not comply with Defendants' demands in

the April 3 Letter. While "Title VI invokes Congress's power under the Spending Clause," the "legitimacy" of conditions attached to federal action under this power "rests on whether the [recipient] voluntarily and knowingly accepts the terms" imposed on it. *Barnes v. Gorman*, 536 U.S. 181, 185-86 (2002); *see Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022); *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 584 (spending power "does not include" the power to "surpris[e]" funding recipients "with post-acceptance or 'retroactive' conditions"). Harvard and Plaintiffs' members agreed to comply with Title VI when they accepted federal funding. They did not agree that the Executive branch could suddenly impose sweeping and invasive new demands like those listed in the April 3 Letter. Defendants' actions exceed the federal government's power by retroactively rewriting the funding terms that Harvard and Plaintiffs' members had accepted, casting aside the settled understandings on which funding recipients have relied in structuring their operations.

Defendant's imposition of these new conditions additionally constitutes coercion prohibited by the Spending Clause because Harvard as a practical matter has no choice but to accede to them. Defendants' overt threat of crippling economic punishment goes far beyond the "relatively mild encouragement" permitted under the Spending Clause and amounts to impermissible "economic dragooning" in violation of the Constitution. *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 581-82. Government research grants make up about 11 percent of Harvard's total operating revenue, more than the proportion of threatened funding the Supreme Court held to be impermissibly coercive in *NFIB*. *See* Ex. 8; *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 582 (threatened loss of over 10% of budget leaves recipient with "no real option but to acquiesce"). Defendants' demands seek to dramatically "transform" the relationship between the federal government and Harvard,

effectuating "a shift in kind, not merely degree." *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 583-84. The Spending Clause bars such "post-acceptance" coercion. *Id.* at 584.

Defendants' actions thus constitute an unconstitutional usurpation of Congress's spending power, an unconstitutional effort to amend Congressional appropriations by attaching conditions not adopted by Congress, and a violation of the separation of powers. "When an executive acts *ultra vires*," as is the case here, "courts are normally available to reestablish the limits on his authority." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (quotation omitted); *see Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 27 (2015) (federal courts have authority to enjoin "violations of federal law by federal officials").

### C.    Defendants' Actions Violate the First Amendment

There are three independent reasons that Defendants' actions violate the First Amendment, any one of which is sufficient to establish likelihood of success on the merits.

#### 1.    Defendants' Coercion of Harvard to Suppress the Speech, Association, and Academic Freedom of Others Is Unconstitutional

Last year, the Supreme Court unanimously affirmed that a "government official cannot do indirectly what she is barred from doing directly: A government official cannot coerce a private party to punish or suppress disfavored speech on her behalf." *Vullo*, 602 U.S. at 190. Yet that is what Defendants have done by leveraging billions of dollars in federal funding to force Harvard to acquiesce to demands that will suppress core First Amendment rights. *See Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 603 (1967) ("academic freedom ... is of transcendent value to all of us and … is therefore a special concern of the First Amendment").

The government "violate[s] the First Amendment through coercion of a third party" by engaging in "conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress … speech." *Vullo*, 602 U.S. at 191;

*see also Dube v. State Univ. of New York*, 900 F.2d 587, 598 (2d Cir. 1990)("[F]or decades it has been clearly established that the First Amendment tolerates neither laws nor other means of coercion, persuasion or intimidation 'that cast a pall of orthodoxy' over the free exchange of ideas in the classroom" (quoting *Keyishian*, 385 U.S. at 603)).

Defendants' announcement of an "investigation" and "review" that declared *all* federal funding in jeopardy if Harvard did not immediately accede to Defendants' demands conveyed a threat of adverse government action. Ex. 5; *see also* Ex. 7. That threat is especially acute given that Defendants summarily cut $400 million of funding to Columbia University in a nearly identical sequence of events and more recently have been reported to have summarily cut funding to Cornell and Northwestern Universities. Exs. 19-20. Lest there be any doubt, President Trump has explicitly threatened that "All Federal Funding will STOP" if universities like Harvard continued to "allow[] illegal protests" on private campuses or did not ban masks—both policies implicated in the specific demands made of Harvard. Ex. 22. It is hard to imagine a more coercive directive than a summary cutoff of hundreds of millions, if not billions, of dollars in federal funding followed by a demand from the highest levels of the Executive branch to immediately take specified actions as "preconditions" for any continued federal funding, directed at an institution that relies on $9 billion in federal funds.

Plainly Defendants' actions were directed squarely at suppressing First Amendment rights. The April 3 demands are directed at restricting scholarship, protest, association, and academic independence by: (a) shuttering or imposing changes on programs perceived to promote disfavored viewpoints; (b) disciplining students and student groups who participated in disfavored speech or expressive activity; (c) prohibiting anonymous speech through a ban on facial coverings; (d) demanding new time, place, and manner restrictions on demonstrations; and (e) implementing

undefined "admissions reform" and "hiring reform," whose only relevance to Defendants' investigation could be to alter the alleged "promotion of divisive ideologies" referenced in Defendants' announcement of their investigation. Ex. 7. Each demand infringes on "'the four essential freedoms' of a university," making the government the unconstitutional regulator of "who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring).

Each demand also punishes or suppresses the constitutionally protected activities of Plaintiffs' members. Plaintiffs and their members are experiencing the coercive effects of Defendants' actions. *See supra* Bkgr.B-D. To provide only one example: academics and researchers have responded to this threat by altering their scholarship, *see* Ex. 29 ¶ 22; Ex. 26 ¶ 14; Ex. 17 ¶ 34, and academic scholarship is core protected speech under the First Amendment. *See Heim v. Daniel*, 81 F.4th 212, 229 (2d Cir. 2023) (recognizing special First Amendment protections for academic scholarship because it "serves a broad public purpose" (cleaned up)).

Although it is clear that Defendants are, in fact, motivated by an unconstitutional desire to suppress particular viewpoints, Defendants' coercive actions would violate the First Amendment even if they were motivated by a desire to enforce Title VI. In *Bantam Books, Inc. v. Sullivan*, the Supreme Court held that a commission that threatened booksellers for distributing what it believed to be obscenity violated the First Amendment even though "obscenity is not within the area of constitutionally protected speech." 372 U.S. 58, 65 (1963). The Court found that booksellers would likely self-censor out of fear, cutting courts out of determining whether targeted material was actually unprotected. *Id.* at 69-71. Likewise, even if Defendants here sought only to target unlawful conduct, their efforts to leverage billions of dollars to coerce Harvard in service of that goal are unconstitutional. The enormous pressure Defendants' exercise of its financial leverage exerts on

Harvard exemplifies "the hazards to protected freedoms" caused by systems of "informal censorship." *Id.* at 70.

### 2. Defendants' April 3 Demands Unconstitutionally Condition Federal Funding on the Forfeiture of First Amendment Rights

"[T]he government may not place a condition on the receipt of a benefit or subsidy that infringes upon the recipient's constitutionally protected rights, even if the government has no obligation to offer the benefit in the first instance." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* ("*Open Soc'y*"), 570 U.S. 205, 212 (2013); *see also Perry v. Sindermann*, 408 U.S. 593, 597 (1972). The government may "define the limits of [a] government spending program," but it may not impose "conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *Open Soc'y*, 570 U.S. at 214-15.

The conditions imposed by the April 3 Letter require either compelled speech or a forfeiture of First Amendment rights. *See supra* Arg.I.C.1. Defendants have demanded that Harvard directly suppress speech, scholarship, and association by making continued funding contingent on shuttering disfavored programs, punishing disfavored speech, reorienting admissions and hiring around government preferences, banning anonymous speech, and enacting new restrictions on public protest and on hosted speech—requiring the university to forfeit its own right to determine how best to strike a balance between competing interests when serving as a forum for speech and debate and harming Plaintiffs' members as a result.[3] But the government may not "compel[] a grant recipient to adopt a particular belief as a condition of funding"—such conditions by their "very nature affect protected conduct outside the scope of the federally funded

---

[3] The First Amendment protects the right to host, or decline to host, different types of speech depending on the host's preferred viewpoints. *See Moody v. NetChoice LLC*, 603 U.S. 707, 740-41 (2024).

program." *Open Soc'y*, 570 U.S. at 218 (quotations omitted). Defendants' use of funding as a cudgel to compel speech and suppress expression thus violates the unconstitutional conditions doctrine.

### 3. Defendants' Actions Unconstitutionally Target Protected Expression Based on Viewpoint

Defendants' actions also constitute unlawful viewpoint discrimination. "Ideologically driven attempts to suppress a particular point of view are presumptively unconstitutional." *Rosenberger v. Rectors & Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995). That maxim holds "[e]specially" true where government action "suggests an attempt to give one side of a debatable public question an advantage in expressing its views to the people." *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 785-86 (1978). Even when regulating unprotected expression, "[t]he government may not regulate … based on hostility—or favoritism—towards the underlying message expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992).

Defendants' public statements demonstrate their intent to target Harvard because it is perceived as "left" or "Marxist," Ex. 1, and is allegedly "promoting divisive ideologies," Ex. 5. It has also demonstrated an intent to target certain kinds of protests and speech on Harvard's campus, including the speech of Plaintiffs and their members. Ex. 22. That is unconstitutional. *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (noting "bedrock principle" that "government may not prohibit the expression of an idea simply because society finds the idea itself offensive"). Defendants' subsequent demands targeted specific academic departments for "shuttering" or restructuring. Ex. 7. Plaintiffs' affirmations further demonstrate the viewpoint-based targeting of Defendants' actions. Exs. 17-18. Defendants' efforts to suppress those viewpoints violate the First Amendment and should be immediately enjoined.

### D.    Defendants' Actions Violate Due Process

Defendants' actions violate the Fifth Amendment's guarantee of due process. Specifically, Defendants' actions are void for vagueness because Defendants issued sanctions and demands that failed to provide Harvard or Plaintiffs' members with fair notice of what conduct is forbidden or required, and that invite arbitrary and unpredictable enforcement. *See F.C.C. v. Fox Television Stations*, 567 U.S. 239, 253 (2012) ("[P]recision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way."). Defendants failed to provide any constitutionally adequate basis for threatening and imminently cancelling federal funding, relying entirely on unexplained assertions regarding a failure to protect students and faculty from antisemitism and other unspecified violations of Titles VI and VII. *See* Ex. 7. Their "reforms" preconditioning the non-cancellation of federal funding (a concept unmoored from Title VI law or procedure) established no clear standards for compliance (such as "admissions reform"). *See id.* Defendants thus provided no constitutionally adequate notice regarding the grounds on which funding had been revoked or would be subject to revocation in the future. *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) ("Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.") (quotation and alteration omitted). The vagueness of Defendants' actions is particularly concerning because they suppress protected speech, as explained above. *Fox Television*, 567 U.S. at 253-54 (vagueness doctrine must be applied rigorously "[w]hen speech is involved … to ensure that ambiguity does not chill protected speech.").

### III.    Defendants' Actions Are Already Causing Irreparable Harm and the Imminent Cancellation of Harvard's Federal Funding Risks Even Deeper Harm

Defendants' unlawful investigation and review of Harvard's federal funding, and the specter of Harvard following in the wake of Columbia University by acquiescing to Defendants'

unlawful demands, are already causing irreparable harm to Plaintiffs and their members. *See supra* Bkgr.A-B. Failure to enjoin Defendants' actions would lead to even more devastating consequences. Harvard University as a whole—and Plaintiffs' members specifically—are entirely reliant on federal funding. Ex. 9. Cuts of hundreds of millions of dollars like the ones Defendants have imposed on other universities would devastate the critical scientific research that Plaintiffs' members have engaged in, including forcing them to abandon long-time projects. Ex. 28. These injuries are beyond remediation, including because of disruption to ongoing research and other programs; there is no "possibility [of] adequate compensatory or other corrective relief … at a later date." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quotation omitted). Thus, substantial harms have already begun to manifest, will continue to accumulate in the absence of an injunction, and are not adequately compensable by money damages. *See Me. Forest Prods. Council v. Cormier*, 586 F. Supp. 3d 22, 63 (D. Me. 2022).

In addition, Plaintiffs and their members are suffering and will continue to suffer irreparable harm from the impairment of free speech, association and academic freedom set out in the declarations of Plaintiffs and their members and discussed in Bkgr.A-B, *supra*. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (citing *New York Times Co. v. United States*, 403 U.S. 713 (1971); *see also Am. C.L. Union Fund of Michigan v. Livingston Cnty.*, 796 F.3d 636, 649 (6th Cir. 2015) ("[E]ven minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief" (citation omitted)).

Without urgent intervention by the Court, further extraordinary harm is very "likely" to occur. *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 22-23 (2008); *see also Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Indeed, it is almost certain: as established in Bkgr.A,

*supra*, if the Court does not restrain Defendants from cancelling Harvard's federal funding and enforcing its mandatory preconditions to funding, there is no question that they will do so. The only question is whether they will do both, an uncertainty that speaks to the magnitude of irreparable harm but not its existence.

## IV.    The Balance of Equities and Public Interest Support a TRO

The balance of equities and public interest also strongly favor preliminary relief. "[T]here is substantial public interest in having governmental agencies abide by the federal laws." *Massachusetts v. Nat'l Insts. of Health*, 2025 WL 702163, at *32 (D. Mass. Mar. 5, 2025) (quotation omitted).

"[T]he government has no legitimate interest in pursuing unconstitutional agency action; it is always in the public interest to prevent the violation of a party's constitutional rights." *Doe v. Trump*, 2025 WL 485070, at *14 (D. Mass. Feb. 13, 2025) (quotation omitted); *see also TikTok Inc. v. Trump*, 507 F.Supp.3d 92, 115 (D.D.C. 2020) (government "cannot suffer harm from an injunction that merely ends an unlawful practice." (quotation omitted)).

The public also has a strong interest in the continuance of robust scientific and medical research at one of America's leading research institutions. The public has an especially strong interest in seeing to fruition the investments of public monies already committed to multi-year projects that will now not be completed absent injunctive relief. *See, e.g.*, Exs. 26-29; *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 87 (2d Cir. 2020) (preliminary injunction where challenged rule would "likely result in '[w]orse health outcomes … and [r]educed productivity and educational attainment'"); *see also Massachusetts v. Nat'l Insts. of Health*, 2025 WL 702163, at *35 ("there is a noteworthy factor of judicial economy and efficiency that likewise favors a universal solution to the current dilemma [of the lawfulness of agency action]."). No public interest is served by allowing continued violations of Title VI, the APA, and the

Constitution.

## **CONCLUSION**

For the forgoing reasons the Court should grant Plaintiffs' motion for a TRO.

Dated:    April 11, 2025                    Respectfully submitted,

                                    By:    /s/ Daniel H. Silverman

Philippe Z. Selendy*                    Daniel H. Silverman (BBO# 704387)
Sean P. Baldwin*                        COHEN MILSTEIN SELLERS & TOLL PLLC
Corey Stoughton*                        769 Centre Street
Julie Singer*                           Suite 207
Hannah R. Miles*                        Boston, MA 02130
SELENDY GAY PLLC                        (617) 858-1990
1290 Avenue of the Americas 20th Floor  dsilverman@cohenmilstein.com
New York, NY  10104
Tel: 212-390-9000                       Joseph M. Sellers*
pselendy@selendygay.com                 Benjamin D. Brown*
sbaldwin@selendygay.com                 Phoebe M. Wolfe*
cstoughton@selendygay.com               Margaret (Emmy) Wydman*
jsinger@selendygay.com                  COHEN MILSTEIN SELLERS & TOLL PLLC
hmiles@selendygay.com                   1100 New York Ave NW, 8th Floor
                                        Washington, DC 20005
**\*** PHV Application Forthcoming      (202) 408-4600
                                        jsellers@cohenmilstein.com
                                        bbrown@cohenmilstein.com
                                        pwolfe@cohenmilstein.com
                                        ewydman@cohenmilstein.com


                                        * PHV Application Forthcoming


                                        *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the CM/ECF system will be sent by certified mail on April 14, 2025 to the United States attorney for Massachusetts, the civil-process clerk at the United States attorney's office, and to the Attorney General of the United States at Washington, D.C, pursuant to Federal Rule of Civil Procedure 4(i).

<u>/s/ *Daniel Silverman*</u>
Daniel Silverman