# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS–HARVARD
FACULTY CHAPTER, AMERICAN
ASSOCIATION OF UNIVERSITY
PROFESSORS, and INTERNATIONAL
UNION, UNITED AUTOMOBILE,
AEROSPACE AND AGRICULTURAL
IMPLEMENT WORKERS OF AMERICA,

                      Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF
JUSTICE et al.

                    Defendants.

Case No. 1:25-cv-10910

---

## AMENDED COMPLAINT

Plaintiffs American Association of University Professors–Harvard Faculty Chapter ("AAUP-Harvard"), American Association of University Professors ("AAUP"), and International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") (collectively, "Plaintiffs"), through their attorneys, Selendy Gay PLLC and Cohen Milstein Sellers & Toll PLLC, for their complaint against the United States Department of Justice ("DOJ"); Pamela Bondi, in her official capacity as the Attorney General; Leo Terrell, in his official capacity as Senior Counsel to the Assistant Attorney General for Civil Rights and head of the DOJ Task Force to Combat Anti-Semitism; the United States Department of Education ("ED"); Linda McMahon, in her official capacity as the Secretary of Education; Craig Trainor, in his official capacity as Acting Assistant Secretary for the Office for Civil Rights, ED; Thomas E. Wheeler, in his official capacity as Acting General Counsel of the ED; the United States Department of Health and Human Services ("HHS"); Robert F. Kennedy, Jr., in his official capacity as the Secretary of HHS; Sean

R. Keveney, in his official capacity as Acting General Counsel of HHS; National Institutes of Health ("NIH"); Jayanta Bhattacharya, in his official capacity as the Director of NIH; the United States General Services Administration ("GSA"); Stephen Ehikian, in his official capacity as Acting Administrator of GSA; and Josh Gruenbaum, in his official capacity as Commissioner of the Federal Acquisition Service (collectively, "Defendants"), allege as follows:

## NATURE OF ACTION

1.    This action challenges the Trump administration's unlawful and unprecedented misuse of federal funding and civil rights enforcement authority to undermine academic freedom and free speech on a university campus.

2.    On March 31, 2025, after several months of threats and posturing, Defendants announced that they were "reviewing" Harvard's federal funding for asserted but unspecified failures to address antisemitism (the "March 31 Announcement"). In a letter to Harvard three days later, on April 3, Defendants demanded that Harvard adopt a list of vague yet sweeping programmatic and structural changes to university management, operations, and curriculum (the "April 3 Letter"). Defendants described these changes as "non-exhaustive" preconditions for Harvard "to remain a responsible recipient of federal taxpayer dollars" valued at approximately $9 billion. On April 11, Defendants sent Harvard another letter expanding on the April 3 demands, imposing additional, and even more extreme, demands (the "April 11 Letter").

3.    In a letter sent on April 14, Harvard asserted that it would not accept the demands made in the April 11 Letter (the "April 14 Response"). Hours later, the Trump administration announced it was freezing more than $2 billion in federal funding to Harvard. Since then, many Harvard employees working on federally sponsored projects have received orders to stop working or terminating their grants. Many more have had their work disrupted or damaged, in some cases irreparably so, because of Defendants' implementation of the funding freeze and promise of further

large-scale funding freezes. Since at least April 24, the NIH has refused to disburse federal funds to Harvard, threatening research vital to the public health of hundreds of millions of Americans and billions of people around the world.

4.     Harvard, like all American universities, depends on federal funding to conduct its academic research. This funding is essential to the global preeminence of research universities like Harvard.

5.     Actual and threatened funding freezes like those made by the Trump administration are an existential "gun to the head" for a university. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012). They also hold hostage billions of dollars in congressional appropriations that are crucial to ensuring the American university system remains a global leader in scientific, medical, and technological research. Defendants insist they are enforcing Title VI of the Civil Rights Act— the anti-discrimination law covering institutions that receive federal funds. But under Title VI and its implementing regulations, the government may terminate funding *only* after complying with several specific steps, including issuing findings of noncompliance; making an effort to obtain voluntary compliance and determining that voluntary compliance is impossible; giving notice to both the university and Congress; providing a hearing; and ensuring that any changes demanded as a condition of avoiding termination are tailored to the findings of noncompliance. 42 U.S.C. § 2000d *et seq.* These procedures exist because Congress recognized that allowing federal agencies to hold funding hostage, or to cancel it cavalierly, would give them dangerously broad power in a system in which institutions depend so heavily upon federal funding.

6.     Defendants have not followed any of these procedures. Instead, Defendants summarily froze billions of dollars in federal funding to Harvard, all without any meaningful process or any specific finding of wrongdoing, because Harvard refused to implement the Trump

administration's demands to overhaul the University's governance and leadership, academic programs, admissions system, hiring process, and discipline system—with the promise of more onerous conditions on funding yet to come. These sweeping demands are not remedies targeting the causes of any determination of noncompliance with federal law. Instead, they overtly seek to impose on Harvard University political views and policy preferences advanced by the Trump administration and commit the University to punishing disfavored speech.

7.      These tactics amount to exploiting Title VI to coerce universities into undermining free speech and academic inquiry in service of the government's political or policy preferences. Just last year the Supreme Court unanimously reaffirmed that such coercion is unconstitutional. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024).

8.      Defendants' actions against Harvard follow a playbook that has already succeeded in undermining free speech and academic freedom in America. In March, Defendants launched a similar investigation into Columbia University and, shortly thereafter, summarily terminated over $400 million in federal contracts while threatening billions more. Under immense financial pressure, Columbia acceded to the Trump administration's demands. A remarkable component of that concession was Columbia's agreement to "[e]xpand[] … intellectual diversity" as defined by the Trump administration, alter its procedures for hiring faculty and disciplining students according to the administration's policy preference, hire a new internal security force with the power to remove and arrest individuals from campus, and overhaul its Middle Eastern studies department, all without any formal finding of misconduct. Despite its voluntary cooperation, as of April 10, the Trump administration had been reported to be seeking further demands from Columbia in the form of a consent decree and the NIH has further frozen all of Columbia's grant funding without any notice. The Trump administration has also frozen over $1 billion in funding for Cornell University and

$790 million for Northwestern University with an even more shocking lack of process, not even purporting to issue communications providing notice under Title VI or any other legal authority.

9.    The Trump administration has made clear in public remarks that its intent in freezing Harvard's federal funding is to suppress academic freedom, set American research back, and make an example of venerated institutions with which the Trump administration disagrees.

10.    Defendants' unlawful actions have already caused severe and irreparable harm by halting academic research and inquiry at Harvard, including in areas that have no relation whatsoever to charges of antisemitism or other civil rights violations.

11.    Defendants' actions also create, by design, a pervasive climate of fear and self-censorship for Plaintiffs and their members. Despite Harvard's celebrated public stance rejecting Defendants' demands, Harvard has already been coerced into acceding to some of those demands and into restricting academic freedom and punishing disfavored speech on campus. To name just a few examples of the actions Harvard has taken after the April 3 and April 11 Letters: Harvard has closed its DEI office and retasked its former DEI officials to work on different institutional priorities, and centralized student discipline for inter-school disciplinary matters in a newly empowered central body convened by the Office of the University President—all actions that closely mirror the demands Defendants made in their April 3 and April 11 Letters. Even before the April 3 and April 11 Letters themselves, Harvard fired the leadership of a controversial University program as an early concession to Trump administration demands.

12.    Plaintiffs' members have already been—and will continue to be—harmed by actual and threatened funding freezes. AAUP–Harvard members and UAW members have been forced to delay their research and halt their experiments midstream. If the funding freezes continue, these members will have to close their labs, dismiss staff, and terminate their studies, resulting in the lost

value of essential research. The funding freeze and threats of future cuts also directly harm graduate student workers and postdoctoral scholars whose tuition and living costs are largely sponsored by federal grants. Losing their funding will delay or entirely prohibit members from being able to complete their thesis and dissertation research, either slowing the timeline to degree completion or causing some members to reconsider their projects or even drop out of their programs.

13.    "Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and ... is therefore a special concern of the First Amendment." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967). "To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). Our country's greatness depends in meaningful part upon the continued independence and intellectual freedom of its universities and colleges. The Court should act to ensure free speech and academic freedom by enjoining Defendants' acts and declaring them unlawful.

## THE PARTIES

### A.    Plaintiffs

14.    Plaintiff American Association of University Professors–Harvard Faculty Chapter, founded in April 2024, is a nonprofit membership association of faculty across Harvard University's many departments and schools and a chapter of the AAUP. AAUP–Harvard advocates for meaningful and democratic shared governance, academic freedom, and the economic security of those who perform the institution's core instructional work. AAUP–Harvard is headquartered in Cambridge, Massachusetts.

15.    Plaintiff American Association of University Professors is a membership association and labor union of faculty and academic professionals throughout the country organized under Section 501(c)(6) of the Internal Revenue Code. AAUP is headquartered in Washington, D.C.

6

Founded in 1915, AAUP remains the nation's leading organization primarily dedicated to protecting academic freedom and shared governance in higher education. AAUP has approximately 44,000 members on college and university campuses across the country, including a large number of faculty members who rely on federal grants to support their work across a range of academic disciplines.

16.     AAUP's mission is to advance academic freedom and shared governance of higher education institutions; to define fundamental professional values and standards for higher education; to promote the economic security of faculty, academic professionals, graduate students, postdoctoral fellows, and all those engaged in teaching and research in higher education; to help the higher education community organize to make its goals a reality; and to ensure higher education's contribution to the common good. AAUP has helped to shape American higher education by developing the standards and procedures that maintain quality in education and academic freedom in this country's colleges and universities.

17.     Plaintiff the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America is one of the largest and most diverse unions in North America, with members in the United States, Canada, and Puerto Rico, and in virtually every sector of the economy. From its earliest days, the UAW has been a leader in the struggle to secure economic and social justice for all people. It has a rich history of supporting inclusion, equity, and diversity in the higher education sector and in all workplaces. The UAW has nearly 1,000,000 active and retired members and represents approximately 120,000 workers in higher education—graduate students, postdoctoral scientists, researchers, university staff, and faculty—at institutions across the country including Northeastern University, Wellesley College, University of Southern California, University of California, California State University, University of Washington, Columbia University,

New York University, Harvard University, University of Pennsylvania, Princeton University, and Worcester Polytechnic Institute, among many others. Tens of thousands of UAW members rely on federal grant funding for their jobs and training.

18.    Harvard's UAW-affiliated bargaining units include the Harvard Graduate Students Union ("HGSU–UAW") and Harvard Academic Workers ("HAW–UAW"). HGSU–UAW represents approximately 5,400 academic workers across Harvard, including teaching fellows, course assistants, and graduate research assistants. HAW–UAW represents more than 3,300 non-student academic workers, including postdoctoral researchers, lecturers, teaching assistants, research scientists, and others who do similar work at The Faculty of Arts and Sciences, Harvard Medical School, and the Harvard Divinity School. Many members of HGSU–UAW and HAW–UAW hold positions funded by the federal government, such as research grants from the National Science Foundation ("NSF") or NIH.

**B.    Defendants**

19.    Defendant the United States Department of Justice is a federal agency headquartered in Washington, D.C. The DOJ is an agency within the meaning of the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 551(1), 701(b)(1).

20.    Defendant Pamela Bondi is sued in her official capacity as the United States Attorney General.

21.    Defendant Leo Terrell is sued in his official capacity as Senior Counsel to the Assistant Attorney General for Civil Rights and head of the DOJ Task Force to Combat Anti-Semitism.

22.    Defendant the United States Department of Health and Human Services is a federal agency headquartered in Washington, D.C. HHS is an agency within the meaning of the APA. 5 U.S.C. §§ 551(1), 701(b)(1).

8

23.    Defendant Robert F. Kennedy, Jr. is sued in his official capacity as the United States Secretary of HHS.

24.    Defendant Sean R. Keveney is sued in his official capacity as the Acting General Counsel of HHS.

25.    Defendant the National Institutes of Health is a federal agency within HHS and is headquartered in Bethesda, Maryland. NIH is an agency within the meaning of the APA. 5 U.S.C. §§ 551(1), 701(b)(1).

26.    Defendant Jayanta Bhattacharya is sued in his official capacity as the Director of the NIH.

27.    Defendant the United States Department of Education is a federal agency headquartered in Washington, D.C. ED is an agency within the meaning of the APA. 5 U.S.C. §§ 551(1), 701(b)(1).

28.    Defendant Linda McMahon is sued in her official capacity as the United States Secretary of Education.

29.    Defendant Thomas E. Wheeler is sued in his official capacity as Acting General Counsel of the ED.

30.    Defendant Craig Trainor is sued in his official capacity as Acting Assistant Secretary for the Office for Civil Rights, United States Department of Education.

31.    Defendant the United States General Services Administration is a federal agency headquartered in Washington, D.C. GSA is an agency within the meaning of the APA. 5 U.S.C. §§ 551(1), 701(b)(1).

32.    Defendant Stephen Ehikian is sued in his official capacity as Acting Administrator of the GSA.

33.    Defendant Josh Gruenbaum is sued in his official capacity as Commissioner of the Federal Acquisition Service within the GSA.

## JURISDICTION AND VENUE

34.    This action arises under the United States Constitution, 42 U.S.C. § 2000d-2, 42 U.S.C. § 1988, and 5 U.S.C. §§ 702, 706.

35.    This Court has subject matter jurisdiction pursuant to Article III of the United States Constitution and 28 U.S.C. §§ 1331.

36.    Plaintiffs do not seek money damages or an order mandating specific performance of any contract. Instead, they seek an order declaring unlawful and setting aside sweeping agency action taken in violation of Plaintiffs' constitutional rights and rights guaranteed by statute and regulation. Therefore, this Court has jurisdiction over Plaintiffs' claims.

37.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTUAL ALLEGATIONS

**I.    Defendants' Campaign to Undermine Free Speech and Academic Freedom**

38.    President Trump expressly campaigned on a promise to undermine free speech and academic freedom by using federal power to control universities.

39.    President Trump's 2024 campaign website included numerous statements describing his intention to curtail academic freedom and control the viewpoints expressed on campuses.

40.    That website included President Trump's plan "to reclaim our once great educational institutions from the radical Left and Marxist maniacs."[1]

---

[1] *Agenda47: Protecting Students from the Radical Left and Marxist Maniacs Infecting Educational Institutions*, DonaldJTrump.com (July 17, 2023), https://www.donaldjtrump.com/agenda47/agenda47-protecting-students-from-the-radical-left-and-marxist-maniacs-infecting-educational-institutions.

41.     It expressly identified threats to withhold federal funding and extract financial pen-

alties from private universities, specifically "at Harvard," as a means of such control, stating "we

will take the billions and billions of dollars that we will collect by taxing, fining, and suing exces-

sively large private university endowments, and we will then use that money to endow a new insti-

tution called the American Academy."[2]

42.     The President's campaign website also pledged to suppress views contrary to (1) its

preferred narrative with respect to the Israeli-Palestinian conflict, and (2) its preferred narratives

with respect to race and gender—what it vaguely refers to as "diversity, equity, and inclusion," or

"DEI," or sometimes "wokeness."

43.     President Trump's campaign website highlighted that such viewpoints would be

prohibited at the American Academy, stating that "there will be no wokeness or jihadism allowed—

none of that's going to be allowed."[3]

44.     Prior to his appointment as Senior Counsel to the Assistant Attorney General for

Civil Rights and head of the DOJ Task Force to Combat Anti-Semitism, Defendant Terrell prom-

ised that "Harvard will lose much more [funding] effective January 2025" because "America will

no longer fund Jew Hating Schools!"[4] In connection with news reports that President Trump had

tapped Terrell for his federal position, Terrell threatened, "Harvard, I start work next week!"[5]

---

[2]     *Agenda47: The American Academy*, DonaldJTrump.com (Nov. 1, 2023), https://www.donaldjtrump.com/agenda47/agenda47-the-american-academy.
[3]     *Id.*
[4]     Leo Terrell (@TheLeoTerrell), X (Oct. 20, 2024, 3:33PM), https://x.com/TheLeoTerrell /status/1848085166297686207.
[5]     Leo Terrell (@TheLeoTerrell), X (Jan. 14, 2025, 11:19PM), https://x.com/TheLeoTerrell /status/1879382847511052551.

45.    Prior to his election as Vice President, JD Vance stated that "the professors are the enemy"[6] and that "the universities are the enemy."[7] Since becoming Vice President he has praised Hungarian President Victor Orbán's aggressive strategy to make Hungarian universities better reflect Orbán's own ideology.[8]

46.    Hungary[9]—along with its authoritarian counterparts in Turkey[10] and Brazil[11]— has attempted to place universities under the control of the central government.

47.    On January 20, 2025, President Trump signed Executive Order 14151, titled "Ending Radical and Wasteful Government DEI Programs and Preferencing."[12]

48.    Executive Order 14151 states that "'diversity, equity, inclusion, and accessibility' (DEIA)" programs are "illegal and immoral discrimination programs." The order directs "[e]ach agency, department, or commission head" to "terminate, to the maximum extent allowed by law, all ... 'equity-related' grants or contracts."[13]

---

[6] JD Vance, *Nat'l Conservatism Conf., Keynote Address: The Professors Are the Enemy* (Nov. 2, 2021), available at https://www.youtube.com/watch?v=0FR65Cifnhw&embeds_referring_euri=https%3A%2F%2Fnationalconservatism.org%2F&source_ve_path=MjM4NTE.

[7] *Id.*

[8] Rob Dreher, *"I would like to see European elites actually listen to their people for a change": An Interview with J.D. Vance*, The European Conservative (Feb. 22, 2024), https://europeanconservative.com/articles/dreher/i-would-like-to-see-european-elites-actually-listen-to-their-people-for-a-change-an-interview-with-j-d-vance/.

[9] Lydia Gall, *Hungary Continues Attacks on Academic Freedom*, Human Rights Watch (Sept. 3, 2020), https://www.hrw.org/news/2020/09/03/hungary-continues-attacks-academic-freedom.

[10] Muzaffer Kaya, *Turkey's Purge of Critical Academia*, Middle East Rsch. & Info. Project (2018), https://merip.org/2018/12/turkeys-purge-of-critical-academia.

[11] Pedro Salgado, *The Crisis of Brazilian Universities: Higher Education Under Bolsonaro*, Int'l Rsch. Grp. on Authoritarianism & Counter-Strategies (July 21, 2021), https://irgac.org/articles/the-crisis-of-brazilian-universities-higher-education-under-bolsonaro/.

[12] Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025).

[13] *Id.*

49.     On January 21, 2025, President Trump signed Executive Order No. 14173, titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity."[14]

50.     Executive Order 14173 states that "'diversity, equity, and inclusion' (DEI)," and "'diversity, equity, inclusion, and accessibility' (DEIA)" policies are "illegal," "dangerous," and "immoral" and can violate federal civil rights laws. It directs federal agencies to take action "[h]olding Federal contractors and subcontractors responsible for taking 'affirmative action'" against DEI and DEIA policies and directs the heads of all agencies to "take all appropriate action with respect to the operations of their agencies to advance in the private sector the policy of individual initiative, excellence, and hard work," which the Executive Order asserts is inconsistent with "DEIA."[15]

51.     Executive Order 14173 further directs the Attorney General to submit a report "containing recommendations for enforcing Federal civil-rights laws and taking other appropriate measures to encourage the private sector to end illegal discrimination and preferences, including DEI." In addition, the Order states that the Attorney General's report must "contain a proposed strategic enforcement plan" that, relevant here, includes "up to nine potential civil compliance investigations" of institutions including "institutions of higher education with endowments over 1 billion dollars."[16]

52.     Neither Executive Order 14151 nor Executive Order 14173 define the terms "DEI," "DEIA," "diversity," "equity," "inclusion," or "accessibility."

53.     On January 27, 2025, the Office of Management and Budget ("OMB") issued a memorandum requiring all agencies to "temporarily pause all activities related to obligation or

---

[14] Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025).
[15] *Id.*
[16] *Id.*

disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal."[17]

54.    On January 28, 2025, Harvard University announced that the OMB guidance "require[s] a pause on a subset of federally funded research activities implicated in an evolving set of executive orders or through stop work orders or other guidance issued by federal agencies" and promised that "member[s] of our research community" would "receive additional direction."[18]

55.    On January 29, 2025, President Trump signed Executive Order 14188, titled "Additional Measures to Combat Anti-Semitism."[19]

56.    Executive Order 14188 requires the heads of all executive agencies or departments to submit reports identifying all civil and criminal authorities or actions within their jurisdictions "that might be used to curb or combat anti-Semitism, and containing an inventory and analysis of all pending administrative complaints, as of the date of the report, against or involving institutions of higher education alleging civil-rights violations related to or arising from post-October 7, 2023, campus anti-Semitism."[20]

57.    Executive Order 14188 explicitly reaffirmed Executive Order 13899, which President Trump issued on December 11, 2019, during his first term. Executive Order 13899 specifically

---

[17] *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance*, Off. of Mgmt. & Budget (Jan. 27, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/03/M-25-13-Temporary-Pause-to-Review-Agency-Grant-Loan-and-Other-Financial-Assistance-Programs.pdf.

[18] *Emerging Regulations and Legislation*, Harvard University Office of the President (Jan. 28, 2025), https://www.harvard.edu/president/news/2025/emerging-regulations-and-legislation/.

[19] Exec. Order No. 14188, 90 Fed. Reg. 8847 (Jan. 29, 2025).

[20] *Id.*

invokes Title VI enforcement as the means for agencies to combat antisemitism on university campuses.[21]

58.    Executive Order 14188 makes no mention of the First Amendment or the need to protect free speech alongside efforts to eradicate illegal discrimination and harassment.

59.    On February 3, 2025, DOJ announced the creation of a multi-agency "Task Force to Combat Anti-Semitism" ("DOJ Task Force"), led by Defendant Terrell, to carry out the mandate of Executive Order 14188.[22] The DOJ Task Force includes representatives from DOJ, ED, and HHS.

60.    That same day, ED announced Title VI investigations into five private and state universities (Columbia, Northwestern University, Portland State University, the University of California at Berkeley, and the University of Minnesota, Twin Cities) where ED stated that "widespread antisemitic harassment has been reported."[23] The announcement did not point to any specific allegations of antisemitic harassment.

61.    On March 3, 2025, HHS, ED, and GSA announced a "comprehensive review of Columbia University's federal contracts and grants in light of ongoing investigations for potential violations of Title VI of the Civil Rights Act."[24] The announcement did not point to any specific allegations of antisemitic harassment.

---

[21] Exec. Order No. 13899, 84 Fed. Reg. 68779 (Dec. 11, 2019).

[22] Press Release, Off. of Pub. Affs., *Justice Dep't Announces Formation of Task Force to Combat Anti-Semitism*, U.S. Dep't of Just. (Feb. 3, 2025), https://www.justice.gov/opa/pr/justice-department-announces-formation-task-force-combat-anti-semitism.

[23] Press Release, U.S. Dep't of Educ., *U.S. Dep't of Educ. Probes Cases of Antisemitism at Five Univs.*, (Feb. 3, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-probes-cases-of-antisemitism-five-universities.

[24] Press Release, U.S. General Servs. Admin., *HHS, ED, and GSA announce additional measures to end anti-Semitic harassment on college campuses* (Mar. 3, 2025), https://www.gsa.gov/about-us/newsroom/news-releases/hhs-ed-and-gsa-announce-additional-measures-to-end-antisemitic-harassment-03032025.

62.     On March 4, 2025, President Trump posted on Truth Social, "All Federal Funding will STOP for any College, School, or University that allows illegal protests. Agitators will be imprisoned/or permanently sent back to the country from which they came. American students will be permanently expelled or, depending on the crime, arrested. NO MASKS! Thank you for your attention to this matter."[25]

63.     The post did not say how federal officials would distinguish "illegal protests" from protests protected by the First Amendment or how they would identify "agitators" for purposes of implementing the President's policy, nor did it otherwise provide guidance to faculty, students, or administrators seeking to exercise (or to allow others to exercise) First Amendment rights while avoiding the risk of imprisonment, deportation, expulsion, arrest, or loss of "[a]ll" federal funding.

64.     On March 7, 2025—only four days after announcing its review of Columbia's federal funding—DOJ, HHS, ED, and GSA announced the "immediate cancellation of approximately $400 million in federal grants and contracts to Columbia University due to the school's continued inaction in the face of persistent harassment of Jewish students."[26] The announcement stated that these cuts "represent the first round of action and additional cancellations are expected to follow."[27]

65.     Defendants' press release announcing this action stated in no uncertain terms that the measure was intended to send a message "to Columbia and other universities."[28] The March 7

---

[25]    Donald Trump (@realDonaldTrump), Truth Social (Mar. 4, 2025, 7:30AM), https://truthsocial.com/@realDonaldTrump/posts/114104167452161158.

[26] Press Release, *DOJ, HHS, ED, and GSA announce initial cancellation of grants and contracts to Columbia University worth $400 million*, U.S. General Servs. Admin. (Mar. 7, 2025), https://www.gsa.gov/about-us/newsroom/news-releases/doj-hhs-ed-and-gsa-announce-initial-cancellation-of-grants-and-contracts-03072025.

[27] *Id.*

[28] Press Release, U.S. Dep't of Health and Hum. Servs., *DOJ, HHS, ED, and GSA Announce Initial Cancellation of Grants and Contracts to Columbia University Worth $400 Million,* (Mar. 7, 2025), https://www.hhs.gov/about/news/2025/03/07/doj-hhs-ed-gsa-announce-initial-cancellation-grants-contracts-columbia-university-worth-400-million.html.

press release stated, "decisive action by the DOJ, HHS, ED, and GSA to cancel Columbia's grants and contracts serves as a notice to every school and university that receives federal dollars that this Administration will use all the tools at its disposal to protect Jewish students and end anti-Semitism on college campuses."[29]

66.     On or about March 9, 2025, Defendant Terrell stated on Fox News that "We are going to bankrupt these universities. We are going to take away every single federal dollar. That is why we are targeting these universities. The academic system in this country has been hijacked by the left, has been hijacked by the Marxists. They have controlled the mindset of our young people … and we have to put an end to it."[30]

67.     He further stated, "If these universities do not play ball, lawyer up, because the federal government is coming after you." He concluded, "President Trump is going after [the universities] in every aspect … this taskforce is every agency. Homeland Security is involved, the FBI is involved, HHS, the [Education] department, and the Treasury department because we are going to go after their 501(c)(3) status …. This is my number one commitment."[31]

68.     On March 10, Defendants sent letters to Harvard and 59 other universities "warning them of potential enforcement actions if they do not fulfill their obligations under Title VI of the Civil Rights Act to protect Jewish students on campus."[32] The targeted universities include a mix of private and public universities in a total of 24 states and Washington D.C.

---

[29] *Id.*

[30] Mark McMillan, *Leo Terrell with Mark Levin- How we'll defeat antisemitism in the USA*, YouTube (Mar. 9, 2025) https://www.youtube.com/watch?v=NOFIKRr2Sco.

[31] *Id.*

[32] Press Release, *U.S. Department of Education's Office for Civil Rights Sends Letters to 60 Universities Under Investigation for Antisemitic Discrimination and Harassment*, U.S. Dep't of Educ. (Mar. 10, 2025), https://www.ed.gov/about/news/press-release/us-department-of-educations-office-civil-rights-sends-letters-60-universities-under-investigation-antisemitic-discrimination-and-harassment.

69.     Defendants also issued a press release to ensure publicity concerning these letters. The press release explicitly stated that Defendants had "announced the immediate cancellation of $400 million in federal grants and contracts to Columbia University due to the school's continued inaction to protect Jewish students from discrimination."[33]

70.     The clear import of the press release was to threaten Harvard and the other universities who received the letter that they, too, might be subject to "immediate cancelation" of federal grants and contracts, outside of the required Title VI procedures.

71.     On March 10, Harvard issued a public statement acknowledging the "substantial financial uncertainties driven by rapidly shifting federal policies" and instituting "a temporary pause on staff and faculty hiring across the University."[34]

72.     On March 13, 2025, HHS, ED, and GSA sent another letter to Columbia "outlin[ing] immediate next steps that we regard as a precondition for formal negotiations regarding Columbia University's continued financial relationship with the United States government."[35] The letter listed nine demands, including *inter alia* that Columbia impose specific forms of discipline (including "expulsion or multi-year suspension") on students involved in particular protests; restructure its entire student disciplinary system in a centralized manner dictated by the federal government; institute a "mask ban"; place the Middle East, South Asian, and African Studies department into receivership; and overhaul its "undergraduate admissions, international recruiting, and graduate admissions practices."[36]

---

[33] *Id.*

[34] *Financial Stewardship*, Harvard University Office of the President (Mar. 10, 2025)*,* https://www.harvard.edu/president/news/2025/financial-stewardship/.

[35] *Id.*

[36] Letter from J. Gruenbaum to K. Armstrong (Mar. 13, 2025), https://static01.nyt.com/newsgraphics/documenttools/6d3c124d8e20212d/85dec154-full.pdf. The

73.     In a March 19, 2025 interview, Defendant Terrell was asked if it was his "intention" to "get a consent decree where Columbia gets a new law school dean, they get a new president, a new board, a new department of history, a new set of reasonable time, place, and manner regulations for a [sic] speech on campus that ban masks." Terrell answered, "Yes, yes, and yes."[37]

74.     On March 21, 2025, Columbia shared updated policies appearing to give in to nearly all of Defendants' demands.[38]

75.     For example, Defendants demanded that Columbia abolish its independent body responsible for discipline decisions and centralize discipline proceedings. Columbia stated that it would relocate the disciplinary body within the Office of the Provost (who reports to the President), restrict participation to faculty and administrators, institute a "rigorous vetting and conflict review process to ensure objectivity, impartiality, and commitment to following and enforcing our community's rules and policies,"[39] and give the provost final approval over all panel members and appellate deans.

76.     Defendants demanded that Columbia "empower internal law enforcement," including ensuring officers have full authority to arrest and remove "agitators who foster an unsafe or hostile work or study environment or otherwise interfere with classroom instruction or the

---

March 13, 2025 Letter did not say what federal "policy" requires over and above federal law, nor did it allege any specific violations of federal law.
[37] *On Crushing Anti-Semitism on Campus*, Hughniverse Podcast (Mar. 19, 2025), https://hughhewitt.com/leo-terrell-senior-counsel-to-the-attorney-general-for-civil-rights-on-crushing-anti-semitism-on-campus.
[38] *Advancing Our Work to Combat Discrimination, Harassment, and Antisemitism at Columbia*, Columbia Office of the President (Mar. 21, 2025), https://president.columbia.edu/sites/default/files/content/03.21.2025%20Columbia%20-%20FINAL.pdf.
[39] *Id.* at 1

functioning of the university."[40] Columbia announced that it has hired 36 "special officers"—it is unclear whether this is in addition to the 117 public safety officers the University had already hired in the past 16 months—who will "have the ability to remove individuals from campus and/or arrest."[41]

77.    Defendants demanded that Columbia place the Middle East, South Asian, and African Studies department in an "academic receivership" for a "minimum of five years."[42] It is very rare for a university to decide to place an academic department under receivership, and a demand by the federal government that a university place an academic department in receivership is entirely unprecedented. Nevertheless, in response to Defendants' demands, Columbia announced the appointment of a new Senior Vice Provost who will "conduct a thorough review of the portfolio of programs in regional areas across the University, starting immediately with the Middle East. This review will include the Center for Palestine Studies; the Institute for Israel and Jewish Studies; Middle Eastern, South Asian, and African Studies; the Middle East Institute; the Tel Aviv and Amman global hubs; the School of International and Public Affairs Middle East Policy major; and other University programs focused on the Middle East (together, the 'Middle East Programs')."[43] The new Senior Vice Provost will take steps including "ensur[ing] the educational offerings are

---

[40] Letter from J. Gruenbaum to K. Armstrong (Mar. 13, 2025), https://static01.nyt.com/newsgraphics/documenttools/6d3c124d8e20212d/85dec154-full.pdf.

[41] *Advancing Our Work to Combat Discrimination, Harassment, and Antisemitism at Columbia* 2, Columbia Office of the President (Mar. 21, 2025), https://president.columbia.edu/sites/default/files/content/03.21.2025%20Columbia%20-%20FINAL.pdf.

[42] Letter from J. Gruenbaum to K. Armstrong (Mar. 13, 2025), https://static01.nyt.com/newsgraphics/documenttools/6d3c124d8e20212d/85dec154-full.pdf.

[43] *Advancing Our Work to Combat Discrimination, Harassment, and Antisemitism at Columbia* 3, Columbia University Office of the President (Mar. 24, 2025), https://president.columbia.edu/sites/default/files/content/03.21.2025%20Columbia%20-%20FINAL.pdf.

comprehensive and balanced," reviewing "leadership and curriculum," creating a new process for hiring faculty in these programs, reviewing the process for "approving curricular changes," and making recommendations about "necessary changes" and "academic restructuring" to "ensure academic excellence and complementarity" in Columbia's Middle East programs.[44]

78.    Columbia made explicit that it will engineer the ideological balance of speech on campus in response to the federal government's demands. Columbia stated that it will expand "intellectual diversity among faculty."[45] It explained, "Faculty searches have begun and will be expanded to ensure intellectual diversity across our course offerings and scholarship."[46]

79.    Despite all this, Defendants have not stated that Columbia's federal funding will be restored. To the contrary, Defendants stated that "Columbia's compliance with the Task Force's preconditions is only the first step in rehabilitating its relationship with the government, and more importantly, its students and faculty" and only the "first step in the university maintaining a financial relationship with the United States government."[47]

80.    As of the time of filing of this Amended Complaint, Defendants have not reinstated or restored the $400 million in terminated funding and in fact have only continued to take additional coercive actions towards Columbia. The Trump administration is reportedly seeking a consent decree that could extract further concessions and impose active oversight over Columbia's

---

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] Press Release, *HHS, ED, and GSA Respond to Columbia University's Actions to Comply with Joint Task Force Pre-Conditions*, Dep't of Health and Hum. Servs. (Mar. 24, 2025), https://www.hhs.gov/press-room/columbia-comply-anti-semitism-task-force-preconditions-met.html.

implementation of the wide-ranging commitments the university has already made.[48] Defendants have also escalated Columbia's funding freezes, despite its concessions: the NIH has frozen all of Columbia's grants indefinitely and will no longer pay any investigators working on existing NIH projects: researchers will need NIH approval to draw from existing funding.[49] The Trump administration failed to provide Columbia with any notice of these additional cancellations.[50]

81.    On April 3, *The New York Times* reported that the Trump administration had frozen over $1 billion in funding for Cornell University and $790 million for Northwestern University, including federal grants and contracts with the Departments of Agriculture, Defense, Education, and Health and Human Services.[51] This reporting came less than one month after Cornell and Northwestern had been "warn[ed]" in Defendants' March 10 letter "of potential enforcement actions" if they did not fulfill their obligations under Title VI.[52] The information was leaked by U.S. officials, who spoke anonymously about the "unannounced decision."[53]

82.    Cornell confirmed that it "ha[d] not received information that would confirm this figure" but nonetheless "received more than 75 stop work orders from the Department of Defense related to research that is profoundly significant to American national defense, cybersecurity, and

---

[48] Jonah E. Bromwich et al., *Trump May Seek Judicial Oversight of Columbia, Potentially for Years*, N.Y. Times (Apr. 10, 2025), https://www.nytimes.com/2025/04/10/nyregion/columbia-trump-consent-decree.html.

[49] Sara Reardon, *Exclusive: NIH freezes all research grants to Columbia University*, Science (Apr. 9, 2025), https://www.science.org/content/article/nih-freezes-all-research-grants-columbia-university.

[50] *Id.*

[51] Michael C. Bender & Sheryl Gay Stolberg, *Trump Administration Freezes $1 Billion for Cornell and $790 Million for Northwestern, Officials Say*, N. Y. Times (Apr. 8, 2025), https://www.nytimes.com/2025/04/08/us/politics/cornell-northwestern-university-funds-trump.html?smid=nytcore-ios-share&referringSource=articleShare.

[52] *Id.*

[53] *Id.*

health" and was "actively seeking information about federal officials to learn more about the basis for these decisions."[54]

83.    Northwestern officials also first learned of the Trump administration's funding freeze through media reports.[55] Northwestern was unable to confirm the veracity of that reporting until two days after the initial reports,[56] on April 10, when an HHS "spokesperson" confirmed to a local media site that Northwestern's freeze was "underway" because of "federal antisemitism *investigations* into the University."[57] Northwestern "has not received any official notification from the federal government about a large-scale freeze or rationale for such a move."[58]

84.    Shortly after summarily cancelling Columbia University's funding, Defendant Terrell appeared on a podcast in which he stated, "what we did was we basically gave them noticed [sic], and we stopped providing the funding. And I've got news for you. To Harvard, to NYU, to Michigan, same thing's happening to them. It's going to happen, because we're going to look at the numbers of federal dollars, and . . . it totals in the hundreds of millions of dollars. And we're going after them."[59]

---

[54] Michael I. Kotlikoff et al., *Federal research funding*, Cornell University (Apr. 8, 2025), https://statements.cornell.edu/2025/20250408-federal-research-funding.cfm.

[55] Michael Schill et al., *Reports on Federal Funding Freeze*, Northwestern University (Apr. 8, 2025), https://www.northwestern.edu/leadership-notes/2025/reports-on-federal-funding-freeze.html.

[56] Michael Schill et al., *Update on Federal Funding*, Northwestern University (Apr. 10, 2025), https://www.northwestern.edu/leadership-notes/2025/update-on-federal-funding.html.

[57] Isaiah Steinberg and Nineth Kanieski Koso, *HHS cites incidents of antisemitism in confirmation of Northwestern funding freeze while experts question legality*, The Daily Northwestern (Apr. 10, 2025), https://dailynorthwestern.com/2025/04/10/campus/hhs-cites-incidents-of-antisemitism-in-confirmation-of-northwestern-funding-freeze-while-experts-question-legality/ (emphasis added).

[58] Michael Schill et al., *Update on Federal Funding*, Northwestern University (Apr. 10, 2025), https://www.northwestern.edu/leadership-notes/2025/update-on-federal-funding.html.

[59] *On Crushing Anti-Semitism on Campus*, Hughniverse Podcast (Mar. 19, 2025), https://hughhewitt.com/leo-terrell-senior-counsel-to-the-attorney-general-for-civil-rights-on-crushing-anti-semitism-on-campus.

85.      The interviewer later asked, "Who's the next target? I want it to be Harvard, and I want it to be Michigan, and I want it to be UCLA, but I don't get to pick the targets .... Who's the next target?" Defendant Terrell answered, "It's one of those three schools. I can't disclose it right now, because I'll get in trouble. But one of those three schools. I just gave you some breaking news."[60]

86.      Less than two weeks later, Defendants confirmed that the next target was Harvard.

## II.      Defendants' Pretextual Investigation and Unlawful Threat—Ultimately Realized—to Withhold Federal Funding from Harvard

### A.      Defendants' March 31 Announcement, April 3 Letter, and April 11 Letter, and Harvard's Response

87.      On March 31, 2025, Defendants HSS, ED, and GSA announced "a comprehensive review of federal contracts and grants at Harvard University and its affiliates" as "part of the ongoing efforts of the Joint Task Force to Combat Anti-Semitism."[61]

88.      The March 31 Announcement referred to "Harvard's failure to protect students on campus from anti-Semitic discrimination" and stated that the Task Force would "review the more than $255.6 million in grants between Harvard University, its affiliates and the Federal Government" as well as "more than $8.7 billion in multi-year grant commitments to Harvard University and its affiliates to ensure the university is in compliance with federal regulations, including its civil rights responsibilities."[62]

89.      The announcement further criticized Harvard for "promoting divisive ideologies over free inquiry."[63]

_____

[60] *Id.*
[61] Press Release, *HHS, ED, and GSA Initiate Federal Contract and Grant Review of Harvard University*, Dep't of Health and Hum. Servs. (Mar. 31, 2025), https://www.hhs.gov/press-room/task-force-antisemitism-harvard-contracts-grants.html.
[62] *Id*.
[63] *Id.*

90.    The announcement did not specify what it meant by "divisive ideologies" or provide any specific allegations of promoting such ideologies. It was not even clear whether this statement was intended to refer to some aspect of the scope of Defendants' investigation and review.

91.    The announcement did not point to any specific allegations of antisemitic discrimination, nor did it request or advise Harvard of any steps to deter or remedy such discrimination.

92.    Weeks earlier, on February 3, 2025, HHS had launched a Title VI investigation into Harvard, relating to allegations of pro-Palestine messaging worn by some Harvard Medical School students at graduation ceremonies. In a letter notifying Harvard of the investigation, HHS Associate Deputy Director Daniel Shieh wrote that the department initiated the proceedings because of a January 27, 2025 New York Post article that showed students wearing keffiyehs and stoles displaying the Palestinian flag.[64]

93.    HHS gave Harvard Medical School thirty days to provide their account of the protest and actions they took in preparation to prevent discrimination. An HMS spokesperson confirmed that the school had submitted a response addressing "all requests from the Feb. 3 letter" and was "cooperating with the compliance review."[65]

94.    According to the website of ED's Office of Civil Rights ("OCR"), there are two open investigations into Harvard University on the basis of race and national origin discrimination. One of the investigations was opened on July 24, 2023, and the other was opened on February 6,

---

[64] Dhruv T. Patel and Grace E. Yoon, *Health and Human Services Dept. to Investigate Harvard Medical School over Commencement Protests*, Harvard Crimson (Feb. 5, 2025), https://www.thecrimson.com/article/2025/2/5/hhs-investigation-hms-commencement/.

[65] Graham W. Lee and Elise A. Spenner, *Harvard Medical School Submits Documents in Antisemitism Investigation*, Harvard Crimson (Apr. 8, 2025), https://www.thecrimson.com/article/2025/4/8/hms-investigation-docs/.

2024.[66] One of those claims is for national origin discrimination involving religion, and one is for admissions. This data was last updated on January 14, 2025.

95.    Upon information and belief, both of those investigations remain open.

96.    Defendants' March 31 Announcement did not reference these investigations. It is not clear whether or how Defendants' March 31 action or any of the subsequent actions alleged herein relate to any open investigations.

97.    The same day of Defendants March 31 Announcement, Harvard publicly acknowledged "the important goal of combatting antisemitism," and stated that "[u]rgent action and deep resolve are needed to address this serious problem that is growing across America and around the world."[67]

98.    Harvard stated that, over the past fifteen months, it had "devoted considerable effort to addressing antisemitism," including that the University had:

- "[S]trengthened our rules and our approach to disciplining those who violate them."

- "[E]nhanced training and education on antisemitism across our campus and introduced measures to support our Jewish community and ensure student safety and security."

- "[L]aunched programs to promote civil dialogue and respectful disagreement inside and outside the classroom."

- "[A]dopted many other reforms" to "combat antisemitism and to foster a campus culture that includes and supports every member of our community."[68]

---

[66] *Pending Cases Currently Under Investigation at Elementary-Secondary and Post-Secondary Schools*, U.S. Dep't. of Educ., Off. for Civil Rights, https://ocrcas.ed.gov/open-investigations?field_ois_state=All&field_ois_discrimination_statute=700&field_ois_type_of_discrimination=All&items_per_page=1000&field_ois_institution=Harvard+University&field_ois_institution_type=All&field_open_investigation_date_1=&field_open_investigation_date_2=&field_open_investigation_date=&field_open_investigation_date_3= (last updated Jan. 14, 2025).

[67] *Our Resolve*, Harvard University Office of the President (Mar. 31, 2025), https://www.harvard.edu/president/news/2025/our-resolve/.

[68] *Id.*

99.     Three days later, on April 3, 2025, Harvard's President Alan Garber received an e-mail from Defendant Josh Gruenbaum with the subject line "Official Notice: Task Force to Combat Anti-Semitism Letter of Demands to Harvard University." The email stated: "I am sending you an official notice of pre-conditions your institution must comply with in order to be in good standing and continue to be the recipient of federal taxpayer dollars."

100.    The email attached the April 3 Letter to President Garber and "Harvard Corporation Lead Member" Penny Pritzker, outlining "immediate next steps that we regard as necessary for Harvard University's continued financial relationship with the United States government" and list-ing nine demands "that the government views as necessary for Harvard to implement to remain a responsible recipient of federal taxpayer dollars."[69]

101.    The list constituted a broad and eclectic range of vaguely defined provisions, only some of which had any apparent connection to combating antisemitism, including demands to:

- review and make "necessary changes" to unspecified "[p]rograms and departments that fuel antisemitic harassment";

- make unspecified programmatic changes "to address bias, improve viewpoint diversity, and end ideological capture";

- overhaul student discipline, among other things to ensure that "senior administrative leaders are responsible for final decisions";

- enact a "mask ban";

- hold student groups accountable for unspecified "violations of Harvard policy"

- undertake sweeping "[g]overnance and leadership reforms" described only as "mean-ingful" and designed to "empower faculty and administrative leaders who are commit-ted to implementing the changes indicated in this letter";

---

[69]    Letter from Josh Gruenbaum to Alan M. Garber (Apr. 3, 2025), https://s3.documentcloud.org/documents/25879226/april-3-harvard-preconditions-letter.pdf.

- adopt "merit-based admissions policies" and "[m]erit-based hiring reform" without any description of what those polices entail other than an additional demand to "cease all preferences based on race, color, or national origin";

- "shutter" all "DEI programs," which Defendants allege "teach students, faculty, staff, and leadership to make snap judgments about each other based on crude race and identity stereotypes, which fuels division and hatred based on race, color, national origin, and other protected identity characteristics" without specifying what programs constitute "DEI programs";

- "cooperate with law enforcement to ensure student safety" without further elaboration; and

- "commit to full cooperation with DHS," and "make organizational changes as necessary to enable full compliance."

102. The April 3 Letter stated that "Harvard University, however, has fundamentally failed to protect American students and faculty from antisemitic violence and harassment in addition to other alleged violations of Title VI and Title VII of the Civil Rights Act of 1964."

103. The letter did not point to any specific allegations of antisemitic violence or harassment and made no findings relating to any such allegations.

104. The April 3 Letter did not provide any constitutional, statutory, or regulatory authority for the government's imposition of its specified conditions on a private university. It did not issue any factual findings or explain whether or how implementation of any of the demanded actions would deter or remedy antisemitic harassment or any "other alleged violations" of Title VI or Title VII. Nor did it address whether there were less intrusive means of ensuring compliance with those laws.

105. The letter did not reference the HHS investigation opened on February 4 or any other OCR investigation. Nor did it purport to make any findings related to that investigation or explain whether or how any of the letter's nine demands related to any allegations or findings of that investigation.

106.    The letter made no mention of the First Amendment or the need to protect free speech alongside the imperative to eradicate illegal discrimination and harassment.

107.    The demands in the letter are not even internally consistent. The DOJ Task Force demands that Harvard take steps to "improve viewpoint diversity" while simultaneously demanding that it cease hiring and admission initiatives that Harvard instituted to accomplish that very task.

108.    On April 11, Defendants Gruenbaum, Wheeler, and Keveney sent another letter to President Garber and Pritzker.[70] The April 11 Letter elaborated on the demands of the April 3 Letter and attempted to impose further—and even more extreme—demands on "Harvard University's operations" as preconditions to "maintain[ing] Harvard's financial relationship with the federal government." Among other things, the April 11 Letter demanded that Harvard "to the satisfaction of the federal government":

- make "meaningful governance reform and restructuring to make possible major change consistent with" the April 11 Letter;

- subject itself to an ongoing "comprehensive audit by the federal government" of its hiring and admissions practices through at least 2028;

- agree to "immediately report to federal authorities, including the Department of Homeland Security and State Department, any foreign student ... who commits a conduct violation" and otherwise "report all requested immigration and related information to the United States Department of Homeland Security";

- subject itself to an annual third-party audit of its "student body, faculty, staff, and leadership" at least through 2028 to determine whether "each department, field or teaching unit [is] individually viewpoint diverse";

- hire and admit "a critical mass" of new faculty and students "who will provide viewpoint diversity" to the satisfaction of the federal government;

- reform a long list of programs, schools, centers, and departments the letter identified as "of concern" to the Trump administration;

---

[70]    Letter from Josh Gruenbaum to Alan M. Garber (Apr. 11, 2025), https://static01.nyt.com/newsgraphics/documenttools/092f8701fdf305fd/4d7d152d-full.pdf

- cooperate with the Trump administration to "determine appropriate sanctions for those faculty members" found to have "discriminated against Jewish and Israeli students";

- "immediately shutter all diversity, equity, and inclusion (DEI) programs, offices, committees, positions, and initiatives";

- reform its student discipline processes;

- "implement a comprehensive mask ban" with a minimum and "immediate" consequence of suspension for any violation;

- retroactively investigate and "carry out meaningful discipline" for all "violations" since the 2023-2024 academic year, including "permanently expelling" students involved in particular incidents enumerated in the letter;

- "commit to cooperating in good faith with law enforcement";

- establish whistleblower programs allowing Harvard affiliates to report noncompliance with the demands in the letter to both university leadership and the federal government and be protected from adverse actions for doing so;

- "disclose the source and purpose" of all "foreign funds" and subject itself to a "forensic audit" of the same; and

- provide a quarterly report to the federal government "certified for accuracy" documenting its implementation of the demands in the letter.

109.    The April 11 Letter concluded by demanding "immediate cooperation in implementing these critical reforms."

110.    These demands, too, are internally inconsistent. Defendants demand that Harvard "abolish all criteria, preferences, and practices… that function as ideological litmus tests," in its admissions and hiring, while also requiring Harvard ensure that a "critical mass" of its faculty and student body reflect "viewpoint diversity" and "prevent[] admitting students hostile to the American values and institutions inscribed in the U.S. Constitution and Declaration of Independence, including students supportive of terrorism or anti-Semitism." Defendants also demand that Harvard "reduc[e] the power held by faculty … more committed to activism than scholarship" while threatening to cancel federal grants to Harvard's cutting-edge scientific scholars and researchers.

30

111.    On April 14, Harvard University responded to the April 11 Letter through counsel. The April 14 Response declined to accept any of the demands in the April 11 Letter and identified them as violations of the University's First Amendment and statutory rights.

112.    Hours after Harvard rejected the Trump administration's demands for control, the DOJ Task Force "announce[ed] a freeze on $2.2 billion in multi-year grants and $60[ million] in multi-year contract value to Harvard University."[71] Defendants did not articulate a legal basis for these funding freezes other than the Title VI basis referenced in their prior letters and public announcements.

113.    On April 21, Harvard University filed a seven-count complaint before this Court challenging these funding cutoffs.[72]

114.    While one Trump administration spokesperson has suggested that the April 11 Letter was "unauthorized" and should not have been sent, Defendants have nonetheless stood by its contents and, as of the time of filing of this Amended Complaint, have declined to withdraw it.[73] Because it is not clear whether the April 11 Letter was authorized, it is not clear whether federal funding would be restored to Harvard or if Defendants would cease their threats to funding even if Harvard met the demands listed in the Letter.

115.    In fact, the Trump administration has only doubled down on its efforts to coerce Harvard, accusing its leadership of "malpractice" and "showboating" for failing to "call the

---

[71] Press Release, *Joint Task Force statement regarding Harvard University*, U.S. General Servs. Admin. (Apr. 14, 2025), https://www.gsa.gov/about-us/newsroom/news-releases/joint-task-force-statement-regarding-harvard-university-04142025.

[72] Complaint, *President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, No. 1:25-cv-1104 (D. Mass. Apr. 21, 2025) (ECF No. 1).

[73] Michael S. Schmidt and Michael C. Bender, *Trump Officials Blame Mistake for Setting Off Confrontation with Harvard*, N.Y. Times (Apr. 18, 2025), https://www.nytimes.com/2025/04/18/business/trump-harvard-letter-mistake.html.

members of the antisemitism task force who they had been talking to for weeks" after receiving the April 11 Letter and attempting to strongarm the University to "come to the negotiating table in good faith."[74]

116.    Since at least April 24, the NIH has refused to disburse funding to Harvard in response to normal-course requests for reimbursement of federally sponsored project expenditures and, on information and belief, so have all other federal government entities sponsoring projects at Harvard. This is the same approach that Defendants took to cutting off funding to Columbia University as discussed above.

### B.    Defendants' Failure to Follow Title VI Statutory and Regulatory Requirements Governing Title VI Investigations and Termination of Federal Funding

117.    Section 602 of Title VI sets out specific procedural requirements that federal agencies must follow before taking "any action terminating, or refusing to grant or continue, [federal financial] assistance because of failure to comply with [Section 601]." 42 U.S.C. § 2000d-1. Specifically, Title VI only allows for termination of federal assistance after "there has been an express finding on the record, after opportunity for hearing, of a failure to comply" with Title VI's nondiscrimination provision. *Id.* No such action may be taken until the agency "has determined that compliance cannot be secured by voluntary means." *Id.* Finally, before termination, the agency must "file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action." *Id.*

---

[74] Alan Blinder and Michael C. Bender, *Harvard Plans to Use Trump's Haste Against Him as It Fights Funding Cut*, N.Y. Times (Apr. 22, 2025), https://www.nytimes.com/2025/04/22/us/trump-harvard-legal-case.html; Michael S. Schmidt and Michael C. Bender, *Trump Officials Blame Mistake for Setting Off Confrontation with Harvard*, N.Y. Times (Apr. 18, 2025), https://www.nytimes.com/2025/04/18/business/trump-harvard-letter-mistake.html.

Agency action terminating federal funding will not be effective until thirty days after the congressional report is filed. *Id.*

118.    Further procedural requirements are laid out in binding federal regulations. Section 602 "direct[s]" federal agencies to "issu[e] rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." *Id.* Agencies are required to seek approval of those regulations from the President, *id.*, who has delegated that authority to the Attorney General, who then oversees and coordinates enforcement of Title VI among federal agencies. *See, e.g.*, Exec. Order No. 12250 (1980) at §§ 1–2; Exec. Order 11764, 3A C.F.R. § 124 (1974 Comp.); Exec. Order 11247, 3 C.F.R. 1964–1965 Comp. 348 (Sept. 24, 1965).

119.    Pursuant to Section 602, and consistent with this legislative intent, each of the Defendant agencies has promulgated regulations imposing additional procedural requirements on the termination of federal funding for alleged noncompliance with Section 601.

120.    These regulations, which are effectively the same across the Defendant agencies, provide that "[n]o order suspending, terminating or refusing to grant or continue Federal financial assistance shall become effective until (1) the responsible Department official has advised the applicant or recipient of his failure to comply and has determined that compliance cannot be secured by voluntary means, (2) there has been an express finding on the record, after opportunity for hearing, of a failure by the applicant or recipient to comply with a requirement imposed by or pursuant to this part, (3) the expiration of 30 days after the Secretary has filed with the committee of the House and the committee of the Senate having legislative jurisdiction over the program involved, a full written report of the circumstances and the grounds for such action." 34 C.F.R. § 100.8(c) (ED); *see* 45 C.F.R. § 80.8(c) (HHS); 28 C.F.R. § 42.108(c) (DOJ); 41 C.F.R. § 101-6.211-3 (GSA).

121.    OCR, which has responsibility for enforcing Title VI with respect to educational institutions like Harvard, has developed a Case Processing Manual ("CPM") laying out the proper procedures for handling discrimination cases, including Title VI cases.[75] DOJ publishes a similar legal manual specific to Title VI enforcement through its own Civil Rights Division.

122.    Defendants' actions targeting Harvard deviate drastically from OCR's procedures and do not comply with the statutory or regulatory requirements.

123.    The CPM states that "[w]hen OCR opens a complaint for investigation, it will issue letters of notification to the complainant and the recipient" containing details about the allegations and information about mediation options. Case Processing Manual, art. 1, § 111.

124.    This process implements Defendants' binding regulations—including those of HHS, ED, DOJ, or GSA—stating that where the evidence "indicates a failure to comply with [Section 601], the responsible Department official or his designee will so inform the recipient and the matter will be resolved by informal means whenever possible." 34 C.F.R. § 100.7(d) (ED); *see* 45 C.F.R. § 80.7(d) (HHS); 28 C.F.R. § 42.107(d) (DOJ); 41 C.F.R. § 101–6.210–4(a) (GSA).

125.    Upon information and belief, no such letter of notification has been sent.

126.    To the extent that the March 31 Announcement, April 3 Letter, or April 11 Letter are intended to function as this letter of notification, they do not contain the requisite level of specificity regarding the allegations, or the information required by OCR procedures or agency regulations.

127.    Federal regulations further require that any Title VI investigation include "a review of the pertinent practices and policies of the recipient, the circumstances under which the possible

---

[75] *Case Processing Manual*, U.S. Dept. of Educ., Off. for Civil Rights (Feb. 19, 2025), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm.pdf.

noncompliance with this part occurred, and other factors relevant to a determination as to whether the recipient has failed to comply with this part." 34 C.F.R. § 100.7(c) (ED); 45 C.F.R. § 80.7(c) (HHS); 28 C.F.R. § 42.107(c) (DOJ).

128.    Upon information and belief, the investigation that Defendants have invoked as the basis for terminating Harvard's federal funding has not complied with this regulation. Indeed, there are no indications that Defendants undertook *any* review of Harvard's pertinent practices and policies, the circumstances surrounding any noncompliance with Title VI, or any other relevant factor.

129.    On February 28, 2025, the DOJ Task Force announced that it intended to visit ten university campuses that had allegedly "experienced antisemitic incidents since October 2023" including Harvard, as well as Columbia and Northwestern University.[76]

130.    Public reporting indicates that representatives of the DOJ Task Force visited Boston, Massachusetts on April 9, 2025, to meet with city officials,[77] but there is no record that the DOJ Task Force visited Harvard or met with officials there.

131.     If, after the investigatory process, OCR determines that an educational institution is not in compliance with Title VI based upon the preponderance of the evidence, the OCR Case Processing Manual states that OCR will "negotiate a resolution agreement and issue a letter of finding(s)." Case Processing Manual, art. III, § 303(b). The letter of findings should "explain[] the reason(s) for its decision to both the recipient and the complainant." *Id*., art. III, § 303(e).

---

[76] Press Release, Off. of Pub. Affs., *Federal Task Force to Combat Antisemitism Announces Visits to 10 College Campuses that Experienced Incidents of Antisemitism*, Dep't of Just. (Feb. 28, 2025), https://www.justice.gov/opa/pr/federal-task-force-combat-antisemitism-announces-visits-10-college-campuses-experienced.

[77] Tonya Alanez, *DOJ Officials Visit Boston City Hall in Advance of Antisemitism Taskforce's Proposed Meeting with Wu*, Boston Globe (Apr. 9, 2025), https://www.bostonglobe.com/2025/04/09/metro/federal-antisemitism-task-force-pre-visit-to-boston/.

132.    Upon information and belief, Defendants have not issued a letter of findings or any determination or investigatory findings to support their actions.

133.    The resolution agreement that should accompany the letter of findings functions like proposed settlement terms, laying out "action steps that, when implemented, will remedy both the individual discrimination at issue and any similar instances where future violative conduct may recur." *Id.*, art. III, § 303(b).

134.    OCR and the non-compliant education institution then have 90 calendar days to negotiate a final agreement. *Id.*, art. III, § 303(f).

135.    Upon information and belief, Defendants have not proposed a resolution agreement, nor have mediation or negotiations been offered.

136.    The forgoing actions, governed by statute, regulation, and agency procedure, constitute a process intended to precede any movement toward enforcement actions including the termination of federal funding. That process exists to effectuate governing laws and rules mandating that voluntary compliance and negotiated resolutions are the enforcement norm. Section 602 requires that *no action* to terminate or revoke funding may be taken "until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and *has determined that compliance cannot be secured by voluntary means*." 42 U.S.C. § 2000d-1 (emphasis added).

137.    Codified Department of Justice guidelines reiterate the importance of voluntary compliance, as well as the importance of clear communication about the specific nature of any alleged noncompliance. "Title VI requires that a concerted effort be made to persuade any noncomplying applicant or recipient voluntarily to comply with title VI. Efforts to secure voluntary compliance should be undertaken at the outset in every noncompliance situation and should be pursued

through each stage of enforcement action. Similarly, where an applicant fails to file an adequate assurance or apparently breaches its terms, notice should be promptly given of the nature of the noncompliance problem and of the possible consequences thereof, and an immediate effort made to secure voluntary compliance." 28 C.F.R. § 50.3; *see also* 34 C.F.R. § 100.7(d) (ED); 45 C.F.R. § 80.7(d) (HHS); 28 C.F.R. § 42.107(d) (DOJ); 41 C.F.R. § 101–6.210–4(a) (OMB) (only where "it has been determined that the matter cannot be resolved by informal means" shall terminating "action ... be taken").

138.    Resolution agreements are common. According to OCR's public database, OCR resolved eight Title VI investigations specifically related to national-origin discrimination claims involving religion in January 2025 and twenty-six in 2024.[78]

139.    Only where these efforts fail has Congress authorized threats to federal funding.

140.    Section 602 provides that terminating or refusing to grant or to continue assistance may be done only after "an express finding on the record, after opportunity for hearing, of a failure to comply with [Section 601]." 42 U.S.C. § 2000d-1.

141.    To that end, if negotiations have reached an impasse and/or the 90-day window has elapsed, OCR issues a formal "Impasse Letter" that includes a description of the unsuccessful attempts to resolve the complaint and "informs the recipient that OCR will issue a letter of impending enforcement action in 10 calendar days if a resolution agreement is not reached within that 10-day period."[79] The case processing manual includes specific details and language about what must be

---

[78]*Office for Civil Rights Recent Resolution Search*, U.S. Dept. of Educ., Off. of Civil Rights, https://ocrcas.ed.gov/ocr-search?race_and_national_discrimination%5B%5D=549&title_vi=526&sort_order=DESC&sort_by=field_resolved (last visited Apr. 5, 2025).

[79] *Case Processing Manual* 18-19, U.S. Dept. of Educ., Off. for Civil Rights (Feb. 19, 2025), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm.pdf.

included in the letter of impending enforcement action.[80] If, following negotiation and an impasse letter, voluntary compliance proved unattainable, only then could OCR even begin enforcement proceedings that might include threats to federal funding.[81]

142.    Upon information and belief, Defendants have not issued an Impasse Letter or made any determination that voluntary compliance is unattainable.

143.    Following an Impasse Letter and determination that voluntary compliance is unattainable, Department of Education regulations and the CPM require OCR to provide institutions with specific notice of the proposed enforcement action and the opportunity for a hearing on the record with counsel. 34 C.F.R. §§ 100.8–9.

144.    Upon information and belief, no such communication has occurred and no such hearing has been offered or occurred.[82]

145.    After a determination of noncompliance on the record, OCR is then required to submit a report to the relevant House and Senate committees detailing the circumstances giving rise to the enforcement action and grounds for the revocation of funds. Section 602 states that "the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action[,]" and that "[n]o [terminating] action shall become

---

[80] *Id.* at 19.

[81] *Id.* at 23.

[82] Agency regulations further set out detailed provisions governing these hearings, 34 C.F.R. § 100.9(a); *see* 45 C.F.R. § 80.9(a); 28 C.F.R. § 42.109(a); 41 C.F.R. § 101–6.212–1, including that they comply with certain APA requirements, 34 C.F.R. § 100.9(d)(1)-(2); *see* 45 C.F.R. § 80.9(d)(1)-(2); 28 C.F.R. § 42.109(d)(1)-(2); 41 C.F.R. § 101–6.212–4(a)-(b). The Defendant agencies' regulations also impose requirements regarding post-hearing termination decisions and notices. 34 C.F.R. § 100.10(a)-(d); *see* 45 C.F.R. § 80.10(a)-(d); 28 C.F.R. § 42.110(a)-(d); 41 C.F.R. § 101–6.213–1-4.

effective until thirty days have elapsed after the filing of such report." 42 U.S.C. § 2000d-1.; *see also* 34 C.F.R. § 100.8(c).

146.    Upon information and belief, no such reports have been submitted.

147.    Section 602 further provides that any "termination or refusal [to grant or to continue assistance under Title VI] shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made and, *shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found.*" 42 U.S.C. § 2000d-1 (emphasis added); *see also* 34 C.F.R. § 100.8(c); 45 C.F.R. § 80.8(c); 28 C.F.R. § 42.108(c); 41 C.F.R. § 101–6.211–3.

148.    Despite this requirement, Defendants' actions purport to freeze billions of dollars in federal grants untethered to any finding of noncompliance in any particular program.

149.    These stringent procedural requirements for termination or refusal to grant or continue assistance reflect congressional intent to safeguard against the potential exploitation of Title VI funding leverage as a "vindictive or punitive" measure against federal funding recipients.[83] From the very inception of the Civil Rights Act of 1964, lawmakers were aware of and concerned about the far-reaching authority Title VI grants the federal government over programs receiving federal funds. The congressional notice requirement, presidential approval of agency regulations implementing Title VI (discussed below), and requirement for a hearing on the record were all introduced as amendments to the original bill and were expressly aimed at preventing abuses of power.[84]

150.    Senator John Pastore from Rhode Island, who was the floor manager in the Senate for the Civil Rights Act of 1964, explained that "Failure of a recipient to comply with a rule,

---

[83] *See* 88 Cong. Rec. S7062 (statement of Sen. John Pastore).
[84] *See* 88 Cong. Rec. H2498 (statement of Rep. Edwin Willis); 88 Cong. Rec. H2499 (statement of Rep. John Lindsay).

regulation, or order issued by an agency may ultimately lead to a termination or refusal of Federal assistance. Cutoff of assistance is not the object of title VI, however. I wish to repeat: Cutoff of assistance is not the objective of title VI. Fund cutoff is a last resort, to be used only if all else fails to achieve the real objective—the elimination of discrimination in the use and receipt of Federal funds."[85]

151.    Senator Pastore further elaborated on the importance of the statutory and regulatory safeguards in ensuring that revocation of funding was "a last resort" rather than a "punitive or vindictive measure," noting that "cutoff of funds would not be consistent with the objective of the Federal assistance statutes if other effective means of ending discrimination are available."[86]

152.    Until the Trump administration's unlawful pattern of threatening federal funding, Congress' effort to ensure that Title VI be enforced through nonpunitive means had been a success. As of January 14, 2025, OCR had at least 3,281 open Title VI investigations into educational institutions, 649 of which are focused on post-secondary institutions.[87] Eighty of those specifically focus on discrimination on the basis of national origin involving religion.[88]

153.    Claims of religious discrimination, including antisemitism, fall within Title VI where they overlap with race or national origin discrimination and are investigated as discrimination on the basis of national origin involving religion.[89]

---

[85] 88 Cong. Rec. S7059, 7059 (statement of Sen. John Pastore).

[86] *Id.*

[87] *Pending Cases Currently Under Investigation at Elementary-Secondary and Post-Secondary Schools*, U.S. Dept. of Educ., Off. for Civil Rights, https://ocrcas.ed.gov/open-investigations?field_ois_state=All&field_ois_discrimination_statute=700&field_ois_type_of_discrimination=All&items_per_page=20&field_ois_institution=&field_ois_institution_type=752&field_open_investigation_date_1=&field_open_investigation_date_2=&field_open_investigation_date=&field_open_investigation_date_3= (last updated Jan. 14, 2025).

[88] *Id.*

[89] Abigail A. Graber, Cong. Rsch. Serv., LSB11129, Religious Discrimination at School: Application of Title VI of the Civil Rights Act of 1964 (2024).

154.    Despite the number of open Title VI investigations, there is no record of any cancelation or revocation of funding to educational institutions due to Title VI noncompliance, with the possible exception of the Trump administration's recent actions toward Columbia and other universities.

155.    A 2019 Congressional Research Service analysis could not find any termination orders issued under Title VI by OCR in the prior 25 years.[90]

**C.    Defendants' Failure to Provide a Reasoned Decision for Their Actions**

156.    Defendants failed to provide any reasoned basis for their actions. Defendants' March 31 Announcement and the April 3 and April 11 Letters do not identify any specific evidence of any antisemitic harassment to which the University was deliberately indifferent, or any other evidence of wrongdoing.

157.    Defendants have not acknowledged the efforts that Harvard is already taking to address any alleged antisemitism and racial discrimination in admissions. Harvard has issued a number of statements, studies, reports, and policy changes in response to complaints of antisemitism and discrimination on campus.

158.    On January 10, 2024, Students Against Antisemitism ("SAA") filed a lawsuit against Harvard College, claiming that Harvard had subjected Jewish students to discrimination and a hostile environment in violation of Title VI of the Civil Rights Act.[91]

159.    On May 22, 2024, the Louis D. Brandeis Center for Human Rights Under Law and Jewish Americans for Fairness in Education filed another lawsuit against Harvard College, also

---

[90] Jared Cole, Cong. Rsch. Serv., R45665, Civil Rights at School: Agency Enforcement of Title VI of the Civil Rights Act of 1964 19 n. 154 (2019).

[91] Complaint, *Kestenbaum v. President and Fellows of Harvard College*, 24-cv-10092 (D. Mass. Jan. 10, 2024), ECF No. 1.

alleging violations of Title VI of the Civil Rights Act based on alleged antisemitic discrimination, a hostile environment, and retaliation.[92]

160.    On January 21, 2025, Harvard announced that it had settled both lawsuits. As part of the settlement, Harvard agreed to take numerous actions to combat antisemitism on campus including, *inter alia*, (1) adopting the more expansive definition of antisemitism propounded by the International Holocaust Remembrance Alliance ("IHRA"), which includes an acknowledgement that Zionism is a part of many Jewish people's religious identity; (2) preparing a public annual report for the next five years covering Harvard's response to discrimination or harassment based on Title VI-protected traits; (3) providing transparency regarding discipline outcomes in Title VI matters; (4) providing additional resources to support the study of antisemitism, including hosting an annual academic symposium on the topic of antisemitism; (5) reaffirming annually that antisemitism will not be tolerated at Harvard; (6) providing expert training on combating antisemitism for staff involved in reviewing complaints of discrimination; (7) broadly promoting annual training for the University community focused on recognizing and combating antisemitism; and (8) ensuring that Title VI and Harvard's Non-Discrimination policies are enforced equally, applying a single standard for all students, including Jewish and Israeli students.[93]

161.    Moreover, in June 2023, the Supreme Court struck down the use of race-based affirmative action in college admissions and ordered Harvard to stop using race as a factor in its

---

[92] Complaint, *Louis D. Brandeis Center for Human Rights Under Law v. President and Fellows of Harvard College*, 24-cv-11354 (D. Mass. May 22, 2024), ECF No. 1.

[93] *Harvard and Students Against Antisemitism Announce Settlement of Lawsuit*, Harvard University (Jan. 21, 2025), https://www.harvard.edu/media-relations/2025/01/21/press-release-settlement-harvard-saa/; *The Brandeis Center and Jewish Americans for Fairness in Education Agree with Harvard to Settle Title VI Litigation*, Harvard University (Jan. 21, 2025), https://www.harvard.edu/media-relations/2025/01/21/press-release-settlement-harvard-brandeis-ctr-jafe/.

admissions process.[94] Harvard immediately took several steps in response, including (1) ensuring that admissions readers do not have access to applicants' self-reported answers to questions about race and ethnicity; (2) reviewing and updating application reader and alumni interviewer training; (3) revising its application supplement to require students to answer five short-answer questions designed to help reviewers better understand an applicant's life experiences; and (4) expanding its admissions recruiting efforts to reach more diverse potential applicants.[95]

162.    On information and belief, Defendants have not made a reasoned determination whether Harvard's responses to complaints of antisemitism and discrimination on campus were or were not sufficient under Title VI, and did not make any such determination prior to sending the March 31 Announcement, the April 3 Letter, or the April 11 Letter. Rather, upon information and belief, any investigation into any such complaints were still ongoing at the time of those letters.

163.    Defendants also have provided no basis for the breadth of their threats to Harvard's federal funding. For example, Defendants have not explained what grants have been selected for review and potential termination and on what basis, or whether these grants have any connection to any alleged Title VI violation, nor have Defendants identified any such connection for the grants they have terminated or for which they have declined to disburse funding since April 14.

164.    The lack of any connection between Defendants' funding freezes and threatened cuts and their legal basis for those cuts has exacerbated the harm, as Plaintiffs and their members do not know and cannot anticipate whether any program receiving federal funding will be impacted,

---

[94] *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181, 230 (2023).
[95] *Weighing the Future of Harvard Admissions*, Harvard Gazette (Oct. 3, 2023), https://news.harvard.edu/gazette/story/2023/10/weighing-the-future-of-harvard-admissions/.

requiring all such programs to prepare for the possibility of significant and immediate termination of funding.

165.    Defendants also have not acknowledged or considered the enormous reliance interests implicated by their freezing of billions of dollars supporting critical research and other activities. The summary press releases and letters released by Defendants make no mention of the incalculable damage that Defendants' actions will cause—to patients whose clinical trials will end, faculty whose careers will be derailed, employees around the world whose livelihoods are in jeopardy, and the public who will no longer benefit from the research those federal grants supported.

166.    Defendants also have failed to explain the basis for any of the many conditions they have imposed on Harvard, nor have they explained how those demands would bring Harvard into compliance with Title VI.

### D.    Defendants' Overt Expressions of Viewpoint-Based Animus

167.    The true motive for Defendants' actions is not mysterious. The Trump administration's remarks on social media, press releases, and other public forums highlight its discriminatory, viewpoint-based motives in freezing Harvard's federal funds and imposing conditions on further funding.

168.    On April 14, the day Defendants froze $2 billion in federal funds, President Trump asked, "What if we never pay them? Wouldn't that be cool?"[96] A senior government official described the Trump administration's strategy: "to make examples of elite schools to intimidate other universities."[97]

---

[96] Michael C. Bender et al., *Inside Trump's Pressure Campaign on Universities*, N.Y. Times (Apr. 14, 2025), https://www.nytimes.com/2025/04/14/us/politics/trump-pressure-universities.html.
[97] *Id.*

169.    The next day, April 15, President Trump took to Truth Social to write, "Perhaps Harvard should lose its Tax Exempt Status and be Taxed as a Political Entity if it keeps pushing political, ideological, and terrorist inspired/supporting 'Sickness?' Remember, Tax Exempt Status is totally contingent on acting in the PUBLIC INTEREST!"[98] President Trump reiterated this threat on May 2, explaining that "We are going to be taking away Harvard's Tax Exempt Status" because "[i]t's what they deserve!"[99]

170.    This purported instruction to the Internal Revenue Service to investigate and potentially revoke Harvard's status as a tax-exempt non-profit entity is unlawful. That threat of unlawfully imposing arbitrary consequences for disfavored speech is part of Defendants' broader pattern of abusing power to target Harvard and Plaintiffs' members based on viewpoint. In particular, private foundation funding for university research work—which many of Plaintiffs' members use to supplement their federal funding—is generally only available to tax-exempt organizations. By threatening to unlawfully revoke Harvard's tax-exempt status alongside its federal funding, Defendants expand their unlawful and coercive funding threat to jeopardize even research dollars Harvard receives from third parties outside the government's control.

171.    Also on April 15, the White House Press Secretary Karoline Leavitt said, "[President Trump] wants to see Harvard apologize, and Harvard should apologize for the egregious antiSemitism that took place on their college campus against Jewish American students."[100]

172.    On April 16, President Trump again took to Truth Social to write:

---

[98]    Donald Trump (@realDonaldTrump), Truth Social (Apr. 15, 2025, 10:09AM) https://truthsocial.com/@realDonaldTrump/posts/114342374504628520.
[99]    Donald Trump (@realDonaldTrump), Truth Social (May 2, 2025, 7:25AM) https://truthsocial.com/@realDonaldTrump/posts/114437989795464761.
[100]    *White House: Trump wants Harvard to apologize*, Reuters (Apr. 15, 2025) https://www.reuters.com/world/us/white-house-trump-wants-harvard-apologize-2025-04-15/.

> Everyone knows that Harvard has "lost its way." They hired, from
> New York (Bill D) and Chicago (Lori L), at ridiculously high sala-
> ries/fees, two of the WORST and MOST INCOMPETENT mayors
> in the history of our Country, to "teach" municipal management and
> government. These two Radical Left fools left behind two cities that
> will take years to recover from their incompetence and evil. Harvard
> has been hiring almost all woke, Radical Left, idiots and "bird-
> brains" who are only capable of teaching FAILURE to students and
> so-called "future leaders." Look just to the recent past at their pla-
> giarizing President, who so greatly embarrassed Harvard before the
> United States States [sic] Congress. When it got so bad that they just
> couldn't take it anymore, they moved this grossly inept woman into
> another position, teaching, rather than firing her ON THE SPOT.
> Since then much else has been found out about her, but she remains
> in place. Many others, like these Leftist dopes, are teaching at Har-
> vard, and because of that, Harvard can no longer be considered even
> a decent place of learning, and should not be considered on any list
> of the World's Great Universities or Colleges. Harvard is a JOKE,
> teaches Hate and Stupidity, and should no longer receive Federal
> Funds. Thank you for your attention to this matter![101]

173.    On April 19, a White House official told CNN, "Instead of grandstanding, Harvard should focus on rebuilding confidence among all students, particularly Jewish students, by priori-tizing their safety, holding radical activists accountable, and ending discrimination on campus."[102]

174.    On April 24, President Trump again posted about Harvard on Truth Social, this time attacking not only the University, but also the lawyers representing it on this very issue:

> Harvard is an Anti-Semitic, Far Left Institution, as are numerous
> others, with students being accepted from all over the World that
> want to rip our Country apart. The place is a Liberal mess, allowing
> a certain group of crazed lunatics to enter and exit the classroom and
> spew fake ANGER AND HATE. It is truly horrific! Now, since our
> filings began, they act like they are all "American Apple Pie." Har-
> vard is a threat to Democracy, with a lawyer, who represents me,
> who should therefore be forced to resign, immediately, or be fired.

---

[101]    Donald    Trump    (@realDonaldTrump),    Truth    Social    (Apr.    16,    2025,    7:05AM)
https://truthsocial.com/@realDonaldTrump/posts/114347313852363347.
[102]    Michelle Watson and Betsy Klein, *New York Times: Trump administration sent letter of
demands    to    Harvard    University    in    error*,    CNN    (Apr.    19,    2025),
https://www.cnn.com/2025/04/19/us/harvard-trump-administration-letter-mistake/index.html.

He's not that good, anyway, and I hope that my very big and beau-
tiful company, now run by my sons, gets rid of him ASAP![103]

175. That motive is also evident in the nature of the conditions Defendants have imposed
on discussions about restoring funding. Defendants' March 31 Announcement, April 3 Letter, and
April 11 Letter all contain provisions expressly targeting specific disfavored viewpoints. The April
11 Letter demands that Harvard's faculty and departments be "individually viewpoint diverse" to
the satisfaction of the Trump administration and calls upon Harvard to audit its faculty and their
departments for "viewpoint diversity." If found lacking, Harvard is to reform the lack of diverse
viewpoints by hiring a "critical mass" of new faculty to provide viewpoint diversity. It also requires
Harvard to cooperate with the Trump administration to "to determine appropriate sanctions for
those faculty members" who "discriminated against Jewish or Israeli students or incited students to
violate Harvard's rules following October 7."[104]

## III.    Impact of Defendants' Actions on Plaintiffs

### A.    The Federal Research Funding Apparatus

176. The federal government is the largest source of funding for scientific research in
the United States and, until it was surpassed by China in 2024, the world at large.

177. This funding primarily comes through grants sponsored by the NIH and its various
constituent institutes—like the National Cancer Institute, the National Institute of Mental Health,
and the National Institute of Allergy and Infectious Diseases—as well as the NSF and the Depart-
ment of Defense ("DOD").[105]

---

[103]    Donald Trump (@realDonaldTrump), Truth Social (Apr. 24, 2025, 9:33 AM)
https://truthsocial.com/@realDonaldTrump/posts/114393194962253226.
[104]    Letter from Josh Gruenbaum to Alan M. Garber (Apr. 11, 2025),
https://static01.nyt.com/newsgraphics/documenttools/092f8701fdf305fd/4d7d152d-full.pdf.
[105] Some of these federal grant sponsors also sponsor contracts under which researchers conduct
research for the federal government.

178.     The funding process for researchers like those who are members of AAUP–Harvard and UAW typically begins with a notice (a "Notice of Funding Opportunity" or "NOFO")[106] published by a federal entity sponsor announcing that funding is available for a particular activity or project and stating the parameters for a proposal to receive funding. In addition to specific NOFOs, some funding sponsors have funds available for more general scientific purposes for which researchers can apply.

179.     NOFOs are not always targeted solely at funding specific research projects. For example, some NOFOs relate to funding programs designed to support the development of future scientists. One such program, the T32 grant program, provides institutions with funding they can use to train pre- and post-doctoral researchers in specific research areas with a documented shortage of highly qualified scientists; the F32 program provides similar funding to individual pre- and post-doctoral researchers.

180.     Individual researchers typically prepare a proposal seeking to secure funding for a specific use, sometimes targeted at specific NOFOs, other times targeted at more general funding availability. Individual researchers themselves generally cannot submit these proposals, however. Instead, they must submit their proposals through an Eligible Organization, like Harvard.

181.     Once submitted, these proposals get routed to a Program Officer housed in the relevant federal sponsor who reviews these proposals, eliminates any that are incomplete or fail to meet basic criteria, and forwards the remainder to the sponsor's relevant Scientific Review Group ("SRG"), a group of non-federal scientists led by a NIH scientist who conduct a peer-review

---

[106] The terminology for these announcements varies widely, and NOFO is a general umbrella term encompassing them all. Other names include funding opportunity announcement ("FOA"), program announcement ("PA"), request for application ("RFA"), etc. For consistency, Plaintiffs use NOFO throughout.

assessment of the proposals and each assign individual scores (with lower scores being better) that are then averaged to produce an overall score for the proposal. Submitted proposals are then ranked from lowest score (best) to highest score (worst). Applicants receive their proposal's score, its percentile ranking among other proposals, and feedback in a summary statement prepared by the SRG.

182.    These proposals and their score, ranking, and other evaluation materials are then presented to the sponsor's Advisory Council for a funding decision. Although the Advisory Council typically reviews and makes funding determinations proceeding from lowest-scoring proposal to highest-scoring proposal until the available funding for that review round is fully allocated, the Council may fund higher-scoring proposals without necessarily funding all lower-scoring proposals if it so chooses. The level at which funding runs out for a given review round (called the "payline") is often expressed as a percentage of proposals submitted to that sponsor and generally ranges from 10 to 15 percent.

183.    If the Advisory Council elects to fund a particular proposal, the Eligible Organization receives a Notice of Award stating that funding is available for the given project.

184.    The federal government generally does not, however, provide lump-sum funding for these projects after issuing a Notice of Award. Instead, once a project is approved and funding made available at a specific level, those funds remain with the federal government until drawn down. Eligible Organizations, like Harvard University, typically incur the expenses associated with the project and submit invoices for those expenses to the relevant federal government sponsor. That sponsor then draws down the funds available for the project and disburses those funds as a reimbursement.

185.    Multi-year grants are funded one year at a time, with later funding subject to an annual Research Performance Progress Report ("RPPR") assessment. The RPPR requires the

researcher to report on the major goals and objectives of the project; their progress toward them and other achievements during the reporting year; and their plans, including proposed budgets, for the upcoming year. A project sponsor rarely refuses to fund further years of a multi-year grant where the applicant submitted an RPPR, and approval for the next year's funding typically comes roughly one month after RPPR submission.

### B.    Federally Funded Research and Scholarship at Harvard

186.    There is no comprehensive public accounting of the billions of dollars in commitments that Defendants have frozen, but the publicly available information about those commitments underscores the devastating impact of any widespread cuts to AAUP–Harvard and UAW members.

187.    In 2024, Harvard University received $686 million in federal funding, accounting for nearly 70 percent of its total sponsored research expenditure and approximately 11 percent of its total operating revenue.[107]

188.    The NIH is by far Harvard's largest government funding source, accounting for more than 70 percent of all federal funding in 2024, or $488 million.[108]

189.    The NIH is the primary driver of biomedical research at Harvard, supporting a vast network of laboratories and research centers. Numerous institutes within the NIH, such as the National Cancer Institute, the National Institute of Mental Health, and the National Institute of Allergy and Infectious Diseases, provide funding for dozens of research centers affiliated with Harvard.

---

[107]    *FY 2024 Financial Report* 9, Harvard University (Oct. 2024), https://finance.harvard.edu/files/fad/files/fy24_harvard_financial_report.pdf; Avani B. Rai and Saketh Sundar, *Harvard's Federal Funding Is Under Fire. Here's What's at Risk.*, Harvard Crimson (Jan. 31, 2025), https://www.thecrimson.com/article/2025/1/31/harvard-funding-threat.

[108]    Avani B. Rai and Saketh Sundar, *Harvard's Federal Funding Is Under Fire. Here's What's at Risk.*, Harvard Crimson (Jan. 31, 2025), https://www.thecrimson.com/article/2025/1/31/harvard-funding-threat.

Some of the largest Harvard-affiliated recipients of NIH funding include the Harvard University Center for AIDS Research, the M.D.-Ph.D. physician scientist program—funded via the T32 grant program discussed above—which trains the next generation of medical researchers, and a large clinical research center focused on diagnosing rare conditions.[109]

190.    The NSF provided approximately $56 million in federal funding to Harvard in 2024, accounting for approximately 8 percent of Harvard's total federal funding.[110]

191.    The NSF supports a wide spectrum of cutting-edge, practically applied research across the natural and social sciences at Harvard. NSF grants fund projects in diverse fields such as ecology, political science, physics, computer science, and engineering. Examples of NSF-funded projects at Harvard include basic scientific research on powdery mildews—a primary cause of disease for important agricultural crops,[111] the creation of intelligent nature-inspired olfactory sensors to accurately identify dangerous volatile compounds in the air,[112] the support of advanced cyberinfrastructure for research computing,[113] and the development of biodegradable, living materials for use in advanced robotics.[114]

---

[109] *Id.*

[110] Saketh Sundar, *Senate Committee Targets $3 Million in Harvard NSF Research Grants for 'Far-Left Ideology'*, Harvard Crimson (Feb. 19, 2025), https://www.thecrimson.com/article/2025/2/19/senate-report-grants/.

[111] *Pfister and Bradshaw Receive NSF Grant*, Harvard University (July 10, 2023), https://www.huh.harvard.edu/news/pfister-and-bradshaw-receive-nsf-grant.

[112] *Holly Samuelson Awarded Starter Grant Funding from the National Science Foundation*, Harvard University (Mar. 22, 2024), https://www.gsd.harvard.edu/2024/03/holly-samuelson-awarded-starter-grant-funding-from-the-national-science-foundation/.

[113] *Research Computing Part of $5.3M NSF Award for Advanced Cyberinfrastructure*, Harvard University (Mar. 4, 2014), https://science.fas.harvard.edu/news/research-computing-part-53m-nsf-award-advanced-cyberinfrastructure.

[114] *Award Abstract # 2421461*, NSF, https://www.nsf.gov/awardsearch/showAward?AWD_ID=2421461.

192.     The DOD provides approximately $55 million in federal funding to Harvard, accounting for approximately 8 percent of Harvard's total federal funding.[115]

193.     DOD funding supports diverse research, including projects working to develop integrated human organ-on-chip microphysiological systems,[116] biologically inspired soft smart exosuits for injury prevention and performance augmentation,[117] and a portable device to treat sepsis and clean blood of harmful agents.[118]

194.     Over a third of sponsored expenditures go toward salaries. More than 6,200 Harvard employees, including 1,673 faculty members, relied on sponsored expenditures for at least part of their salaries in 2024.[119]

195.     In addition to the direct impact on research that Plaintiffs' members and other members of the Harvard community undertake using federal funds disbursed through Harvard, Defendants' withdrawal of federal project funding will also impact the five independent Boston-area hospitals affiliated with Harvard Medical School at which Harvard Medical School faculty (including Plaintiffs' members) conduct cutting-edge research using funds awarded to and disbursed through the hospitals, including Massachusetts General Hospital, Brigham and Women's Hospital, Boston Children's Hospital, Dana-Farber Cancer Institute, and Beth Israel Deaconess Medical Center,

---

[115] Avani B. Rai and Saketh Sundar, *Harvard's Federal Funding Is Under Fire. Here's What's at Risk.*, Harvard Crimson (Jan. 31, 2025), https://www.thecrimson.com/article/2025/1/31/harvard-funding-threat.

[116] *Grant       Summary*,       USA       Spending, https://www.usaspending.gov/award/ASST_NON_W911NF1220036_2100.

[117] *Contract     Summary*,     USA     Spending,     https://www.usaspending.gov/award/CONT_AWD_W911NF14C0051_9700_-NONE-_-NONE-.

[118] *Contract       Summary*,       USA       Spending, https://www.usaspending.gov/award/CONT_AWD_HR001113C0025_9700_-NONE-_-NONE-.

[119] Avani B. Rai and Saketh Sundar, *Harvard's Federal Funding Is Under Fire. Here's What's at Risk.*, Harvard Crimson (Jan. 31, 2025), https://www.thecrimson.com/article/2025/1/31/harvard-funding-threat/.

which collectively received more than $1.56 billion in NIH funding in 2024. This is more than double the approximately $686 million that Harvard University received from the entire federal government in the same year.[120]

196.    The hospitals depend on NIH support to fund thousands of active research programs, including everything from molecular biology wet labs to late-stage clinical trials.[121] These research projects are routinely designed and led by physicians who are faculty members or researchers affiliated with Harvard Medical School, including physician-scientists who are Plaintiffs' members.

197.    The Greater Boston Chamber of Commerce has recognized the importance of this federal funding to the community, noting that "[e]ach dollar invested in research at medical schools and teaching hospitals generates $2.60 in economic activity."[122]

## C.    Impacts of Funding Freeze on Plaintiffs' Members

198.    On April 14, Defendants announced that they had frozen over $2 billion in federal funding to Harvard. Many Harvard employees working on federally sponsored projects have received orders stopping their work or terminating their grants. Since at least April 24, the NIH has refused to disburse funds in response to Harvard's normal-course invoices on these projects, and, on information and belief, so have all other federal government entities sponsoring projects at Harvard. And Harvard researchers who submitted RPPRs for multi-year grants as early as January 2025 still have not received approval for future year spending.

---

[120] Saketh Sundar, *Trump Admin's $9 Billion Review of Harvard's Grants Could Hit Boston's Hospitals Hardest*, Harvard Crimson (Apr. 4, 2025), https://www.thecrimson.com/article/2025/4/4/funding-review-hospitals/.
[121] *Id.*
[122] *With Federal Funds, Harvard Helps Drive Local Economy*, Harvard Gazette (Mar. 1, 2020), https://news.harvard.edu/gazette/story/2020/03/harvard-attracts-federal-funding-supports-economy/.

199.    Plaintiffs' members have experienced and are experiencing significant harms as a result of these actions. Defendants' March 31 Announcement and April 3 Letter caused Plaintiffs' members' significant harm because "[b]efore any budget cuts ha[d] even been made, academic leaders [at Harvard University] ha[d] stalled hiring, stalled expansions, stalled research conferences and graduate student admissions" as a direct result of Defendants' threats.[123] And these harms have only been magnified by Defendants' decision to freeze over $2 billion in federal funding to Harvard while threatening to cut billions more.

### 1.    AAUP and AAUP–Harvard Members

200.    Shortly after Defendants announced that they had frozen over $2 billion in federal funding to Harvard on April 14, at least several AAUP–Harvard members[124] received orders to stop their work on federally sponsored projects. Since this freeze on April 14, other AAUP–Harvard members have also received stop-work orders, experienced grant cancellations, or otherwise lost their funding.

201.    These AAUP–Harvard members report having to cease all work, which, in turn, has already meant delayed project timelines; missed gating points for scientific research, such as institutional review board meetings; clinical trials and experiments halted midstream, resulting in untreated patients and the lost value of already-expended research effort; and the potential for lost human capital as talented and meticulously trained scientists and support staff begin searching for work elsewhere. If these cessations continue, these members expect they or their labs will be forced to take even more harmful steps, such as euthanizing lab animals or permanently dismissing staff.

---

[123] Saketh Sundar, *Trump Admin's $9 Billion Review of Harvard's Grants Could Hit Boston's Hospitals Hardest*, Harvard Crimson (Apr. 4, 2025) (quoting Statement of Jonathan Kagan, Director of Basic Research, Chair of Gastroenterology, Boston Children's Hospital), https://www.thecrimson.com/article/2025/4/4/funding-review-hospitals/.
[124] Every member of AAUP–Harvard is necessarily a member of AAUP.

202.    In the most extreme cases, AAUP–Harvard members report that if they can no longer access funding they expect they will soon need to abruptly shut down partnerships with study participants and third-party collaborators with whom these members have spent decades carefully cultivating personal and professional relationships. These members report that these abrupt shut-downs would not only devastate the science they are working on today but also make it more diffi-cult for them to structure future scientific work—because they would have squandered trust with study participants, who will now be reluctant to enroll, and tarnished important relationships with service partners, who will be unwilling to invest in future collaborative scientific work with Harvard researchers.

203.    The President of the Harvard-AAUP Chapter has also been impacted by the hiring freeze because it includes a freeze on hiring new research assistants, which slows the pace of faculty research, as well as a freeze on new tenure-track hiring, leaving critical teaching gaps.

204.    One AAUP member attests that the University has already halted seed grants that are fundamental to initiating new projects and scientific collaborations. Harvard is encouraging faculty to pursue philanthropic funding for their work, but this faculty member's research is unlikely to garner private funding.

205.    Another AAUP–Harvard member is on the faculty of the Harvard T.H. Chan School of Public Health. This member's research focuses on health outcomes in pregnant women and their children. This member is the principal investigator on a twenty-year U.S.-based multisite network study evaluating the effects of antiretroviral treatment for mothers with HIV and their children in its last year of funding. The grant supports twenty-four clinical research sites conducting five different research studies involving about 150 total staff. The suspension of funding to Harvard has prevented the release of carry-over funds (unspent funds from prior grant years) which were

committed by various NIH institutes but held in reserve for the last year to ensure the appropriate closure of the studies. These closure activities include data and specimen submission, document archiving, and regulatory compliance of human research activities at the clinical sites. This refusal to release carry-over funds will likely lead to an early termination of subawards from Harvard to this member's clinical research sites, with devastating consequences for the sites' research programs.

206.    The same member is also the principal investigator on another multisite cohort study on women with HIV in its last year of funding. Funding has ceased following the Trump administration's notice of its suspension of federal government research funding to Harvard. As a result, valuable data collected on voluntary study participants will not be included in public data repositories. The funding freeze has caused this member to lay off one staff member and send notices of possible furloughs to three additional staff members. This member has also needed to communicate with the thirteen clinical sites enrolling and following study participants that their work may not continue unless funding is received at Harvard. This member's own faculty position at Harvard is no longer secure, as 90 percent of this member's salary comes from research grants.

207.    And because Defendants' funding cutoffs indiscriminately affect all work receiving any form of financial assistance from the federal government at any Harvard affiliate, many AAUP–Harvard members expect to imminently experience these same harms as soon as their programs next request reimbursement for expenses from the federal government.

208.    One AAUP–Harvard member is on the faculty of Harvard Medical School. This faculty member's research focuses on interventions for adolescents with HIV. This faculty member has recently finished enrolling individuals in a federally funded international study of interventions for adolescents with HIV. This faculty member expects they will soon lose access to their federal

funding for this study and so will soon need to suspend or terminate it. Doing so would require this faculty member to lay off or terminate study staff, including staff in a foreign country, and stop providing services they committed to providing to young people living with HIV.

209.    AAUP–Harvard member Meredith Rosenthal is on the faculty of the Harvard T.H. Chan School of Public Health and is at risk of losing her NIH funding. About sixty percent of Rosenthal's salary comes from research grants, including those funded by the NIH. Rosenthal understands that her current grant, as well as any future federal grants for which she may apply, are within the funding the Trump administration has announced it is withholding from Harvard. A loss of federal funding would be devastating for Rosenthal's health policy research. Without federal funding, she would likely have to stop her study without reaching its conclusion, wasting all of the resources that have been spent to this point. Rosenthal would also have to let go of some of her staff if NIH rescinds her grant money, including graduate student summer research staff. A loss of federal funds would make collaboration across institutions much more challenging for Rosenthal. Ambitious, large-scale programs that foster academic discourse and innovation, like the one Rosenthal currently conducts research under, would disappear.  Rosenthal's team has been working overtime to squeeze in as much work as possible while they still have grant funding, but they will not be able to finish their research before the grants are up for renewal. This rush to squeeze in work under threat of funding termination could affect the quality of the team's research.

210.    Another AAUP member is also on the faculty at the Harvard T.H. Chan School of Public Health. This member's research involves developing methods that map the processes that control how cells change as they move from health to disease; a strong emphasis of this member's work is how these control processes depend on sex and gender as a biological variable. This member and their research are funded in large part by a National Cancer Institute Outstanding

Investigator Award through the R35 grant mechanism. The R35 grant mechanism was designed to recognize investigators with a long career of exceptional contributions and provides $600,000 of funding a year for seven years. The National Cancer Institute has announced a pause in new awards but has confirmed that the funding of current awardees will continue for the duration of their award. This member nevertheless expects that they will lose access to this funding before the end of the current award period because NIH is refusing to reimburse current-year funds to Harvard. Losing this funding would mean the large repository of cutting-edge software tools this member's team developed over many years, all of which are publicly available as open-source tools for academic and commercial use, would become dysfunctional and this member would not be able to move their research projects forward. A loss of current award period funding would also require this member to lay off or terminate postdoctoral fellow staff and this member's research team would diminish to zero members. This award also constitutes 50% of this member's salary.  Tenured faculty at the School of Public Health are expected to cover 90% of their research effort and failure to meet that threshold would result in a salary reduction for this member. And even if the funding was released at a later date, these losses would effectively prevent this member from securing NIH funding for these projects for the foreseeable future, perhaps for several years.

211.    The President of the AAUP–Harvard Faculty Chapter reports that cutting $8.7 billion dollars in federal funding would leave no part of the University untouched. They similarly report that the School of Public Health is particularly vulnerable because 60 percent of its operating budget comes from sponsored support, including federal grants.

212.    Numerous AAUP members are biomedical researchers.

213.    Biomedical research funded by federal grants requires planning years in advance because of the technical expertise required and the need to prepare human samples that are obtained

at significant cost and effort. Part of this long-term planning requires having additional fundable projects lined up to provide continuous resources for long-term research initiatives. Frozen federal funding puts at risk years' worth of researchers' future grants which would disrupt their life's work.

214.    Another AAUP member is on the faculty at Harvard Medical School and an internationally recognized scholar in their field. They are afraid to have their name publicized in connection with this litigation because if they lose federal funding, they will need to seek bridge funding and fear their actions may influence their ability to receive this alternative funding. This faculty member reports that, as a result of Defendants' threats to withdraw promised federal funding—now realized—they have seen administrative staff who are responsible for tasks such as grant administration and human studies review seek employment elsewhere. Early career scientists who have completed multiple years of postgraduate training are seeking career opportunities outside of research. Scientists with unique and advanced skills are seeking positions outside of academia. Projects that require the recruitment of human study participants are being reduced out of concern that the associated research project will not be continued to completion. This faculty member further reports that foundational scientific research that has taken many years of human effort and institutional investment to reach its current stage is being paused in a manner that may preclude the possibility of future research.

## 2.    UAW Members

215.    The President of the Harvard Graduate Students Union ("HGSU–UAW") reports that HGSU–UAW members have and will be directly harmed by the current funding freeze and potential additional cuts. Federal grants represent an important source of funding for graduate student workers at Harvard. Students who work as research assistants have their tuition covered and receive salary or stipends to pay for living costs. A loss of those grants means no funding for the majority of research assistant positions, resulting in many HGSU–UAW members being unable to

cover their tuition and living expenses. In turn, this will result in severely stalling or entirely pro-

hibiting members' ability to produce both academic work and work as university employees. Cut-

ting federal grants will interrupt the thesis and dissertation research HGSU–UAW members are

completing, either slowing the timeline to degree completion or causing some members to recon-

sider their projects or even drop out of their programs.

216.    For example, the HGSU–UAW President reports that eight students in the Health

Policy program are supported by training grants from the Agency for Healthcare Research and

Quality, which funds their tuition and living stipends while also paying for crucial professional

development activities, such as conference travel and additional academic training. Without this

funding, the ability of these eight students to continue their programs is put in jeopardy and will

severely detract from the experience of being a doctoral student at Harvard and eliminate profes-

sional development opportunities right as they are beginning their careers.

217.    In another example cited by the HGSU–UAW President, seven first- and second-

year PhD students and two postdoctoral fellows in the Program of Virology are funded by the T32

grant program described above. A funding freeze on T32 payments means that Harvard is no longer

receiving the funds used to cover these researchers' tuition and living expenses, which puts this

training program in jeopardy. If the T32 grant is permanently cut, the ability of the Virology Pro-

gram to support graduate students and postdoctoral scholars will dissolve. Additionally, cuts to the

T32 grant would restrict these researchers' freedom of research into topics that the Trump admin-

istration has arbitrarily determined are non-essential, despite the high impact on public health that

these research topics present.

218.    One HGSU–UAW member is a graduate research fellow who understands that pay-

ments on their NIH virology training grant have been frozen. This researcher's salary is covered by

the NIH training grant, so a loss of funding would mean likely losing their job. This member supervises the only other researcher on their project, whose salary is also government funded. Beyond the loss of their jobs, a loss of funding would necessarily result in a serious slowing of their research and could lead to experiments being destroyed, wasting hundreds of thousands of dollars already spent on a project with promising results. This researcher's lab has already laid off two employees, including the lab manager, which has required this researcher to work additional hours on administrative tasks, like ordering supplies and hazardous waste removal, with no additional pay. This researcher has also had to work additional unpaid hours on grant writing to cover the imminent losses in the coming months. Even if they are able to secure private funding, such private sources will only cover a minimal version of the project and will only cover the first steps. This researcher has asked multiple levels of Harvard leadership about whether Harvard would fund their research, none of which said they would. Amid the ongoing attacks on Harvard, this researcher has been applying to fewer virology projects and is moving towards other fields, even considering career options outside of science.

219.    Another HGSU–UAW member is a PhD student and teaching fellow whose doctoral thesis focuses on the development of observational research methods for vaccine safety and efficacy and applying these methods to real world data. Their research work is only possible through a NIH-funded external collaboration with a large health system and the data they manage. This member's research group and industry partner were awarded separate grants under the SeroNet program, a coordinated effort by NIH to expand the nation's capacity for SARS-CoV-2 serologic testing and advance research on the immune response to SARS-CoV-2 infection and COVID-19 vaccination among diverse and vulnerable populations. Losing NIH funding would require that the industry partner end its affiliation with Harvard and fund the labor from other sources. Because the

industry partner manages data and data analysis on this project, this member's research would not be able to continue if this affiliation ends. This member would have to cease their work in its current state and begin writing a final manuscript with minimal input from industry partners. They would also need to switch research projects at the last minute to fulfill their dissertation requirements and parts of their dissertation would need to be replaced on short notice. More broadly, losing funding for this project would also result in gaps in the vaccine study design literature. There are no immediate plans to replace this funding if lost permanently.

220.    Another HGSU–UAW member and PhD student reports that they received notice that their NIH dissertation grant was terminated on April 29 and that the termination was made "retroactive" to December 31, 2024. As a result of the termination, this student faces imminent loss of salary and incentive funding provided by their program. This student was rejected from all of the Harvard-based T32 postdoctoral jobs that they applied for, despite receiving preliminary offers from most. This student, whose research focuses on transgender health, now needs to completely reinvent and reframe their health research to focus on other topics not related to their body of work.

221.    Additionally, two days after receiving notification of grant termination, on May 1, this student received notification from the government stating that they were allegedly in federal noncompliance for not submitting a final progress report following the grant termination. NIH typically requires a final progress report to be submitted within 120 days of grant termination. Because the government made the termination "retroactive" to December 31, 2024, it appears that the government is now claiming that this student was obligated to submit a final progress report within 120 days of that date (April 30, 2025), even though the student had only received notification of grant termination the *day before*. It is now likely that this student's record will show that they were in

noncompliance with grant requirements, which could prevent them from receiving federal funds in the future.

222.     Jennifer Chen is a HGSU–UAW member and postdoctoral researcher at Harvard who received an email notifying her that her grant program had been terminated and that any funds beyond the active award, which ends June 30, will not be funded. Because she is on maternity leave, she will be unable to use the remaining funds on her active award before they expire. Losing her grant also makes her a less competitive candidate on the job market because her grant was intended to cover her salary and would have also funded a portion of a lab as a faculty member. Applying for non-governmental sources of funding to replace the frozen funds will inevitably delay her timeline for finishing her postdoctoral research and applying to faculty jobs.

223.     Another HGSU–UAW member is a staff scientist at Harvard who understands that the funding freeze will imminently affect their work and job stability. This scientist is a biocurator working at FlyBase—a free database of Drosophila (fruit fly) genetics research that scientists around the world rely on for their work. FlyBase is funded by grants from the NIH and NSF. Without continued federal funding, this scientist predicts layoffs and cut hours, and fears that the FlyBase database would need to stop updating. Disruptions in funding would mean that newly discovered genes, data, and other discoveries would not be integrated in the FlyBase database and shared with the world. Even a temporary halt in funding would result in a large backlog of work, causing delays in reporting on fundamental scientific findings. The harm would have ripple effects across the globe, as Drosophila scientists worldwide rely on FlyBase to conduct vital research that contributes to both human medical research and fundamental understandings of biology. This scientist does not believe there is a viable alternate source of funding that would realistically replace the federal funding for FlyBase.

### D.    Harms to Plaintiffs Directly

224.    Plaintiffs have themselves suffered direct harm as a result of the March 31 Announcement, April 3 Letter, April 11 Letter, and the threats to federal funding and imposition of policy and procedure changes demanded by Defendants.

#### 1.    Harm to AAUP and AAUP-Harvard

225.    As part of its core organizational activities, Plaintiff AAUP regularly consults and works with local chapters and individual members regarding academic freedom, faculty governance, and other issues involving the employment relationship between university employees and their employers, including but not limited to collective bargaining. AAUP local chapters also provide for the representation of individual members regarding academic freedom, shared governance, and due process issues in proceedings before their university employers. Investigations of complaints of institutions violating academic freedom principles in relationship to AAUP members are authorized by the Executive Director and conducted by a subcommittee appointed by the Executive Director.

226.    AAUP also maintains a standing committee, known as Committee A on Academic Freedom and Tenure, which "[p]romotes principles of academic freedom, tenure, and due process in higher education through the development of policy documents and reports relating to these subjects and the application of those principles to particular situations that are brought to its attention."

227.    Defendants' actions have undermined and eroded the longstanding principles of academic freedom, shared governance, and due process that AAUP previously helped secure at Harvard and other institutions where its members are employed.

228.    Defendants' actions have made it more difficult and resource-intensive for Plaintiff AAUP to carry out its advocacy that benefits faculty in general and its individual members in particular. Because Defendants have pressured Harvard and other universities to abandon their

commitment to academic freedom, shared governance, and due process principles, AAUP must now expend more time and money to ensure that its members' rights in these regards are adequately protected.

229.    Defendants' actions have also made it more difficult and resource-intensive for Plaintiff AAUP to provide accurate and effective guidance to its chapters and members regarding these principles. Plaintiff AAUP has had to divert staff and financial resources to address the significant influx of inquiries from chapter leaders and members regarding the effect of such actions on members' academic freedom, shared governance, and due process rights. In addition to responding to such individual requests, staff for Plaintiff AAUP have had to conduct nationwide calls and virtual meetings with chapter leaders regarding Defendants' actions and to provide guidance on representing individual members in the face of such actions.

230.    Defendants' actions have directly impaired these and other activities of AAUP.

231.    Plaintiff AAUP–Harvard has also suffered harm as a result of Defendants' actions. Defendants' actions have made it more difficult and resource-intensive for Plaintiff AAUP–Harvard to carry out its advocacy that benefits Harvard faculty in general and AAUP–Harvard members in particular. Because Defendants have pressured Harvard to abandon its commitment to academic freedom, shared governance, and due process principles, AAUP–Harvard must now expend more time and money to ensure that its members' rights in these regards are adequately protected and that individual members are adequately represented before their employer.

232.    Defendants' actions have impeded AAUP–Harvard's ability to recruit members into its Harvard chapter as some potential members fear that membership in the group may be perceived negatively by Defendants and the Trump administration, which may in turn imperil their access to grants and their job security.

233.    AAUP–Harvard has had to spend time responding to the fallout from Defendants' actions, including putting people in touch with needed resources and sponsoring trainings and work-shops for faculty, instead of doing the internal governance work that is its core mission.

234.    Defendants' actions have also caused a pervasive sense of fear and intimidation among AAUP and AAUP–Harvard members. Because of Defendants' actions and the threats of further cuts to research funding, some members have been compelled to forego participating in and supporting the AAUP's activities, or asserting their academic freedom, shared governance, and due process rights because Defendants actions make clear that such participation, support, or assertion will render them targets for retaliation.

## 2.    Harm to UAW

235.    Plaintiff UAW, as part of its core organizational activities, works with its local un-ions to negotiate UAW-represented workers' terms and conditions of employment. Local UAW unions at Harvard advocate for members' job security, fair wages, academic freedom, and safe working conditions, including protections from bullying, harassment, and discrimination. In addi-tion, UAW has a long-standing history of supporting expansion of civil and workers' rights includ-ing non-discrimination protections, as well as increased federal funding for scientific research, due to its importance for innovation, economic growth, and public health.

236.    Defendants' actions have directly impaired these and other central activities of UAW. UAW has been forced to spend significant time and resources responding to the fallout from Defendants' actions, including counseling members who have lost or anticipate loss of jobs or fund-ing and connecting members with outside resources, instead of doing the representational, organiz-ing, and advocacy work that is its core mission. UAW has had to divert staff and financial resources to address the significant influx of inquiries from local union leaders and members regarding the

effect of the administration's actions on research funding, academic freedom, and due process rights.

237.    Defendants' actions have also caused a pervasive sense of fear and intimidation among UAW members. Because of Defendants' actions and the threats of further cuts to research funding, some members no longer feel comfortable asserting their academic freedom and First Amendment rights. UAW members have expressed fears that publicly supporting the UAW's efforts opposing Defendants' actions could jeopardize their future eligibility for federal research funding. As many members are early career scientists, access to such federal funding is essential to their long-term academic and research goals. Losing these opportunities would significantly disrupt their career trajectories.

### E.    Impacts on Academic Freedom and Free Speech

238.    Plaintiffs' members have experienced and are experiencing significant harms to their First Amendment rights to free speech and academic freedom as a result of Defendants' actions.

239.    As alleged above, Defendants' threatened and actual freezing of federal funds is motivated by viewpoint discrimination and, thus, chills the expression of such viewpoints on campus, whether those viewpoints are expressed in the course of academic instruction, research, debate, or other on-campus expression of ideas.

240.    Moreover, Defendants' actions directly threaten the free speech and academic freedom of Plaintiffs' members by targeting specific disfavored viewpoints and demanding changes that will directly impair freedom of speech and academic freedom. All members of Harvard–AAUP are employed by a university that has already been compelled, and will continue, to host less speech, and less diverse speech, as a result of Defendants' actions.

### 1. Harvard Begins Implementing Some of Defendants' Demands

241.    Defendants' threats have already had and will continue to have a coercive effect on Harvard University, including by pressuring the University to acquiesce to some of its unlawful demands. Such acquiescence has included severely curtailed rules regarding campus demonstrations, posters, and signage, as well as new rules regarding silent expressive activity in residence halls, educational buildings, libraries, and other campus spaces.

242.    It has also included termination of long-standing staff and programming disfavored by the Trump administration. For example, after Defendants sent the March 10 warning letter, Harvard removed two faculty members from their roles as Director and Associate Director of the Center for Middle Eastern Studies. This Center had been a focus of Defendants' threats; it was one of five Harvard centers, departments, and programs specifically named in Defendants' April 11 Letter as targets for an "audit" aimed at "reforming" programs that Defendants believe "reflect ideological capture" or "fuel antisemitic harassment." In addition to the removal of these tenured and tenure-track faculty members from their positions, Harvard terminated longstanding staff affiliated with other programs targeted by Defendants.

243.    Many of these changes took place during a period when Harvard was reportedly negotiating with Defendants in hopes of avoiding the execution of Defendants' unlawful threats.

244.    To date, despite Harvard's rejection of Defendants' demands, these changes have not been reversed. On the contrary, despite its public stance and its filing of a lawsuit on April 21, Harvard continues to take actions suggesting it remains open to enacting some number of reforms Defendants demanded in the April 3 and April 11 Letters, and demonstrating the coercive effect of Defendants' actions.

245.    When the Harvard Crimson summarized the above events (and others) in an April 30 article describing how Harvard's leadership was responding to Defendants' threats, it titled the article "Harvard Fights in Court but Retreats on Campus."[125]

246.    The New York Times has reported that even after Harvard announced its rejection of Defendants' demands, several of Harvard's most powerful donors had been—and likely still are—agitating for Harvard to accede to those demands, including former Secretary of State Condoleezza Rice and hedge fund managers John Paulson and William A. Ackman. The article states that, far from rejecting this suggestion and contrary to Harvard's public position categorically rejecting those demands, "Dr. Garber told one donor that the devil would be in the details in what the White House asked of Harvard."[126]

247.    On April 24, President Garber announced that the University had altered its longstanding policies vesting ultimate authority for student discipline in each of the university's respective faculties. Instead, all inter-school disciplinary cases at Harvard will now be adjudicated by a panel convened by the President that is newly empowered "to investigate and impose penalties in cross-school disciplinary hearings." This change to the university's longstanding internal governance practices closely echoes the April 11 Letter's demand that Harvard "immediately reform its student discipline policies and procedures so as to swiftly and transparently enforce its existing

---

[125] Dhruv T. Patel & Grace E. Yoon, *Harvard Fights in Court but Retreats on Campus*, The Crimson (Apr. 30, 2025), https://www.thecrimson.com/article/2025/4/30/Harvard-Fights-Retreats.

[126] Rob Copeland et al., *As Harvard Is Hailed a Hero, Some Donors Still Want It to Strike a Deal*, N.Y. Times (Apr. 22, 2025), https://www.nytimes.com/2025/04/22/business/harvard-trump-deal.html?smid=url-share.

disciplinary policies with consistency and impartiality, and without double standards based on identity or ideology."[127]

248.    On April 28, Harvard announced that it was closing its Office for Equity, Diversity, Inclusion, and Belonging ("EDIB"). EDIB and the affinity groups it supports are important, and broadly supported, programs that help ensure members of demographic groups less widely represented at the university feel supported and able to fully and meaningfully participate in university life. Former staff of that office will now be retasked to a new Office for Community and Campus Life, which will pursue different institutional priorities from the shuttered EDIB office.[128]

249.    The same day, the Office for Community and Campus Life announced in an email to Harvard's affinity groups that it would no longer host or fund affinity group celebrations during commencement.[129]

250.    These changes are responsive to the April 11 Letter demand to "shutter all diversity, equity, and inclusion (DEI) programs, offices, committees, positions, and initiatives."[130]

251.    The connection between these changes and Defendants' coercion is evident from the manner in which they mirror Defendants' specific demands. It is also clear from Harvard's own statements. For example, in emails to the Harvard community, President Garber has repeatedly

---

[127]    Letter from Josh Gruenbaum to Alan M. Garber (Apr. 11, 2025), https://static01.nyt.com/newsgraphics/documenttools/092f8701fdf305fd/4d7d152d-full.pdf.
[128]    Letter from Sherri Ann Charleston to Harvard University (Apr. 28, 2025), https://links.repoint.harvard.edu/servlet/MailView?ms=MzU5MDY2NTgS1&r=MjE4MzYzMTkzNzcS1&j=Mjg4Mzk4MjYzOAS2&mt=1&rt=0.
[129] Cam. N. Srivastava, *Harvard Will Not Fund Affinity Group Graduation Celebrations Following Ed Department Warning* (Apr. 28, 2025), https://www.thecrimson.com/article/2025/4/29/affinity-funding-cut/.
[130]    Letter from Josh Gruenbaum to Alan M. Garber (Apr. 11, 2025), https://static01.nyt.com/newsgraphics/documenttools/092f8701fdf305fd/4d7d152d-full.pdf.

cited recent speech-restrictive changes in campus policy as proof that Defendants' attacks against Harvard are unfounded.

252.    These coerced changes have had and will continue to have a direct effect on the free speech and academic freedom of Plaintiffs and their members. For example, the changes to disciplinary policies are a direct response to Defendants' perception that disciplinary bodies previously under the direct authority of Harvard's faculties were insufficiently punishing students who had engaged in certain protests and other expressive activity, particularly activity expressing particular viewpoints regarding Israel and Palestine. Harvard's acquiescence to that demand thus is reasonably perceived as a step toward punishment of such viewpoints and has the direct effect of chilling speech on campus.

253.    As a further example, the shuttering of Harvard's EDIB program and withdrawal of support for affinity group celebrations has reasonably caused Plaintiffs and their members to fear that any research, instruction, programming, or other campus speech falling under the Trump administration's vague, overbroad and indiscernible understanding of "DEI," including research, instruction, programming, or speech related to issues concerning race, gender, ethnicity, gender expression, or sexual orientation, will incur sanctions from Defendants and adverse action from Harvard University.

254.    Against this backdrop, any number of academic programs, research areas, instructional activities, or campus speech activities undertaken by Plaintiffs' members are at risk of becoming the next offering surrendered by the university in hopes of avoiding Defendants' threatened and ongoing unlawful coercion.

### 2.    Examples of Chilling Effects on Plaintiffs' Members

255.    Defendants' actions have caused Plaintiffs' members to fear that their scholarship and teaching, if not aligned with the views or priorities of the Trump administration, could lead to

even further incursions on the academic freedom of their own departments. As a result, some are engaging and will engage in self-censorship on topics that are in tension with Defendants' espoused viewpoint.

256.     Plaintiffs' members' speech and academic freedom have been chilled in a variety of ways. This complaint provides a few examples.

257.     One UAW member is a Harvard lecturer whose curriculum will change as a result of the Trump administration's attacks on Harvard. This member typically teaches courses on topics including the Holocaust, World War II, and global transgender history, all of which are implicated by the administration's targeting of academic freedom at Harvard. This member has already decided not to teach a course on global transgender history in the upcoming Fall semester. While they currently plan to teach courses on World War II and the Holocaust next year, they anticipate needing to make curricular and pedagogical changes in response to the administration's continued threats. In particular, this member reads the administration's demands in its April 11 Letter as requiring undefined but extreme changes to their course content and teaching methodology to avoid accusations of antisemitism, "ideological capture," or failure to promote "viewpoint diversity." Due to the current threats and attacks on Harvard, this member cannot in good conscience recommend that doctoral applicants attend Harvard right now.

258.     The HGSU–UAW President has also experienced the chilling effects of the Trump administration's actions against Harvard. Her job as a teaching fellow in music and the humanities often involves teaching students about gender and queer theory, the philosophy of marginalized groups, colonialism, and cultural appropriation, as well as the cultural concepts of debated issues like national borders and music genres. In planning and executing class discussions about these topics, she encourages her students to engage in critical thinking, often in connection with current

events or well-known texts, such as the writings of Harvard alumnus and post-colonial scholar Edward Said. The Trump administration's threats to constrain academic freedom and expression at Harvard will make it more difficult for her to adequately educate her students and foster a robust academic space.

259.    One AAUP member is a professor in Women, Gender, and Sexuality Studies ("WGS"). Their research explores the ways in which race, gender, and region have shaped collective memory and archival silence, they teach undergraduate courses on labor history, immigration, and gun violence, and they advise undergraduate students pursuing independent research on topics related to gender, sexuality, and power. This faculty member reasonably fears that Harvard University may accede to Defendants' demands in the face of immense financial pressure. They reasonably fear for the future of their research. Their research and teaching concerns gender and sexuality studies, ethnic studies, African American studies, and critical race theory—all fields disfavored by Defendants. If Harvard's leadership makes further concessions to comply with Defendants' demands, this faculty member believes Women, Gender, and Sexuality studies could become a target, with enhanced scrutiny on its curricular offerings and research. This member does not have tenure, which makes them particularly vulnerable to Defendants' demands for budget cuts.

260.    The President of AAUP–Harvard is similarly fearful that colleagues will be denied tenure if their research falls under the broad areas for "reform" listed in the Demand Letter.

261.    The WGS faculty member has also witnessed a chilling effect on scholarly and pedagogical innovation as a direct result of Defendants' attacks on higher education. Their colleagues who teach courses related to gender and sexuality have been targeted and doxed based on the titles and intellectual foci of their courses. They expect these attacks will increase if Harvard further complies with Defendants' demands or loses federal funding.

262.     The President of AAUP–Harvard similarly reports that the demand concerning DEI programs will be interpreted, especially among non-tenure-track and other contingent faculty who do not have the protections of tenure, as implying that any kind of teaching and research related to race, ethnicity, racial equity, and identity in a U.S. or global context could lead to career-damaging consequences.

263.     The WGS faculty member has witnessed a chilling impact on the academic environment at Harvard. They have witnessed that their students are becoming fearful about sharing their perspectives in public. This faculty member's speech has also been chilled. They are Jewish and have conducted significant research on Jewish history in the United States. They wear a keffiyeh on campus as a reminder of their obligation as a Jew to use their relative privilege to participate in *tikkun olam*, or healing the world. They do not believe it is antisemitic to care about and respond to the suffering of others and express care for and solidarity with the Palestinian people. Nonetheless, they have become more cautious about sharing their thoughts related to Palestine and Israel in the classroom and on campus. They also worry now that if they wear their keffiyeh in public, they may be inviting physical harm or violence.

264.     An AAUP member reports that they had been vocal in support of pro-Palestine student protestors in the past but adjusted their speech and teaching as a result of this latest chilling wave of threats from Defendants.

265.     This same member reports that they changed their teaching plans for next semester because they fear harassment. They had planned to teach a course that would have dealt with topics including settler colonialism, slavery, Indian removal, and the U.S.-Mexico War, all of which could be covered by Defendants' ill-defined demand that anything related to DEI be eliminated.

266.    The AAUP–Harvard President reports that two colleagues have changed their plans for courses they intend to teach next fall to avoid topics explicitly disfavored by the Trump administration—one changed their curricular offerings to no longer be explicitly about transgender issues and another to no longer be explicitly about race.

267.    Numerous AAUP members also report on the chilling effect Defendants' threats and demands have had on students.

268.    Rosenthal reports having heartbreaking conversations with graduate students about the risks associated with pursuing certain questions and topics disfavored by Defendants' political agenda for fear that it will inhibit their ability to receive federal grants and find academic jobs. The AAUP–Harvard President reports that students have changed their senior research topics, as well as their behavior, as a result of Defendants' demands.

269.    In one of the AAUP–Harvard President's classes, students were recently speaking about setting up a mutual support Signal group after the detention of Rumeysa Ozturk at Tufts University. One non-citizen student said they were too scared to have Signal on their phone out of fear border agents would think they had something to hide. This prevents the student from fully participating in the scholarly community.

270.    Another non-citizen student was walking through Harvard Yard when they saw a protest with cameras. They pulled up their hoodie and fled in the opposite direction because they were afraid of the repercussions of being photographed at a protest in which they were not even involved.

271.    All members of the AAUP–Harvard chapter are employed by Harvard, and as a result are directly impacted by the threatened imposition of new policies and procedures demanded in the April 3 and April 11 Letters.

272.    AAUP members report that Harvard University has already made changes to policies and procedures in response to Defendants' threats and in anticipation of threats to its federal funding. This complaint provides a few examples.

273.    One AAUP member reports that during the spring admissions cycle, the Public Health School admitted fewer students, and the Global Health program admitted no new students at all, due to the vulnerable state of its federal funding. The AAUP–Harvard President reports that the shrinking of admissions to the School of Public Health will have lasting effects on future scientific research.

## CAUSES OF ACTION

### COUNT I

### APA (5 U.S.C. §§ 702, 704, 706) – Contrary to Procedure and Contrary to Law (Title VI and related law and procedure)

274.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

275.    The APA directs courts to hold unlawful and set aside agency actions that are "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). The APA further directs courts to hold unlawful and set aside agency actions that are found to be "[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C).

276.    Section 602 of Title VI and binding regulations with the force of law, as well as Defendants' internal procedures, establish procedural requirements that must be followed in order to escalate an investigation to a termination of federal funding for alleged noncompliance with Title VI of the Civil Rights Act. *See, e.g.*, 42 U.S.C. § 2000d-1; 34 C.F.R. §§ 100.6-100.11 (ED); 45 C.F.R. §§ 80.6–80.11 (HHS); 28 C.F.R. §§ 42.106–111 (DOJ); 41 C.F.R. §§ 101–6.209-214 (GSA).

277.    Defendants' failure to follow these requirements renders their actions alleged herein without observance of procedure required by law and contrary to law.

278.    Nothing in Title VI, Title VII, or any other law authorizes Defendants' actions as alleged herein taken outside the scope of these governing requirements.

279.    No lawful grant or contract condition authorizes Defendants' actions as alleged herein taken outside the scope of these governing requirements.

280.    Defendants' actions alleged herein constitute "[a]gency action made reviewable by statute," 5 U.S.C. § 704; 42 U.S.C. § 2000d-2, as well as "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704, and is therefore subject to judicial review, 5 U.S.C. §§ 702, 704.

281.    Plaintiffs and their members have suffered a legal wrong as a result of, and have been adversely affected or aggrieved by, Defendants' actions alleged herein for purposes of 5 U.S.C. § 702 and 42 U.S.C. § 2000d-2, including by chilling their speech, including their teaching, and terminating funding for their ongoing scientific research as well as their ability to support that research by making appropriate hiring decisions.

## COUNT II

### APA (5 U.S.C. §§ 702, 704, 706) – Arbitrary and Capricious

282.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

283.    The APA directs courts to hold unlawful and set aside agency actions that are found to be "[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

284.    Agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quotation omitted). This standard requires that agencies provide "a satisfactory explanation for its action[,] including a rational connection between

the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted). An action is also arbitrary and capricious if the agency "failed to consider ... important aspect[s] of the problem." *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 25 (2020) (quotation omitted) (alterations in original).

285.    Defendants' actions alleged herein are arbitrary and capricious because the decision to undertake them was not objectively reasonable and Defendants failed to provide a reasoned explanation for that decision.

286.    Defendants have frozen billions of dollars in funding to Harvard but have failed to provide any reasoned explanation regarding whether or in what particular manner Harvard has failed to comply with any specific requirement of Title VI, Title VII or its implementing regulations.

287.    Defendants have failed to provide any reasoned explanation for whether the funding they have frozen has any relation to the programs (or parts of programs) in which the unidentified Title VI or Title VII violation or violations occurred, or of why those billions of dollars in grants and contracts in particular were targeted for review.

288.    Defendants have failed to provide any reasoned explanation for the imposition of any of the demands listed in the April 3 or April 11 Letters. Defendants failed to link any of the demands to any specific violation of federal law or any funding requirement. Defendants failed to provide any reasoned explanation for why any of the requirements were necessary or sufficient to remedy any violation of federal law. Defendants failed to consider or even acknowledge any of the steps Harvard University has already undertaken that resemble, or obviate the need for, Defendants' demands.

289.    The conditions imposed by the April 3 and April 11 Letters are also arbitrary and capricious because they are vague and indiscernible and fail to provide a sufficiently reasoned basis

to guide compliance.

290.    Defendants' actions alleged herein constitute "[a]gency action made reviewable by statute," 5 U.S.C. § 704, as well as "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704, and is therefore subject to judicial review, 5 U.S.C. §§ 702, 704.

291.    Plaintiffs and their members have suffered a legal wrong as a result of, and have been adversely affected or aggrieved by, Defendants' actions alleged herein for purposes of 5 U.S.C. § 702, including by chilling their speech, including their teaching, and terminating funding for their ongoing scientific research as well as their ability to support that research by making appropriate hiring decisions.

## COUNT III

## First Amendment: Freedom of Speech

292.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

293.    The First Amendment protects Plaintiffs' and Plaintiffs' members' right to free speech and academic freedom, including the right to pursue research and express different viewpoints and political beliefs without retaliation, punishment or deterrence based on the subject matter of that research, or those viewpoints and beliefs.

294.    Defendants' actions alleged herein violate the First Amendment because they constitute coercion, persuasion, and/or intimidation that is intended to and has the effect of inhibiting the free exchange of ideas and promoting a government orthodoxy.

295.    Defendants' actions alleged herein further violate the First Amendment by interfering with Harvard University's curriculum and decisions concerning who may teach and/or areas of research.

296.    Defendants' actions alleged herein further violate the First Amendment by targeting for retaliation specific areas or topics of research, scholarship, and other forms of expression based

79

on content and viewpoint, and by seeking to punish Harvard University, its faculty and its students for engaging in speech disfavored by the government.

297.    Defendants' actions alleged herein further violate the First Amendment by infringing upon the right of Plaintiffs and their members to make expressive choices about what third-party speech to host and provide a forum for in the pursuit of intellectual and academic inquiry and debate.

298.    Defendants' actions alleged herein further violate the First Amendment because they constitute threats of legal sanction and other means of coercion to achieve the suppression of disfavored speech and academic freedom, including by coercing a private party to punish, suppress, or control speech on the government's behalf.

299.    Defendants' actions alleged herein have the purpose and effect of direct and indirect censorship and both content-based and viewpoint-based discrimination against faculty and students at Harvard University, including Plaintiffs' members.

300.    Defendants' actions alleged herein further violate the First Amendment because they constitute funding conditions that place an unconstitutional burden on the First Amendment rights set forth above and leverage funding to regulate unrelated matters outside the contours of any discrete federal program.

301.    Each of these actions standing alone constitutes an independent First Amendment violation.

302.    Defendants' actions alleged herein have already and will continue to chill the speech and academic freedom of Plaintiffs, Plaintiffs' members, and other faculty and students whose freedoms are integral to the mission and work of Plaintiffs and their members.

303.    Defendants' actions alleged herein are not justified by any substantial or compelling

government interest and are not narrowly tailored to serve any such interest.

304.    Federal courts have the equitable power to enjoin unlawful actions by executive officials. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015). This Court can and should exercise its equitable power to enter appropriate declaratory and injunctive relief.

### COUNT IV

### APA (5 U.S.C. §§ 702, 704, 706) – Contrary to Law (First Amendment)

305.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

306.    The APA directs courts to hold unlawful and set aside agency actions that are contrary to constitutional rights. 5 U.S.C. § 706(2)(B).

307.    Defendants' actions alleged herein are contrary to constitutional rights for the reasons set forth in Count III of this Complaint.

308.    Defendants' actions alleged herein constitute "[a]gency action made reviewable by statute," 5 U.S.C. § 704, as well as "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704, and is therefore subject to judicial review, 5 U.S.C. §§ 702, 704.

309.    Plaintiffs and their members have suffered a legal wrong as a result of, and have been adversely affected or aggrieved by, Defendants' actions alleged herein for purposes of 5 U.S.C. § 702.

### COUNT V

### Separation of Powers / Spending Clause (U.S. Const., art I) / *Ultra Vires* Action

310.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

311.    The Constitution vests the legislative power, including the spending power and the authority to place conditions on federal spending, in Congress. U.S. Const., art. I. Federal legislation must be passed by both chambers of Congress before it may be presented to the President, and, if signed, become law. *Id.*; *I.N.S. v. Chadha*, 462 U.S. 919, 951 (1983).

312.    The Constitution vests executive power in the President, U.S. Const., art. II, and imposes on the President a duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3.

313.    Congress exercised its Article I legislative and spending authority to authorize the federal grants and contracts for which Defendants have purported to freeze funding.

314.    None of the funds received by Harvard University have a congressionally authorized condition requiring them to comply with any of the demands in the April 3 or April 11 Letters or that subject them to review in the manner Defendants have undertaken as alleged herein. Defendants' termination of federal funding to Harvard thus is not authorized by statute and will unlawfully override the direct congressional authorization of federal funding. No Article II constitutional power authorizes Defendants to cancel duly authorized federal funding on grounds not authorized by statute.

315.    No law or statute, including Title VI and Title VII, requires Harvard to comply with the demands in the April 3 or April 11 Letters. The demands in the April 3 and April 11 Letters are not necessary to ensure compliance with Title VI or any other federal civil rights law. Even if they were, as alleged above, Defendants failed to follow statutory, regulatory, and other binding procedural requirements for the exercise of powers under these statutes.

316.    No provision of the Constitution authorizes the Executive Branch to enact, amend, or repeal statutes, including both Title VI and appropriations approved and signed into law.

317.    Defendants' actions alleged herein are, therefore, an unconstitutional usurpation of the spending power of Congress, an unconstitutional effort to amend congressional appropriations by attaching conditions not contemplated by Congress, and a violation of the separation of powers. They are therefore *ultra vires*.

318.    Federal courts have the equitable power to enjoin unlawful actions by executive officials. *See, e.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). This Court can and should exercise its equitable power to enter appropriate declaratory and injunctive relief.

## COUNT VI

### APA (5 U.S.C. §§ 702, 704, 706) – Contrary to Law (Separation of Powers / Spending Clause /*Ultra Vires*)

319.     Plaintiffs incorporate the above paragraphs as if fully set forth herein.

320.    The APA directs courts to hold unlawful and set aside agency actions that are found to be "not in accordance with law," 5 U.S.C. § 706(2)(A) or "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B).

321.    Defendants' actions alleged herein are contrary to Article I of the Constitution for the reasons set forth in Count V of this Complaint.

322.    Defendants' actions alleged herein constitute "[a]gency action made reviewable by statute," 5 U.S.C. § 704, as well as "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704, and is therefore subject to judicial review, 5 U.S.C. §§ 702, 704.

323.    Plaintiffs and their members have suffered a legal wrong as a result of, and have been adversely affected or aggrieved by, Defendants' actions alleged herein for purposes of 5 U.S.C. § 702.

## COUNT VII

### Fifth Amendment Due Process Clause (U.S. Const. amend. V)

324.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

325.    The Due Process Clause of the Fifth Amendment to the United States Constitution requires due process of law before the deprivation of a constitutionally protected interest.

326.    Plaintiffs' members have constitutionally protected property interests in funding that supports their salaries and stipends, as well as in their ongoing research. Plaintiffs' members have relied on this funding, and the protections of federal law governing this funding, in pursuing their research, hiring staff, making commitments to research partners, and in many other ways. Plaintiffs' members also have constitutionally protected liberty interests in their freedom of speech and expression, including academic freedom, and in pursuing their livelihoods.

327.    Defendants' termination of federal funding as set forth in this Complaint does not provide the university or Plaintiffs' members fair notice or a reasonable opportunity to be heard.

328.    The Due Process Clause also prohibits government actions that fail to give fair notice of what conduct is forbidden or required.

329.    Defendants' actions alleged herein establish unconstitutionally vague standards for determining whether federal funding will be terminated and do not tie the cancelation of grants and contracts to specific alleged acts or omissions, much less specific conduct reasonably related to the grants and contracts at issue. Nor did the announcement provide any adequate notice to Plaintiffs' members or to Harvard regarding what conduct was forbidden or required to avoid such consequences.

330.    Federal courts have the equitable power to enjoin unlawful actions by executive officials. *See, e.g.*, *Armstrong*, 575 U.S. at 326-27. This Court can and should exercise its equitable power to enter appropriate declaratory and injunctive relief.

## COUNT VIII

## APA (5 U.S.C. §§ 702, 704, 706) – Contrary to Law (Fifth Amendment Due Process)

331.    Plaintiffs incorporate the above paragraphs as if fully set forth herein.

332.    The APA directs courts to hold unlawful and set aside agency actions that are found to be "not in accordance with law." 5 U.S.C. § 706(2)(A). The APA also directs courts to hold

unlawful and set aside agency actions that are contrary to constitutional rights. 5 U.S.C. § 706(2)(B).

333.    Defendants' actions alleged herein are contrary to constitutional rights for the reasons set forth in Count VII of this Complaint.

334.    Defendants' actions alleged herein constitute "[a]gency action made reviewable by statute," 5 U.S.C. § 704, as well as "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704, and is therefore subject to judicial review. 5 U.S.C. §§ 702, 704.

335.    Plaintiffs and their members have suffered a legal wrong as a result of, and have been adversely affected or aggrieved by, Defendants' actions alleged herein for purposes of 5 U.S.C. § 702.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that this Court:

A.  Declare unlawful and set aside Defendants' investigation and review of Harvard University's federal funds, including the threatened and imminent withdrawal or cancellation of federal funds set out in the March 31 Announcement and April 3 and April 11 Letters and the conditions imposed in the April 3 and April 11 Letters, as undertaken in the absence of constitutional and statutory authority, not in compliance with applicable law and procedure, unlawfully coercive, and unconstitutionally intended to target protected speech;

B.  Preliminarily and permanently enjoin any further investigation or review of Harvard University's federal funding, including any threat to withdraw or cancel federal funding or actual withdrawal or cancelation of such funding from Harvard University, in the absence of constitutional and statutory authority and in compliance with applicable law and procedure;

C.  Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from using the withdrawal of federal funds or the threat of withdrawal of federal funds to coerce Harvard University to suppress viewpoints or speech of Plaintiffs and their members, including by specifically enjoining the conditions imposed in the April 3 and April 11 Letters;

D.  Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from using the power of the

government to target and punish Harvard University for the viewpoints and speech of Plaintiffs and their members;

E.   Award Plaintiffs their reasonable attorneys' fees and costs in accordance with law including but not limited to 42 U.S.C. § 1988; and

F.   Award such other relief as the Court deems just and proper.

Dated:   May 5, 2025                                      Respectfully submitted,

                                              By:        /s/ *Daniel H. Silverman*

Philippe Z. Selendy*                                     Daniel H. Silverman (BBO# 704387)
Sean P. Baldwin*                                         COHEN MILSTEIN SELLERS & TOLL PLLC
Corey Stoughton*                                         769 Centre Street
Julie Singer*                                            Suite 207
Hannah R. Miles*                                         Boston, MA 02130
SELENDY GAY PLLC                                         (617) 858-1990
1290 Avenue of the Americas 20th Floor                   dsilverman@cohenmilstein.com
New York, NY  10104
Tel: 212-390-9000                                        Joseph M. Sellers*
pselendy@selendygay.com                                  Benjamin D. Brown*
sbaldwin@selendygay.com                                  Phoebe M. Wolfe*
cstoughton@selendygay.com                                Margaret (Emmy) Wydman*
jsinger@selendygay.com                                   COHEN MILSTEIN SELLERS & TOLL PLLC
hmiles@selendygay.com                                    1100 New York Ave NW, 8th Floor
                                                         Washington, DC 20005
* Admitted *pro hac vice*                                (202) 408-4600
                                                         jsellers@cohenmilstein.com
                                                         bbrown@cohenmilstein.com
                                                         pwolfe@cohenmilstein.com
                                                         ewydman@cohenmilstein.com

                                                         *Attorneys for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document, filed electronically through the Court's CM/ECF system, was sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).


Dated: May 5, 2025                                     */s/ Daniel Silverman*
                                                                    Daniel Silverman