# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE,

*Plaintiff*,

v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, et al.,

*Defendants*.

Case No. 1:25-cv-11048-ADB

# MEMORANDUM IN SUPPORT OF
# PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 5

    A.   Harvard Has Long Secured Federal Grants for Crucial, Cutting-Edge Research........... 5

    B.   Congress Set Out Detailed and Mandatory Procedures in Title VI that Agencies Must Follow Before Halting Federal Funding Due to Discrimination. .......................... 6

    C.   Harvard Responds to Antisemitism on Its Campus. ...................................................... 7

    D.   Defendants Threaten Harvard's Federal Research Funding. ....................................... 11

    E.   Harvard Rejects the Government's Unconstitutional Demands. ................................. 14

    F.   Defendants Retaliate by Freezing and then Terminating Harvard's Federal Research Funding........................................................................................................... 15

LEGAL STANDARD ........................................................................................................ 21

ARGUMENT ..................................................................................................................... 22

I.    The Government's Actions Violate the First Amendment (Counts 1 and 2). ..................... 22

    A.   The Government's Targeted Coercion of Harvard Is Unlawful Retaliation for Harvard's Protected Expression. ................................................................................... 23

    B.   The Government's Demands Imposed Unconstitutional Conditions on Harvard's Funding. .................................................................................................................... 28

    C.   At Minimum, the Government's Conduct Triggers Strict Scrutiny, Which the Government Cannot Satisfy. ........................................................................................ 30

II.   The Freeze Orders and Terminations Violate Title VI (Counts 3 and 4). ........................... 32

III.  The Freeze Orders and Termination Letters Are Arbitrary and Capricious (Count 5)......... 38

    A.   The Government Failed to Provide a Reasoned Explanation Why It Was Necessary to Freeze and Terminate Funding to Harvard.............................................. 38

    B.   The Government Failed to Consider Important Aspects of the Problem in Freezing and Terminating Funding to Harvard............................................................................ 42

    C.   The Government Failed to Consider Serious Reliance Interests Before Freezing and Terminating Federal Funding to Harvard................................................................ 45

IV.  The Freeze Orders and Termination Letters Are *Ultra Vires* (Counts 2 and 6). ................. 46

V.   The Court Should Enter an Injunction Permanently Enjoining Conduct Similar to The Freeze Orders and Termination Letters. ................................................................................ 46

CONCLUSION................................................................................................................... 48

CERTIFICATE OF SERVICE .......................................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Bell*,
711 F.2d 161 (D.C. Cir. 1983)................................................................................34

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013)..............................................................................29, 30, 31

*Alexander v. Choate*,
469 U.S. 287 (1985)................................................................................39

*Alexander v. Sandoval*,
532 U.S. 275 (2001)............................................................................6, 32, 39

*Am. Pub. Health Ass'n v. NIH*,
No. 1-25-cv-10787-WGY, slip op. (D. Mass. May 30, 2025)................................37

*Amerijet Int'l, Inc. v. Pistole*,
753 F.3d 1343 (D.C. Cir. 2014)..............................................................40

*Amoco Prod. Co. v. Village of Gambell*,
480 U.S. 531 (1987)................................................................................46

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021)................................................................................31

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015)............................................................................22, 46

*Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*,
490 F.3d 1 (1st Cir. 2007)........................................................................23

*Ass'n Am. Univs. v. Dep't of Energy*,
2025 WL 1414135 (D. Mass. May 15, 2025)............................................47

*Barton v. Clancy*,
632 F.3d 9 (1st Cir. 2011)........................................................................25

*Bennett v. Spear*,
520 U.S. 154 (1997)................................................................................22

*Berge v. Sch. Comm. of Gloucester*,
107 F.4th 33 (1st Cir. 2024)....................................................................23

*Berner v. Delahanty*,
    129 F.3d 20 (1st Cir. 1997)....................................................................................28

*Blasdel v. Nw. Univ.*,
    687 F.3d 813 (7th Cir. 2012) ................................................................................23

*Borough of Duryea v. Guarnieri*,
    564 U.S. 379 (2011)..............................................................................................24

*Bos. Redevelopment Auth. v. Nat'l Park Serv.*,
    838 F.3d 42 (1st Cir. 2016)...................................................................................39

*California v. ATF*,
    718 F. Supp. 3d 1060 (N.D. Cal. 2024) ................................................................35

*Citizens Awareness Network, Inc. v. U.S. Nuclear Regul. Comm'n*,
    59 F.3d 284 (1st Cir. 1995)...................................................................................21

*City of Brookings Mun. Tele. Co. v. FCC*,
    822 F.2d 1153 (D.C. Cir. 1987) ............................................................................44

*City of Providence v. Barr*,
    954 F.3d 23 (1st Cir. 2020)...................................................................................46

*Climate United Fund v. Citibank, N.A.*,
    2025 WL 1131412 (D.D.C. Apr. 16, 2025) ...........................................................37

*DHS v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020)..............................................................................21, 37, 43, 45

*Doe v. Noem*,
    2025 WL 1099602 (D. Mass. Apr. 14, 2025) ........................................................40

*El Dia, Inc. v. Governor Rosello*,
    165 F.3d 106 (1st Cir. 1999).................................................................................31

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016)..............................................................................................44

*Esch v. Yeutter*,
    876 F.2d 976 (D.C. Cir. 1989) ..............................................................................39

*Esso Standard Oil Co. v. Freytes*,
    467 F. Supp. 2d 156 (D.P.R. 2006).................................................................46, 47

*Frazier v. Mabus*,
    901 F. Supp. 2d 600 (W.D. Pa. 2012)...................................................................35

*Guardians Ass'n v. Civ. Serv. Comm'n of City of N.Y.*,
  463 U.S. 582 (1983)............................................................................6, 33

*Healy v. James*,
  408 U.S. 169 (1972).............................................................................24

*Hous. Cmty. Coll. Sys. v. Wilson*,
  595 U.S. 468 (2022).............................................................................23

*Housatonic River Initiative v. EPA*,
  75 F.4th 248 (1st Cir. 2023).................................................................39

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
  341 U.S. 123 (1951).............................................................................27

*Koontz v. St. Johns River Water Mgmt. Dist.*,
  570 U.S. 595 (2013).............................................................................29

*League of Women Voters v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016)..................................................................25

*Lozman v. Riviera Beach*,
  585 U.S. 87 (2018)...............................................................................24

*Manchester v. Town of Ludlow*,
  2025 WL 1208717 (D. Mass. Apr. 25, 2025) ........................................28

*Mandel v. U.S. Dep't of Health, Ed. & Welfare*,
  411 F. Supp. 542 (D. Md. 1976)...........................................................33

*Massachusetts v. NIH*,
  2025 WL 702163 (D. Mass. Mar. 5, 2025)......................................40, 48

*Matal v. Tam*,
  582 U.S. 218 (2017).............................................................................27

*Media Matters for Am. v. Paxton*,
  2025 WL 1536459 (D.C. Cir. May 30, 2025).........................................23

*Michigan v. EPA*,
  576 U.S. 743 (2015).............................................................................43

*Moody v. NetChoice*,
  603 U.S. 707 (2024)........................................................3, 27, 28, 29, 31

*Morton v. Ruiz*,
  415 U.S. 199 (1974).............................................................................35

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ....................................................................................................38

*Nat'l Council of Nonprofits v. OMB*,
  763 F. Supp. 3d 36 (D.D.C. Feb. 3, 2025) ...............................................................44

*Nat'l Rifle Ass'n v. Vullo*,
  602 U.S. 175 (2024) ..........................................................................................3, 27, 30

*New York v. Trump*,
  133 F.4th 51 (1st Cir. 2025) .......................................................................................22

*Ohio v. EPA*,
  603 U.S. 279 (2024) ...............................................................................................21, 38

*Orr v. Trump*,
  2025 WL 1145271 (D. Mass. Apr. 18, 2025) .............................................................40

*Perry v. Sinderman*,
  408 U.S. 593 (1972) ...............................................................................................29, 30

*R.I. Dep't of Env't. Mgmt. v. United States*,
  304 F.3d 31 (1st Cir. 2002) .........................................................................................22

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) .....................................................................................................31

*Regents of Univ. of Mich. v. Ewing*,
  474 U.S. 214 (1985) ...............................................................................................23, 24

*Rosenberger v. Rectors & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) .....................................................................................................27

*Smyth v. Dudek*,
  2025 WL 895362 (D. Mass. Mar. 24, 2025) ..............................................................37

*Tolan v. Cotton*,
  572 U.S. 650 (2014) .....................................................................................................22

*United States v. Playboy Ent. Grp.*,
  529 U.S. 803 (2000) .....................................................................................................29

*Weinstock v. Columbia Univ.*,
  224 F.3d 33 (2d Cir. 2000) ..........................................................................................24

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*,
  2025 WL 1502329 (D.D.C. May 27, 2025) ...........................................................24, 25

*Woonasquatucket River Watershed Council v. USDA*,
  2025 WL 1116157 (D.R.I. Apr. 15, 2025)............................................................22, 42, 44, 46

*Zeno v. Pine Plains Cent. Sch. Dist.*,
  702 F.3d 655 (2d Cir. 2012)..........................................................................................40

**Statutes**

5 U.S.C. § 704 ............................................................................................................21

5 U.S.C. § 706 ......................................................................................................21, 46

42 U.S.C. § 2000d ....................................................................................................6, 32

42 U.S.C. § 2000d-1 ....................................................................4, 6, 32, 33, 34, 42

42 U.S.C. § 2000d-2 ....................................................................................................21

**Regulations**

2 C.F.R. § 200.340 ............................................................................................ 18, 36-37

2 C.F.R. § 200.341 ......................................................................................................37

2 C.F.R. § 200.342 ......................................................................................................37

2 C.F.R. § 200.344 ....................................................................................................5, 48

6 C.F.R. § 21 ..................................................................................................................7

6 C.F.R. § 21.13 ............................................................................................................36

6 C.F.R. § 21.15 ............................................................................................................36

7 C.F.R. § 15.8 ..........................................................................................................7, 36

7 C.F.R. § 15.9 ..............................................................................................................36

10 C.F.R. § 1040.1 ..........................................................................................................7

10 C.F.R. § 1040.89-9 ....................................................................................................36

10 C.F.R. § 1040.114 ......................................................................................................36

14 C.F.R. § 1250.101 ......................................................................................................7

14 C.F.R. § 1250.107 ......................................................................................................36

14 C.F.R. § 1250.108 ......................................................................................................36

15 C.F.R. § 8.11 ..............................................................................................7, 36

15 C.F.R. § 8.12 ...................................................................................................36

18 C.F.R. § 808.1 .................................................................................................36

24 C.F.R. § 1.8 ..............................................................................................7, 36

24 C.F.R. § 1.9 ....................................................................................................36

28 C.F.R. § 42.103 ................................................................................................7

28 C.F.R. § 42.107 ...............................................................................................32

28 C.F.R. § 42.108 ..........................................................................................32, 36

28 C.F.R. § 42.109 ...............................................................................................36

32 C.F.R. § 195.1 ..................................................................................................7

32 C.F.R. § 195.9 .................................................................................................36

32 C.F.R. § 195.10 ...............................................................................................36

34 C.F.R. § 100.2 ..................................................................................................7

34 C.F.R. § 100.8 .................................................................................................36

34 C.F.R. § 100.9 .................................................................................................36

41 C.F.R. § 101-6.203 ...........................................................................................7

41 C.F.R. § 101-6.211-3 ......................................................................................36

41 C.F.R. § 101-6.212 ..........................................................................................36

45 C.F.R. § 80.2 ....................................................................................................7

45 C.F.R. § 80.8 ...................................................................................................36

45 C.F.R. § 80.9 ...................................................................................................36

45 C.F.R. § 611.1 ..................................................................................................7

45 C.F.R. § 611.8 .................................................................................................36

45 C.F.R. § 611.9 .................................................................................................36

45 C.F.R. § 1040.121 ...........................................................................................36

48 C.F.R. § 52.203-13 ..................................................................................................... 19

**Other Authorities**

@realDonaldTrump, Truth Social (Apr. 15, 2025, 10:09 AM ET),
    https://tinyurl.com/4u7dmjdc ............................................................................... 16

@realDonaldTrump, Truth Social (Apr. 16, 2025, 7:05 AM ET),
    https://tinyurl.com/yww6nfw7 ............................................................................... 16

@realDonaldTrump, Truth Social (Apr. 24, 2025, 9:33 AM ET),
    https://tinyurl.com/y84mntt2 ................................................................................. 16

@realDonaldTrump, Truth Social (May 2, 2025, 7:25 AM ET),
    https://tinyurl.com/35wu7kpk ................................................................................ 16

@realDonaldTrump, Truth Social (May 26, 2025, 8:27 AM ET),
    https://tinyurl.com/4jfk7k2k .................................................................................. 19

@SulkinMaya, X.com (Apr. 22, 2025, 10:13 AM ET), https://perma.cc/9S9T-
    X3PV ..................................................................................................................... 21

@TheLeoTerrell, X.com (Oct. 20, 2024, 3:33 PM ET), https://perma.cc/C9EZ-
    9Q2J ....................................................................................................................... 12

Alan Blinder, *Alan Garber Will Stay On as Harvard's President*, N.Y. Times
    (Aug. 2, 2024), https://perma.cc/6HTP-55RL .......................................................... 9

Alan M. Garber & John F. Manning, *Our Research Enterprise*, Off. of the
    President and Provost (May 14, 2025), https://perma.cc/5RYZ-M6SL ..................... 45

Alan M. Garber, *The Promise of American Higher Education*, Harvard Univ.: Off.
    of the President (Apr. 14, 2025), https://perma.cc/L4G7-J8UB .......................... 1, 15

Alan M. Garber, *Update on Presidential Task Forces*, Harvard Univ.: Off. of the
    President (Apr. 29, 2025), https://perma.cc/57TR-CNQ4 ....................................... 11

*Announcement of Presidential Task Forces*, Harvard Univ.: Off. of the President
    (Jan. 19, 2024), https://perma.cc/45XJ-4NSV .......................................................... 9

Avani B. Rai & Saketh Sundar, *Harvard's Researchers Take Center Stage in
    Funding Showdown with Trump*, Harvard Crimson (Apr. 15, 2025),
    https://perma.cc/KH7R-4GBY ................................................................................ 35

Benjamin Boettner, *David Walt Named as Laureate for National Medal of
    Technology and Innovation*, Wyss Inst. (Jan. 7, 2025),
    https://perma.cc/W8ZG-SMZ8 .............................................................................. 43

*Campus Use Rules*, Harvard Univ.: Off. of the Exec. Vice President,
https://perma.cc/2M4M-ZS2C ............................................................................9

Canceling Harvard's Federal Funding: Education Secretary Linda McMahon on
President Trump's Plan (CNBC, aired May 28, 2025, 9:12 AM ET),
https://tinyurl.com/2bh7wfws ............................................................................2

Dep't of Ed., Off. for Civil Rights, *Case Processing Manual* (Feb. 19, 2025),
https://perma.cc/RS9X-77CF ..................................................................... 39-40

Dep't of Educ., Off. for Civil Rights, *Annual Report to the Secretary, the
President, and the Congress* (Fiscal Year 2019), https://perma.cc/FBK2-
74WA ...............................................................................................................44

Dhruv T. Patel & Grace E. Yoon, *HHS Freezes $60 Million in Federal Grants to
Harvard in Third Round of Trump Cuts*, Harvard Crimson (May 20, 2025),
https://perma.cc/3592-75P6 ..............................................................................19

*Frequently Asked Questions*, Harvard Univ.: Off. for Cmty. Conduct,
https://perma.cc/3NKY-LD97 .............................................................................8

*Frequently Asked Questions: Protests in Libraries*, Harvard Libr. (Dec. 10, 2024),
https://perma.cc/AK9P-GPHH.............................................................................8

*Guidance on Addressing Online Harassment*, Harvard Univ.: Off. of the President
(Sept. 5, 2024), https://perma.cc/25YW-EFN2 ....................................................8

*Harvard University: Developing Advanced NMR Techniques to Predict and
Monitor CO2 Storage and Mineralization for Enhanced Mining Exploration
and Operation*, ARPA-E, https://perma.cc/9WG9-XT6L .....................................35

J. Sellers Hill & Nia L. Orakwue, *Harvard Student Groups Face Intense Backlash
for Statement Calling Israel 'Entirely Responsible' for Hamas Attack*, Harvard
Crimson (Oct. 10, 2023), https://perma.cc/Z3K4-QJKF ........................................8

*John Manning Named Next Provost*, Harvard Gazette (Aug. 15, 2024),
https://perma.cc/UAP8-34CP; ............................................................................9

Josef Federman & Issam Adwan, *Hamas Surprise Attack Out of Gaza Stuns Israel
and Leaves Hundreds Dead in Fighting, Retaliation*, Associated Press (Oct. 7,
2023), https://tinyurl.com/mr2m7hek ...................................................................8

Letter from Alan M. Garber, President, Harvard Univ., to Linda E. McMahon,
Sec'y of Educ., U.S. Dep't of Educ. (May 12, 2025), https://perma.cc/Y7F9-
C7FD..................................................................................................................19

Letter from Kristi Noem, Sec'y of Homeland Sec., to Harvard Univ. (May 22,
2025), https://perma.cc/Q2NW-E8DF .................................................................20

Lewis Carroll, *Alice's Adventures in Wonderland* (Macmillan & Co. 1866) (1865) ...................32

Liz Mineo, *Freezing Funding Halts Medical, Engineering, and Scientific Research*, Harvard Gazette (Apr. 21, 2025), https://perma.cc/4MQ6-DRXA........................35

Max J. Krupnick, *David Deming Announced as Harvard College Dean*, Harvard Mag. (May 15, 2025), https://perma.cc/EP98-23MK ................................................9

Michael C. Bender & Michael S. Schmidt, *Trump Administration Escalates Harvard Feud with New Justice Dept. Investigation*, N.Y. Times (May 15, 2025), https://perma.cc/M326-4APV.......................................................................21

Mike Damiano & Hilary Burns, *Can Harvard Outlast the Trump Administration and its Unrelenting Onslaught?*, Boston Globe (May 31, 2025), https://perma.cc/ZL5N-D9ZB...............................................................................20, 26

*New Member of Harvard Corporation*, Harvard Univ.: Off. of the President (May 29, 2025), https://perma.cc/22HB-YZWS ................................................................9

Nicholas Nehamas, *Trump's Push to Defund Harvard Prompts Clash Over Veteran Suicide Research*, N.Y. Times (May 16, 2025) .........................................43

Nina Pasquini, *Research on Hold: Funding Freeze Halts Harvard Projects Overnight*, Harvard Mag. (Apr. 18, 2025), https://perma.cc/5K2W-D4TN ...........................43

President Donald Trump Taking Questions in the Oval Office (Newsmax, aired May 28, 2025, 12:42 PM ET), https://perma.cc/ZUC6-3SP6........................................2, 19, 26

Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias, Harvard Univ., *Final Report* (Apr. 29, 2025), https://perma.cc/2QS7-4YE6 .............. 9, 34-35

Press Release, U.S. Dep't of Educ., *U.S. Department of Education Initiates Records Request from Harvard University After Discovering Inaccurate Foreign Financial Disclosures* (Apr. 18, 2025), https://perma.cc/94K2-BQS7.....................20

Press Release, U.S. Dep't of Health & Human Servs., *Joint Task Force to Combat Anti-Semitism Statement on Additional Harvard Actions* (May 13, 2025), https://perma.cc/99B4-AG8Z.....................................................................................18

Press Release, U.S. Dep't of Homeland Sec., *Secretary Noem Terminates $2.7 Million in DHS Grants; Orders Harvard to Prove Compliance with Foreign Student Requirements*, https://perma.cc/R6SV-9ECQ.................................................16

Press Release, U.S. Dep't of Just., *Justice Department Announces Formation of Task Force to Combat Anti-Semitism* (Feb. 3, 2025), https://perma.cc/9JBC-UZ2D .......................................................................................................................12

*Read the Trump Administration Letter About Harvard Contracts*, N.Y. Times
  (May 27, 2025)...................................................................................................19

*Revising and Implementing Policies, Procedures, and Training*, Harvard Univ.,
  https://perma.cc/DB36-LBRF ..............................................................................11

*Right-of-Center Scholars, Lawyers, and Former Government Officials*, Chron. of
  Higher Educ. (May 23, 2025), https://perma.cc/986N-54T6...................................28

Ronald Brownstein, *Trump's Drive Against Top Universities Could Carry a Big
  Economic Cost*, CNN (Apr. 13, 2025), https://perma.cc/HR4S-5MC2....................5

*Rules for Use of Campus Spaces*, Harvard Univ.: Off. of the Exec. Vice President
  (Aug. 1, 2024), https://perma.cc/3HTH-S4B2........................................................8

Samuel A. Church & Cam N. Srivastava, *DHS Threatens to Revoke Harvard's
  Eligibility to Host International Students Unless It Turns Over Disciplinary
  Records*, Harvard Crimson (Apr. 17, 2025), https://perma.cc/775F-QA32............20

Sophia Cai & Megan Messerly, *White House Convenes Meeting to Brainstorm
  New Harvard Measures*, Politico (May 30, 2025),
  https://tinyurl.com/mr3vy69p ............................................................................27

*Statement of Interim President and Deans on University Rights and
  Responsibilities*, Harvard Univ.: Off. of the President (Jan. 19, 2024),
  https://perma.cc/2ND4-HHDV ............................................................................8

Stephanie Saul, *Trump Intends to Cancel All Federal Funds Directed at Harvard*,
  N.Y. Times (May 27, 2025), https://perma.cc/YE82-KVJT...................................19

*Update on University Committee on Rights and Responsibilities*, Harvard Univ.:
  Off. of the President (Apr. 24, 2025), https://perma.cc/ZD9M-B6JL .....................11

Vita Fellig, *HHS Cancels $60m in CDC-Related Grants for Harvard Citing Jew-
  Hatred*, Jewish News Syndicate (May 20, 2025), https://tinyurl.com/y5x2hp64...................21

## INTRODUCTION

Since Harvard's founding nearly 400 years ago, its students, faculty, and researchers have worked to identify and solve some of society's most pressing problems. They have developed novel drugs to fight Parkinson's and Alzheimer's diseases, engineered nanofibers to protect American military servicemembers and first responders, supported American astronauts in space, and designed an artificial intelligence system that can be used to diagnose and treat cancer. These pathbreaking and life-saving advancements are due in part to the longstanding collaboration between the Government and research universities such as Harvard. Generations of Americans are healthier and safer as a result.

Over the last two months, the Government has abruptly—without any process or reasoned explanation—ended that longstanding partnership in a manner that flagrantly violates the First Amendment multiple times over. On April 11, 2025, citing concerns about alleged antisemitism and ideological bias at Harvard, the Government identified a list of "conditions" that Harvard must satisfy to continue receiving federal funding. Those demands included hiring a third party to conduct an "audit" of the viewpoints of Harvard's student body, faculty, and staff; depending on the audit's results, hiring a "critical mass" of new faculty and admitting a "critical mass" of new students to achieve "viewpoint diversity" in "each department, field, or teaching unit"; and "reducing the power" of certain faculty and students on campus. All told, the tradeoff put to Harvard was clear: Allow the Government to micromanage your viewpoints and your academic institution or jeopardize your ability to pursue medical breakthroughs, scientific discoveries, and innovative solutions.

Because Harvard would not allow itself to be taken over by the Government, Harvard rejected the Government's demands on April 14, 2025. Alan M. Garber, *The Promise of American Higher Education*, Harvard Univ.: Off. of the President (Apr. 14, 2025), https://perma.cc/L4G7-

J8UB. Within hours, the Government retaliated by freezing billions of dollars in federal funding to Harvard. One week later, Harvard again acted to protect its First Amendment freedoms by bringing this lawsuit. The Government *again* retaliated, announcing an end of all new grants to the University, followed by a slew of letters from various agencies formally terminating existing grants with Harvard. Leaving no doubt that the Government's actions were retaliation for Harvard filing suit, the President contrasted Harvard with schools that have not sued, making clear that Harvard is "hurting [itself]" by "fighting."[1] In his words, "every time [Harvard] fight[s], they lose another $250 million."[2] The Secretary of Education echoed that sentiment, announcing that Harvard must "answer to" the filing of this "lawsuit."[3]

The Government's across-the-board freeze and terminations are unreasonable and unreasoned. The Government asserts antisemitism concerns as the basis for its actions but fails to explain how the termination of funding for research to treat cancer, support veterans, and improve national security addresses antisemitism. The Government further fails to acknowledge, let alone engage with, the dozens of steps Harvard has taken and committed to take to address antisemitism and bias. The administrative record in this case only confirms the Government's rush to judgment. It is devoid of any individualized assessments of Harvard's funded projects, the University's efforts to confront antisemitism, or any connection between the two. Instead, the record, although heavily redacted, nevertheless makes clear that the directive to freeze and terminate every dollar of Harvard's research funds came directly from the White House, which dictated the form that

---

[1]    President Donald Trump Taking Questions in the Oval Office at 6:01 (Newsmax, aired May 28, 2025, 12:42 PM ET), https://perma.cc/ZUC6-3SP6.

[2]    *Id.* at 0:54.

[3]    Canceling Harvard's Federal Funding: Education Secretary Linda McMahon on President Trump's Plan at 1:53 (CNBC, aired May 28, 2025, 9:12 AM ET), https://tinyurl.com/2bh7wfws.

such terminations would take and set arbitrary deadlines for particular terminations. That blunt-force punishment is the antithesis of reasoned agency decisionmaking.

Unsurprisingly, the Government's thoughtless approach put grants that administering agencies deemed "critical" to their mission at risk for termination. In one instance, after learning a Department of Defense ("DoD") grant aimed at increasing awareness of emerging biological threats was terminated by senior officials, a contracting official pleaded to save it, noting that Harvard was the "critical" and "top performing team" on the program, and that "[i]nadequate knowledge of the biological threat landscape poses grave and immediate harm to national security" and threatens military servicemember safety. Despite the clear public and national benefit, the Government had informed Harvard the day earlier that the grant had been canceled. In the Government's view, so long as Harvard is punished for exercising its First Amendment rights, the ends justify the means. Nothing in the Government's administrative record indicates that the Secretary of Defense yielded to the contracting official's plea.

The Government's actions are unlawful for multiple reasons. *First*, the Government's actions violate the First Amendment. They are unconstitutional retaliation against Harvard for exercising its First Amendment rights to decide what to teach, to express certain views, and to petition the courts to defend itself. The Government's actions also impose unconstitutional conditions that seek to "interfere with private actors' speech to advance [the Government's] own vision of ideological balance," *Moody v. NetChoice*, 603 U.S. 707, 741 (2024), and "'to achieve the suppression' of disfavored speech," *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 189 (2024) (citation omitted). The Government's content- and viewpoint-based attempt to coerce and control Harvard is blatantly unconstitutional.

*Second*, the Government's actions violate Title VI and its implementing regulations. The Government has asserted antisemitism as the basis for its funding freeze and terminations. Make no mistake: Harvard rejects antisemitism and discrimination in all of its forms. It has made and continues to make structural reforms to eradicate antisemitism on campus. But rather than engage with Harvard regarding those ongoing efforts or even acknowledge them, the Government announced a sweeping and escalating halt to current and future federal research funding to Harvard. That unilateral diktat ignores the prerequisites Congress established in Title VI, which sets forth detailed procedures that the Government "shall" satisfy *before* freezing or terminating federal funding based on discrimination, including providing an opportunity for voluntary compliance, holding a hearing, and tailoring its response to the particular program deemed noncompliant. 42 U.S.C. § 2000d-1. The Government did *none* of those things.

*Third*, the Government's actions are arbitrary and capricious. The Government has not identified any rational connection between antisemitism concerns and the medical, scientific, technological, and other research funding it has frozen or terminated. Nor has the Government acknowledged the significant consequences that the indefinite freeze and termination of billions of dollars in federal research funding will have on Harvard's research programs, the beneficiaries of that research, and the national interest in furthering American innovation. It has also not accounted for the important reliance interests that the longstanding and fruitful collaboration between Harvard and the federal Government has engendered. In all of these ways, the wholesale termination of funding to Harvard violates the basic requirements of the Administrative Procedure Act ("APA").

The Government's unprecedented and unlawful conduct also makes a mockery of this Court's schedule, which now has added urgency. On May 5, just one week after this Court set an

expedited briefing schedule to address the April 14 freeze of federal funds, the Government began terminating Harvard's federal funding. Those actions put Harvard on a 120-day shot clock to "submit all reports (financial, performance, and other reports required by the Federal award)" and "liquidate all financial obligations incurred under the Federal award *no later than 120 calendar days* after the conclusion of the period of performance." 2 C.F.R. § 200.344(b), (c) (emphasis added). Once that close-out occurs, Harvard anticipates the Government will take the position that no restoration of funds is possible, meaning relief from this Court is necessary as soon as possible and no later than September 3, 2025, which is the first date by which Harvard must start submitting this paperwork that would finally close out grant funding.

The Court accordingly should grant summary judgment to Harvard, vacate and set aside the Government's unlawful Freeze Orders and Termination Letters, and permanently enjoin any similar action against Harvard.

## BACKGROUND

### A.    Harvard Has Long Secured Federal Grants for Crucial, Cutting-Edge Research.

University research has long been one of our nation's leading drivers of scientific and medical advancement to improve public welfare. For this reason, since the Second World War, Congress has appropriated monies that are awarded competitively to retain the best researchers in the country—often working at research universities like Harvard—to engage in these vital efforts.[4] Today, this work serves as a cornerstone of American innovation.

Harvard University is the oldest institution of higher learning in the United States and one of the world's leading research universities. Declaration of John Shaw dated June 2, 2025 ("Shaw

---

[4]    Ronald Brownstein, *Trump's Drive Against Top Universities Could Carry a Big Economic Cost*, CNN (Apr. 13, 2025), https://perma.cc/HR4S-5MC2.

Decl.") ¶ 3. Harvard's researchers have pioneered life-altering advancements in improving cancer prevention and treatment, understanding neurodegenerative disorders, creating a new class of antibiotics to treat infections, and studying how spaceflight affects blood cell formation in astronauts. Shaw Decl. ¶ 7. Furthermore, Harvard's research programs—funded in part by the Government—serve as training grounds for the next generation of scientific, technological, medical, and public health leaders, with grants supporting the work of thousands of graduate students and postdoctoral fellows. Shaw Decl. ¶¶ 9, 21.

### B.    Congress Set Out Detailed and Mandatory Procedures in Title VI that Agencies Must Follow Before Halting Federal Funding Due to Discrimination.

Research universities that receive federal funding are subject to Title VI of the Civil Rights Act of 1964, which provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Title VI empowers federal agencies to enforce this provision by terminating federal financial assistance, but it also sets out "elaborate restrictions" agencies must follow to do so. *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001) (citing 42 U.S.C. § 2000d-1).

Because Congress designed termination of federal funding to be a last resort, *Guardians Ass'n v. Civ. Serv. Comm'n of City of N.Y.*, 463 U.S. 582, 601 (1983), those detailed procedures require an agency to first "advise[] the appropriate person or persons of the failure to comply with the requirement and . . . determine[] that compliance cannot be secured by voluntary means," 42 U.S.C. § 2000d-1. If the agency determines that voluntary compliance is not possible, then it must hold a hearing and make express findings on the record before terminating or refusing to grant or to continue federal financial assistance. *Id*. The agency head must file "a full written report of the circumstances and the grounds for such action" with the relevant committees in the House and

Senate. *Id*. The action does not "become effective until thirty days have elapsed after the filing of such report." *Id*. And any terminations the agency imposes must be "limited in [their] effect to the particular program, or part thereof, in which such noncompliance has been so found." *Id*. Agency regulations set forth additional procedural requirements that must be satisfied before the Government may terminate or refuse to grant or to continue federal financial assistance based on Title VI.[5]

### C.    Harvard Responds to Antisemitism on Its Campus.

On October 7, 2023, the terrorist organization Hamas conducted a surprise attack on Israel, killing and brutalizing thousands of Israelis and Americans and taking more than 240 people hostage.[6] This began an ongoing war between Israel and Hamas. Like other schools, Harvard experienced increased tensions among members of its campus community, including students.[7] Members of the Jewish and Israeli communities at Harvard experienced treatment that was vicious and reprehensible.

---

[5]    *E.g.*, 45 C.F.R. § 80.2 (Department of Health and Human Services ("HHS"), National Institutes of Health ("NIH"), and Centers for Disease Control ("CDC")); 45 C.F.R. § 611.1 (National Science Foundation ("NSF")); 32 C.F.R. § 195.1 (DoD); 10 C.F.R. § 1040.1 (Department of Energy ("Energy")); 34 C.F.R. § 100.2 (Department of Education ("Education")); 41 C.F.R. § 101-6.203 (General Services Administration ("GSA")); 28 C.F.R. § 42.103 (Department of Justice ("DOJ")); 14 C.F.R. § 1250.101 (National Aeronautics and Space Administration ("NASA")); 24 C.F.R. § 1.8 (Department of Housing and Urban Development ("HUD")); 7 C.F.R. § 15.8 (Department of Agriculture ("USDA")); 6 C.F.R. § 21 (Department of Homeland Security ("DHS")); 15 C.F.R. § 8.11 (Department of Commerce ("Commerce")).

[6]    Josef Federman & Issam Adwan, *Hamas Surprise Attack Out of Gaza Stuns Israel and Leaves Hundreds Dead in Fighting, Retaliation*, Associated Press (Oct. 7, 2023), https://tinyurl.com/mr2m7hek.

[7]    J. Sellers Hill & Nia L. Orakwue, *Harvard Student Groups Face Intense Backlash for Statement Calling Israel 'Entirely Responsible' for Hamas Attack*, Harvard Crimson (Oct. 10, 2023), https://perma.cc/Z3K4-QJKF.

In response, Harvard made policy and other changes aimed at ensuring its campus is safe, fair, and welcoming to Jewish and Israeli students. Harvard has disciplined those who violate applicable policies, Declaration of Peggy Newell dated June 2, 2025 ("Newell Decl.") ¶ 18; enhanced programs and policies designed to address bias and promote ideological diversity and civil discourse, Newell Decl. ¶¶ 11, 13-15, 24-25[8]; adopted new accountability procedures and clarified policies, Newell Decl. ¶¶ 3, 5, 8, 10-11, 13[9]; supplemented existing safety and security measures, Newell Decl. ¶ 17[10]; and refined its procedures and protections for reporting misconduct, Newell Decl. ¶ 16. Updated policies clarify that protests are not permitted in classrooms, libraries, dormitories, dining halls, Harvard offices, and other places where they would interfere with normal activities, and they expressly prohibit unauthorized encampments, exhibits, and displays on campus.[11] All of these changes were publicly announced and widely reported.

---

[8] *See also, e.g.*, *Guidance on Addressing Online Harassment*, Harvard Univ.: Off. of the President (Sept. 5, 2024), https://perma.cc/25YW-EFN2; *Frequently Asked Questions*, Harvard Univ.: Off. for Cmty. Conduct, https://perma.cc/3NKY-LD97.

[9] *See also Statement of Interim President and Deans on University Rights and Responsibilities*, Harvard Univ.: Off. of the President (Jan. 19, 2024), https://perma.cc/2ND4-HHDV; *Frequently Asked Questions: Protests in Libraries*, Harvard Libr. (Dec. 10, 2024), https://perma.cc/AK9P-GPHH.

[10] *See also, e.g.*, *Rules for Use of Campus Spaces*, Harvard Univ.: Off. of the Exec. Vice President (Aug. 1, 2024), https://perma.cc/3HTH-S4B2; *Campus Use Rules*, Harvard Univ.: Off. of the Exec. Vice President, https://perma.cc/2M4M-ZS2C.

[11] *Statement of Interim President and Deans on University Rights and Responsibilities*, Harvard Univ.: Off. of the President (Jan. 19, 2024), https://perma.cc/2ND4-HHDV; *see also Frequently Asked Questions: Protests in Libraries*, Harvard Libr. (Dec. 10, 2024), https://perma.cc/AK9P-GPHH (explaining how Harvard's Protest and Dissent Guidelines found in the University-wide Statement on Rights and Responsibilities apply to protests in Harvard's libraries); *Rules for Use of Campus Spaces*, Harvard Univ.: Off. of the Exec. Vice President (Aug. 1, 2024), https://perma.cc/3HTH-S4B2; *Campus Use Rules*, Harvard Univ.: Off. of the Exec. Vice President, https://perma.cc/2M4M-ZS2C.

Newell Decl. ¶¶ 4, 6, 9, 12, 19, 23. Harvard has also made several leadership and personnel changes.[12]

Concurrently with these changes, President Garber charged a Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias ("Harvard Task Force") in January 2024 with "identifying the root causes of and contributing factors to bias-based behaviors on campus" and "recommending approaches to combat bias and to mitigate its impact on campus."[13] On April 29, 2025, the Harvard Task Force released a final 311-page report that, while noting "numerous examples of students, staff, and faculty dedicated to renewing and strengthening the Harvard community," acknowledged the "alienating and hostile atmosphere" experienced by many Jewish and Israeli students at Harvard, as well as "instances where administrators and faculty at certain Harvard Schools seemingly fell short in their responsibility to uphold principles of open inquiry, civility, and respectful disagreement within specific courses, programs, and events."[14] The Harvard Task Force was clear, however, that it did not act "as an investigative body," it did not require "corroborating evidence," and its report is not "a definitive conclusion."[15]

---

[12] *See, e.g.,* Alan Blinder, *Alan Garber Will Stay On as Harvard's President*, N.Y. Times (Aug. 2, 2024), https://perma.cc/6HTP-55RL; *John Manning Named Next Provost*, Harvard Gazette (Aug. 15, 2024), https://perma.cc/UAP8-34CP; Max J. Krupnick, *David Deming Announced as Harvard College Dean*, Harvard Mag. (May 15, 2025), https://perma.cc/EP98-23MK; *New Member of Harvard Corporation*, Harvard Univ.: Off. of the President (May 29, 2025), https://perma.cc/22HB-YZWS.

[13] *Announcement of Presidential Task Forces*, Harvard Univ.: Off. of the President (Jan. 19, 2024), https://perma.cc/45XJ-4NSV. The Harvard Task Force "first convened under the name 'Presidential Task Force on Combating Antisemitism,' with 'Anti-Israeli Bias' added in June 2024 to better reflect [its] charge." Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias, Harvard Univ., *Final Report* 5 n.1 (Apr. 29, 2025), https://perma.cc/2QS7-4YE6 [hereinafter *Final Report*].

[14] *Final Report* 26-28, 191, *supra* n.13.

[15] *Id.* at 6-7, 139.

To address its troubling findings, the Harvard Task Force recommended comprehensive changes to "campus culture and student experience" and "governance" at Harvard.[16] The report called for changes in nine specific areas related to "campus culture and student experience": (1) admissions, (2) early student experiences, (3) academics, (4) academic offerings, (5) "co-curricular activities and residential life," (6) "building a pluralistic community," (7) religious life, (8) administrative infrastructure, and (9) "protests, complaints, and discipline."[17] The report recommended that Harvard:

- Create a dedicated leadership position "specifically tasked with addressing antisemitism and anti-Israel bias";

- Provide students with "substantially more opportunities to learn about antisemitism, Jewish history and culture, the history and politics of Israel, Zionism, and the Israeli-Palestinian conflict," and encourage classes to be co-taught where possible to help students ground their views "in established facts, rigorous scholarship, and adequately considered perspectives";

- Develop a channel for informal grievances and anonymous complaints;

- Ensure "greater consistency in disciplinary procedures" across Harvard's Schools; and

- Provide more oversight by tenured faculty over "educational programs and instructor training."[18]

The Harvard Task Force made clear that "the resolutions and the reforms" must come from Harvard.[19] If "external parties . . . seek to compel adoption of some of [the] proposed reforms," the report observed, it "will make it more difficult for Harvard to fix itself."[20]

Harvard is implementing recommendations in the report. As President Garber made clear after the report's release, "Harvard cannot—and will not—abide bigotry" and is committed to

---

[16]    *Id.* at 173-90.

[17]    *Id.* at 174-88.

[18]    *Id.* at 29, 178-79, 184, 188.

[19]    *Id.* at 4.

[20]    *Id.*

"address[ing] with determination at every level of the University" the challenges identified in the report and to "act[ing] decisively" to do so.[21] To that end, Harvard already has taken steps to "centralize[] . . . and to strengthen its disciplinary procedures," including by "empower[ing] the President to call on a faculty panel of the University Committee on Rights and Responsibilities ('UCRR') to investigate, find facts, and impose discipline in cases involving students from multiple Schools and alleged violations of" University policies. Newell Decl. ¶ 16.[22] Harvard's Academic Council (the president, provost, deans, and other senior leaders) is "further developing and implementing new recommendations" in order to "nurtur[e] a widespread sense of belonging and promot[e] respectful dialogue; revis[e] and implement[] policies, procedures, and training; and strengthen[] academic and residential life." Newell Decl. ¶ 29. The University's deans are reviewing recommendations concerning admissions, appointments, curriculum, and orientation and training programs, and they have been directed to submit "action plans" by June 2025 for each of Harvard's schools. Newell Decl. ¶ 29. The Office of the President and Provost "will oversee the implementation of recommendations," including "the establishment of a University-wide initiative to promote and support viewpoint diversity." Newell Decl. ¶ 29.

### D.    Defendants Threaten Harvard's Federal Research Funding.

On February 3, 2025, DOJ announced the formation of a multi-agency Task Force to Combat Antisemitism ("Federal Task Force") including representatives from DOJ, the Department

---

[21]    Alan M. Garber, *Update on Presidential Task Forces*, Harvard Univ.: Off. of the President (Apr. 29, 2025), https://perma.cc/57TR-CNQ4.

[22]    *See also Update on University Committee on Rights and Responsibilities*, Harvard Univ.: Off. of the President (Apr. 24, 2025), https://perma.cc/ZD9M-B6JL; *Revising and Implementing Policies, Procedures, and Training*, Harvard Univ., https://perma.cc/DB36-LBRF.

of Education ("Education"), HHS, and other agencies.[23] Leo Terrell, an appointee of the President, was selected to head the Federal Task Force. Prior to his appointment, Terrell made his views about Harvard clear, promising that "Harvard will lose much more effective January 2025."[24] On March 31, the Federal Task Force notified Harvard of a "review" of more than $8.7 billion in federal funding to Harvard (the "March 31 Letter"). GSAHarv_00000003-4.[25] The March 31 Letter linked the review of funding to Defendants' allegations about antisemitism on Harvard's campus. GSAHarv_00000003; *see* Declaration of Steven P. Lehotsky dated June 2, 2025 ("Lehotsky Decl."), Ex. 1 at 2 (cover e-mail stating review related to antisemitism concerns).

The Federal Task Force followed up on April 3, 2025, with an "official notice" of certain "pre-conditions" with which Harvard was required to comply to continue receiving federal funding. HHSHarv_00000061. The April 3 Letter expressly invoked Title VI, alleging that Harvard had "failed to protect American students and faculty from antisemitic violence and harassment in addition to other alleged violations of Title VI and Title VII" (the "April 3 Letter"). HHSHarv_00000062-63. And it described "several broad, non-exhaustive areas of reform that the government views as necessary for Harvard to implement to remain a responsible recipient of federal taxpayer dollars," including reforms "to foster clear lines of authority"; oversight of "biased programs" and to "improve viewpoint diversity"; and efforts "to shutter" diversity, equity, and inclusion ("DEI") programs that "teach" certain things. HHSHarv_00000062-63. The April 3

---

[23]   Press Release, U.S. Dep't of Just., *Justice Department Announces Formation of Task Force to Combat Anti-Semitism* (Feb. 3, 2025), https://perma.cc/9JBC-UZ2D.

[24]   @TheLeoTerrell, X.com (Oct. 20, 2024, 3:33 PM ET), https://perma.cc/C9EZ-9Q2J.

[25]   The parties are working to assemble a compilation of excerpts from the administrative record that are referenced in the briefing. The parties will submit this compilation to the Court in short order.

Letter demanded Harvard's "immediate cooperation in implementing" what it deemed "these critical reforms." HHSHarv_00000063.

On the same day, the Government sent Harvard's counsel an email to schedule a meeting, attaching a document that provided a "[m]enu" of demands. HHSHarv_00005233. Many of those demands mirrored those contained in the April 3 Letter, such as a "choice" between "install[ing] new leadership in problematic depts" and "receivership." HHSHarv_00005234 (formatting altered). The document also sought a "[s]enior secured 1st Lien on all Harvard assets which will serve as collateral to pay back [the] government from Harvard in event of non-compliance in the future." HHSHarv_00005235.

On April 11, 2025, the Federal Task Force sent another letter to President Garber (the "April 11 Letter"). HHSHarv_00000098-102. The April 11 Letter, which "incorporates and supersedes" the April 3 Letter, asserted that Harvard "failed to live up to . . . [the] civil rights conditions that justify federal investment" and laid out a more detailed list of conditions to "maintain Harvard's financial relationship with the federal government," many of which were aimed at monitoring and policing the viewpoints of the University's students and faculty. HHSHarv_00000098. They included:

- "commission[ing] an external party, which shall satisfy the federal government as to its competence and good faith, to *audit the student body, faculty, staff, and leadership* for viewpoint diversity, such that each department, field, or teaching unit *must be individually viewpoint diverse*";

- "abolish[ing] all criteria, preferences, and practices, whether mandatory or optional, throughout its admissions and hiring practices, that function as ideological litmus tests";

- for departments, fields, and teaching units found to "lack viewpoint diversity," "hiring a *critical mass* of new faculty" and "admitting a *critical mass* of students" to provide the Government's preferred balance of viewpoint diversity;

- "reform[ing] and restructuring" governance; "*reducing the power* held by students and untenured faculty," as well as "the power held by faculty . . . more committed to activism than scholarship"; and

- "shutter[ing]" all DEI programs "through *structural and personnel changes*."

HHSHarv_00000098-100 (emphases added). The final arbiter of compliance with these conditions would be the federal government, which would retain the right to audit Harvard (or review final audit reports by third parties) until at least the end of 2028. HHSHarv_00000102. Like the April 3 Letter, the April 11 Letter made clear the Government expected "immediate cooperation in implementing these critical reforms" if the University wanted to "maintain Harvard's financial relationship with the federal government." HHSHarv_00000098-102. Neither the April 3 nor the April 11 letter acknowledged the reforms and commitments Harvard had already made, including commissioning the Harvard Task Force, which already had issued its preliminary recommendations. Nor did the letters even purport to follow Title VI's rigorous procedural requirements that govern termination of federal financial assistance.

### E.    Harvard Rejects the Government's Unconstitutional Demands.

In a letter to the Government on April 14, 2025, Harvard explained that "[n]either Harvard nor any other private university can allow itself to be taken over by the federal government." HHSHarv_00000105. Because the April 11 Letter "presents demands that, in contravention of the First Amendment, invade university freedoms long recognized by the Supreme Court," "Harvard is not prepared to agree to demands that go beyond the lawful authority of this or any administration" and "will not accept the government's terms." HHSHarv_00000104-05. That same day, President Garber explained in a public message to the Harvard community that "[a]lthough some of the demands outlined by the government are aimed at combating antisemitism, the

majority represent direct governmental regulation of the 'intellectual conditions' at Harvard."[26] He explained that Harvard "do[es] not take lightly [its] moral duty to fight antisemitism," noting the steps Harvard had already taken and would continue to take.[27] Ultimately, President Garber made clear that "[n]o government—regardless of which party is in power—should dictate what private universities can teach, whom they can admit and hire, and which areas of study and inquiry they can pursue."[28]

### F.    Defendants Retaliate by Freezing and then Terminating Harvard's Federal Research Funding.

Within hours of Harvard's April 14 refusal of the demands, the Government "announc[ed] a freeze on $2.2 billion in multi-year grants and $60 [million] in multi-year contract[s] . . . to Harvard University" (the "April 14 Freeze Order"). GSAHarv_00000012-13. The April 14 Freeze Order cited as its motivation "[t]he harassment of Jewish students" and "the troubling entitlement mindset that is endemic in our nation's most prestigious universities and colleges." GSAHarv_00000013. It did not acknowledge Harvard's communications from earlier that day, outlining the measures Harvard had taken and had committed to take. The Government immediately began issuing stop work orders, which require the cessation of all activities related to the projects. *See, e.g.*, HHSHarv_00005225-29. On April 15, 2025, the morning after the Government announced its freeze, the President opined that Harvard should lose its tax-exempt status because of its "political" and "ideological" views.[29] On April 16, the President criticized

---

[26]  Alan M. Garber, *The Promise of American Higher Education*, Harvard Univ.: Off. of the President (Apr. 14, 2025), https://perma.cc/L4G7-J8UB.

[27]  *Id.*

[28]  *Id.*

[29]  @realDonaldTrump, Truth Social (Apr. 15, 2025, 10:09 AM ET), https://tinyurl.com/4u7dmjdc; *see also* @realDonaldTrump, Truth Social (May 2, 2025, 7:25 AM

Harvard for "hiring almost all woke, Radical Left, idiots" and said Harvard "should no longer receive Federal Funds."[30] That same day, DHS terminated two grants "totaling over $2.7 million to Harvard University, declaring it unfit to be entrusted with taxpayer dollars."[31] On April 24, three days after Harvard filed this suit, the President again denounced the University as "a Liberal mess," while referencing this lawsuit.[32]

On May 5, 2025, the Secretary of Education, somehow purporting to speak on behalf of every federal agency and department, announced an "end of new grants for the University" (the "May 5 Freeze Order"). EDHarvAR_0000010. The May 5 Freeze Order stated that "Harvard should no longer seek GRANTS from the federal government, since none will be provided," and stated unequivocally that "Harvard will cease to be a publicly funded institution." EDHarvAR_0000009. In addition to a litany of seemingly unrelated complaints, the letter expressed the Government's objection to what it characterized as an imbalance of viewpoints in Harvard's governance. EDHarvAR_0000008-10. The Government also reiterated its earlier demands from the April letters and emphasized that "[t]he Administration's priorities have not changed." EDHarvAR_0000010.

Even before the May 5 Freeze Order, the Government had begun preparations to terminate existing grants to Harvard. The Federal Task Force collected from agencies the total universe of available grants, *see, e.g*., NASA-AR03541; NASA-AR03547; NASA-AR03558-3636, and

---

ET), https://tinyurl.com/35wu7kpk ("We are going to be taking away Harvard's Tax Exempt Status. It's what they deserve!").

[30]  @realDonaldTrump, Truth Social (Apr. 16, 2025, 7:05 AM ET), https://tinyurl.com/yww6nfw7.

[31]  Press Release, U.S. Dep't of Homeland Sec., *Secretary Noem Terminates $2.7 Million in DHS Grants; Orders Harvard to Prove Compliance with Foreign Student Requirements*, https://perma.cc/R6SV-9ECQ.

[32]  @realDonaldTrump, Truth Social (Apr. 24, 2025, 9:33 AM ET), https://tinyurl.com/y84mntt2.

then—under the direction of the White House and using a common template letter, *see, e.g.*, NASA-AR03637; NASA-AR03679; DoDHarv_00000001—began terminating them on an agency-by-agency basis. Harvard received such letters from NIH, *see* HHSHarv_00000473-75; the USDA, *see* USDA-HARV-AR-00008-9; the Department of Energy, *see* ENERGY AR3932-33; DoD, *see* DoDHarv_00000039-40; NSF, *e.g.*, NSF_Harvard000002; HUD, *see* HUDHarvAR_00000063-64; the Department of Education, *e.g.*, EDHarvAR_0000011-12; the Department of Commerce ("Commerce"), Lehotsky Decl., Ex. 5; and the Centers for Disease Control and Prevention ("CDC"), Lehotsky Decl., Ex. 6. CDC is an agency within HHS.

The terminated awards funded research into issues ranging from breast cancer detection and prevention, to biological threats, to overcoming antibiotic resistance. Shaw Decl. ¶¶ 11, 13. Research in these diverse and critical areas was terminated using boilerplate language with little material variation from agency to agency. No letter presented any program-specific rationale for the terminations, and no letter reflected that any program-specific consideration had occurred. This is because—as the record reflects—the termination decisions were made outside the agencies that are charged with administering the programs and that had made the decision to provide federal funding to Harvard in the first place. *See, e.g.*, HHSHarv_00000061.

Despite ignoring the specific programs and statutory funding authorities at issue, almost all of the letters relied on a purported change in program goals or agency priorities, invoking 2 C.F.R. § 200.340(a)(4). As the letters note, that regulation provides that a federal agency may terminate an award "pursuant to the terms and conditions of the . . . award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4); *see* HHSHarv_00000473-75; ENERGY AR3932-33; DoDHarv_00000039-40; NSF_Harvard000039; HUDHarvAR_00000063; Lehotsky Decl., Ex. 5

17

at 2. In purporting to explain why Harvard's grant awards "no longer effectuate agency priorities," all but one of the letters cited "Harvard's ongoing inaction in the face of repeated and severe harassment and targeting of Jewish students," coupled with Harvard's "refus[al] to take appropriate action . . . . or implement necessary reforms." HHSHarv_00000473-75; ENERGY AR3932-33; DoDHarv_00000039-40; NSF_Harvard000039; Lehotsky Decl., Ex. 6 at 2; *see* USDA-HARV-AR-00008-9; EDHarvAR_0000011; Lehotsky Decl., Ex. 5 at 2. The one letter that did not cite such concerns contained no explanation at all as to which agency priorities supposedly had changed or why Harvard's grant awards purportedly no longer aligned with agency priorities. HUDHarvAR_00000063-64. Most of the letters asserted that "no modification of the projects could align the projects with agency priorities" because Harvard had rejected the Government's demands. *E.g.*, USDA-HARV-AR-00008; HHSHarv_00000474; ENERGY AR3932.

On May 13, 2025, the Federal Task Force issued a press release claiming "Harvard University has repeatedly failed to confront the pervasive race discrimination and anti-Semitic harassment plaguing its campus," and stating that "[t]he Task Force fully supports the Trump Administration's multi-agency move to cut funding to Harvard."[33] Again, the Government did not engage with or even acknowledge the many reforms and commitments Harvard had already made and committed to make to "eliminate antisemitism and other forms of hate from [its] campus."[34] Nor did the Government claim in any way to be adhering to Title VI's detailed procedural requirements.

---

[33] Press Release, U.S. Dep't of Health & Human Servs., *Joint Task Force to Combat Anti-Semitism Statement on Additional Harvard Actions* (May 13, 2025), https://perma.cc/99B4-AG8Z; GSAHarv_00000015.

[34] Letter from Alan M. Garber, President, Harvard Univ., to Linda E. McMahon, Sec'y of Educ., U.S. Dep't of Educ. (May 12, 2025), https://perma.cc/Y7F9-C7FD.

After this flurry of termination letters, the Government resumed its broadscale reductions in federal funding to Harvard. On May 20, 2025, HHS announced it was cutting an additional $60 million in multi-year grants to Harvard.[35] On May 26, the President stated that he was considering taking away "Three Billion Dollars" from "a very antisemitic Harvard," which he would then give to "TRADE SCHOOLS."[36] And on May 27, GSA targeted approximately $100 million in contracts,[37] instructing agencies to "consider [their] contracts with Harvard University and determine whether Harvard and its services effectively promote the priorities of the agency."[38]

The Government has left no doubt as to the impetus for the Freeze Orders and Termination Letters. On May 28, 2025, during an interview in the Oval Office, President Trump candidly remarked that Harvard is "hurting [itself]" by "fighting."[39] He noted that "Columbia has been, really, and they were very, very bad. . . . But they're working with us on finding a solution."[40] Harvard, meanwhile, "wants to fight. They want to show how smart they are, and they're getting their ass kicked."[41] In President Trump's words, "every time [Harvard] fight[s], they lose another $250 million."[42] "All they're doing is getting in deeper and deeper and deeper."[43] That same day,

---

[35] Dhruv T. Patel & Grace E. Yoon, *HHS Freezes $60 Million in Federal Grants to Harvard in Third Round of Trump Cuts*, Harvard Crimson (May 20, 2025), https://perma.cc/3592-75P6.

[36] @realDonaldTrump, Truth Social (May 26, 2025, 8:27 AM ET), https://tinyurl.com/4jfk7k2k.

[37] Stephanie Saul, *Trump Intends to Cancel All Federal Funds Directed at Harvard*, N.Y. Times (May 27, 2025), https://perma.cc/YE82-KVJT. This time, the Government invoked yet another authority—48 C.F.R. § 52.203-13(b)(2)(ii)—as grounds to terminate contracts.

[38] *Read the Trump Administration Letter About Harvard Contracts*, N.Y. Times (May 27, 2025), https://perma.cc/V4DC-VS4Y.

[39] President Donald Trump Taking Questions in the Oval Office at 6:01, *supra* n.1.

[40] *Id.* at 6:04.

[41] *Id.* at 6:19.

[42] *Id.* at 0:54.

[43] *Id.* at 5:10.

the Secretary of Education told CNBC, "[W]e had conversations with President Garber" and "Harvard's answer was a lawsuit."[44] She added, "I've said all along I would like to see Harvard come back to the table. But when the response out of the box is a lawsuit, then you've got to answer to that."[45] On May 30, a White House spokesperson reiterated, "Mr. Garber's public outbursts only fuel the push to shut off the taxpayer money propping up their institution."[46]

Since the Government began sending the Freeze Orders and Termination Letters, Harvard has received notices of termination for over 950 already-awarded federal research projects.[47] Shaw

---

[44] Canceling Harvard's Federal Funding at 1:53, *supra* n.3.

[45] *Id.* at 10:27.

[46] Mike Damiano & Hilary Burns, *Can Harvard Outlast the Trump Administration and its Unrelenting Onslaught?*, Boston Globe (May 31, 2025), https://perma.cc/ZL5N-D9ZB.

[47] The Freeze Orders and Termination Letters are part of a broader Government effort to punish Harvard for refusing to succumb to the Government's unlawful demands. On April 16, DHS threatened Harvard's eligibility to enroll international students. Samuel A. Church & Cam N. Srivastava, *DHS Threatens to Revoke Harvard's Eligibility to Host International Students Unless It Turns Over Disciplinary Records*, Harvard Crimson (Apr. 17, 2025), https://perma.cc/775F-QA32. Five weeks later, it followed through, abruptly revoking Harvard's Student and Exchange Visitor Program certification. Lehotsky Decl., Ex. 4. Letter from Kristi Noem, Sec'y of Homeland Sec., to Harvard Univ. (May 22, 2025), https://perma.cc/Q2NW-E8DF. Harvard sued the next day, and the Court has enjoined the Government's actions. *See* ECF 11, *President & Fellows of Harvard Coll. v. DHS*, No. 1:25-cv-11472-ADB (D. Mass. May 23, 2025) (granting temporary restraining order); ECF 50, *President & Fellows of Harvard Coll.*, No. 1:25-cv-11472-ADB (May 29, 2025) (maintaining temporary restraining order). Between April 17 and April 28, the Department of Education and HHS sent Harvard multiple records requests. *See, e.g.*, Press Release, U.S. Dep't of Educ., *U.S. Department of Education Initiates Records Request from Harvard University After Discovering Inaccurate Foreign Financial Disclosures* (Apr. 18, 2025), https://perma.cc/94K2-BQS7 (Education); @SulkinMaya, X.com (Apr. 22, 2025, 10:13 AM ET), https://perma.cc/9S9T-X3PV (HHS). And on May 19, 2025, DOJ announced that it had opened a False Claims Act investigation into Harvard. *See* Michael C. Bender & Michael S. Schmidt, *Trump Administration Escalates Harvard Feud with New Justice Dept. Investigation*, N.Y. Times (May 15, 2025), https://perma.cc/M326-4APV.

Decl. ¶ 15. Harvard has continued to receive those notices, including after the filing of the Amended Complaint. Lehotsky Decl., Ex. 6.[48]

## LEGAL STANDARD

Under the APA, courts must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D). This standard "is not a rubber stamp," *Citizens Awareness Network, Inc. v. U.S. Nuclear Regul. Comm'n*, 59 F.3d 284, 290 (1st Cir. 1995), and requires that agency action be "reasonable and reasonably explained," *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (citation omitted). Review is limited to "the grounds that the agency invoked when it took the action." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020).

Both "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review" under the APA. 5 U.S.C. § 704. The Freeze Orders and Termination Letters are reviewable on both grounds. Title VI expressly provides for judicial review under the APA of grant terminations based on alleged civil rights violations. *See* 42 U.S.C. § 2000d-2. And the Freeze Orders and Termination Letters "mark the 'consummation' of the agency's decisionmaking process," and constitute action "by which

---

[48]    *See* Vita Fellig, *HHS Cancels $60m in CDC-Related Grants for Harvard Citing Jew-Hatred*, Jewish News Syndicate (May 20, 2025), https://tinyurl.com/y5x2hp64.

'rights or obligations have been determined' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted).[49]

Even where the APA does not apply, this Court has the "equitable power[]" to "enjoin unconstitutional actions by state and federal officers." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327-28 (2015); *see also R.I. Dep't of Env't. Mgmt. v. United States*, 304 F.3d 31, 42-43 (1st Cir. 2002). In that circumstance, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (quoting Fed. R. Civ. P. 56(a)).

## ARGUMENT

## I.   The Government's Actions Violate the First Amendment (Counts 1 and 2).

This case is about the Government's attempt to control the balance of viewpoints at Harvard and commandeer Harvard's autonomous decisionmaking by offering the University an impermissible choice: submit to federal control over its viewpoints, governance, academic programs, students, faculty, and staff or lose every dollar in federal funding. After Harvard exercised its well-established First Amendment rights to reject the Government's unconstitutional demands and to sue to protect its constitutional freedoms, the Government made good on its unconstitutional ultimatum, freezing and terminating billions of dollars in funding and foreclosing Harvard's ability to seek future federal grants.

The Government's actions violated Harvard's First Amendment rights in at least two ways: (1) by retaliating against Harvard based on the exercise of its First Amendment rights, and (2) by

---

[49]   Courts often recognize that agency decisions "paus[ing] all . . . funding" are final agency action. *Woonasquatucket River Watershed Council v. USDA*, 2025 WL 1116157, at *15 (D.R.I. Apr. 15, 2025); *see also, e.g.*, *New York v. Trump*, 133 F.4th 51, 69 (1st Cir. 2025) (funding freeze constituted "final agency action[]").

imposing content- and viewpoint-based burdens on those rights through the imposition of funding conditions that are unrelated to any legitimate government interest in combating antisemitic harassment or otherwise. The Freeze Orders and Termination Letters should be vacated and set aside, and any further similar action against Harvard should be permanently enjoined.

### A.    The Government's Targeted Coercion of Harvard Is Unlawful Retaliation for Harvard's Protected Expression.

"The First Amendment generally 'prohibits government officials from subjecting individuals to retaliatory actions after the fact for having engaged in protected speech.'" *Media Matters for Am. v. Paxton*, 2025 WL 1536459 at *2 (D.C. Cir. May 30, 2025) (quoting *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022)). To establish a prima facie case of First Amendment retaliation, a plaintiff must prove (1) "that [it] engaged in First Amendment-protected conduct," (2) "that [it] suffered an adverse action," (3) "that [its] protected conduct played a 'substantial or motivating' part in the adverse action." *Berge v. Sch. Comm. of Gloucester*, 107 F.4th 33, 37 (1st Cir. 2024) (citation omitted).

*First*, Harvard engaged in constitutionally protected conduct (1) when it refused the Government's demands, which sought to control viewpoints at Harvard, and (2) when it filed this lawsuit. Harvard's First Amendment rights "establish[] a zone of First Amendment protection for the educational process itself," *Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007) (citation omitted), and encompass not only "the independent and uninhibited exchange of ideas among teachers and students," but Harvard's "autonomous decisionmaking," *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 n.12 (1985). Those rights include the ability to "manage an academic community and evaluate teaching and scholarship free from [governmental] interference." *Blasdel v. Nw. Univ.*, 687 F.3d 813, 816 (7th Cir. 2012) (citation omitted). They also include Harvard's "prerogative 'to determine for itself on academic

grounds *who* may teach,'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 47 (2d Cir. 2000) (citation omitted), as well as *what* is taught in the "college classroom," *Healy v. James*, 408 U.S. 169, 180 (1972). The First Amendment also protects the right "to petition the Government for a redress of grievances," U.S. Const. amend. I, meaning "the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011). Put simply, "[f]iling and pursuing lawsuits are forms of protected petitioning," *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 2025 WL 1502329, at *18 (D.D.C. May 27, 2025), that are "integral to the democratic process," *Borough of Duryea*, 564 U.S. at 388.

Harvard exercised both of these critical First Amendment freedoms here, and each drew a swift retaliatory response from the Government. In its April 3 and April 11 Letters, the Government demanded that Harvard overhaul its governance, hiring, and academic programs to the Government's liking—including adopting a balance of ideological diversity and viewpoint that the Government preferred. *See supra* pp.12-14. These extraordinary demands sought to substitute the Government's own judgment for Harvard's. *Ewing*, 474 U.S. at 226 n.12. And when Harvard exercised its First Amendment rights by rejecting the Government's unlawful demands and protecting the University's academic freedom, the Government took no time in striking back. Within hours, the Government froze billions of dollars in federal funding to the University. *See* GSAHarv_00000012-13 ("Harvard's statement today reinforces the troubling entitlement mindset that is endemic in our nation's most prestigious universities[.]"). When Harvard again engaged in First Amendment-protected activity by filing the present lawsuit, the Government again retaliated, announcing a complete and total ban on Harvard's ever again obtaining federal grant funding and terminating billions of dollars of Harvard's federal funding. *See supra* pp.15-21. *Lozman v. Riviera*

*Beach*, 585 U.S. 87, 101 (2018) (recognizing that a claim of government retaliation in response to a lawsuit is "high in the hierarchy of First Amendment values" because the right to petition is "one of the most precious of the liberties safeguarded by the Bill of Rights" (citation omitted)).

*Second*, the Government's actions are patently adverse. "[V]iewed objectively," they "would have a chilling effect on [Plaintiff's] exercise of First Amendment rights" or "would deter a reasonably hardy individual in the exercise of his or her constitutional rights." *Barton v. Clancy*, 632 F.3d 9, 29-30 (1st Cir. 2011). The Government threatened to withhold federal funding unless Harvard surrendered its academic freedom to government control. *See supra* pp.11-14. When Harvard refused, the Government made true on its threat and froze the funds. *See supra* p.15. When Harvard then sued to protect its rights, the Government began terminating the frozen funds and foreclosed all future funding to Harvard. *See supra* p.16.

The message from the Government is clear: Fight, and you will suffer. The Freeze Orders and Termination Letters were the chosen means. And the termination of research funding would deter most any university from exercising its First Amendment rights to avoid jeopardizing its research and educational missions and the livelihoods of its faculty and researchers. *See Wilmer Cutler Pickering Hale & Dorr LLP*, 2025 WL 1502329, at *14 (government action deters speech when it "shouts through a bullhorn: If you take on causes disfavored by President Trump, you will be punished!"); *see also, e.g.*, *League of Women Voters v. Newby*, 838 F.3d 1, 74 (D.C. Cir. 2016) ("An organization is harmed if the 'actions taken by [the defendant] have "perceptibly impaired" the [organization's] programs'" and "directly conflict with the organization's mission." (citations omitted)).

*Third*, the causal link between Harvard's constitutionally protected conduct and the Government's decision to issue its demands and to sanction Harvard for exercising its right not to

accept them is abundantly clear. The Government has been strikingly forthcoming about its motivation. The Termination Letters articulate no individualized grounds for terminating specific grants but instead refer back to the Government's earlier demands and not only state but stress that the impetus for the terminations was Harvard's refusal to accede to the Government's demands. HHSHarv_00000472-75 ("the University has refused to take *appropriate* action" (emphasis added)); USDA-HARV-AR-00008-9 (same); ENERGY AR3932-3933 ("Harvard has refused to take immediate, definitive and *appropriate* remedial action" (emphasis added)).

The Government has made no secret that Harvard's suit is the reason for reprisal. Just last week, President Trump contrasted the Government's comparatively more favorable treatment of Columbia—which "has been . . . very, very bad" but, importantly to the Government, has not sued—with its treatment of Harvard, which the President perceives as "want[ing] to fight." [50] As the President explicitly stated, "every time [Harvard] fight[s], they lose another $250 million." [51] The Secretary of Education likewise connected the dots on the Government's retaliatory motive: "[W]hen the response out of the box is a lawsuit, then you've got to answer that." [52] As did a White House spokesperson: "Mr. Garber's public outbursts only fuel the push to shut off the taxpayer money propping up their institution." [53] After a multi-agency meeting just last Wednesday, May 28, 2025, reportedly convened by the White House to "brainstorm additional punitive measures" against Harvard, the same White House spokesperson suggested that if Harvard had not sued, it

---

[50]  President Donald Trump Taking Questions in the Oval Office at 6:05, *supra* n.1.

[51]  *Id.* at 0:54.

[52]  Canceling Harvard's Federal Funding at 10:31, *supra* n.3.

[53]  Damiano & Burns, *Can Harvard Outlast the Trump Administration*, *supra* n.46.

"would have saved [itself] from [its] self-inflicted demise."[54] Other statements made by the President during this period further underscore the retaliatory nature of the Government's actions. *See supra* pp.15-19.

The Government has made its retaliatory motive painfully clear. Indeed, the Government's campaign to "single[] out" Harvard, *Matal v. Tam*, 582 U.S. 218, 248 (2017) (Kennedy, J., concurring in part and concurring in judgment), through an "officially prepared and proclaimed governmental blacklist[] possess[es] almost every quality of [a] bill[] of attainder, the use of which [has been] from the beginning forbidden to both national and state governments," *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 143-44 (1951) (Black, J., concurring). It cannot be "that the authors of the Constitution, who outlawed the bill of attainder, inadvertently endowed the executive with the power to engage in the same tyrannical practices that had made the bill such an odious institution." *Id.* at 144.

Although any governmental retaliation based on protected speech is an affront to the First Amendment, the retaliation here was especially unconstitutional because it was based on Harvard's "particular views"—the balance of speech on its campus and its refusal to accede to the Government's unlawful demands. *Vullo*, 602 U.S. at 188. The Government's actions against Harvard "target[]" not just "subject matter," but "particular views taken by speakers on a subject." *Rosenberger v. Rectors & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). The Supreme Court has "many times held" that "[o]n the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana." *Moody*, 603 U.S. at 719, 741-42.

---

[54]   Sophia Cai & Megan Messerly, *White House Convenes Meeting to Brainstorm New Harvard Measures*, Politico (May 30, 2025), https://tinyurl.com/mr3vy69p.

The Government's demand that Harvard achieve the Government's conception of "viewpoint diversity" in faculty hiring and student admissions is expressly viewpoint-based. It requires Harvard to hire certain faculty and admit certain students based on (1) the current balance of viewpoints at Harvard and (2) the expressed viewpoints of the faculty to be hired and students to be admitted. HHSHarv_00000098-102. Such viewpoint-based demands are pernicious. They coerce Harvard to host and promote more of the Government's favored views and less of its disfavored views. Although the First Amendment promotes "an expressive realm in which *the public* has access to a wide range of views," it does so "by preventing *the government* from 'tilt[ing] public debate in a preferred direction'" and "decid[ing] what counts as the right balance of private expression." *Moody*, 603 U.S. at 719, 741-42 (first emphasis added) (citation omitted).[55]

**B.    The Government's Demands Imposed Unconstitutional Conditions on Harvard's Funding.**

Even if the Government's actions were not retaliatory, they would independently violate the First Amendment because they condition federal funding on the Government's content- and viewpoint-based restrictions on Harvard's speech and views. Such a claim must first "identify a restriction . . . targeting or limiting speech." *Manchester v. Town of Ludlow*, 2025 WL 1208717, at *5 (D. Mass. Apr. 25, 2025); *see Berner v. Delahanty*, 129 F.3d 20, 26 (1st Cir. 1997) (similar).

---

[55]   As a group of scholars, lawyers, and former government officials have noted, "having the federal government control the viewpoints that are taught and tolerated at universities is not the solution" because "viewpoint diversity" "cannot be reduced to any sort of manageable government-supervised standard." *Statement on Academic Freedom and Harvard by Right-of-Center Scholars, Lawyers, and Former Government Officials*, Chron. of Higher Educ. (May 23, 2025), https://perma.cc/986N-54T6. Moreover, "[a]ny attempt by the federal government to police whether a university is providing adequate viewpoint diversity would itself have to involve viewpoint discrimination, in determining which viewpoints should be represented and which viewpoints need not be." *Id.*

The Government then "bears the burden of proving the constitutionality of its actions" under the applicable level of scrutiny. *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 816 (2000).

For the reasons above, the Government's demands target Harvard's exercise of its First Amendment rights to make decisions that affect the balance of viewpoints on its campus. *See supra* pp.22-28. Those viewpoint-based demands seek to replace the "balance of private expression" at Harvard with the Government's preferred balance of expression. *Moody*, 603 U.S. at 719. It would unquestionably violate the First Amendment if the Government sought to directly regulate Harvard's governance, admissions, and hiring decisions "to 'un-bias' what it thinks biased." *Id*.

Because it would be unconstitutional for the Government to impose its demands on Harvard directly, it is also unconstitutional to impose those same speech restrictions indirectly, through conditions on Harvard's receipt of federal funding. It is blackletter law that the Government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests," because such a denial would "penaliz[e]" and "inhibit[]" the exercise of constitutional rights to "produce a result which [the Government] could not command directly." *Perry v. Sinderman*, 408 U.S. 593, 597 (1972) (citation omitted); *see Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* ("*AID*"), 570 U.S. 205, 214 (2013). Even if the Government could deny funding "for some other reason," that "authority does not imply a lesser power to condition [funding] on [a person's] forfeiture of his constitutional rights." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 608 (2013).

The Government threatened to—and the Freeze Orders and Termination Letters in fact did—deny Harvard the valuable benefit of federal funding due to Harvard's unwillingness to relinquish its First Amendment rights. Specifically, as a condition of a continued "financial relationship with the federal government," the Government demanded, among other measures, that

Harvard increase "viewpoint diversity" in faculty hiring and admissions to achieve the Government's preferred balance of views and shutter academic programs associated with viewpoints the Government disfavors. HHSHarv_00000098-102. The Government thus threatened and terminated funding to "produce a result"—government control over Harvard's academic freedom and speech—that it "could not command directly." *Perry*, 408 U.S. at 597 (citation omitted).

These conditions went far beyond any permissible regulation of speech in the context of the programs funded by the Government at Harvard. *See AID*, 570 U.S. at 217. The Government did not attach germane restrictions that "define the limits of the government spending program" to individual research grants, *id.* at 214; it required Harvard to fundamentally reshape all aspects of its operations as an institution of higher education in order to achieve the Government's preferred ideological balance. "By demanding that funding recipients adopt—as their own—the Government's view on an issue of public concern, the condition by its very nature affects 'protected conduct outside the scope of the federally funded program.'" *Id*. at 218 (citation omitted). If it had accepted the Government's demands, Harvard would have had no ability to make academic decisions about the expression of ideas on its campus without government oversight. The demands thus would not leave Harvard free "to exercise its First Amendment rights outside the scope of the federal program[s]" and are therefore unconstitutional. *Id*. at 219.

## C.    At Minimum, the Government's Conduct Triggers Strict Scrutiny, Which the Government Cannot Satisfy.

The Government's actions are flatly unconstitutional both because they constitute a retaliatory punishment for Harvard's exercise of its First Amendment freedoms and because they impose viewpoint-based conditions on Harvard's federal funding. *See Vullo*, 602 U.S. at 180;

*Mansky*, 585 U.S. at 11; *AID*, 570 U.S. at 221. There is no balancing test under the Constitution that would permit such an outcome.

But at a minimum, strict scrutiny applies because the Government's actions impose explicit content-based burdens. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). And the Government's actions fail strict scrutiny because they are not "narrowly tailored to serve [a] compelling [government] interest[]." *Id.*

The Government has no legitimate interest—much less a compelling one—in forcibly rebalancing speech to suit its ideological preferences. The Government may not "'tilt[] public debate in a preferred direction'" to "improve or better balance the speech market," or "'restrict the speech of some elements of our society in order to enhance the relative voice of others.'" *Moody*, 603 U.S. at 741 (citations omitted); *see El Dia, Inc. v. Governor Rosello*, 165 F.3d 106, 109 (1st Cir. 1999).

Although Harvard and the Government share an interest in combating antisemitic harassment, and Harvard is independently committed to increasing its ideological diversity, indiscriminately freezing and terminating billions of dollars in funding is not the "least restrictive means" of achieving that end. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (citation and quotation marks omitted). Moreover, the Government's demands are the opposite of narrowly tailored. They do not (and do not purport to) combat antisemitic harassment or any other compelling objective in any tailored fashion, and they ignore more targeted measures—like seeking corrective actions focused on any specific programs found to foster antisemitic harassment. They instead, in violation of the First Amendment, pursue the unrelated and unconstitutional end of controlling the balance of viewpoints across every department and program and all aspects of Harvard campus life.

## II.    The Freeze Orders and Terminations Violate Title VI (Counts 3 and 4).

Title VI of the Civil Rights Act of 1964 prohibits "any program or activity receiving Federal financial assistance" from discriminating on the basis of race, color, or national origin. 42 U.S.C. § 2000d. In Title VI, Congress identified specific procedures that an agency must follow *before* "terminating[] or refusing to grant or continue[] assistance" based on an alleged Title VI violation. *Id.* at § 2000d-1 Consistent with Title VI, agency Defendants have promulgated regulations implementing similar procedural requirements that likewise must be followed *before* funding may be terminated, withheld, or frozen for an alleged Title VI violation.[56] *See infra* p.36.

The Government has failed at every step to abide these "elaborate" procedural requirements. *Sandoval*, 532 U.S. at 290. Instead, in a rush to judgment, the Government implemented the Freeze Orders and Termination Letters without following the statutory procedures under Title VI or its own regulations in violation of the APA. "Sentence first—verdict afterwards," as the Queen of Hearts said.[57] The Secretary of Education suggested that Harvard should have continued discussions rather than filing suit, *see supra* p.20, but the Government has this exactly backwards: By terminating funding to Harvard without following the process that Congress mandated, it is the *Government* and not Harvard that took an unlawful procedural shortcut. The Freeze Orders and Termination Letters should be vacated and set aside, and any further similar action should be permanently enjoined.

---

[56]    The Government is fully aware of these mandatory procedural steps. For example, on April 11, 2025, DOJ's Civil Rights Division sent Harvard a letter announcing that it was "commencing a compliance review investigation of Harvard University [specifically, Harvard Medical School] pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*," and noting that "[i]f we conclude that Harvard University is violating Title VI, we will inform you and work with you to secure compliance by informal voluntary means. 28 C.F.R. §§ 42.107 & 42.108." Lehotsky Decl., Ex. 2 at 2. Yet they have utterly ignored those statutory restraints here in craven fealty to command to punish Harvard.

[57]    Lewis Carroll, *Alice's Adventures in Wonderland* 187 (Macmillan & Co. 1866) (1865).

*First,* the Government failed to "advise[] [Harvard] of the failure to comply" with Title VI or provide Harvard with any genuine opportunity to "secure[]" compliance with Title VI "by voluntary means." 42 U.S.C. § 2000d-1. Instead, although terminating federal funding is supposed to be a "last resort, to be used only if all else fails." *Guardians Ass'n*, 463 U.S. at 601 (citation omitted), the Government wants to use it as a cudgel from the start. It sent an escalating series of unconstitutional demands, including many unrelated to antisemitism. Then, when Harvard refused to relinquish its First Amendment rights, the Government terminated Harvard's federal funding. *See supra* p.16. The Government did not even acknowledge, let alone engage with, the numerous steps Harvard has taken and committed to take to address these issues, or that much of that work follows candid self-examination and acknowledgment of shortcomings by the University. The Government's rush to judgment "knowingly foreclosed viable avenues of negotiation while invoking the enforcement process and ordering deferral [of funds], thereby destroying the essence of voluntary negotiation." *Mandel v. U.S. Dep't of Health, Ed. & Welfare*, 411 F. Supp. 542, 555-56 (D. Md. 1976), *aff'd sub nom. Mayor & City Council of Baltimore v. Mathews*, 571 F.2d 1273 (4th Cir. 1978); *see* Plaintiff's Rule 56.1 Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment ("SOF") ¶¶ 96-97.

*Second,* if the Government determines that compliance by voluntary means is not possible, then it may terminate grants only *after* affording the recipient an "opportunity for a hearing" and after making "an express finding on the record." 42 U.S.C. § 2000d-1. The Government here, however, afforded Harvard no "opportunity for [a] hearing" of any kind before abruptly freezing and terminating its funding. 42 U.S.C. § 2000d-1; SOF ¶ 98. Nor did it make any "finding[s]" whatsoever—express or otherwise—on any "record." 42 U.S.C. § 2000d-1; SOF ¶ 99.

*Third*, if the Government takes an action to freeze or terminate funding, then the responsible agency head must file "a full written report of the circumstances and the grounds for such action" with the relevant committees in the House and Senate. 42 U.S.C. § 2000d-1. And no termination of funding may "become effective until thirty days have elapsed after the filing of such report." *Id.* These requirements reflect Congress's recognition of a federal funding recipient's "important reliance interests" in continued federal funding, *Am. Fed'n of Tchrs.*, 2025 WL 1191844, at *11 (staying effective date of final agency action threatening Title VI enforcement), and of the fact that "some funding terminations harm beneficiaries of programs funded as much as they harm fund recipients themselves," *Adams v. Bell*, 711 F.2d 161, 181 (D.C. Cir. 1983). The Government submitted no "written report" to Congress, let alone a "full" report from each relevant agency head to any relevant committee of the House or Senate. 42 U.S.C. § 2000d-1; SOF ¶ 100. And it did not allow for the "thirty days" to elapse before the Freeze Orders and Termination Letters became effective. 42 U.S.C. § 2000d-1; *see* SOF ¶ 101. Instead, the Freeze Orders and Termination Letters took effect immediately. SOF ¶ 101.

*Fourth*, the Freeze Orders and Termination Letters are not "limited in [their] effect to the particular program, or part thereof, in which such noncompliance has been so found." 42 U.S.C. § 2000d-1. As an initial matter, compliance with this statutory requirement has not been satisfied because the Government has not identified with particularity any alleged violation of Title VI, much less the particular program to which any such alleged violation relates. *See supra* p.17.[58] Moreover, the sheer breadth of the Freeze Orders and Termination Letters—which cover the

---

[58]  To the extent the Government relies on the final report of the Harvard Task Force, which post-dates the April 14 Freeze Order, that report expressly is not a "definitive conclusion," is not the result of any "investigation" whatsoever, and also includes hearsay and uncorroborated allegations. *Final Report* 6-7, 139, *supra* n.13.

entirety of Harvard's present and future federal funding—demonstrates that those actions have no reasonable relationship to any purported Title VI violation. The Government in one fell swoop terminated grants related to all manner of medical, scientific, technological, and other projects—ranging from improving the neurologic outcomes for pediatric cancer survivors, to developing drugs to treat long-term radiation exposure and chemotherapy,[59] to studying the effects of particulate matter exposure on military veterans, HHSHarv_00004700,[60] to creating "technologies that provide energy-relevant minerals for economic and national security."[61] *See* SOF ¶ 74. Yet the Government has not identified *any* connection between these valuable research projects and any alleged violation of Title VI, nor can it do so.

*Fifth*, in addition to ignoring the congressionally mandated statutory requirements at issue here, the Freeze Orders and Termination Letters also run afoul of the Government's own regulations implementing Title VI's procedural requirements. *Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.").[62] Like Title VI, the applicable regulations require an opportunity to secure

---

[59]   Liz Mineo, *Freezing Funding Halts Medical, Engineering, and Scientific Research*, Harvard Gazette (Apr. 21, 2025), https://perma.cc/4MQ6-DRXA.

[60]   *See also* Avani B. Rai & Saketh Sundar, *Harvard's Researchers Take Center Stage in Funding Showdown with Trump*, Harvard Crimson (Apr. 15, 2025), https://perma.cc/KH7R-4GBY.

[61]   *Harvard University: Developing Advanced NMR Techniques to Predict and Monitor CO2 Storage and Mineralization for Enhanced Mining Exploration and Operation*, ARPA-E, https://perma.cc/9WG9-XT6L.

[62]   "Precisely which standard ['arbitrary and capricious' or 'not in accordance with law'] applies is not significant; the analysis is largely the same" when the underlying issue is whether an agency is "not adhering to their own final rule/regulation." *California v. ATF*, 718 F. Supp. 3d 1060, 1085 (N.D. Cal. 2024); *see, e.g.*, *Frazier v. Mabus*, 901 F. Supp. 2d 600, 613-14 (W.D. Pa. 2012) (discussing both standards in context of holding that agency failed to follow its own regulations).

compliance through voluntary means,[63] a hearing and findings on the record,[64] the filing of a report with Congress,[65] and a limitation on the suspension or termination to the particular program (or part) that violates Title VI.[66] The Government's failure to follow any of these regulatory procedures is an additional, independent reason that the Freeze Orders and Termination Letters must be set aside as not in accordance with law.

Because the Government could not argue that it has complied with Title VI or its own regulations, the Termination Letters cite a supposed change in "agency priorities" as grounds for terminating Harvard's federal funding under 2 C.F.R. § 200.340. *See, e.g.*, HHSHarv_00000473-75;     ENERGY     AR3932-33;     DoDHarv_00000039-40;     NSF_Harvard000039;

---

[63]  45 C.F.R. § 80.8(c) (HHS, NIH, and CDC); 45 C.F.R. § 611.8(c)(1) (NSF); 32 C.F.R. § 195.9(c) (DoD); 10 C.F.R. § 1040.89-9(c)(1) (Energy); 34 C.F.R. § 100.8(c)(1) (Education); 41 C.F.R. § 101-6.211-3(a) (GSA); 28 C.F.R. § 42.108(c)(1) (DOJ); 14 C.F.R. § 1250.107(c)(1) (NASA); 24 C.F.R. § 1.8(c)(1) (HUD); 7 C.F.R. § 15.8(c)(1) (USDA); 6 C.F.R. § 21.13(c)(1)(i) (DHS); 15 C.F.R. § 8.11(c)(1) (Commerce).

[64]  45 C.F.R. § 80.8(c) (HHS, NIH, and CDC); 45 C.F.R. § 611.8(c)(2) (NSF); 32 C.F.R. § 195.9(c) (DoD); 10 C.F.R. § 1040.89-9(a)(1) (Energy); 34 C.F.R. § 100.8(c)(2) (Education); 41 C.F.R. § 101-6.211-3(b) (GSA); 28 C.F.R. § 42.108(c)(2) (DOJ); 14 C.F.R. § 1250.107(c) (NASA); 24 C.F.R. § 1.8(c)(2) (HUD); 7 C.F.R. § 15.8(c)(2) (USDA); 6 C.F.R. § 21.13(c)(1)(ii) (DHS); 15 C.F.R. § 8.11(c)(2) (Commerce). Each agency has related regulations governing the specific procedural requirements of the referenced hearings. *See* 45 C.F.R. § 80.9 (HHS, NIH, and CDC); 45 C.F.R. § 611.9 (NSF); 32 C.F.R. § 195.10 (DoD); 45 C.F.R. § 1040.121 and 18 C.F.R. § 808.1 (Energy); 34 C.F.R. § 100.9 (Education); 41 C.F.R. § 101-6.212 (GSA); 28 C.F.R. § 42.109 (DOJ); 14 C.F.R. § 1250.108 (NASA); 24 C.F.R. § 1.9 (HUD); 7 C.F.R. § 15.9 (USDA); 6 C.F.R. § 21.15 (DHS); 15 C.F.R. § 8.12 (Commerce).

[65]  45 C.F.R. § 80.8(c) (HHS, NIH, and CDC); 45 C.F.R. § 611.8(c)(4) (NSF); 32 C.F.R. § 195.9(c) (DoD); 10 C.F.R. § 1040.114(e) (Energy); 34 C.F.R. § 100.8(c)(3) (Education); 41 C.F.R. § 101-6.211-3(d) (GSA); 28 C.F.R. § 42.108(c)(4) (DOJ); 14 C.F.R. § 1250.107(c)(4) (NASA); 24 C.F.R. § 1.8(c)(4) (HUD); 7 C.F.R. § 15.8(c)(4) (USDA); 6 C.F.R. § 21.13(c)(1)(iv) (DHS); 15 C.F.R. § 8.11(c)(3) (Commerce).

[66]  45 C.F.R. § 80.8(c)(3) (HHS, NIH, and CDC); 45 C.F.R. § 611.8(c) (NSF); 32 C.F.R. § 195.9(c)(4) (DoD); 45 C.F.R. § 1040.114(e) (Energy); 34 C.F.R. § 100.8(c)(3) (Education); 41 C.F.R. § 101-6.211-3 (GSA); 28 C.F.R. § 42.108(c) (DOJ); 14 C.F.R. § 1250.107(c)(4) (NASA); 24 C.F.R. § 1.8(c)(4) (HUD); 7 C.F.R. § 15.8(c)(4) (USDA); 6 C.F.R. § 21.13(c)(2) (DHS); 15 C.F.R. § 8.11(c)(4) (Commerce).

HUDHarvAR_00000063; Lehotsky Decl., Ex. 5 at 2-3. That "change," however, is the same grievance cited by the Government for weeks—alleged antisemitism and ideological bias at Harvard. EDHarvAR_0000008-10 (stating that "[t]he Administration's priorities have not changed").

The Government does not hide the fact that the Terminations, like the Freeze Orders that preceded them, are part of a coordinated decision to cancel Harvard's funding for purported discrimination—a decision that triggers Title VI and agency regulations. *See supra* p.32. The Government's belated invocation of Section 200.340, which applies by its terms only "to the extent authorized by law," does not somehow obviate the need to follow the overriding procedures Congress specified in Title VI. *See Climate United Fund v. Citibank, N.A.*, 2025 WL 1131412, at *16 (D.D.C. Apr. 16, 2025) ("The regulation establishes a boundary to ensure that when dealing with federal awards, no agency exceeds the legal authority granted to them."); *Am. Pub. Health Ass'n v. NIH*, No. 1-25-cv-10787-WGY, slip op. at 30 (D. Mass. May 30, 2025) ("[T]his regulation only allows agencies to terminate . . . agreements to the extent authorized by law, and this regulation cannot authorize actions that contravene statutory requirements, nor does it relieve the Public Officials of their duty to follow the law.").[67] This Court should not credit this obvious post-hoc attempted end run around the specific statutory scheme Congress has established to resolve the Government's allegations of discrimination. *See, e.g.*, *Regents of Univ. of Cal.*, 591 U.S. at 24 ("This is not the case for cutting corners to allow [the agency] to rely upon reasons absent from its original decision."); *Smyth v. Dudek*, 2025 WL 895362, at *37 (D. Mass. Mar. 24, 2025)

---

[67]    Even if these sections did apply, the Government also failed to follow the procedures outlined in 2 C.F.R. §§ 200.340-.342. Section 200.341 requires an agency to provide "written notice of termination" that includes "the reasons for termination." *Id.* § 200.341(a). An agency "must" also provide "an opportunity to object and provide information challenging the action." *Id.* § 200.342. As discussed, the Government provided no notice and no opportunity to be heard. *See supra* p.33.

(Burroughs, J.) ("[T]he Court may not rely on the *post-hoc* rationalizations offered by [an agency].").

## III.    The Freeze Orders and Termination Letters Are Arbitrary and Capricious (Count 5).

"An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio*, 603 U.S. at 292 (citation omitted). An agency acts arbitrarily and capriciously if it has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The Government's rush to freeze and terminate billions of dollars in current and future federal funding to Harvard for critical research lacks the basic requisites of reasoned decisionmaking. *See supra* p.17. In its haste to cancel Harvard's funding, the White House demanded that agencies terminate funding, leaving them with no time or freedom to explain their decisions, consider important aspects of the problem and alternatives, or account for the pivotal reliance interests tossed aside by Harvard's blacklisting. The Government's actions are therefore arbitrary and capricious in violation of the APA.

### A.    The Government Failed to Provide a Reasoned Explanation Why It Was Necessary to Freeze and Terminate Funding to Harvard.

The record shows two overriding reasons behind the Government's abrupt and sweeping actions against Harvard, neither of which satisfies the APA's requirement of reasoned, non-arbitrary decisionmaking. *First*, the Government disagrees with Harvard's refusal to abandon its academic freedom and submit to micromanagement by the Government, including ensuring it meets the Government's preferred balance of ideological diversity. *See supra* pp.11-14. As the

38

Department of Education itself has recognized, that is not a proper factor for an agency to consider. *See* Dep't of Ed., Office for Civil Rights, *Case Processing Manual* 12 (Feb. 19, 2025), https://perma.cc/RS9X-77CF ("OCR will not interpret any statute or regulation to impinge upon rights protected under the First Amendment or to require recipients to encroach upon the exercise of such rights."); *see also Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (noting that an agency's reliance on improper factors violates the APA).

*Second*, the Government claims that Harvard has not taken sufficient action to address the evil of antisemitism. *See supra* p.15. But the Government has failed to explain why concerns about antisemitism would support the sweeping action it took against Harvard, particularly where Harvard has made many substantial policy and other changes over the past several months aimed at ensuring its campus is safe, fair, and welcoming to Jewish and Israeli students. *See supra* pp.7-11. As Harvard informed the Government in writing, the University has disciplined those who violate applicable policies; enhanced programs designed to address bias and promote ideological diversity and civil discourse; adopted new accountability procedures and clarified policies; and supplemented existing safety and security measures.[68] *See* HHSHarv_00000104.

These are not the actions of a university that "intentional[ly] discriminat[es]" against its students." *Sandoval*, 532 U.S. at 280; *see Alexander v. Choate*, 469 U.S. 287, 293 (1985) ("Title

---

[68]    The administrative record does not include Harvard's statements and announcements regarding measures it has taken or will take to combat antisemitism, such as President Garber's April 14, 2025 statement outlining those efforts. And the Government never gave Harvard an opportunity to explain additional steps taken since the initial freezing of funding. The Court may, however, consider these materials in deciding whether the Government failed to consider a factor that is relevant to its analysis, which Harvard's response to antisemitism undoubtedly is. *See Housatonic River Initiative v. EPA*, 75 F.4th 248, 279 (1st Cir. 2023) (examining whether agency had failed to consider relevant factors in determining whether supplementation was appropriate); *see also Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) ("[E]xceptions to the general rule [against going beyond the administrative record] have been recognized . . . (2) when the agency failed to consider factors which are relevant to its final decision.").

VI itself directly reache[s] only instances of intentional discrimination."). Harvard has not been "deliberately indifferent" to antisemitic harassment on campus. *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664 (2d Cir. 2012). To the contrary, Harvard has taken dozens of steps—and plans to take more—to actively address the problem. *See supra* pp.7-11.

The Government has provided no explanation why Harvard's plethora of measures are so insufficient as to warrant the draconian penalty levied against it. Nor could it. The Government instead simply asserts that Harvard has failed "to uphold civil rights laws." GSAHarv_00000012-13; *see also* EDHarvAR_0000008-10 ("In every way, Harvard has failed to abide by its legal obligations . . . ."). Such "conclusory statements will not do." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014); *see Orr v. Trump*, 2025 WL 1145271, at *18 (D. Mass. Apr. 18, 2025); *Doe v. Noem*, 2025 WL 1099602, at *17 (D. Mass. Apr. 14, 2025); *Massachusetts v. NIH*, 2025 WL 702163, at *19 (D. Mass. Mar. 5, 2025). Without further investigation, the Government could not perform its ordinary duty under Title VI to evaluate whether "[t]he evidence supports a conclusion of noncompliance." Dep't of Ed., Off. for Civil Rights, *Case Processing Manual* 17. Unsurprisingly given the Government's departure from any semblance of normal process, the administrative record contains no evidence predating the Government's actions to cut off funding that Harvard has been deliberately indifferent to antisemitism on campus.

Rather than providing such evidence or explanation, the administrative record leaves no doubt as to the arbitrariness of the Government's actions. The Government rushed to terminate Harvard's funding not because it concluded after careful assessment that federal financial support for certain programs at certain of Harvard's 12 different schools suborned antisemitism, but because the White House demanded across-the-board terminations of funding to Harvard university-wide solely to inflict maximum punishment upon Harvard. The record demonstrates

that White House officials were engaged in a multi-agency effort to identify grants with Harvard that were eligible for termination. GSAHarv_00000035-37; GSAHarv_00000038-39; NASA-AR03692-3703; *see also* GSAHarv_00000124-34. When such grants had been identified, the White House controlled how agencies would explain the terminations, including by using a common "template" letter.[69] *See* NASA-AR03637 ("Once we have a list of grants that we deem are okay to terminate, we need to update the template letter that's attached and send it to the WH for review."); USDA-HARV-AR-00084 ("This is the form the WH wants to see it in"). It then gave the agencies a deadline for terminating the grants following the "final greenlight from the White House." USDA-HARV-AR-00001; *see* NASA-AR03679 ("Due to WH deadline of 5pm – we are pressing with cancellation of these 5 contracts.").

The rush to terminate Harvard's funding across the board put agencies in the difficult position of having to immediately decide whether to terminate individual grants that were entirely consistent with, and in fact critical to, agency priorities. For example, DoD sent Harvard a signed letter dated May 12, 2025, attaching a list of grants that "will be terminated." DoDHarv_00000039-46. A day *after* sending this final decision, DoD leadership informed officials at the agency that the Secretary of Defense had directed the cancellation of the grants and asked them to issue notices and stop work orders to individual grant recipients. DoDHarv_00000033. Apparently taken unaware by the decision, the director of contracting at the Defense Advanced Research Projects Agency ("DARPA") pleaded with her superiors to save one of the DARPA grants with Harvard,

---

[69]   The template letter appears to be fully redacted from the record, *see* NASA-AR03643-45, but its use is reflected by the common language used across the termination decisions, *compare* ENERGY AR3940 ("Supporting research in such an environment is plainly inconsistent with DOE's priorities and *raison d'etre* of funding and championing the very best American research and educational institutions."), *with* HHSHarv_00000474 (same except for substitution of agency names).

related to a program called AMPHORA working to increase awareness of emerging biological

threats. As she explained,

> Harvard is currently the top performing team on the AMPHORA program.
> Inadequate knowledge of the biological threat landscape poses grave and
> immediate harm to national security. Development of critical technologies that
> enables bio surveillance and biocollection in austere, field forward locations
> bolsters national security and warfighter safety and lethality by enabling medical
> countermeasure development to new and emerging threats and provides biological
> threat intelligence to the deployed warfighter. This technology is significantly
> outpacing the state-of-the art and provides a novel leap-ahead capability to the
> force. Harvard's effort is at a pivotal juncture in Phase 1 as they are just starting the
> microfluidic experiments that will give first indications of whether the program
> goal is achievable. They are also a critical integrator of multiple technologies that
> enable this effort and could not be readily reproduced.

DoDHarv_00000047. The Government's thoughtless and retaliatory strategy meant that

contracting officers and policy experts took a back seat in deciding whether to terminate grants

that continued to benefit the public. *See* DoDHarv_00000047; *see also* DoDHarv_00000001

(informing Harvard that a separate grant would be terminated "per direction from our

Headquarter[s] which is also directed thru White House guidance").

This "shoot first, aim never" approach to the termination of Harvard's funding is the very

definition of arbitrary decision-making. *See Woonasquatucket*, 2025 WL 1116157, at *18

("'[F]urthering the President's wishes cannot be a blank check' for the Agencies to do as they

please." (citation omitted)). The Government has given no reasoned explanation that would justify

such an irrational approach. *See* 42 U.S.C. § 2000d-1 (requiring the Government to use methods

"consistent with . . . the objectives of the statute authorizing the financial assistance").

### B. The Government Failed to Consider Important Aspects of the Problem in Freezing and Terminating Funding to Harvard.

Even if the Government had rationally connected the Freeze Orders and Termination

Letters to a legitimate Government concern, its actions still would be arbitrary and capricious

because it "fail[ed] to consider" a glaringly "important aspect[] of the problem" before it: whether

any putative benefits from terminating Harvard's funding could outweigh the costs of terminating critical research programs. *Regents of Univ. of Cal.*, 591 U.S. at 25 (citation omitted). In addition to canceling military research pivotal to national security, the Government ordered immunologists overseeing a multi-school tuberculosis consortium to immediately stop research,[70] HHSHarv_00005181, told a Harvard researcher at the Wyss Institute to halt his development of an advanced chip designed to measure NASA astronauts' radiation exposure during the upcoming Artemis II mission to the Moon, HHSHarv_00004937,[71] and directed yet another Wyss Institute scientist, a recipient of the nation's highest honor for technological achievement, to cease his research into Lou Gehrig's disease, HHSHarv_00005228.[72] Officials at the Department of Veterans Affairs have begun the process of cutting funding for research into, among other life-saving measures, "a predictive model to help V.A. emergency room physicians decide whether suicidal veterans should be hospitalized."[73] *See* HHSHarv_00002326. This is sadly just the tip of the iceberg, as future projects at Harvard of a similar caliber are now categorically barred from even being considered for federal support.

The Government's terminations ignore the cost to the Government, the University, its researchers, and the country. *Cf. Michigan v. EPA*, 576 U.S. 743, 759 (2015) ("The Agency must consider cost—including, most importantly, cost of compliance—before deciding whether regulation is appropriate and necessary."). None of the letters to Harvard or the other documents

---

[70]  *See* Nina Pasquini, *Research on Hold: Funding Freeze Halts Harvard Projects Overnight*, Harvard Mag. (Apr. 18, 2025), https://perma.cc/5K2W-D4TN.

[71]  *Id.*

[72]  *See id.*; Benjamin Boettner, *David Walt Named as Laureate for National Medal of Technology and Innovation*, Wyss Inst. (Jan. 7, 2025), https://perma.cc/W8ZG-SMZ8.

[73]  Nicholas Nehamas, *Trump's Push to Defund Harvard Prompts Clash Over Veteran Suicide Research*, N.Y. Times (May 16, 2025), https://perma.cc/U7W8-K6KM.

in the administrative record—which the Government represents reflects the complete basis for the terminations—includes any analysis of these factors. "To say that" this suspension of "a breathtakingly large sum of money . . . without any consideration for the consequences of that decision" "failed to consider an important aspect of the problem[] would be putting it mildly." *Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36, 55 (D.D.C. Feb. 3, 2025).

The Government also failed to consider whether less drastic alternatives, such as modifying the grants or requiring corrective actions short of full government intervention into Harvard's self-governance, would be sufficient to address any putative Title VI violations related to antisemitism. These are the remedies that the Government has adopted for Title VI violations for decades,[74] and the abrupt and unexplained departure from that long-established agency practice is itself arbitrary and capricious. *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) ("'[U]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'" (citation omitted)). Moreover, "failure of an agency to consider obvious alternatives has led uniformly to reversal." *City of Brookings Mun. Tele. Co. v. FCC*, 822 F.2d 1153, 1169 (D.C. Cir. 1987) (citation omitted); *see Woonasquatucket*, 2025 WL 1116157, at *17 ("The Court finds that the Government failed to provide a rational reason that the need to 'safeguard valuable taxpayer resources' justifies a sweeping pause of all already-awarded IIJA and IRA funds with such short notice.").

---

[74]    *See, e.g.*, Dep't of Educ., Off. for Civil Rights, *Annual Report to the Secretary, the President, and the Congress* (Fiscal Year 2019), https://perma.cc/FBK2-74WA (noting investigations were opened into allegations of antisemitism at Williams College, the University of North Carolina, and Duke, all of which were resolved through voluntary resolution after investigation).

### C.    The Government Failed to Consider Serious Reliance Interests Before Freezing and Terminating Federal Funding to Harvard.

No university is entitled to Government funding. But the Government may not eliminate funding without addressing the "serious reliance interests" that the Freeze Orders and Termination Letters upset. *Regents of Univ. of Cal.*, 591 U.S. at 30. Defunded research experiments do not enter suspended animation, ready to be magically revived once the Government reverses course. Physical materials degrade. Shaw Decl. ¶ 19. Graduate students lose their funding and need to find different positions. Shaw Decl. ¶ 16. Professors halt their research and abandon projects. Shaw Decl. ¶ 20. Even supposing the Government had a legitimate basis to halt some funding to Harvard (which it did not), there is no conceivable reason to force researchers to throw out experiments in which the Government has already invested considerable sums.[75] Furthermore, although no scientist is guaranteed any specific future grant, Harvard's status as a research institution depends on the expectation—fostered by the Government for decades—that its scientists will be able to compete on fair terms for federal funding. The future funding freeze completely upends these expectations, and the May 5 Freeze Order failed to consider this impact on Harvard, its researchers and their long-term work, or the public these grants have long benefited.

The Government's "fail[ure] to address" the "serious reliance interests" engendered by current grant awards and researchers' expectation to compete for future ones is textbook arbitrary-and-capricious conduct. *Regents of Univ. of Cal.*, 591 U.S. at 30; *see also Woonasquatucket*, 2025

---

[75]  The fact that Harvard is committing its own funds to cover a fraction of the terminated research grants does not overcome those reliance interests or the harm to the University. Alan M. Garber & John F. Manning, *Our Research Enterprise*, Off. of the President and Provost (May 14, 2025), https://perma.cc/5RYZ-M6SL; *see also* Shaw Decl. ¶¶ 16-31 (describing harms to Harvard and Harvard community). Quite the contrary, Harvard has made clear that it "cannot absorb the entire cost of the suspended or canceled federal funds." Garber & Manning, *Our Research Enterprise*, https://perma.cc/5RYZ-M6SL; *see* Shaw Decl. ¶ 30.

WL1116157, at *18 ("Nothing from . . . Defendants shows that they considered the consequences of their broad, indefinite freezes: projects halted, staff laid off, goodwill tarnished.").

## IV.    The Freeze Orders and Termination Letters Are *Ultra Vires* (Counts 2 and 6).

Even if APA review were not available here (it is), the Government's actions should still be set aside as *ultra vires*. This Court retains the "equitable power[]" to "enjoin unconstitutional actions by state and federal officers." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327-28 (2015). Congress has not precluded non-statutory judicial review of the executive actions here.

As detailed above, the Government's actions are flagrantly in violation of the First Amendment. And it has ignored the mandatory statutory requirements to revoke federal funding to a university based on allegations of antisemitism. *See supra* p.32; *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) ("Any action that an agency takes outside the bounds of statutory authority is ultra vires."). The Government's actions are *ultra vires* and must be set aside.

## V.    The Court Should Enter an Injunction Permanently Enjoining Conduct Similar to The Freeze Orders and Termination Letters.

This Court should vacate and set aside the Freeze Orders and the Termination Letters under 5 U.S.C. § 706. But given the Government's actions, a permanent injunction is also warranted. "Where a plaintiff seeks permanent injunctive relief, the test is the same [as for preliminary injunctive relief], except that 'the movant must show actual success on the merits of the claim, rather than a mere likelihood of success.'" *Esso Standard Oil Co. v. Freytes*, 467 F. Supp. 2d 156, 159 (D.P.R. 2006) (citation omitted), *aff'd sub nom. Esso Standard Oil Co. v. Lopez-Freytes*, 522 F.3d 136 (1st Cir. 2008); *see Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987). The plaintiff must also demonstrate that it "would be irreparably injured in the absence of injunctive relief," that "the harm to [plaintiff] from defendant's conduct would exceed the harm to

the defendant accruing from the issuance of an injunction," and "that the public interest would not be adversely affected by an injunction." *Esso*, 467 F. Supp. 2d at 168.

As demonstrated above, each of these elements is easily satisfied here. In addition to having demonstrated success on the merits through this motion, *id.* at 169, Harvard will suffer irreparable harm due to the significant consequences that the Freeze Orders and Termination Letters are having on Harvard's research programs and the extensive disruption of its research operations, which will devastate the integrity and continuity of ongoing research and jeopardize their future viability. Shaw Decl. ¶¶ 16-31; *see also Ass'n Am. Univs. v. Dep't of Energy*, 2025 WL 1414135, at *18-19 (D. Mass. May 15, 2025) (Burroughs, J.) (finding irreparable harm based on universities' loss of funding where "the harm is . . . massive" and has "collateral effects," as well as "long-term impacts," such as "loss of human capital, cumulative knowledge and sometimes the degradation of physical infrastructure").

The balancing of harms and the public interest plainly favor granting permanent injunctive relief. The Government's unconstitutional and unlawful funding cuts will cause staffing reductions, Shaw Decl. ¶ 22, "damage the national research pipeline," Shaw Decl. ¶ 21, and "slow[] down or halt[] research" to the point of allowing "competitor nations to surpass the United States." Shaw Decl. ¶ 25. Moreover, "[t]he disruption in ongoing research would harm public health" by upending "federally funded projects directly addressing critical public health challenges, including cancer treatments and prevention, infectious diseases, and Parkinson's." Shaw Decl. ¶ 27. "In light of the terminations, those projects are in jeopardy, and potentially life-changing and life-saving scientific and medical discoveries will be delayed or blocked altogether." Shaw Decl. ¶ 27; *see, e.g.*, *Ass'n Am. Univs.*, 2025 WL 1414135, at *20 (loss of federal funding for programs that seek to advance various national interests is "to the detriment of the country as

a whole"). These harms unquestionably outweigh any damage that the permanent injunction will cause the Government, which "cannot suffer harm from an injunction that merely ends an unlawful practice." *Massachusetts*, 2025 WL 702163, at *32 ("[T]here is no public interest in upholding unlawful agency action.").

The necessity of an injunction is demonstrated by the Government's continued attempt to punish Harvard's during the pendency of this case by whatever mechanisms it can. Both before and after the Complaint was amended, the Government has, based on purported allegations of antisemitism, continued to terminate funding without complying with the law. *See supra* pp.15-19; Lehotsky Decl., Ex. 6. On May 27, 2025, the Government directed agencies to terminate remaining contracts not already terminated. *See supra* p.19; Lehotsky Decl., Ex. 7. If this Court concludes that the bases for such terminations are illegal, then an injunction should cover these actions as well. Harvard should not be required to file serial complaints to relitigate the issues decided by this Court.

## CONCLUSION

The Court should grant summary judgment to Harvard, vacate and set aside the Government's unlawful Freeze Orders and Termination Letters, and permanently enjoin any similar action. Plaintiff respectfully requests a ruling from the Court as soon as reasonably possible in advance of September 3, 2025, which is 120 calendar days from May 6, 2025, when Harvard began receiving termination letters from the Government. *See* 2 C.F.R. § 200.344(b), (c).

Dated: June 2, 2025

Respectfully submitted,

_/s/ Steven P. Lehotsky_____

William A. Burck*
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, DC 20005
williamburck@quinnemanuel.com

Robert K. Hur*
KING & SPALDING LLP
1700 Pennsylvania Ave. NW, Suite 900
Washington, DC 20006
rhur@kslaw.com

Joshua S. Levy (BBO #563017)
Mark Barnes (BBO #568529)*
John P. Bueker (BBO #636435)
Elena W. Davis (BBO #695956)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
Joshua.Levy@ropesgray.com
Mark.Barnes@ropesgray.com
John.Bueker@ropesgray.com
Elena.Davis@ropesgray.com

Douglas Hallward-Driemeier
(BBO #627643)
Stephen D. Sencer*
ROPES & GRAY LLP
2009 Pennsylvania Avenue, NW
Washington, DC 20006
Douglas.Hallward-Driemeier@ropesgray.com
Stephen.Sencer@ropesgray.com

Steven P. Lehotsky (BBO # 655908)
Scott A. Keller*
Jonathan F. Cohn*
Mary Elizabeth Miller* (BBO # 696864)
Shannon G. Denmark*
Jacob B. Richards (BBO # 712103)
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
T: (512) 693-8350
F: (512) 727-4755
steve@lkcfirm.com
scott@lkcfirm.com
jon@lkcfirm.com
mary@lkcfirm.com
shannon@lkcfirm.com
jacob@lkcfirm.com

Katherine C. Yarger*
LEHOTSKY KELLER COHN LLP
700 Colorado Blvd., #407
Denver, CO 80206
katie@lkcfirm.com

Joshua P. Morrow*
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
josh@lkcfirm.com

Danielle K. Goldstein*
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
danielle@lkcfirm.com

*Admitted Pro Hac Vice_

## CERTIFICATE OF SERVICE

Counsel for Plaintiff certify that they have submitted the foregoing document with the clerk of court for the District of Massachusetts, using the electronic case filing system of the Court. Counsel for Plaintiff hereby certify that they have served all parties electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

/s/ *Steven P. Lehotsky*
Steven P. Lehotsky