# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS–HARVARD
FACULTY CHAPTER et al.,

              Plaintiffs,

        v.

UNITED STATES DEPARTMENT OF
JUSTICE et al.,

              Defendants.

Case No. 1:25-CV-10910-ADB

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Philippe Z. Selendy*
Sean P. Baldwin*
Corey Stoughton*
Julie Singer*
Drake Reed*
SELENDY GAY PLLC
1290 Avenue of the Americas 20th Floor
New York, NY 10104
Tel: 212-390-9000
pselendy@selendygay.com
sbaldwin@selendygay.com
cstoughton@selendygay.com
jsinger@selendygay.com
dreed@selendygay.com

* admitted *pro hac vice*

Daniel H. Silverman (BBO# 704387)
COHEN MILSTEIN SELLERS & TOLL PLLC
769 Centre Street
Suite 207
Boston, MA 02130
(617) 858-1990
dsilverman@cohenmilstein.com

Joseph M. Sellers*
Benjamin D. Brown*
Phoebe M. Wolfe*
Margaret (Emmy) Wydman*
Sabrina Merold*
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave NW, Suite 800
Washington, DC 20005
(202) 408-4600
jsellers@cohenmilstein.com
bbrown@cohenmilstein.com
pwolfe@cohenmilstein.com
ewydman@cohenmilstein.com
smerold@cohenmilstein.com

# **TABLE OF CONTENTS**

**Pages**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................2

LEGAL STANDARD .................................................................................................9

ARGUMENT ............................................................................................................9

I.    The Court Has Jurisdiction Over Plaintiffs' Claims. .....................................10

    A.    Plaintiffs Have Standing. ......................................................................10

        1.    Plaintiffs Have Standing to Sue on Behalf of Their Members. ...........11

        2.    Plaintiffs Have Direct Standing. .................................................15

    B.    Plaintiffs Properly Bring These Claims in Federal District Court. .........17

II.   Defendants' Actions Violate the APA. ........................................................20

    A.    Defendants Failed to Follow Any of the Procedures Required by Title VI and Defendants' Own Regulations. .......................................................22

    B.    Defendants' Actions Were Arbitrary and Capricious. ...........................24

        1.    Defendants Failed to Reasonably Explain Their Decisions....................24

        2.    The Record Contains No Evidence to Support Defendants' Actions. ...................................................................................28

        3.    Defendants Ignored Significant Reliance Interests....................31

    C.    Defendants Cannot Evade Title VI or the APA by Invoking 2 C.F.R. § 200.340...........................................................................................33

        1.    § 200.340 Cannot Override the Statutory Requirements of Title VI........34

        2.    Any Exercise of Authority Under § 200.340 Is Arbitrary and Capricious. ...............................................................................38

III.  Defendants' Actions Violate the First Amendment....................................40

    A.    Defendants' Actions Are Unconstitutional Coercion ............................41

B.      Defendants' Actions Are Unlawful Retaliation and Viewpoint Discrimination................................................................................................45

IV.   The Court Should Enter a Permanent Injunction Barring Conduct Similar to Defendants' Actions.......................................................................................47

CONCLUSION....................................................................................................................48

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
    570 U.S. 205 (2013)................................................................................43

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
    2025 WL 752378 (D.D.C. Mar. 10, 2025)...............................................33

*In re Aiken Cnty.*,
    725 F.3d 255 (D.C. Cir. 2013) ...............................................................36

*Alexander v. Sandoval*,
    532 U.S. 275 (2001)................................................................................22

*Am. Textile Mfrs. Inst., Inc. v. Donovan*,
    452 U.S. 490 (1981)..........................................................................31, 33

*Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*,
    64 F.4th 1354 (D.C. Cir. 2023)..............................................................12

*Ass'n of Amer. Univs. v. Dep't of Energy*,
    2025 WL 1414135 (D. Mass May 15, 2025) (Burroughs, J.)...............18, 19, 20, 48

*Atchison v. Wichita Bd. of Trade*,
    412 U.S. 800 (1973)................................................................................39

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963).............................................................................41, 42

*Bd. of Pub. Instruction of Taylor Cnty., Fla. v. Finch*,
    414 F.2d 1068 (5th Cir. 1969) ...............................................................23

*Bd. of Regents of State Colleges v. Roth*,
    408 U.S. 564 (1972)................................................................................38

*Bos. Redevelopment Auth. v. Nat'l Park Serv.*,
    838 F.3d 42 (1st Cir. 2016)......................................................................9

*Bowen v. Am. Hosp. Ass'n*,
    476 U.S. 610 (1986)................................................................................29

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988)................................................................................19

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962).........................................................................................21, 27

*California v. U.S. Dep't of Educ.*,
132 F.4th 92 (1st Cir. 2025).........................................................................20

*Chicago Women in Trades v. Trump*,
2025 WL 1114466 (N.D. Ill. Apr. 14, 2025).........................................43

*Ciba-Geigy Corp. v. EPA*,
801 F.2d 430 (D.C. Cir. 1986)....................................................................21

*City of Arlington v. FCC*,
569 U.S. 290 (2013)........................................................................................34

*City of Providence v. Barr*,
954 F.3d 23 (1st Cir. 2020).........................................................................34

*Clinton v. City of N.Y.*,
524 U.S. 417 (1998)................................................................................36, 37

*Clukey v. Town of Camden*,
717 F.3d 52 (1st Cir. 2013).........................................................................38

*Colorado v. U.S. Dep't of Health & Hum. Servs.*,
2025 WL 1426226 (D.R.I. May 16, 2025) ............................................36

*Colwell v. Dep't of Health & Hum. Servs.*,
558 F.3d 1112 (9th Cir. 2009) ..................................................................17

*Conservation L. Found., Inc. v. Acad. Express, LLC*,
129 F.4th 78 (1st Cir. 2025)..................................................................10, 11

*Crawford-El v. Britton*,
523 U.S. 574 (1998)................................................................................46, 47

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
596 U.S. 212 (2022)........................................................................................37

*Davis v. Monroe Cnty. Bd. of Ed.*,
526 U.S. 629 (1999)........................................................................................36

*Dep't of Com. v. New York*,
588 U.S. 752 (2019)........................................................................................25

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
140 S. Ct. 1891 (2020)..................................................................................23

*Dominion Energy Brayton Point, LLC v. Johnson*,
    443 F.3d 12 (1st Cir. 2006) ........................................................................22

*Dube v. State Univ. of New York*,
    900 F.2d 587 (2d Cir. 1990) .......................................................................45

*Dubois v. U.S. Dep't of Agric.*,
    102 F.3d 1273 (1st Cir. 1996) ....................................................................24

*Duxbury Trucking, Inc. v. Mass. Highway Dep't*,
    2009 WL 1258998 (D. Mass. Apr. 29, 2009) ............................................17

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) ...................................................................................25

*Equal Means Equal v. Ferriero*,
    3 F.4th 24 (1st Cir. 2021) ..........................................................................17

*Esso Standard Oil Co. v. Freytes*,
    467 F. Supp. 2d 156 (D.P.R. 2006) ...........................................................48

*FCC v. Fox Tel. Stations, Inc.*,
    567 U.S. 239 (2012) ...................................................................................38

*FCC v. League of Women Voters of California*,
    468 U.S. 364 (1984) ...................................................................................44

*FDA v. Alliance for Hippocratic Medicine*,
    602 U.S. 367 (2024) ............................................................................15, 17

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
    110 F.4th 295 (1st Cir. 2024) ....................................................................14

*Finberg v. U.S. Dep't of Agric.*,
    6 F.4th 1332 (D.C. Cir. 2021) ...................................................................28

*Gericke v. Begin*,
    753 F.3d 1 (1st Cir. 2014) ..........................................................................47

*Gustavsen v. Alcon Lab'ys, Inc.*,
    903 F.3d 1 (1st Cir. 2018) ..........................................................................11

*Hartman v. Moore*,
    547 U.S. 250 (2006) ...................................................................................47

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ...................................................................................15

*Hous. Cmty. Coll. Sys. v. Wilson*,
  595 U.S. 468 (2022) ........................................................................................47

*Iancu v. Brunetti*,
  588 U.S. 388 (2019) ........................................................................................45

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*,
  477 U.S. 274 (1986) ........................................................................................14

*Keyishian v. Bd. of Regents of Univ. of N.Y.*,
  385 U.S. 589 (1967) .................................................................................41, 45

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ........................................................................................11

*Massachusetts v. NIH*,
  2025 WL 702163 (D. Mass. Mar. 5, 2025) ...........................................18, 48

*McIntyre v. Ohio Elections Comm'n*,
  514 U.S. 334 (1995) ........................................................................................47

*Melone v. Coit*,
  100 F.4th 21 (1st Cir. 2024) ............................................................................31

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................................................ *passim*

*Murthy v. Missouri*,
  603 U.S. 43 (2024) (Alito, J., dissenting) ......................................................41

*Nat'l Air Traffic Controllers Ass'n v. United States*,
  160 F.3d 714 (Fed. Cir. 1998) ........................................................................19

*Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*,
  2025 WL 1188160 (D.N.H. Apr. 24, 2025) .......................................... *passim*

*Nat'l Endowment for the Arts v. Finley*,
  524 U.S. 569 (1998) ........................................................................................47

*Nat'l Fed'n of Indep. Bus. v. Occupational Safety & Health Admin.*,
  595 U.S. 109 (2022) ........................................................................................37

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) ........................................................................................42

*Nat'l Org. for Women, Inc. v. Scheidler*,
  510 U.S. 249 (1994) ........................................................................................12

*Nat'l Rifle Ass'n of Am. v. Vullo*,
   602 U.S. 175 (2024)..................................................................................42

*New Hampshire Motor Transp. Ass'n v. Rowe*,
   324 F. Supp. 2d 231 (D. Me. 2004) ....................................................14, 15

*New York v. Trump*,
   2025 WL 1098966 (D.R.I. Apr. 14, 2025)............................................18, 19

*Nieves v. Bartlett*,
   587 U.S. 391 (2019)..................................................................................47

*Ocasio v. City of Lawrence, Mass.*,
   788 F. Supp. 99 (D. Mass. 1992) ...............................................................11

*Ohio v. EPA*,
   603 U.S. 279 (2024)..............................................................................24, 26

*Pennhurst State Sch. & Hosp. v. Halderman*,
   451 U.S. 1 (1981)......................................................................................37

*Perry v. Sindermann*,
   408 U.S. 593 (1972)..................................................................................43

*Playboy Enters., Inc. v. Pub. Serv. Comm'n of Puerto Rico*,
   906 F.2d 25 (1st Cir. 1990)........................................................................11

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015)..................................................................................46

*Rhode Island Bhd. Of Corr. Officers v. Rhode Island*,
   357 F.3d 42 (1st Cir. 2004)........................................................................15

*Rhode Island v. Trump*,
   2025 WL 1303868 (D.R.I. May 6, 2025) ....................................................20

*Ridley v. Massachusetts Bay Transp. Auth.*,
   390 F.3d 65 (1st Cir. 2004)........................................................................46

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
   515 U.S. 819 (1995)..............................................................................43, 46

*Rust v. Sullivan*,
   500 U.S. 173 (1991)..................................................................................44

*Safari Club Int'l v. Jewell*,
   842 F.3d 1280 (D.C. Cir. 2016)..................................................................21

*San Francisco v. Trump*,
   897 F.3d 1225 (9th Cir. 2018) ........................................................................37

*Santa Clara v. Trump*,
   250 F. Supp. 3d 497 (N.D. Cal. 2017) .............................................................37

*Santa Cruz Lesbian and Gay Cmty. Ctr. v. Trump*,
   508 F. Supp. 3d 521 (N.D. Cal 2020) ..............................................................44

*Schlafly v. Volpe*,
   495 F.2d 273 (7th Cir. 1974) .....................................................................17, 23

*Southern Christian Leadership Conf. v. Connolly*,
   331 F. Supp. 940 (E.D. Mich. 1971) ...............................................................36

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) .........................................................................................10

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) .........................................................................................13

*Viscito v. Nat'l Plan. Corp.*,
   34 F.4th 78 (1st Cir. 2022) .................................................................................9

*W. Va. Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943) .........................................................................................41

*Webb v. Injured Workers Pharmacy, LLC*,
   72 F.4th 365 (1st Cir. 2023) .............................................................................12

*Weber v. Cranston Sch. Comm.*,
   212 F.3d 41 (1st Cir. 2000) ..............................................................................18

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
   2025 WL 1116157 (D.R.I Apr. 15, 2025) ........................................................33

**Statutes and Rules**

5 U.S.C. §§ 554 ......................................................................................................22

5 U.S.C. § 554(a) ....................................................................................................22

5 U.S.C. § 556 .........................................................................................................22

5 U.S.C. § 557 .........................................................................................................22

5 U.S.C. § 704 .........................................................................................................21

5 U.S.C. § 706 ...........................................................................................................1

5 U.S.C. § 706(2)(A)........................................................................................................................20, 24

5 U.S.C. § 706(2)(C)........................................................................................................................23

5 U.S.C. § 706(2)(D)........................................................................................................................20, 23

28 U.S.C. § 1491(a)(1)........................................................................................................................18

42 U.S.C. § 2000d........................................................................................................................27

42 U.S.C. § 2000d-1........................................................................................................................17, 21, 22, 23

42 U.S.C. § 2000d-2........................................................................................................................17, 35

42 U.S.C. § 2000e-5........................................................................................................................28

**Regulations**

2 C.F.R. § 1.105(b)........................................................................................................................33

2 C.F.R. § 200.340........................................................................................................................*passim*

2 C.F.R. § 200.340(a)(4)........................................................................................................................*passim*

7 C.F.R. § 15.8 (USDA)........................................................................................................................22

10 C.F.R. § 1040.1 (DOE)........................................................................................................................22

14 C.F.R. § 1250.101 (NASA)........................................................................................................................722, 31

24 C.F.R. § 1.8 (HUD)........................................................................................................................22

28 C.F.R. § 42.103 (DOJ)........................................................................................................................22

28 C.F.R. § 42.411(a)........................................................................................................................35

32 C.F.R. § 195.1 (DoD)........................................................................................................................22

34 C.F.R. § 100.8 (ED)........................................................................................................................22

41 C.F.R. § 101-6.211-1 to -4 (GSA)........................................................................................................................22

45 C.F.R. § 611.1 (NSF)........................................................................................................................7, 19, 22, 26

45 C.F.R. § 75.372........................................................................................................................22

45 C.F.R. § 80.8-.10........................................................................................................................22

48 C.F.R. § 52.249 .................................................................................................................34

69 Fed. Reg. 26276-01 ..........................................................................................................34

89 Fed. Reg. 80055–57 ..........................................................................................................34

**Other Authorities**

110 Cong. Rec. 2463 .............................................................................................................35

110 Cong. Rec. 2469 .............................................................................................................35

110 Cong. Rec. 2498 .............................................................................................................35

110 Cong. Rec. 2501 .............................................................................................................35

110 Cong. Rec. 6546 .............................................................................................................35

## PRELIMINARY STATEMENT

Plaintiffs—associations representing the faculty and graduate students at Harvard University—seek summary judgment and a permanent injunction to end the Trump administration's lawless effort to leverage billions of dollars of federal funding to coerce Harvard into implementing sweeping changes that compromise the University's independence and the free speech rights of Plaintiffs' members. Harvard's resistance to fully implementing the administration's demands has resulted in the termination of all federal funding, interrupting research programs vital to American economic competitiveness, public health, and global leadership and jeopardizing the reputations and livelihoods of Plaintiffs' members.

Defendants—numerous federal agencies and agency heads who have executed the President's unlawful agenda—have presented their actions as an effort to enforce federal civil rights laws against a funding recipient. Yet they have made no effort to comply with statutory requirements under Title VI of the Civil Rights Act of 1964, which governs the exercise of such authority, thus violating the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. The administrative record Defendants produced to justify their actions reveals an incoherent hodgepodge of flimsy rationale, none of which comes close to providing a reasoned basis for either the "funding conditions" Defendants seek to impose or the decision to terminate federal funding, also in violation of the APA.

Defendants' actions also violate the First Amendment. Their demands were designed to reshape a world-renowned educational institution according to the Trump administration's preferences and punish it for permitting members of its educational community—including Plaintiffs' members—to speak, teach, learn, and research in ways that the President opposed. When Harvard rejected those demands, Defendants retaliated with swift vitriol. Defendants' efforts to disguise their illegal conduct as an unreviewable act of policy discretion flounder against the sturdy tide of

reality. No *post hoc* invocation of authority to disburse grant funding according to "agency priorities" can wash away the factual record, which conclusively establishes that Defendants' course of conduct has been directed by the White House for the purpose of targeting academic freedom and free expression on Harvard's campus and punishing Harvard for resisting unlawful coercion.

## BACKGROUND

On March 31, 2025, after several months of vague threats to Harvard and other schools, Defendants HHS,[1] ED, and GSA announced that a multi-agency "Task Force" would review Harvard's federal funding based on alleged failures to address antisemitism on campus (the "March 31 Announcement"). Plaintiffs' Statement of Material Facts Not in Dispute Pursuant to Local Rule 56.1 ("SMF") ¶14. In a memorandum sent to Harvard President Alan Garber that day, Defendant Josh Gruenbaum, Commissioner of the Federal Acquisition Service, stated that "GSA is leading a Task Force comprehensive review of Federal contracts with certain institutions of higher education that are being investigated for potential infractions and dereliction of duties to curb or combat anti-Semitic harassment, including Harvard University." *Id.* ¶16. Gruenbaum's memorandum did not identify any specific "potential infractions and derelictions of duties" or state any factual basis for its allegations. *Id.* The memorandum stated that the federal government was prepared to stop work on $255.6 million of contract work and an additional $8.7 billion in grants if it determined there were "compliance concerns, false claims, or other infractions." *Id.* In a public statement issued by the Task Force, Gruenbaum remarked, "This administration has proven that we will take swift action to hold institutions accountable if they allow anti-Semitism to fester. We will not hesitate to act if Harvard fails to do so." *Id.* ¶15.

---

[1] Capitalized terms not defined herein have the meaning assigned in Plaintiffs' Second Amended Complaint, Dkt. 64.

The administrative record contains no evidence that Defendants undertook any investigation in the days following their March 31 Announcement. Nonetheless, on April 3, 2025, the Task Force sent a letter (the "April 3 Letter") to Harvard's President declaring that "Harvard University ... has fundamentally failed to protect American students and faculty from antisemitic violence and harassment in addition to other alleged violations of Title VI and Title VII of the Civil Rights Act of 1964." *Id.* ¶¶19–21. The April 3 Letter also did not make findings regarding any specific civil rights violations or set forth any factual basis supporting its conclusions. *Id.* Nonetheless, it demanded "immediate" implementation of sweeping "reforms" that the government deemed "necessary for Harvard University's continued financial relationship with the United States government." *Id.* Among these demands, Defendants insisted that Harvard make unspecified programmatic changes "to address bias, improve viewpoint diversity, and end ideological capture"; overhaul student discipline, among other things, to ensure that "senior administrative leaders are responsible for final decisions"; enact a "mask ban"; hold student groups accountable for unspecified "violations of Harvard policy"; and "shutter" all "DEI programs," which Defendants allege "teach students, faculty, staff, and leadership to make snap judgments about each other based on crude race and identity stereotypes, which fuels division and hatred based on race, color, national origin, and other protected identity characteristics." *Id.* ¶20.

Although the April 3 Letter invoked the agencies' enforcement powers under Title VI, the scope of the letter's demands made clear that Defendants' goal was to broadly reshape Harvard in their preferred image. The April 3 Letter concluded: "We expect your immediate cooperation in implementing these critical reforms *that will enable Harvard to return to its original mission of providing a high-quality education in a safe environment for all students through a focus on truth-seeking, innovative research, and academic excellence*." *Id.* ¶21 (emphasis added).

Statements from Defendants and their executive branch leaders reinforced that Defendants' purpose was to control what speech is allowed on Harvard's campus. On March 4, for example, President Trump posted on Truth Social:

> All Federal Funding will STOP for any College, School, or University that allows illegal protests. Agitators will be imprisoned/or permanently sent back to the country from which they came. American students will be permanently expelled or, depending on the crime, arrested. NO MASKS! Thank you for your attention to this matter.

*Id.* ¶6. On or about March 9, Defendant Leo Terrell appeared on Fox News and stated: "We are going to bankrupt these universities. We are going to take away every single federal dollar. That is why we are targeting these universities. The academic system in this country has been hijacked by the left, has been hijacked by the Marxists. They have controlled the mindset of our young people … and we have to put an end to it." *Id.* ¶9. In a March 19 interview, Defendant Terrell made clear that the Trump administration intended to extend this campaign of control to Harvard: "I've got news for you. To Harvard, to NYU, to Michigan, same thing's happening to them. It's going to happen, because we're going to look at the numbers of federal dollars, and . . . it totals in the hundreds of millions of dollars. And we're going after them." *Id.* ¶12.

On April 11, 2025, Defendants sent another letter (the "April 11 Letter" and, together with the April 3 Letter, the "Demand Letters") elaborating on these themes and imposing further—and even more extreme—demands on "Harvard University's operations" as preconditions to "maintain[ing] Harvard's financial relationship with the federal government." *Id.* ¶¶23–25. Like the April 3 Letter, the April 11 Letter did not make any findings or provide any factual basis for its allegations, and the administrative record contains no evidence that Defendants took any steps to investigate those allegations. Yet they demanded Harvard's "immediate" compliance with a long list of "reforms," many of which appeared unrelated to Title VI or any civil rights obligation. *Id.* ¶¶24–25. Among other things, the April 11 Letter demanded that Harvard: "reduc[e] the power

held by faculty…more committed to activism than scholarship"; "review[]" all faculty for "plagiarism"; submit to a third-party audit of its students and faculty for "viewpoint diversity"; "immediately shutter all diversity, equity, and inclusion (DEI) programs"; and implement a "comprehensive mask ban." *Id.* ¶25.

On April 14, 2025, Harvard responded to the Demand Letters through counsel (the "April 14 Response"). *Id.* ¶27. Harvard's response explained that Defendants had not complied with proper procedures governing civil rights investigations and that their demands were overbroad and unlawful. *Id.* The letter closed by stating that Harvard would not agree to the conditions in the Demand Letters. *Id.* Harvard University made this letter and Defendants' April 11 Letter public.

Just hours after the April 14 Response was sent, Defendants announced that they had frozen over $2 billion in funding to Harvard (the "Funding Freeze"). *Id.* ¶31. In their public statement announcing that freeze, Defendants HHS, ED, and GSA repeated vague allegations that "[t]he disruption of learning that has plagued campuses in recent years is unacceptable" and "[t]he harassment of Jewish students is intolerable," without citing a single specific incident or providing any evidence in support. *Id.* NIH immediately implemented the Funding Freeze by ceasing to disburse payments to Harvard. *See id.* ¶61.

President Trump's contemporaneous public statements make clear that the true reason for the Funding Freeze was not civil rights but rather retaliation for the University's resistance to the President's attempts to control free speech and academic freedom at Harvard, including through the conditions in the Demand Letters. On April 15, one day after the Funding Freeze, President Trump articulated his view that Harvard "push[es] political, ideological, and terrorist inspired/supporting 'Sickness'," escalating his threat to cut off not only federal funding but also Harvard's tax-exempt status. *Id.* ¶89. The next day, on April 16, he declared that Harvard had "lost its way"

because it hired the President's political opponents as faculty "who are only capable of teaching FAILURE to students and so-called 'future leaders.'" *Id.* ¶87. He concluded that post: "Harvard is a JOKE, teaches Hate and Stupidity, and should no longer receive Federal Funds." *Id.* On April 24, he declared Harvard "a threat to Democracy." *Id.* And on May 2, he again threatened to revoke Harvard's tax-exempt status. *Id.* ¶89.

On May 5, Defendant Secretary of Education Linda McMahon sent Harvard a letter (the "Ineligibility Decision") on behalf of the entire executive branch announcing Defendants' decision to end all future federal funding to Harvard. *Id.* ¶¶32–33. The Ineligibility Decision expressed the same sweeping disapproval of Harvard reflected in the President's public statements, declaring that "[i]n every way, Harvard has failed to abide by its legal obligations, its ethical and fiduciary duties, its transparency responsibilities, and any semblance of academic rigor." *Id.* ¶33. As with Defendants' prior communications, the Ineligibility Decision did not provide any evidence or make any findings that Harvard had violated its "legal obligations." Instead, Secretary McMahon cited several policy choices she attributed to Harvard and with which the Trump administration disagreed, including hiring faculty members whom the Trump administration disfavors; developing alternative grading systems and "scrapp[ing]" standardized tests; instituting a "remedial math" program for students needing additional mathematics education; "teach[ing] [Harvard's] students to despise" a "free-market system"; and "encourag[ing] resentment and instill[ing] grievance and racism into our wonderful young Americans." *Id.* It concluded that because Harvard rejected the administration's "proposed common-sense reforms" which "the administration remains commit-ted to" (that is, the "reforms" proposed in the Demand Letters), Harvard "should no longer seek GRANTS from the federal government, since none will be provided." *Id.*

At the same time, since at least April 30, Defendant GSA had been gathering detailed information about Harvard's federal grants. *Id.* ¶34. Gruenbaum and other GSA officials, in coordination with the White House, identified grants for cancellation and instructed individual Defendant agencies to terminate them. *Id.* ¶¶35–41. Defendants complied. Between May 6 and May 12, Defendants NIH, NSF, DOD, DOE, ED, HHS, HUD, USDA, and NASA each sent a letter terminating grants identified by GSA, ultimately ending awards with a face value of roughly $2.7 billion. *Id.* ¶¶42–85.

These grant-specific letters followed a template developed by GSA and the White House, *id.* 39–41, and cited, for the first time, a rationale that grants were being canceled because they no longer effectuated "agency priorities," primarily relying on OMB guidance codified at 2 CFR § 200.340, *id.* 42–85.[2] These letters did not identify the manner in which any specific project failed to effectuate agency priorities except to say (at most)[3] that the agency's priority is to safeguard taxpayer dollars and fund only institutions that comply with principles and laws of nondiscrimination, making clear that grants were terminated as a consequence of Harvard's refusal to comply with the Demand Letters.

The administrative record contains no evidence that any of the Defendants conducted any investigation of Harvard for failure to comply with its civil rights obligations as a recipient of

---

[2] The USDA termination letter did not cite 2 CFR § 200.340 or any other source of regulatory authority for its actions. *See id.* ¶85. In fact, the record reveals that Defendants apparently knew that they did not have any legal authority to unilaterally terminate the USDA grants—but did so anyway. *See id.* ¶81("To the extent we're thinking of these as potential termination candidates, note these are not grants and do not have unilateral termination options per 2 CFR part 200.").

[3] Neither HUD nor NASA stated what their agency priorities are at all, despite claiming that Harvard's funding no longer effectuates them. *See id.* ¶¶69, 72. Defendant NASA's termination letters, for example, simply state that Harvard's grants are not "mission essential," with no explanation of *why* it was terminating Harvard's non-mission essential grants. *Id.* ¶72.

federal funding, nor does it contain any findings of actual violations. Nonetheless, as Defendants have implemented their decisions to freeze and then terminate funding, they have continued to invoke civil rights as a putative rationale for their actions. For example, on May 7, Defendant McMahon reaffirmed that Defendants' actions were grounded in civil rights enforcement, stating:

> [T]his is absolutely not about the First Amendment . . . this is about civil rights. . . . [I]t is [about] making all of the students there feel that their civil rights are intact. . . . If federal dollars . . . are going to an institution that is not in compliance with the law, I mean the Supreme Court case that was recently you know against Harvard said, ... "you must comply with your admissions policies," and they're not doing it. We've seen some results that they're not doing it, so we want them to comply with the law.

*Id.* ¶93. Defendant McMahon's May 7 statement also recognized something particularly troubling about Defendants' coercion of Harvard—it had already started to have an impact: "In the interim, ... they're doing some of the things [we asked for in the Demand Letters] . . . [so] we're thinking we're having an impact as well." *Id.*

Indeed, Harvard had already begun bowing to Defendants' unlawful pressure. For example, Defendants list "[c]entraliz[ation of] discipline instead of many ad boards and faculty councils across the institution" and the "[e]limination of all DEI" among their demands. *Id.* ¶18; *see also id.* ¶¶20, 25 (setting forth similar demands in the Demand Letters). Harvard recently centralized its discipline structure and shuttered its DEI office. *Id.* ¶119. As Plaintiffs' members recognized, these and other actions taken by Harvard demonstrate that even as Harvard challenges Defendants' unlawful acts, the University is nonetheless susceptible to their coercive pressure. *Id.* ¶¶115–20. These members regard these actions by Harvard as being taken to appease the Trump administration, which has prompted self-censorship and chilling of their free speech and academic inquiry for fear of further escalation. *Id.*

Since terminating Harvard's federal funding, the Trump administration has continued to target the Harvard community. On May 22, Secretary of the Department of Homeland Security Kristi Noem notified Harvard that "effective immediately, Harvard University's Student and Exchange Visitor Program certification is revoked." *President and Fellows of Harvard Coll. v. U.S. Dep't of Homeland Sec.*, Complaint at ¶141, Case No. 25-cv-11472 (D. Mass. May 23, 2025). Harvard challenged that revocation on May 23, *id.*, and this Court granted its motion for a temporary restraining order enjoining that unlawful conduct on the same day, Case No. 25-cv-11472, Dkt. 11 (D. Mass. May 23, 2025).

## LEGAL STANDARD

"A grant of summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Viscito v. Nat'l Plan. Corp.*, 34 F.4th 78, 83 (1st Cir. 2022) (quotation omitted). Defendants, as the nonmoving party, must identify specific evidence establishing such a genuine dispute and "conclusory allegations, improbable inferences, and unsupported speculation" are insufficient. *Id.*; *see also Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (setting out summary judgment standard in the context of APA claims).

## ARGUMENT

Plaintiffs are entitled to judgment as a matter of law on their claims under the APA and the First Amendment.[4] *First*, this Court has jurisdiction over Plaintiffs' claims. Plaintiffs have both standing and the right to bring their claims in this Court.

---

[4] Plaintiffs have pled and preserve their right to seek judgment on their causes of action under separation of powers, the spending clause, and due process, Dkt. 64, Counts V, VI, VII and VIII, particularly should the Court improbably accept any argument that Defendants' actions are a proper exercise of authority under 2 C.F.R. § 200.340, *see* Section II.C, *infra*.

*Second*, Defendants' actions violate the APA for several reasons. Even though Defendants relied on federal civil rights laws to authorize their actions, they categorically failed to comply with any of the procedural requirements Congress imposed on executive action enforcing those laws. The absence of a consistent rationale or any evidentiary basis for Defendants' actions, as well as their irresponsible escalation to the termination of all federal funding, requires the vacatur of Defendants' actions even if they were an exercise of agency policymaking discretion—a *post hoc* rationale the record flatly belies.

*Third*, Defendants' actions violate the First Amendment. Defendants targeted billions in federal funding to Harvard as a means of imposing demands on Harvard targeting free speech and academic freedom. The First Amendment forbids such coercion. The record also establishes that Defendants' motivation was discrimination against disfavored viewpoints and retaliation, both against the holders of those viewpoints and against Harvard for resisting efforts to punish them.

This Court should grant Plaintiffs' motion for summary judgment.

## I.    The Court Has Jurisdiction Over Plaintiffs' Claims.

This Court has subject matter jurisdiction over Plaintiffs' claims because Plaintiffs (1) have standing and (2) seek equitable relief that this Court has authority to grant.

### A.    Plaintiffs Have Standing.

Plaintiffs have standing based on both injuries to their members—whose research funding has been cut with disastrous impacts and whose speech and academic freedom are chilled—and injuries Plaintiffs have incurred directly. As to each of these associational and direct bases for standing, Plaintiffs have demonstrated they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Conservation L. Found., Inc. v. Acad. Express, LLC*, 129 F.4th 78, 86 (1st Cir. 2025) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24,

10

2016)). For each of these elements, Plaintiffs have "'set forth' by uncontroverted affidavit 'specific facts' ... 'which for purposes of the summary judgment motion will be taken to be true.'" *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

### 1.    Plaintiffs Have Standing to Sue on Behalf of Their Members.

Plaintiffs have standing to sue on behalf of their members because "(1) '[those] members would otherwise have standing to sue in their own right'; (2) 'the interests [the associations] seek[] to protect are germane to the organization's purpose'; and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Id.*

### a.    Plaintiffs' Members Have Standing to Sue in Their Own Right.

Plaintiffs need to demonstrate only a single member's standing. *See Playboy Enters., Inc. v. Pub. Serv. Comm'n of Puerto Rico*, 906 F.2d 25, 34 (1st Cir. 1990). Yet here, numerous Plaintiffs' members are suffering injuries fairly traceable to Defendants' conduct and redressable by the Court. These harms establish an "'invasion of a legally protected interest' that is both 'concrete and particularized' as well as 'actual or imminent,' rather than 'conjectural or hypothetical.'" *Gustavsen v. Alcon Lab'ys, Inc.*, 903 F.3d 1, 8 (1st Cir. 2018) (quoting *Lujan*, 504 U.S. at 561). And these harms encompass both present-day harms to Plaintiffs' members as well as imminent risks of substantial future harm.

*First*, some of Plaintiffs' members have been forced to cease research activities and have not been able to resume them, causing them "continuing direct injury" sufficient to support a request for injunctive relief. *See Ocasio v. City of Lawrence*, 788 F. Supp. 99, 100 (D. Mass. 1992). For example, within hours of the Funding Freeze, AAUP–Harvard member Don Ingber received an order from the federal government to cease work on two federally funded projects. SMF ¶176. Ingber immediately ceased this work and has not resumed it. *Id.* ¶177. As a result, Ingber's team was unable to attend an important meeting related to work his lab was doing for the upcoming

Artemis II mission to the moon and is presently unable to continue the work necessary to meet the deadlines to participate in that long-scheduled mission. *Id.* ¶179. AAUP–Harvard member Sarah Fortune received a similar "stop-work order" within hours of the Funding Freeze. *Id.* ¶168. As a result, "[t]he flow of samples from other sites, the flow of operations, the flow of data and the day-to-day immune profiling at [Fortune's] lab have all ceased." *Id.* In addition, the lab "has stopped receiving shipments from [its] collaborators, [and] stopped performing experiments." *Id.* Fortune is actively and presently "losing whole bodies of work because [her lab is] laying off the scientists who carry the knowledge from the past 5 years of research," much of which is not yet completed. *Id.* ¶168. Her lab is "losing not only the future funding but many of the discoveries from the past investments." *Id.* ¶169; *see also id.* ¶¶141–43 (discussing similar harms to AAUP–Harvard member Paige Williams). These harms will continue until and unless the Court enjoins Defendants' actions, and so suffice to establish standing for injunctive relief. *See Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 64 F.4th 1354, 1362–63 (D.C. Cir. 2023) (continuing direct injury from refusal to consider artist's submission for stamp design program sufficient to establish standing to seek prospective injunctive relief).

*Second*, Defendants terminated funding supporting many of Plaintiffs' other members, who expect to imminently experience these same harms once they exhaust their limited, short-term funds. *Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 375 (1st Cir. 2023) ("[A] material risk of future harm can satisfy the concrete-harm requirement, at least as to injunctive relief, when the risk of harm is sufficiently imminent and substantial." (quotation omitted)); *see also Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 256 (1994) (holding abortion clinics had standing based on attempts to induce them to stop providing services). The risk here is imminent and substantial: as soon as Plaintiffs' members exhaust their limited bridge funding, they necessarily will

cease research and study activities, SMF ¶¶124–26, 148, 163, 177, 186, 225, 247; lose critical samples or data, *id.* ¶¶163–64, 168, 225; layoff or discharge staff (and in some cases risk losing their jobs themselves), *id.* ¶¶124–26, 128, 136, 155–56, 158, 165, 188, 227, 229–30, 230, 240–41; and terminate research partnerships and programs or readjust the scope of those partnerships, *id.* ¶¶128, 142–43, 195–96, 239, 243. As a result of abrupt terminations, these harms also threaten Plaintiffs' members' professional reputations by imminently costing them goodwill among research participants and partners. *Id.* ¶143; *see, e.g.*, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) (listing "reputational harms" as an example of "intangible harms" that are sufficiently "concrete" for standing purposes); *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 2025 WL 1188160, at *12 (D.N.H. Apr. 24, 2025) (finding professional association had demonstrated predictable chain of events causing harm to them in response to ED letter to public schools demanding they eliminate "DEI").

*Third*, Defendants' actions have chilled some of Plaintiffs' members' protected speech and academic freedom. Defendants' sweeping and retaliatory demands leave Plaintiffs' members whose work falls within the areas the Trump administration has condemned—including those whose work relates to vaguely defined "DEI" concepts or views disfavored by the government on issues relating to Israel and Palestine—fearful that their work, or their positions, will be targeted by Defendants directly or as part of the coercive pressure Defendants have exerted on Harvard. SMF ¶¶114, 200, 205–10, 211–13, 215–16. As a result, Plaintiffs' members have begun to avoid speech and subject matter that might draw the wrath of the Trump administration directly or cause them to become the University's next target in its concessions to Defendants' demands. *Id.* ¶¶137, 210–17, 235–37, 247–48; *Nat'l Educ. Ass'n*, 2025 WL 1188160, at *13. These fears "in response to" the Demand Letters and the pressure on Harvard to cave to the Trump Administration's

coercion "are *themselves* caused by the [Demand Letters'] vagueness, the steep penalties [Defendants] have announced for [Harvard's] noncompliance with [their] requirements, and the measures [Defendants] ha[ve] already taken" demonstrating they expect Harvard to comply. *Id.* (emphasis in original). And here, "censorship of [Plaintiffs'] members is the predictable and direct result of the [Defendants' demands to the] school ... employing them." *Id.* at *14.

> **b.**    **The Interests Plaintiffs Seek to Protect Are Germane to Their Purpose.**

The primary mission of Plaintiffs AAUP and AAUP–Harvard is "to advance academic freedom and shared governance in higher education, define fundamental professional values and standards for higher education, promote the security of academic workers, and ensure higher education's contribution to the common good." SMF ¶¶96, 103. Plaintiff UAW represents two bargaining units at Harvard and "bargain[s] contracts, handl[es] problems with employers," and educates members. *Id.* ¶¶105–06. Thus, protecting the economic and academic freedom interests of their members as threatened here is germane to the organizational purpose of all three Plaintiffs. *See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 110 F.4th 295, 309 (1st Cir. 2024) (assuming without deciding that Puerto Rican association of municipal mayors would satisfy the germaneness test with respect to claims regarding municipal finances); *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 286–87 (1986) (recognizing obtaining and protecting benefits for their worker members is germane to the purpose of labor unions like UAW).

> **c.**    **Neither the Claims Asserted nor the Relief Requested Requires Member Participation.**

Neither the nature of the claims nor the relief requested requires the participation of individual members in this lawsuit. Liability is established by Defendants' actions, which have targeted Harvard's funding indiscriminately, not in ways that vary by the circumstances of the

individuals harmed. *See New Hampshire Motor Transp. Ass'n v. Rowe*, 324 F. Supp. 2d 231, 236 (D. Me. 2004). Moreover, "[a]ssociational standing is generally granted in cases seeking injunctive relief rather than damages," like this one, "because individualized proof is not necessary and the relief usually inures to the benefit of all members injured." *Id; see also Rhode Island Bhd. Of Corr. Officers v. Rhode Island*, 357 F.3d 42, 48–49 (1st Cir. 2004) (permitting union to bring contract claim on behalf of all members seeking declaratory relief about validity of contract provision).

### 2.    Plaintiffs Have Direct Standing.

Plaintiffs also have standing by virtue of injuries they themselves incurred as a result of Defendants' actions. An organization "suffers an injury in fact 'when the organization suffers an injury to its organizational activities' in a manner that 'drain[s] ... the organization's resources.'" *Nat'l Educ. Ass'n*, 2025 WL 1188160, at *8 (D.N.H. Apr. 24, 2025) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). These must be expenses related to "core business activities" that are necessarily diverted or impeded because of the challenged conduct or policy. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024).

Defendants' actions have "directly affected ... [Plaintiffs'] core business activities" by requiring a significant increase in resources needed to undertake those activities. *Id.* Like the plaintiff in *Havens Realty Corp.*, Plaintiffs' core business activities include providing resources and counseling to their members to ensure they can maintain their academic freedom, free speech rights, and economic security—including in contracts collectively bargained for by Plaintiff UAW. For example, AAUP's standing Committee A on Academic Freedom and Tenure "[p]romotes principles of academic freedom, tenure, and due process in higher education through the development of policy documents and reports relating to these subjects and the application of those principles to particular situations that are brought to its attention." SMF ¶97. Through local chapters like AAUP–Harvard, AAUP provides resources and programming to individual members on managing

15

threats to academic freedom on their campus, including "represent[ing] ... individual members regarding academic freedom, shared governance, and due process issues in proceedings before their university employers." *Id.* Similarly, Plaintiff UAW, through its two bargaining units, represents over 8,000 academic workers across the university in contract negotiation, employment disputes, and member education. *Id.* ¶106.

Defendants' actions have substantially taxed Plaintiffs' resources because of both the climate of fear they have created on campus and the disastrous consequences of their abrupt funding termination. AAUP has "diverted internal resources of staff time and expenses to assist Harvard members [as they] prepare to respond to the demands of the Trump administration." *Id.* ¶101. For example, AAUP–Harvard now meets with its membership twice as often and uses these meetings to "address the significant obstacles" that Defendants' Demand Letters and abuse of power have created for "the academic freedom and economic security of [AAUP–Harvard's] members." *Id.* ¶104. At these meetings, AAUP–Harvard and its members "discuss[] how and whether AAUP–Harvard members can maintain their academic freedom in the wake of these attacks." *Id.* AAUP–Harvard has also developed and sponsored workshops and trainings for AAUP–Havard members on digital surveillance, information security, and academic freedom rights to ensure its members have the tools and knowledge they need to protect themselves from Defendants' attacks. *Id.* And Defendants' actions will interfere with AAUP's and AAUP–Harvard's ability to perform other core business activity services, as AAUP–Harvard now "has to spend time dealing with crises and putting people in touch with needed resources instead of doing the internal governance work that the AAUP usually does within the university." *Id.*

Similarly, Plaintiff UAW has been "forced to spend significant time and resources responding to the repercussions of the administration's actions on its members." *Id.* ¶107. These activities

have included counseling members who have lost their funding, anticipate losing their jobs, or have not been able to complete their experiments or thesis research. *Id.* Because these risks affect academic progress and put UAW members at risk of having to leave their jobs—and thus UAW membership—entirely, UAW has had to spend considerable time advising these members on how to navigate these complex challenges. *Id.* This "expenditure of time and diversion of resources to respond to the fallout of the administration's actions has affected [UAW's] ability to do the representational, organizing, and advocacy work that is its core mission." *Id.*

These cognizable injuries in fact are fairly traceable to Defendants' actions and are redressable by this Court. *See Nat'l Educ. Ass'n*, 2025 WL 1188160, at *9; *see also All. for Hippocratic Med.*, 602 U.S. at 395; *Equal Means Equal v. Ferriero*, 3 F.4th 24, 30 (1st Cir. 2021). Thus, Plaintiffs have Article III standing in their own right.

## B.    Plaintiffs Properly Bring These Claims in Federal District Court.

This Court has subject matter jurisdiction to issue declaratory and injunctive relief from a course of agency conduct that violates well-established constitutional and statutory law.

Title VI specifically authorizes judicial review under the APA of Defendants' actions "terminating or refusing to grant or to continue financial assistance" for failure to comply with Title VI's nondiscrimination requirements. 42 U.S.C. § 2000d-2. Indeed, Congress made clear that such funding decisions "shall not be deemed committed to unreviewable agency discretion." *Id.* This congressional intent is well-recognized by courts. *See Schlafly v. Volpe*, 495 F.2d 273, 282 (7th Cir. 1974) ("The clear intent of section 2000d-2 is to provide a forum for judicial review for persons aggrieved by the severe action [the termination of federal funds] authorized by § 2000d-1."); *Colwell v. Dep't of Health & Hum. Servs.*, 558 F.3d 1112, 1128 (9th Cir. 2009) ("Judicial review of any funding termination [under Title VI] is available in an Article III court."); *Duxbury Trucking, Inc. v. Mass. Highway Dep't*, 2009 WL 1258998, at *5 (D. Mass. Apr. 29, 2009) ("The

[Massachusetts Highway Department's] regulations and Title VI indicate that the [Federal Highway Administration's] handling of such a claim is subject to judicial review under the rubric of the APA."). Thus, as parties aggrieved under Title VI,[5] Plaintiffs are entitled to judicial review of Defendants' termination of federal funding.

The Tucker Act, which provides for adjudication of contract disputes with the United States in the Court of Federal Claims, cannot override this more specific statutory provision. Nor could the Tucker Act divest this Court of subject matter jurisdiction more generally, because it does not apply to this case. Whether the Tucker Act applies depends on (1) the source of the rights upon which the plaintiff bases its claim, and (2) the type of relief sought. *Ass'n of Amer. Univs. v. Dep't of Energy*, 2025 WL 1414135, at *7 (D. Mass May 15, 2025) (Burroughs, J.). But Plaintiffs' allegations do not fall into the Tucker Act's purview under either of these prongs.

*First*, Plaintiffs' claims are founded upon rights protected by the Constitution and a federal statute, not "upon any express or implied contract with the United States[.]" 28 U.S.C. § 1491(a)(1); Second Am. Compl. ¶¶298–359. This case deals not with the "terms and conditions of each"—or any—"individual grant that the [Plaintiffs' members] receive from the Agency Defendants," but rather "the Agency Defendants' implementation of a broad, categorical freeze on obligated funds" in a manner that violated the First Amendment and Title VI. *New York v. Trump*, 2025 WL 1098966, at *2 (D.R.I. Apr. 14, 2025); *see also Massachusetts v. NIH*, 2025 WL 702163, at *6 (D. Mass. Mar. 5, 2025) ("[T]he gravamen of Plaintiff's Complaints does not turn on terms of a contract between the parties; it turns on federal statute and regulations put in place by Congress

---

[5] Plaintiffs are "person[s] aggrieved" under Title VI, 42 U.S.C. § 2000d-2, for the same reasons that they have Article III standing. *See* Section I.A, *supra*; *Weber v. Cranston Sch. Comm.*, 212 F.3d 41, 48 (1st Cir. 2000) ("Courts have construed the phrase 'any person aggrieved' as an expression of Congressional intent to accord standing to the fullest extent permitted by the case and controversy provision of Article III.").

and NIH."). The terms and conditions of Plaintiffs' members' individual grants are not at issue because Defendants acted without considering them. *See, e.g.*, SMF ¶¶36–41, 81. Instead, their decisions were broad pronouncements from cross-agency task forces and high-level executive branch officials; even the individual termination letters, to the extent they provide any explanation at all, expressly refer back to the purported civil rights rationale for those decisions, *not* to any grant terms or conditions. *See, e.g.*, SMF ¶¶44 (DOD termination letter), 51 (DOE termination letter), 63 (NIH termination letter), 76 (NSF termination letter), 84 (USDA termination letter).

*Second*, Plaintiffs seek forward-looking equitable relief from conduct in violation of those rights, not money damages from, or specific performance of, any contractual term. The fact that one consequence of that relief *might* involve continued payment of money by the federal government does not transform this case into a Tucker Act matter. *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988). On the contrary, the Court of Federal Claims *cannot* grant the exclusively equitable relief Plaintiffs seek here. *See Bowen*, 487 U.S. at 905 ("[W]e have stated categorically that "the Court of Claims has no power to grant equitable relief.'"); *Nat'l Air Traffic Controllers Ass'n v. United States*, 160 F.3d 714, 716 (Fed. Cir. 1998) (affirming Court of Federal Claims' dismissal of case for lack of jurisdiction where only claim before court was equitable claim for declaratory relief). Plaintiffs do not seek retroactive compensation for a wrong, but rather seek (1) "to protect their right[s] to maintain" the funding memorialized in Defendant Agencies' grants "absent the [Defendants] meeting the regulatory requirement[s] for a deviation" or termination, and (2) to enjoin the Defendants "broad, categorical" statement about the unavailability of any future funding. *Ass'n of Amer. Univs.*, 2025 WL 1414135, at *6. In other words, this case is about "process, not damages." *New York*, 2025 WL 1098966, at *2.

The Supreme Court's recent emergency ruling in *Department of Education v. California* does not suggest otherwise. 145 S. Ct. 966 (2025).[6] There, in addition to lacking the specific jurisdictional grant from Title VI, "'the terms and conditions of each individual grant award' were 'at issue.'" *Massachusetts v. Kennedy*, 2025 WL1371785, at *7 (quoting *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96–97 (1st Cir. 2025)). The plaintiffs in *California* also sued only to enjoin funding terminations, effectively bringing "claims for past pecuniary harms." *Ass'n of Amer. Univs.*, 2025 WL 1414135, at *6. As the Supreme Court itself acknowledged, however, this Court retains jurisdiction to enjoin agency action where, as here, the effect might be to restore improperly terminated funding. *Dep't of Educ.*, 145 S. Ct. at 968 ("[A] district court's jurisdiction is not barred by the possibility that an order setting aside an agency's action may result in the disbursement of funds." (quotation omitted)).

## II.    Defendants' Actions Violate the APA.

Defendants grounded their attack on Harvard's federal funding in their authority to enforce civil rights and anti-discrimination laws. SMF ¶¶15–16, 20, 25, 31–33, 43, 50, 57, 62, 76, 83. Congress enacted Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, to govern exercise of that authority. To investigate allegations, make findings, and impose funding penalties for violations of civil rights, Defendants must follow Title VI's procedures. Their failure to do so here constitutes agency action taken "without observance of procedure required by law," in violation of the APA. 5 U.S.C. § 706(2)(D).

Defendants' actions must also be set aside because the incoherent and conclusory rationale for their decisions to issue the Demand Letters and summarily freeze and then terminate billions

---

[6] Nor should *Department of Education v. California* be afforded undue weight. The emergency, per curiam opinion's "precedential value is limited." *Rhode Island v. Trump*, 2025 WL 1303868, at *6 (D.R.I. May 6, 2025).

of dollars of Harvard's funding do not represent reasoned decision-making and are thus "arbitrary [and] capricious" in violation of the APA. 5 U.S.C. § 706(2)(A). Each Defendant was required to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choices made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). They did not. Their actions were also arbitrary and capricious because each Defendant "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, [and] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* at 43.

Defendants' actions, beginning on March 31, are subject to judicial review under the APA because they are "[a]gency action made reviewable by statute" under Title VI. *See* 5 U.S.C. § 704. Alternatively, Defendants' actions are subject to judicial review under the APA because they are "final agency action for which there is no other adequate remedy in a court." *Id.* By the time of the March 31 "review" of Harvard's funding, and certainly by the Demand Letters, Defendants' "decisionmaking process had culminated," with the "writing [] on the wall" that Defendants had already decided Harvard should lose its federal funding if it did not adopt the conditions articulated in the Demand Letters. *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1289 (D.C. Cir. 2016); *see also Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986) (action is final where the agency "articulates an unequivocal position," and "expects regulated entities to alter their primary conduct to conform to that position").

### A.    Defendants Failed to Follow Any of the Procedures Required by Title VI and Defendants' Own Regulations.

Congress incorporated into Title VI detailed procedural prerequisites to the withholding of federal funds based on violations of federal civil rights laws. 42 U.S.C. § 2000d-1; *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001) (Title VI places "elaborate restrictions" on agency enforcement). Specifically, an agency may terminate or refuse to grant federal assistance *only* after there has been: (1) notice to the recipient "of the failure to comply" with Title VI; (2) an "opportunity for hearing"; (3) "an express finding on the record"[7] of noncompliance with Title VI; (4) a "determin[ation] that compliance cannot be secured by voluntary means"; and (5) a "full written report of the circumstances and the grounds for such action" submitted to Congress. 42 U.S.C. § 2000d-1. No termination decision "shall become effective until thirty days have elapsed after the filing of such report" with Congress. 42 U.S.C. § 2000d-1. These procedural protections are also codified in Defendants' own binding regulations.[8]

Defendants did not even attempt to follow Title VI's requirements or their own regulations before taking enforcement action against Harvard and summarily terminating billions of dollars in vital federal research funding. *First*, **no notice** of a Title VI investigation or specific violations was ever provided to Harvard before Defendants began taking enforcement actions. Neither the Demand Letters nor Defendants' public announcements provided any specific factual bases for the proposed action. SMF ¶¶14–16, 20, 25, 32–33. *Second*, there was **no offer of a hearing** of any

---

[7] This language triggers APA's formal adjudication procedures contained in 5 U.S.C. §§ 554, 556, 557. *See Dominion Energy Brayton Point, LLC v. Johnson*, 443 F.3d 12, 14 (1st Cir. 2006) (APA's formal adjudication procedures apply "in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing") (quoting 5 U.S.C. § 554(a)).

[8] *See* 45 C.F.R. § 80.8-.10 (HHS and NIH); 34 C.F.R. § 100.8 (ED); 41 C.F.R. § 101-6.211-1 to -4 (GSA); 45 C.F.R. § 611.1 (NSF); 32 C.F.R. § 195.1 (DoD); 10 C.F.R. § 1040.1 (DOE); 28 C.F.R. § 42.103 (DOJ); 14 C.F.R. § 1250.101 (NASA); 24 C.F.R. § 1.8 (HUD); 7 C.F.R. § 15.8 (USDA).

kind in which the asserted bases for the action could be discerned and challenged. *Third*, Defendants made ***no express findings on the record*** that would warrant a finding that Harvard violated Title VI and so, *fourth*, there was ***no determination that compliance could not be achieved voluntarily***. Defendants simply asserted that Harvard failed to comply with Title VI and, within hours of learning that Harvard would not comply with their draconian demands, Defendants began enforcement action by freezing more than $2 billion in federal funding to the University. SMF ¶¶27–31. *Fifth*, as there were no findings made to support Defendants' actions, it is not surprising that ***no report to Congress*** was filed thirty days in advance of the funding termination. By failing to comply with these requirements, Defendants' actions were taken "without observance of procedure required by law," in violation of the APA. 5 U.S.C. § 706(2)(D).

Defendants also violated Title VI's substantive limits on the scope of any funding termination, which must be limited to the "particular program, or part thereof, in which such noncompliance has been so found." 42 U.S.C. § 2000d-1. Defendants bear the burden of demonstrating a nexus between any misconduct and the scope of the funding termination. *See Bd. of Pub. Instruction of Taylor Cnty., Fla. v. Finch*, 414 F.2d 1068, 1078 (5th Cir. 1969). By indiscriminately terminating all funding to Harvard, Defendants made no attempt to tailor their sanction or justify its broad scope, in contravention of statutory limits on their power. *See id.* ("Congressional history indicates that limiting the scope of the termination power was integral to the legislative scheme.").

Defendants' flouting of Title VI's requirements thus violates the APA—including its prohibitions on agency actions taken "without observance of procedure required by law," actions "not in accordance with law," actions "in excess of statutory … limitations," and "arbitrary [or] capricious" actions. 5 U.S.C. § 706(2)(A), (C), (D); *see, e.g.*, *Schlafly v. Volpe*, 495 F.2d 273, 276–77 (7th Cir. 1974) (plaintiff stated claim under APA where agency froze funding under Title VI

without following procedures in 42 U.S.C. § 2000d-1); *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020) (DHS termination of DACA violated the APA).

### B.    Defendants' Actions Were Arbitrary and Capricious.

Even setting aside the failure to comply with Title VI's requirements, Defendants' actions must also be enjoined as arbitrary and capricious because they are "not reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 280 (2024). "Only by carefully reviewing the record and satisfying [itself] that the agency has made a reasoned decision can the court ensure that agency decisions are founded on a reasoned evaluation of the relevant factors." *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1285 (1st Cir. 1996). Defendants' actions fail this test for several reasons: their decisions were neither reasonable nor coherently explained; the record provides no factual or evidentiary basis for those decisions; and they failed to consider important reliance interests before terminating Harvard's federal funding. Thus, each of Defendants' actions must be set aside as arbitrary and capricious action in violation of the APA. *See* 5 U.S.C. § 706(2)(A).

### 1.    Defendants Failed to Reasonably Explain Their Decisions.

Defendants have failed to reasonably explain both (1) their conclusion that Harvard was noncompliant with federal civil rights laws and (2) their decision to threaten, freeze, and terminate all of Harvard's federal funding.

### a.    Defendants Did Not Reasonably Explain Their Noncompliance Determination.

Defendants violated the APA by failing to communicate a reasoned basis for their conclusions that Harvard was noncompliant with Title VI or any other civil rights laws. While Defendants' public statements and letters to Harvard bristle with accusatory rhetoric, they make no concrete findings. Instead, Defendants' decisions rest solely on conclusory assertions that Harvard has failed to comply with civil rights laws based on unspecified incidents of antisemitism and/or

discrimination in admissions and student-run programs. SMF ¶¶15–16, 20, 25, 31–33, 43, 50, 57, 62, 76, 83. Such "conclusory statements do not suffice to explain [Defendants'] decision." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016). Moreover, the inconsistency of Defendants' articulation of their conclusory rationale, especially when coupled with the aggressiveness of Defendants' timeline and the vitriol of communications such as the Ineligibility Decision and the President's statements, suggests alternative, improper motives. *See Dep't of Com. v. New York*, 588 U.S. 752, 783–84 (2019) (invalidating agency action upon finding that the agency's proffered explanation was contrived and not the real reason for the decision); *see* Section III, *infra* (viewpoint discrimination and retaliation). The APA forbids such capricious governance.

The April 3 Letter asserts that Harvard "has fundamentally failed to protect American students and faculty from antisemitic violence and harassment, in addition to other alleged violations of Title VI and Title VII," without citing a single specific incident or evidence that would support that conclusion. SMF ¶¶21–22. The April 11 Letter similarly asserts that Harvard "has in recent years failed to live up to both the intellectual and civil rights conditions that justify federal investment," but provides no factual or legal basis. SMF ¶¶24–25. Defendants' Funding Freeze announcement contains only vague statements that "[t]he harassment of Jewish students is intolerable," without citing any specific allegation of harassment. *Id.* ¶31. Similarly, the Ineligibility Decision merely repeats conclusory allegations of antisemitism from Defendants' prior communications and adds unrelated accusations, like complaints about Harvard's math curriculum and hiring of former Mayors De Blasio and Lightfoot. *Id.* ¶33. The letters Harvard received from individual agencies between May 6 and May 12 mainly repeat Defendants' prior vague and unsupported allegations, including that Harvard "has a disturbing lack of concern for the safety and wellbeing of Jewish students" and is guilty of "ongoing inaction in the face of repeated and severe harassment

and targeting of Jewish students." *Id.* ¶¶43 (DOD), 50 (DOE), 57 (ED), 62 (HHS), 83 (USDA). The only evidence in support of those allegations is a citation to Harvard's Final Report of the Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias ("Harvard Antisemitism Report"), discussed *infra* Section II(B)(2)(c). In addition to repeating allegations of antisemitism, the NIH, NSF, DOD, DOE, and ED termination letters further include identical claims that "Harvard continues to engage in race discrimination, including in its admissions process, and in other areas of student life," but provide no factual basis for these claims. SMF ¶¶43, 50, 57, 62, 76.

b.      **Defendants Did Not Reasonably Explain Their Enforcement Decisions.**

Defendants' actions are arbitrary and capricious for the additional reason that they provided no justification for why they chose the specific actions they did—including imposition of the conditions in the Demand Letters and their decisions to freeze and then terminate roughly $2.7 billion in federal funding to Harvard and bar Harvard from future federal grants. An agency must articulate not only a "satisfactory explanation for its action" but also "a rational connection between the facts found and the choice made." *Ohio*, 603 U.S. at 292–93 (quoting *State Farm*, 463 U.S. at 43). That is, agency actions must be reasonably tailored to the identified problem. *State Farm,* 463 U.S. at 46–47 (even assuming one type of seatbelt was ineffective, that did not justify rescinding the entire passive restraint rule). Defendants have failed to establish that rational connection or tailoring at each stage of their decision-making process.

*First*, Defendants failed to provide any rationale for imposing the demands in their Demand Letters. The letters did not even attempt to explain how these demands would bring Harvard into compliance with Title VI—or whether the demands had any connection to Title VI compliance at all. For instance, the April 11 Letter demanded that Harvard, among other things: "reduc[e] the power held by faculty … more committed to activism than scholarship"; review all faculty for "plagiarism"; submit to a third-party audit of its students and faculty for "viewpoint diversity,";

"immediately shutter all diversity, equity, and inclusion (DEI) programs"; and implement a "comprehensive mask ban." SMF ¶25. At no point have Defendants explained how these overbroad demands are proportionate to or targeted at Harvard's supposed noncompliance with "upholding federal civil rights laws." *Id.* ¶23; *see Burlington Truck Lines*, 371 U.S. at 168 (APA violation occurs where "[t]here are no findings and no analysis []to justify the choice made").

*Second*, Defendants provided no explanation for their sudden, indiscriminate decision to freeze and ultimately terminate roughly $2.7 billion of Harvard's federal funding and bar Harvard from receiving federal grants in the future. SMF ¶¶31–33, 34–88. For decades, federal agencies have used their funding power as designed: by identifying specific policies or practices in need of reform and working with funding recipients to address those specific policies or practices. Instead of addressing a particular problem, the termination of Harvard's federal funding appears punitive and political, rather than calibrated to achieve compliance with the law. Such unexplained severity is arbitrary and capricious on its face. *See State Farm*, 463 U.S. at 48, 51–52 (agency's failure to consider an "alternative way of achieving the objectives" or provide adequate reasons for rejecting the alternative rendered decision arbitrary).

Defendants' failure to consider alternatives that would keep federal funding in place is especially irrational because of the effect their actions will have on Harvard's obligation to comply with civil rights laws. Indeed, Defendants' decision to terminate all current and future federal funding to Harvard means that Harvard will *no longer be bound* by Title VI or subject to any future enforcement. 42 U.S.C. § 2000d (Title VI's nondiscrimination provisions apply only to entities receiving federal financial assistance). And this effect extends to other civil rights protections, too, including those conferred by Title IX, the Age Discrimination Act, and Section 504 of the Rehabilitation Act—all of which apply only to institutions receiving federal funds.

### 2.    The Record Contains No Evidence to Support Defendants' Actions.

Defendants' actions also violate the APA because they are unsupported by any evidence in the sparse administrative record. *See State Farm*, 463 U.S. at 52–53 (striking down agency action where there was "no direct evidence in support of the agency's finding."); *Finberg v. U.S. Dep't of Agric.*, 6 F.4th 1332, 1337–38 (D.C. Cir. 2021) (holding agency's finding lacked sufficient support where it rested on unsupported and conclusory premises for which there was "no evidence").

### a.    March 31 Announcement & April 3 Letter

The record contains only *one* document dated prior to April 3 and it is thus the *only* evidence that Defendants could have relied on for their: (1) March 31 conclusion that Harvard was noncompliant with its civil rights obligations such that a review of its federal funding was warranted, and (2) April 3 Letter asserting that Harvard had "fundamentally failed to protect American students and faculty from antisemitic violence and harassment in addition to other alleged violations of Title VI and Title VII"[9] and demanding "immediate" implementation of broad reforms that "the government views as necessary" for Harvard to continue receiving federal funds. This document, a December 2024 U.S. House of Representatives Staff Report on Antisemitism ("House Report"),[10] was a politically motivated attack on the University and does not contain the kind of evidence that could justify Defendants' actions. While the House Report claims to present so-called "findings" of "likely" Title VI violations at several universities, including Harvard, it

---

[9] Title VII of the Civil Rights Act of 1964 does not confer any power on Defendants to enforce its provisions through funding termination. Title VII's exclusive enforcement mechanisms are vested in the EEOC's investigative and litigation powers, as well as private rights of action. *See* 42 U.S.C. § 2000e-5.

[10] While the record does contain an April 1 letter from the organization People for the Ethical Treatment of Animals discussing its recommendation that the Task Force shut down one of Harvard's studies, the letter is entirely devoid of any allegations of antisemitism or other bias. *See* SMF ¶67(c). Thus, on its face, it could not have formed the basis for Defendants' decisions.

actually contains only conclusory allegations that come nowhere close to suggesting a violation of any civil rights law. Instead, the Report is a thinly veiled attack on protected speech that fails to justify executive branch control over the operations of a private university. The only "findings" the House Report makes against Harvard are complaints that (1) the University "chose not to condemn Hamas" in a public statement, (2) Harvard administrators disagreed with each other about describing the phrase "from the river to the sea" as "antisemitic hate speech," (3) Harvard "downgraded" suspensions of students who had engaged in protest activities on campus, and (4) Harvard's then-President Gay "disparaged Representative Elise Stefanik." SMF ¶67(b). At no point does the Report explain how these accusations could establish a Title VI violation. And the Report entirely fails to consider the obvious First Amendment concerns that would be implicated by any government action against Harvard for this protected speech. *See* Section III, *infra.* These critical defects in the House Report make it a wholly unreliable basis for Defendants' actions. *See Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626 (1986) ("[I]t must appear that there are findings, supported by evidence, of the essential facts … which would justify the [agency's] conclusion.").

### b.    April 11 Letter & April 14 Freeze

The record contains only four documents that are dated between April 4 and April 14, and thus could have provided the basis for Defendants' April 11 Letter or the April 14 Funding Freeze. None of these documents provide sufficient, if any, evidentiary basis for the conclusions contained in the April 11 Letter and certainly do not justify the extreme decision to freeze more than $2 billion in funding to Harvard on April 14. *See State Farm*, 463 U.S. at 52–53 (enjoining agency action where there was "no direct evidence in support of the agency's finding").

Two of these documents are emails from private citizens that focus on the disparate impact of "legacy" admissions practices at Harvard. SMF ¶67. There is no clear connection between these

two emails and Defendants' actions. Neither the April 3 Letter nor April 11 Letter mention Harvard's legacy admissions practices, and none of Defendants' demands in those letters addressed legacy admissions. The third document is an April 10 email exchange between the Task Force and Harvard's counsel discussing the resignation of "Bashar Masri" from Harvard Kennedy School's Dean's Council after a lawsuit against him. *Id.* Again, there is no clear connection between these emails and Defendants' conclusions or actions.

The final document appears to be a memorandum submitted to the Task Force on April 11, entitled "Addressing Antisemitism and Anti-Americanism at Harvard University." *Id.* The memorandum has no author listed and the record provides no context regarding why or how it was created. It makes conclusory allegations of antisemitism at Harvard, with no specific facts or sources cited, before proposing a litany of "reforms" recommended by the unnamed author. *Id.* The memorandum does not mention First Amendment concerns, reliance interests on Harvard's federal funding, or any source of legal authority that the government would have to impose any of these "reforms." Some of the "reforms" would be blatantly unconstitutional; for example, the author encourages the government to force Harvard to eliminate any program affiliated with Palestinian studies, human rights, "ethnic studies," or "DEI." *Id.*

### c.    May 5 Ineligibility Decision & May Termination Letters

Only two additional documents in the administrative record are possibly relevant to Defendants' decisions following April 14, but neither justifies their actions. First, an April 21 email chain between members of the Task Force contains a screenshot of an Instagram post marking April 17 as "Palestinian Prisoner's Day." *Id.* The post appears to be attributed to the Instagram accounts of student groups at Oxford, Cambridge, and Harvard. *Id.* There is no clear connection between this post—which calls for no action and does nothing more than acknowledge a day of

30

remembrance for "Palestinians who have been wrongfully imprisoned or unlawfully detained"—and Defendants' course of conduct. *Id.*

The last potentially relevant document in the record is the Harvard Antisemitism Report, which is included in the administrative records from HHS, GSA, DOE, NASA, and USDA. *See, e.g.*, SMF ¶ 67. That report was not released until April 29, 2025, well after Defendants had already made their determination of noncompliance and had started recycling conclusory restatements of it. Its inclusion in the record smacks of *post hoc* rationalization. *See Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981) ("[T]he *post hoc* rationalizations of the agency ... cannot serve as a sufficient predicate for agency action."). It also bears no relationship to Defendants' purported conclusions relating to race discrimination in admissions or any other aspect of campus life.

In any case, the agencies that cite the Harvard Antisemitism Report do not explain how the Report represents "ongoing inaction" or proves that Harvard "has a disturbing lack of concern for the safety and wellbeing of Jewish students." *See Melone v. Coit*, 100 F.4th 21, 29 (1st Cir. 2024) (holding that a "decision is arbitrary and capricious" if the agency "offer[s] an explanation for its decision that runs counter to the evidence before the agency"). At a minimum, nothing about the Report provides a sufficient evidentiary basis for the specific decisions Defendants took to impose the radically intrusive conditions of the Demand Letters or to terminate roughly $2.7 billion in federal funding.

### 3.    Defendants Ignored Significant Reliance Interests.

Defendants also violated the APA's requirement to consider the impact of terminating Harvard's federal funding, and refusing to provide future grants, on those who have relied on them for their research and livelihood. *See Regents*, 591 U.S. at 30 (agency must "address whether there was 'legitimate reliance'" on a policy before changing it). Harvard and its faculty, graduate students and researchers—including Plaintiffs' members—have for years relied on federal grants to

conduct vital research and education. *See* Section I.A, *supra*. By suddenly terminating funding in the middle of grant budget periods, Defendants inflicted massive, unexpected chaos: experiments halted, research teams cast into limbo, students and staff left in the lurch.

Plaintiffs' members have structured their entire careers around the federal grant funding system. Junior faculty recognize that their success in obtaining federal funding will be one of the main factors in their tenure assessment, and thus rely on the continued availability of that funding to pursue the research that will allow them to obtain said tenure. SMF ¶136. Tenured faculty members rely on federal funding to ensure that they can train valuable researchers and support staff over the long term, as well as to staff their labs with the teams they need to do effective scientific inquiry. *Id.* ¶¶149, 170. Students depend on the availability of these funds to support labs where they can participate in research and gain essential training, allowing them to obtain their degrees in a timely manner. *Id.* ¶¶149–50. Non-citizen laboratory staff members are particularly vulnerable in their dependence on federal funds to ensure the jobs that they rely on to secure visas continue to exist. *Id.* ¶178. Laboratories, medical and public health initiatives, and even the federal government itself depend on the availability of these funds and the advancements they support. *Id.* ¶¶145, 156–57, 179. And research programs vital to American scientific inquiry, medical advances, public health, economic competitiveness, and—again—even the federal government itself rely on this funding to support their existence. *See, e.g.*, *id.* ¶¶145, 156–57, 164, 169, 179, 226, 241, 245.

Yet nowhere in the administrative record is there a scintilla of evidence that Defendants considered these reliance interests at all. That failure, on its own, violates the APA. *See Regents*, 591 U.S. at 30–31 (collecting cases); *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 2025 WL 1116157, at *2 (D.R.I. Apr. 15, 2025) (enjoining funding freeze where the agency "failed to account for any reliance interests" in issuing the stop-work order); *AIDS Vaccine Advoc.*

*Coal. v. U.S. Dep't of State*, 2025 WL 752378, at *10 (D.D.C. Mar. 10, 2025) (finding agency action arbitrary where "nothing in the record suggested that Defendants considered and had a rational reason for disregarding the massive reliance interests of businesses and organizations that would have to shutter programs or close their doors altogether").

### C. Defendants Cannot Evade Title VI or the APA by Invoking 2 C.F.R. § 200.340.

Apparently recognizing their failure to follow Title VI's mandatory procedures, Defendants shifted to a new legal justification for their funding decisions after this litigation was filed. Their May 2025 termination letters rely, for the first time, on 2 C.F.R. § 200.340(a)(4) to claim that the grants were terminated because they no longer align with "agency priorities." SMF ¶¶42, 49, 62, 68.[11] But Defendants did not cite "agency priorities," let alone § 200.340, in the Demand Letters, the April 14 Funding Freeze, or the May 5 Ineligibility Determination. This reference in some of the individual agency termination letters is, at most, an impermissible and unpersuasive *post hoc* rationalization. *See Am. Textile Mfrs. Inst.*, 452 U.S. at 539 (1981) ("[T]he *post hoc* rationalizations of the agency ... cannot serve as a sufficient predicate for agency action."). Based on this timing alone, the Court should disregard any argument that Defendants' actions are an exercise of this authority. And, in any event, 2 C.F.R. § 200.340 is merely codified guidance issued by OMB and is not binding on agencies unless and until they adopt their own implementing regulations.[12] Importantly, HHS—and thus NIH, Harvard's largest government funding source—has *not*

---

[11] The USDA termination letters do not cite *any* legal basis for their actions, including 2 C.F.R. § 200.340. *See* note 2, *supra*.

[12] *See* 2 C.F.R. § 1.105(b) ("Publication of the OMB guidance in the CFR does not change its nature—it is guidance, not regulation."); 69 Fed. Reg. 26276-01.

adopted 2 C.F.R. § 200.340(a)(4) and thus has not given the "agency priorities" termination pro-vision regulatory authority.[13]

Even if the Court did entertain that argument, it would fail as a matter of law. *First*, even where agencies have promulgated their own implementing regulations, § 200.340(a)(4) does not confer on agencies the power to terminate federal funds on the basis of civil rights enforcement without complying with the requirements of Title VI and the APA. Any interpretation of § 200.340 to confer such power would run afoul of uncontroverted constitutional limitations on executive power and require the Court to strike that regulation down as unconstitutional. *Second*, any action pursuant to § 200.340(a)(4) would still be subject to review under the APA, such that Defendants' failure to engage in reasoned decision-making in their determination that *all* of Harvard's grants suddenly no longer effectuate agencies' priorities is fatal.[14]

## 1.    § 200.340 Cannot Override the Statutory Requirements of Title VI.

2 C.F.R. § 200.340(a)(4) provides that a recipient's federal assistance may only be termi-nated under that provision "*to the extent authorized by law.*" Terminating federal funds for alleged noncompliance with civil rights laws in a manner that ignores Title VI's procedural protections is *not* "authorized by law." *See* Section II.A, *supra*. Regulations cannot empower federal agencies to override statutory responsibilities. *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) ("When an executive agency administers a federal statute, the agency's power to act is

---

[13] 89 Fed. Reg. 80055–57 (HHS will adopt § 200.340 only effective October 1, 2025); 45 C.F.R. § 75.372 (operative NIH regulation does not allow termination based on changed agency priorities). For this reason alone, NIH's terminations allegedly based solely on changing "agency priorities" under § 200.340(a)(4) cannot withstand scrutiny.

[14] To the extent Defendants rely on Federal Acquisition Regulation ("FAR"), 48 C.F.R. § 52.249, to assert the right to terminate certain contracts for the government's "convenience," the same arguments apply. The FAR regulations cannot override the statutory requirements of Title VI and the government's attempt to do so is arbitrary and capricious.

'authoritatively prescribed by Congress.'" (quoting *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013))).

This Court's enforcement of Title VI's statutory limitations is critical to effectuating Congress's goal of ensuring that the executive branch does not abuse its power over federal funds. At the time of Title VI's passage, opponents were concerned that permitting agencies to enforce civil rights laws by threatening federal funding provided the executive branch with unprecedented power to control the allocation of federal funds, a function constitutionally delegated to Congress. *See, e.g.*, 110 Cong. Rec. 2463, 2469, 2498, 2501. They also feared that any such funding termination would unnecessarily harm the beneficiaries that federal assistance programs aimed to serve. *Id*. In response, Title VI's sponsors emphasized that its procedural protections would prioritize enforcement of civil rights through voluntary compliance rather than the interruption of vital federal assistance. Indeed, as Senator Humphrey explained during the hearings: "[Title VI] encourages Federal departments and agencies to be resourceful in findings ways of ending discrimination voluntarily *without forcing a termination of funds* needed for education, public health, social welfare, disaster relief, and other urgent programs" and that the "[c]utoff of funds needed for such purposes *should be the last step, not the first*, in an effective program to end racial discrimination." 110 Cong. Rec. 6546 (1964) (emphasis added); *see also* 28 C.F.R. § 42.411(a) ("Effective enforcement of title VI requires that agencies take prompt action to achieve voluntary compliance in all instances in which noncompliance is found.").

Accordingly, in addition to allowing agencies to terminate funds, the final version of Title VI provided for safeguards to protect recipients and beneficiaries from the loss of funds without sufficient factual foundation and the opportunity to rebut the predicate findings. To ensure the

35

requirements of Title VI were satisfied, Congress explicitly provided that agencies' findings be subject to judicial scrutiny. 42 U.S.C. § 2000d-2.

Any argument that § 200.340(a)(4) enables Defendants to circumvent Title VI would entirely nullify Congress's intent with regard to not only Title VI but also numerous civil rights statutes that mirror Title VI's procedural protections, including Title IX, the Age Discrimination Act, and Section 504 of the Rehabilitation Act of 1973. This would set a dangerous precedent under which agencies could simply invoke changing agency priorities to not only bypass those procedural protections but also unilaterally decide what kind of conduct constitutes "discrimination," without regard to precedent governing the proper interpretation of Title VI (or any other civil rights law). *See State Farm*, 463 U.S. at 41 (rejecting interpretation that "would render meaningless Congress' authorization for judicial review"); *cf. Davis v. Monroe Cnty. Bd. of Ed.,* 526 U.S. 629, 640-41 (1999) (holding, in the context of Title IX, that agencies may not enforce definitions of discrimination not discernable from the text of civil rights statutes premised on the spending power).

For the same reason, allowing as much would raise serious separation of powers, Spending Clause, and due process concerns. The Constitution vests the spending power, including the authority to place conditions on federal spending, exclusively in Congress. U.S. Const., art. I. The executive branch has no power to unilaterally enact, amend, or repeal parts of duly enacted statutes, including spending statutes. *Clinton v. City of N.Y.*, 524 U.S. 417, 438-39 (1998); *Nat'l Fed'n of Indep. Bus. v. Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022) ("Administrative agencies ... possess only the authority that Congress has provided."); *Colorado v. U.S. Dep't of Health & Hum. Servs.*, 2025 WL 1426226, at *18 (D.R.I. May 16, 2025). Nor can the Executive branch terminate appropriations authorized by Congress, except as Congress has specifically

provided. *See, e.g.*, *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) ("[A] President sometimes has policy reasons ... for wanting to spend less than the full amount appropriated by Congress for a particular project or program. But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds."); *San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) ("Absent congressional authorization, [an agency] may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals ... [without] violat[ing] the constitutional principle of the Separation of Powers."). Where the executive branch exercises power that belongs to Congress, its actions violate the separation of powers. *See Clinton*, 524 U.S. at 451 (Kennedy, J., concurring) (noting that where the "decision to spend [is] determined by the Executive alone, without adequate control by ... Congress, liberty is threatened").

Congress has not granted Defendants authority to impose new conditions on recipients of federal funding via an assertion of agency priorities under 2 C.F.R. § 200.340. *See also Santa Clara v. Trump*, 250 F. Supp. 3d 497, 516 (N.D. Cal. 2017) ("[T]he power to place conditions on funds belongs exclusively to Congress."). When Congress seeks to impose conditions on the receipt of federal funds, "it must do so unambiguously" such that the recipient is able to "exercise their choice knowingly, cognizant of the consequences of their participation." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *see also Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022) ("Unlike ordinary legislation, which 'imposes congressional policy' on regulated parties 'involuntarily,' Spending Clause legislation operates based on consent."). Harvard and Plaintiffs' members were on notice when they accepted federal funding that they must comply with federal law, including Title VI, but they were not on notice that they could be subject to civil rights enforcement outside of the scheme set forth by federal law.

Such an absence of notice and clear standards also raises serious due process concerns. Plaintiffs have a cognizable property interest in continued receipt of the terminated federal funds because they have "a legitimate claim of entitlement to it," cabined only by conditions and limitations of which they were provided reasonable notice. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972); *Clukey v. Town of Camden*, 717 F.3d 52, 56 (1st Cir. 2013) ("Property interests exist when an [actor's] discretion is clearly limited so that the [recipient] cannot be denied [the benefit] unless specific conditions are met."). The expansive reading of 2 C.F.R. § 200.340 necessary to justify Defendants' actions would erode the "appropriate procedural safeguards" necessary to protect against the risk that the government may erroneously deprive Plaintiffs of those interests. *Clukey*, 717 F.3d at 59. Due process is also implicated by the vagueness that otherwise infects whatever standards such an expansive reading of § 200.340 would provide. *FCC v. Fox Tel. Stations, Inc.*, 567 U.S. 239, 253 (2012) (holding that a law will be void for vagueness, particularly where free speech is at issue, where it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement").

Congress carefully and intentionally constructed Title VI's procedural protections to avoid these due process and spending power concerns. The Court should not permit Defendants to circumvent statutory commands by simply re-labelling a Title VI action as a decision about "agency priorities" under § 200.340. If it did, Defendants' actions would be unconstitutional and *ultra vires* in violation of constitutional constraints on executive actions.

### 2.    Any Exercise of Authority Under § 200.340 Is Arbitrary and Capricious.

Even if Defendants' actions were pursuant § 200.340—which they are not—their actions would still be subject to APA review and should be enjoined as arbitrary and capricious. Indeed,

in its statement upon publication of the final rule codified as § 200.340, OMB noted that it had received many comments that "expressed a concern that the proposed language will provide Federal agencies too much leverage to arbitrarily terminate awards without sufficient cause." 85 FR 49506-01. In response, OMB assured those commenters that "*agencies are not able to terminate grants arbitrarily*" under 2 C.F.R. § 200.340(a)(4). 85 FR 49506-01 (emphasis added). Thus, even if Defendants' actions were taken "pursuant" to § 200.340 instead of Title VI, they must nonetheless be enjoined because they were arbitrary and capricious in violation of the APA.

> **a.    Defendants Failed to Explain Why They Departed from Longstanding Practice Governing Civil Rights Enforcement Relating to Federal Funding Recipients.**

Defendants' choice to rely on 2 C.F.R. § 200.340 instead of following Title VI procedures was independently arbitrary and capricious because they provided no explanation for departing from longstanding practice. For over half a century, federal agencies have enforced civil rights through Title VI's established procedures—investigating complaints, negotiating voluntary compliance where possible, and only then, if necessary, moving to formal fund termination with all required procedural safeguards. This settled course of behavior reflects the agencies' and Congress's careful balancing of civil rights enforcement with the concerns set forth in the discussion of Title VI's legislative history. *See* Section II.C.1, *supra*. No federal agency has *ever* relied on authority under 2 C.F.R. § 200.340(a)(4) to enforce civil rights protections. As the Supreme Court has observed, a "settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress. There is, then at least a presumption that those policies will be carried out best if the settled rule is adhered to." *State Farm*, 463 U.S. at 41–42 (1983) (quoting *Atchison v. Wichita Bd. of Trade*, 412 U.S. 800, 807–808 (1973)). Defendants' rejection of that presumption is entirely unexplained and, therefore, arbitrary and capricious. *See id.* at 43.

### b. Defendants Failed to Explain Why Harvard's Federal Funding No Longer Effectuates Agency Priorities.

Defendants also provided no reasoned explanation for how any of the terminated grants "no longer effectuate[] the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). As detailed above, the lone agency priority articulated in the administrative record is the priority to ensure funds are only expended on institutions that comply with their nondiscrimination obligations. *See* Section II.C, *supra*. But for the same reasons detailed in Section II.C., *supra*, Defendants' determination that Harvard's funding no longer effectuated their nondiscrimination priorities was neither reasonable nor reasonably explained.

Defendants also failed to consider the ways in which the funding terminations *undermine* agency priorities. Defendants have, for decades, granted Harvard billions of dollars in federal funds because Harvard's research has demonstrably advanced the agencies' priorities. For example, Harvard's research has directly promoted the agencies' goals of furthering scientific advances and discoveries that serve the public interest and save lives, and Defendants' termination of previously awarded grants to Harvard thwarts these longstanding agency priorities. *See* SMF ¶¶121, 154, 156, 160, 163, 168, 174, 225, 232, 241, 245–46. And by interrupting hundreds of research projects mid-stream, Defendants' actions will result in significant waste of taxpayer funds already invested in Harvard's ongoing projects that will no longer be completed and will, in some cases, be irreparably destroyed. *See* SMF ¶¶164, 169, 179, 225–26, 241, 245. By ignoring the impact of their actions on these other priorities, Defendants "entirely failed to consider an important aspect of the problem," in violation of the APA. *State Farm*, 463 U.S. at 43.

### III. Defendants' Actions Violate the First Amendment.

Defendants' actions violate the First Amendment in two distinct ways. First, Defendants have engaged in unconstitutional coercion by using—and later following through on—threats to

withhold billions of dollars of current and future federal funding in order to impose demands on Harvard that directly target free speech and academic freedom. Second, Defendants' actions are motivated by (a) discrimination against disfavored viewpoints allegedly promoted on Harvard's campus, and (b) retaliation against both the holders of those disfavored viewpoints and Harvard for refusing to allow Defendants to impose their will on the Harvard community.

In these two ways, Defendants have exhibited clear disregard for the one "fixed star in our constitutional constellation … that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion[.]" *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). *See also Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 603 (1967) ("[A]cademic freedom ... is of transcendent value to all of us and … is therefore a special concern of the First Amendment[.]"); *Murthy v. Missouri*, 603 U.S. 43, 77 (2024) (Alito, J., dissenting) ("Freedom of speech serves many valuable purposes, but its most important role is protection of speech that is essential to democratic self-government ... and speech that advances humanity's store of knowledge, thought, and expression in fields such as science, medicine, history, the social sciences, philosophy, and the arts[.]").

### A.    Defendants' Actions Are Unconstitutional Coercion.

Defendants are holding hostage billions of dollars of federal funding in an effort to coerce Harvard University into falling in line. But the executive branch cannot intimidate a private university into suppressing academic freedom and free speech, whether by directly targeting that speech or seeking control of university administration in a manner that compromises free academic inquiry.

The First Amendment prohibits the government from "us[ing] the power of the State to punish or suppress disfavored expression." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024). This includes relying on the "'threat of invoking legal sanctions and other means of

coercion ... to achieve the suppression' of disfavored speech." *Id.* at 188–89 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)). Here, the means of coercion is billions of dollars in federal funding that support Harvard's—and Plaintiffs' members'—globally renowned research programs, putting "a gun to the head" of a private university and its faculty and staff, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012), to force them to acquiesce to demands that violate the First Amendment.

As discussed, Defendants' termination of funding to Harvard is designed to coerce Harvard into undertaking steps that punish what Defendants view as disfavored speech, impose government orthodoxy, and compromise academic independence.[15] Defendants have stated that Harvard lost its federal funding because, in Defendants' judgment, it lacks "viewpoint diversity," *id.* ¶¶17–18, 20, 25; did not "focus on truth-seeking, innovative research, and academic excellence," *id.* ¶21; and failed to address "ideological capture," *id.* ¶¶20, 25. The President himself stated in no uncertain terms that Harvard lost its funding because it "push[es] political, ideological, and terrorist inspired/supporting 'Sickness[]'," *id.* ¶89; it hired his political opponents, *id.* ¶90; and he considers it "a threat to Democracy," *id.* ¶91. To "reform" Harvard in response to these grievances, Defendants demanded that Harvard scrap programs and punish protestors. *Id.* ¶¶20, 25. These steps would be a violation of the First Amendment if the government attempted to undertake them directly. *See*

---

[15] Although Defendants are, in fact, motivated by an unconstitutional desire to suppress particular viewpoints, *see* Section III.B, *infra*, Defendants' coercive actions would violate the First Amendment even if they were motivated by a desire to enforce Title VI. In *Bantam Books*, the Supreme Court found a violation of the First Amendment where a commission threatened booksellers for distributing what it believed to be obscenity, even though "obscenity is not within the area of constitutionally protected speech[.]" 372 U.S. at 65. The Court found that booksellers would likely self-censor out of fear, cutting courts out of determining whether targeted material was actually unprotected. *Id.* at 69–71. Likewise, even if Defendants here sought only to target unlawful conduct, coercing Harvard in service of that goal is unconstitutional. The enormous pressure Defendants' financial leverage exerts on Harvard exemplifies the "hazards to protected freedoms" caused by systems of "informal censorship." *Id.* at 70–71.

*Rosenberger v. Rector & Visitors of Univ. of Virginia,* 515 U.S. 819, 832, 835–37 (1995) (holding that a public university's denial of funding to student group on the basis of viewpoints expressed in student group's publication was unconstitutional); *Perry v. Sindermann,* 408 U.S. 593, 597 (1972) ("[The government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech."). So, too, would Defendants' demands for a "department-by-department" viewpoint "audit" to ensure that "[e]very department … found to lack viewpoint diversity" is "reformed by hiring a critical mass of new faculty … who will provide viewpoint diversity[,]"and for punishment of individuals promoting a different viewpoint than the government's on the Israeli-Palestinian conflict. SMF ¶¶20, 25.

This coercive aspect distinguishes Defendants' actions from discretionary decisions to terminate funding for programs that "conflict with [their] current policy determinations[,]" which have been upheld in other cases. *Cf. Chicago Women in Trades v. Trump*, 2025 WL 1114466, at *13 (N.D. Ill. Apr. 14, 2025). The administrative record demonstrates that Defendants have not cut funding because the federal government's research agenda changed. Rather, they cut funding as part of an attempt to "do indirectly what [they are] barred from doing directly: … coerc[ing] a private party to punish or suppress disfavored speech on [their] behalf." *Vullo*, 602 U.S. at 190. This is an unlawful attempt to "expand their regulatory jurisdiction to suppress the speech of [individuals] that they have no direct control over." *Nat'l Educ. Ass'n*,, 2025 WL 1188160, at *26 (quoting *Vullo*, 602 U.S. at 197–98).

Nor, in light of the breadth of their demands and the scope of their funding cuts, can Defendants claim to be merely ensuring that government funds are not spent on activities it does not wish to endorse. It has long been established that the government's power to "define the limits of [a] government spending program" does not extend to "conditions that seek to leverage funding to

regulate speech outside the contours of the program itself." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013) (holding that the government may not condition public health funding on agreement with the government's policy to oppose prostitution); *see also Rust v. Sullivan*, 500 U.S. 173, 196 (1991); *FCC v. League of Women Voters of California*, 468 U.S. 364, 398–400 (1984). The Trump administration has violated this principle before, in a manner that mirrors the unlawful acts here. *See Santa Cruz Lesbian and Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543 (N.D. Cal 2020) ("Requiring federal grantees to certify that they will not use grant funds to promote concepts the Government considers 'divisive,' even where the grant program is wholly unrelated to such concepts, is a violation of the grantee's free speech rights.").

That Defendants may not yet have succeeded in coercing Harvard's complete compliance is irrelevant. The Demand Letters are conduct which, "viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress" speech and academic freedom. *Vullo*, 602 U.S. at 191. The attempt is sufficient to establish Defendants' liability.

Moreover, the record demonstrates that Harvard has, in fact, capitulated in a manner that has already caused direct harm to Plaintiffs' free speech and academic freedom. For example, in just the last two months, Harvard has dismissed faculty members the Trump administration demanded it dismiss, SMF ¶¶17–18, 116; ended partnerships the Trump administration demanded it end, *id.* ¶¶17–18, 117; changed its disciplinary procedures to align with those the Trump administration demanded it implement, *id.* ¶¶17, 119; and shuttered offices the Trump administration demanded it close, *id.* ¶¶25–26, 119.

Beyond these examples, Defendants' course of conduct has created a climate of fear on Harvard's campus, chilling both free expression and the robust exchange of ideas—as it was

44

designed to do. Some AAUP–Harvard members have begun advising their mentees to consider the potential consequences of selecting research topics that may draw the ire of the Trump Administration directly or Harvard as it is subjected to additional pressure to accede to Defendants' demands. *Id.* ¶137. And Plaintiffs' members have also changed their on-campus speech and behavior—and in some cases even their teaching and research plans—to ensure they do not become a target. *Id.* ¶¶114, 137, 200, 204–17, 235–37, 248–49, 252–55. *Dube v. State Univ. of New York*, 900 F.2d 587, 598 (2d Cir. 1990) ("[F]or decades it has been clearly established that the First Amendment tolerates neither laws nor other means of coercion, persuasion or intimidation 'that cast a pall of orthodoxy' over the free exchange of ideas in the classroom." (quoting *Keyishian*, 385 U.S. at 603)).

## B.    Defendants' Actions Are Unlawful Retaliation and Viewpoint Discrimination.

Defendants' actions also violate the First Amendment because they are unlawful retaliation and viewpoint discrimination. The record demonstrates that Defendants intentionally targeted viewpoints they disfavored on Harvard's campus and, following Harvard's defiance, that Defendants escalated to grievance-fueled retaliation as punishment for Harvard's unwillingness to accede to most of their demands. This conduct violates the First Amendment.

Defendants' grounds of a purported lack of "viewpoint diversity," SMF ¶¶17–18, 20, 25, and persistent "ideological capture," *id.* ¶¶20, 25, constitute "discriminat[ion] against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019).[16] Just as the government cannot "regulat[e] speech when the specific motivating ideology or the opinion or

---

[16] For the same reason, Defendants' actions, at a minimum, trigger strict scrutiny because they impose content-based burdens. *See Reed v. Town of Gilbert*, 576 U.S. 155, 156 (2015). And these actions fail that test because they are not "narrowly tailored to serve [a] compelling [government] interest[]." *Id.* at 163.

perspective of the speaker is the rationale for the restriction[,]" it cannot punish Harvard for permitting its faculty, students, and speakers to convey opinions or perspectives that the government views as distasteful. *See Rosenberger* 515 U.S. at 829 (internal citation omitted). And Defendants' proposed "reforms"—such as a viewpoint audit and punishment for protests that oppose the government's preferred position, SMF ¶¶20, 25—themselves underscore the viewpoint discrimination motivating their actions. *See Ridley v. Massachusetts Bay Transp. Auth.*, 390 F.3d 65, 82 (1st Cir. 2004) (finding that the government engages in viewpoint discrimination when there "is a governmental intent to intervene in a way that prefers one particular viewpoint in speech over other perspectives on the same topic").

Beyond these direct attacks on what the Trump administration has deemed disfavored viewpoints, after the April 11 Letter, Defendants' decision to escalate its threats to eventual termination of all federal funding was plainly motivated by retaliation for Harvard's defense of its academic freedom. For example, the May 6, 2025, NIH termination letter that ended 658 awards to Harvard researchers worth over $2.2 billion stated that NIH was taking that action in part because "upon being made aware of systematic institutional failures to address deeply rooted antisemitism and racial discrimination"—that is, upon receiving the Demand Letters—"the University has refused to take appropriate action"—that is, Harvard had resisted the Trump administration's demands. SMF ¶62; *see also id.* ¶¶31–32, 89–95. Because Harvard's conduct was both constitutionally protected and a substantial or motivating factor for Defendants' decision to cut federal funding, Defendants have violated the First Amendment. *Gericke v. Begin*, 753 F.3d 1, 6 (1st Cir. 2014); *see also Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("'Official reprisal for protected speech ... 'threatens to inhibit exercise of the protected right.'" (quoting *Crawford-El v. Britton*, 523 U.S. 574, 588 n.10 (1998))); *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) ("One

obvious implication" of the First Amendment is that government officials may not "subject[ ] in-

dividuals to 'retaliatory actions' after the fact for having engaged in protected speech." (quoting

*Nieves v. Bartlett*, 587 U.S. 391, 398, (2019))).[17]

The impact of Defendants' retaliation is particularly acute for Plaintiffs and their members.

As the Supreme Court has noted, "[t]he reason why ... retaliation offends the Constitution is that

it threatens to inhibit exercise of the protected right." *Crawford-El*, 523 U.S. at 588 n.10; *see also,*

*e.g.*, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995) ("[T]he First Amendment ...

protect[s] unpopular individuals from retaliation—and their ideas from suppression[.]"). A silenc-

ing effect has cascaded across Harvard's campus amongst students, faculty, and staff who fear

their research agendas, course syllabi, and campus protests have triggered Defendants' attacks on

Harvard and could continue to do so in the future. SMF ¶¶114, 137, 200, 204–17, 235–37, 248–

49, 252–55. Summary judgment is necessary to restore the security the First Amendment provides

for freedom of speech and academic inquiry.

## IV.    The Court Should Enter a Permanent Injunction Barring Conduct Similar to Defendants' Actions.

Permanent injunctive relief is warranted here. *See Esso Standard Oil Co. v. Freytes*, 467

F. Supp. 2d 156, 159 (D.P.R. 2006), *aff'd sub nom. Esso Standard Oil Co. v. Lopez-Freytes*, 522

F.3d 136 (1st Cir. 2008). For the reasons discussed above, Plaintiffs have shown "actual success

on the merits." *see* Sections II and III, *supra*. Plaintiffs and their members will suffer irreparable

---

[17] Defendants' invocation of discretionary power over funding decisions does not permit it to es-
cape liability for violating the First Amendment. *See Nat'l Endowment for the Arts v. Finley,* 524
U.S. 569, 587 (1998) (upholding NEA's subjective criteria for federal arts funding against a facial
challenge but stating that "[i]f the NEA were to leverage its power to award subsidies on the basis
of subjective criteria into a penalty on disfavored viewpoints, then we would confront a different
case.").

harm from Defendants' actions. *See, e.g.*, SMF ¶¶179 (deadlines permanently missed if funding not restored); 164, 234, 241 (research materials or progress permanently destroyed if funding not restored); 170 (irreparable loss of staff members if funding not restored); 126, 130, 179 (irreparable reputational harms if funding not restored); *see also Ass'n Am. Univs. v. Dep't of Energy*, 2025 WL 1414135, at *19 (D. Mass. May 15, 2025) (Burroughs, J.). And the balancing of harms and the public interest favor such permanent injunctive relief. SMF ¶¶121, 154, 156, 160, 163, 168, 174, 225, 232, 241, 245–46; *Ass'n Am. Univs.*, 2025 WL 1414135, at *20; *Massachusetts v. NIH*, 2025 WL 702163, at *32. The Court should enter permanent injunctive relief barring conduct similar to the Demand Letters, the Funding Freeze, the Ineligibility Determination, and the individual termination letters that followed.

## <u>CONCLUSION</u>

For the reasons set forth above the Court should grant Plaintiffs' motion for summary judgment.

Dated:   June 2, 2025

Respectfully submitted,

By:     /s/ *Daniel H. Silverman*
Daniel H. Silverman (BBO# 704387)

Philippe Z. Selendy*
Sean P. Baldwin*
Corey Stoughton*
Julie Singer*
Drake Reed*
SELENDY GAY PLLC
1290 Avenue of the Americas 20th Floor
New York, NY 10104
Tel: 212-390-9000
pselendy@selendygay.com
sbaldwin@selendygay.com
cstoughton@selendygay.com
jsinger@selendygay.com
dreed@selendygay.com

* admitted *pro hac vice*

COHEN MILSTEIN SELLERS & TOLL PLLC
769 Centre Street
Suite 207
Boston, MA 02130
(617) 858-1990
dsilverman@cohenmilstein.com

Joseph M. Sellers*
Benjamin D. Brown*
Phoebe M. Wolfe*
Margaret (Emmy) Wydman*
Sabrina Merold*
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave NW, 8th Floor
Washington, DC 20005
(202) 408-4600
jsellers@cohenmilstein.com
bbrown@cohenmilstein.com
pwolfe@cohenmilstein.com
ewydman@cohenmilstein.com
smerold@cohenmilstein.com

*Attorneys for Plaintiffs*

49