# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE | |
| *Plaintiff,* | |
| vs. | No. 1:25-cv-11048-ADB |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | |
| *Defendants.* | |

## [PROPOSED]
## BRIEF OF *AMICUS CURIAE*
## THE MUSLIM LEGAL FUND OF AMERICA

Dated: June 9, 2025

Respectfully submitted,

*/s/ Christina Jump*
Christina A. Jump, D.C. ID No. TX151
Chelsea Glover, D.C. ID No. TX0065
Jinan Chehade, D.C. ID No. 65511
Constitutional Law Center for Muslims in America*
*Legal Division of Muslim Legal Fund of America*
100 North Central Expy, Ste. 1010
Richardson, TX 75080
Tel: (972) 914-2507
Fax: (972) 692-7454
cjump@clcma.org
cglover@clcma.org
jinan.chehade@mlfa.org

*/s/ Mark D. Stern*
Mark D. Stern
BBO #479500
Mark D. Stern P.C.
34 Liberty Avenue
Somerville, MA 02144
Phone: 617-776-4020
Fax: 617-776-9250
markdsternpc@comcast.net
www.attorneymarkdstern.com

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................... ii

TABLE OF AUTHORITIES .............................................................................................. iii

I.    IDENTITY AND STATEMENT OF INTEREST OF *AMICUS CURIAE* ...................... 1

II.   BACKGROUND AND SUMMARY OF ARGUMENT .................................................. 2

III.  RELEVANT FACTS ....................................................................................................... 2

    A.   Harvard Must Comply with Its Voluntary Resolution Agreement ...................... 2

    B.   Harvard's Task Forces Reveal Pervasive Anti-Palestinian, Anti-Arab,

        and Anti-Muslim Discrimination and Harassment ................................................ 4

IV.   ARGUMENT ................................................................................................................... 7

    A.   The Administration's Demands Violate Title VI and Harvard's

        Agreement ............................................................................................................. 7

    B.   The Administration Failed to Comply with Due Process Requirements .............. 9

V.    CONCLUSION ............................................................................................................. 10

## TABLE OF AUTHORITIES

**Cases**

*NAACP v. Claiborne Hardware Co.*
   458 U.S. 886 (1982) ................................................................................................................ 8

**Statutes**

34 C.F.R. §§ 100.6–100.8 ............................................................................................................ 9

42 U.S.C. § 2000d, *et seq* ....................................................................................................... 7, 9

5 U.S.C. § 706(2)(A) ................................................................................................................... 9

**Other Authorities**

Razmi Ajami, Determination Letter re Complaint No. 01-24-2155, DEP'T OF EDUC. OFF. FOR CIV. RTS.
   (Jan. 17, 2025) https://ocrcas.ed.gov/sites/default/files/ocr-letters-and-agreements/01242155-a.pdf. ... 1

Voluntary Resolution Agreement – Harvard University re OCR Complaint No. 01-24-2155, DEP'T OF
   EDUC. OFF. FOR CIV. RTS. (Jan. 17, 2025) https://ocrcas.ed.gov/sites/default/files/ocr-letters-and-
   agreements/01242155-b.pdf. .................................................................................................... 1

## I.    IDENTITY AND STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

*Amicus Curiae*, the Legal Division within the Muslim Legal Fund of America ("MLFA"),[2] operates as a nonprofit law center dedicated to protecting individuals' constitutional and civil rights from harm or discrimination based on religion, race, or national origin (including shared ancestry). MLFA's Civil Litigation attorneys represent over a dozen Harvard students via a 2024 complaint with the Department of Education's ("DOE") Office for Civil Rights ("OCR"), that asserts violations of Harvard's obligations under Title VI of the Civil Rights Act of 1964 due to discrimination against its Palestinian, Arab, and Muslim students and their allies.[3]    On January 17, 2025, the OCR found multiple failures by Harvard to protect its Palestinian, Arab, Muslim, Jewish, and Israeli students under Title VI.[4]    Harvard failed to properly investigate at least 125 complaints of shared ancestry discrimination from Palestinian, Arab, Muslim, Jewish, and Israeli students. *See* n. 3 and Ex. A at pp. 8–9, 12.    Harvard promised to remedy those failures via a Voluntary Resolution Agreement ("the Agreement").[5]    The Administration's demanded actions would require Harvard to violate its existing obligations, including to *Amicus Curiae*'s student clients. This relevant experience of *Amicus Curiae*'s Civil Litigation attorneys makes it well-positioned to enhance this Court's understanding of the issues in this case.    *Amicus Curiae* therefore files this Neutral Brief, to both assist this Court and assert the ongoing rights of its

---

[1] Counsel for *Amicus Curiae* states that no counsel for a party authored this brief in whole or in part, and no party or counsel for a party, or any other person other than amicus made a monetary contribution intended to fund the preparation or submission of this brief.
[2] Also known by its trade name and previous name, the Constitutional Law Center for Muslims in America.
[3] The public, FOIA-redacted complaint is available at https://www.ed.gov/sites/ed/files/policy/gen/leg/foia/ma-harvard-3-compandnotlet.pdf.
[4] Razmi Ajami, Determination Letter re Complaint No. 01-24-2155, DEP'T OF EDUC. OFF. FOR CIV. RTS. (Jan. 17, 2025), available at https://ocrcas.ed.gov/sites/default/files/ocr-letters-and-agreements/01242155-a.pdf.
[5] Voluntary Resolution Agreement – Harvard University re OCR Complaint No. 01-24-2155, DEP'T OF EDUC. OFF. FOR CIV. RTS. (Jan. 17, 2025), available at https://ocrcas.ed.gov/sites/default/files/ocr-letters-and-agreements/01242155-b.pdf.

student clients.  As Harvard wholly fails to acknowledge the Agreement in its filings to date—despite its direct relevance here—*Amicus Curiae* now alerts the Court.

## II.    BACKGROUND AND SUMMARY OF ARGUMENT

*Amicus Curiae* files this brief urging the Court to rule in favor of Harvard for the following reasons: First, the Administration's demands ignore the relevant history of discrimination and harassment at Harvard following October 7, 2023.  Second, the Administration's demands would force Harvard to violate Title VI and the Agreement, by discriminating against a protected group in the name of defending the rights of another protected group.  Third, the Administration's demands violate Title VI's procedures to enforce compliance.  *Amicus Curiae* respectfully requests this Court declare the Administration's demands of Harvard improper and violative of Title VI and Harvard's obligations under the Agreement.

## III.    RELEVANT FACTS

### A.    Harvard Must Comply with Its Voluntary Resolution Agreement

As referenced above, Harvard agreed to resolve a discrimination complaint filed against it on behalf of over a dozen Harvard University students asserting numerous examples of shared heritage discrimination. *See* n. 2 and Ex. B. Harvard voluntarily entered this Agreement after the DOE OCR found identifying numerous failures by Harvard to protect the rights of its Palestinian, Arab and Muslim students, as well as Jewish and Israeli students, along with those students' allies who faced similar discrimination.  *See* n. 3 and n. 4.  Once Harvard did enter that Agreement, it became—and remains—bound by its terms.  And these students remain the intended beneficiaries of Harvard's promises—despite Harvard's failure to mention the existence of, let alone its obligations under, this Agreement in either its Original Complaint or its Amended Complaint in this matter.  *See, e.g.*, Doc. 1 (Original Complaint) and Doc. 59 (First Amended Complaint) (omitting the words "Muslim", "Arab," and "Palestinian" entirely from both documents).

The Agreement requires Harvard to take seven specific actions: **(1)** identify and revise "all Policies and Procedures that directly or indirectly apply to receiving, processing, and/or investigating incidents of discrimination, including harassment, based on national origin, including actual or perceived shared ancestry (e.g., Palestinian, Arab, Muslim, Jewish, Israeli) to ensure compliance with the requirements of Title VI," with specified statements and commitments to make;[6]  **(2)** ensure that "its reports submitted through its anonymous reporting hotline(s) are reviewed and, if they raise allegations of discrimination on the basis of national origin, including shared ancestry, are processed" appropriately under all applicable policies, procedures and laws;[7] **(3)** create an action plan to "ensure that Local Designated Resources, and/or other personnel charged with [evaluating reports] of potential shared ancestry discrimination, whether anonymous or (in)formal, are applying similar standards consistent with the Policies and Procedures";[8] **(4)** present a report to all senior leadership on the policy changes per the previous requirements and "the University's obligations under Title VI to avoid treating individuals differently and/or subjecting them to a discriminatory hostile environment, on the basis of national origin, including shared ancestry," and provide annual training to all staff with any role in evaluating complaints of shared ancestry discrimination;[9] **(5)** put in place a new system to maintain all documents relating to reports of discrimination and "ensure that its files contain all information necessary to process complaints under Title VI and for the University and the [DOE] to be able to ascertain whether the University is complying with Title VI," which shall include a narrative of all oral reports and a description of any actions taken and by whom, as well as documentation of any remedial action and/or disciplinary action taken to prevent harassment from

---

[6] *Supra* n. 5 at pp. 1–3.
[7] *Id.* at pp. 3–4.
[8] *Id.* at p. 4.
[9] *Id.* at pp. 4–5.

recurring;[10] **(6)** provide an electronic spreadsheet delineating each complaint of shared ancestry received from the 2023-2024 school year forward, along with the date the University received notice, a unique identifier of the reporter and also the target of the discrimination, the race/national origin of those affected, the alleged discriminator(s) and their corresponding race/national origin, the date of the complained-of events, the date of and nature of any response, the basis for the response, and any determinations made and what action the University took in response;[11] and **(7)** develop, administer, and report results on a Climate Survey to students and employees to identify whether they "have been or are currently subjected to or have witnessed discrimination, including harassment, on campus or during University related activities, based on national origin, specifically including shared ancestry" with a definition of that term.[12]

To date, Harvard has yet to satisfy any more than partial, mostly one-sided and vague revisions to its Procedures; all other requirements set forth above remain unmet.

**B.**   **Harvard's Task Forces Reveal Pervasive Anti-Palestinian, Anti-Arab, and Anti-Muslim Discrimination and Harassment**

Harvard's own investigations into campus discrimination following October 7 revealed pervasive discrimination against Jewish and Israeli students, as well as Palestinian, Muslim, and Arab students.   In early 2024, following months of campus hostility, President Alan Garber established two Task Forces[13] to address and combat bias and discrimination experienced by the Harvard community: the Presidential Task Force on Combating Anti-Muslim, Anti-Arab, and Anti-Palestinian Bias ("AMAAAP Task Force"), and the Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias ("ASAI Task Force").   On April 29, 2025, both Task Forces

---

[10] *Id.* at p. 5.
[11] *Id.* at pp. 5–6.
[12] *Id.* at pp. 6–7.
[13] Alan Garber, Announcement of Presidential Task Forces, HARVARD UNIV.   (Jan. 19, 2024), https://www.harvard.edu/president/news/2024/announcement-of-presidential-task-forces/.   Harvard's Complaint and Amended Complaint curiously only refer to the ASAI Task Force. *See* Doc. 1 ¶ 57, Doc. 59 ¶ 65.

released their Final Reports.[14]  Both Task Forces confirmed that Palestinian, Muslim, Arab, Jewish, and Israeli students experienced far higher levels of discrimination and lack of safety than their peers.[15]  However, across all measures of safety and belonging, Muslim and MENA (Middle Eastern and North African) respondents identified the highest negative outcomes.[16]

Both Task Forces confirmed that Palestinian, Muslim, and Arab students feel a higher threat to their safety than other students, including Jewish and Israeli students.  Although only 6% of Christians and Non-Religious Affiliated respondents reported feeling physically unsafe on campus, 15% of Jewish respondents and 47% of Muslim respondents feel physically unsafe.[17] The AMAAAP Task Force found that multiple students and staff faced verbal harassment based on their appearance, including being called "terrorist," "baby-killer," and "antisemite," simply for wearing a *hijab* or a Palestinian *keffiyeh*.[18]  Multiple female *hijabi* students felt unsafe commuting to and from campus after the attack of a *hijabi* woman with a knife on campus in October 2023; Harvard issued no response.[19]  Pro-Palestinian students, many of whom are Palestinian, Muslim, and Arab, endured targeted harassment through doxxing attacks after October 7, 2023.[20]  These students faced trucks near campus that displayed their names and faces and called them antisemites, while their fellow students leaked video footage, private communications, and contact information about these students to websites that accused them of promoting hate against Jews and Israel.[21]  These students experienced hate mail and death threats from strangers, with

---

[14] Presidential Task Force on Combating Anti-Muslim, Anti-Arab, and Anti-Palestinian Bias, *Final Report ("AMAAAP Task Force Report")*, HARVARD UNIV. (Apr. 29, 2025), https://www.harvard.edu/wp-content/uploads/2025/05/FINAL-Harvard-AMAAAPB-Report-5.7.25.pdf; Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias, *Final Report ("ASAI Task Force Report")*, HARVARD UNIV. (Apr. 29, 2025), https://www.harvard.edu/wp-content/uploads/2025/05/FINAL-Harvard-ASAIB-Report-5.7.25.pdf.
[15] AMAAAP Task Force Report, p. 58–61; ASAI Task Force Report, p. 121.
[16] AMAAAP Task Force Report, p. 58–66; ASAI Task Force Report, p. 243–44.
[17] AMAAAP Task Force Report, p. 58; ASAI Task Force Report, p. 243.
[18] AMAAAP Task Force Report, p. 60.
[19] *Id.* at p. 78–79.
[20] *Id.* at p. 76.
[21] *Id.* at p. 76.

some saying the students should be sent to Gaza and killed.[22]  These students noted Harvard's

failure to immediately and publicly condemn the doxxing, feeling Harvard's inaction emboldened

the perpetrators while abandoning the targeted students.[23]

The AMAAAP Task Force further reports that Palestinian, Muslim, and Arab students felt

the University prioritized the concerns of the pro-Israel community over the pro-Palestinian

community.[24]  The Report notes students' frustration with Harvard's multiple statements prior to

January 2024 expressing sympathy for Israelis and condemning antisemitism, while saying

nothing regarding Palestinian victims or condemning Islamophobia.[25]    Former President

Claudine Gay issued a University-wide email condemning the phrase "from the river to the sea,"

which students felt revealed a willful misrepresentation of activists' use of the phrase to advocate

the end of the genocide of the Palestinian people.[26]  But President Gay issued no equivalent

statement preventing prevalent violent language or actions targeting Palestinians, Muslims, and

Arabs.  Palestinian, Muslim, and Arab students also feel Harvard disproportionately penalized

their expressions of political opinions supporting Palestine.   Ninety-two percent—nearly all—of

Muslim respondents agreed they experience academic or professional penalties for expressing

political views, compared to 61% of Jewish respondents and only 51% of Christian respondents.[27]

Many pro-Palestinian students and faculty feel Harvard selectively enforces its policies to stifle

pro-Palestinian expression.[28]    Harvard suspended its chapter of the Palestine Solidarity

Committee ("PSC") for hosting an unauthorized event, solely based on the group's repost of an

event on social media, and students feel Harvard administrators and police surveil pro-Palestinian

---

[22] *Id.* at p. 78.
[23] *Id.* at p. 76–77.
[24] *Id.* at p. 77.
[25] *Id.* at p. 77.
[26] *Id.* at p. 78.
[27] *Id.* at p. 59.
[28] *Id.* at p. 80.

organizing as an intimidation tactic.[29]  Harvard's recent adoption of a pro-Israel definition of antisemitism raised fear among the Palestinian, Muslim, Arab, and pro-Palestinian community that Harvard will now automatically view any actions supporting Palestine as antisemitism.[30]  The ASAI Task Force Report reflected that even Jewish students face repercussions for pro-Palestinian expression, and experience antisemitic harassment from fellow Jewish students.[31]

Notably, the ASAI Task Force emphasized the importance of community participation in and consent to proposed reforms to address antisemitism.  The ASAI Task Force began its Report by recognizing, "These significant reforms must be adopted through internal processes that have widespread buy-in within the Harvard community. . . . The experiences set out in this report and its recommendations come from Harvard.  So, too, must the resolutions and the reforms."[32]

## IV.    ARGUMENT

### A.    The Administration's Demands Violate Title VI and Harvard's Agreement

The Administration's selective focus on protecting only Jewish and Israeli students—while disregarding OCR's explicit finding that Muslim, Arab, and Palestinian students have also experienced severe harassment—violates the principle of equitable enforcement.  Title VI prohibits discrimination and harassment on the basis of race and national origin, including shared ancestry, in federally funded programs.  42 U.S.C. § 2000d, *et seq.*  Title VI demands schools "take prompt and effective steps" to end harassment and "eliminate any hostile environment and its effects."[33]  Selective enforcement of Title VI that prioritizes one group while neglecting others

---

[29] *Id.* at p. 81; *see also* Doc. 59 ¶ 63.

[30] AMAAAP Task Force Report, p. 83; *see also* Doc. 59 ¶¶ 61–62.

[31] ASAI Task Force Report, p. 132–33; *see also* Alice Speri, *Jewish organizers are increasingly confronting Trump: 'The repression is growing, but so is the resistance',* THE GUARDIAN (May 31, 2025), *available at* https://www.theguardian.com/us-news/2025/may/31/jewish-americans-antisemitism-gaza-trump.

[32] *Id.* at p. 4.

[33] *See* Office for Civil Rights, *Dear Colleague Letter on Discrimination Based on Shared Ancestry or Ethnic Characteristics*, U.S. DEP'T OF EDUC. (Mar. 14, 2024), *available at* https://www.ed.gov/sites/ed/files/about/offices/list/ocr/letters/colleague-202403-massahp.pdf.

named in the same investigation contradicts Title VI, OCR's governing guidance, and the Agreement. The Administration's demands also harm many of the communities it purports to protect.[34] For example, students of Jewish, Muslim, Arab, Palestinian and Israeli backgrounds benefit from Harvard's Diversity, Equity, and Inclusion ("DEI") infrastructure, which provides resources for reporting discrimination and reduces feelings of exclusion among targeted student populations. Similarly, punishing students who participate in pro-Palestinian protests—several of whom are Jewish—chills student expression, stigmatizes dissent, and risks reinforcing the ethnic or religious stereotyping prohibited by Title VI. *See, e.g.*, *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 933 (1982) ("A massive and prolonged effort to change the social, political, and economic structure of a local environment cannot be characterized as a violent conspiracy simply by reference to the ephemeral consequences of relatively few violent acts.").

These demands also conflict with the Agreement and the Task Force Reports, which require Harvard to change its policies to address harassment and discrimination against Palestinian, Arab, Muslim, and allied students as well as Jewish and Israeli students.[35] The Administration demands Harvard (1) immediately dismantle DEI infrastructure necessary to fulfill the reporting and training requirements of the Agreement; (2) impose ideological hiring and admissions standards that undermine Harvard's duty to uphold non-discriminatory and equitable practices; (3) harshly discipline students, who already feel unsafe and discriminated against, for "antisemitism" via supporting Palestine; and (4) disclose sensitive information about students and their harassment complaints to a hostile government in violation of the Agreement's confidentiality requirements. The Administration's demands contradict the due process

---

[34] *See supra* n. 4.
[35] Many of those of the Jewish faith who support Palestinian rights against what they see as Israeli oppression deeply resent this Administration invoking antisemitism to censor their speech, when this Administration also allies with antisemitic elements of American politics. *See, e.g.*, Speri, *supra*, n. 31.

mechanisms Harvard and the DOE committed to in the Agreement. The Administration's directives derive from neither Title VI nor Harvard's existing legal obligations under the Agreement. They substitute political preference for legal process, an impermissible attempt to override the law and existing agreements.

**B.    The Administration Failed to Comply with Due Process Requirements**

Title VI and its implementing regulations establish a clear framework for identifying and remedying discrimination. Before withholding any federal funds from a recipient institution, the DOE must engage in a fact-based inquiry, provide notice of any violation, and offer the institution an opportunity to comply voluntarily. *See* 42 U.S.C. § 2000d-1; 34 C.F.R. §§ 100.6–100.8. The Administration here followed none of those processes. The DOE OCR already concluded an investigation into Harvard in January 2025, prompted by *Amicus Curiae*'s complaint. That investigation resulted in a detailed Determination Letter and the Agreement that prescribes remedial steps tailored to the findings. The Department conducted no later investigation and issued no determination of noncompliance. Yet the Administration nonetheless demands Harvard eliminate its DEI programs, enforce ideological litmus tests for hiring, and issue sweeping disciplinary mandates for pro-Palestinian student and faculty speech—all without affording Harvard any opportunity to challenge the legal or factual bases of those requirements. The Administration's actions impose sanctions based on political preferences, not regulatory findings. It ignores the existing agreement Harvard already entered.[36] And it violates the Administrative Procedure Act's bedrock requirement that agency action not be arbitrary, capricious, or contrary to any laws. *See* 5 U.S.C. § 706(2)(A).

---

[36] So does Harvard. *See, e.g.,* Docs. 1 and 59.

## V.    <u>CONCLUSION</u>

Harvard's ongoing failure to protect its Palestinian, Muslim, and Arab students from discrimination and harassment remains deeply concerning, and will only worsen if Harvard complies with the Administration's demands.  Palestinian, Muslim, and Arab students continue to endure a hostile educational environment, in violation of both federal law and the Agreement Harvard chose to enter.  The Administration's narrow focus on antisemitism via criticism of Israel—which it invokes to justify its selective enforcement against Harvard—does not address, and in fact disregards, the pervasive anti-Palestinian, anti-Muslim, and anti-Arab bias Harvard itself recognizes exists on its campus.  That narrow focus operates not as a tool to prohibit discrimination, but as a retaliatory step to silence pro-Palestinian speech on campus.  The Administration's weaponization of Title VI conflicts with the DOE's guidance and undermines the statute's core purpose: to ensure that <u>all</u> students, regardless of shared ancestry or ethnic identity, fully enjoy the benefits of federally funded programs, including universities.  *Amicus Curiae* respectfully requests this Court grant Harvard the declaratory and injunctive relief it seeks, and find the Administration's demands and retaliatory withholding of funds unconstitutional.

Dated: June 9, 2025                                        Respectfully submitted,

/s/ Christina Jump                                       /s/ Mark D. Stern
Christina A. Jump, D.C. ID No. TX151        Mark D. Stern
Chelsea Glover, D.C. ID No. TX0065           BBO #479500
Jinan Chehade, D.C. ID No. 65511               Mark D. Stern P.C.
Constitutional Law Center for Muslims in America*    34 Liberty Avenue
*Legal Division of Muslim Legal Fund of America*     Somerville, MA 02144
100 North Central Expy, Ste. 1010               Phone: 617-776-4020
Richardson, TX 75080                                  Fax: 617-776-9250
Tel: (972) 914-2507                                     markdsternpc@comcast.net
Fax: (972) 692-7454                                    www.attorneymarkdstern.com
cjump@clcma.org
cglover@clcma.org
jinan.chehade@mlfa.org