UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS—HARVARD FACULTY CHAPTER, AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, *et al.*,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF JUSTICE, *et al.*,

Defendants

No. 1:25-cv-10910

**BRIEF OF PUBLIC CITIZEN**
**AS AMICUS CURIAE SUPPORTING PLAINTIFFS**
**Leave to file granted on June 9, 2025**

Mark Stern
BBO #479500
34 Liberty Avenue
Somerville, Massachusetts 02144
(617) 776-4020
attorneymarkdstern@comcast.net
www.attorneymarkdstern.com

Paul Alan Levy (pro hac vice sought)
Public Citizen Litigation Group
1600 20th Street, NW
Washington, D.C. 20009
(202) 588-7725
plevy@citizen.org

Attorneys for Public Citizen

## TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Interest of Amicus Curiae . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A. The Government's Attack on Harvard and the Harvard Community Contravenes Well-Settled First Amendment Principles. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

B. The Government's Justifications for Its Actions Against Harvard's Treatment of Student Protests Do Not Meet the Test of Strict Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . 5

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## TABLE OF AUTHORITIES

### CASES

*Bates v. City of Little Rock*,
361 U.S. 516 (1960) . . . . . . . . . . 3

*Boy Scouts of America v. Dale*,
530 U.S. 640 (2000) . . . . . . . . . . 4

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*,
515 U.S. 557 (1995) . . . . . . . . . . *4*

*Healy v. James*,
406 U.S. 169 (1972) . . . . . . . . . . 3

*Hustler Magazine v. Falwell*,
485 U.S. 46 (1988) . . . . . . . . . . 6

*Keyishian v. Board of Regents*,
385 U.S. 589 (1967) . . . . . . . . . . 3, 6

*Letter Carriers v. Austin*,
418 U.S. 264 (1974) . . . . . . . . . . 5

*McCullen v. Coakley,*
573 U.S. 464 (2014) . . . . . . . . . . 5

*McIntyre v. Ohio Elections Commission*,
514 U.S. 334 (1995) . . . . . . . . . . 3, 4

*Moody v. Netchoice LLC*,
603 U.S. 707 (2024) . . . . . . . . . . *4*

*N.A.A.C.P. v. Claiborne Hardware Co.*,
458 U.S. 886 (1982) . . . . . . . . . . 7

*N.A.A.C.P. v. State of Alabama*,
357 U.S. 449 (1959) . . . . . . . . . . 3

*Organization for a Better Austin v. Keefe*,
402 U.S. 415 (1971) . . . . . . . . . . 5

*Snyder v. Phelps*,
562 U.S. 443 (2011) . . . . . 5

*Sweezy v. New Hampshire*,
354 U.S. 234 (1957) . . . . . 3, 6

*Talley v. California,*
362 U.S. 60 (1960) . . . . . 3

*Watchtower Society v. Village of Stratton*,
536 U.S. 150 (2002) . . . . . 4

**CONSTITUTION**

First Amendment . . . . . *passim*

**MISCELLANEOUS**

Del Valle, *Columbia University Has a Doxing Problem* (Apr. 26, 2024), available at https://www.theverge.com/24141073/columbia-doxxing-truck-student-encampment-palestine-israel . . . . . 7

Flitter, *A Wall Street Law Firm Wants to Define Consequences of Israel Protests*, (July 8, 2024), available at https://www.nytimes.com/2024/07/08/business/sullivan-cromwell-israel-protests.html. . . . . . 7

Papadopoulous, *ICE agents 'doxed' on social media, wear masks after receiving death threats, director says*(June 2, 2025), available at https://www.boston25news.com/news/local/ice-agents-doxed-social- media-wear-masks-after-receiving-death-threats-director-says/2NIC6OZ6XRGMXDRYLWLIKJ66GU/ . . . . . 7

## INTEREST OF AMICUS CURIAE

Public Citizen is a non-profit consumer advocacy organization based in Washington, D.C., with members in every state. Since its founding in 1971, Public Citizen has encouraged public participation in civic affairs, including through public protests. For example, in 1999, it helped organize the 1999 "Battle in Seattle," a large protest at a meeting of the World Trade Organization. More recently, Public Citizen helped organize a protest at Donald Trump's private golf-club dinner with the top buyers of his $TRUMP meme coin. Public Citizen has also participated as amicus curiae in numerous cases involving the First Amendment rights of citizens who participate in civic affairs and public debates.

## BACKGROUND

One of the issues in this case is the Trump Administration's attempt to sanction Harvard University for its response to student demonstrations in 2024 protesting the Israeli military response in Gaza to the October 2023 Hamas attack in Israel. The Administration claims that Harvard's failure to suppress those protests with sufficient vigor caused emotional harm to Jewish and Israeli students by allowing anti-Semitism to flourish on campus, and warrants sanctions against Harvard.

Shortly after taking office, President Trump issued an executive order that required all executive agencies to submit reports identifying actions that they could take against "institutions of higher education [alleged to have committed] civil rights violations related to or arising from post October 7, 2023 campus anti-Semitism," DN 76, Plaintiffs' Statement of Material Facts ("SMF"), ¶ 2. He also threatened a "law-and-order" response to campus protests, *id.* ¶ 6:

> All Federal Funding will STOP for any College, School, or University that allows illegal protests. Agitators will be imprisoned/or permanently sent back to the country from which they came. American students will be permanently expelled or, depending on the crime, arrested. NO MASKS!

Subsequently, the Administration threatened to suspend funding for universities in general, and Harvard in particular, that did not impose certain restrictions on speech on campus, including strict enforcement of rules said to be needed to protect Jewish students from anti-Semitic expression. *Id.* ¶¶ 11, 17, 18, 25, 31, 33, 50. The threats specifically included a demand that Harvard forbid "masking for the purpose of concealing identity" and require students to "wear ID at all times." *Id.* ¶ 18; *see also* ¶ 25 ("Harvard must implement a comprehensive mask ban"). At the same time, the Administration demanded that Harvard promote "viewpoint diversity" among the faculty and student body. *Id.* ¶¶ 17, 18, 20, 25. When Harvard rejected these demands, the Trump Administration began taking administrative action, including the cancellation of contracts and grants.

## ARGUMENT

### A. The Government's Attack on Harvard and the Harvard Community Contravenes Well-Settled First Amendment Principles.

The government contends that student political speech on a college campus about the State of Israel can be suppressed by government edict, and that Harvard University can be punished for not suppressing that speech, as well as not barring students from wearing masks to allow them to protest anonymously. But political speech cannot be suppressed by labeling political speech as anti-Semitic, and hence as a civil rights issue, on the theory that the speech creates discomfort for some Jewish students. The government's actions against Harvard run directly into three separate lines of well-settled First Amendment precedent, each of which is sufficient to warrant entry of a permanent injunction against defendants.

First, the First Amendment protects academic freedom, including the freedom to articulate views at odds with opinions favored by government officials. In cases going back decades, the

Supreme Court has upheld the right to espouse unpopular views in the classroom under the rubric of academic freedom, recognizing the right as fundamental to a democratic society. As the Court explained, "[t]o impose any straitjacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. . . . Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957); *see Keyishian v. Board of Regents*, 385 U.S. 589 (1967). The Supreme Court extended the protective mantle of academic freedom to student protestors in *Healy v. James*, 406 U.S. 169 (1972), stating "The college classroom **with its surrounding environs** is peculiarly 'the marketplace of ideas,' and we break no constitutional ground in reaffirming this Nation's dedication to safeguarding academic freedom." *Id.* at 180-181 (emphasis added). Thus, the First Amendment's protection for academic freedom limits the use of government authority to suppress the "ability to participate in the give and take of campus debate . . . by denial of access to the customary media for communicating with the administration, faculty members and other students." *Id.* at 181-182.

Second, the Supreme Court has long recognized that, because "identification and fear of reprisal might deter perfectly peaceful discussions of public matters of importance," the First Amendment protects the right to communicate views anonymously. *Talley v. California*, 362 U.S. 60, 65 (1960), citing *Bates v. City of Little Rock*, 361 U.S. 516 (1960) and *N.A.A.C.P. v. State of Alabama*, 357 U.S. 449, 462 (1959). Thus, in *McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995), the Court, recognizing that a speaker's "decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible," concluded that "the interest in having anonymous

works enter the marketplace of ideas unquestionably outweighs any public interest in requiring disclosure as a condition of entry." *Id. at* 341–342 (1995). Accordingly, the Court held, a speaker's "decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." *Id.* In *Watchtower Society v. Village of Stratton,* 536 U.S. 150 (2002), the Court further held that the right to speak anonymously forbids a general requirement that any person who wishes to go door-to-door to "promote any cause" must obtain a permit recording his name and be ready to identify himself to any official who asks for his permit.

Third, the First Amendment limits the use of government authority to restrict the ability of private parties to decide what speech by third parties will or will not be made from their facilities. Thus, in *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995), the Court held that the holders of a government parade permit could exclude expressions of gay identity from their parade, notwithstanding state anti-discrimination laws. And in *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), the Court upheld the right of a private organization to exclude gay scoutmasters whose expression was at odds with the stances that the organization wanted to be communicated to its youthful charges. More recently, in *Moody v. Netchoice LLC*, 603 U.S. 707 (2024), the Supreme Court applied the lessons of *Hurley* in holding that the First Amendment constrains efforts by two state governments to regulate the process by which social media platforms engage in content moderation, deciding which speech may or may not be delivered on their platforms, and deciding what consequences should be imposed on speakers whose content is determined, either before or after the fact, to run afoul of the rules applied by the platforms' owner.

The principles set forth in these three lines of cases confirm that the First Amendment

protects the right of a private university to decide what speech may be articulated by student protestors, to decide whether to allow students to conceal their identities when speaking, to determine in what facilities the speech may be delivered, and to assess what consequences should be visited on student protestors who contravene the university's rules and directives.

### B. The Government's Justifications for Its Actions Against Harvard's Treatment of Student Protests Do Not Meet the Test of Strict Scrutiny.

Because the First Amendment protects a university's decisions about the regulation of student speech, only a compelling government purpose would authorize the federal government to penalize a university by imposing financial consequences based on the school's choices about how to treat student protestors. The Trump Administration's purported concerns about the impact of the protests on Jewish students fall well short of the required showing, for several reasons.

To start, regardless of whether some students may be upset by the protests, the hurt feelings of those who witness speech do not justify government suppression of that expression. Doctors and other personnel who work in the facilities of Planned Parenthood and other abortion clinics (and the women who come to use their services) must live with the emotional impact of the First Amendment's protections for the rights of anti-abortion protestors who parade on public streets nearby. *See McCullen v. Coakley*, 573 U.S. 464 (2014). Gold Star mothers must accept the emotional impact of the First Amendment's protection for a religious sect that insists on parading near their children's funerals, announcing that "God hates fags." *See Snyder v. Phelps,* 562 U.S. 443 (2011). Realtors must accept the dissemination of leaflets and mounting of picket lines that accuse them of blockbusting. *See Organization for a Better Austin v. Keefe*, 402 U.S. 415 (1971). And workers who cross picket lines must be willing to bear the emotional impact of being named as

"scabs" in a union newsletter. *See Letter Carriers v. Austin,* 418 U.S. 264 (1974). Indeed, the Supreme Court has held that emotional distress suffered by the target of a satirical magazine cartoon does not form a basis for suing over that speech, unless the speech is otherwise actionable (such as for libel). *Hustler Magazine v. Falwell*, 485 U.S. 46 (1988). So, too, that Jewish students (or other students) may be offended when fellow students denounce the state of Israel or express support for Palestine is not a proper basis for a governmental actor to demand that a university bar such speech or such speakers from campus.

When students choose to attend heterogenous universities that attract attendees from very different backgrounds and with very different opinions—universities that feature the "viewpoint diversity" that the defendants in this case purport to support—they may encounter opinions that make them deeply uncomfortable. Learning to live with those differences is part of the maturation process described in *Sweezy*, 354 U.S. at 250. University staff employ a range of techniques, free from government compulsion, to help students learn to appreciate each others' differences, and to phrase their criticisms in ways that promote mutual respect and enable students to co-exist in the educational environment. As the Supreme Court said in *Keyishian*, "The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers the truth out of a multitude of tongues, rather than through any authoritative selection." 385 U.S. at 603 (cleaned up). To be sure, a university could decide that certain speech will not be tolerated on its campus, and that the police should be called in when a student speaks at a time, in a place or in a manner that contravenes university rules. But in the absence of a compelling government interest, the constraints that the First Amendment's requirement of strict scrutiny imposes on government action in the realm of political speech bars the government from insisting that Harvard do so.

Likewise, the Administration has offered no compelling interest supporting its insistence that Harvard forbid student protestors from concealing their identities by wearing masks. Indeed, the reasons animating the Supreme Court's protection for the First Amendment right to speak anonymously are implicated by the potential consequences for student protestors, which may lead some of the protestors to conceal their identities by wearing masks. For instance, some opponents of the protests have been doxing protestors leading to "relentless online harassment," Del Valle, *Columbia University Has a Doxing Problem* (Apr. 26, 2024), available at https://www.theverge.com/24141073/columbia-doxxing-truck-student-encampment-palestine-israel, and private companies have demanded explanations from protestors who have applied for jobs. Flitter, *A Wall Street Law Firm Wants to Define Consequences of Israel Protests*, (July 8, 2024), available at https://www.nytimes.com/2024/07/08/business/sullivan-cromwell-israel-protests.html.[1]

The Administration's threats directed at Harvard make passing reference to acts of "violence" and "harassment" allegedly directed at individual Jewish students. But even to the extent that the government can point to anti-Semitic slurs directed on a personal basis to individual Jewish students passing by the protests, such as statements that rise to the level of fighting words, the First Amendment does not permit a government body to impose collective responsibility on a group engaged in protesting for the abusive speech or conduct of individual participants in the protest, at least in the absence of a showing of ratification by those in charge. *N.A.A.C.P. v. Claiborne Hardware Co.,* 458 U.S. 886 (1982).

[1] The Administration's law enforcement officials have worn masks, based on similar concerns. Papadopoulous, *ICE agents 'doxed' on social media, wear masks after receiving death threats, director says*(June 2, 2025), available at https://www.boston25news.com/news/ local/ ice-agents-doxed-social-media-wear-masks-after-receiving-death-threats-director-says/ 2NIC6OZ6XRGMXDR YLWLIKJ66GU/.

## CONCLUSION

For these reasons, as well as other reasons offered by the plaintiffs in this case and in *President and Fellows of Harvard College v. U.S. Department of Health and Human Services*, No. 1:25-cv-11048, the Court should grant plaintiffs' motion for summary judgment.

Respectfully submitted,

/s/ Mark Stern
Mark Stern
BBO #479500
34 Liberty Avenue
Somerville, Massachusetts 02144
(617) 776-4020
attorneymarkdstern@comcast.net
www.attorneymarkdstern.com

/s/ Paul Alan Levy
Paul Alan Levy (pro hac vice sought)
Public Citizen Litigation Group
1600 20th Street, N.W.
Washington, D.C. 20009
(202) 588-7725
plevy@citizen.org

Attorneys for Public Citizen

June 9, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that on this date I am filing Public Citizen's Brief as Amicus Curiae by the Court's ECF system, which will effect service on all parties to this action.

/s/ Mark Stern

Mark Stern
BBO #479500
34 Liberty Avenue
Somerville, Massachusetts 02144
(617) 776-4020
attorneymarkdstern@comcast.net
www.attorneymarkdstern.com

Attorney for Public Citizen

June 9, 2025