## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETS

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE

                    Plaintiff,

v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, et
al.,

                    Defendants.

No. 1:25-cv-11048-ADB

**BRIEF OF *AMICUS CURIAE* THE LEADERSHIP NOW PROJECT IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

P. Benjamin Duke (admitted *pro hac vice*)
Graham Glusman (admitted *pro hac vice*)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018-1405
(212) 841-1000
pbduke@cov.com
gglusman@cov.com

Joy A. Chen (BBO No. 714192)
COVINGTON & BURLING LLP
One International Place, Suite 1020
Boston, MA 02110
(617) 603-8821
jchen@cov.com

## TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE* ........................................................................ 1

INTRODUCTION ................................................................................................. 1

ARGUMENT ........................................................................................................ 3

I.    The Administration's Arbitrary Cancellations of Harvard's Contracts
      Would Hurt America's Economy and Undercut Our Global Leadership and
      Competitiveness .......................................................................................... 3

II.   The Administration's Assault on Academic Freedom Violates the First
      Amendment and Threatens to Corrupt the Quality of University Research
      and Undercut American Economic Competitiveness. .................................... 7

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Hosty v. Carter*,
  412 F.3d 731 (7th Cir. 2005) ...................................................................................7

*Moody v. NetChoice*,
  603 U.S. 707 (2024)................................................................................................2

*Regents of Univ. of Mich. v. Ewing*,
  474 U.S. 214 (1985)................................................................................................7

**Statutes, Regulations, and Constitutional Amendments**

42 U.S.C. § 2000d-1 ......................................................................................... *passim*

32 C.F.R. § 195.1 ......................................................................................................2

45 C.F.R. § 80.2 .......................................................................................................2

45 C.F.R. § 611.1 .....................................................................................................2

U.S. Const., First Amendment ........................................................................... *passim*

## INTEREST OF *AMICUS CURIAE*[1]

Leadership Now Project ("Leadership Now") is a national membership organization that is committed to protecting democracy as a foundation for political stability and a thriving economy. Leadership Now supports a set of core principles that includes defending the rule of law, increasing competitiveness in the political system to improve the quality of governance, supporting civic participation, and planting seeds for longer-term national growth and prosperity. Preserving responsive, democratic government is critical to the American economy and touches the lives of all Americans. Leadership Now's submission is informed by the collective experience of its members as business leaders, who include senior business executives across more than 25 states in industries including financial services, consumer products, technology, manufacturing, and healthcare, and their collective interest in fostering American economic innovation and protecting the rule of law.

## INTRODUCTION

Since World War II, the engine of American business innovation and global competitiveness has been super-charged by the American people's steadfast, bipartisan investment in federal funding of independent research in basic science and technology through our nation's unparalleled university system. Congress structured Title VI of the Civil Rights Act of 1964 to guarantee the independence of federally-funded research and ensure that universities and other private contractors could count on the federal government as a reliable business partner in implementing these major investments. *See* 42 U.S.C. § 2000d-1. Title VI established in statute a core principle of American governance enshrined in the First Amendment, which prohibits the

---

[1] No party's counsel authored this brief in whole or in part. No entity or person—other than *amicus curiae*, their members, and their counsel—made any monetary contribution intended to fund the preparation or submission of this brief.

federal government from conditioning its benefits on content-based requirements that encroach on private universities' academic freedom of expression. For decades, the path-breaking advances in science, technology, and other fields generated by federally-funded university research have fueled private business research and development ("R&D"), supported American prosperity, and produced incalculable benefits for all Americans.

Defendants' abrupt cancellation of billions of dollars in federal research funding—without legitimate cause and in stark violation of plaintiff Harvard University's procedural rights— undermines this system. Defendants' overreaching demands amounted to an attempted takeover, including, *inter alia*, submission to the Administration's control of Harvard's academic programs and its hiring and admissions practices.[2] As Harvard demonstrates, the cancellations are unconstitutional and otherwise illegal. They violate the First Amendment, which prohibits governmental "interfer[ence] with private actors' speech to advance its own vision of ideological balance." *Moody v. NetChoice,* 603 U.S. 707, 741 (2024). Moreover, they run roughshod over Defendants' statutory obligations under Title VI, which impose extensive procedural requirements before "terminating, or refusing to grant or continue" federal funding. *See* 45 C.F.R. § 80.2 (HHS and NIH); 45 C.F.R. § 611.1 (NSF); 32 C.F.R. § 195.1 (DoD).

Defendants' violations of the First Amendment and disregard of well-established law would cause grave harm to Harvard and its faculty, staff, students, and administrators, while causing severe economic damage far beyond Harvard alone. Absent intervention by this Court, all universities (not just Harvard) face intolerable threats to their academic freedom that could in turn deprive the nation of the benefits of future scientific discoveries and innovations. Other universities are already in the crosshairs. A senior Justice Department official has declared that the

---

[2] Am. Compl. Ex. A.

2

University of California system should expect "massive lawsuits," and the Administration—if unchecked by this Court—has other universities "on the East Coast, on the West Coast, in the Midwest" in its sights.[3] Leadership Now respectfully submits this *amicus* brief to urge this Court to permanently enjoin Defendants from implementing their unconstitutional and unlawful actions against Harvard and continuing to violate Harvard's First Amendment rights.

## ARGUMENT

**I.    The Administration's Arbitrary Cancellations of Harvard's Contracts Would Hurt America's Economy and Undercut Our Global Leadership and Competitiveness.**

Though under five percent of the world's population, the United States is the largest performer of R&D, spending $806 billion—or 3.5% of its gross domestic product—on R&D in 2021.[4] From 2011 to 2021, the federal government funded over 50 percent of R&D conducted at institutions of higher education, including Harvard.[5] In turn, the pipeline of government funding for university research has fed a symbiotic relationship with American businesses, whose own R&D draws on advances in scientific and technical knowledge incubated in universities to develop cutting-edge new products and technologies. Over the last several decades, this dynamic partnership of government, universities, and the private sector has transformed the U.S. into a

---

[3] Akayla Gardner & Maxwell Adler, *University of California is Next Target of Trump's Antisemitism Probe*, Bloomberg (May 27, 2025), https://www.bloomberg.com/news/articles/2025-05-27/university-of-california-next-target-of-trump-s-antisemitism-probe

[4] Science & Engineering Indicators, *The State of U.S. Science and Engineering 2024* (Mar. 13, 2024).

[5] Gardner & Adler, *supra*.

juggernaut in fields such as technology, engineering, medicine, and biotech.[6] The result has been "decades of innovation, economic growth and military advances."[7]

While American businesses invest heavily in R&D, the federal government—with the benefit of longer time horizons, broad bipartisan commitment to the advancement of scientific knowledge, and no quarterly pressure to demonstrate investment returns—is uniquely capable of making long-term investments in fundamental scientific research and realizing the societal benefits of such research across a broad array of fields. In contrast, R&D in the business sector focuses most of its activity on product development and applied research that translates directly to new and improved goods, services, and processes.[8] In the biomedical field, for example, scientific discoveries may not become commercially profitable for decades. A 2018 analysis of the 28 most important drugs approved by the Food and Drug Administration ("FDA") found that on average, it took more than *30 years* for a basic discovery made in a lab to become an FDA-approved drug.[9] In the throes of the Covid-19 pandemic, companies like Moderna, Pfizer, and Johnson & Johnson were able to draw on decades of accumulated academic knowledge in different fields to develop the safe, highly effective mRNA vaccines that were critical to stemming the tide of infection.[10]

---

[6] First Amend. Compl., ¶ 44.

[7] James Glanz, *World Scientists Look Elsewhere as U.S. Labs Stagger Under Trump Cuts*, N.Y. TIMES (May 31, 2025).

[8] Science & Engineering Indicators, *The State of U.S. Science and Engineering 2024* (Mar. 13, 2024).

[9] Jonathan Spector et al., *Fundamental science behind today's important medicines*, 10 SCIENCE TRANSNATIONAL MEDICINE 1 (2018).

[10] Philip Barrett, et al., *Why Basic Science Matters for Economic Growth*, IMG BLOG (Oct. 6, 2021).

These vaccines are credited with having saved more than three million American lives.[11] Without federal funding of basic research, the benefits of these vaccines would not have been realized.

This example is just one among countless others. Federally-funded academic research has been used to develop life-changing products, including supercomputers, artificial intelligence, speech recognition, the internet, smart phones, seismic imaging, LED lights, medical diagnostics, and advanced prosthetics.[12] These innovations and other breakthroughs have demonstrable economic benefits: studies repeatedly show, across countries and across economies, that public spending on R&D generates a higher multiplier effect on both GDP and follow-on business R&D than other forms of fiscal spending.[13] The wide-ranging arbitrary cuts that the Administration has made to Harvard's funding—which include myriad defense-related contracts among many other areas—undermine the U.S.'s military preparedness on the world stage, the U.S. economy's fundamental strength, and its capacity for innovation.

The Administration's regressive attack on Harvard's federal funding comes at the worst possible time, when the American ascendancy in science and technology is increasingly challenged by other nations, especially China. Over the last decade, the U.S. has seen increased global competition: the "age of American unipolarity" that followed the collapse of the Soviet Union in the 1980s is over.[14] Since 2016, China has surpassed the U.S. as the top producer of science and

---

[11] Brad Dress, *COVID vaccines saved 3.2 million US lives, researchers say*, THE HILL (Dec. 13, 2022).

[12] Michael Collins, *Declining Federal Research is Hurting US Innovation*, INDUSTRYWEEK (Jan. 22, 2020).

[13] *See* Giovanna Ciaffi et al., *Measuring the macroeconomic response to public investment in innovation: evidence from OECD countries*, 33 INDUSTRIAL AND CORPORATE CHANGE 363, 366 (2024) (collecting studies).

[14] G. John Ikenberry, *Power and liberal order: America's postwar world order in transition*, 5 INTERNATIONAL RELATIONS OF THE ASIA-PACIFIC 133, 133 (2005).

engineering ("S&E") research articles.[15] From 2003 to 2022, annual S&E publications increased by roughly a third in the U.S., whereas they increased approximately 10-fold in China and 8-fold in India.[16] Similarly, although the U.S. had twice as many international patent applications as China in 2015, China surpassed the U.S. for the first time in 2021.[17]

Defendants' attempt to punish Harvard by canceling research funding, and the pattern it could set across higher education, would enable competing nations to poach America's top scientists and researchers.[18] Already, other nations are increasing their budgets and creating programs to attract American researchers and academics that are being pushed out by the Administration.[19] In March 2025, the Australian Strategic Policy Institute declared that the Administration's open hostility towards academia is a "once-in-a-century brain gain opportunity" for U.S. competitors.[20] In early May 2025, shortly after the Administration withdrew federal funding from Harvard, the European Union announced it would spend an additional 500 million euros over the next two years to "make Europe a magnet for researchers."[21]

Retraction of federal funding also results in a smaller pool of American-trained talent for U.S. private employers to hire, resulting in fewer technological innovations, fewer scientific breakthroughs, and fewer improvements in the lives and health of Americans. Federal funding

---

[15] Science & Engineering Indicators, *The State of U.S. Science and Engineering 2024* (Mar. 13, 2024).

[16] *Id.*

[17] *Id.*

[18] James Glanz, *World Scientists Look Elsewhere as U.S. Labs Stagger Under Trump Cuts*, N.Y. TIMES (May 31, 2025).

[19] Patricia Cohen, *The World is Wooing U.S. Researchers Shunned by Trump*, N.Y. TIMES (May 14, 2025).

[20] Danielle Cave, *As Trump sacks scientists, Australia should hire them. US drain is our brain gain*, AUSTRALIAN STRATEGIC POLICY INSTITUTE (Mar. 7, 2025).

[21] Cohen, *supra* note 20.

supports the training of scientists, doctors, engineers, economists, and other professionals—who often later become entrepreneurs and business leaders. For example, the medical-scientists training program ("MSTP") run by the National Institutes of Health ("NIH") funds MD-PhD education programs to produce top medical and pharmaceutical leaders.[22] Since the program's conception in 1964, over 10,000 students have received MSTP support, creating "prominent leaders in many biomedical research fields."[23] Indeed, businesses owned or operated by members of Leadership Now regularly hire university-trained research talent and depend on their expertise for the success of these businesses' in-house R&D. By cutting federal funding essential to sustaining a robust university research environment at Harvard and elsewhere, the Administration is depleting the next generation of scientific talent, charting a course toward American economic weakness and stagnation, and leaving the American public far worse off.

## II.    The Administration's Assault on Academic Freedom Violates the First Amendment and Threatens to Corrupt the Quality of University Research and Undercut American Economic Competitiveness.

The principle of academic freedom is a central pillar of the protections afforded by the First Amendment. *See Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 n.12 (1985). Academic freedom encompasses the free exchange of ideas on campus as well as a fundamental guarantee of "autonomous decision-making by the academy itself." *Id.*; *see also Hosty v. Carter*, 412 F.3d 731, 736 (7th Cir. 2005) ("[A]cademic freedom includes the authority of the university to manage an academic community and evaluate teaching and scholarship free from interference by other units of government[.]"). The First Amendment's protection against partisan or other content-based

---

[22] NIH, *Institutional Dual-Degree Clinician-Scientist Training Program: MSTP*, https://www.nigms.nih.gov/training/instpredoc/Pages/MSTP-and-LEAD-MSTP.

[23] Clifford Harding et. al, *History and Outcomes of Fifty Years of Physician-Scientist Training in Medical Scientist Training Programs*, 92 ACAD. MED. 1, 1 (2017).

interference in academic research is critical to the freedom of such research, and to its *quality*. American businesses—and the American economy and society as a whole—draw sustenance from federally-funded scientific, technological, and other research in the U.S. due not only to its abundance, but also to its *excellence*.

Defendants' demands to essentially take over the ideological content and composition of Harvard's university-wide programs—and their peremptory cancellation of federally-funded research contracts in retaliation for Harvard's refusal to succumb to those demands—directly threaten the quality of research conducted at Harvard and other U.S. universities. This threat is not hypothetical. Recent scholarship has demonstrated a positive relationship between academic freedom and research production and quality as measured by the number of science, technology, engineering, and mathematics ("STEM") publications in seventeen OECD countries. A mere one-point increase in measured levels of academic freedom was correlated with a seven percent increase in STEM publication volume and a fifteen percent increase in that country's number of STEM publications in top-ranked academic journals.[24] Academic freedom in America is a key reason why the U.S. is ranked as the best country in the world for scientific research.[25] And it is no coincidence that, as of 2024, more than 42 percent of all Nobel prizes in the sciences have been awarded to scientists from the U.S., second to none.[26]

Since the end of World War II, the federal government's adherence to the principle of non-interference with academic freedom has ensured that universities can pursue groundbreaking

---

[24] Frank Fernandez, Volha Chykina, Yin Chun Lin, *Science at risk? Considering the importance of academic freedom for STEM research production across 17 OECD countries*, 19 PLOS ONE 9 (2024), https://doi.org/10.1371/journal. pone.0298370

[25] Oluwatoni Olujinmi, *The 10 best countries for scientific research in 2023*, WORLD EXCELLENCE (Nov. 25, 2023).

[26] Areppim, *Science Nobel Prizes by Nation* (2024), https://stats.areppim.com/stats/stats_nobelhierarchy.htm.

research without fear of partisan or other unwarranted government intrusion. That respect for academic freedom ensures that the quality of potentially life-changing research is not tainted by ideological or political bias. Title VI affords the government necessary and appropriate supervision over university recipients' performance under their federally-funded contracts and compliance with contractual and statutory requirements. *See* 42 U.S.C. § 2000d-1 (setting forth detailed procedures for termination or suspension of funding). But it could not be more clear under Title VI that any withdrawal of funding "shall be limited in its effect *to the particular program, or part thereof*, in which such noncompliance has been so found." *Id.* (emphasis added). Moreover, the federal government is prohibited from effecting any such termination or suspension without (1) notice to the recipient; (2) an opportunity for voluntary compliance; (3) an opportunity for a hearing, *followed by an express finding on the record after such hearing*; and—perhaps most notably—(4) a written report to the appropriate committees in Congress. *Id.*

The deliberately circumscribed powers of the federal government to intervene in the affairs of the academy under Title VI reinforce universities' First Amendment rights and provide a statutory bulwark preserving their academic freedom. Yet, even while referring to the applicability of Title VI (42 U.S.C. § 2000d-1), Defendants have made no pretense of complying with its strict procedural requirements. Defendants fail to allege, much less demonstrate, any connection whatsoever between their asserted concerns at Harvard and any one of the hundreds of Harvard's federal research contracts in myriad different fields that they have slashed with no rhyme or reason. Defendants repeatedly assert that Harvard's federal contracts no longer fulfill "agency priorities," *see, e.g.,* Am. Compl. Ex. E, F, G, while entirely ignoring that this putative rationale has no statutory basis except "to the extent allowed by law"—including Title VI. Am. Compl. Ex. G. Whatever the extent of Harvard's acknowledged challenges with regard to antisemitism or viewpoint diversity may be (an issue on which *Amicus* here expresses no view), any lawful impact

9

on a federally-funded contract subject to Title VI plainly must be limited to each "particular program, or part thereof," based on particularized proof of wrongful discrimination in each program affected. The record is devoid of any such proof, let alone compliance with the due process requirements imposed under Title VI.

Defendants' attempts to coerce Harvard to conform to its ideological preferences as a condition of receiving critical research funding fundamentally undermines the unbiased pursuit of truth that is the bedrock of academic research. If unchecked, the Administration's actions would insinuate bias and fear of arbitrary retaliation into every federally-funded research program at Harvard and every other university that might fall out of favor with the Administration. The Administration's actions, in addition to violating Harvard's rights, fundamentally threaten the academic freedom that has enabled universities to help make the U.S. a dominant technological and scientific force for decades. The American economy, the businesses that rely upon the system of federally-funded research, and the American people as a whole will suffer harm as a result. This unconstitutional and unlawful assault on Harvard's rights should not be permitted to stand.

## CONCLUSION

For the reasons explained above, *Amicus* Leadership Now respectfully submits that this Court should grant summary judgment in favor of Harvard and enter an injunction (a) vacating and setting aside Defendants' freeze orders, termination letters, and unconstitutional conditions asserted therein, (b) permanently enjoining Defendants from implementing the orders, letters and unconstitutional conditions, and from continuing to violate Harvard's First Amendment rights, and (c) granting any other relief as the Court deems just and proper.

Dated: June 9, 2025                         Respectfully Submitted,

                                            */s/ P. Benjamin Duke*

                                            P. Benjamin Duke (admitted *pro hac vice*)
                                            Graham Glusman (admitted *pro hac vice*)
                                            COVINGTON & BURLING LLP
                                            The New York Times Building
                                            620 Eighth Avenue
                                            New York, New York 10018-1405
                                            (212) 841-1000
                                            pbduke@cov.com
                                            gglusman@cov.com

                                            Joy A. Chen (BBO No. 714192)
                                            COVINGTON & BURLING LLP
                                            One International Place, Suite 1020
                                            Boston, MA 02110
                                            (617) 603-8821
                                            jchen@cov.com


                                            *Counsel for the Leadership Now Project*