**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS— HARVARD FACULTY CHAPTER, et al. | |
| *Plaintiffs*, | Case No. 1:25-CV-10910-ADB |
| v. | |
| UNITED STATES DEPARTMENT OF JUSTICE, et al., | |
| *Defendants*. | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 1

BACKGROUND ......................................................................................................... 3

LEGAL STANDARD ................................................................................................. 3

ARGUMENT .............................................................................................................. 3

I.      This Court Lacks Subject Matter Jurisdiction ......................................... 3

       A.     Plaintiffs Do Not Have Standing ................................................. 3

            1.    Plaintiffs Lack Article III Standing.................................... 3

                 a.    Plaintiffs Lack Standing to Sue In Their Own Right ................. 4

                 b.    Plaintiffs' Members Lack Standing to Sue Themselves ............ 5

                 c.    Plaintiffs Cannot Meet the Other Associational Standing Factors ....................................................................................... 8

            2.    Plaintiffs Lack Standing to Enforce Payments to a Nonparty ............ 9

       B.     The Tucker Act Precludes This Court from Exercising Jurisdiction Over Plaintiffs' Claims ..................................................................... 11

II.     Plaintiffs' Challenges to the March 31 Announcement and the April 3 and 11 Letters Fail Under the APA Because They Do Not Challenge Final Agency Actions ................................................................................................. 18

III.    Plaintiffs' First Amendment Claims Fail.............................................. 21

       A.     Harvard Was Not Coerced Into Suppressing Speech ............... 21

       B.     The Government Would Have Terminated Harvard's Contract Regardless of the Viewpoints Harvard Reflected in the Rejection Letter and this Lawsuit and Thus Such Termination Does Not Constitute Unconstitutional

i

Retaliation ................................................................................. 24

IV.    The Grant Terminations Complied with the APA ...................................................... 25

        A.    Title VI Does Not Govern Grant Terminations Based on Policy ............. 25

        B.    The Freeze Orders and Terminations Do Not Violate the APA Because They Were Reasonable Exercises of the Government's Authority to Terminate for Nonalignment with Antidiscrimination Priorities .............. 30

                1.    The grant terminations were not arbitrary and capricious ............... 30

                2.    The April 3 and April 11 Letters were not arbitrary and capricious. 33

                3.    The agencies did not fail to consider important aspects of the problem or reliance interests before terminating funding ............................... 34

V.    Plaintiffs' Second Amended Complaint Asserts No Viable Separation of Powers or Spending Clause Claim ............................................................................ 36

VI.    Plaintiffs Have Failed to Establish a Due Process Violation ................................. 38

VII.    Under the APA, the Appropriate Remedy is Limited to the Agency Action Giving Rise to the Suit Rather than a Forward-Looking Injunction ................................. 41

VIII.    There is no ripe dispute as to Defendants Bondi and U.S. Department of Justice ..................................................................................................... 44

        CONCLUSION ............................................................................................. 44

## TABLE OF AUTHORITIES

### Cases

*Abramson v. Pataki*,
 278 F.3d 93 (2d Cir. 2002)............................................................ 39

*Am. Civ. Liberties Union of Mass. v. U.S. Conf. of Cath. Bishops*,
 705 F.3d 44 (1st Cir. 2013)........................................................... 19

*Am. Sci. & Eng'g, Inc. v. Califano*,
 571 F.2d 58 (1st Cir. 1978)........................................................... 16

*Am. Tel. and Tel. Co. v. United States*, *Am. Tel. and Tel. Co. v. United States*,
 124 F.3d 1471, 1478 (Fed. Cir. 1997), aff'd, 307 F.3d 1374 (Fed. Cir. 2002)................ 37

*Am. Textile Mfrs. Inst. v. Donovan*,
 452 U.S. 490 (1981)..................................................................... 28

*Armstrong v. Exceptional Child Center, Inc., et al.*,
 575 U.S. 320 (2015)..................................................................... 38

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)..................................................................... 23

*Ashwander v. Tennessee Valley Auth.*,
 297 U.S. 288 (1936)................................................................. 16, 38

*Atterbury v. U.S. Marshals Serv.*,
 805 F.3d 398 (2d Cir. 2015)........................................................... 13

*B&L Prods., Inc. v. Newsom*,
 104 F.4th 108 (9th Cir. 2024) ......................................................... 22

*Bd. of Regents of State Colls. v. Roth*,
 408 U.S. 564 (1972)..................................................................... 40

*Bennett v. Spear*,
 520 U.S. 154 (1997)................................................................. 18, 19

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
 419 U.S. 281 (1974)............................................................. 31, 32, 33

*Brendsel v. Off. of Fed. Hous. Enter. Oversight*,
 339 F. Supp. 2d 52 (D.D.C. 2004) ..................................................... 37

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ......................................................................................... 42

*Cameron v. Johnson*,
    390 U.S. 611 (1968) ......................................................................................... 23

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971), *abrogated on other grounds by Califano v. Sanders*,
    430 U.S. 99, 105 (1977) ................................................................................... 25

*City of L.A. v. Shalala*,
    192 F.3d  (D.C. Cir. 1999) ............................................................................... 42

*City of New York v. Dep't of Def.*,
    913 F.3d 423 (4th Cir. 2019) ............................................................................. 7

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) .................................................................................. 4, 6, 8

*Consol. Edison Co. of New York v. U.S., Dep't of Energy*,
    247 F.3d 1378 (Fed. Cir. 2001) ....................................................................... 15

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
    596 U.S. 212 (2022) ......................................................................................... 36

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) ......................................................................................... 30

*Dep't of Educ. v. California*,
    604 U.S. __, 145 S. Ct. 966 (2025) .............................................. 11, 12, 13, 38

*Dep't of Homeland Security v. Regents of the University of California*,
    591 U.S. 1 (2020) ...................................................................................... 28, 34

*DeVillier v. Texas*,
    601 U.S. 285 (2024) .................................................................................. 16, 38

*Diaz v. Johnson*,
    No. 19-1501, 2020 WL 9437887 (1st Cir. Nov. 12, 2020) .............................. 16

*Edwards v. Aurora Loan Servs.*,
    791 F. Supp. 2d 144 (D.D.C. 2011) ................................................................ 10

*Elrod v. Burns*,
    427 U.S. 347 (1976) ......................................................................................... 41

*Estate of Landers v. Leavitt,*
    545 F.3d 98 (2d Cir. 2009) ................................................................................. 24

*Ethyl Corp. v. Browner,*
    989 F.2d 522 (D.C. Cir. 1993) ............................................................................ 43

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ........................................................................................... 29

*FCC v. Fox Television Stations, Inc.,*
    567 U.S. 239 (2012) ........................................................................................... *39*

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021) ........................................................................................... 25

*FDA v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024) ....................................................................................... 4, 5

*FTC v. Standard Oil Co. of California,*
    449 U.S. 232 (1980) ........................................................................................... 19

*Genesis Healthcare Corp. v. Symczyk,*
    569 U.S. 66 (2013) ............................................................................................. *20*

*Gizzo v. Ben-Habib,*
    44 F. Supp. 3d 374 (S.D.N.Y. 2014) .................................................................. 40

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) ........................................................................................... 39

*Great-West Life & Annuity Ins. Co. v. Knudson,*
    534 U.S. 204 (2002) ..................................................................................... 12, 38

*Greenwich Citizens Comm., Inc. v. Ctys. of Warren & Washington Indus. Dev. Agency,*
    77 F.3d 26 (2d Cir. 1996) .................................................................................. 22

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.,*
    527 U.S. 308 (1999) ........................................................................................... 38

*Guardians Ass'n v. Civil Serv. Comm'n,*
    463 U.S. 582 (1983) ........................................................................................... 29

*Haaland v. Brackeen,*
    599 U.S. 255 (2023) ............................................................................................. 6

*Hankard v. Town of Avon,*
    126 F.3d 418 (2d Cir. 1997)........................................................................ 24, 41

*Harper v. Werfel,*
    118 F.4th 100 (1st Cir. 2024) ............................................................................ 18

*Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, Nat. Ass'n,*
    747 F.3d 44 (2d Cir. 2014) ................................................................................ 10

*Ingersoll-Rand Co. v. United States,*
    780 F.2d 74 (D.C. Cir. 1985) .............................................................. 12, 13, 14

*J.C. Prods., Inc. v. United States,*
    608 F. Supp. 92 (W.D. Mich. 1984) .................................................................. 14

*Kalderon v. Finkelstein,*
    495 Fed. App'x 103 (2d Cir. 2012) .................................................................... 40

*Keepers, Inc. v. City of Milford,*
    807 F.3d 24 (2015) ............................................................................................ 11

*Kestenbaum v. President & Fellows of Harvard Coll.,*
    743 F. Supp. 3d 297 (D. Mass. 2024) ............................................................... 24

*Klamath Water Users Protective Ass'n v. Patterson,*
    204 F.3d 1206 (9th Cir. 1999),
    *opinion amended on denial of reh'g,* 203 F.3d 1175 (9th Cir. 2000) .............................. 10

*Kowalski v. Tesmer,*
    543 U.S. 125 (2004) .......................................................................................... 10

*Kreis v. Secretary of Air Force,*
    866 F.2d 1508 (D.C. Cir. 1989) ........................................................................ 30

*Laird v. Tatum,*
    408 U.S. 1 (1972) ....................................................................................... 5, 6, 7

*Lewis v. Wash. State Univ.,*
    586 F. App'x 271 (9th Cir. 2014) ...................................................................... 40

*Lujan v. Def. of Wildlife,*
    504 U.S. 555 (1992)........................................................................................ 4, 7

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
    567 U.S. 209 (2012).......................................................................................... 12

*Med. Ass'n of State of Ala. v. Schweiker*,
    554 F. Supp. 955 (M.D. Ala. 1983) ............................................................ 8

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982) .................................................................. 13

*Minneapolis & St. Louis R. Co. v. Columbus Rolling Mill*,
    119 U.S. 149 (1886) .................................................................................. 20

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ............................................................................. 30, 35

*Murthy v. Missouri*,
    603 U.S. 43 (2024) ........................................................................... passim

*Nat'l Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998) .................................................................................. 41

*National Rifle Association v. Vullo*,
    602 U.S. 175 (2024) .................................................................................. 22

*Nat'l Urban League et al. v. Trump et al.*,
    2025 WL 1275613 ............................................................................... 40, 41

*New Mexico v. Musk*,
    No. 25 Civ. 429 (TSC), 2025 WL 520583 (D.D.C. Feb. 18, 2025).................. 42

*New York v. Trump*,
    --- F. Supp. 3d --- , No. 25-cv-39, 2025 WL 715621 (D.R.I. Mar. 6, 2025) .................. 43

*New York v. Trump*,
    133 F.4th 51 (1st Cir. Mar. 26, 2025) .............................................. 43

*Nieves v. Bartlett*,
    587 U.S. 391 (2019).................................................................................. 23

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004).................................................................................... 18

*Palisades Gen. Hosp. Inc. v. Leavitt*,
    426 F.3d 400 (D.C. Cir. 2005)................................................................... 42

*Pennhurst State School and Hospital v. Halderman*,
    451 U.S. 1 (1981).................................................................................... 36

*Penthouse Intern., Ltd. v. McAuliffe*,
    702 F.2d 925 (11th Cir. 1983) ............................................... 22

*Peregrine Myanmar Ltd. v. Segal*,
    89 F.3d 41 (2d Cir. 1996) .................................................. 43

*Perry Capital LLC v. Mnuchin*,
    864 F.3d 591 (D.C. Cir. 2017) ............................................ 13

*Raines v. Byrd*,
    521 U.S. 811 (1997) ....................................................... 3

*Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*,
    421 F.3d 1 (1st Cir. 2005) ................................................ 40

*Sackett v. EPA*,
    566 U.S. 120 (2012) ...................................................... 19

*Sardarian v. Fed. Emergency Mgmt. Agency*,
    No. 3:19-CV-00910 (OAW), 2022 WL 4080325 (D. Conn. Apr. 1, 2022) .............. 10, 11

*Sessions v. Dimaya*,
    584 U.S. 148 (2018) ...................................................... 39

*Sharp v. Weinberger*,
    798 F.2d 1521 (D.C. Cir. 1986) ........................................... 17

*Sierra Club, Inc. v. Granite Shore Power LLC*,
    No. 19-cv-216-JL, 2019 WL 8407255 (D.N.H. Sept. 13, 2019) ....................... 1

*Simon v. Eastern Kentucky Welfare Rights Org.*,
    426 U.S. 26 (1976) ..................................................... 6, 7

*Synder v. Phelps*,
    562 U.S. 443 (2011) .................................................. 21, 22

*Tennessee v. Becerra*,
    131 F.4th 350 (6th Cir. 2025) ........................................... 34

*Town of Norwood v. F.E.R.C.*,
    202 F.3d 392 (1st Cir. 2000) .............................................. 8

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) .................................................... 3, 4

*Tucson Airport Auth. v. Gen. Dynamics Corp.*,
    136 F.3d 641 (9th Cir. 1998) ................................................. 15

*United States v. AVX Corp.*,
    962 F.2d 108 (1st Cir. 1992) ............................................. 4, 8

*United States Conf. of Catholic Bishops v. U.S. Dep't of State*,
    _ F. Supp. 3d __, 2025 WL 763738 *D.D.C. (March 11, 2025) ............... 11, 17

*United States v. Mayendia-Blanco*,
    905 F.3d 26 (1st Cir. 2018) ................................................. 33

*United States v. Tingey*,
    30 U.S. 115 (1831) ..................................................... 26, 29

*United Workers & Com. Workers Union Local 751 v. Brown Group, Inc.*,
    517 U.S. 544 (1996) ........................................................ 9

*Univ. of Med. & Dentistry of N.J. v. Corrigan*,
    347 F.3d 57 (3d Cir. 2003) ................................................. 19

*Up State Fed. Credit Union v. Walker*,
    198 F.3d 372 (2d Cir. 1999) ................................................ 13

*Utah ex rel. Cox v. Env't Prot. Agency*,
    No. 23-1157, 2025 WL 1354371 (D.C. Cir. May 2, 2025) ...................... 42

*Util. Solid Waste Activities Grp. v. Env't Prot. Agency*,
    901 F.3d 414 (D.C. Cir. 2018) .............................................. 42

*Warth v. Seldin*,
    422 U.S. 490 (1975) ..................................................... 9, 24

*West v. Lynch*,
    845 F.3d 1228 (D.C. Cir. 2017) ............................................. 7

*Xie v. University of Texas M.D. Anderson Cancer Ctr.*,
    No. 20-20622, 2021 WL 5968648 (5th Cir. Dec. 15, 2021) ................... 40

*Younger v. Harris*,
    401 U.S. 37 (1971) ..................................................... 23, 24

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
    576 U.S. 1 (2015) ......................................................... 37

**Statutes**

5 U.S.C. § 551 ............................................................................................................ 20

5 U.S.C. § 702 ............................................................................................................ 12

5 U.S.C. § 704 ....................................................................................................... 12, 18

28 U.S.C. § 1491(a)(1) ................................................................................................ 12

29 U.S.C. § 152(5) ........................................................................................................ 8

42 U.S.C. § 282(b)(1) ................................................................................................. 37

42 U.S.C. § 282(b)(3) ................................................................................................. 37

42 U.S.C. § 2000d ...................................................................................................... 27

42 U.S.C. § 2000d-1 ................................................................................................... 26

42 U.S.C. § 2000d-2 ............................................................................................... 14, 25

**Rules and Regulations**

2 C.F.R. § 200 ............................................................................................................ 28

2 C.F.R. § 200.340 ..................................................................................... 15, 27-29, 34

2 C.F.R. § 200.340(a)(2) ............................................................................................ 15

2 C.F.R. § 200.340(a)(4) ........................................................................... 15, 27, 29, 34

89 Fed. Reg. 30046 ..................................................................................................... 27

Fed. R. Civ. P. 65(c) ................................................................................................... 44

## INTRODUCTION

In light of numerous incidents of antisemitism at Harvard University ("Harvard"), and upon learning of Harvard's acknowledged failures to address antisemitism, the United States attempted to engage with Harvard about their failure to adequately protect students and staff in their programs. Following failed efforts to negotiate a resolution of these issues, and consistent with the Trump administrations' priorities to keep students safe on campus, the federal agencies exercised their authority to cancel Federal Government grants to Harvard for no longer aligning with the agencies' policy priorities. As set out in the text of Harvard's contracts, these taxpayers-funded contracts — to which Harvard has no entitlement — include explicit conditions requiring the agreements effectuate the policy purposes of the federal government or else be subject to cancellation.

The Plaintiffs here, two labor organizations and one of their local chapters, whose members include University staff, have tried to insert themselves into the picture. They ask this Court to restore the funding and prevent potential termination of additional funding. Though none of the money at issue was directly allocated to Plaintiffs or their members, Plaintiffs assert various claims under the Administrative Procedure Act ("APA"), First Amendment, Separation of Powers, the Spending Clause, and Due Process, and seek a permanent injunction to maintain Harvard's discriminatory status quo. These claims lack merit.  On summary judgment, Plaintiffs seek judgment on only their APA and First Amendment claims.[1]

---

[1] Plaintiffs have thus waived any argument that they are entitled to summary judgment on Count V-VIII of their Second Amended Complaint. *See Sierra Club, Inc. v. Granite Shore Power LLC*, No. 19-cv-216-JL, 2019 WL 8407255, at *7 (D.N.H. Sept. 13, 2019) (collecting cases for the proposition that arguments not raised in moving party's opening brief are deemed waived).

This Court should deny Plaintiffs' motion for summary judgment for several independent reasons. As a threshold matter, Plaintiffs lack standing as they have not shown sufficient harm to themselves or their members resulting from the agencies' actions. Plaintiffs are not parties to the grants issued to Harvard, lack any protected interest, and fail to establish any legally cognizable harm. Moreover, Plaintiffs bring claims that properly sound in contract. At its core, they allege that the agencies' terminations of Harvard's contract agreements was unlawful, and seek an order from the Court reinstating those agreements and requiring the agencies' to continue providing Harvard with taxpayer funds pursuant to the terms of those now-cancelled contracts, and preventing potential termination of additional funding.  Even assuming Plaintiffs had standing (they do not), these are not claims that this Court has jurisdiction to resolve; pursuant to the Tucker Act, these claims properly belong in the Court of Federal Claims. Plaintiffs' attempts to repackage these contract claims (of a nonparty) are transparent. And, because Plaintiffs' raise contract claims, their Constitutional claims premised on those grant terminations too must fail.

Plaintiffs' claims also fail on the merits. First, the agencies' termination of funding complied with both the substantive and procedural requirements of the APA. Likewise, Plaintiffs' First Amendment Claim, and associated APA claim relying on that alleged constitutional violations, fails because they have not established that the Government violated the First Amendment. Plaintiffs have further failed to adequately plead a separation of powers, spending clause, or due process violation, and the Court should therefore grant Defendants summary judgment on Counts V-VIII. Accordingly, the Court should deny Plaintiffs' motion.

## BACKGROUND

Defendants incorporate by reference, as if fully stated herein, the "Background" section of Defendants' Cross Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment in the related case, *President and Fellows of Harvard College v. U.S. Dep't of Justice, et al.*, No. 25-cv-11048-ADB.

## LEGAL STANDARD

Defendants incorporate by reference, as if fully stated herein, the "Legal Standard" section of Defendants' Cross Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment in the related case, *President and Fellows of Harvard College v. U.S. Dep't of Justice, et al.*, No. 25-cv-11048-ADB.

## ARGUMENT

### I.      This Court Lacks Subject Matter Jurisdiction

Because "'standing is not dispensed in gross,'" each plaintiff "'must demonstrate standing for each claim that they press' against each defendant, 'and for each form of relief that they seek.'" *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)). The "standing inquiry [must be] especially rigorous when reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997).

#### A.  Plaintiffs Do Not Have Standing

##### 1.  <u>Plaintiffs Lack Article III Standing</u>

As an initial matter, the Court should dismiss all of Plaintiffs claims because they lack Article III standing. At its "irreducible constitutional minimum," Article III standing requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and particularized

injury-in-fact, either actual or imminent, and not conjectural or hypothetical, (2) a causal connection between the injury and defendants' challenged conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560-61 (1992). Plaintiffs assert standing both on the basis of direct injury to themselves and "on behalf of their members." Plaintiffs' allegations are insufficient under either theory.

To establish associational or representational standing, a plaintiff must establish that: "(1) at least one of the members possesses standing to sue in his or her own right; (2) the interests that the suit seeks to vindicate are pertinent to the objectives for which the organization was formed; and (3) neither the claim asserted nor the relief demanded necessitates the personal participation of affected individuals." *United States v. AVX Corp.*, 962 F.2d 108, 116 (1st Cir. 1992). As explained below, Plaintiffs fail on all three prongs.

The alleged injury in fact cannot be "speculative—meaning that the injury must have already occurred or be likely to occur soon." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). If the injury has not materialized, it must be "certainly impending," and "[a]llegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). And it must be "concrete—that is, real, and not abstract." *TransUnion*, 594 U.S. at 424 (internal quotation marks omitted); *see also Murthy*, 603 U.S. at 43, 58 ("because the plaintiffs request forward-looking relief, they must face a real and immediate threat of repeated injury" (internal quotation marks omitted)).

### a.    Plaintiffs Lack Standing to Sue In Their Own Right

Plaintiffs' theory for direct standing has been rejected by both the Supreme Court and other courts in this district. Plaintiffs assert that they themselves have suffered harm through interference with their "core business activities" and necessary diversion of resources from other activities. *See* Pls' Mem. in Support of Mot. Summ. J., ECF No. 25 ("Pl's Mem.") at 15-17. But

"an organization . . . cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Alliance for Hippocratic Med.*, 602 U.S. at 394; *see also Am. Fed. of Gov't Employees, AFL-CIO, et al. v. U.S. O.P.M.*, Slip Op., No. 24A904 (April 8, 2025) (finding non-profits did not have standing); *Am. Fed. of Gov't Employees, AFL-CIO, et al. v. Ezell*, No. 25-cv-10276-GAO, Doc. No. 66 (Feb. 12, 2025) (finding unions lacked standing to challenge OPM directive). Nor is diversion of organizational resources sufficient to convey standing, at least where those resources are spent opposing the very Government determinations at issue, *Hippocratic Med.*, 602 U.S. at 395, as appears to be the case here. *See* Pl's Mem. at 16-17 (claiming that Plaintiffs have "diverted internal resource . . . to assist Harvard members [as they] prepare to respond to the demands of the Trump administration"; "meets with tis membership twice as often . . . to address the significant obstacles that Defendants' Demand Letters and abuse of power have created"; "developed and sponsored workshops and trainings . . . to ensure its members have the tools and knowledge they need to protect themselves from Defendants' attacks"; "spend time dealing with crises"; "spend significant time and resources responding to the repercussions of the administration's actions on its members"; "counseling members who have lost their funding"; "advising members on how to navigate these complex challenges."). Simply put, Plaintiffs cannot spend their way into standing.

### b.    Plaintiffs' Members Themselves Lack Standing to Sue

Nor do Plaintiffs sufficiently allege injury to their members to support their claims flowing from a future loss of funding, which they claim has chilled protected First Amendment activity. Pls' Mem. at 45, 47. It is well-settled that "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972); *cf. Murthy*, 603 U.S. at 73 ("[P]laintiffs 'cannot manufacture

standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.'" (quoting *Clapper*, 568 U.S. at 416)). In the absence of allegations of specific present or future First Amendment harm, Plaintiffs cannot satisfy Article III standing for claims premised on the threat of future funding withdrawal. *Laird*, 408 U.S. at 13-14.[2]

Plaintiffs' members lack standing because redressability and causation are lacking. Plaintiffs' members alleged personal harms are too attenuated to support jurisdiction because any asserted harms must flow from independent choices made by the nonparty educational institution (Harvard), or their injury is otherwise too speculative. A "federal court cannot redress 'injury that results from the independent action of some third party not before the court.'" *See Murthy*, 603 U.S. at 57. Courts are "'reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment,'" *id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013)), and have rejected theories of redressability that depend on such guesswork, *id.*, 603 U.S. at 73; *Haaland v. Brackeen*, 599 U.S. 255, 293-94 (2023). And the Court has forbidden standing based merely on speculation of how a Governmental action may encourage a harm to Plaintiffs. *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26 (1976) at 41-43.

Plaintiffs allege that their members have been "forced to cease research activities and have been unable to resume them"; will need to "cease research and study activities" when their bridge funding is exhausted; and have had their "protected speech and academic freedom" chilled in an effort to avoid becoming "the University's next target." ECF No. 75 at 11-13. However, "it is not enough for plaintiffs to simply identify a governmental action that ultimately affected them

---

[2] Plaintiffs acknowledge that some of the terminated funding has been covered by other sources. *See* ECF No. 75 at 12-13.

through the independent responses and choices of third parties." *City of New York v. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) (Wilkinson, J.) (citation omitted). Ultimately, it is the choice of a nonparty, Harvard, whose funding was cut, to determine what to do. If, for example, Harvard chooses to continue funding the project, then no harm flows to Plaintiffs' members from the termination. Thus, the choices of nonparties who have "broad and legitimate discretion," interrupt any link between the challenged actions and the alleged harms. *See Lujan*, 504 U.S. at 562. When this kind of "conjecture is necessary, redressability is lacking." *West v. Lynch*, 845 F.3d 1228, 1237 (D.C. Cir. 2017) (citing *Simon*, 426 U.S. 26 (1976) at 43-44).

Other alleged harms of Plaintiffs' members are based entirely on Harvard's independent actions, which were independent of any Government action. Pl.'s Mem. 44; *see Murthy*, 603 U.S. at 57-58 (holding that plaintiffs alleging that Government officials pressured social media platforms to suppress protected speech were required to show the platforms' likely response to establish standing). For example, Plaintiffs assert that their employer Harvard has "dismissed faculty members," "ended partnerships," "changed its disciplinary procedures," and "shuttered offices" in alignment with the desires of the Trump administration. Pls.' Mem. at 44. But Plaintiffs acknowledge that Harvard rejected the Government's offer for a settlement, and has expressly stated that it had made, and would continue to make the changes that it saw fit "to ensure that the university is a welcoming and supportive learning environment for all students." *Id.* at 5; HHSHarv_00000104-05. That Harvard chose to take steps that the Trump administration may favor because it felt those were in its students' best interest is not the same as being caused by the Government. Moreover, Plaintiffs' ostensible concerns that their speech could trigger additional funding freezes or other retribution is speculative and therefore insufficient. *See* Pls.' Mem. at

47; *Clapper*, 568 U.S. at 414 (a "speculative chain of possibilities does not establish that injury based on potential future [action] is certainly impending or is fairly traceable").

Plaintiffs also contend that their membership may suffer harm in the future to their "professional reputations," and that they fear being "targeted by Defendants," ECF No. 75 at 13, but those allegations are too speculative to satisfy Article III standing. *See Clapper*, 568 U.S. at 409 (explaining that any allegation of "threatened injury must be *certainly impending*" (citation omitted)).

### c.    Plaintiffs Cannot Meet the Other Associational Standing Factors

Plaintiffs have also failed to establish that the interests that the suit seeks to vindicate are pertinent to the objectives for which the organization was formed. *AVX Corp.*, 962 F.2d at 116; *see also Town of Norwood v. F.E.R.C.*, 202 F.3d 392, 407 (1st Cir. 2000) ("Germaneness of the interests served by a lawsuit to the purpose of the organization is a settled requirement for standing based on membership."). AAUP,[3] AAUP-Harvard Faculty Chapter, and UAW are labor organizations "which exists for the purpose, in whole or in part, of *dealing with employers* concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." 29 U.S.C. § 152(5); Pls.' Sec. Am. Compl. (ECF No. 64) ¶¶ 17, 19; 249 ("issues involving the employment relationship between university employees and their employers"; "proceedings before their university employers"); 255 (ensure "adequate[ ] represent[ation] before their employer"); 259 ("terms and conditions of employment"). The restoration of Federal Government funding to nonparty Harvard is not reasonably connected to the reasons Plaintiffs' members became members of Plaintiff organizations. *See Med. Ass'n of State of Ala. v.*

---

[3] Neither Plaintiffs' Second Amended Complaint (ECF No. 64) nor their Memorandum (ECF No. 75) make clear whether any of AAUP's members are associated with Harvard.

*Schweiker*, 554 F. Supp. 955, 965 (M.D. Ala. 1983) (denying associational standing because "organization may [assert associational standing] only when the injury to its members has some reasonable connection with the reasons the members joined the organization and with the objectives of the organization").

Finally, the claims Plaintiffs have asserted require the participation of individual members. "[W]hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought." *Warth v. Seldin*, 422 U.S. 490, 515 (1975). While associational standing may be asserted in matters in which an association seeks only "prospective relief" that will "inure to the benefit of those members of the association actually injured," it is particularly inappropriate where "the damages claims are not common to the entire membership, nor shared by all in equal degree." *Id.*; *United Workers & Com. Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544 (1996) at 546 (explaining that participation of individual members normally required for "an association's action for damages running solely to its members"). Here, the harm suffered by Plaintiffs' members, if any, "is peculiar to the individual member concerned, and both the fact and extent of the injury would require individualized proof." *Warth*, 422 U.S. at 515-16. Accordingly, "each member . . . who claims injury as a result of respondents' practices must be a party to the suit, and [the association] has no standing to claim damages on his behalf." *Id.*

## 2.   <u>Plaintiffs Lack Standing to Enforce Payments to a Nonparty</u>

Plaintiffs and their members also lack standing to enforce the rights of Harvard. Plaintiffs seek an order forcing the Government to make payments on agreements that do not belong to them or their members, but rather with nonparty Harvard — claims that properly sound in contract. Indeed, all of Plaintiffs' claims, including those premised on purportedly improper procedures,

viewpoint discrimination, or other theories, are entirely aimed at invalidating termination of *another entity's* contracts, thereby enforcing the payment of monies from the United States to which they are not even owed. It is well established that only parties, or select nonparties (intended beneficiaries), may enforce contracts with the United States. *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004).

"In order to establish standing to enforce" payment of a government contract, or any other terms, a plaintiff must show that they are party to the contract or an intended third-party beneficiary. *Edwards v. Aurora Loan Servs.*, 791 F. Supp. 2d 144, 150 (D.D.C. 2011); *see also Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, Nat. Ass'n*, 747 F.3d 44, 49 (2d Cir. 2014) (holding that plaintiff lacked prudential standing because it could not "enforce the terms of" an agreement "as to which it is neither a party nor a third-party beneficiary"); *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999), *opinion amended on denial of reh'g*, 203 F.3d 1175 (9th Cir. 2000)) ("Before a third party can recover under a contract, it must show that the contract was made for its direct benefit—that it is an intended beneficiary of the contract."). Plaintiffs can show neither.

Plaintiffs and their members were not party to the contracts, and Plaintiffs do not argue (nor could they) that they or their members are intended beneficiaries. *See Klamath*, 204 F.3d at 1211 ("[T]he third party must show that the contract reflects the express or implied intention of the parties to the contract to benefit the third party."). Plaintiffs' members thus have no "legally protected interests" under these contracts—they are neither parties nor intended third-party beneficiaries. *See Sardarian v. Fed. Emergency Mgmt. Agency*, No. 3:19-CV-00910 (OAW), 2022 WL 4080325, at *1–2 (D. Conn. Apr. 1, 2022) (dismissing suit for lack of standing where plaintiff did not have a "legally protected interest" under *Lujan,* because FEMA awarded "the grant in

10

question" to the State of Connecticut and to the Town of Westport, and plaintiff was not the recipient of the Federal grant). *Id.* Plaintiffs therefore lack standing to enforce the terms of these contracts and funding arrangements. Plaintiffs' attempt to manufacture standing by repackaging these claims as implicating the APA or constitutional considerations should be rejected, as they have "offered no reason to depart from the normal rule that a litigant must assert its own rights, not those of a third party," *Keepers, Inc. v. City of Milford,* 807 F.3d 24, 42 (2015).

In a nearly identical case, at least one of the same Plaintiffs in this case also challenged the Government's grant terminations to Columbia University in the Southern District of New York, raising almost the identical claims that Plaintiffs raise here. *See AAUP, et al. v. United Stated Dept' of Justice, et al.*, No. 25-cv-02429-MKV (S.D.N.Y.). Just today, the district court appropriately dismissed the AAUP's claims for lack of standing, noting that:

> Neither the Executive Branch nor the Legislature ever awarded the grants and contracts at issue to Plaintiffs or any of their members. The funding that Plaintiffs ask this Court to commandeer was awarded to Columbia, which is conspicuously absent from this case. If any funds have been wrongfully withheld, such funds may be recovered at the end of a successful lawsuit by the appropriate plaintiff in an appropriate forum. *See Dep't of Educ. v. California*, 604 U.S. __, 145 S. Ct. 966, 969 (2025).

ECF No. 148 at 2. This Court should follow the same course.

## B. The Tucker Act Precludes This Court from Exercising Jurisdiction Over Plaintiffs' Claims

Putting aside Plaintiffs' lack of standing, this Court lacks subject matter jurisdiction for an additional reason: Plaintiffs' claims—which seek payment of funds to Harvard pursuant to agreements between the Government and the University—are in essence contract claims that can only be brought in the Court of Federal Claims.

"Federal courts start from the presumption that they lack jurisdiction," and "the party invoking a federal court's jurisdiction has the burden of proving it." *United States Conf. of Catholic Bishops v. U.S. Dep't of State*, _ F. Supp. 3d __, 2025 WL 763738 *D.D.C. (March 11,

11

2025). Plaintiffs rely in large part on the APA to challenge the agencies' grant and contract terminations. *See, e.g.*, Pls' Mem. at 20-38; Sec. Am. Compl. ¶¶ 298-315, 329-33, 343-47, 355-59. Although the APA provides a limited waiver of sovereign immunity for claims "seeking relief other than money damages," 5 U.S.C. § 702, that waiver of sovereign immunity does not apply "'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought,'" *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025); *see also* 5 U.S.C. § 704 ("[F]inal agency action for which there is no other adequate remedy in a court are subject to judicial review."). This exception "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012).

"[T]he APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money,'" as Plaintiffs seek here. *See California*, 145 S. Ct. at 968 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)). This jurisdictional divide ensures that contract claims against the Government are channeled to the court that has "unique expertise" in that area. *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985). And, because the Tucker Act already affords an adequate remedy in a court for a party who seeks funding that it believes the government is obligated to pay pursuant to a contract or grant, judicial review is not available under the APA. *See* 5 U.S.C. § 704. In *California*, the Supreme Court applied these principles to conclude that the Government was likely to succeed in showing that the district court lacked jurisdiction over a challenge to the

Government's termination of education-related grants with similar termination provisions to those at issue here. *See California*, 145 S. Ct. at 968.4

Accordingly, regardless of how a claim is styled, a district court lacks jurisdiction if the claim "is in 'its essence' contractual." *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982)). Whether a claim is in essence a contract claim over which the Court of Federal Claims has exclusive jurisdiction depends on a two-pronged analysis: a court must examine both "the source of the rights upon which the plaintiff bases its claims, and . . . the type of relief sought." *Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 406 (2d Cir. 2015) (quoting *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 375 (2d Cir. 1999) and *Megapulse*, 672 F.2d at 968). Here, both prongs establish that Plaintiffs' claims for payment of the terminated grants are contractual.

First, the source of the rights Plaintiffs assert are the grant and contract agreements themselves, without which no claims would exist. Put another way: absent the Defendant agencies' decisions to award grants to Harvard, Harvard would have no rights to the terminated federal awards that Plaintiffs challenge here. Plaintiffs challenge the over $2 billion "Funding Freeze," and although they argue that concerns over loss of funding impacts academic freedom and speech, their claims arose only when the Government terminated the grants pursuant to the terms of the grant agreements.[4] "The question presented by the complaint could be phrased as whether the contract forbids termination under these conditions." *Ingersoll*, 780 F.2d at 78.

---

[4] With respect to contracts for procurement and services, there is no question that such contracts are contractual in nature. *See* Federal Acquisition Regulation, Part 2.101 (governing "acquisitions," which are defined as "the acquiring by contract with appropriated funds of supplies or services (including construction) by and for the use of the Federal Government through purchase or lease, whether the supplies or services are already in existence or must be created, developed, demonstrated, and evaluated.").

In another case challenging grant terminations brought under the cloak of the APA, although plaintiffs based their claims on federal statutes instead of using contract-based language, Judge Stearns recognized that the claims in essence "sought to enforce a contractual obligation to pay money." *Mass. Fair Hous. Ctr. v. Dep't of Hous. & Urban Dev.*, No. 3:25-cv-30041, ECF No. 42 (Apr. 14, 2025) (citing *California*). Thus, the district court was obligated to "defer . . . to the Supreme Court's unmistakable directive that, for jurisdictional purposes, the proper forum for this case is the Court of Federal Claims." *Id.* Plaintiffs here attempt to distinguish their claims from those in *California*, Pls.' Mem. at 20, but this is simply the same contract-based claim repackaged in a different box. *See Ingersoll*, 780 F.2d at 78 (citing *J.C. Prods., Inc. v. United States*, 608 F. Supp. 92, 94 (W.D. Mich. 1984) (where government terminated plaintiffs contract, cause of action is on the contract despite plaintiffs' claims of statutory and constitutional violations)).

Plaintiffs' focus on Title VI with respect to their APA claims is misplaced. *See* Pls' Mem. at 22-38; Sec. Am. Compl. ¶¶ 298-315. Title VI provides: "Any department or agency action taken pursuant to section 2000d–1 of this title shall be subject to such judicial review *as may otherwise be provided by law for similar action taken by such department or agency on other grounds*." 42 U.S.C. § 2000d-2 (emphasis added).  While the agencies did not act pursuant to Title VI, even if they had, the plain language of the statute directs that the cause of action "shall be" the Tucker Act because it is "provided by law for similar action [*i.e.*, contract terminations] taken by such department or agency on other grounds."  Only if the challenged agency action is "not otherwise subject to judicial review" can an entity "obtain judicial review of such action in accordance with chapter 7 of title 5 [the APA]."  Under the Title VI scheme, the APA is only a backup if another statute does not already provide for judicial review, but in this case, the Tucker Act's judicial

14

review provisions govern. But, any event, the grants and contracts with Harvard were not terminated pursuant to Title VI, which is therefore inapplicable.

With respect to grants, the terms governing termination are contained in OMB regulation, 2 C.F.R. § 200.340. The 2024 version of the regulation effective October 1, 2024, allowed the agencies to terminate a grant "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. 200.340(a)(4)[5] The regulation reinforces the contractual nature of the terminations by referencing the terms and conditions of the award.

Plaintiffs' constitutional claims are also premised on the notion that the Government has a contractual obligation to provide funding. *See, e.g.*, Pl's Mem. at 40-47; Second Am. Compl. ¶¶ 251, 260, 262-64; 315-28; 334-42, 348-54 (alleging First Amendment "impacts" and due process violations from funding termination to Harvard). If the Government has no such obligation, it owes no duty to Harvard (or to the Plaintiffs) giving rise to an alleged constitutional violation. In short, "[b]ecause the United States's obligation is in the first instance dependent on the contract, these claims are contractually-based" and "the district court lacks jurisdiction under the Tucker Act." *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 647 (9th Cir. 1998) (concluding that district court lacked jurisdiction under the Tucker Act over due process claim because it was contractually based); *see also, e.g.*, *Consol. Edison Co. of New York v. U.S., Dep't of Energy*, 247 F.3d 1378, 1385-86 (Fed. Cir. 2001) (directing district court to transfer case

---

[5] For those agencies that did not provide Harvard funding after adoption of the 2024 version, such as the Department of Education, the Harvard grants were operating under the 2020 version of the Uniform Guidance. There, the Departments terminated those grants pursuant to then 2 C.F.R. 200.340(a)(2), which provides the Government arguably even stronger authority to terminate the grants "to the greatest extent authorized by law, if an award no longer effectuates the programs goals or agency priorities."

asserting constitutional, including due process, claims to the Court of Federal Claims in a case sounding in contract because "the Court of Federal Claims can supply an 'adequate remedy' to prevent the constitutional wrongs alleged by [plaintiff]"). And the Court of Federal Claims can consider that constitutional issue in the context of determining whether Harvard is entitled to relief., *e.g.*, whether the agreements were improperly terminated. The Court should not allow Plaintiffs to invoke its jurisdiction by repacking contract claims as constitutional challenges.

And, because Plaintiffs' essentially raise contract claims, Plaintiffs' constitutional claims must fail for an additional reason. The Constitution does not provide a cause of action for monetary damages, which is what Plaintiffs seek in this case. *See DeVillier v. Texas*, 601 U.S. 285, 291 (2024) ("Constitutional rights do not typically come with a built-in cause of action to allow for private enforcement in courts."). Moreover, where there is an alternative remedy for Plaintiffs' claims in the Court of Federal Claims, this Court should not entertain Plaintiffs' constitutional claims. if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will only decide the latter." *See Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter.").

Nor does Plaintiffs' attempt to disguise their claims as ones for "forward-looking equitable relief from conduct in violation of those rights" change the result. *See* Pls' Mem. at 19; *see also Diaz v. Johnson*, No. 19-1501, 2020 WL 9437887, at *2 (1st Cir. Nov. 12, 2020) (holding that plaintiff "cannot manufacture an APA claim by asking the court to declare that the failure to fund his proposal was an arbitrary or capricious act"); *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 63 (1st Cir. 1978) ("We have concluded that the essence of the action is in contract, and plaintiff

cannot by the mystique of a different form of complaint make it otherwise" (internal quotation marks and citation omitted)). The relief Plaintiffs seek is essentially a monetary remedy. Plaintiffs' requested injunction makes clear that the essence of their action is to "set aside" "the withdrawal or cancellation of federal funds" (i.e. continue to perform on the contract). Sec. Am. Compl. (ECF No. 64) at 92.  The injunctive relief Plaintiffs requests closely match the district court's order stayed by the Supreme Court in *California*. *See California v. U.S. Dept. of Ed.*, No. 25-cv-10548, ECF No. 41 at 9-10 (D. Mass. Mar. 10, 2025) ("Defendants are temporarily enjoined from … maintaining… the termination of any previously awarded … grants for recipients in Plaintiff States, … such as suspension or withholding of any funds approved and obligated for the grants"). At bottom, in seeking an injunction to maintain payments pursuant to the schedule in a contract with the United States, Plaintiffs "want[ ] the Government to keep paying up." *U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, ---F. Supp. 3d---, 2025 WL 763738, at *5-6 (D.D.C. Mar. 11, 2025), *injunction pending appeal denied*, No. 25-5066 (D.C. Cir. Mar. 28, 2025) (per curiam). Because the claims here are "founded upon a contract" they "must be heard in Claims Court." *Id.* at *7 (citing *Sharp v. Weinberger*, 798 F.2d 1521, 1524 (D.C. Cir. 1986) (Scalia, J.) ("We know of no case in which a court has asserted jurisdiction . . . to issue an injunction compelling the United States to fulfill its contractual obligations.")).

17

## II.    Plaintiffs' Challenges to the March 31 Announcement and the April 3 and 11 Letters Fail Under the APA Because They Do Not Challenge Final Agency Actions[6]

Plaintiffs purport to challenge the agencies March 31 announcement that that they would conduct a "comprehensive review of federal contracts," and the letters of April 3 and April 11 ("Government Offer Letter") as "final agency action for which there is no other adequate remedy in court." Pls.' Mem. at 21. But, "to the extent that an APA challenge can be properly brought in this Court, the only final agency action reviewable under the APA is the letters terminating specific contracts. Plaintiffs cannot challenge a decision to review, or the April 3 and Government Offer Letter as those letters do not constitute reviewable final agency action.

The APA only permits review of "final agency action." 5 U.S.C. § 704; *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (judicial review under the APA is limited to "circumscribed, discrete" and concrete actions). To be final, the action must satisfy two conditions. First, it "must mark the consummation of the agency's decision-making process." *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). "Second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* (quoting *Bennett*, 520 U.S. at 178). The Directives fail both conditions.

For the first condition, the First Circuit recently explained in *Harper* that "investigatory measures are not final agency action," because such measures are "tentative or interlocutory in

---

[6] Plaintiffs have not named any other final agency actions in their Motion for Summary Judgment. *See* ECF No. 75. Thus, any claims of other final agency actions are waived. To the extent Plaintiffs attempt to claim in further briefing that Education Secretary McMahon's May 5, 2025 letter to Harvard was a final agency action, Defendants incorporate by reference, as fully set forth herein, the arguments raised in the related case, *President and Fellows of Harvard College v. U.S. Dep't of Justice, et al.*, No 25-v-11048, that Secretary McMahon's letter does not constitute a final agency action.

nature." *Id.* (collecting cases). The opening of a review or investigation is a preliminary step, "leading toward the possibility of a final action in the form of an enforcement or other action." *Id.* (quoting *Univ. of Med. & Dentistry of N.J. v. Corrigan*, 347 F.3d 57, 69 (3d Cir. 2003)). The final agency action would occur when the agency decides to act on an existing grant.

The March 31 announcement merely ordered a *review* of federal contracts and grants at Harvard. HHSHarv_00000007; HHSHarv_00000008; GSAHarv_00000003. Initiating a review is not the consummation of the agency's decision-making process. *Cf. Sackett v. EPA*, 566 U.S. 120, 127 (2012) (finding final agency action where a compliance order was "not subject to further Agency review"). Initiating an agency review also does not determine the grantees' rights and obligations. *See FTC v. Standard Oil Co. of California*, 449 U.S. 232, 241 (1980) (issuing a complaint and initiating enforcement proceedings did not have "definitive" legal consequences and was still subject to challenge and review). Here, too, the March 31 announcement did not definitively affect any of Plaintiffs' or their members' rights and obligations and remained subject to review.

The April 3 letter and Government Offer Letter are similarly not cognizable under the APA. As an initial matter, the Government Offer Letter "supersede[d] the terms of the federal government's prior letter of April 3, 2025," GSAHarv_00000007, and any challenge to the April 3 letter by itself is therefore moot. *See Am. Civ. Liberties Union of Mass. v. U.S. Conf. of Cath. Bishops*, 705 F.3d 44, 53 (1st Cir. 2013) (explaining that challenges ""to government regulatory schemes which have expired or been effectively repealed" are moot."). Moreover, the Government Offer Letter (and the April 3 letter, which was incorporated into the Government Offer Letter) is not reviewable because it is merely the starting bid in a negotiation that Harvard has rejected, and thus is not agency action under the APA, let alone final agency action.

19

The opening offer of a negotiation does not determine rights or obligations, nor does it have its own legal consequences. Plaintiffs—which carry the burden to show agency action—fails to demonstrate how the Government Offer Letter meets criteria for agency action. The act of a grantor sending a contract or grant proposal to a grantee is not an "agency action" as defined by the APA. It does not itself have legal effect; it is not akin to a binding rule or government order. *See* 5 U.S.C. § 551. Treating it as final agency action so would transform any contract negotiation or proposal between the Government and another party into a series of potential APA challenges and lawsuits. This is not and cannot be the law.

Fundamental principles of contract law further demonstrate that the letters sent to Harvard attempting to either negotiate a resolution of a contract dispute or resolve a broader dispute between the Government and Harvard, did not have any binding legal effect such that either parties' "rights or obligations [were] determined." *Id*. The Joint Task Force's attempt to negotiate is governed by the familiar requirements in contract formation of offer and acceptance. "An unaccepted settlement offer—like any unaccepted contract offer—is a legal nullity, with no operative effect. As every first-year law student learns, the recipient's rejection of an offer 'leaves the matter as if no offer had ever been made.'" *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66 (2013) (Kagan, J., dissenting) (quoting *Minneapolis & St. Louis R. Co. v. Columbus Rolling Mill,* 119 U.S. 149, 151 (1886)).

Here, the Joint Task Force offered terms that Harvard rejected, extinguishing any legal effect the offer may have had. *See* Gov.'s Offer Letter, GSAHarv_00000007-00000011 ("If acceptable to Harvard, this document will constitute an agreement in principle, which the parties will work in good faith to translate into a more thorough, binding settlement agreement."); Harvard's Rejection Letter, HHSHarv_0000104-05 ("Harvard will not accept the government's

terms as an agreement in principle."). Accordingly, the proposed terms are just that, a proposal. As the offered terms do not have legal effect as a contract, they cannot have legal effect as final agency action.

## III.    Plaintiffs' First Amendment Claims Fail

The Government did not violate the First Amendment by attempting to negotiate with Harvard or exercising its authority to terminate agency grants and contracts. Plaintiffs put forth three theories: (1) that Defendants' actions impermissibly coerce the University to restrict or suppress their members' speech; (2) that Defendants' actions were unconstitutional retaliation and viewpoint discrimination. Both theories fail.

As an initial matter, both theories start from the false premise that the Government is targeting protected expression and speech rather than conduct. Pls' Mem. at 40-47. But the Government has not restricted protected speech or expression on the basis of viewpoint. Quite the opposite. Rather, the Government Offer Letter, for example, asks the University, among other things, to institute "[t]ime, place, and manner rules" and forbids "any student group or club that endorses or promotes criminal activity, illegal violence, or illegal harassment." GSAHarv_00000007–011. This type of time, place, and manner regulation is "not beyond the Government's regulatory reach." *Synder v. Phelps*, 562 U.S. 443, 456-57 (2011). This is reason enough for the Court to dismiss Plaintiffs' First Amendment claims, and the APA claims premised on a First Amendment violation (Counts III and IV).

### A.    Harvard Was Not Coerced Into Suppressing Speech

Further, Harvard was not coerced by Government's actions to suppress Plaintiffs' members speech. How could it be: Harvard rejected the Government's Offer. HHSHarv_00000105. Moreover, as Harvard acknowledged in its rejection letter that it, *on its own accord*, "has made,

and will continue to make, lasting and robust structural, policy, and programmatic changes." *Id.* Any steps that Harvard has taken to suppress the speech of Plaintiffs or their members was done *on its own accord*, and was not coerced by the Government.[7]

Plaintiffs' coercion theory principally relies on *National Rifle Association v. Vullo*, 602 U.S. 175, 198 (2024), *see* Pls' Mem. at 41-45, but that case is different in kind. *Vullo* stands for the proposition that the government may not take an "adverse . . . action in order to punish or suppress [a] plaintiff's speech." *Id.* at 191. There, as alleged, the government (among other things) offered to drop "unrelated" infractions against an insurance company, in exchange for it cutting ties with gun groups, because of their speech. *Id.* at 192–93. Even at the motion to dismiss stage, Justice Jackson recognized that *Vullo* that was at the outer bounds of third-party coercion. *See id.* at 200-203 (Jackson, J., concurring). But this case, unlike *Vullo*, does not involve the government threatening coercive action against one party to get at the protected speech of a third; instead, the government is using its enforcement authority to act directly upon a regulated entity because of *that entity's* own conduct. In other words, the actions taken here – unlike in *Vullo* – relate to the University's own malfeasance (*i.e.*, failing to take sufficient action to combat antisemitism). *See Penthouse Intern., Ltd. v. McAuliffe*, 702 F.2d 925, 927–28 & n.6 (11th Cir. 1983); *cf. B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 117 n.16 (9th Cir. 2024) (instructing that *Vullo* was inapplicable to First Amendment claim because in *Vullo* the government "did not have the authority to accomplish the result it sought by direct regulation"). As the Supreme Court has held, "governmental entities may act properly in furtherance of legitimate state interests" even where there is an incidental effect on speech. *Greenwich Citizens Comm., Inc. v. Ctys. of Warren &*

---

[7] And, as explained above, Plaintiffs' allegations that the Government's negotiations with Harvard has created a subjective "chill" of their speech is insufficient to establish objective harm or a threat of specific future harm. *See supra* section I (A)(1)(b).

*Washington Indus. Dev. Agency*, 77 F.3d 26, 31 (2d Cir. 1996) (citing *Younger v. Harris*, 401 U.S. 37, 51 (1971) and *Cameron v. Johnson*, 390 U.S. 611, 619 (1968)).

Unlike in *Vullo*, there are no plausible allegations here that any of the actions taken by the agencies were done "in order to" suppress or punish protected speech, rather than to pursue a legitimate interest. Plaintiffs offer little more than *ipse dixit* assertions that facially legitimate actions were in fact prompted by improper censorious motives when no such motives are indicated in the documents terminating funding, press releases regarding the funding, or any of the communications to Harvard. Such assertions not only run headlong into the presumption of regularity, *see Nieves v. Bartlett*, 587 U.S. 391, 400–02 (2019), but also they also fail to satisfy the basic requirements of pleading, *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009) (plaintiff must marshal allegations that "invidious discrimination" was more plausible than "obvious alternative explanation[s]").

This is especially so because all of the available information supports that the agencies had—and still has—a legitimate basis for taking the actions at issue here, acting properly to ensure that taxpayer dollars are not used to support research at an institution that has demonstrated a lack of concern for the wellbeing of Jewish students. In fact, Harvard *itself* has acknowledged issues on its campus following the Hamas terrorist attacks on Israel on October 7, 2023. For example, in its 311-page report concerning ongoing antisemitism at Harvard, HHSHarv_00000162-472 ("Harvard Report"), Harvard made clear that blame falls upon Harvard faculty and administrators who frequently dismissed Jewish students' concerns or even actively engaged in antisemitic activities, and described "Harvard Schools, departments, institutes, centers, and instructors as promoting or tolerating anti-Israeli critiques that blend into animosity towards Jews." Harvard Report at 29. Requiring Harvard to take steps to ensure that students are not subjected to disruptive

and antisemitic speech is entirely appropriate. *Estate of Landers v. Leavitt*, 545 F.3d 98, 113 (2d Cir. 2009). To the extent Plaintiffs allege any effect on their speech rights, they allege only an incidental chill pursuant to the government's legitimate interest in ensuring that taxpayer funds are not used to support an institution that has failed to protect Jewish students. *Younger v. Harris*, 401 U.S. 37, 51 (1971) ("Moreover, the existence of a chilling effect even in the area of First Amendment rights, has never been considered a sufficient basis, in and of itself, for prohibiting state action.") (internal citations omitted). Indeed, Plaintiffs fail to identify any *actually* protected speech allegedly being targeted here. *See Hankard v. Town of Avon*, 126 F.3d 418, 423 (2d Cir. 1997). Antisemitic harassment is not shielded by the First Amendment. *See Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F. Supp. 3d 297, 309 (D. Mass. 2024) ("The court consequently is dubious that Harvard can hide behind the First Amendment" to cover for its "indecisive, vacillating, and at times internally contradictory [response to antisemitism].")

## B. The Agencies Would Have Terminated Harvard's Contracts Regardless of the Viewpoints Harvard Reflected in the Rejection Letter and this Lawsuit and Thus Such Termination Does Not Constitute Unconstitutional Retaliation

Because Plaintiffs' arguments concerning alleged unlawful retaliation and viewpoint discrimination mirror those made by Plaintiff in the related matter, *President and Fellows of Harvard College v. U.S. Dep't of Justice, et al.*, No. 25-cv-11048-ADB, and rely on the same administrative record, Defendants incorporate by reference, as if fully set forth herein, the arguments raised in Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment in the related case concerning these same allegations. Moreover, as noted above, Plaintiffs here lack standing to assert claims of unlawful retaliation and/or viewpoint discrimination against Harvard, and not against themselves or their members. *See Warth*, 422 U.S. at 510 ("prudential standing rule . . . normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves"). And, as

24

explained above, Plaintiffs' allegations that the Government's negotiations and actions related to Harvard have created a subjective "chill" of their members' speech is insufficient to establish objective harm or a threat of specific future harm. *See supra* section I (A)(1)(b).

## IV.    The Grant Terminations Complied with the APA

Even if the Court were to find that the agencies' actions are reviewable under the APA, Plaintiffs APA claims must fail because the agencies acted reasonably and followed proper procedures. Therefore, the Court should deny Plaintiffs' request for summary judgment on Counts I and II and instead grant judgment in Defendant's favor.

Under the arbitrary and capricious standard, the agency's decision is presumed valid, and a court reviews only whether that decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

### A.    Title VI Does Not Govern Grant Terminations Based on Policy

Plaintiffs contests that the agencies' termination of certain agreements pursuant to explicit contractual authority is precluded by the separate Title VI scheme. Not so. Plaintiffs APA claims based on Title VI must therefore be dismissed (Count 1).

As initial matter, whether Title VI is the exclusive mechanism to cut off Federal Government grant funding for Harvard's failure to address campus-wide discrimination, or whether the agencies may terminate pursuant to other terms of those contracts, is a question that should be answered by the Court of Federal Claims, not this Court. *See* 42 U.S.C. § 2000d-2

(noting that judicial review of agency action should be taken "*as may otherwise be provided by law for similar action taken by such department or agency on other grounds.*" (emphasis added).

Even if this Court were to hear the issue, it is well established that the government has broad power to contract, including imposing conditions as part of those contracts. *See United States v. Tingey*, 30 U.S. 115, 125 (1831) (Story, J.). And, according to that broad power, the Government bargained for the clause appearing in all of Harvard's contracts allowing for termination for nonalignment with policy priorities.[8]  The agencies properly determined that the clause was triggered and exercised their termination authority. The only question remaining is whether the sovereign power to contract into this clause was limited by any "prohibit[ions] by law." *Tingey*, 30 U.S. at 125.  It was not.

Plaintiffs contends that Title VI of the Civil Rights, which provides procedures for grant terminations taken *pursuant to that Act*, 42 U.S.C. § 2000d-1 (discussing a contractor's "failure to comply with a requirement imposed pursuant to *this section*") (emphasis added), somehow limited the Government's sovereign power. But the Government's terminations of Harvard's contracts were not taken pursuant to Title VI; they were taken pursuant to the Government's authority under the agreed-upon contractual clause in its contracts with Harvard— an independent contractual basis which provided the Government authority to terminate. *See, e.g.* NASA-AR03748. Harvard's attempt to assert if the Government identifies antisemitism as a reason for grant termination, then Title VI's procedures are the only mechanism by which the termination can be effectuated are without merit.  *See* Pls' Mem. at 22 (characterizing Title VI as the "only" mechanism to terminate or refuse to grant federal assistance for civil rights violations); 34 (contending that agencies may not terminate federal funds on the basis of civil rights enforcement

---

[8] *E.g.*, NASA-AR00883, at -895

without complying with Title VI). But Title VI's separate procedures do not preclude or abrogate the Government's separate contract authorities, and Plaintiffs fail to cite to any statute, regulation, or precedent that dictates otherwise.

Title VI and contract terminations for policy are based on different legal authorities and entail different procedures. Title VI of the Civil Rights Act of 1964 enacted a general requirement for recipients of federal funding that applies to all funding agreements, regardless of whether it is included as a provision of the agreement. 42 U.S.C. § 2000d. It leaves no discretion to the Government to waive its requirements, as it uses mandatory language stating that each agency is "directed to effectuate the provisions of section 2000d of this title." *Id* at § 2000d-1. Agencies are instructed to do so through the implementation of "rules, regulations, or orders of general applicability." *Id*. Notably, 2 C.F.R. § 200.340 is not a rule that was promulgated under the Title VI authority. *See Guidance for Federal Financial Assistance*, 89 Fed. Reg. 30046, 30047-48 (Apr. 24, 2024) (citing statutory authorities).

Requirements imposed by contract, by contrast to Title VI, are based on the provisions authorized by the instruments themselves. It is a discretionary choice by the agency to include the terms of 2 C.F.R. § 200.340 as a provision of the contracts it executes. While the regulations under 2 C.F.R. Subpart B may make the inclusion of the terms mandatory, those regulations themselves are a product of the agencies' discretionary choice to promulgate them. 2 C.F.R. § 1.105(c) ("Federal agency regulations in subtitle B may give regulatory effect to the OMB guidance"). The contract provisions at issue here state that "The Federal award may be terminated . . . if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). And, as with most contractual terms, the party to whose benefit those terms inures can chose to enforce or waive them as appropriate. The agency priority of not funding entities that fail to address

antisemitism does not depend on the finding of a Title VI violation, therefore there is no reason that Title VI procedures would govern these terminations or "override," Pls' Mem. at 34, the contracted for and agreed upon termination procedures spelled out by 2 C.F.R. § 200.340.

Plaintiffs provide no support for their contention that Title VI was meant to be exclusive of any contractual provisions that may also be used to address antisemitism. Plaintiffs' narrow view that Title VI provides the exclusive mechanism to address ongoing or rampant civil rights violations is at odds with congressional intent, which was to provide an independent basis to enforce its provisions, even where individual contracts failed to include such language, in an effort to maximally protect civil rights. *See AAUP et al. v. U.S. D.O.J et al.*, No 25-cv- 02429 (S.D.N.Y. June 16, 2025), ECF No. 148 at 30 ("[I]t strikes this Court as unlikely that Title VI is the sole and exclusive legal tool available to a President who instructs executive agencies to prioritize combatting anti-Semitism on university and college campuses.") (cleaned up). Given that the terminations here were not taken pursuant to Title VI, there was no obligation for the Government follow any of the procedures prescribed by that Act.

Plaintiffs' contentions that the agency's contemporaneous invocations Part 200 of the C.F.R. at the time of the funding terminations was a "post-hoc" rationalization demonstrates a lack of understanding of that term. Pls' Mem. at 33. As the Supreme Court made clear in *Dep't of Homeland Security v. Regents of the University of California*, "post hoc justifications are raised in court by those appearing on behalf of the agency or by agency officials themselves." 591 U.S. 1, 23 (2020) (citing *Am. Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490, 539 (1981). They are not the properly provided "contemporaneous explanations" provided by agencies at the time of taking a final agency action. *Id.* In their terminations, the agencies were clear that they did not rely on Title VI, but on 2 C.F.R. Part 200 and the Federal Acquisition Regulations ("FAR"). *See, e.g.*

DoDHarv_00000003. That the Government may not have quoted "agency priorities" in non-termination communications is of no moment; the Government provided a reasonable basis, and reasonably explained its justification, contemporaneous to the agencies' funding terminations. *See* Pls.' Mem. at 33; *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (the court must "uphold a decision of less-than-ideal clarity if the agency's path may reasonably be discerned" (quotation marks and citation omitted)). The contemporaneous explanations by the agencies justifying terminations were based on contractual language, not Title VI. As Title VI does not govern terminations based on contract provisions entered into under 2 C.F.R. § 200.340, and the Government's reliance upon that that authority was stated contemporaneously with the challenged actions, Plaintiffs' argument that the Government violated Title VI must fail.

Plaintiffs further allege that even if the Title VI procedures do not apply, the Government's reliance of 2 C.F.R. § 200.340 violated the APA because it "departed from longstanding practice governing civil rights enforcement relating to federal funding recipients" and "failed to explain why Harvard's federal funding no longer effectuates agency priorities." Pls' Mem. at 38-40. Plaintiffs however, cite no authority as to why the Executive Branch may not include combatting antisemitism amongst its "agency priorities" within the meaning of 2 C.F.R. § 200.340(a)(4). Like the district court in New York, this Court should find no such limitation on agency priority. *See AAUP et al. v. U.S. DOJ, et al.*, No. 25-cv-02429 (S.D.N.Y June 16, 2026), ECF No. 148 at 29. However, as explained above, the Government's broad power to contract has been long recognized and includes the authority to impose conditions as part of those contracts. *See Tingey*, 30 U.S. 115, 125 (1831) (Story, J.). That the Government has chosen to exercise a contractual provision is not novel and is appropriate under long established contract law. And, while "Congress intended Title VI to be a typical 'contractual' spending-power provision," *Guardians Ass'n v. Civil Serv.*

29

*Comm'n*, 463 U.S. 582, 599 (1983), there is nothing to suggest Title VI was meant to be exclusive of any contractual provisions that may also be used to address discrimination.

**B.    The Freeze Orders and Terminations Do Not Violate the APA Because They Were Reasonable Exercises of the Government's Authority to Terminate for Nonalignment with Agency Priorities**

**1.   <u>The grant terminations were not arbitrary and capricious</u>**

Review under the arbitrary and capricious standard is "deferential," *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) and simply examines whether the agency's decision "was the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983). The funding termination here meets this standard, particularly in the context of discretionary grants, where the Government unquestionably enjoys wide latitude to determine how best to implement the program.

As discussed above, Defendant agencies' individual termination decisions are the only challengeable final agency action, and they meet the APA's limited standard. The administrative record demonstrates that the termination decisions followed a "comprehensive review of Federal contracts with certain institutions of higher education that are being investigated for potential infractions and dereliction of duties to curb or combat anti-Semitic harassment, including Harvard University" pursuant to the February 3, 2025, Executive Order on combatting antisemitism. GSAHarv_00000003-4. In the context of discretionary grants, each agency enjoys wide latitude to determine how best to implement their respective program and the decision-making process for each termination. *Cf. Kreis v. Secretary of Air Force*, 866 F.2d 1508, 1514 (D.C. Cir. 1989) ("the question whether a particular action is arbitrary or capricious must turn on the extent to which the relevant statute, or other source of law, constrains agency action").

Plaintiffs contend that Defendant's freezing and termination of grants was arbitrary and capricious because the Government failed to explain their conclusion that Harvard was

noncompliant with federal civil rights laws and their decision to exercise their authority to terminate funding. Pls.' Mem. at 24-26. But a court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

Plaintiffs' assertion that the Government failed to communicate how Harvard was noncompliant with Title VI or other civil rights law is based on the same faulty premise addressed above: that the Government terminated Harvard's contracts under its Title VI authority. Not so. The Government terminated Harvard's contracts pursuant to its authority under the terms of those contracts: that funding of a University that failed to adequately address antidiscrimination on its campus and did not effectuate agency priority. A findings letter detailing Harvard's noncompliance with Title VI or other federal civil rights laws was not necessary to enforce a contractual provision. *See supra* section IV (A).

Plaintiffs' contention that the Government failed to explain their enforcement decisions, Pls.' Mem. at 26-33, or why Havard's funding failed to effectuate agency priority, Pls' Mem. at 40, is perplexing. Plaintiffs recognize in their briefings the Trump administration's priority to stomp out antisemitism on University campuses. *See* Feb. 3, 2025 Executive Order on combatting antisemitism, GSAHarv_00000003-4. And the Government's April 3 letter and April 11 Offer Letter, as well as its other communications, made clear that provided funding to an institution that had demonstrated a lack of concern for the wellbeing of Jewish students and failed to create a safe learning environment was inconsistent with agency priorities and that taxpayer dollars should not be used in this regard. *See* GSAHarv_00000005-11. Each agency then made clear that it terminated its grants to Harvard pursuant to that broader government policy concerning antisemitism at institutions of higher education and the insufficiency of Harvard's compliance with that policy.

Agencies articulated that basis for grant termination in their termination letters. *See, e.g.,* HHSHarv_00000473-4; EDHarvAR_0000011-12; ENERGY AR3929-30 (stating that each agency is "aware of recent events at Harvard University involving antisemitic action that suggest the institution has a disturbing lack of concern for the safety and wellbeing of Jewish students. Harvard's ongoing inaction in the face of repeated and severe harassment and targeting of Jewish students has ground day-to-day campus operations to a halt, deprived Jewish students of learning and research opportunities to which they are entitled, and brought shame upon the University and our nation as a whole. Indeed, as the Harvard Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias concluded, actions at Harvard during the 2023-2024 academic year resulted in widespread abuse of Jewish and Israeli students by an institution 'that mainstreamed and normalized what many Jewish and Israeli students experience as antisemitism and anti-Israeli bias.'"). In fact, the agencies relied on Harvard's own finding that "actions at Harvard during the 2023-2024 academic year resulted in widespread abuse of Jewish and Israeli students by an institution that 'mainstreamed and normalized what many Jewish and Israeli students experience as antisemitism and anti-Israeli bias." *Id.*

The connection between antisemitism prevention policy goals of the Administration and specific Harvard grants was also explained: government agencies do not, as a matter of policy, want to fund entities that do not take adequate actions to prevent antisemitism. GSAHarv_00000002-3; GSAHarv_00000015. Moreover, government agencies further concluded that Harvard's actions to date were inadequate, thus addressing Harvard's concerns that its efforts were not considered. *See id.*; HHSHarv_00000474; ENERGY AR3929-30. Plaintiffs may disagree with this conclusion, but it is both documented in and supported by the administrative record, which is what the APA requires. The record, therefore, demonstrates that "the agenc[ies] . . .

articulate[d] a 'rational connection between the facts found and the choice made.'" *Bowman Transp.*, 419 U.S. at 285 (citation omitted). Under this permissive standard, the Court must uphold the agencies' grant terminations. The record, therefore, demonstrates that "the agenc[ies] . . . articulate[d] a 'rational connection between the facts found and the choice made.'" *Bowman Transp.*, 419 U.S. at 285 (citation omitted). Under this permissive standard, the Court must uphold the agencies' grant terminations.

### 2.  <u>The April 3 and April 11 Letters were not arbitrary and capricious</u>

Plaintiffs allege only in passing that the April 3 and the Government Offer Letter were arbitrary and capricious because of the decision to issue them contained "incoherent and conclusory rationale." Pls' Mem. at 20. Any further argument concerning this is wholly undeveloped and is therefore waived. *See United States v. Mayendia-Blanco,* 905 F.3d 26, 32 (1st Cir. 2018) ("[I]t is a well-settled principle that arguments not raised by a party in its opening brief are waived.").

Further, as explained above, the April 3 and Government Offer Letters were not final agency actions subject to APA review. *See supra* section II. Moreover, as detailed above, the Government had justifiable concerns about antisemitism on Harvard's campus. *See supra* Background. Harvard has essentially admitted via its own report that the Government's concerns were justified. *See* HHHSHarv_00000162-472. Plaintiffs fail to explain why engaging in negotiations to advance a legitimate government interest — the eradication of antisemitism on the University campus — does not represent reasoned decision-making. The issuance of the April 3 and Government Offer Letter, and any other challenged communications with Harvard, does not violate the APA.

3.  **The agencies did not fail to consider important aspects of the problem or reliance interests before terminating funding.**

Plaintiffs also contends that the Government's actions were arbitrary and capricious because the Government did not consider (1) "an important aspects of the problem," namely the ways that funding terminations "undermine" agency priorities, Pls' Mem. at 40; and (2) the reliance interests of Plaintiffs' members, Pls' Mem. at 31.  Starting with the latter, Plaintiffs' allegation that the Government never considered their members' reliance interests is fundamentally flawed: Plaintiffs have not explained how they could develop such interests in grants to a third party (Harvard) that could expressly be terminated in the Government's discretion. *See* Pls' Mem. at 31-33; *see also, e.g.*, *Tennessee v. Becerra*, 131 F.4th 350, 370 (6th Cir. 2025) ("Tennessee likely has no legally cognizable reliance interest in the receipt of a *discretionary* funding award on the conditions that it prefers.") (emphasis in original). Each grant incorporates, as part of its terms and conditions, the termination provisions of 2 C.F.R. § 200.340. Most significantly, this regulation states that an award could be terminated at any time "if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4).

But even if Plaintiffs could, somehow, have a reliance interest in third party grants, federal agencies maintain substantial discretion in determining how much weight to give those interest. *Regents of Univ. of Cal.*, on which Plaintiffs rely, affirms that fact. In *Regents*, involving a challenge to the recission of the Deferred Access to Childhood Arrivals (DACA) program, the Supreme Court noted that DACA recipients had made significant economic, personal, and financial commitment "in reliance on the DACA program." *See* 591 U.S. at 31. But even there, the Supreme Court emphasized that while "[t]hese are certainly noteworthy concerns, . . . they are not necessarily dispositive." *Id.*  Rather, the agency may determine that other interests and policy concerns outweigh any reliance interests, or it *may accord them no or diminished weight*. *Id.* at 32

(emphasis added). Plaintiffs' reliance interests in Harvard's federal funding must be judged in light of the legal framework under which they are given and taken away. Because federal grants and the terms and conditions to which they are subject provide the agencies substantial discretion in their termination and because there is no right to future grants, the agencies did not clearly err in judging that any reliance interest in continued federal funding would be unjustified.

Turning next to Plaintiffs' contention that Defendants failed to consider the benefits that grants to Harvard have on agency priorities, the record demonstrates that the agencies adequately considered the benefit of federally funded research on the Government and the public. *See* Government's Offer Letter, HHSHarv_00000098 ("The United States has invested in Harvard University's operations because of the value to the country of scholarly discovery and academic excellence."). In making its decision, however, the agencies concluded that the inadequacy of Harvard's efforts to address antisemitism on campus—an important government interest— outweighed the Government's interests in maintaining certain existing federal grants and contracts. *See* "April 14 Press Release", GSAHarv_00000012-13. This weighing of interests is vested in the agencies, even if the plaintiff (or the court) would have weighed those interests differently. *See State*, 463 U.S. at 43 ("[The court] may not supply a reasoned basis for the agency's action that that agency itself has not given ... [and should] ... uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." (internal citations omitted)). While Plaintiffs may believe that terminating Harvard's contracts "undermines" agency priorities, this Court should not accept Plaintiffs' invitation to do what the Supreme Court has said it may not: "substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

V.    **Plaintiffs' Second Amended Complaint Asserts No Viable Separation of Powers or Spending Clause Claim**

Plaintiffs' decision not to seek summary judgment on Counts V-VIII of their Second Amended Complaint after review of the Administrative Record is telling. Plaintiffs' claims are unsupported and summary judgment should be granted to Defendants.

This Court should grant Defendants summary judgment on Plaintiffs' separation of powers and spending clause claims, as well as the associated APA claim. Sec. Am. Compl. (ECF No. 64). Plaintiffs' separation of powers argument fails for independent reasons. *First*, the Executive has both express and implied authority to terminate individual grants. *Second*, plaintiffs' separation of powers and spending clause arguments are merely repackaged claims under Title VI, which fail for the reasons outlined above. *See AAUP, et al. v. U.S. Dep't of Justice*, No. 25-cv-02429-MKV (S.D.N.Y. June 16, 2025), ECF No. 148 at 29-30 (denying AAUP's separation of powers claims, premised on a failure to comply with Title VI procedural requirements, on the faulty presumption that Title VI is the "sole and exclusive 'legal tool []'" for the Executive Branch to combat antisemitism).

In addition, the Government's cancellation of funding due to concerns regarding compliance with antidiscrimination laws is entirely proper. "Congress has broad power under the Spending Clause of the Constitution to set the terms on which it disburses federal funds. '[L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the [recipients] agree to comply with federally imposed conditions.'" *Cummings v. Premier Rehab Keller*, P.L.L.C., 596 U.S. 212, 216 (2022) (quoting *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981)). And "when the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all

that he possesses in his own right plus all that Congress can delegate." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015).

For example, Congress specifically charged the Secretary of Health and Human Services, through the Director of the National Institutes of Health, with responsibility "for the overall direction of the National Institutes of Health and for the establishment and implementation of general polices respecting the management and operation of programs and activities within the National Institutes of Health." 42 U.S.C. § 282(b)(1). The Director of NIH also "shall, in consultation with the heads of the national research institutes and national centers, be responsible for program coordination across the national research institutes and national centers, including conducting priority-setting reviews, to ensure that the research portfolio of the National Institutes of Health is balanced." 42 U.S.C. § 282(b)(3). Taken together these two provisions explicitly authorize Executive to wield significant discretion in setting agency priorities, including terminating grants.

Congress knows how to write laws that constrain Executive Branch discretion, including laws that mandate inclusion of terms in agency contracts. *Am. Tel. and Tel. Co. v. United States*, 124 F.3d 1471, 1478 (Fed. Cir. 1997), aff'd, 307 F.3d 1374 (Fed. Cir. 2002). Congress did not do so with respect to the Defendant agencies' contracts with Harvard. *See Brendsel v. Off. of Fed. Hous. Enter. Oversight*, 339 F. Supp. 2d 52, 65 (D.D.C. 2004) (Congress' "silence is controlling"). Rather, Congress left the agencies with significant discretion to contract, including to administer grants, and did not cabin agency discretion to terminate grants. Thus, no separation of powers or spending clause concerns exists.

Nor can Plaintiffs bring an *ultra vires* claim to challenge alleged constitutional violations in the context of Harvard's grant terminations, not only because of their lack of standing, but also

because such a claim is precluded by the Tucker Act. Congress's grant of equity jurisdiction to the federal courts is confined to the relief that "was traditionally accorded by *courts of equity*," *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318-19, 329 (1999) (emphasis added). Actions to enforce contractual rights are actions at law. *See Devillier v. Texas*, 601 U.S. 285, 292 (2024) ("the mere fact that the Takings Clause provided the substantive rule of decision for the equitable claims in those cases does not establish that it creates a cause of action for damages, a remedy that is legal, not equitable, in nature."). Regardless, "[t]he power of federal courts in equity to enjoin unlawful executive action is subject to express and implied statutory limitations." *Armstrong v. Exceptional Child Center, Inc. et al.*, 575 U.S. 320 (2015) at 328.

Here, Plaintiffs request that this Court reimpose the agencies' obligations to pay money to Harvard. As discussed above, these are contract-based claims for money damages that belong in the Claims Court. *California*, 145 S. Ct. 966 (2025) (citing *Great-West Life & Annuity Ins.*, 534 U.S. at 210-12). The Tucker Act "displace[d] the equitable relief" that Plaintiffs seek and remains available to Harvard. Thus, where Congress has provided another vehicle for Harvard to effectuate its rights, there is no basis to provide freestanding, equitable remedies absent (and contrary to) congressional direction. And, as noted above, "if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will only decide the latter." *Ashwander*, 297 U.S. at 347 (Brandeis, J. concurring).

This Court should grant judgment in favor of Defendants on Counts V and VI of Plaintiffs' Second Amended Complaint.

## VI.    Plaintiffs Have Failed to Establish a Due Process Violation

In their Complaint, Plaintiffs make sweeping Fifth Amendment Due Process challenges, alleging that their members have been deprived of a constitutionally protected property interest in

Harvard's funding and a reasonable opportunity to be heard, and that the Defendants' actions establish vague standards of what conduct was forbidden to avoid grant terminations. Plaintiffs' fail at the threshold and on the merits.

To begin with, the void-for-vagueness doctrine "guarantees that ordinary people have 'fair notice' of the conduct a *statute* proscribes." *Sessions v. Dimaya*, 584 U.S. 148, 155-56 (2018) (plurality) (emphasis added). Although courts have applied this doctrine outside of the statutory context, they have done so only with respect to regulations of primary conduct. *See, e.g.*, *FCC v. Fox Television Stations, Inc*., 567 U.S. 239, 253 (2012) ("A fundamental principal in our legal system is that laws *which regulate persons or entities* must give fair notice of conduct that is forbidden or required.") (emphasis added) (citations omitted). There is good reason for the doctrine's limited reach. The Due Process Clause prohibits uneven enforcement, and ensures notice, of requirements with which the public must comply. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). But here, the Government's funding terminations do not regulate Plaintiffs' members' conduct. Instead, the termination of Harvard's grants only reflects the Government's decisions about what agreements it chooses to fund or terminate. The directions neither require nor prohibit any actions from Plaintiffs' members; they remain free to engage in their conduct without penalty.

Plaintiffs' due process claim fails for the additional reason that they do not have a constitutionally protected interest in the grants and contracts at issue. In order to state a due process claim, Plaintiffs must, as an initial step, "allege the deprivation of a constitutionally protected interest." *Abramson v. Pataki*, 278 F.3d 93, 99 (2d Cir. 2002). To have a constitutionally protected interest in a particular benefit "a person clearly must have more than an abstract need or desire for it. He must have more than unilateral expectation of it. He must, instead, have a legitimate claim

of entitlement to it." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Plaintiffs allege a constitutionally protected interest in the grants and contracts between the federal government and Harvard. Sec. Am. Compl. ¶¶ 350.

While the Supreme Court has identified a narrow set of government benefits protected under the Due Process Clause, it has not extended this protection to "'ordinary' or 'routine' government contracts." *Gizzo v. Ben-Habib*, 44 F. Supp. 3d 374, 385 (S.D.N.Y. 2014); *see also Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1, 10 (1st Cir. 2005) ("We have held with a regularity bordering on the echolalic that a simple breach of contract does not amount to an unconstitutional deprivation of property."); *see also Nat'l Urban League et al. v. Trump et al.*, 2025 WL 1275613, at * 18 ("Plaintiffs offer no reason to think their contracts and grants . . . are different from the millions of government contracts in effect at any point in time to which courts seldom apply due-process principles.") (cleaned up).

Researchers, such as Plaintiffs' members, do not have a property interest in grants between the federal government and the grantee institution. *Kalderon v. Finkelstein*, 495 Fed. App'x 103, 106-107 (2d Cir. 2012) (dismissing plaintiff's Fifth Amendment due process claim because plaintiff, a researcher, did not have a property interest in a grant between NIH and plaintiff's employer, a university); s*ee also Xie v. University of Texas M.D. Anderson Cancer Ctr.*, No. 20-20622, 2021 WL 5968648, at *4 (5th Cir. Dec. 15, 2021) (holding that faculty at an institution receiving a federal grant do not have a property interest in the grant and noting that "other circuits have rejected arguments that faculty have a property interest in research grants.") (citing *Lewis v. Wash. State Univ.*, 586 F. App'x 271, 271 (9th Cir. 2014)). Here, as in *Kalderon*, Plaintiffs fail to identify any statutory source that entitles them—rather than the University—to a property interest in the grants and contracts at issue.

Finally, Plaintiffs seemingly intend to invoke a vagueness standard that pertains to government enforcement actions. But, in *Nat'l Endowment for the Arts v. Finley*, the Supreme Court rejected the application of that demanding vagueness standard in the context of government funding decisions. *See* 524 U.S. 569, 588-89 (1998) ("The terms of the provision are undeniably opaque, and if they appeared in a criminal statute or regulatory scheme, they could raise substantial vagueness concerns. . . . But when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe."); *see also id.* (cautioning that "[t]o accept [plaintiffs'] vagueness argument would be to call into question the constitutionality of . . . valuable Government programs and countless others like them" that "award[] scholarships and grants on the basis of subjective criteria such as 'excellence'"); *Nat'l Urban League*, 2025 WL 1275613, at *18-*19 (refusing to apply more demanding vagueness standards to government funding directives).

For these reasons, their due process claim must be dismissed, and summary judgment on Counts VII and VIII must be granted in favor of Defendants.

## VII.  Under the APA, the Appropriate Remedy is Limited to the Agency Action Giving Rise to the Suit Rather than a Forward-Looking Injunction

Plaintiffs allege that absent a permanent injunction, their members will suffer irreparable harm. Pls' Mem. at 47-48. While a First Amendment freedoms . . . unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.), as detailed above, Plaintiffs have failed to demonstrate irreparable harm in the form of an actual or imminent loss of First Amendment freedoms caused by the Government. Further, Plaintiffs do not sufficiently tie their vague allegations of chilled speech to the relief they actually seek through this preliminary injunction, restoration of federal funding. Plaintiffs' allegations are too speculative to warrant prospective injunctive relief." *See Hankard*, 126 F.3d at 424 ("The chilling effect alleged by the

41

plaintiffs is speculative, indirect and remote."); *New Mexico v. Musk*, No. 25 Civ. 429 (TSC), 2025 WL 520583, at *3 (D.D.C. Feb. 18, 2025) (declining to issue preliminary injunction because "the possibility that Defendants *may* take actions that irreparably harm Plaintiffs is not enough.") (emphasis in original) (internal quotation marks omitted)).

It is a bedrock principle of equity that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiff." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). The remedy for a successful APA challenge is limited to relief from the challenged the agency action. The APA does not provide district courts "jurisdiction to order specific relief," including the award of or performance of a contract. *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005). "Thus, 'under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the correct legal standards.'" *Id.* (quoting *City of L.A. v. Shalala*, 192 F.3d 1045, 1011 (D.C. Cir. 1999). Thus, any relief should be limited to remedying improper agency action and must leave intact the Executive Branch's discretion to engage in further consideration of the topic at hand and consider other future agency actions consistent with law.

A permanent injunction would constitute an extraordinary remedy in this case. As the D.C. Circuit has observed, a "decision by the court to vacate an agency's adjudication . . . would usually result in a remand for further administrative proceedings, and we have explained that it is sometimes appropriate to let an agency correct an error before judicial determination of the merits." *Utah ex rel. Cox v. Env't Prot. Agency*, No. 23-1157, 2025 WL 1354371, at *4 (D.C. Cir. May 2, 2025); *see also Util. Solid Waste Activities Grp. v. Env't Prot. Agency*, 901 F.3d 414, 436 (D.C. Cir. 2018) ("Remand has the benefit of allowing agencies to cure their own mistakes rather

than wasting the courts' and the parties' resources reviewing a record that both sides acknowledge to be incorrect or incomplete." (quoting *Ethyl Corp. v. Browner*, 989 F.2d 522, 524 (D.C. Cir. 1993))), *judgment entered*, 2018 WL 4158384 (D.C. Cir. Aug. 21, 2018). These same principles apply for grant terminations were this Court to find that the terminations constituted final agency action and violated the APA. If any relief is warranted, it should be targeted to the challenged grant terminations and permit the agency to revisit their decisions, with any corrections as necessary. Vacatur of the challenged actions achieves the aims of judicial efficiency and appropriately circumscribes the relief to the challenged agency actions.

On the other hand, a permanent injunction barring Defendants from taking "any similar action" is a vague and unreasonable request for relief. *See Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 52 (2d Cir. 1996) (vacating an injunction as vague and requiring that injunctions "be specific in terms" and "describe in reasonable detail . . . the acts or acts sought to be restrained."). It would also potentially prevent the Defendants from curing any potential violation in the future, *i.e.*, with additional explanation or after additional or different process. *See, e.g., New York v. Trump*, --- F. Supp. 3d --- , No. 25-cv-39, 2025 WL 715621, at *16 (D.R.I. Mar. 6, 2025) ("The Court's order does not prevent the Defendants from making funding decisions in situations under the Executive's actual authority in the applicable statutory, regulatory, or grant terms[.]") (citation omitted)), *appeal filed*, No. 25-1413 (1st Cir. Apr. 28, 2025)); *see also New York v. Trump*, 133 F.4th 51, 71 n. 16 (1st Cir. Mar. 26, 2025) (emphasizing that "the preliminary injunction clearly refers to a 'categorical pause or freeze of funding,' which, by its terms, could not apply to a pause or freeze based on an individualized determination under an agency's actual authority to pause such funds").

Should this Court issue permanent injunctive relief, that relief should address only sufficiently and specifically proven irreparable harms by the Plaintiffs. That the Plaintiffs are membership associations does not warrant extending injunctive relief to every member of that association or beyond. Nor does irreparable harm resulting from one grant termination warrant a preliminary injunction for all other terminations. Moreover, given that many of the declarations only discuss harms insufficient to justify a permanent injunction, this Court should tailor any injunction to the irreparable harms proven (and to the Plaintiffs' members that proved it). Moreover, this Court should order Plaintiffs to post a bond adequate to compensate the Government in the event that the injunction is overturned on appeal or otherwise. *See* Fed. R. Civ. P. 65(c).

**VIII.    There is no ripe dispute as to Defendants Bondi and U.S. Department of Justice.**

For the reasons outlined in Defendants' Cross Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment in the related case, *President and Fellows of Harvard College v. U.S. Dep't of Justice, et al.*, No. 25-cv-11048-ADB, this Court should dismiss the claims against Defendants Bondi and the Department of Justice. As Plaintiffs have acknowledged in their Statement of Undisputed Material Facts, the Administrative Record has shown that DOJ has not cancelled any contracts awarded to Harvard or other final agency action ripe for this Court to review. ECF No. 76 ¶¶ 55-56.

**CONCLUSION**

For the foregoing reasons, the Government respectfully requests the Court deny Plaintiffs' Motion for Summary Judgment (ECF No. 74) and grant the Government's Cross-Motion for Summary Judgment.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

Dated: June 16, 2025                    By:    /s/ Anuj K. Khetarpal
ANUJ K. KHETARPAL
Assistant United States Attorney
U.S. Attorney's Office
1 Courthouse Way, Ste. 9200
Boston, MA 02210
(617) 748-3658
Anuj.Khetarpal@usdoj.gov

## CERTIFICATE OF SERVICE

I, Anuj K. Khetarpal, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ Anuj K. Khetarpal
ANUJ K. KHETARPAL
Assistant U.S. Attorney

Dated:  June 16, 2025