**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS— HARVARD FACULTY CHAPTER, et al. | |
| *Plaintiffs*, | Case No. 1:25-CV-10910-ADB |
| v. | |
| UNITED STATES DEPARTMENT OF JUSTICE, et al., | |
| *Defendants*. | |

**DEFENDANTS' LOCAL RULE 56.1 RESPONSE TO PLAINTIFFS' LOCAL RULE 56.1
STATEMENT OF UNDISPUTED MATERIAL FACTS AND IN SUPPORT OF
DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, Plaintiffs state the following material facts as to which there is no genuine dispute in support of their Motion for Summary Judgment:

**I.     After his inauguration, President Trump and his administration moved quickly to punish American universities that did not bend to his demands.**

1.      On January 29, 2025, President Trump signed Executive Order 14188, titled "Additional Measures to Combat Anti-Semitism." *See* HHSHarv_00000001.[1]

**Response: Defendants admit or have no basis to dispute.**

2.      Executive Order 14188 requires the heads of all executive agencies or departments to submit reports identifying all civil and criminal authorities or actions within their jurisdictions "that might be used to curb or combat anti-Semitism, and containing an inventory and analysis of all pending administrative complaints, as of the date of the report, against or involving institutions

---

[1] Citations to Bates stamped documents are those produced by Defendants in the administrative record. The parties have agreed to file a joint excerpt of all cited portions of the administrative record at the close of briefing.

of higher education alleging civil-rights violations related to or arising from post-October 7, 2023, campus anti-Semitism." *Id.*

      **Response: Defendants admit or have no basis to dispute.**

      3.    Executive Order 14188 explicitly reaffirmed Executive Order 13899, which President Trump issued on December 11, 2019, during his first term. Executive Order 13899 specifically invokes Title VI enforcement as the means for agencies to combat antisemitism on university campuses. *Id.*

      **Response: Defendants admit or have no basis to dispute.**

      4.    On February 3, 2025, DOJ[2] announced the creation of a multi-agency "Task Force to Combat Anti-Semitism," led by Defendant Leo Terrell, to carry out the mandate of Executive Order 14188. Ex. 1. The DOJ Task Force includes representatives from GSA, DOJ, ED, and HHS.

      **Response: Defendants admit or have no basis to dispute.**

      5.    On March 3, 2025, HHS, ED, and GSA announced a "comprehensive review of Columbia University's federal contracts and grants in light of ongoing investigations for potential violations of Title VI of the Civil Rights Act." Ex. 2 at 2. The announcement did not point to any specific allegations of "antisemitic harassment." *Id.*

      **Response: Disputed. Material cited cannot be presented in a form that would be admissible in evidence. Cited material contains allegations of "relentless harassment of Jewish students" and that "Jewish students have been assaulted and harassed."**

      6.    On March 4, 2025, President Trump posted on Truth Social:

> All Federal Funding will STOP for any College, School, or University that allows illegal protests. Agitators will be imprisoned/or permanently sent back to the country from which they came. American

---

[2] Capitalized terms not defined herein have the meaning assigned in Plaintiffs' Second Amended Complaint, Dkt. 64.

students will be permanently expelled or, depending on the crime, arrested. NO MASKS! Thank you for your attention to this matter.

Ex. 3.

**Response: Defendants admit or have no basis to dispute.**

7.      On March 7, 2025 DOJ, HHS, ED, and GSA announced the "immediate cancellation of approximately $400 million in federal grants and contracts to Columbia University due to the school's continued inaction in the face of persistent harassment of Jewish students." Ex. 4 at 3. The announcement stated that these cuts "represent the first round of action and additional cancellations are expected to follow." *Id.*

**Response: Defendants admit or have no basis to dispute.**

8.      The press release announcing the action stated, "decisive action by the DOJ, HHS, ED, and GSA to cancel Columbia's grants and contracts serves as a notice to every school and university that receives federal dollars that this Administration will use all the tools at its disposal to protect Jewish students and end anti-Semitism on college campuses." *Id*. at 4.

**Response: Defendants admit or have no basis to dispute.**

9.      On or about March 9, 2025, Defendant Terrell stated: "We are going to bankrupt these universities. We are going to take away every single federal dollar. That is why we are targeting these universities." Ex. 5 at 1:41. He further stated, "The academic system in this country has been hijacked by the left, has been hijacked by the Marxists. They have controlled the mindset of our young people … and we have to put an end to it," *id.* at 2:41, and that "If these universities do not play ball, lawyer up, because the federal government is coming after you," *id.* at 4:17. He concluded, "President Trump is going after [the universities] in every aspect … this taskforce is every agency … Homeland Security is involved, the FBI is involved, HHS, the [Education]

department, and the Treasury department because we are going to go after their 501(c)(3) status …. This is my number one commitment." *Id.* at 6:35.

      **Response: Defendants admit or have no basis to dispute.**

10.     On March 10, Defendant ED issued a press release stating that it had sent letters to Harvard and fifty-nine other universities "warning them of potential enforcement actions if they do not fulfill their obligations under Title VI of the Civil Rights Act to protect Jewish students on campus." Ex. 6 at 1.

      **Response: Defendants admit or have no basis to dispute**.

11.     In a March 19, 2025 interview, Defendant Terrell was asked if it was his "intention" to "get a consent decree where Columbia gets a new law school dean, they get a new president, a new board, a new department of history, a new set of reasonable time, place, and manner regulations for a [sic] speech on campus that ban masks." Ex. 7 at 9:31–9:43. Terrell answered, "Yes, yes, and yes." *Id.* at 9:59.

      **Response: Defendants admit or have no basis to dispute.**

12.     In the same interview Defendant Terrell stated, "what we did was we basically gave them noticed [sic], and we stopped providing the funding. And I've got news for you. To Harvard, to NYU, to Michigan, same thing's happening to them. It's going to happen, because we're going to look at the numbers of federal dollars, and … it totals in the hundreds of millions of dollars. And we're going after them." *Id.* at 4:12–4:34.

      **Response: Defendants admit or have no basis to dispute.**

13.     The interviewer later asked, "Who's the next target? I want it to be Harvard, and I want it to be Michigan, and I want it to be UCLA, but I don't get to pick the targets .... Who's the next target?" Defendant Terrell answered, "It's one of those three schools. I can't disclose it right

now, because I'll get in trouble. But one of those three schools. I just gave you some breaking news." *Id.* at 11:34–11:53.

      **Response: Defendants admit or have no basis to dispute**.

## II.    Defendants freeze and ultimately terminate federal funding to Harvard on the basis of alleged civil rights violations despite undertaking no related investigative activities.

    14.    On March 31, Defendants HHS, ED, and GSA announced that they were "reviewing" Harvard's federal funding for failures to address antisemitism. GSAHarv_00000001–002.

      **Response: Defendants admit or have no basis to dispute**.

    15.    This March 31 announcement included the following statements from Defendants Linda McMahon, Sean Keveney, and Josh Gruenbaum:

> "Harvard has served as a symbol of the American Dream for generations—the pinnacle aspiration for students all over the world to work hard and earn admission to the storied institution," said Secretary of Education Linda McMahon. "Harvard's failure to protect students on campus from anti-Semitic discrimination—all while promoting divisive ideologies over free inquiry—has put its reputation in serious jeopardy. Harvard can right these wrongs and restore itself to a campus dedicated to academic excellence and truth-seeking, where all students feel safe on its campus."
>
> ...
>
> "The Task Force will continue its efforts to root out anti-Semitism and to refocus our institutions of higher learning on the core values that undergird a liberal education," said HHS Acting General Counsel and Task Force member, Sean Keveney. "We are pleased that Harvard is willing to engage with us on these goals."
>
> ...
>
> "Hate in any form goes against the foundational principles of America. While Harvard's recent actions to curb institutionalized anti-Semitism—though long overdue—are welcome, there is much more that the university must do to retain the privilege of receiving federal taxpayer's hard earned dollars," said FAS Commissioner and Task Force Member, Josh Gruenbaum. "This administration has proven that we will take swift action to hold institutions accountable if they

allow anti-Semitism to fester. We will not hesitate to act if Harvard fails to do so."

GSAHarv_00000001–002.

> **Response: Defendants admit or have no basis to dispute.**

16.    The same day, Defendant Gruenbaum sent a memorandum to the president of Harvard, Alan Garber, stating the following:

> Pursuant to President Trump's Executive Order "Additional Measures to Combat Anti-Semitism", on February 3, 2025, a multi-agency Task Force to Combat Anti-Semitism was created, consisting of the Departments of Justice, Education, Health and Human Services, and the General Services Administration. GSA is leading a Task Force comprehensive review of Federal contracts with certain institutions of higher education that are being investigated for potential infractions and dereliction of duties to curb or combat anti-Semitic harassment, including Harvard University.
>
> In light of this review, the Federal Government is ready to work with each appropriate contracting agency on the potential issuance of Stop Work Orders for all contracts identified in the attached schedule, which total $255.6 million of contract ceiling value. In addition, we are requiring you to send a list of all other contracts between the Federal Government and Harvard University or its affiliates which are not listed on the schedule to GSA's Federal Acquisition Service Commissioner and Task Force member, Josh Gruenbaum. Commissioner Gruenbaum will lead GSA's review. All materials should be sent to: universitycontracts@gsa.gov. Please be advised that alongside our fellow agencies, we will also be reviewing the greater than $8.7 billion of multi-year grant commitments between Harvard University, its affiliates and the Federal Government for potential compliance concerns, false claims or other infractions.
>
> The Federal Government reserves the right to terminate for convenience any contracts it has with your institution at any time during the period of performance. Additionally, the Federal Government reserves the right to take any relevant administrative action it deems necessary in response to any wrongdoing identified during the pendency of the investigations.

GSAHarv_00000003.

> **Response: Defendants admit or have no basis to dispute.**

17.    On April 2, Defendant Keveney sent counsel for Harvard a document. Under the heading "Already Done by Harvard" this document listed the following bullets (restated here verbatim):

- Did not renew MOU with Birzeit University in West Bank.
- Faculty/Programs
  - Center for Middle Eastern Studies leadership dismissed.
  - Leadership of Religion and Public Life program at the Harvard Divinity School "departed suddenly" earlier this year.
  - Suspended Religion, Conflict, and Peace Initiative at HDS to "to rethink its focus and reimagine its future."
- Antisemitism lawsuit settlement implementation
  - Appoint an employee at its Office for Community Conduct to supervise and consult on antisemitism complaints.
  - Annual public report of Title VI violations and its response to those violations
  - IHRA definition + antisemitism trainings. Clarifying that Jewish and Israeli students are covered by existing policy.
  - Establish additional partnerships in Israel.
  - Investing additional resources
- Strengthened time, place, manner restrictions and enforcement.
  - Library demonstrations and classroom disruptions have been met with immediate consequences, including for involved faculty.
  - Librarian who removed photos of 10/7 hostages was immediately put on admin. leave and fired 2 days later.
  - Increased campus police patrols.
- Intellectual diversity.
  - FAS Dean Hoekstra told directors of FAS centers they would be required to meet with their divisional deans to explain how their programs are complying with recent guidance on intellectual diversity.
- Admissions
  - Promoting viewpoint diversity by requiring an admissions essay where applicants describe when they had a strong disagreement and how they resolved it in a tolerant manner.
  - Will return to requiring standardized test scores for admissions.
- Discipline
  - Overhauled fact-finding procedures for university disciplinary proceedings.
  - Faculty is voting this week on changes to disciplinary proceedings: only faculty trained to serve will be on disciplinary boards. There will be no appeals of disciplinary decisions short of expulsion.

HHSHarv_00005232.

**Response: Defendants admit or have no basis to dispute**.

18.    Under the heading "Menu" this document listed the following bullets (re-

stated here verbatim):

- Empower task forces/ensure reports are released. Should probably not be an ask, but we do want to have more info on why there hasn't been public movement since preliminary reports back in June '24.

- **Disciplinary reform and retrospective**.
  o Retrospective/review of discipline since 10/7. Address failures in holding rule violators accountable. Public reporting or reporting to TF.
  o Centralize discipline instead of many ad boards and faculty councils across the institution. Massively narrow scope.
  o Primacy of the presidency – appeals all end in the president's office.
  o Allow interim suspensions pending discipline or criminal proceedings when warranted.
  o Centralize complaint handling (fact finding procedures are already being standardized but not centralized).
  o Proactive enforcement, allow admin to initiate without requiring students to submit report first.
  o Zero tolerance for learning disruptions. Better enforcement of non-discrimination and anti-bullying policies.
  o More clarity on new rules – including IHRA (ensuring students understand the difference between criticism of Israel and antisemitism, and where that line may be crossed)
    ▪ Where is it posted?

- **Student group accountability**.
  o Augmented Columbia accountability ask. Unrecognized groups must be held accountable, and recognized "cutout" groups must be treated the same as suspended/unrecognized organizations.
  o Protect the Harvard trademark. Unregistered groups like HOOP should not be using school trademarks.

- **Masking.**
  o No masking for the purpose of concealing identity or intimidation. Masked students must wear ID at all times.

- **Governance reforms**.
  o Harvard Corporation/Board of Overseers.
    ▪ End gatekeeping of Overseer candidates by Harvard Alumni Association
    ▪ Promote viewpoint diversity (next slate should demonstrate this commitment).
  o Resolution/Exec Committee – subset of Corporation to negotiate, ensure implementation, and report on progress.
  o * Further governance reforms/slim down *
  o Faculty Council reforms or * abolition. *

- ▪ Transparency
  - o A university-wide faculty senate does not currently exist but is something being planned and debated. Planning body held first meeting in December, very slow progress. Thoughts?
- **"Senior vice provost" oversight/review (install new leadership in problematic depts, same goals as CU) – CHOICE btwn this and receivership**
  - o Center for Middle East Studies
  - o **FXB (François-Xavier Bagnoud Center for Health and Human Rights)**. FXB is undergoing an internal review/investigation.
    - ▪ As a result of the internal review, Harvard did not renew its MOU with Birzeit University this year, but Harvard should end that relationship in its entirety. <u>Commit to never renew.</u>
    - ▪ FXB continues to operate the Palestine Program for Health and Human Rights.
      - ● Its "Palestine Social Medicine Course" will not take place at Birzeit this year, but will likely take place in Jordan again.
  - o FAS Department of Near Eastern Languages and Civilizations
  - o FAS Ethnicity, Migration, Rights Program
  - o FAS Jewish Studies
  - o HDS Religion and Public Life Program *
    - ▪ End relationship with Dar al-Kalima University ("Decolonizing Power").
  - o Carr Center for Human Rights
- **Reporting/collaborate with Feds on foreign funding, assets, etc.**
  - o S117 FULL DISCLOSURE – formal, profs receiving foreign $, take appropriate action
  - o DHS – report ALL students and faculty
  - o Clery Act
- **Collaboration and cooperation with Boston/Cambridge PD.**
- **Elimination of all DEI**
  - o Harvard Foundation for intercultural and race relations
- **Merit-based admissions reform – TOTAL compliance with SFFA**
  - o **Comprehensive reforms.**
  - o Provide clearer guidelines.
  - o Commit to admissions study similar to Columbia, with public report.
    - ▪ Title VI admissions investigation and report (contract w/ outside org. Peter*NC)
  - o End prioritization of "activists" and DEI criteria.
- **Faculty and merit-based hiring reform**
  - o **Accountability for faculty and staff involved in rule-breaking and promoting antisemitic encampments, etc.**
  - o Tenure reform.

- o New hires (including tenure track) to promote viewpoint diversity and free exchange of ideas.
  - ▪ Commit to cluster hiring across the University (not just in one program/school).
- o Public change of stance on hiring priorities.
- o Adopt UChicago Shils report on hiring.
- o Clear guidelines on criteria for faculty hiring and tenure, with emphasis on intellectual diversity.
- o End prioritization of "activists" and DEI criteria.
- **"Legacy of antisemitism initiative"**
- **(Third-party) Monitoring and Financial Accountability**
  - o ***Senior secured 1st Lien on all Harvard assets which will serve as collateral to pay back government from Harvard in event of non-compliance in the future***
- Minimum 15 years of acceptable leadership experience to become President / head of the university

HHSHarv_00005233–5235.

**Response: Defendants admit or have no basis to dispute.**

19. On April 3, Defendants HHS, ED, and GSA sent a joint letter (the "April 3 Letter") outlining "immediate next steps that [Defendants] regard as necessary for Harvard University's continued financial relationship with the United States government" and listing nine demands "that the government views as necessary for Harvard to implement to remain a responsible recipient of federal taxpayer dollars." GSAHarv_00000005.

**Response: Defendants admit or have no basis to dispute the quoted materials. Defendants dispute the characterizations of the material as "demands."**

20. The April 3 Letter imposed the following demands (restated here verbatim):

**Oversight and accountability for biased programs that fuel antisemitism.** Programs and departments that fuel antisemitic harassment must be reviewed and necessary changes made to address bias, improve viewpoint diversity, and end ideological capture.

**Disciplinary reform and consistent accountability.** Harvard has an obligation to consistently and proactively enforce its existing disciplinary policies, ensuring that senior administrative leaders are

responsible for final decisions. Reforms must include a comprehensive mask ban (with medical and religious exemptions, given identification is always displayed) and a clarified time, place, and manner policy. Harvard must review and report on disciplinary actions for antisemitic rule violations since October 7, 2023.

**Student group accountability.** Recognized and unrecognized student groups, and their leadership, must be held accountable for violations of Harvard policy.

**Governance and leadership reforms.** Harvard must make meaningful governance reforms to improve its organizational structure to foster clear lines of authority and accountability, and to empower faculty and administrative leaders who are committed to implementing the changes indicated in this letter.

**Merit-based admissions reform.** Harvard must adopt and implement merit-based admissions policies; cease all preferences based on race, color, or national origin in admissions throughout its undergraduate, graduate, and other programs; and demonstrate through structural and personnel action that these changes are durable.

**Merit-based hiring reform.** Harvard must adopt and implement merit-based hiring policies; cease all preferences based on race, color, religion, sex, or national origin in hiring throughout its teaching and research faculty, staff, and leadership; and demonstrate through structural and personnel action that these changes are durable.

**Diversity, Equity, and Inclusion (DEI) programs.** DEI programs teach students, faculty, staff, and leadership to make snap judgments about each other based on crude race and identity stereotypes, which fuels division and hatred based on race, color, national origin, and other protected identity characteristics. All efforts should be made to shutter such programs.

**Cooperation with law enforcement.** Harvard must cooperate with law enforcement to ensure student safety.

**Transparency and reporting to ED, DHS, and other federal regulators.** Harvard must comply fully with existing statutory reporting requirements under Section 117 of the Higher Education Act, commit to full cooperation with DHS and other federal regulators, and make organizational changes as necessary to enable full compliance.

GSAHarv00000005–06.

**Response: Defendants admit or have no basis to dispute the quoted materials. Defendants dispute the characterizations of the material as "demands."**

21.     The April 3 Letter stated that "Harvard University ... has fundamentally failed to protect American students and faculty from antisemitic violence and harassment in addition to other alleged violations of Title VI and Title VII of the Civil Rights Act of 1964." GSAHarv_00000005. It concluded: "We expect your immediate cooperation in implementing these critical reforms that will enable Harvard to return to its original mission of providing a high-quality education in a safe environment for *all* students through a focus on truth-seeking, innovative research, and academic excellence." GSAHarv_00000006.

**Response: Defendants admit or have no basis to dispute.**

22.     The April 3 Letter did not point to any specific allegations of antisemitic violence or harassment and made no findings relating to any such allegations. *Id.*

**Response: Defendants do not dispute. However, the facts stated herein are not material to Plaintiff's claims as they are a characterization of the April 3 Letter, which is itself a part of the Administrative Record in this case.**

23.     Eight days later, on April 11, Defendants HHS, ED, and GSA again sent a joint letter (the "April 11 Letter" and, together with the April 3 Letter, the "Demand Letters"). GSAHarv_00000007–011. The April 11 Letter stated that "Harvard has in recent years failed to live up to both the intellectual and civil rights conditions that justify federal investment." *Id.* It also stated that the United State's investment in Harvard "depends on Harvard upholding federal civil rights laws."

**Response: Defendants admit or have no basis to dispute.**

24.    The April 11 Letter elaborated on the demands of the April 3 Letter and attempted to impose further—and even more extreme—"reforms" on "Harvard University's operations" as preconditions to "maintain[ing] Harvard's financial relationship with the federal government." *Id.*

**Response: Defendants do not dispute. However, the facts stated herein are not material to Plaintiff's claims as they are a characterization of the April 11 Letter, which is itself a part of the Administrative Record in this case.**

25.    The April 11 Letter imposed the following demands (restated here verbatim):

**Governance and leadership reforms.** By August 2025, Harvard must make meaningful governance reform and restructuring to make possible major change consistent with this letter, including: fostering clear lines of authority and accountability; empowering tenured professors and senior leadership, and, from among the tenured professoriate and senior leadership, exclusively those most devoted to the scholarly mission of the University and committed to the changes indicated in this letter; reducing the power held by students and untenured faculty; reducing the power held by faculty (whether tenured or untenured) and administrators more committed to activism than scholarship; and reducing forms of governance bloat, duplication, or decentralization that interfere with the possibility of the reforms indicated in this letter.

**Merit-Based Hiring Reform**. By August 2025, the University must adopt and implement merit-based hiring policies, and cease all preferences based on race, color, religion, sex, or national origin throughout its hiring, promotion, compensation, and related practices among faculty, staff, and leadership. Such adoption and implementation must be durable and demonstrated through structural and personnel changes. All existing and prospective faculty shall be reviewed for plagiarism and Harvard's plagiarism policy consistently enforced. All hiring and related data shall be shared with the federal government and subjected to a comprehensive audit by the federal government during the period in which reforms are being implemented, which shall be at least until the end of 2028.

**Merit-Based Admissions Reform**. By August 2025, the University must adopt and implement merit-based admissions policies and cease all preferences based on race, color, national origin, or proxies thereof, throughout its undergraduate program, each graduate program individually, each of its professional schools, and other programs. Such adoption and implementation must be durable and

13

demonstrated through structural and personnel changes. All admissions data shall be shared with the federal government and subjected to a comprehensive audit by the federal government—and non-individualized, statistical information regarding admissions shall be made available to the public, including information about rejected and admitted students broken down by race, color, national origin, grade point average, and performance on standardized tests—during the period in which reforms are being implemented, which shall be at least until the end of 2028. During this same period, the dean of admissions for each program or school must sign a public statement after each admissions cycle certifying that these rules have been upheld.

**International Admissions Reform**. By August 2025, the University must reform its recruitment, screening, and admissions of international students to prevent admitting students hostile to the American values and institutions inscribed in the U.S. Constitution and Declaration of Independence, including students supportive of terrorism or anti-Semitism. Harvard will immediately report to federal authorities, including the Department of Homeland Security and State Department, any foreign student, including those on visas and with green cards, who commits a conduct violation. As above, these reforms must be durable and demonstrated through structural and personnel changes; comprehensive throughout all of Harvard's programs; and, during the reform period, shared with the federal government for audit, shared on a non-individualized basis with the public, and certified by deans of admissions.

**Viewpoint Diversity in Admissions and Hiring**. By August 2025, the University shall commission an external party, which shall satisfy the federal government as to its competence and good faith, to audit the student body, faculty, staff, and leadership for viewpoint diversity, such that each department, field, or teaching unit must be individually viewpoint diverse. This audit shall begin no later than the summer of 2025 and shall proceed on a department-by-department, field-by-field, or teaching-unit-by-teaching-unit basis as the federal government no later than the end of 2025. Harvard must abolish all criteria, preferences, and practices, whether mandatory or optional, throughout its admissions and hiring practices, that function as ideological litmus tests. Every department or field found to lack viewpoint diversity must be reformed by hiring a critical mass of new faculty within that department or field who will provide viewpoint diversity; every teaching unit found to lack viewpoint diversity must be reformed by admitting a critical mass of students who will provide viewpoint diversity. If the review finds that the existing faculty in the relevant department or field are not capable of hiring for viewpoint diversity, or that the relevant teaching unit is

not capable of admitting a critical mass of students with diverse viewpoints, hiring or admissions within that department, field, or teaching unit shall be transferred to the closest cognate department, field, or teaching unit that is capable of achieving viewpoint diversity. This audit shall be performed and the same steps taken to establish viewpoint diversity every year during the period in which reforms are being implemented, which shall be at least until the end of 2028.

**Reforming Programs with Egregious Records of Antisemitism or Other Bias.** By August 2025, the University shall commission an external party, which shall satisfy the federal government as to its competence and good faith, to audit those programs and departments that most fuel antisemitic harassment or reflect ideological capture.

> The programs, schools, and centers of concern include but are not limited to the Divinity School, Graduate School of Education, School of Public Health, Medical School, Religion and Public Life Program, FXB Center for Health & Human Rights, Center for Middle Eastern Studies, Carr Center for Human Rights at the Harvard Kennedy School, Department of Near Eastern Languages and Cultures, and the Harvard Law School International Human Rights Clinic.

> The report of the external party shall include information as to individual faculty members who discriminated against Jewish or Israeli students or incited students to violate Harvard's rules following October 7, and the University and federal government will cooperate to determine appropriate sanctions for those faculty members within the bounds of academic freedom and the First Amendment.

> The report of the external party shall be submitted to University leadership and the federal government no later than the end of 2025 and reforms undertaken to repair the problems. This audit shall be performed and the same steps taken to make repairs every year during the period in which reforms are being implemented, which shall be at least until the end of 2028.

**Discontinuation of DEI**. The University must immediately shutter all diversity, equity, and inclusion (DEI) programs, offices, committees, positions, and initiatives, under whatever name, and stop all DEI-based policies, including DEI-based disciplinary or speech control policies, under whatever name; demonstrate that it has done so to the satisfaction of the federal government; and demonstrate to

15

the satisfaction of the federal government that these reforms are durable and effective through structural and personnel changes. By August 2025, the University must submit to the government a report—certified for accuracy—that confirms these reforms.

**Student Discipline Reform and Accountability.** Harvard must immediately reform its student discipline policies and procedures so as to swiftly and transparently enforce its existing disciplinary policies with consistency and impartiality, and without double standards based on identity or ideology. Where those policies are insufficient to prevent the disruption of scholarship, classroom learning and teaching, or other aspects of normal campus life, Harvard must develop and implement disciplinary policies sufficient to prevent those disruptions. This includes but is not limited to the following:

> Discipline at Harvard must include immediate intervention and stoppage of disruptions or deplatforming, including by the Harvard police when necessary to stop a disruption or deplatforming; robust enforcement and reinstatement of existing time, place, and manner rules on campus, including ordering the Harvard police to stop incidents that violate time, place, and manner rules when necessary; a disciplinary process housed in one body that is accountable to Harvard's president or other capstone official; and removing or reforming institutional bodies and practices that delay and obstruct enforcement, including the relevant Administrative Boards and FAS Faculty Council.

> Harvard must adopt a new policy on student groups or clubs that forbids the recognition and funding of, or provision of accommodations to, any student group or club that endorses or promotes criminal activity, illegal violence, or illegal harassment; invites non-students onto campus who regularly violate campus rules; or acts as a front for a student club that has been banned from campus. The leaders or organizers of recognized and unrecognized student groups that violate these policies must be held accountable as a matter of student discipline and made ineligible to serve as officers in other recognized student organizations. In the future, funding decisions for student groups or clubs must be made exclusively by a body of University faculty accountable to senior University leadership. In particular, Harvard must end support and recognition of those student groups or clubs that engaged in anti-Semitic activity since October 7th, 2023, including the Harvard Palestine Solidarity Committee, Harvard Graduates Students 4 Palestine, Law Students 4 Palestine, Students for Justice in Palestine, and the National

Lawyers Guild, and discipline and render ineligible the officers and active members of those student organizations.

Harvard must implement a comprehensive mask ban with serious and immediate penalties for violation, not less than suspension. Harvard must investigate and carry out meaningful discipline for all violations that occurred during the 2023-2024 and 2024-2025 academic years, including the Harvard Business School protest of October 2023, the University Hall sit-in of November 2023, and the spring encampment of 2024. This must include permanently expelling the students involved in the October 18 assault of an Israeli Harvard Business School student, and suspending students involved in occupying university buildings, as warranted by the facts of individual cases.

The Harvard president and police chief must publicly clarify that the Harvard University Police Department will enforce University rules and the law. Harvard must also commit to cooperating in good faith with law enforcement.

**Whistleblower Reporting and Protections**. The University must immediately establish procedures by which any Harvard affiliate can report noncompliance with the reforms detailed in this letter to both university leadership and the federal government. Any such reporter shall be fully protected from any adverse actions for so reporting.

**Transparency and Monitoring**. The University shall make organizational changes to ensure full transparency and cooperation with all federal regulators. No later than June 30, 2025, and every quarter thereafter during the period in which reforms are being implemented, which shall be at least until the end of 2028, the University shall submit to the federal government a report—certified for accuracy—that documents its progress on the implementation of the reforms detailed in this letter. The University must also, to the satisfaction of the federal government, disclose the source and purpose of all foreign funds; cooperate with the federal government in a forensic audit of foreign funding sources and uses, including how that money was used by Harvard, its agents, and, to the extent available, third parties acting on Harvard's campus; report all requested immigration and related information to the United States Department of Homeland Security; and comply with all requirements relating to the SEVIS system.

GSAHarv_00000007–011.

**Response: Defendants admit or have no basis to dispute the quoted materials. Defendants do not dispute. However, the facts stated herein are not material to Plaintiff's claims as they are a characterization of the April 11 Letter, which is itself a part of the Administrative Record in this case.**

26.     The April 11 Letter concluded by demanding "immediate cooperation in implementing these critical reforms." *Id.*

**Response: Defendants admit or have no basis to dispute the quoted materials. However, the facts stated herein are not material to Plaintiff's claims as they are a characterization of the April 11 Letter, which is itself a part of the Administrative Record in this case.**

27.     On April 14 at 4:46 pm, Harvard University responded to the April 11 Letter through counsel. HHSHarv_00000103–105. Harvard's April 14 Response stated:

> Harvard is committed to fighting antisemitism and other forms of bigotry in its community. Antisemitism and discrimination of any kind not only are abhorrent and antithetical to Harvard's values but also threaten its academic mission.
>
> To that end, Harvard has made, and will continue to make, lasting and robust structural, policy, and programmatic changes to ensure that the university is a welcoming and supportive learning environment for all students and continues to abide in all respects with federal law across its academic programs and operations, while fostering open inquiry in a pluralistic community free from intimidation and open to challenging orthodoxies, whatever their source.
>
> Over the past 15 months, Harvard has undertaken substantial policy and programmatic measures. It has made changes to its campus use policies, adopted new accountability procedures; imposed meaningful discipline for those who violate university policies; enhanced programs designed to address bias and promote ideological diversity and civil discourse; hired staff to support these programs and support students' changed partnerships; dedicated resources to combat hate and bias; and enhanced safety and security measures. As a result, Harvard is in a very different place than it was a year ago. These efforts, and additional measures the university will be taking against

antisemitism, not only are the right thing to do but also are critical to strengthening Harvard's community as a place in which everyone can thrive.

It is unfortunate, then, that your letter disregards Harvard's efforts and instead presents demands that, in contravention of the First Amendment, invade university freedoms long recognized by the Supreme Court. The government's terms also circumvent Harvard's statutory rights by requiring unsupported and disruptive remedies for alleged harms that the government has not proven through mandatory processes established by Congress and required by law. No less objectionable is the condition, first made explicit in the letter of March 31, 2025, that Harvard accede to these terms or risk the loss of billions of dollars in federal funding critical to vital research and innovation that has saved and improved lives and allowed Harvard to play a central role in making our country's scientific, medical, and other research communities the standard-bearers for the world. These demands extend not only to Harvard but to separately incorporated and independently operated medical and research hospitals engaging in life-saving work on behalf of their patients. The university will not surrender its independence or relinquish its constitutional rights. Neither Harvard nor any other private university can allow itself to be taken over by the federal government. Accordingly, Harvard will not accept the government's terms as an agreement in principle.

Harvard remains open to dialogue about what the university has done, and is planning to do, to improve the experience of every member of its community. But Harvard is not prepared to agree to demands that go beyond the lawful authority of this or any administration.

HHSHarv_00000104–105.

**Response: Defendants admit or have no basis to dispute.**

28.     At 7:25 pm on April 14, Defendant Gruenbaum asked for one of Harvard's lawyers to "call [him] within the next 5 min." HHSHarv_00000107.

**Response: Defendants admit or have no basis to dispute.**

29.     At 7:33 pm, Robert Hur, one of Havard's lawyers, responded that he would "call [Gruenbaum] shortly." HHSHarv_00000106.

**Response: Defendants admit or have no basis to dispute.**

30. Defendant Gruenbaum responded to Hur's email with a link to an April 14 press release posted on the GSA website. *Id.*

**Response: Defendants admit or have no basis to dispute.**

31. In that press release, the Funding Freeze, Defendants HHS, ED, and GSA stated:

> Harvard's statement today reinforces the troubling entitlement mindset that is endemic in our nation's most prestigious universities and colleges—that federal investment does not come with the responsibility to uphold civil rights laws. The disruption of learning that has plagued campuses in recent years is unacceptable. The harassment of Jewish students is intolerable. It is time for elite universities to take the problem seriously and commit to meaningful change if they wish to continue receiving taxpayer support. The Joint Task Force to combat anti-Semitism is announcing a freeze on $2.2 billion in multi-year grants and $60M in multi-year contract value to Harvard University.

GSAHarv_00000012–13.

**Response: Defendants admit or have no basis to dispute.**

32. On May 5, Defendant McMahon, the Secretary of Education, sent President Garber a letter ("the Ineligibility Decision") in which Defendant McMahon stated that the Administration "remains committed to" the demands in the Demand Letters and "inform[ing] [President Garber] that Harvard should no longer seek GRANTS from the federal government, since none will be provided." EDHarvAR_0000008–09.

**Response: Defendants admit or have no basis to dispute the quoted materials. Defendants do not dispute. However, the facts stated herein are not material to Plaintiff's claims as they are a characterization of the May 5 Letter, which is itself a part of the Administrative Record in this case.**

33. Defendant McMahon's letter stated, in full:

> The Federal Government has a sacred responsibility to be a wise and important steward of American taxpayer dollars. Harvard University, despite amassing a largely tax-free $53.2 billion dollar [sic]

endowment (larger than the GDP of 100 countries), received billions of dollars of taxpayer largess each year. Receiving such taxpayer funds is a privilege, not a right. Yet instead of using these funds to advance the education of its students, Harvard is engaging in a systemic pattern of violating federal law. Where do many of these "students" come from, who are they, how do they get into Harvard, or even into our country—and why is there so much HATE? These are questions that must be answered, among many more, but the biggest question of all is, why will Harvard not give straightforward answers to the American public?

Harvard University has made a mockery of this country's higher education system. It has invited foreign students, who engage in violent behavior and show contempt for the United States of America, to its campus. In every way, Harvard has failed to abide by its legal obligations, its ethical and fiduciary duties, its transparency responsibilities, and any semblance of academic rigor. It has scrapped standardized testing requirements and a normalized grading system. This year Harvard was forced to adopt an embarrassing "remedial math" program for undergraduates. Why is it, we ask, that Harvard has to teach simple and basic mathematics, when it is supposedly so hard to get into this "acclaimed university"? Who is getting in under such a low standard when others, with fabulous grades and a great understanding of the highest levels of mathematics, are being rejected?

Harvard has even been embroiled in humiliating plagiarism scandals, exposed clearly and plainly in the media, with respect to your then University President, who has an embarrassment to our Nation. Much of Harvard's hateful discrimination was revealed last year, by the great work of Congresswoman Elise Stefanik, and her Committee. As if it were trying to embarrass itself even further, Harvard hired failed Mayors Bill De Blasio and Lori Lightfoot, perhaps the worst mayors ever to preside over major cities in our country's history, to supposedly teach "leadership" at their School of Public Health. This is like hiring the captain of the Titanic to teach navigation to future captains of the sea.

This incomprehensible failure becomes more understandable after reviewing Harvard's management. The Harvard Corporation, which is supposed to competently and professionally manage Harvard's vast academic, financial, and physical resources, is run by strongly left-leaning Obama political appointee Penny Pritzker, a Democratic operative, who is catastrophic and running the institution in a totally chaotic way. Harvard alumnus and highly successful hedge fund manager Bill Ackman noted that, under her leadership, Harvard has become "a political advocacy organization for one party."

Ackman has called for the resignation of Pritzker, concluding that "[t]he mismanagement here is Penny Pritzker" and noting that any serious corporation would have removed her after a litany of recent failures and the fact that, incredibly, "Harvard is not in a good financial position." According to Ackman, one of the world's foremost financial experts, Harvard's so-called $53 billion endowment is "massively overstated as far as what it's really worth," and Harvard has irresponsibly taken out $8 billion in debt.

If this is true, it is concerning evidence of Harvard's disastrous mismanagement, indicating an urgent need for massive reform—not continued taxpayer investment. If Harvard prefers not to change, then Harvard should have no problem using its overflowing endowment to fund its bloated bureaucracy.

At its best, a university should fulfill the highest ideals of our Nation, and enlighten the thousands of hopeful students who walk through its magnificent gates. But Harvard has betrayed this ideal.

Perhaps most alarmingly, Harvard has failed to abide by the United States Supreme Court's ruling demanding that it end its racial preferencing, and continues to engage in ugly racism in its undergraduate and graduate schools, and even within the Harvard Law Review itself. Our universities should be bastions of merit that reward and celebrate excellence and achievement. They should not be incubators of discrimination that encourage resentment and instill grievance and racism into our wonderful young Americans.

The above concerns are only a fraction of the long list of Harvard's consistent violations of its own legal duties. Given these and other concerning allegations, this letter is to inform you that Harvard should no longer seek GRANTS from the federal government, since none will be provided. Harvard will cease to be a publicly funded institution, and can instead operate as a privately-funded institution, drawing on its colossal endowment, and raising money from its large base of wealthy alumni. You have an approximately $53 Billion head start, much of which was made possible by the fact that you are living withing the walls of, and benefitting from, the prosperity secured by the United States of American and its free-market system you teach your students to despise.

The Administration had previously been willing to maintain federal funding to Harvard, so long as Harvard committed to complying with long-settled Federal Law, including to protect and promote student welfare and the landmark decision of our Supreme Court against racial preferencing. The proposed common-sense reforms—which the administration remains committed to—include a return to

merit-based admissions and hiring, an end to unlawful programs that promote crude identity stereotypes, disciplinary reform and consistent accountability, including for student groups, cooperation with Law Enforcement, and reporting compliance with the Department of Education, Department of Homeland Security, and other Federal Agencies. The Administration's priorities have not changes and today's letter marks the end of new grants for the University.

These requests will advance the best interests of Harvard University, so it can reclaim its status as a respected educational institution for the future leaders of America. Thank you for your attention to this matter!

EDHarvAR_0000008–010.

**Response: Defendants admit or have no basis to dispute.**

### A.    Defendant GSA

34.    Beginning as early as April 30, representatives of Defendant GSA contacted members of the individual defendant agencies "to collect a few data points" on grants. GSAHarv_00000019; *see also* USDA-HARV-AR-00001; NASA-AR03692.

**Response: Defendants admit or have no basis to dispute.**

35.    Defendant Gruenbaum and GSA employee Brandon Bartel then coordinated Harvard grant and contract terminations from each defendant agency. GSAHarv_00000038; May 19, 2025, Declaration of Josh Gruenbaum ("Gruenbaum Decl.") ¶10.[3]

**Response: Disputed. Mischaracterizes the cited materials.**

36.    On May 8, Gruenbaum directed Bartel to "send [a] group" consisting of representatives from each Defendant agency a spreadsheet containing detailed information on a list of 1056 federal grants to Harvard with a total face value of over $2.8 billion. GSAHarv_00000038–39.

**Response: Defendants admit or have no basis to dispute.**

---

[3] The Gruenbaum Decl. was produced by Defendants as part of the administrative record from Defendant GSA.

37.     Bartel did so. GSAHarv_00000040–118.

**Response: Defendants admit or have no basis to dispute.**

38.     GSA then identified a set of grants at each agency that they "asked [the Defendant agencies] to prepare … for … termination awaiting final greenlight from the White House." USDA-HARV-AR-00001.

**Response: Defendants admit or have no basis to dispute.**

39.     Gruenbaum and GSA drafted a template letter which GSA directed agencies to use when canceling grants pursuant to this GSA directive. Gruenbaum Decl. ¶10.

**Response: Disputed. Mischaracterizes the cited materials.**

40.     Gruenbaum reviewed and approved the letters the Defendant agencies drafted to effect the terminations. *See, e.g.*, GSAHarv_00000119.

**Response: Disputed. Mischaracterizes the cited materials.**

41.     The Defendant agencies did in fact await the green light from GSA before sending their termination letters. *See, e.g.*, GSAHarv_00000125. And Gruenbaum, acting on behalf of GSA, coordinated with White House staff to ensure that the President and members of his "Domestic Policy Council" could monitor and direct these developments in real time. GSAHarv_00000126 (email from Gruenbaum to May Mailman, Deputy Assistant to the President and Senior Policy Strategist, and Joshua Hoyt of the Executive Office of the President stating "[s]o that WH [White House] is tracking, NASA is saying they will proceed"); GSAHarv_00000133.

**Response: Disputed. Mischaracterizes the cited materials.**

**B.     Defendant DOD**

42.     On May 12, Defendant Secretary of Defense Pete Hegseth sent President Garber a letter stating that "the projects in the enclosed spreadsheet will be terminated pursuant to 2 C.F.R.

§ 200.340(a)(4)" because they "no longer effectuate[d] the program goals or agency priorities." DoDHarv_00000039.

**Response: Defendants admit or have no basis to dispute**.

43.    Defendant Hegseth's May 12 letter cited the same bases as the Demand Letters, stating that "[w]e understand that Harvard continues to engage in race discrimination, including in its admissions process, and in other areas of student life," that "recent events at Harvard University involving antisemitic action … suggest the institution has a disturbing lack of concern for the safety and wellbeing of Jewish students," and that Harvard had exhibited a pattern of "ongoing inaction in the face of repeated and severe harassment and targeting of Jewish students." *Id*.

**Response: Defendants admit or have no basis to dispute**.

44.    The letter concluded that "[s]upporting research in such an environment is plainly inconsistent with DoD's priorities." *Id*.

**Response: Defendants admit or have no basis to dispute**.

45.    Neither Defendant Hegseth's May 12 letter nor any other part of the administrative record produced by DOD includes any specific allegations or findings relating to race discrimination, antisemitism, or any other civil rights violation. *Id*.

**Response: Disputed.**

46.    Defendant Hegseth's May 12 letter did not provide any explanation for how the terminated projects no longer effectuated program goals or agency priorities other than Harvard's alleged civil rights violations, nor did it provide any explanation specific to the research supported by any of the individual projects. *Id*.

**Response: Defendants do not dispute. However, the facts stated herein are not material to Plaintiff's claims as they are a characterization of the May 12 Letter, which is itself a part of the Administrative Record in this case.**

47.    The letter attached a spreadsheet listing 56 awards with a total award amount of $105,372,130. DoDHarv_00000042–046.

**Response: Defendants admit or have no basis to dispute**.

48.    On May 13, James Hickey informed over twenty DOD staff members that "SecDef has directed termination of the attached grants to Harvard University. Please issue [Stop Work Orders]+termination notice by EOD today, 5/13, for the grants in your respective portfolios." Do-DHARV_00000048. These staffers complied with the SecDef directive. DoDHARV_00000001–032.

**Response: Defendants admit or have no basis to dispute.**

**C.    Defendant DOE**

49.    On May 12, Defendant the Department of Energy sent President Garber letters stating that "the projects in the attached spreadsheet [are] hereby terminated ... pursuant to 2 C.F.R. § 200.340(a)(4)" because they "no longer effectuate[] the program goals or agency priorities." ENERGY AR3940; ENERGY AR3944.

**Response: Defendants admit or have no basis to dispute.**

50.    These letters cited the same bases as the Demand Letters, stating that DOE "understands that Harvard University (Harvard) continues to engage in race discrimination, including in its admissions process, and in other areas of student life," that "recent events at Harvard involving antisemitic action … suggest the institution has a disturbing lack of concern for the safety and wellbeing of Jewish students," and that Harvard had exhibited a pattern of "ongoing inaction in

the face of repeated and severe harassment and targeting of Jewish students." ENERGY AR3929–946.

      **Response: Defendants admit or have no basis to dispute.**

51.     The letters concluded that "[s]upporting research in such an environment is plainly inconsistent with DOE's priorities." ENERGY AR3929–946.

      **Response: Defendants admit or have no basis to dispute.**

52.     Neither the DOE May 12 letters nor any part of the administrative record produced by the DOE includes allegations or findings relating to race discrimination, antisemitism, or any civil rights violation.

      **Response: Defendants do not dispute. However, the facts stated herein are not material to Plaintiff's claims as they are a characterization of the May 12 Letter, which is itself a part of the Administrative Record in this case.**

53.     The DOE's letters did not provide any explanation for how the terminated projects no longer effectuated program goals or agency priorities other than Harvard's alleged civil rights violations, nor did it provide any explanation specific to the research supported by any of the individual projects.

      **Response: Defendants do not dispute. However, the facts stated herein are not material to Plaintiff's claims as they are a characterization of the May 12 Letter, which is itself a part of the Administrative Record in this case.**

54.     The letters attached spreadsheets listing 18 awards with a total award amount of $72,083,094.00. ENERGY AR3921–925.

      **Response: Defendants admit or have no basis to dispute.**

### D.    Defendant DOJ

55.    The administrative record produced by DOJ comprises declarations stating that DOJ has canceled no grants or contracts awarded to Harvard. It includes no other documents. May 16, 2025, Declaration of Maureen A. Henneberg; May 19, 2025, Declaration of Tara Jamison; May 6, 2025, Declaration of Erin M. Lorah.

**Response: Defendants admit or have no basis to dispute.**

56.    The administrative record produced by DOJ includes no record of any investigation or findings as to any civil rights violations, including allegations of antisemitism.

**Response: Defendants admit or have no basis to dispute.**

### E.    Defendant ED

57.    On May 12, Murray Bessette of the ED Office of Planning, Evaluation, and Policy Development sent a letter to a professor in the Harvard Graduate School of Design terminating that professor's award and citing "2 C.F.R. § 200.340-43." EDHarvAR_0000011–012. This termination letter states that ED "understands that Harvard continues to engage in race discrimination, including in its admissions process, and in other areas of student life" that "recent events at Harvard involving antisemitic action ... suggest the institution has a disturbing lack of concern for the safety and wellbeing of Jewish students," and that Harvard had exhibited a pattern of "ongoing inaction in the face of repeated and severe harassment and targeting of Jewish students." EDHarvAR_000011. This award had a face value of $821,415. EDHarvAR_0000013.

**Response: Defendants admit or have no basis to dispute.**

58.    Neither Bessette's letter nor Defendant McMahon's May 5 Ineligibility Decision nor any other part of the administrative record produced by ED includes any specific allegations or findings relating to race discrimination, antisemitism, or any other civil rights violation.

**Response: Defendants do not dispute. However, the facts stated herein are not material to Plaintiff's claims as they are a characterization of Besette's Letter and the May 5 Ineligibility Decision, which are themselves a part of the Administrative Record in this case.**

59.    Defendant McMahon and Murray Bessette's letters did not provide any explanation for how the terminated projects no longer effectuated program goals or agency priorities other than Harvard's alleged civil rights violations, nor did it provide any explanation specific to the research supported by any of the individual projects.

**Response: Defendants do not dispute. However, the facts stated herein are not material to Plaintiff's claims as they are a characterization of Besette's Letter and the May 5 Ineligibility Decision, which are themselves a part of the Administrative Record in this case.**

60.    These letters invoke allegations of civil rights violations including antisemitism as the basis for these actions but the administrative record produced by ED includes no record of any investigation or findings as to any such violations.

**Response: Defendants admit or have no basis to dispute.**

**F.    Defendant HHS**

61.    On April 14, Robert Foster, Deputy General Counsel for HHS, announced to HHS colleagues that HHS "has taken action to pause payments on NIH grants to Harvard University ... These payments are to remain paused until further notice. This will impact $2.172B in total grant funding ... across 658 individual grants." HHSHarv_00000110.

**Response: Defendants admit or have no basis to dispute**.

62.    On May 6, Michelle G. Bulls, Director of the HHS Office of Policy for Extramural Research Administration, sent President Garber a letter stating "that funding for the attached

spreadsheet will be terminated ... pursuant to ... 2 C.F.R. § 200.340(a)(4)" because the "awards no longer effectuate agency priorities." HHSHarv_00000473. The letter stated that "NIH understands that Harvard continues to engage in race discrimination including in its admissions process, and in other areas of student life," that "recent events at Harvard University involving antisemitic action ... suggest the institution has a disturbing lack of concern for the safety and wellbeing of Jewish students," and that Harvard had exhibited a pattern of "ongoing inaction in the face of repeated and severe harassment and targeting of Jewish students." HHSHarv_00000474. The letter states that "upon being made aware of systematic institutional failures to address deeply rooted antisemitism and racial discrimination, the University has refused to take appropriate action." *Id.*

> **Response: Defendants admit or have no basis to dispute.**

63.     The letter concludes that "[s]upporting research in such an environment is plainly inconsistent with NIH's priorities." *Id.*

> **Response: Defendants admit or have no basis to dispute.**

64.     Neither communication nor any other part of the administrative record produced by HHS includes any specific allegations or findings relating to race discrimination, antisemitism, or any other civil rights violation.

> **Response: Defendants do not dispute. However, the facts stated herein are not material to Plaintiff's claims as they are a characterization of Besette's Letter and the May 5 Ineligibility Decision, which are themselves a part of the Administrative Record in this case.**

65.     Neither Foster's email nor Bull's letter provided any explanation for how the terminated projects no longer effectuated program goals or agency priorities other than Harvard's

alleged civil rights violations, nor did it provide any explanation specific to the research supported by any of the individual projects.

> **Response: Defendants do not dispute. However, the facts stated herein are not material to Plaintiff's claims as they are a characterization of Besette's Letter and the May 5 Ineligibility Decision, which are themselves a part of the Administrative Record in this case.**

66.    Bull's letter attached spreadsheets listing 658 awards with a total award amount of $2,256,278,773.00. HHSHarv_00000476.

> **Response: Defendants admit or have no basis to dispute.**

67.    Defendant HHS also included in its administrative record the following documents:

   a.    The Demand Letters.

   b.    A copy of the December 18, 2024, U.S. House of Representatives Staff Report on Antisemitism. HHSHarv_00000013–055. The House Report's "findings" included: "Harvard Administrators Deliberately Chose Not to Condemn Hamas in Their Widely Criticized October 9th Statement"; "Harvard's Then-President Gay and Then-Provost Garber Asked Harvard Corporation Senior Fellow … Not to Call the Slogan 'From The River To The Sea' … antisemitic hate speech"; "Harvard failed to suspend any students for conduct violations" and "Harvard College's disciplinary board downgraded many sanctions": and Harvard's "then-President Gay disparaged Representative Elise Stefanik in an official Board of Overseers meeting[.]" *Id.*

   c.    An April 1, 2025 letter from Katherine V. Roe, Ph.D., from the organization People for the Ethical Treatment of Animals "request[ing] that ... you consider canceling Harvard's National Institutes of Health (NIH) funding for cruel and ineffective visual deprivation experiments on infant rhesus macaques." HHSHarv_00000056–060.

   d.    An April 4, 2025 email from Jonathan Bari to Defendants Keveney, Wheeler, and Gruenbaum attaching a January 2024 email chain between Bari and President Alan Garber discussing legacy admissions. HHSHarv_00000064.

   e.    An April 5, 2025 email from John Hoffman to Defendants Keveney, Thomas Wheeler, and Gruenbaum stating "I salute your efforts, and that of

the administration to eradicate antisemitism, while insisting that colleges receiving governments grants adopt merit based admissions policies" and that "legacy admissions" policies "stand[] in direct opposition to any merit based admissions policy" and so "eliminating legacy practices must be included in such reform [at Harvard] before reactivating federal grant monies flowing Harvard's way." HHSHarv_00000075–078.

f.    An April 10, 2025 email chain between Defendants Keveney, Wheeler, and Gruenbaum (among others) and counsel for Harvard University discussing the resignation of Bashar Masri from the Harvard Kennedy School's Dean's Council in which Gruenbaum writes "So I presume he resigned once the complaint was officially filed …?" HHSHarv_00000079–082.

g.    A fourteen-page memorandum document titled "Addressing Antisemitism and Anti-Americanism at Harvard University." The document is undated and does not identify its author. The document concludes that, in the unidentified author's view, antisemitism was occurring at Harvard as of whatever date the document was written. The document then identifies many steps that the unidentified author recommends. The author encourages the government to force Harvard to eliminate any program that is at all affiliated with Palestinian studies, human rights, "ethnic studies," or "DEI." HHSHarv_00000083–097.

h.    An April 21 email chain between Defendants Gruenbaum and Keveney plus Robert Charrow of HHS circulating a screenshot of an Instagram post from the account "@oxact4pal" marking April 17 as "Palestinian Prisoner's Day." The post discusses a scheduled day of remembrance for "Palestinians who have been wrongfully imprisoned or unlawfully detained." The email chain includes a second screenshot identifying collaborators on the post that appear to be associated with student groups at Oxford University, Cambridge University, and Harvard. HHSHarv_00000159–161.

i.    A copy of the final report, dated April 29, 2025, from Harvard's Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias. HHSHarv_00000162–472.

**Response: Defendants admit or have no basis to dispute.**

### G.    Defendant HUD

68.    On May 12, Defendant HUD sent several letters to President Garber stating that certain federal funding commitments to Harvard had been terminated "pursuant to [HUD's] authority under 2 C.F.R. § 200.340(a)(4)". HUDHarvAR_00000062–067.

**Response: Defendants admit or have no basis to dispute.**

69.     Each of these letters stated that "HUD has determined that this award no longer effectuates agency priorities" but provided no explanation of the agency priorities at issue or why the program itself no longer effectuated them, nor does any other aspect of the administrative record produced by Defendant HUD. *Id.*

> **Response: Defendants do not dispute. However, the facts stated herein are not material to Plaintiff's claims as they are a characterization of the May 12 letter, which is itself a part of the Administrative Record in this case..**

70.     These letters identify 3 awards with a total award amount of $2,058,062. HUDHarvAR_00000062–067; GSAHarv_00000038.

> **Response: Defendants admit or have no basis to dispute.**

### H.    Defendant NASA

71.     On May 9, Defendant NASA sent a letter addressed to the President and Fellows of Harvard College stating that five NASA grants to Harvard University had been terminated. NASA-AR03749. These grants had a total award amount of $12,420,262.00. NASA-AR03703.

> **Response: Defendants admit or have no basis to dispute.**

72.     This letter stated that the grants were terminated because they "no longer effectuate[] the program goals or agency priorities" but provided no explanation of the agency priorities at issue or why the program itself no longer effectuated them other than that they were not "mission essential," nor does any other aspect of the administrative record produced by Defendant NASA. *Id.*

> **Response: Defendants do not dispute. However, the facts stated herein are not material to Plaintiff's claims as they are a characterization of the May 9 Letter, which is itself a part of the Administrative Record in this case.**

### I.    Defendant NSF

73.    On April 18 and April 25, Jamie French of Defendant NSF sent emails to Vice Provost for Research John Shaw stating that NSF had terminated certain awards to Harvard University. NSF_Harvard000002; NSF_Havard000010. These emails canceled six awards with a face value of $3,287,474. NSF_Harvard000002–037.

**Response: Defendants admit or have no basis to dispute.**

74.    These emails stated that the grants were terminated because they are "not in alignment with current NSF priorities" but provided no explanation of the agency priorities at issue or why the programs themselves no longer effectuated them, nor does any other aspect of the administrative record produced by Defendant NSF. NSF_Harvard000002; NSF_Harvard000010.

**Response: Disputed.**

75.    On May 12, French sent a letter to President Garber stating that "the attached awards are terminated." NSF_Harvard000039.

**Response: Defendants admit or have no basis to dispute.**

76.    This May 12 letter stated that "NSF understands that Harvard continues to engage in race discrimination including in its admissions process, and in other areas of student life, as well as failing to promote a research environment free of antisemitism and bias." *Id.*

**Response: Defendants admit or have no basis to dispute.**

77.    None of these communications nor any other part of the administrative record produced by NSF includes any specific allegations or findings relating to race discrimination, antisemitism, or any other civil rights violation. *Id.*

**Response: Defendants do not dispute. However, the facts stated herein are not material to Plaintiff's claims as they are a characterization of the April 18 and April 25**

**emails, and the May 12 Letter, which is themselves a part of the Administrative Record in this case**.

78.    None of these communications cited 2 C.F.R. § 200.340.

**Response: Defendants admit or have no basis to dispute.**

79.    Neither French's emails nor French's letter provided any explanation for how the terminated projects no longer effectuated program goals or agency priorities other than Harvard's alleged civil rights violations, nor do they provide any explanation specific to the research supported by any of the individual projects.

**Response: Defendants do not dispute. However, the facts stated herein are not material to Plaintiff's claims as they are a characterization of the April 18 and April 25 emails, and the May 12 Letter, which is themselves a part of the Administrative Record in this case.**

80.    French's letter attached a spreadsheet listing 193 awards. NSF_Harvard000041–044. These 193 awards have a face value of $192,135,950.00. NSF_Harvard000045–1037.

**Response: Defendants admit or have no basis to dispute.**

**J.    Defendant USDA**

81.    In a May 8 spreadsheet setting grants for cancellation, the rows setting forth the four grants associated with Defendant USDA contain a note stating, "To the extent we're thinking of these as potential termination candidates, note these are not grants and do not have unilateral termination options per 2 CFR part 200." USDA-HARV-AR-00084–086; Harvard Grants – Line Item.xlsx at rows 344; 376; 551; 819 (document produced as native).

**Response: Defendants admit the existence of the quoted material. However, the facts stated herein are not material to Plaintiff's claims as they are a characterization of**

**the "Harvard Grants – Line Item.xlsx" spreadsheet, which is itself a part of the Administrative Record in this case.**

82.    On May 9, Defendant USDA sent a letter to President Garber stating that "funding for the projects in the attached spreadsheet will be terminated." USDA-HARV-AR-00008–009.

**Response: Defendants admit or have no basis to dispute.**

83.    This termination letter states that "recent events at Harvard involving antisemitic action ... suggest the institution has a disturbing lack of concern for the safety and wellbeing of Jewish students" and that Harvard had exhibited a pattern of "ongoing inaction in the face of repeated and severe harassment and targeting of Jewish students." *Id.*

**Response: Defendants admit or have no basis to dispute.**

84.    This termination letter concludes that "[s]upporting research in such an environment is plainly inconsistent with Forest Service priorities." *Id.*

**Response: Defendants admit or have no basis to dispute.**

85.    This termination letter did not cite 2 C.F.R. § 200.340 or any other source of regulatory authority.

86.    Neither the USDA's May 9 letter nor any other part of the administrative record produced by USDA includes any specific allegations or findings relating to race discrimination, antisemitism, or any other civil rights violation.

**Response: Defendants dispute. Moreover, the facts stated herein are not material to Plaintiff's claims as they are a characterizations of the May 9 Letter and the Administrative Record of USDA, which themselves  a part of the Administrative Record in this case.**

87.     The letter did not provide any explanation for how the terminated projects no longer effectuated program goals or agency priorities other than Harvard's alleged civil rights violations, nor did it provide any explanation specific to the research supported by any of the individual projects.

**Response: Defendants dispute. Moreover, the facts stated herein are not material to Plaintiff's claims as they are a characterization of the May 9 Letter, which is itself a part of the Administrative Record in this case.**

88.     This letter attached a spreadsheet listing 4 awards. Harvard Agreements Spreadsheet.xlsx (document produced as native). These awards had a face value of $729,471. *See* Harvard Grants – Line Item.xlsx (document produced as native).

**Response: Defendants admit or have no basis to dispute.**

**III.     Defendants continue to punish Harvard for its refusal to meet their demands.**

89.     On April 15, the day after Defendants initially announced their freeze of $2.2 billion in federal funds to Harvard, President Trump posted on Truth Social: "Perhaps Harvard should lose its Tax Exempt Status and be Taxed as a Political Entity if it keeps pushing political, ideological, and terrorist inspired/supporting 'Sickness?' Remember, Tax Exempt Status is totally contingent on acting in the PUBLIC INTEREST!" Ex. 8.

**Response: Defendants admit or have no basis to dispute.**

90.     On April 16, President Trump posted on Truth Social:

> Everyone knows that Harvard has "lost its way." They hired, from New York (Bill D) and Chicago (Lori L), at ridiculously high salaries/fees, two of the WORST and MOST INCOMPETENT mayors in the history of our Country, to "teach" municipal management and government. These two Radical Left fools left behind two cities that will take years to recover from their incompetence and evil. Harvard has been hiring almost all woke, Radical Left, idiots and "birdbrains" who are only capable of teaching FAILURE to students and so-called "future leaders." Look just to the recent past at their

plagiarizing President, who so greatly embarrassed Harvard before the United States States [sic] Congress. When it got so bad that they just couldn't take it anymore, they moved this grossly inept woman into another position, teaching, rather than firing her ON THE SPOT. Since then much else has been found out about her, but she remains in place. Many others, like these Leftist dopes, are teaching at Harvard, and because of that, Harvard can no longer be considered even a decent place of learning, and should not be considered on any list of the World's Great Universities or Colleges. Harvard is a JOKE, teaches Hate and Stupidity, and should no longer receive Federal Funds. Thank you for your attention to this matter!

Ex. 9.

**Response: Defendants admit or have no basis to dispute.**

91.    On April 24, President Trump again posted about Harvard on Truth Social:

Harvard is an Anti-Semitic, Far Left Institution, as are numerous others, with students being accepted from all over the World that want to rip our Country apart. The place is a Liberal mess, allowing a certain group of crazed lunatics to enter and exit the classroom and spew fake ANGER AND HATE. It is truly horrific! Now, since our filings began, they act like they are all "American Apple Pie." Harvard is a threat to Democracy, with a lawyer, who represents me, who should therefore be forced to resign, immediately, or be fired. He's not that good, anyway, and I hope that my very big and beautiful company, now run by my sons, gets rid of him ASAP!

Ex. 10.

**Response: Defendants admit or have no basis to dispute.**

92.    On May 2, President Trump reiterated his tax status threat, stating that "We are going to be taking away Harvard's Tax Exempt Status" because "[i]t's what they deserve!"

Ex. 11.

**Response: Defendants admit or have no basis to dispute.**

93.    On May 7, Defendant McMahon stated:

Part of their lawsuit is about First Amendment, and I said, this is absolutely not about the First Amendment, we want First Amendment rights, this is about civil rights. This is about safety on campuses, it is making all of the students there feel that their civil rights

are intact, that they weren't being prohibited from attending class.
That they weren't afraid to be on campus. Harvard had a lot of en-
campments, their antisemitism that they did not address you know
for years. But we also wanted to make sure some of the other things
that we talked about was are they vetting students who are coming
in from outside of the country to make sure they're not activists, are
they vetting professors that they're hiring to make sure that they're
not teaching ideologies but that they're teaching subject matter?

...

In the interim, on the side, they're doing some of the things [we
asked for] ... [so] we're thinking we're having an impact as well.

...

When you see things like, they have to offer remedial math or be-
ginning algebra, what are their acceptance standards? Have they
lowered them?

...

If federal dollars, which means taxpayer dollars, your dollars, my
dollars, taxpayer dollars are going to an institution that is not in com-
pliance with the law, I mean the Supreme Court case that was re-
cently you know against Harvard said, you know, "you must comply
with your admissions policies," and they're not doing it. We've seen
some results that they're not doing it, so we want them to comply
with the law.

Ex. 12 at 0:35–1:22; 1:43–2:04; 2:40–2:49; 3:54–4:20.

**Response: Defendants admit or have no basis to dispute.**

94.    On May 13, Defendants HHS, ED, and GSA released a joint statement declaring

that

Harvard's campus, once a symbol of academic prestige, has become
a breeding ground for virtue signaling and discrimination. This is
not leadership; it is cowardice. And it's not academic freedom; it's
institutional disenfranchisement. There is a dark problem on Har-
vard's campus, and by prioritizing appeasement over accountability,
institutional leaders have forfeited the school's claim to taxpayer
support. As a result, eight federal agencies across the government
are announcing the termination of approximately $450 million in
grants to Harvard, which is in addition to the $2.2 billion that was

> terminated last week. [Defendants HHS, ED, and GSA] fully sup-
> port the Trump Administration's multi-agency move to cut funding
> to Harvard, demonstrating the entire Administrations commitment
> to eradicating discrimination on Harvard's campus. As we have
> made clear time and again, this Task Force will not waver in its mis-
> sion to root out discrimination, hate and bigotry at institutions en-
> trusted with public funds. Harvard, and its leadership group who are
> tainted by egregious infractions under its watch, faces a steep uphill
> battle to reclaim its legacy as a lawful institution and center of aca-
> demic excellence.

GSAHarv_00000015.

> **Response: Defendants admit or have no basis to dispute.**

95.    On May 28 Defendant McMahon stated that

> When we looked at different aspects of what Harvard was doing rel-
> ative to anti-Semitism on its campuses they were not enforcing Title
> VI the way it should be. And we had conversations with President
> Garber and I expected that we would have more, but Harvard's an-
> swer was a lawsuit so that's where we find ourselves ... I think the
> President is looking at this as, OK, how, how can we really make
> our point, and what are the things that Harvard and other universities
> are doing that we, that we have to call attention to?

Ex. 13 at 1:43–2:19.

> **Response: Defendants admit or have no basis to dispute.**

**IV.    Defendants' actions harm Plaintiffs and Plaintiffs' members.**

 **A.    Harms to Plaintiffs**

  **1.    Plaintiff AAUP**

96.    The "primary mission" of Plaintiff AAUP "is to advance academic freedom and

shared governance in higher education, define fundamental professional values and standards for

higher education, promote the economic security of academic workers, and ensure higher educa-

tion's contribution to the common good." Ex. 15 ¶6. AAUP has three guiding principles: academic

freedom, governance, and economic security. Ex. 14 ¶22.

> **Response: Defendants admit or have no basis to dispute.**

97. Plaintiff AAUP "regularly consults, works with, and represents local chapters and individual members regarding academic freedom, faculty governance, and other issues involving the employment relationship between AAUP members and their employers, including but not limited to collective bargaining." Ex. 15 ¶19. Through its local chapters, AAUP "provides for the representation of individual members regarding academic freedom, shared governance, and due process issues in proceedings before their university employers." *Id.* ¶22. AAUP maintains a standing committee, known as Committee A on Academic Freedom and Tenure, which "[p]romotes principles of academic freedom, tenure, and due process in higher education through the development of policy documents and reports relating to these subjects and the application of those principles to particular situations that are brought to its attention." *Id.* ¶20.

**Response: Defendants admit or have no basis to dispute.**

98. AAUP joint governance guidelines "detail the joint responsibility of faculty, administrations, and governing boards to govern colleges and universities" and note that "when it comes to academic matters, a faculty decision should normally be the final decision." Ex. 14 ¶33.

**Response: Defendants admit or have no basis to dispute.**

99. Defendants' actions have "directly impaired the AAUP's mission by pressuring Harvard to curtail speech and academic freedom on campus." Ex. 15 ¶27.

**Response: Defendants dispute. Defendants make argumentative legal conclusions. Moreover, Plaintiffs have failed to show legally cognizable harm.**

100. Plaintiff AAUP "must now expend more time and money to ensure that its members' rights in these regards are protected." *Id.* ¶25.

**Response: Defendants dispute. Defendants make argumentative legal conclusions. Moreover, Plaintiffs have failed to show legally cognizable harm**.

101.    Plaintiff AAUP has "diverted internal resources of staff time and expenses to assist Harvard members prepare to respond to the demands of the Trump administration." *Id.* ¶22. In response to a "significant influx of inquiries from chapter leaders and members regarding the effect of [Defendants'] actions on members' academic freedom, shared governance, and due process rights ... AAUP staff have had to conduct nationwide calls and virtual meetings with chapter leaders regarding [Defendants'] actions and how to represent individual members in the face of such actions." *Id.* ¶26.

**Response: Defendants have no basis to dispute.**

102.    Defendants' actions have also "caused a pervasive sense of fear and intimidation among AAUP members." *Id.* ¶29. Because of Defendants' actions, "some AAUP members no longer feel comfortable participating in and supporting the AAUP's activities, or asserting their academic freedom, shared governance, and due process rights." *Id.*

**Response: Defendants dispute. Defendants make argumentative legal conclusions. Moreover, Plaintiffs have failed to show legally cognizable harm.**

### 2.    Plaintiff AAUP-Harvard Faculty Chapter

103.    Plaintiff AAUP-Harvard "advocates for policies at Harvard that promote AAUP's mission of advancing academic freedom and shared government, defining professional values and standards for higher education, ensuring higher education's contribution to the common good, and safeguarding the economic security of faculty, academic professionals, graduate students, post-doctoral fellows, and others engaged in teaching and research in higher education." Ex. 14 ¶5. As part of this mission, AAUP-Harvard "provides support to AAUP members on Harvard's campus." *Id.*

**Response: Defendants admit or have no basis to dispute.**

104.    Plaintiff AAUP-Harvard now "has to spend time dealing with crises and putting people in touch with needed resources instead of doing the internal governance work that the AAUP usually does within the university." *Id.* ¶20. AAUP-Harvard now "holds twice as many meetings with [its] members as [it] did before" the actions described herein to "address the significant obstacles" the Demand Letters and funding freezes and terminations "pose to the academic freedom and economic security of [AAUP-Harvard's] members." *Id.* ¶21. AAUP-Harvard uses these meetings to "discuss[] how and whether AAUP-Harvard members can maintain their academic freedom in the wake of these attacks." *Id.* AAUP-Harvard has also "sponsored a training on digital surveillance and information security for [its] members, and [is] in the process of planning a Know Your Rights workshop aimed specifically at faculty." *Id.* ¶20.

**Response: Defendants admit or have no basis to dispute.**

### 3.    Plaintiff UAW

105.    Plaintiff UAW "is one of the largest and most diverse unions in North America, with members in the United States, Canada, and Puerto Rico and in virtually every sector of the economy including approximately 120,000 workers in higher education"—graduate students, postdoctoral scholars ("postdocs"), researchers, university staff, and faculty—at institutions across the country, including at Harvard. Ex. 34 ¶3. UAW members are part of over 600 local unions across the U.S., Canada and Puerto Rico. *Id.* ¶4Local unions receive support "in organizing new members, bargaining contracts, handling problems with employers, member education, political action, community activities and more from both the national UAW offices and centers and each of the nine regional offices." *Id*.

**Response: Defendants admit or have no basis to dispute.**

106.    Plaintiff UAW represents two bargaining units that include union members directly impacted by the termination of federal funding at Harvard University: the Harvard Graduate

Students Union ("HGSU-UAW Local 5118") and Harvard Academic Workers ("HAW-UAW"). *Id.* ¶9. HGSU-UAW Local 5118 "represents approximately 5,400 academic workers across the Harvard University, including teaching fellows, course assistants, and graduate student research assistants." *Id*. HAW-UAW "represent[s] more than 3,300 non-student academic workers, including postdoctoral researchers, lecturers, teaching assistants, research scientists, and others who do similar work at The Faculty of Arts and Sciences, Harvard Medical School, and the Harvard Divinity School." *Id.*

**Response: Defendants admit or have no basis to dispute.**

107.    Plaintiff UAW represents "thousands of academic workers and non-student academic workers who receive federal funding" at Harvard. *Id.* ¶10. The federal funding terminations have "directly impacted UAW's central activities" as it has been "forced to spend significant time and resources responding to the repercussions of the administration's actions on its members" and connecting them with outside resources, including counseling members who have: lost funding, anticipate losing their jobs, and not been able to complete their experiments or thesis research affecting their academic progress and putting them at risk of having to leave academic science entirely. *Id.* ¶11. For Plaintiff UAW, the "expenditure of time and diversion of resources to respond to the fallout of the administration's actions has affected [its] ability to do the representational, organizing, and advocacy work that is its core mission." *Id.*

**Response: Defendants admit or have no basis to dispute.**

## B.    Harms to Plaintiffs' Members

### 1.    Harms to Plaintiffs AAUP's and Harvard-AAUP's members

108.    Plaintiffs are aware of at least twenty AAUP-Harvard members who have lost their federal funding as a result of Defendants' actions. Ex. 14 ¶13.

**Response: Defendants dispute that Plaintiffs have any claim to federal funding to a third party.**

109.    These members are now unable to continue their research, plan future research, maintain professional relationships, and retain or recruit staff to work on their projects. Ex. 15 ¶13.

**Response: Defendants admit or have no basis to dispute.**

110.    AAUP-Harvard's members are concerned about losing their jobs and ability to continue to support their livelihoods as a result of Defendants' actions. *Id.* ¶15. Defendants' actions may "unrecoverably disrupt" researchers' life work and be "career ending." Ex. 14 ¶46.

**Response: Defendants admit or have no basis to dispute.**

111.    Scientific research "is built upon a complex infrastructure of scientists, data analysts, administrators and trainees" and "requires technical expertise that is developed over years of mentoring and is often held in the hands of specific experienced individuals." *Id.* Researchers must plan years in advance and have fundable projects lined up to provide continuous resources for long-term projects. *Id.*

**Response: Defendants admit or have no basis to dispute.**

112.    Nearly 60% of the operating budget of the Harvard T.H. Chan School of Public Health ("HSPH") comes from federal grants. *Id.* ¶42. Virtually every grant at HSPH has been terminated and some faculty have expressed doubt about whether HSPH will be able to continue existing. *Id.* HSPH "will not be able to recoup their institution and work if federal funding is not resumed within a short time period." *Id.* Faculty at HSPH were recently informed that Harvard will only make about $25 million available to cover research costs for terminated projects during the coming fiscal year. Ex. 16 ¶11.

**Response: Defendants admit or have no basis to dispute.**

113.    Harvard has implemented a hiring freeze in response to Defendants' actions. Ex. 14 ¶44. Plaintiffs' members cannot hire new research assistants and there is a freeze on tenure-track hiring, which means faculty cannot fill teaching gaps in departments. *Id.* Some term-limited lecturers are timing out of their contracts and, due to the hiring freeze, these lecturers will not be replaced and bodies of knowledge will no longer be taught at Harvard as a result. *Id.* ¶45.

**Response: Defendants have no basis to dispute.**

114.    According to the AAUP-Harvard President, Defendants' demands listed in the Demand Letters will have the following effects on AAUP members' academic freedom:

a.    The demands concerning DEI programs "will be interpreted, especially among non-tenure-track and other contingent faculty who do not have the protections of tenure, as implying that any kind of teaching and research related to race, ethnicity, racial equity, and identity, whether in a U.S. or global context, is too risky and could lead to career-damaging consequences." *Id.* ¶35.

b.    The demands about empowering certain faculty and senior leadership and reducing the power held by faculty and administrators "more committed to activism than scholarship" suggest a "litmus test upon faculty, whereby certain faculty members are to be disempowered or professionally marginalized based on ideological criteria." *Id.* ¶36.

c.    The demand that "an external party ... audit the student body, faculty, staff, and leadership for viewpoint diversity" and that every department or field "found to lack viewpoint diversity" be reformed would infringe the ability of scholars "to direct the faculty appointments process according to their professional competence and expertise in their respective fields, and would insert … extra-academic ideological considerations into the evaluation of candidates for teaching and research positions." *Id.* ¶37.

**Response: Defendants admit or have no basis to dispute Plaintiffs' interpretation of what Plaintiffs characterize as "Demand Letters". Defendants dispute that Defendants caused any legally cognizable harm to AAUP members.**

115.    Harvard-AAUP members who work in the programs, schools, and centers targeted in the April 11 Letter "report fear and anxiety stemming from having been singled out for exceptional scrutiny." *Id.* ¶38.

**Response: Defendants admit or have no basis to dispute.**

116.    Harvard has "taken actions in anticipation of the Trump administration investigating the university." *Id.* ¶24. On March 26, 2025 the Director and Associate Director of the Center for Middle Eastern Studies were removed from their directorship positions. *Id.*

**Response: Defendants admit or have no basis to dispute Harvard's actions. Defendant disputes that any actions taken by Harvard were caused by Defendants.**

117.    Harvard declined to renew a partnership between the Harvard School of Public Health's François-Xavier Bagnoud (FXB) Center for Health and Human Rights and Birzeit University in the West Bank and declined to renew the annual contract of the Associate Director for the Religion, Conflict, and Peace Initiative at Harvard Divinity School, the only Palestinian-American at the Divinity School. *Id.* ¶¶24–25.

**Response: Defendants admit or have no basis to dispute Harvard's actions. Defendant disputes that any actions taken by Harvard were caused by Defendants.**

118.    The AAUP-Chapter President believes "it is reasonable to interpret all these actions as having been taken in anticipation of a Trump administration investigation." *Id.* ¶26. "The fact that these programs were all shut down around the same time raised grave concerns that legitimate inquiry regarding Israel and Palestine was being shut down by Harvard as a result of threats made by the Trump administration to investigate the university." *Id.*

**Response: Defendants admit or have no basis to dispute the AAUP-Chapter President's beliefs. Defendant disputes that any actions taken by Harvard were caused by Defendants.**

119.    In response to one of the demands in the April 11 Letter, Harvard changed its disciplinary procedures for students accused of committing infractions of the student code of conduct. *Id.* ¶26. Harvard has also recently "renamed its Office for Equity, Diversity, Inclusion, and Belonging as the Office of Community and Campus Life." *Id.* ¶28.

**Response: Defendants admit or have no basis to dispute Harvard's actions. Defendant disputes that any actions taken by Harvard were caused by Defendants.**

120.    Some of Plaintiffs' members "have started to self-censor their language both inside and outside the classroom" as a result of Defendants' actions and some "now feel limited in what they can say in and outside the classroom" for fear of losing additional federal funding. Ex. 15 ¶14.

**Response: Defendants admit or have no basis to dispute the actions or feelings of a third party. Defendants dispute that actions taken by third parties were caused by Defendants.**

### a.    AAUP-Harvard member Molly Forrest Franke

121.    Franke is a Professor in the Department of Global Health and Social Medicine at Harvard Medical School and an Associate Professor in the Department of Epidemiology at HSPH. Ex. 18 ¶1. Her research focuses on improving health outcomes for individuals affected by tuberculosis and HIV. *Id.* ¶4. Her work also addresses "critical knowledge gaps related to conditions that disproportionately affect the poor and socially marginalized." *Id.*

**Response: Defendants admit or have no basis to dispute.**

122.    Franke's research was entirely federally funded. *Id.* ¶12. She received notice from Harvard on May 15, 2025 that all four of her NIH grants had been terminated. *Id.* ¶13.

**Response: Defendants admit or have no basis to dispute.**

123.    One of Franke's NIH grants funded research on "whether community-engaged social media campaigns and social media influencers could reduce HIV-related stigma and, thereby, improve the health of young people." *Id.* ¶14. This grant was about to enter a no-cost extension year, during which Franke's research team would have completed their analyses and published their findings. *Id.* Now, they do not have funding to complete their work and "if funding is not restored soon" Franke's research team "will not be able to publish [their] analyses." *Id.*

**Response: Defendants dispute that the named party was a party or an intended beneficiary of any contract.**

124.    Franke's second terminated NIH grant funded research on treatment of multi-drug resistant tuberculosis. *Id.* ¶15. This grant was also in a no-cost extension year and Franke had submitted another NIH grant application to continue the work. *Id.* In early May, she was told by an NIH employee that NIH program officers were instructed to sit on grant applications from Harvard, and she is "virtually certain" the grant application to continue the work will not be funded. *Id.* If funding for this research "is not restored soon," Franke "will not be able to publish outstanding analyses." *Id.* Without new funding, Franke expects to lay off staff in Peru and Lesotho, "some of whom have more than ten years of specialized training and experience managing these types of data." *Id.*

**Response Response: Defendants dispute that the named party was a party or an intended beneficiary of any contract.**

125.    Franke's third terminated NIH grant funded "the evaluation of a community-based support intervention" for adolescents and young adults with HIV in Peru transitioning to adult-centered HIV care. *Id.* ¶¶16, 19. Her research team was completing the third of five funded years when the grant was terminated. *Id.* ¶16. This grant funded a team at Harvard including a postdoc, statistician, research coordinator, and programmer and 15 to 20 individuals in Peru, all of whom "reasonably presumed that they had job security for the remaining two years of the project." *Id.* ¶20. Franke's research coordinator is bilingual, "has been crucial in bridging cultural and linguistic differences," and "has built rapport with the team in Peru that not anyone can build." *Id.* ¶25.

**Response: Defendants dispute that the named party was a party or an intended bene-fiary of any contract.**

126.    Franke's third NIH grant involves a trial of young people ages 14 to 23, 93% of whom have a recent HIV diagnosis, one-third of whom lack caregiver support, over half of whom have mental health needs, and many of whom live in poverty. *Id.* ¶21. Franke's research team committed 9 to 12 months of intervention for enrolled participants, as well as follow-up from project staff. *Id.* The intervention includes pairing participants with adult health workers who attend medical visits with them and help them enroll in health insurance and obtain national IDs. *Id.* ¶¶21–22. "The trial also includes social support groups, education sessions, and mental health and substance use screening and linkage to care for participants." *Id.* ¶21. Trial participants depend on these services, lack comparable support, and voluntarily chose to enroll in the trial based on the terms presented to them at the time of enrollment. *Id.* The project's intervention is intended to gradually taper over time so that participants can eventually gain independence navigating care systems, and if the project cannot continue, all participants will not receive intended offboarding

support. *Id.* ¶22. "[E]arly termination is unethical and represents an extraordinary breach of trust." *Id.* ¶21.

> **Response: Defendants dispute that the named party was a party or an intended beneficiary of any contract.**

127.    Partnerships Franke has established throughout this project "are also gravely threatened by the termination of the grant supporting it." *Id.* ¶24. Local implementing partners in Peru, including the Peruvian Ministry of Health, enable Franke's work. *Id.* Franke believes termination will "jeopardize [her] relationships" and "damage the positive reputation" she has built with the Ministry of Health over many years. *Id.*

> **Response: Defendants admit or have no basis to dispute.**

128.    If federal funding is not restored, project staff for this project "will soon have to explain to participants that projects are ending, and [Franke] will soon have to let the team in Peru go." *Id.* ¶28.

> **Response: Defendants admit or have no basis to dispute.**

129.    Franke's fourth terminated NIH grant funded research about unsuccessful tuberculosis treatment outcomes. *Id.* ¶17. This was a two-year award and as a result of this grant termination, Franke will not be able to complete proposed analyses about "the contributions of daily medication adherence and comorbidities such as HIV and diabetes to tuberculosis treatment outcomes." *Id.*

> **Response: Defendants dispute that the named party was a party or an intended beneficiary of any contract.**

130.    Franke's terminated grants have "established and fortified critical infrastructure in Peru, Lesotho, and Kazakhstan for carrying out research aimed at improving outcomes for people

with HIV and tuberculosis." *Id.* ¶26. "Without federal funding, this critical infrastructure cannot be sustained, posing a formidable barrier to future research." *Id.*

> **Response: Defendants dispute that the named party was a party or an intended beneficiary of any contract.**

131.    Graduate students and postdocs hired to support Franke's research will also suffer as a result of her grant terminations. *Id.* ¶29. For example, Franke has a postdoc who planned to apply for a NIH career development award, but because of Defendants' actions, it is unclear how he can advance his academic career at Harvard. *Id.* It is difficult for postdocs to find a new postdoc position at a different institution given the large number of postdocs whose funding has been terminated at Harvard and other institutions. *Id.* As a result, he is considering leaving the academy to pursue opportunities in industry. *Id.*

> **Response: Defendants dispute that the named party was a party or an intended beneficiary of any contract.**

### b.    AAUP-Harvard member Meredith Rosenthal

132.    Rosenthal is a Professor of Health Economics and Policy in the Department of Health Policy and Management at the Harvard T.H. Chan School of Public Health and the interim chair of the department. Ex. 19 ¶1. Her research focuses on "policies to improve affordability, equity, and access to healthcare" and examines the structure and impact of health policy mechanisms on patient behavior. *Id.* ¶3.

> **Response: Defendants admit or have no basis to dispute.**

133.    Sixty percent of Rosenthal's salary comes from research grants, including those funded by the NIH and the Agency for Healthcare Research and Quality, an agency within HHS. *Id.* ¶13.

> **Response: Defendants admit or have no basis to dispute.**

134.    Rosenthal's NIH grant funded research into reducing health disparities by examining whether a tool that helps identify lower cost medication alternatives increases medication adherence for patients with chronic health conditions. *Id.* ¶14. One of the goals of the research was to assess whether that tool benefits patients differently based on socioeconomic class or geographic location. *Id.* ¶14. The grant provided $2.5 million in federal funding over 3.5 years, and had one year left on its funding term when it was terminated on May 15, 2025. *Id.* ¶15.

**Response: Defendants dispute that the named party was a party or an intended beneficiary of any contract.**

135.    The grant funded the salaries of four Harvard faculty, two Harvard research assistants, one Harvard PhD student, and collaborators at two other universities. *Id.*

**Response: Defendants admit or have no basis to dispute.**

136.    Rosenthal's colleagues in the Department of Health Policy and Management will have to terminate research staff positions funded by federal grants and will face hurdles securing funding for their PhD students. *Id.* ¶16. It may be career ending for early-career tenure candidates, who may not be competitive candidates for promotion to full professorship without the opportunity to lead rigorous, peer-reviewed research that only federal funding can support. *Id.* ¶17.

**Response: Defendants admit or have no basis to dispute.**

137.    Moreover, Rosenthal has been advising Harvard's health policy doctoral students to weigh the potential consequences of pursuing questions and topics that the Trump administration may label as "DEI" or contrary to its policy agenda on their ability to receive federal funding and secure an academic position. *Id.* ¶22.

**Response: Defendants admit or have no basis to dispute.**

### c.    AAUP-Harvard member Paige Williams

138.    Williams is a non-tenured Senior Lecturer in the Department of Biostatistics at the Harvard T.H. Chan School of Public Health. Ex. 20 ¶1. Her research focuses on cohort studies evaluating health outcomes in pregnant women with HIV and their children. *Id.* ¶4.

**Response: Defendants admit or have no basis to dispute.**

139.    Ninety percent of Williams's salary comes from NIH-funded research grants. *Id.* ¶13. She was a principal investigator ("PI") on two longitudinal NIH studies and co-investigator on 3 additional NIH grants, all of which were terminated on May 6, 2025. *Id.* ¶14.

**Response: Defendants admit or have no basis to dispute.**

140.    Williams's first terminated NIH grant funded the Pediatric HIV/AIDS Cohort Study ("PHACS"), a 20-year United States-based multisite network conducting multiple studies on the effects of antiretroviral treatment for mothers with HIV and their children. *Id.* ¶15.

**Response: Defendants dispute that the named party was a party or an intended beneficiary of any contract.**

141.    The grant, which provided over $88 million dollars over its last 5-year grant cycle, supported 7 Harvard faculty, 6 Harvard senior research scientists, and over 20 additional Harvard staff as well as 24 clinical research sites around the country, which employed about 150 total staff. *Id.* ¶16. The NIH refused to release carry-over funds to PHACS, which Williams reserved from prior grant years to ensure proper closure of the 20-year study and are typically released as a matter of course. *Id.* ¶17. Because of the funding lapse, Williams and her team are now not able to perform "crucial study closure activities like data and specimen submission, document archiving, and regulatory compliance for human research activities at the clinical sites." *Id.*

**Response: Defendants admit or have no basis to dispute.**

142.    Williams's second terminated NIH grant funded the Health Outcomes around Pregnancy and Exposure to HIV/ARV, (or "HOPE") study, a multisite cohort study on women with HIV at 13 clinical research sites around the country. *Id.* ¶19.

**Response: Defendants dispute that the named party was a party or an intended beneficiary of any contract.**

143.    This grant, which would have provided about $14.5 million in federal funding over 5 years, was in its last year of funding when it was terminated. *Id.* The grant provided salary support for 4 PIs and the equivalent of 6 additional full-time staff members and supported 13 clinical research sites. *Id.* Due to funding shortages, 13 clinical sites were also unable to perform close out activities, meaning the study will likely "lose a significant amount of data gathered in the last four years of the study." *Id.* ¶20. Williams has already laid off one staff member and furloughed 3 additional staff members. *Id.* The abrupt funding termination also has had "an enormous impact on [Williams's] study participants, who are women living with HIV." *Id.* at 22. Because "[t]here remains an unfortunate stigma attached to HIV," Williams's research "rel[ies] on the willingness of [her] study participants to share openly some of the most vulnerable and challenging aspects of their lives. *Id.* In other words, "[her] work thus depends on a foundation of trust between [her] and the participants [she] work[s] with, and many of [her] participants have expressed that they feel [her team] betrayed the commitment [Williams] made to better understand their health conditions when [Williams] abruptly ceased study activities. *Id.*

**Response: Defendants admit or have no basis to dispute.**

### d.    AAUP-Harvard member John Quackenbush

144.    Quackenbush is a Professor of Computational Biology and Bioinformatics at the Harvard T.H. Chan School of Public Health and the Chair of the Department of Biostatistics at the School of Public Health. Ex. 16 ¶1. His research focuses on cancer treatments, specifically

"developing methods that map the processes that control how cells change as they transition from health to disease" and the roles that sex and gender play. *Id.* ¶5.

**Response: Defendants admit or have no basis to dispute.**

145.    Around fifty percent of Quackenbush's salary came from a National Cancer Institute R35 grant, which funded research to "develop new methods to map processes involved in cellular regulation, to develop software tools that would allow us and other scientists around the world to map and study these controls, and to study sex as a biological variable in the context of how it affects cancer." *Id.* ¶12. His "team built the first system capable of modeling how each of the 25,000 genes in the human genome change over time and demonstrated its application to development of breast cancer. This method was recognized by the NCI as one of the most important advances in cancer research in 2024." *Id.* ¶17. The grant, which provided $600,000 a year in funding for seven years, was terminated on May 15, 2025. *Id.* ¶¶12, 13.

**Response: Defendants admit or have no basis to dispute.**

146.    Quackenbush's other terminated NIH grant funded the development of methods to "study how different chromosomal backgrounds result in different risk for disease." *Id.* ¶14. That grant, which accounted for a large part of his remaining salary, was terminated as of April 4, 2025. *Id.*

**Response: Defendants dispute that the named party was a party or an intended beneficiary of any contract**.

147.    Tenured faculty at the School of Public Health must fund 90% of their research effort or will otherwise face a "substantial salary reduction." *Id.* ¶18. For Quackenbush, "[t]rying to re-establish a research program after the rug has been yanked out from under it with little notice" is "an untenable position." *Id.*

**Response: Defendants admit or have no basis to dispute.**

148.    Quackenbush has lost all of his federal funding. *Id.* ¶15. As a result, the more than 20 publicly-available software tools he has developed "will soon become dysfunctional," *id.*, and due to its nature and magnitude, his research "will effectively be dead" "[u]nless funding is restored by the end of the summer and the federal government agrees to fund new and renewal grant proposals from Harvard researchers," *id.* ¶18.

**Response: Defendants dispute that the named party was a party or an intended beneficiary of any contract.**

149.    Quackenbush is involved with training the over 40 students in the Department of Biostatistics with the financial support of NIH training grants. *Id.* ¶¶21, 22. The Department has lost all of its training grants, meaning that the students now all face a lack of support for their studies and research. *Id.* ¶22. Because of the apprenticeship style training of the field, he cannot train the department's postdoctoral fellows and graduate students without federal funding. *Id.* ¶24. As a result, "promising lines of research will disappear." *Id.* ¶20.

**Response: Defendants admit or have no basis to dispute.**

150.    Quackenbush's mentees and students are now looking elsewhere for opportunities to complete their training and finish their degrees, including overseas in Canada and Europe, a loss that "would be a blow to science in the U.S." *Id.*

**Response: Defendants admit or have no basis to dispute.**

### e.    AAUP-Harvard member Scott Delaney

151.    Delaney is a Research Scientist at the Harvard T.H. Chan School of Public Health ("HSPH"). Ex. 22 ¶3. He is an epidemiologist and studies "how environmental, social, and legal forces affect neurodegenerative diseases in older Americans and neurodevelopmental health in

American children." *Id.* ¶3. The "driving motivation" of his career "is to improve the lives of people battling neurological disorders." *Id.*

**Response: Defendants admit or have no basis to dispute.**

152.   Delaney has a three-year employment agreement with HSPH that began in May 2024. *Id.* ¶5. As a Research Scientist, Delaney is paid "to conduct research, not to teach, mentor, or perform other duties." *Id.* ¶8. As a professional researcher, Delaney must ensure his salary is "fully funded by research grants." *Id.* For many Research Scientists at HSPH, including Delaney, NIH grants "provide most funding for our research and salaries." *Id.*

**Response: Defendants admit or have no basis to dispute.**

153.   Delaney's research group at HSPH consists of 4 Research Scientists including Delaney, "a masters-level biostatistician, and 5-6 students and postdoctoral fellows." *Id.* ¶23.

**Response: Defendants admit or have no basis to dispute.**

154.   Delaney's current research and his entire salary were "entirely funded" by a single NIH grant that was frozen in April 2025 and terminated on or about May 15, 2025. *Id.* ¶¶9, 18. This was a five-year grant "meant to support research from September 2022 until July 2027." *Id.* ¶19. This grant funded Delaney's research "on the health effects of various environmental exposures, including fine particle air pollution and extreme temperature events, on brain health." *Id.* ¶10. He was studying "the effects of these exposures on Americans with neurodegenerative diseases." *Id.*; *see also id.* ¶18. His team planned to expand the research to include Americans with Lewy Body Dementia, "a devastating yet understudied syndrome that shares some symptoms in common with both Alzheimer's and Parkinson's Diseases." *Id.* ¶10.

**Response: Defendants admit or have no basis to dispute.**

155.    Prior to the termination of the NIH grant funding Delaney's research and salary, he "received a conditional layoff notice from HSPH that said if [he] d[id] not obtain grants to support [his] salary within six months, [he] w[ould] be laid off on October 14, 2025." *Id.* ¶21. Because "grants for academic research typically take many months or more to apply for and receive," and he "will not be able to obtain private funding to replace [his] federal funding," Delaney "fully expect[s] to be laid off in October." *Id.* However, if his "research group's federal grant is restored within a few months, [his] position will continue to exist and [his] job will no longer be in peril." *Id.* ¶22.

**Response: Defendants dispute that the named party was a party or an intended beneficiary of any contract.**

156.    Everyone in Delaney's research group is also "now at risk of losing their jobs." *Id.* ¶23. His research group has, in collaboration with a larger team, "contributed to the compilation of one of the largest datasets of Medicare claims data available" that includes "21 years' worth of data of every fee-for-service Medicare hospitalization claim in the entire country." *Id.* It has "taken years to train our staff and researchers to work with this massive dataset" and even if his team was able to hire different researchers at a later date, "years of productivity and resources would be required to train these individuals" because there is "a very steep learning curve for anyone working with our data." *Id.*

**Response: Defendants admit or have no basis to dispute.**

157.    The "collective knowledge of the staff and researchers" in Delaney's research group "is also irreplaceable." *Id.* ¶24. "The value of experience and institutional memory within the research group will be lost if individuals are forced to turn to other institutions that are able to fund their work" and projects that have been "years in the making, with extensively trained and

specialized staff, will be compromised" if team members are "forced to find jobs elsewhere." *Id.*
The "scientific community and American public" will "lose research meant to benefit the lives of
people living with neurodegenerative diseases" if "funding is not restored within the next few
months." *Id.*

      **Response: Defendants admit or have no basis to dispute.**

158.    Students and postdoctoral fellows hired to work in Delaney's research group "may
also lose their jobs if funding is not restored." *Id.* ¶25.

      **Response: Defendants admit or have no basis to dispute.**

159.    "NIH grants comprise a larger proportion of HSPH's budget than of any other
school within Harvard." *Id.* ¶27. The federal grant terminations "across HSPH have had a huge
impact on the psyche of everyone within the school." *Id.*

      **Response: Defendants admit or have no basis to dispute.**

      **f.      AAUP-Harvard member Walter Willett**

160.    Willett is a Professor of Epidemiology and Nutrition at the Harvard T.H. Chan
School of Public Health and the director of the Thich Nhat Hanh Center for Mindfulness in Public
Health. Ex. 23 ¶1. He is the most cited nutritionist in the world, and his research "focuses on the
risk factors for heart disease, cancer, and other conditions." *Id.* ¶4.

      **Response: Defendants admit or have no basis to dispute.**

161.    Willett's work was funded by two large grants from the NIH National Cancer In-
stitute. Both grants were terminated on May 6, 2025. *Id.* ¶11.

      **Response: Defendants admit or have no basis to dispute.**

162.    Willett's first terminated grant funded a study, since the 1980s, that follows a cohort
of women to understand how diets and lifestyle relate to cancer risk and, in parallel, follows the
diets of a group of men who got cancer. *Id.* ¶¶12, 13. The study collected "data about heart attacks,

cancer, and other conditions that share risk factors with heart disease, such as dementia and Parkinson's disease." *Id.* ¶13.

**Response: Defendants dispute that the named party was a party or an intended beneficiary of any contract.**

163.    Willett and his team of researchers collect information about participants' "physical and cognitive functions" every two years. *Id.* ¶16. If the next follow-up is not conducted within the next year, some participants, who have contributed information for four decades, may die before Willett is able to follow up with them. *Id.* The study would "deprive all Americans from the benefits of knowledge about diet, other aspects of lifestyle, and use of medications that enhance their possibilities of living longer and healthier lives." *Id.*

**Response: Defendants admit or have no basis to dispute.**

164.    The study has collected biological samples from approximately 30,000 participants that must be stored at low temperatures. *Id.* ¶13. Without funding, Willett can only keep the samples, which will spoil if allowed to thaw, frozen for a few weeks. *Id.* ¶15. No other institution in the world has this data, meaning the samples are irreplaceable. *Id.*

**Response: Defendants admit or have no basis to dispute.**

165.    Willett will soon have to lay off his team of experienced researchers, who have specialized knowledge about the studies. *Id.* ¶17. He is concerned he will not be able to hire them back even if federal funding is later reinstated. *Id.*

**Response: Defendants admit or have no basis to dispute.**

166.    Willet worries that students, "when selecting project subject matter, may choose or change their topics based on fear that certain topics will be at risk due to the Trump

administration's actions." *Id.* ¶20. This includes "research on dietary quality in vulnerable groups such as refugees and low-income groups." *Id.*

**Response: Defendants admit or have no basis to dispute.**

### g.  AAUP-Harvard member Sarah Fortune

167.    Fortune is a Professor of Immunology and Infectious Diseases at the Harvard T.H. Chan School of Public Health and the Chair of the Department of Immunology and Infectious Diseases at HSPH. Ex. 24 ¶1. Her research "focuses on the biology of tuberculosis infection. It seeks to identify bacterial and immune factors that shape tuberculosis infection outcomes." *Id.* ¶4.

**Response: Defendants admit or have no basis to dispute.**

168.    Fortune "lead[s] the HI-IMPAcTB program, one of three initiatives that form the largest investment that the NIH has ever made in the area of tuberculosis, to identify the immune basis of protection from tuberculosis disease. [Her] work informs strategies for tuberculosis diagnosis, vaccine design, targeting [tuberculosis] treatment and tracking previously unrecognized modes of [tuberculosis] transmission." *Id.* ¶4. She received a Stop Work Order for the HI-IMPAcTB contract on April 15, 2025, which "was starting its 5th of 7 years of funding and received roughly $8 million per year to support 21 research groups over 11 institutions." *Id.* ¶12. As a result of the termination of federal funding, "[t]he flow of samples from other sites, the flow of operations, the flow of data and the day-to-day immune profiling at [the] lab have all ceased." *Id.* ¶13. In addition, the lab "has stopped receiving shipments from [its] collaborators, stopped performing experiments, and has been forced to develop a layoff plan." *Id.* ¶13.

**Response: Defendants admit or have no basis to dispute.**

169.    Fortune has been forced to lay off researchers "who generated the data and have been working to analyze and distill the data." *Id.* The lab is "losing whole bodies of work because [it is] laying off the scientists who carry the knowledge from the past 5 years of research," much

of which is not yet completed. *Id.* Her lab is "losing not only the future funding but many of the discoveries from the past investments." *Id.*

**Response: Defendants admit or have no basis to dispute.**

170.    Fortune, who "train[s] [her] staff using an apprenticeship model that would be extremely difficult and time-intensive to replicate," relied on "federal funding to train valuable researchers and support staff over the long term and to staff [her] labs with the staff needed to conduct effective scientific inquiry." *Id.* ¶18. Her team's "shared, institutional knowledge will be scattered to the wind if [she is] forced to let go of more individuals in the lab. It would be impossible to later reproduce the accumulated expertise of [the] current staff if federal funding is later restored." *Id.* ¶18.

**Response: Defendants admit or have no basis to dispute.**

### h.    AAUP-Harvard member Don Ingber

171.    Ingber is the Founding Director of the Wyss Institute for Biologically Inspired Engineering at Harvard University, the Judah Folkman Professor of Vascular Biology at Harvard Medical School and the Vascular Biology Program at Boston Children's Hospital, and the Hansjörg Wyss Professor of Biologically Inspired Engineering at the Harvard John A. Paulson School of Engineering and Applied Sciences. Ex. 25 ¶1.

**Response: Defendants admit or have no basis to dispute.**

172.    Ingber's research "use[s] methods of miniaturization originally developed in the computer industry for manufacturing microchips to build devices with functional circuits that use living cells as their components" called Organ Chips. *Id.* ¶6.

**Response: Defendants admit or have no basis to dispute.**

173.    Until April 14, Ingber "was actively working on two federally funded projects utilizing [his] human Organ Chip work." *Id.* ¶14.

**Response: Defendants admit or have no basis to dispute.**

174.    Ingber's first such project "uses Organ Chip technology to study how the human lung, intestine, bone marrow, and lymph node respond to radiation and to identify drugs that can mitigate the effects of that radiation." *Id.* ¶15. Federal government funding for this project "supports 21 positions in [Ingber's] lab, including 3 graduate students, 1 intern, 2 postdoctoral fellows, 5 technicians, and 10 technical staff members." *Id.*

**Response: Defendants admit or have no basis to dispute.**

175.    Ingber's second such project "uses Organ Chip technology to study the effects of microgravity and radiation on astronauts during spaceflight." *Id.* ¶16. Federal government funding for this project "supports 5 positions in [Ingber's] lab, including 5 technical staff members." *Id.*

**Response: Defendants admit or have no basis to dispute.**

176.    On April 14, Ingber "received 2 notices from the federal government directing me to stop work on both of these projects." *Id.* ¶17.

**Response: Defendants admit or have no basis to dispute.**

177.    "As a result, no work is currently happening in [Ingber's] lab on either project." *Id.* ¶18. Ingber has been "forced to halt experiments midstream" and has thus lost the scientific value of those experiments and has had to shift employees to other areas of work to avoid laying them off. *Id.* "If this funding is not restored soon, [Ingber] will have to terminate many of these positions." *Id.*

**Response: Defendants admit or have no basis to dispute.**

178.    Two non-citizen researchers have recently chosen to leave Ingber's lab as a result of Defendants' actions and concern for their own job security. *Id.* ¶19.

**Response: Defendants admit or have no basis to dispute.**

179.    Work from Ingber's second project was "scheduled to fly aboard the Artemis II mission to the moon alongside the astronauts who donated the cells." *Id.* ¶16. Because they had stopped work pursuant to the federal government's orders, Ingber's team was recently "unable to participate in an important meeting related to the upcoming use of [their] chips on the Artemis II space mission, jeopardizing [their] ability to meet the deadlines associated with that project." *Id.* ¶20. "In an attempt to salvage this important project, meet the deadlines necessary to participate in the Artemis II mission, and protect the livelihood of the staff members who rely on [Ingber] for jobs, [he has] been forced to explore shifting work associated with this project and many of the associated staff positions out of the Wyss Institute to a private company." *Id.* Doing so would cost Ingber and the Wyss Institute the reputational benefits of the project. *Id.*

**Response: Defendants admit or have no basis to dispute.**

180.    Ingber currently has "multiple funding proposals" before the federal government which he is "concerned will not receive funding given the government's position." *Id.* ¶21.

**Response: Defendants admit or have no basis to dispute.**

### i.    AAUP-Harvard member Bence Ölveczky

181.    Ölveczky is a Professor of Organismic and Evolutionary Biology at Harvard University. Ex. 26 ¶1. His research focuses on how the brain learns new motor skills and generates complex behaviors. *Id.* ¶4. A main focus of his lab's work is studying the function of the basal ganglia in the brain, which goes awry in people diagnosed with Parkinson's and Huntington's disease. *Id.*

**Response: Defendants admit or have no basis to dispute.**

182.    Ölveczky had two NIH grants that were terminated on May 15, 2025. *Id.* ¶11. He runs a lab of 10-12 people that was "largely funded by these grants." *Id.* His federal funding

"covered salaries for post-docs and technicians, reagents, animal care costs, instruments, and publication costs." *Id.*

**Response: Defendants dispute that the named party was a party or an intended beneficiary of any contract.**

183.    Ölveczky's first terminated NIH grant funded "research understanding sensorimotor control through neuro-biomechanical simulation." *Id.* ¶12. He was leading a research collaboration with other institutions to create a "virtual animal with a realistic biomechanical musculoskeletal system controlled by an artificial neural network" that "could be trained to mimic the behavior of real animals. *Id.* This research "had the potential to transform how we study the brain" and the "potential to improve AI algorithms required for sophisticated robotic control." *Id.*

**Response: Defendants dispute that the named party was a party or an intended beneficiary of any contract.**

184.    Ölveczky's second terminated NIH grant "funded research aimed at understanding the neural circuits underlying the acquisition and control of motor skills." *Id.* ¶13. This work "informs our understanding of how healthy brains work" and the "neural mechanism affected in disease" and "had the potential to improve the design of rehabilitations strategies, including after a stroke." *Id.*

**Response: Defendants dispute that the named party was a party or an intended beneficiary of any contract.**

185.    Ölveczky has one research project funded by the Simons Foundation for Autism Research studying "how autism affects brain function and behavior, specifically social behaviors." *Id.* ¶14. This private funding "covers work on a narrow set of questions related to autism research" and by contract he can "only use this private funding to advance autism research that matches the

goals of the Foundation." *Id.* This grant will end this year, and Ölveczky was planning on applying for federal grants to continue "this promising research and extend its scope." *Id.*

**Response: Defendants admit or have no basis to dispute.**

186.    Ölveczky's "experiments are complicated and run for a couple of years." *Id.* ¶15. If his work gets cut short, "that means [his team] will not be able to finish [their] experiments, analyze [their] data, and write publications." *Id.* "The funds previously spent will have been for nothing, much of the work will be lost, and the public won't get the benefit of our completed research." *Id.* His lab may also "have little to show for 3-5 years' worth of work" and the "currency in academia" is publishing and getting "credit for advancing the field." *Id.*

**Response: Defendants admit or have no basis to dispute.**

187.    Some of Ölveczky's federally funded experiments involve training rats for months. *Id.* ¶16. If he had to "terminate or pause those experiments," he would "later have to retrain new rats from scratch, which would be onerous and a waste of valuable research time." *Id.* ¶16.

**Response: Defendants admit or have no basis to dispute.**

If federal funding is not restored soon, Ölveczky "may be faced with letting critical staff members go." *Id.* ¶17. His staff "run the experiments, analyze the data, write reports to grant agencies, write journal articles, maintain the animal colonies, and keep my research projects going." *Id.* They have invested years in Ölveczky's research, and if he has to let them go, "it would derail and destroy their careers." *Id.* If he has to let staff go, he "may not be able to replace them," and even if he could later hire new staff when federal funding is restored, he could not replace his current staff "who have spent 3-4 years in my lab and understand our data and how to conduct our experiments" a **Response: Defendants dispute that the named party was a party or an intended benefiary of any contract.**

188.    nd have "institutional memories." *Id.* ¶¶18–20. If he "brought in new staff in a few years after federal funding resumes" he "may have to train them for 2-3 years to be able to run similar experiments." *Id.* ¶21.

**Response: Defendants admit or have no basis to dispute.**

189.    Ölveczky's postdocs' research "would be entirely lost." "[P]ostdocs come up with their own research ideas" and someone new "would not want to do exactly the same type of research my current postdocs are engaged in." *Id.* ¶22.

**Response: Defendants admit or have no basis to dispute.**

### j.    AAUP-Harvard member Shoba Ramanadhan

190.    Ramanadhan is an Associate Professor of Social and Behavior Sciences at the Harvard T.H. Chan School of Public Health. Ex. 21 ¶1. Her research focuses on "strengthening systems in underserved communities to leverage the best available evidence for cancer prevention and control." *Id.* ¶4. "Much of [her] work is conducted in partnership with community-based organizations and coalitions." *Id.* ¶4.

**Response: Defendants admit or have no basis to dispute.**

191.    Ramanadhan conducts research under five major projects that are fully federally funded. *Id.* ¶11. Four out of five of her federal grants from the NIH have been terminated or ended early. *Id.* "Work on the projects that were funded by these grants is expected to stop soon, and [her] department is already helping to plan layoffs for staff on these grants." *Id.*

**Response: Defendants admit or have no basis to dispute.**

192.    Ramanadhan's "first terminated grant funded research about the impact of climate change-related heat stress on people across the globe." *Id.* ¶12. The information collected through the project "is intended to support the local communities where the research is taking place" as well as "other areas with limited resources to protect communities against heat stress." *Id.*

**Response: Defendants dispute that the named party was a party or an intended beneficiary of any contract.**

193.    Ramanadhan's "second terminated grant funded training of researchers to expand the impact of their work on local communities and public health systems." *Id.* ¶13. The project "focuses on social determinants of health … to develop sustainable, high-impact solutions to cancer inequities." *Id.*

**Response: Defendants dispute that the named party was a party or an intended beneficiary of any contract.**

194.    Ramanadhan's "third terminated grant funded cancer-focused outreach to immigrant, refugee, and racial/ethnic minority communities." *Id.* ¶14. The grant also funded workforce development programs that train "students from under-represented minority backgrounds to support them in pursuing research careers focused on cancer and other health inequities." *Id.* "Losing this grant will impact who ultimately goes on to work in the field." *Id.*

**Response: Defendants dispute that the named party was a party or an intended beneficiary of any contract.**

195.    Ramanadhan's fourth terminated grant supported academics across HSPH, Harvard Medical School, and Harvard-affiliated hospitals "to translate their research into programs, practices, and policies that can be implemented widely." *Id.* ¶15. Ramanadhan's work under the project "engages community leaders from underserved communities to help design and execute research projects that are likely to be high impact in their communities." *Id.*

**Response: Defendants dispute that the named party was a party or an intended beneficiary of any contract.**

196.    Ramanadhan works "closely with communities that have been subject to discrimination in the United States" that are "understandably skeptical of scientists and academic researchers." *Id.* ¶16. It can take her research team "5 to 15 years to build the requisite trust and relationships with a community and partner on research." *Id.* Without federal funding, her team "will not be able to honor [their] existing commitments to the communities [they] serve." *Id.* ¶17.

197.    Ramanadhan's team "supports local organizations to use evidence-based interventions for cancer prevention and control." *Id.* ¶19. "If [she] cannot complete her projects, people in the communities [she] serve[s] will not be supported to engage in cancer prevention activities, such as breast cancer screening or vaccination against HPV." *Id.*

**Response: Defendants admit or have no basis to dispute.**

198.    Ramanadhan "will not be able to obtain private foundation funding to replace [her] terminated federal funding." *Id.* ¶18.

**Response: Defendants admit or have no basis to dispute.**

199.    The termination of Ramanadhan's grants "impacts three generations of scientists at Harvard." *Id.* ¶21. Ramanadhan and her colleagues "have had to rescind offers of employment for students at the Masters and Doctoral levels, due to the abrupt termination of funding." *Id.* ¶20. Graduate students on the terminated grants "have lost out on valuable training opportunities, from conducting research to publishing papers and presenting findings at scientific conferences." *Id.* ¶21. Losing her grants "also means [she] lose[s] the ability to support postdoctoral fellows." *Id.* For faculty working towards tenure, as Ramanadhan is, the loss of federal funding "restricts the ability to create the type of broad, high-impact program of research required for tenure." *Id.* ¶22. "[G]iven the large number of researchers suddenly turning towards the same, limited pool of [private] resources, it is likely that many academics will need to leave the field," particularly

"individuals working in areas disfavored by this administration." *Id.* "An entire cohort could lose the opportunity to become tenured because of these cuts." *Id.* This "puts the future of public health training and leadership at risk and risks skewing the field away from topics related to equity and diversity." *Id.*

**Response: Defendants dispute that the named party was a party or an intended beneficiary of any contract.**

200.    Health equity is central to the classes Ramanadhan teaches "on implementation science and qualitative analysis." *Id.* ¶23. "There is no accurate language that [she] can use in [her] courses that does not use terms disfavored by the Trump administration, such as LGBTQ, discrimination, minority and more." If she is "not able to use terminology disfavored by the Trump administration, [she] will not be able to teach or conduct research effectively." *Id.*

**Response: Defendants admit or have no basis to dispute.**

### k.    AAUP-Harvard member Caroline Light

201.    Light is a Lecturer and Director of Undergraduate Studies in Women, Gender, and Sexuality Studies ("WGS"). Ex. 17 ¶1.

**Response: Defendants admit or have no basis to dispute.**

202.    Light's research "explores the ways in which race, gender, and region have shaped collective memory and archival silence" and she has "studied and written about the experience of southern Jewish assimilation as well as the intersection of armed self-defense and race and gender violence." *Id.* ¶4.

**Response: Defendants admit or have no basis to dispute.**

203.    Light "teaches undergraduate courses on labor history, immigration, and gun violence." *Id.* She also advises "undergraduate students pursuing independent research on topics related to gender, sexuality, race, and power." *Id.*

**Response: Defendants admit or have no basis to dispute.**

204.    Light does not have tenure. *Id.* ¶13.

**Response: Defendants admit or have no basis to dispute.**

205.    Light is "concerned about the future of her research" because she worries that Harvard "may feel forced to accede" to Defendants' pressure. *Id.* ¶11. She has "seen Harvard take actions that suggest the university is actively making concessions to comply with the Trump administration's demands in the face of immense financial pressure." *Id.* For example, "Harvard renamed its Office of Equity, Diversity, Inclusion, and Belonging the Office of 'Community and Campus Life.'" *Id.* Harvard also "discontinued financial support for all affinity and graduation celebrations," including graduation celebrations of the LBGTQ+ and First Generation Low Income student groups and "celebrations of students of different races and ethnicities." *Id.*

**Response: Defendants dispute as to relevance to the current proceeding.**

206.    "If Harvard continues to capitulate to the Trump administration's demands," Light worries "about the future security of [her] teaching and scholarship in gender and sexuality studies and ethnic studies." *Id.* ¶12. "If Harvard's leadership decides to make further program cuts," Light believes WGS "could then become a target, with enhanced scrutiny on its curricular offerings and research." *Id.* ¶12. Light's position is "thus vulnerable." *Id.* ¶12.

**Response: Defendants dispute as to relevance to the current proceeding.**

207.    Light has "witnessed a chilling effect on scholarly and pedagogical innovation as a direct result" of Defendants' actions. *Id.* ¶15. Her colleagues teaching on topics related to gender and sexuality "have been targeted and doxed based on the titles and intellectual foci of their courses." *Id.*

**Response: Defendants dispute as to relevance to the current proceeding.**

208.    Light has witnessed a "chilling impact on the academic environment at Harvard" as a result of Defendants' actions. *Id.* ¶17. She has "observed that students are becoming more fearful about sharing their perspectives in public fora." *Id.*

**Response: Defendants dispute as to relevance to the current proceeding.**

209.    Light is Jewish and has "conducted significant research on Jewish history in the [United States]." *Id.* ¶5. She wears a keffiyeh on campus as a reminder of her "obligation as a Jewish person to use [her] relative privilege to participate in 'tikkun olam,' or healing the world." *Id.* ¶18.

**Response: Defendants admit or have no basis to dispute.**

210.    Light does not believe it is antisemitic to care about and respond to the suffering of others and express care for and solidarity with Palestinian people. *Id.* Light has "become more cautious about sharing [her] thoughts on issues related to Palestine and Israel" in the classroom and on campus. *Id.* She also worries that when she wears her keffiyeh in public, she may be the target of physical harm or violence. *Id.*

**Response: Defendants dispute as to relevance to the current proceeding.**

### l.    Anonymous AAUP-Harvard members

211.    Certain of Plaintiffs' members "are afraid to publicly testify about the impacts of" Defendants' actions "because they fear retaliation from Harvard University, Harvard affiliates, or the federal government." Ex. 14 ¶49. These members "have expressed fear that they will be black-listed from future federal grant funding, denied tenure or academic promotion, and/or face retaliation against other members of their department or the students they advise." *Id.* ¶50. "Certain members have expressed concern that because they or their family members are noncitizens, their visas or green cards could be revoked in retaliation for their participation in this litigation." *Id.*

**Response: To the extent that the facts stated above do not concern current or prospective grant funding or First Amendment-protected speech, Defendants dispute as to relevance to the current proceeding.**

212.    The Harvard-AAUP President has "received confidential reports of both top-down censorship and anticipatory self-censorship at Harvard-affiliated publications, in which authors of both scholarly and public-facing material attest to being discouraged from publishing on topics disfavored by the Trump administration." *Id.* ¶29. Individuals who have shared these confidential reports have stressed that the Harvard-AAUP President "cannot discuss these incidents with any specificity because [the individuals] fear being fired from their positions or facing professional retaliation." *Id.*

**Response: Defendants admit or have no basis to dispute.**

213.    The Harvard-AAUP President has two colleagues that have changed their course plans for the fall "out of self-preservation because their planned courses were on topics explicitly disfavored by the Trump administration." *Id.* ¶31. One changed their curricular offerings to no longer be explicitly about transgender issues and the other to no longer be explicitly about race. *Id.*

**Response: Defendants admit or have no basis to dispute.**

214.    Biomedical researchers who have received stop work orders have expressed concerns to the Harvard-AAUP President "about whether they can do research anymore concerning topics like health equity, maternal mortality for women of color, and disparities in health outcomes." *Id.* ¶32.

**Response: Defendants admit or have no basis to dispute.**

215.    An anonymous AAUP member reports that they "changed their teaching plans for next semester because they fear harassment." *Id.* ¶51. They had planned to teach a course that would have dealt with topics including settler colonialism, slavery, Indian removal, and the U.S.-Mexico War, "all of which could be covered by the Defendants' ill-defined demand that anything related to 'DEI' be discontinued." *Id.* ¶53.

**Response: Defendants admit or have no basis to dispute.**

216.    This anonymous AAUP member also reports that they had been vocal in support of pro-Palestine student protestors in the past but adjusted their speech and teaching out of concern for Harvard's response to Defendants' actions. *Id.* ¶52.

**Response: Defendants admit or have no basis to dispute.**

217.    A second anonymous AAUP member will spend part of next year working outside the United States "because they do not feel comfortable being at Harvard anymore due to their pro-Palestine advocacy and opinions." *Id.* ¶56. "This member's decision to spend part of next year working outside the United States is intended as a step towards their full transition outside of the United States" which means "the medical school and patients in the Harvard-affiliated hospital system will not receive the benefit of this faculty member's decades of clinical expertise." *Id.*

**Response: Defendants admit or have no basis to dispute.**

218.    A third anonymous AAUP member is a member of the faculty at Harvard Medical School and an internationally recognized scholar in their field. *Id.* ¶57. This member states that Defendants' actions have "had a catastrophic effect on the atmosphere and conduct of biomedical research at [Harvard Medical School]." *Id.* ¶58. Foundational scientific work that has taken many

years of human effort and institutional investment is being terminated in a manner that "will fundamentally preclude the possibility of future research." *Id.* ¶62.

**Response: Defendants admit or have no basis to dispute.**

219.    All three of this member's NIH grants were suspended as of May 1, totaling millions of dollars. *Id.* ¶59. These grants supported the work of five Boston-area biomedical researchers as well as many biomedical researchers at the member's international research site. *Id.* "They have had to suspend ongoing clinical trials and they do not know what will happen to valuable biomedical samples that have already been gathered as part of their research." *Id.*

**Response: Defendants admit or have no basis to dispute.**

220.    This anonymous AAUP member has also seen administrative staff responsible for tasks such as grants administration and human studies review be dismissed. *Id.* ¶60. They note that early career scientists who have completed multiple years of postgraduate training and scientists with unique and advanced skills are now seeking career opportunities outside of academia or outside of the United States, disrupting the scientific pipeline in ways that will have generational effects. *Id.*

**Response: Defendants admit or have no basis to dispute.**

221.    This member attests that Harvard is encouraging faculty to pursue philanthropic funding for their work, but the type of research they perform is unlikely to garner private funding. *Id.* ¶61.

**Response: Defendants admit or have no basis to dispute.**

222.    This member remains anonymous because they will need bridge funding from another source to maintain their research program and "they fear that their actions might influence the possibility of receiving such support." *Id.* ¶63. Additionally, administrators at the Harvard-

affiliated hospital where they work "have explicitly instructed this faculty member not to voice any public concerns about what is occurring and not to speak to the media." *Id.*

**Response: Defendants admit or have no basis to dispute.**

### m.    AAUP-Harvard members filing under seal

223.    Two of AAUP-Harvard's members are filing their affidavits under seal due to fear of harm to themselves, their families, their research teams, and their careers if they were to file publicly. Plaintiffs refer the Court to their under-seal declarations for a description of how Defendants' actions have harmed them. The facts set forth in these declarations are not subject to dispute.

**Response: Defendants admit or have no basis to dispute the members reasons for filing under seal. Defendants dispute any allegation that the Defendants' action have caused any legally cognizable harm to those members.**

### 2.    Harms to Plaintiff UAW's members

### a.    Plaintiff member Victoria Jenkins

224.    Jenkins is Genome Database Coordinator, a staff scientist position, in Harvard's Department of Molecular and Cellular Biology, and a member of HAW-UAW. Ex. 27 ¶¶1, 4. She works at FlyBase—"the only database dedicated to the Drosophila (fruit fly) genome [which] is essential to the daily work of anyone who works with Drosophila around the world." *Id.* ¶11. Her work focuses on extracting, interpreting, and archiving data from different sources "to standardize the data and make it accessible to the public and other researchers." *Id.* ¶3.

**Response: Defendants admit or have no basis to dispute.**

225.    FlyBase received grant funding from the NIH and NSF and Jenkins learned on May 19, 2025 "that the grant funding, which was previously frozen, has been terminated." *Id.* ¶12. The funding termination will "imminently affect" Jenkins' work as "[w]ithout funding, the FlyBase website will be frozen later this summer and need to stop updating" which will mean "that newly

discovered genes, data, and other discoveries on Drosophila will not be integrated in the FlyBase database and shared with the world." *Id.* ¶13

   **Response: Defendants admit or have no basis to dispute.**

226.    Jenkins worries that due to the funding cuts "[y]ears of experience and essential, historical knowledge on the FlyBase database will be lost" that will "have ripple effects across the globe, as Drosophila scientists worldwide rely on FlyBase to conduct vital research that contributes to human medical research and fundamental understandings of biology." *Id.* ¶14–15.

   **Response: Defendants admit or have no basis to dispute.**

227.    Jenkins is also "very concerned" about her "job security and anticipate[s] layoffs due to the termination of funding." *Id.* ¶15. She does not "believe there is a viable alternate source of funding that would realistically replace federal funding for FlyBase" as in its twenty-five years of existence, "there has been no viable outside funding source." *Id.* ¶16.

   **Response: Defendants admit or have no basis to dispute.**

### b.    Plaintiff member Jennifer Chen

228.    Chen holds a PhD in Bioinformatics and Integrative Genomics from the Massachusetts Institute of Technology, as well as a Master of Science in Biomedical Informatics and a Bachelor of Science in Biomedical Computation from Stanford University. Ex. 28 ¶2. Chen, a member of HAW-UAW, is a Data Science and NIH Postdoctoral Fellow at Harvard University researching evolutionary patterns of innate animal behaviors combined with comparative genomics, single cell transcriptomics, and other large-scale sequencing approaches to investigate how genes govern behavior. *Id.* ¶1–3.

   **Response: Defendants admit or have no basis to dispute.**

229.    Chen received notice on April 2, 2025 that her NIH K99/R00 grant program had been terminated and that any previously guaranteed funds would not be funded beyond June 30,

2025. *Id.* ¶12. Chen has been on maternity leave since receiving the grant termination notice, and has had to work unpaid hours while on leave to attempt to use the remaining active funds before they expire at the end of June. *Id.* ¶14.

**Response: Defendants admit or have no basis to dispute.**

230.    Chen is concerned about the impact of this grant termination on her future job prospects because the now-terminated grant would have covered her faculty salary as well as funded a portion of her lab as a faculty member. *Id.* ¶15. Additionally, her research and job applications are delayed by having to apply for non-governmental funding to replace the terminated NIH funds. *Id.* ¶16.

**Response: Defendants admit or have no basis to dispute.**

### c.    Plaintiff member Adam Sychla

231.    Sychla is a postdoctoral research fellow at Harvard Medical School researching RNA secondary structure analysis to generate next-generation gene therapies. Ex. 30 ¶¶1, 3. Sychla holds a PhD in Biochemistry, Molecular Biology, and Biophysics from the University of Minnesota and a B.S. in Molecular Genetics and Physics from the Ohio State University. *Id.* ¶2. Sychla is a member of HAW-UAW, as well as a member of HAW-UAW's bargaining committee. *Id.* ¶4.

**Response: Defendants admit or have no basis to dispute.**

232.    Sychla's salary is covered by an NIH virology training grant that was terminated by the Trump administration. *Id.* ¶12. This salary has enabled him to study existing viruses in order to better "target new medicines to treat these viruses." *Id.* ¶13. While Sychla has received informal assurances that his salary will be covered for the next year, he has not received any "formal or official confirmation" to that effect, let alone any communication about funding beyond a year from now. *Id.* ¶17.

**Response: Defendants admit or have no basis to dispute.**

233.    Because of the termination, Sychla has had to reallocate his time from research to grant writing in an attempt to cover these lost funds. He has also had to take on additional administrative lab management tasks, as his research lab's manager "was laid off in anticipation of these funding cuts." *Id.* ¶15.

**Response: Defendants admit or have no basis to dispute.**

234.    Sychla is concerned about finding funding coverage because "the number of institutions that could provide grants for [his] project is severely limited." *Id.* ¶20. Without funding coverage, Sychla's entire virology project will stop, causing "approximately $250,000 to $300,000 in losses" beyond the intangible losses of his research progress. *Id.* ¶18.

**Response: Defendants admit or have no basis to dispute.**

235.    Sychla reports that the Trump administration's actions "have also had a chilling effect on [his] actions and the actions of those around [him]," including individuals in his department seeking jobs in other counties for fear of lack of career prospects in the United States or individuals "altering their fields of study or fearing the pursuit of certain fields of study due to concerns that participating in those fields may result in targeting of them and their work." *Id.* ¶¶21, 25.

**Response: Defendants dispute any allegations that a subjective "chilling effect" is legally cognizable or was caused by Defendants.**

236.    Sychla himself has begun considering career options outside of his decade-long field of study and has "been applying to less virology projects due to the Trump administration's attacks on virology." *Id.* ¶22.

**Response: Defendants admit or have no basis to dispute.**

237.    In addition to the attacks on his field of study, Sychla is also concerned about identity or diversity-related retaliation, including as a result of his ongoing public involvement in student and worker advocacy initiatives at Harvard. *Id.* ¶26.

**Response: Defendants admit or have no basis to dispute.**

### d.    Plaintiff member Kelsey Tyssowski

238.    Tyssowski is a Postdoctoral Research Associate in the Departments of Organismic & Evolutionary Biology and Molecular & Cellular Biology at Harvard University, and a member of HAW-UAW. Ex. 31 ¶¶1, 3. Her research "focuses on comparing different subspecies of deer mice with innate behavioral differences to understand how the nervous system enables skilled movement." *Id.* ¶4.

**Response: Defendants admit or have no basis to dispute.**

239.    Tyssowski received "a K99/R00 grant from the NIH" which was "supposed to cover [her] salary through March 2026, covering most of the end of [her] postdoctoral research, and was supposed to cover the first three years of research in [her] own lab." *Id.* ¶10. The loss of federal funding imminently affects her "work and career prospects." *Id.* ¶12. The loss of NIH funding will impact her "ability to travel" "to visit a skilled movement research lab in North Carolina that [she has] been collaborating with as lead scientist for the past five years" and "will negatively impact the research [she] is doing as part of this collaboration." *Id.*

**Response: Defendants admit or have no basis to dispute.**

240.    Tyssowski understands that post June 30, 2025, "any stopgap funding from Harvard University will not cover grants awarded to non-tenure-track researchers" and it will be up to the "discretion of researchers' tenured/tenure-track faculty supervisor as to whether non-tenure track researchers whose federal funding has been terminated will be provided some amount of funding." *Id.* ¶11. At this time, Tyssowski has not "been guaranteed funding to support [her] salary and

research through the summer of 2026" and without this stopgap funding she "may be forced to leave academic science entirely." *Id.*

> **Response: Defendants admit or have no basis to dispute.**

241.    Tyssowski is concerned that the termination of her R00 grant, which would have provided funding for the first few years of research in her own lab, "will negatively impact [her] chances of getting a tenure-track faculty job and continuing [her] research program." *Id.* ¶13. Since August 2019, she has been developing "a new system using deer mouse lines to study skilled movement." *Id.* ¶14. Tyssowski is worried that with the termination of her R00 grant and its impact on her ability to obtain a faculty job and continue her research, "the world might never benefit from the discoveries that could be made with this system, as it depends on mouse lines that don't exist anywhere else in the world and [the] expertise that [she] has developed[.]" *Id.*

> **Response: Defendants dispute that the named person was a party or intended beneficiary of any contract.**

### e.    Plaintiff member Beau Schaeffer

242.    Schaeffer is a PhD student in Population Health Sciences, a teaching fellow at Harvard T.H. Chan School of Public Health, and a member of HGSU-UAW. Ex. 29 ¶¶1, 4. His doctoral thesis "focuses on the development of observational research methods for vaccine safety and efficacy and applying these methods to real world data." *Id.* ¶3.

> **Response: Defendants admit or have no basis to dispute.**

243.    Schaeffer's doctoral thesis is "only possible through a NIH-funded external collaboration with a large industry partner (a health system) and the data they manage." *Id.* ¶10. The termination of NIH funding will imminently impact Schaeffer's "vaccine study design work" as the scope of his "work will be reduced moving forward as the loss of NIH funding will require the industry partner to limit the labor dedicated to its collaboration with Harvard." *Id.* ¶11. The funding

termination will also have broader effects on "vaccine research made possible through the collaboration with the industry partner" as "[w]ithout the federal funding source, it is unclear whether additional, critical research projects with the industry partner would be able to continue." *Id.* ¶11.

**Response: Defendants admit or have no basis to dispute.**

244.    Schaeffer is uncertain "whether and for how long [he] might receive some stopgap funding from Harvard University" as the university's pledge of $250 million in one-time stopgap funding "is far from sufficient or sustainable to replace the roughly $2.7 billion in terminated funds across Harvard University, including terminated funds at the Harvard T.H. Chan School of Public Health." *Id.* ¶12.

**Response: Defendants admit or have no basis to dispute.**

245.    Schaeffer is also concerned that the loss of NIH funding for his research will impact society and "lead to gaps in the vaccine study design literature" at a time when "[i]mproving observational research methods for vaccines is critical given the increased interest surrounding the safety and efficacy of vaccines." *Id.* ¶13. With the termination of federal funding, it is "uncertain the ability to continue vaccine research with the industry partner"—a collaboration that is critical to Schaeffer's "dissertation and developing rigorous observational research to address questions around new and existing vaccines that are not feasible to assess through other means." *Id.* ¶13.

**Response: Defendants admit or have no basis to dispute.**

### f.    Plaintiff member Trudy Merritt

246.    Merritt is a PhD student in Virology at Harvard Medical School and a member of HGSU-UAW. Ex. 32 ¶¶1, 3. Merritt's research focuses on "viral host-interactions and specifically how viruses interact with cell signaling pathways driving inflammation and cell death" and explores "how viruses have evolved mechanisms to evade innate immune response." *Id.* ¶4.

**Response: Defendants admit or have no basis to dispute.**

247.    Merritt's PhD is entirely funded by a T32 grant program and the loss of this federal funding "imminently affects [their] work and ability to continue in [their] PhD program." *Id.* ¶¶10, 11. They are concerned that without the T32 grant, they "will have to halt all progress towards [their] degree to find employment elsewhere to afford essential living expenses." *Id.* ¶12. Since the termination of their NIH funding, Merritt has "received no specific information on how [their] PhD will continue to be funded." *Id.* They are aware that Harvard "has promised $250 million to support research on campus" but note that "it remains unclear how this money will be dispersed and how individual programs might supplement the remaining billions of research funding that has been cut to date." *Id.* The continued uncertainty caused by the termination of their NIH funding has "had a detrimental impact on [their] research progress by increasing anxiety and impacting [their] ability to focus." *Id.*

**Response: Defendants admit or have no basis to dispute.**

248.    The administration's funding terminations and related demands on Harvard to "make changes to retain its funding have had a chilling effect on [Merritt's] actions." *Id.* ¶13. Following their funding termination, Merritt "rewrote grant proposals and applications for federal funding to minimize [their] research's contribution to understanding viral infection and spread" and made these changes "due to concerns that the applications would be rejected outright because of the Trump administration's views on the field of virology." *Id.* ¶14.

**Response: Defendants dispute that they have caused any subjective "chilling effect" or that such a claim is a legally cognizable harm.**

249.    At this time, Merritt has "not submitted the funding applications due to additional actions taken by the Trump administration." *Id.* ¶15. Merritt notes that "[r]egardless of affiliation with entities outside of Harvard" such as lab specific hospital affiliation, "all Harvard graduate

students must submit grants through Harvard." *Id.* The administration's May 5 letter made clear to Merritt that, "as a Harvard graduate student, [they] have no current means of securing federal funding to continue [their] research." *Id.* ¶15.

**Response: Defendants admit or have no basis to dispute.**

### g.    Plaintiff member Jules Riegel

250.    Riegel, a member of HAW-UAW, is a Lecturer on History and Literature at Harvard University, researching and teaching on the Holocaust, World War II, and global transgender history. Ex. 33 ¶¶1, 3.

**Response: Defendants admit or have no basis to dispute.**

251.    The administration's funding terminations, threats, and related demands have chilled their speech and actions, culminating in them opting "not to teach a course on global transgender history in the upcoming fall semester due to fear of content-based retaliation, fear for [their] students' safety, and fear for [themself] as an openly transgender individual." *Id.* ¶¶11–12.

**Response: Defendants dispute that they have caused any subjective "chilling effect" or that such a claim is a legally cognizable harm, as well as any characterizations cited about the Defendants' actions.**

252.    Riegel has more broadly had to reevaluate how to "safely teach courses on topics including global transgender history, World War II, and the Holocaust," including "curricular and pedagogical changes" as a result of "the administration's demands for 'viewpoint diversity,'" "attacks on diversity, equity, and inclusion," and the uncertainty caused by the administration's attacks and vague invocation of "ideological capture." *Id.* ¶¶12–14.

**Response: Defendants admit or have no basis to dispute.**

253.    "As a non-tenure-track faculty member who is also engaged in activism in addition to [their] scholarship," Riegel is "specifically concerned about the administration's goal of

'reducing the power held by students and untenured faculty' and by those 'more committed to activism than scholarship.'" *Id.* ¶15. Riegel is worried that the attacks "may result in [them] having even less control around [their] curriculum, such as hindering [their] ability to determine [their] own course content, or being forced to teach content with which [they] disagree." *Id.*

**Response: Defendants admit or have no basis to dispute.**

254.    Riegel also reports "broad concern within [their] department about how these policies may affect "faculty, staff, and students." *Id.* ¶16.

**Response: Defendants admit or have no basis to dispute.**

255.    As a result of these concerns, Riegel is "fearful for the safety of [their] students, especially international students or students with immigrant backgrounds, including their ability to engage with critical scholarship around the Holocaust and transgender history" and "could not in good conscience recommend that doctoral applicants attend Harvard right now." *Id.* ¶¶17–18.

**Response: Defendants admit or have no basis to dispute.**


Dated: June 16, 2025                              Respectfully submitted,

                                                  LEAH B. FOLEY

                                                  United States Attorney


                                        By:    /s/ Anuj K. Khetarpal
                                               ANUJ K. KHETARPAL
                                               Assistant United States Attorney
                                               U.S. Attorney's Office
                                               1 Courthouse Way, Ste. 9200
                                               Boston, MA 02210
                                               (617) 748-3658
                                               Anuj.Khetarpal@usdoj.gov