**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS–HARVARD
FACULTY CHAPTER et al.,                    Case No. 1:25-CV-10910-ADB

                    Plaintiffs,

          v.

UNITED STATES DEPARTMENT OF
JUSTICE et al.,

                    Defendants.


<u>**PLAINTIFFS' MEMORANDUM IN FURTHER SUPPORT OF**
**THEIR MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO**
**DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**</u>

Philippe Z. Selendy (*pro hac vice*)
Sean P. Baldwin (*pro hac vice*)
Corey Stoughton (*pro hac vice*)
Julie Singer (*pro hac vice*)
Drake Reed (*pro hac vice*)
SELENDY GAY PLLC
1290 Avenue of the Americas 20th Floor
New York, NY  10104
Tel: 212-390-9000
pselendy@selendygay.com
sbaldwin@selendygay.com
cstoughton@selendygay.com
jsinger@selendygay.com
dreed@selendygay.com

Daniel H. Silverman (BBO# 704387)
COHEN MILSTEIN SELLERS & TOLL PLLC
769 Centre Street
Suite 207
Boston, MA 02130
(617) 858-1990
dsilverman@cohenmilstein.com

Joseph M. Sellers (*pro hac vice*)
Benjamin D. Brown (*pro hac vice*)
Phoebe M. Wolfe (*pro hac vice*)
Margaret (Emmy) Wydman (*pro hac vice*)
Sabrina Merold (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave NW, Suite 800
Washington, DC 20005
(202) 408-4600
jsellers@cohenmilstein.com
bbrown@cohenmilstein.com
pwolfe@cohenmilstein.com
ewydman@cohenmilstein.com
smerold@cohenmilstein.com

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

ARGUMENT .......................................................................................................................2

I.     This Court Has Subject Matter Jurisdiction.................................................................2

     A.     The Tucker Act Does Not Displace This Court's Jurisdiction ...............................3

     B.     Plaintiffs Have Standing .........................................................................................6

          1.     Plaintiffs Have Associational Standing on Behalf of Their Members ...........6

          2.     Plaintiffs Have Standing in Their Own Right...........................................10

II.     Defendants Have No Authority to Implement Alternate Civil Rights Enforcement Mechanisms that Contradict Congressional Intent ...........................................................11

     A.     Title VI Limits Agency Power and Provides Enforceable Protections to Recipients of Federal Funds.................................................................................12

     B.     Defendants' Actions Are Not Authorized by Their "Power to Contract" .............14

III.     Defendants' Actions Are Arbitrary and Capricious...........................................................16

     A.     Defendants' Decisions to Impose Funding Conditions and Broadly Freeze and Terminate Federal Funding Are Final Agency Actions.................................16

          1.     The March 31 Announcement and April Demand Letters Are Final ........16

          2.     The May 5 Ineligibility Decision Is Final Agency Action and Is Not Committed to Agency Discretion ........................................................18

     B.     Defendants Do Not and Cannot Show That Their Actions Were the Product of Reasoned Decision-Making ...............................................................19

          1.     Defendants Provide Inconsistent Reasons for Their Actions ...................19

          2.     Defendants Cannot Justify the Breadth of Their Actions .........................21

          3.     Defendants Give No Reason for Their Departure from Longstanding Agency Practice ................................................................22

     C.     The Harvard Antisemitism Report Does Not Support Defendants' Actions.........22

     D.     Defendants Confirm They Did Not Consider Reliance Interests or Important Aspects of the Problem .......................................................................24

IV.    Plaintiffs Have Proven Their First Amendment Claims ..................................................25

       A.    Plaintiffs Have Proven a Coercion Claim ...........................................................25

              1.    The Government is Targeting Plaintiffs' Protected Speech ....................25

              2.    Plaintiffs Have Demonstrated Defendants' Actions Convey a Threat of Adverse Government Action ...............................................28

       B.    Plaintiffs Have Proven Viewpoint Discrimination and Retaliation .....................29

V.    Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Due Process Claim ........................................................................................................................31

VI.    Permanent Injunctive Relief is Warranted ........................................................................32

CONCLUSION ............................................................................................................................33

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*AIDS Vaccine Advoc. Coal. v. Dep't of State*,
    770 F.Supp.3d 121 (D.D.C. 2025) ...................................................................4

*Albrecht v. Comm. on Emp. Benefits of Fed Rsrv.*,
    357 F.3d 62 (D.C. Cir. 2004) ........................................................................4

*Alexander v. Sandoval*,
    532 U.S. 275 (2001) ....................................................................................12

*Am. Civ. Liberties Union of Mass. v. U.S. Conf. of Cath. Bishops*,
    705 F.3d 44 (1st Cir. 2013) .........................................................................17

*Am. Pub. Health Ass'n v. Nat'l Insts. of Health*,
    2025 WL 1548611 (D. Mass. May 30, 2025) .............................................13

*Am. Sci. & Eng., Inc. v. Califano*,
    571 F.2d 58 (1st Cir. 1978) ...........................................................................6

*Am. Wild Horse Pres. Campaign v. Perdue*,
    873 F.3d 914 (D.C. Cir. 2017) .....................................................................22

*Ass'n of Am. Univs. v. Dep't of Energy*,
    2025 WL 1414135 (D. Mass. May 15, 2025) ...............................................4

*Ass'n of Am. Univs. v. Nat'l Sci. Found.*,
    2025 WL 1725857 (D. Mass. June 20, 2025) .............................................24

*Axia NetMedia Corp. v. Massachusetts Tech. Park Corp.*,
    889 F.3d 1 (1st Cir. 2018) ...........................................................................33

*B & L Prods., Inc. v. Newsom*,
    104 F.4th 108 (9th Cir. 2024) ......................................................................26

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988) ......................................................................................5

*Brandenburg v. Ohio*,
    395 U.S. 444 (1969) ....................................................................................26

*Burgos v. Milton*,
    709 F.2d 1 (1st Cir. 1983) .............................................................................6

*Burlington Truck Lines v. United States*,
    371 U.S. 156 (1962)............................................................................................21

*City & Cnty. of San Francisco v. Trump*,
    2025 WL 1282637 (N.D. Cal. May 3, 2025) ......................................................24

*City & Cnty. of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) ...........................................................................15

*City of Providence v. Barr*,
    954 F.3d 23 (1st Cir. 2020).................................................................................15

*Conservation L. Found., Inc. v. Acad. Express, LLC*,
    129 F.4th 78 (1st Cir. 2025).........................................................................6, 8, 9

*Consol. Edison Co. v. Dep't of Energy*,
    247 F.3d 1378 (Fed. Cir. 2001)............................................................................4

*Crowley Gov't Servs., Inc. v. GSA*,
    38 F.4th 1099 (D.C. Cir. 2022) ...................................................................3, 4, 6

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019)....................................................................................18, 20

*Dep't of Educ. v. California*,
    145 S. Ct. 966 (2025)............................................................................................6

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020).........................................................................................20, 22

*Diaz v. Johnson*,
    2020 WL 9437887 (1st Cir. Nov. 12, 2020) ........................................................4

*Doe v. Trump*,
    766 F. Supp. 3d 266 (D. Mass. 2025) .................................................................32

*Earle v. Benoit*,
    850 F.2d 836(1st Cir. 1988)...............................................................................27

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016)............................................................................................22

*FCC v. Fox Tel. Stations, Inc.*,
    567 U.S. 239 (2012)............................................................................................31

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024)...................................................................................... *passim*

*FTC v. Standard Oil Co. of California*,
   449 U.S. 232 (1980)...............................................................................17

*Glob. NAPs, Inc. v. Verizon New England, Inc.*,
   706 F.3d 8 (1st Cir. 2013).....................................................................33

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972)..............................................................................31

*Greenwich Citizens Comm., Inc. v. Ctys. of Warren & Washington Indus. Dev.*
   *Agency*,
   77 F.3d 26 (2d Cir. 1996)......................................................................28

*Haaland v. Brackeen*,
   599 U.S. 255 (2023)................................................................................9

*Harper v. Werfel*,
   118 F.4th 100 (1st Cir. 2024)...............................................................17

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982)..............................................................................11

*Ingersoll-Rand Co. v. United States*,
   780 F.2d 74 (D.C. Cir. 1985)..................................................................4

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*,
   477 U.S. 274 (1986)..............................................................................10

*Kestenbaum v. President & Fellows of Harvard College*,
   743 F. Supp. 3d 297 (D. Mass. 2024) ..................................................27

*Laird v. Tatum*,
   408 U.S. 1 (1972)...............................................................................7, 8

*LeBlanc v. United States*,
   50 F.3d 1025 (Fed. Cir. 1995)................................................................5

*Lincoln v. Vigil*,
   508 U.S. 182 (1993)..............................................................................19

*Maine v. U.S. Dep't of Agric.*,
   2025 WL 1088946 (D. Me. Apr. 11, 2025) .........................................14

*Manuel v. United States*,
   115 Fed. Cl. 105 (2014) (Title VI).........................................................5

*Maryland v. Corp. for Nat'l & Cmty. Serv.*,
   2025 WL 1585051 (D. Md. June 5, 2025) ............................................3

*Mass. Fair Hous. Ctr. v. Dep't of Hous. & Urban Dev.*,
  2025 WL 1225481 (D. Mass. Apr. 14, 2025) ........................................................6

*Massachusetts v. Mylan Lab'ys*,
  357 F. Supp. 2d 314 (D. Mass. 2005) ...................................................................9

*Massachusetts v. NIH*,
  770 F.Supp.3d 277 (D. Mass. 2025) .....................................................................4

*Metro. Transp. Auth. v. Duffy*,
  2025 WL 1513369 (S.D.N.Y. May 28, 2025) .......................................................13

*Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)..........................................................................................21, 24

*Murthy v. Missouri*,
  603 U.S. 43 (2024)..........................................................................................9, 10

*NAACP v. Button*,
  371 U.S. 415 (1963).............................................................................................31

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
  2025 WL 597959 (D.D.C. Feb. 25, 2025) ...........................................................16

*Nat'l Educ. Ass'n v. Dep't of Educ.*,
  2025 WL 1188160 (D.N.H. Apr. 24, 2025).............................................8, 9, 18, 26

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012).............................................................................................28

*Nat'l Rifle Ass'n of Am. v. Vullo*,
  602 U.S. 175 (2024).............................................................................................25

*Nat'l Treasury Emps. Union v. Cornelius*,
  617 F. Supp. 365 (D.D.C. 1985) .........................................................................12

*New York v. Trump*,
  769 F. Supp. 3d 119 (D.R.I. 2025).......................................................................16

*New York v. U.S. Dep't of Health & Hum. Servs.*,
  414 F. Supp. 3d 475 (S.D.N.Y. 2019)..................................................................14

*Ohio v. EPA*,
  603 U.S. 279 (2024)......................................................................................16, 19

*Penthouse Int'l, Ltd. v. McAuliffe*,
  702 F.2d 925 (11th Cir. 1983) .............................................................................27

*Perry Cap. LLC v. Mnuchin*,
    864 F.3d 591 (D.C. Cir. 2017) ................................................................................4

*PFLAG, Inc. v. Trump*,
    769 F. Supp. 3d 405 (D. Md. 2025) .......................................................................15

*Pickering v. Bd. Of Educ.*,
    391 U.S. 563 (1968) ..............................................................................................31

*Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*,
    290 F.3d 1058 (9th Cir. 2002) ...............................................................................26

*Playboy Enters., Inc. v. Pub. Serv. Comm'n of Puerto Rico*,
    906 F.2d 25 (1st Cir. 1990) .....................................................................................7

*Pleasant Grove City v. Summum*,
    555 U.S. 460 (2009) ..............................................................................................26

*Pol'y & Research, LLC v. HHS*,
    313 F. Supp. 3d 62 (D.D.C. 2018) ........................................................................19

*President & Fellows of Harvard Coll. v. Dep't of Homeland Sec.*,
    2025 WL 1737493 (D. Mass. June 23, 2025) .......................................................25

*President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*,
    Case No. 1:25-CV-11048-ADB, Dkt. 186 (June 16, 2025)..........................3, 29, 31

*Schad v. Mt. Ephraim*,
    452 U.S. 61 (1981) ................................................................................................30

*Simon v. E. Ky. Welfare Rts. Org.*,
    426 U.S. 26 (1976) ..................................................................................................9

*Spectrum Leasing Corp. v. United States*,
    764 F.2d 891 (D.C. Cir. 1985) ................................................................................4

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    261 F. Supp. 3d 99 (D. Mass. 2017) .....................................................................10

*Suburban Mort. Assocs., Inc. v. Dep't of Hous. & Urban Dev.*,
    480 F.3d 1116 (Fed. Cir. 2007)...............................................................................5

*Summers v. City of Fitchburg*,
    2016 WL 4926415 (D. Mass. Sept. 15, 2016) ......................................................32

*Sustainability Inst. v. Trump*,
    2025 WL 1587100 (4th Cir. June 5, 2025) .............................................................4

*Thakur v. Trump*,
   2025 WL 1734471 (N.D. Cal. June 23, 2025) ...................................................................6, 23

*Theidon v. Harvard Univ.*,
   948 F.3d 477 (1st Cir. 2020) ................................................................................................30

*Tucson Airport Auth. v. Gen. Dynamics Corp.*,
   136 F.3d 641 (9th Cir. 1998) ..................................................................................................4

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
   578 U.S. 590 (2016) ..............................................................................................................17

*U.S. Conf. of Cath. Bishops v. Dep't of State*,
   770 F. Supp. 3d 155 (D.D.C. 2025) ........................................................................................6

*United States v. Connolly*,
   716 F.2d 882 (Fed. Cir. 1983) ............................................................................................4, 5

*United States v. Tingey*,
   30 U.S. 115 (1831) ................................................................................................................14

*Up State Fed. Credit Union v. Walker*,
   198 F.3d 372 (2d Cir. 1999) ....................................................................................................4

*Warth v. Seldin*,
   422 U.S. 490 (1975) .........................................................................................................29, 30

**Statutes**

5 U.S.C. § 701 ...............................................................................................................................19

5 U.S.C. § 702 ............................................................................................................................5, 6

5 U.S.C. § 704 .....................................................................................................................6, 14, 16

5 U.S.C. § 706 .........................................................................................................................14, 15

42 U.S.C. § 241 .............................................................................................................................15

42 U.S.C. § 282 .............................................................................................................................15

42 U.S.C. § 2000 ......................................................................................................................14, 22

**Other Authorities**

2 C.F.R. Part 180 ...........................................................................................................................19

2 C.F.R. Part 376 ...........................................................................................................................19

2 C.F.R. § 200.340 ......................................................................................... *passim*

110 Cong. Rec. 2467 (1964) ...............................................................................22

Dep't of Educ., Dear Colleague Letter (May 7, 2024),
    https://www.ed.gov/media/document/colleague-202405-shared-ancestrypdf-
    35100.pdf ................................................................................................12

Dep't of Health & Hum. Servs., Dear Colleague Letter (Nov. 22, 2024),
    https://www.hhs.gov/sites/default/files/ocr-dcl-religious-discrimination-
    final.pdf ..................................................................................................12

Dep't of Health & Hum. Servs., *HHS' Civil Rights Office Finds Columbia
    University in Violation of Federal Civil Rights Law* (May 22, 2025),
    https://www.hhs.gov/press-room/ocr-columbia-violates-federal-civil-rights-
    law.html ..................................................................................................12

Dep't of Health & Hum. Servs. Office of Civil Rights, Notice of Violation (June
    30, 2025) https://www.hhs.gov/sites/default/files/harvard-title-vi-notice-viola-
    tion.pdf. ....................................................................................................2

Fed. R. Civ. P. 65(c)(1) .......................................................................................33

Nat'l Insts. of Health, Research General Terms and Conditions (April 8, 2021),
    https://nsf-gov-resources.nsf.gov/files/NIH-research-terms-conditions-
    20210408-r.pdf.........................................................................................13

*A Review of the President's Fiscal Year 2026 Budget Request for the Department
    of Education Before the S. Comm. on Appropriations, Lab., Health and Hum.
    Servs., Educ., and Related Agencies*,
    https://www.appropriations.senate.gov/hearings/a-review-of-the-presidents-
    fiscal-year-2026-budget-request-for-the-department-of-education (June 3,
    2025) ........................................................................................................21

*Examining the Policies and Priorities of the Department of Education Before the
    H. Comm. on Educ. and Workforce*, https://www.youtube.com/live/HwRs-
    EpCC3U (June 4, 2025)...........................................................................21

## <u>INTRODUCTION</u>

Defendants admit that their putative rationale for imposing conditions on, freezing, and ultimately terminating over $2 billion in funding to Harvard University is a purported failure to address civil rights violations (specifically, purported antisemitism). But Defendants also concede, as they must, that they did not follow Title VI's established procedures for terminating federal funding in response to civil rights violations. That concession is dispositive and Plaintiffs' summary judgment motion should be granted. Defendants argue that the executive has unreviewable authority to declare an "agency priority" not to fund universities that it believes have failed to address antisemitism and, on that basis, terminate all federal funding at a moment's notice without making findings based on actual evidence, providing notice and an opportunity to respond or correct, requiring any specific connection between the priority and the terminated funds, or providing any mechanism for review to ensure decisions are reasoned and lawful, rendering those decisions, at a minimum, arbitrary and capricious. Congress passed Title VI to ensure that this never happens. Defendants' argument turns vague federal guidance—2 CFR § 200.340(a)(4)—into a tool for nullifying a more specific legislative enactment—Title VI—and arrogating extraordinary executive authority, flying in the face of centuries of separation of powers and other constitutional law. This Court should reject it.

Defendants' authoritarian disdain for the laws passed by Congress reveals the fundamental truth of this case: their purpose is not to address antisemitism at Harvard or anywhere else. It is to coerce Harvard into remaking itself in Defendants' preferred image and punish Harvard's community for daring to express and explore viewpoints disfavored by or in opposition to the Trump administration. This purpose is confirmed by Defendants' and the President's public statements and the way their wide-ranging funding conditions directly target speech and academic freedom. The First Amendment forbids this.

1

Plaintiffs' members bear the true cost of the harms Defendants have inflicted on the Harvard community. They have been forced suddenly to cease their life's work and to reevaluate their approach to academic inquiry to ensure they do not draw Defendants' ire. They have lost or imminently will lose critical samples and data, as well as the opportunity to deploy their research on important, time-sensitive tasks like intervening in public health crises, advancing the safety of nuclear power infrastructure, and participating in missions to space. They search for ways to protect their own jobs and the jobs of the research teams that depend on them for their livelihoods by, among other things, censoring their speech to avoid becoming targets of Defendants' attacks. They struggle to salvage their professional reputations with outside partners and study participants. Even if Defendants were suddenly to change course at this stage and restore funding, the Trump administration's aggrandized view of its power to arbitrarily threaten funding and control campus life has harmed Plaintiffs' members and will continue to cause that harm by destabilizing the foundation of their work. Only a court order declaring Defendants' course of conduct unlawful and enjoining it can address that harm.[1]

The Court should grant Plaintiffs' motion and deny Defendants' cross-motion.

## ARGUMENT[2]

### I.    This Court Has Subject Matter Jurisdiction

Plaintiffs properly seek equitable relief in this Court to enjoin Defendants' conduct, which

---

[1] Hours before the deadline for filing this brief, Defendants' multi-agency Task Force issued a purported Notice of Violation regarding antisemitism at Harvard. HHS Office of Civil Rights, Notice of Violation (June 30, 2025) https://www.hhs.gov/sites/default/files/harvard-title-vi-notice-violation.pdf. That letter affirms that Title VI should have governed this process from the beginning, underscores that their preemptive termination of funding was unlawful, and represents nothing more than another escalation of Defendants' campaign of coercion and retaliation.

[2] Plaintiffs incorporate their Statement of Material Facts in support of their Motion for Summary Judgment, Dkt. 76, as their statement of facts pursuant to Local Rule 56.1 in opposition to Defendants' Cross-Motion. These facts are not subject to genuine dispute and entitle Plaintiffs to judgment as a matter of law.

goes far beyond the improper termination of federal contracts. District courts are the only courts capable of providing that equitable relief. Plaintiffs have standing to seek redress, both on behalf of their members and in their own right, based on harms to their core business functions.

### A.    The Tucker Act Does Not Displace This Court's Jurisdiction

Defendants' argument rests on the incorrect assertion that Plaintiffs' claims "are in essence contract claims" for "monetary damages." Mem. in Supp. of Defs.' Cross-Mot. for Summ. J. & Opp. to Pls.' Mot. for Summ. J., Dkt. 104 ("Opp.") at 11, 16.[3] In fact, as discussed below, Plaintiffs' claims are founded on the APA[4], Title VI, and the Constitution—not the terms of any contract—and they seek declaratory and injunctive relief requiring Defendants conform their conduct to the laws—not damages. The Court of Federal Claims ("COFC") does not have jurisdiction over this matter. Defendants' argument would strip district courts' jurisdiction over all APA, Title VI, and First Amendment coercion cases against the government merely because they involve federal funding—an untenable proposition that the Tucker Act does not compel.

*First*, Plaintiffs' claims derive from the APA, Title VI, and the First Amendment, not from grant and contract agreements.[5] Mem. In Supp. of Pls.' Mot. For Summ. J., Dkt. 75 ("Br.") 18–19; *contra* Opp. 13–16. Plaintiffs' claims do not require analyzing any grant or contract terms; they turn on what the APA, Title VI, and the Constitution forbid. *See Crowley Gov't Servs., Inc. v. GSA*,

---

[3] *See also* Mem. in Supp. of Defs.' Cross-Mot. for Summ. J. & Opp. to Pl.'s Mot. for Summ. J. ("PF Opp."), *President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, Case No. 1:25-CV-11048-ADB (the "PF Case"), Dkt. 186 (June 16, 2025) at 18–25. Plaintiffs incorporate by reference, as if fully stated herein, the jurisdictional arguments raised by the President and Fellows of Harvard College in the PF Case.

[4] Capitalized terms not herein defined have the meaning assigned in Plaintiffs' Second Amended Complaint ("SAC"), Dkt. 64.

[5] Even if Defendants' reliance on 2 C.F.R. § 200.340 were appropriate (it is not, *see infra* Section II) its reference to "terms and conditions of the Federal award" does not turn Plaintiffs' claims into contract claims. *See Maryland v. Corp. for Nat'l & Comm. Serv.*, 2025 WL 1585051, at *23 (D. Md. June 5, 2025) (where the government purported to cancel grants pursuant to § 200.340, "[t]he grant terms [were] simply not relevant to this case at all").

38 F.4th 1099, 1108–09 (D.C. Cir. 2022); *contra Ingersoll-Rand Co. v. United States*, 780 F.2d

74, 78 (D.C. Cir. 1985).[6] The mere reference to grants and contracts in this action does not establish

that this case falls under the Tucker Act. *See Crowley*, 38 F.4th at 1107–08 ("[W]e have explicitly

rejected the broad notion that any case requiring some reference to or incorporation of a contract

is necessarily on the contract and therefore directly within the Tucker Act."); *Massachusetts v.

NIH*, 770 F. Supp. 3d at 293 ("Plaintiffs' contractual relationships with NIH do not automatically

convert a claim asserting rights based on federal regulations into one which is, 'at its essence,' a

contract claim"); *see also Ass'n of Am. Univs. v. Dep't of Energy*, 2025 WL 1414135, at *6 (D.

Mass. May 15, 2025). Many of the cases upon which Defendants rely affirm this principle. *See

Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) ("[W]e do not think that *any* case

requiring *some* reference to … a contract is necessarily *on the contract*."); *Albrecht v. Comm. on

Emp. Benefits of Fed Rsrv.*, 357 F.3d 62, 69 (D.C. Cir. 2004) (same).[7] Because the APA, Title VI,

and the First Amendment are not money-mandating provisions, as Defendants do not dispute, the

COFC has no jurisdiction to adjudicate Plaintiffs' claims. *See United States v. Connolly*, 716 F.2d

---

[6] *See also Massachusetts v. NIH*, 770 F.Supp.3d 277, 293, 295 (D. Mass. 2025) (plaintiffs' request to "preserve their ongoing and prospective agreements with NIH" turns on "how the regulations govern the provision of these awards," not the terms of a contract); *see also AIDS Vaccine Advoc. Coal. v. Dep't of State*, 770 F.Supp.3d 121, 137 (D.D.C. 2025) ("[I]t would be quite extraordinary to consider Plaintiffs' claims to sound in breach of contract when they do not at all depend on whether the terms of particular awards were breached—they instead challenge whether the agency action here was unlawful, irrespective of any breach.").

[7] Other of their cases involve direct contract claims, *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 646–47 (9th Cir. 1998); *Diaz v. Johnson*, 2020 WL 9437887, at *2 (1st Cir. Nov. 12, 2020), or a request for money damages or specific performance, *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894–95 (D.C. Cir. 1985); *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 376–77 (2d Cir. 1999); *Consol. Edison Co. v. Dep't of Energy*, 247 F.3d 1378, 1385 (Fed. Cir. 2001); *Sustainability Inst. v. Trump*, 2025 WL 1587100 (4th Cir. June 5, 2025).

882, 887 (Fed. Cir. 1983) (First Amendment)[8]; *Manuel v. United States*, 115 Fed. Cl. 105, 114 (2014) (Title VI); 5 U.S.C. § 702 (APA). And the COFC has no jurisdiction over Plaintiffs' Title VI claims for the additional reason that Title VI specifically authorizes judicial review by *this Court*, under the APA. *See* Br. 17–18; *contra* Opp. 14–15.

*Second*, the nature of Plaintiffs' requested relief confirms this Court has jurisdiction. Plaintiffs seek equitable relief from violations of their statutory and constitutional rights, not money damages or specific performance. SAC at 92. Defendants' unlawful conduct began over a month before they terminated funding, when they initiated legal consequences based on unsupported conclusions about Harvard's conduct. Indeed, Plaintiffs filed this action on April 11, 2025, long before the terminations began. *See* Compl., Dkt. 1. The COFC does not have jurisdiction to award Plaintiffs complete relief from these unlawful actions, and the Tucker Act does not apply. *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988) (COFC "has no power to grant equitable relief"); *see also LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995) (same).

Defendants wrongly accuse Plaintiffs of "disguis[ing]" their request for monetary relief as a claim for equitable relief. Opp. 16–17. Not so. Plaintiffs seek an order enjoining Defendants' unlawful actions, which will have no *legal* effect on any contractual obligations. The cases Defendants cite turn on, and even acknowledge, this distinction. *See Suburban Mort. Assocs., Inc. v. Dep't of Hous. & Urban Dev.*, 480 F.3d 1116, 1127 (Fed. Cir. 2007) (distinguishing cases that, like this one, "involve a complex, ongoing relationship between plaintiff and the Government in

---

[8] Defendants' assertion that "[t]he Constitution does not provide a cause of action for monetary damages," Opp. 16 (citing *DeVillier v. Texas*, 601 U.S. 285, 291 (2024)) is inapposite; Plaintiffs do not seek monetary damages. Defendants' argument that the Court would not reach Plaintiffs' First Amendment claims because of the doctrine of constitutional avoidance, Opp. 16, is without merit: there is no alternative ground on which this Court can resolve Plaintiffs' First Amendment claims—indeed, Defendants point to none.

which the plaintiff seeks declaratory or injunctive relief," including prospective relief); *Am. Sci. & Eng., Inc. v. Califano*, 571 F.2d 58, 61, 63 (1st Cir. 1978) (ordering transfer to COFC where, unlike here, "plaintiff's own prayer for relief makes it clear that the enforcement of the license agreements or money damages was its aim, not correction of the alleged due process flaw"); *Burgos v. Milton*, 709 F.2d 1, 3 (1st Cir. 1983) (holding where plaintiff "sought and received a judgment ordering the United States to give him $15,000," case belonged in COFC).

Plaintiffs' prayer for relief does not request that this Court order specific performance of the terminated federal grants. *See* Br. 20; *contra U.S. Conf. of Cath. Bishops v. Dep't of State*, 770 F. Supp. 3d 155 (D.D.C. 2025); *Dep't of Educ. v. California*, 145 S. Ct. 966 (2025); *Mass. Fair Hous. Ctr. v. Dep't of Hous. & Urban Dev.*, 2025 WL 1225481 (D. Mass. Apr. 14, 2025). Indeed, specific performance and monetary damages would not make Plaintiffs whole because neither would declare Defendants' actions unlawful or remedy the threatened prospective harm. *See Thakur v. Trump*, 2025 WL 1734471, at *20 (N.D. Cal. June 23, 2025). That Plaintiffs request "non-monetary relief that has considerable value" and "may obligate the United States to pay" does not mean the Tucker Act applies. *Crowley*, 38 F.4th at 1107.[9]

### B.    Plaintiffs Have Standing

Plaintiffs have standing on behalf of their members and themselves.

### 1.    Plaintiffs Have Associational Standing on Behalf of Their Members

Plaintiffs have associational standing because their members have standing in their own right, the claims are germane to organizational interests, and the participation of members is not necessary. *Conservation L. Found., Inc. v. Acad. Express, LLC*, 129 F.4th 78, 86 (1st Cir. 2025).

---

[9] Defendants are wrong that limitations on the APA's waiver of sovereign immunity, 5 U.S.C. §§ 702, 704; Opp. 12; PF Opp. 16–17, bar this court from exercising jurisdiction. That question turns on the same analysis as above: Plaintiffs seek equitable relief, not money damages; the COFC cannot provide an adequate remedy; and the Tucker Act does not apply.

Plaintiffs need to identify only one such member with standing. *Playboy Enters., Inc. v. Pub. Serv. Comm'n of Puerto Rico*, 906 F.2d 25, 34 (1st Cir. 1990). Defendants' actions have already caused concrete harm to some members and will imminently cause similar harm to many more. Defendants admit that on April 14, shortly after Defendants announced the Funding Freeze, AAUP–Harvard member[10] Don Ingber "received 2 notices from the federal government directing [him] to stop work on both of [his federally funded] projects," which caused significant and continuing harm to Ingber and his work. Def's L. R. 56.1 Resp. to Pls' L. R. 56.1 Statement of Undisputed Material Facts & In Supp. of Def's Cross-Mot. For Summ. J., Dkt. 105 ("XSMF") ¶¶171–80. The same sequence of events occurred for AAUP–Harvard member Sarah Fortune. *Id.* ¶¶167–70. AAUP–Harvard member Paige Williams has already been forced to cease aspects of her work because of Defendants' actions. *Id.* ¶143. These facts establish that Defendants' decisions will imminently cause similar harm to Plaintiffs' other members when their finite existing funding runs out, perpetuating the harm that Plaintiffs' opening brief sets out in detail. Br. 11–13; *see, e.g.*, XSMF ¶225 (the termination of NIH and NSF grants will "imminently affect" HAW-UAW member Victoria Jenkins as the genome database she works on will "need to stop updating").

Defendants also ignore the specific evidence of present and future harm to Plaintiffs' members' rights under the First Amendment, which are far from a mere "subjective chill." Opp. 5–6 (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972)). In *Tatum*, "the chilling effect ar[o]se merely from the individual's knowledge that a governmental agency was engaged in certain activities [and that] individual's concomitant fear that ... the agency might in the future take some other and addition[a]l action detrimental to that individual." 408 U.S. at 11. But as a long line of Supreme Court cases, including *Tatum* itself, acknowledges, a chilling effect establishes standing where, as

---

[10] Every member of AAUP–Harvard, an AAUP chapter, is necessarily a member of AAUP.

here, "the complainant [is] either presently or prospectively subject to the regulations, proscriptions, or compulsions that he [is] challenging." *Id.* Defendants' unlawful funding demands and the direct evidence of their viewpoint discrimination have left Plaintiffs' members both *presently* subject to Defendants' unlawful proscriptions and compulsions, as Harvard has already implemented some of these demands, and *prospectively* subject to them to the extent Defendants' unlawful pressure campaign continues and Plaintiffs are compelled to forgo academic freedom and free speech to avoid further escalation. XSMF ¶¶137, 210–17, 235–37, 247–48. Far from abstract, speculative fears, these fears are directly "caused by the [Demand Letters'] vagueness, the steep penalties [Defendants] have announced for [Harvard's] noncompliance with [their] requirements, and the measures [Defendants] ha[ve] already taken" demonstrating they expect Harvard to comply. *Nat'l Educ. Ass'n v. Dep't of Educ.*, 2025 WL 1188160, at *13 (D.N.H. Apr. 24, 2025).

The fact that Harvard itself may play a role in causing or preventing Plaintiffs' members' injuries does not foreclose standing. "A plaintiff can satisfy traceability by showing that the defendant's conduct is one among multiple causes of the alleged injury." *Conservation L. Found.*, 129 F.4th at 90. This is particularly true where the conduct "cause[s] downstream or upstream economic injuries to others in the chain." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 384 (2024). A plaintiff need only "show a predictable chain of events leading from the government action to the asserted injury." *Id.* at 385.

Defendants ignore this standard for traceability and redressability, which Plaintiffs have met. Plaintiffs' members are the recipients of the funding at issue, which they use to conduct activities the grants direct *those specific individuals* to undertake. Ex. 1[11] ¶¶6, 10–13; Ex. 2 ¶¶6–10. Termination of those grants will inevitably—not speculatively—suspend work, resulting in direct

---

[11] Exhibits cited herein refer to those attached to the Silverman Declaration filed herewith.

harm to Plaintiffs' members. *Id.* This is already happening: absent Defendants' conduct, Plaintiffs' members would still be performing the research they receive federal funding to perform and would not be suffering the other harm discussed above. *See, e.g.*, XSMF ¶¶128–29, 148, 165, 188–89, 224–27, 232–33, 239–40, 243–44, 247; *see Nat'l Educ. Ass'n*, 2025 WL 1188160, at *12.[12]

This alone is sufficient to establish standing. But it is also not "guesswork" or "speculation," *see* Opp. 6, for Plaintiffs to fear that Harvard will act as a causal chain linking Defendants' coercive attack on academic freedom and free speech to Plaintiffs' members' harm. Harvard has now taken several actions that Defendants demanded Harvard take, XSMF ¶¶18, 20, 25, and which they characterized as "necessary for Harvard to implement to remain a responsible recipient of federal taxpayer dollars," *id.* ¶19, and as preconditions to "maintain[ing] Harvard's financial relationship with the federal government," *id.* ¶24, *see also infra* Section IV.A (establishing that a reasonable person would experience Defendants' actions as coercion).[13] Plaintiffs have shown that Defendants' actions were, at a minimum, "one among multiple causes of th[is] alleged injury." *Conservation L. Found.*, 129 F.4th at 90; *see also Nat'l Educ. Ass'n*, 2025 WL 1188160, at *14.[14]

---

[12] None of Plaintiffs' claims are contract claims, *see supra* Section I.A, so none turn on their right to enforce contractual payment to a third party, *contra* Opp. 9–11. Moreover, these grants "show a clear intent on the part of the signatories to confer a special benefit on" the individual researchers. *Massachusetts v. Mylan Lab'ys*, 357 F. Supp. 2d 314, 327 (D. Mass. 2005). They are issued in response to proposals prepared by the individual, *see, e.g.*, XSMF ¶180, fund work undertaken or overseen by that individual, *see, e.g.*, *id.* ¶¶173, 232, identify the individual by name in the paperwork for the grant, *see, e.g.*, NSF_Harvard000045; HHSHarv_00004232, and cannot be operated by professors other than those associated with the grant award, *see* Ex. 1 ¶¶6, 10–13; Ex. 2 ¶¶6–10. Recognizing this intent to benefit these individual researchers, Defendants sent some termination notices directly to those named researchers. *See, e.g.*, DoDHarv_00000001.

[13] That distinguishes this case from *Haaland v. Brackeen*, 599 U.S. 255 (2023), where the theory of standing required the Court to assume that a state court would choose to follow a federal court ruling by which the state court was not bound, *id.* at 293–94; *see also Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–43 (1976) (discussing similar theory).

[14] In *Murthy v. Missouri*, 603 U.S. 43 (2024), which Defendants cite (Opp. 6), the Supreme Court held that plaintiffs needed to "show a substantial risk that, in the near future, at least one

Plaintiffs have demonstrated the "reasonable connection" between "the injury to [their] members" and "the reasons the members joined the organization and ... the objectives of the organization."[15] Opp. 8–9 (quoting *Med. Ass'n of State of Ala. v. Schweiker*, 554 F. Supp. 955, 965 (M.D. Ala. 1983)). The "primary mission" of AAUP "is to advance academic freedom and shared governance in higher education, define fundamental professional values and standards for higher education, promote the economic security of academic workers, and ensure higher education's contribution to the common good." XSMF ¶96; *see also id.* ¶103. Similarly, UAW exists to engage "in organizing new members, bargaining contracts, handling problems with employers, member education, political action, community activities and more from both the national UAW offices and centers and each of the nine regional offices." *Id.* ¶105. This lawsuit, seeking to protect the academic freedom and economic security of Plaintiffs' members, furthers these purposes. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 261 F. Supp. 3d 99, 104–06 (D. Mass. 2017), *rev'd on other grounds*, 600 U.S. 181 (2023).[16]

### 2.   Plaintiffs Have Standing in Their Own Right

Plaintiffs' opening brief demonstrates that they have standing in their own right. Defendants' actions have "directly affected and interfered with [Plaintiffs'] core business activities." *All. for Hippocratic Med.*, 602 U.S. at 395. In particular, Defendants' actions have decimated the academic freedom and economic security of AAUP's and UAW's members on Harvard's campus,

---

[third party] w[ould] restrict the speech of at least one plaintiff in response to the actions of at least one Government defendant," *id.* at 58, and then held that the plaintiffs there failed to make that showing, *id.* at 60. Plaintiffs here have made that showing.

[15] Defendants' suggestion (Opp. 8) that labor organizations may only assert associational standing in matters "dealing with employers" is absurd. *See, e.g.*, *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 286 (1986) (holding union had associational standing to challenge an administrative interpretation of a federal statute).

[16] Defendants' argument that Plaintiffs' members are necessary is groundless. Plaintiffs seek only equitable relief, so there will be no damages calculations in this case at all, let alone calculations that are "not common to the entire membership." Opp. 9.

two objectives that AAUP and UAW exist to create, protect, and promote. Like the housing coun-

seling organization in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), and unlike the

physician associations in *Alliance for Hippocratic Medicine*, 602 U.S. at 394–95, Plaintiffs regu-

larly work with their members to achieve these objectives and Defendants' actions have directly

affected and interfered with their ability to do so, *see, e.g.*, XSMF ¶102, reducing Plaintiffs' ability

to service their members, *see, e.g.*, *id.* ¶¶96, 105. Manifesting that impediment to their core busi-

ness functions, Plaintiffs face greater demands for meetings with and support for their members,

forcing them to divert time and resources to address the direct consequences of Defendants' ac-

tions. *Id.* ¶¶99–102, 104, 107. Far from spending their way into standing, Plaintiffs seek to address

threats to their ability to provide this core business function to their members which, as discussed

above, is a large part of why members join the Plaintiff organizations in the first place. *See All. for*

*Hippocratic Med.*, 602 U.S. at 395.

## II.    Defendants Have No Authority to Implement Alternate Civil Rights Enforcement Mechanisms that Contradict Congressional Intent

Defendants do not (and cannot) dispute that they failed to follow Title VI procedures. In-

stead, Defendants argue they did not need to follow those procedures because their actions were

not taken "pursuant to" Title VI—despite their repeated invocation of Title VI in public statements

and communications with Harvard. *See infra* Section III.B.1. Abandoning decades of agency prac-

tice, Defendants claim that OMB guidance, codified at 2 C.F.R. § 200.340, gives them an "inde-

pendent contractual basis" to summarily terminate billions of dollars in federal funds based on

unsubstantiated allegations of discrimination, untethered to any evidentiary standard and with no

procedural protections against arbitrary, discriminatory, or erroneous decision-making. Opp. 26.

Defendants badly misread 2 C.F.R. § 200.340, which only permits termination of federal

funds "*to the extent authorized by law*." Through Title VI, Congress placed explicit limits on

11

agencies' authority to threaten federal funding for alleged discrimination based on race or national origin, including antisemitism.[17] This clear expression of congressional intent leaves no room for Defendants to claim authority to contract Title VI's limits away. To hold otherwise would infringe on Congress's exclusive spending power, including the power to place conditions on federal spending. The Court should reject Defendants' unprecedented and unlawful attempt to expand agencies' power far beyond what the Constitution and Congress have conferred.

A.    **Title VI Limits Agency Power and Provides Enforceable Protections to Recipients of Federal Funds**

Defendants are wrong that Congress "did not cabin agency discretion to terminate grants." Opp. 37. In Title VI, Congress set forth "elaborate restrictions" on agencies' power to terminate or refuse to grant federal funds to recipients accused of discrimination. *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001). As the legislative history of Title VI confirms, Congress conferred these safeguards to prevent agencies from misusing their funding termination power arbitrarily or to coerce or punish entities disfavored by the executive branch. *See* Br. 34–36. It is unthinkable, then, that Congress left room for agencies to opt out of Title VI's mandatory processes and substantive limitations through rulemaking or the terms of their grants and contracts. *See Nat'l Treasury Emps. Union v. Cornelius*, 617 F. Supp. 365, 371 (D.D.C. 1985) ("the law does not permit [an] agency to regulate away" procedures "granted by Congress"). Defendants admit that Title VI is a

---

[17] Agencies have long recognized that Title VI's protection extends to those "who are or are perceived because of their shared ancestry or ethnic characteristics to be Jewish." ED, Dear Colleague Letter (May 7, 2024), https://www.ed.gov/media/document/colleague-202405-shared-ancestrypdf-35100.pdf. *See also, e.g.,* HHS, Dear Colleague Letter (Nov. 22, 2024), https://www.hhs.gov/sites/default/files/ocr-dcl-religious-discrimination-final.pdf. This is consistent with Defendants' current interpretation of Title VI. *See, e.g.*, Press Release, HHS, HHS' Civil Rights Office Finds Columbia University in Violation of Federal Civil Rights Law (May 22, 2025), https://www.hhs.gov/press-room/ocr-columbia-violates-federal-civil-rights-law.html ("OCR enforces Title VI, which prohibits ... discrimination against individuals that is based on their actual or perceived Israeli or Jewish identity or ancestry.").

*mandatory* statute that "leaves no discretion to the Government to waive its requirements." Opp. 27. Defendants cannot then argue they have authority to ignore its procedural requirements.

To the extent agencies terminate grants pursuant to the conditions in 2 CFR § 200.340, those termination decisions must comply with, not circumvent, the processes and limitations Congress has imposed. *See Am. Pub. Health Ass'n v. Nat'l Insts. of Health,* 2025 WL 1548611, at *10 (D. Mass. May 30, 2025) (holding 2 C.F.R. § 200.340(a)(4) "cannot authorize actions that contravene statutory requirements" because it only allows terminations "to the extent authorized by law"). Defendants' attempt to create an "alternate" method of civil rights enforcement directly undermines Congress's intent to safeguard entities that rely on federal funds from sudden, unnecessary, or politically motivated termination actions by the executive branch. *See* Br. 35.

Moreover, Defendants' assertion that grant recipients have "agreed" to allow the government to terminate their funding pursuant to § 200.340 is not credible. Recipients have long relied on agencies' practice of enforcing civil rights though statutorily mandated processes and Defendants' own regulations and guidance—none of which have ever suggested termination could occur in this way. By its own terms, § 200.340 applies only "to the extent authorized by law." It "does not create a default ability by the federal government to terminate an award over the award recipient's objection, whenever an agency determines its priorities have changed." *Metro. Transp. Auth. v. Duffy*, 2025 WL 1513369, at *28 (S.D.N.Y. May 28, 2025). Defendants also fail to address Plaintiffs' point that NIH—the agency that terminated the vast majority of Harvard's grants—has not adopted the "agency priorities" basis for termination and, thus, recipients could not have been aware that their funds could be terminated for this reason. *See* Br. 33–34.[18]

---

[18] *See* NIH, Research General Terms and Conditions at IV (April 8, 2021), https://nsf-gov-resources.nsf.gov/files/NIH-research-terms-conditions-20210408-r.pdf (NIH "does not adopt 2

Defendants seek expansive power not only to evade Title VI's procedural protections but also to decide what "discrimination" means, untethered from the law, without being required to provide notice of that interpretation and without meeting any evidentiary standard or burden of proof. Agencies would be free to broadly cut off federal funds without regard to Congress's intent to limit funding terminations to the particular "program, or part thereof" found to be discriminatory. 42 U.S.C. § 2000d-1. Defendants' blatant power grab must be rejected. *See New York v. U.S. Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475, 531–32 (S.D.N.Y. 2019) (where challenged regulations "substantially address[ed] conduct covered by Title VII," it was "not credible to claim that Congress tacitly intended to give HHS authority … to define substantive rules of conduct in this area" or to adopt the "extreme enforcement remedy" of terminating all funds); *Maine v. U.S. Dep't of Agric.*, 2025 WL 1088946, at *21–22 (D. Me. Apr. 11, 2025) (finding agency violated APA by ignoring Title IX before terminating funds).

Because Defendants were required to follow Title VI, Plaintiffs are entitled to summary judgment. *See* Br. 22–24. Title VI confers jurisdiction over this case. Br. 17–18, 21 (citing 42 U.S.C. § 2000d-2, 5 U.S.C. § 704). And failure to follow Title VI violates the APA's prohibition on agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## B.    Defendants' Actions Are Not Authorized by Their "Power to Contract"

Defendants insist their actions are authorized by their "broad power to contract, including imposing conditions as part of those contracts." Opp. 26. But while Defendants have a general power "to contract," that power must be exercised within the bounds circumscribed by Congress and the Constitution.[19] "It is no exaggeration to say that 'an agency literally has no power to act ...

---

CFR § 200.240(a)(2) [sic], stating that the Federal awarding agency may terminate a Federal award if the award no longer effectuates the program goals or agency priorities").

[19] *United States v. Tingey*, 30 U.S. 115, 125 (1831), is not applicable here, as it stands for the proposition that the government can sue on its own contracts or to vindicate its property interests.

unless and until Congress confers power upon it.'" *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)).

No law authorizes Defendants to ignore Title VI and impose a conflicting enforcement scheme. As an initial matter, Defendants do not even attempt to identify any law empowering NSF, DOD, DOE, ED, HHS, HUD, USDA, or NASA to act in this way. They cite only the NIH enabling statute, which they claim "explicitly authorize[s] [the] Executive to wield significant discretion in setting agency priorities, including terminating grants." Opp. 37. But that statute merely makes the NIH Director responsible for, *inter alia*, implementing "general policies respecting the management and operation of programs and activities within the [NIH]," conducting "priority-setting reviews, to ensure that the research portfolio of the [NIH] is balanced and free of unnecessary duplication," and "ensur[ing] that scientifically based strategic planning is implemented in support of research priorities." 42 U.S.C. § 282(b)(1), (3), (5). This is not authorization to broadly terminate federal funding based on purported civil rights violations and is far from specific enough to trump the statute Congress passed expressly to govern such action. Congress created the NIH to promote scientific research, not to enforce civil rights outside the bounds of Title VI. 42 U.S.C. § 241(a)(3).

Defendants' "attempt to transform statutory language providing agencies some limited discretion in determining research priorities into specific authorization for the action at issue here, which goes well beyond determining research priorities, 'stretch[es] the statutory language beyond hope of recognition.'" *PFLAG, Inc. v. Trump,* 769 F. Supp. 3d 405, 434–35 (D. Md. 2025) (quoting *Barr*, 954 F.3d at 32). As such, their actions are in "excess of statutory jurisdiction, authority, or limitations" and "an abuse of discretion, or otherwise not in accordance with law," under the APA. 5 U.S.C. § 706(2)(A), (C); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018) (upholding injunction where government had "not even attempted to show that Congress

authorized it to withdraw federal grant moneys from jurisdictions that do not agree with the current Administration's immigration strategies"); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 2025 WL 597959, at *16 (D.D.C. Feb. 25, 2025) (finding plaintiffs likely to succeed on APA claim where there was "no clear statutory hook for this broad assertion of power" to freeze federal assistance); *New York v. Trump*, 769 F. Supp. 3d 119, 127 (D.R.I. 2025) (agencies failed to identify "any constitutional or statutory authority" to "impose this type of categorical [funding] freeze").

## III.    Defendants' Actions Are Arbitrary and Capricious.

Even if Defendants were not constrained by Title VI, their actions must still be set aside as "arbitrary" or "capricious." *Ohio v. EPA*, 603 U.S. 279, 292 (2024).

### A.    Defendants' Decisions to Impose Funding Conditions and Broadly Freeze and Terminate Federal Funding Are Final Agency Actions

Defendants' contention that only the May termination letters can be challenged is wrong.[20] Opp. 18. The termination letters are the implementation of Defendants' decision, which began with the March 31 Announcement declaring Harvard violated the law and was subject to funding termination. In addition to the terminations, each of the earlier challenged actions—including the March 31 Announcement, April Demand Letters, April 14 Freeze (which Defendants do not actually dispute), and May 5 Ineligibility Decision—are final agency action.[21]

#### 1.    The March 31 Announcement and April Demand Letters Are Final

Defendants mischaracterize the March 31 Announcement as the "opening of a review or investigation" and the Demand Letters as the "starting bid in a negotiation." Opp. 19. But a so-

---

[20] Defendants' claim that Plaintiffs have "not named any other final actions" other than the March 31 Announcement and April Demand Letters, Opp. 18 n.6, is demonstrably false. *See* Br. 21 ("Defendants' actions, beginning on March 31 … are subject to judicial review under the APA because they are 'final agency action....'"); 29–31 (challenging the April 14 Freeze, May 5 Ineligibility Decision and May termination letters); SAC ¶¶130–143.

[21] The APA states that a "preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." 5 U.S.C. § 704.

called "investigation" would not *begin* with a conclusion of culpability and an announcement of consequences. Both the March 31 Announcement and Demand Letters set forth final conclusions about antisemitism and other conduct, with no opportunity to dispute, based on which Defendants announced an intent to take punitive action. *See* XSMF ¶¶14–26. In the March 31 Announcement, the Task Force justified its "review" by citing "Harvard's failure to protect students on campus from anti-Semitic discrimination—all while promoting divisive ideologies over free inquiry." *Id.* ¶¶14–15. That "review" was of Harvard's *contracts and grants*, not allegations of antisemitism; the "review" was the legal consequence of final decisions about antisemitism.

No document in the record shows that any "investigation" or information gathering actually occurred after March 31, only further legal consequences.[22] The Demand Letters reiterated conclusions already reached, imposed "reforms" that "the government view[ed] as *necessary*," and expected Harvard's "immediate cooperation" to "maintain Harvard's financial relationship with the United States government." GSAHarv00000005; GSAHarv_00000007–011.[23] They made clear that rejection of the demands would have further legal consequences—which were ultimately realized. These represent consummated decisions, not tentative steps. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599–600 (2016) (agency action can be final even absent

---

[22] In contrast, the First Circuit held in *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024) that the IRS's summonsing authority "clearly [fell] within the category of information gathering" rather than final agency action. Nor is *FTC v. Standard Oil Co. of California*, 449 U.S. 232, 241 (1980) applicable as the FTC's "threshold determination" contained a notice of hearing at which evidence could be presented challenging the allegations. Harvard was provided with no such opportunity because Defendants had made up their minds.

[23] The April 3 Letter is not "moot" because it was superseded by the April 11 Letter. Opp. 19. No government regulatory scheme has "expired or been effectively repealed." *Am. Civ. Liberties Union of Mass. v. U.S. Conf. of Cath. Bishops*, 705 F.3d 44, 53 (1st Cir. 2013). The April 11 Letter "incorporate[d]" the terms of the April 3 Letter, and both required that Harvard accept its conditions to continue a "financial relationship" with the government. GSAHarv_00000007–011; XSMF ¶19.

immediate legal force, when it warns regulated parties that failure to conform to the agency's view will result in significant penalties); *Nat'l Educ. Ass'n.*, 2025 WL 1188160, at *16 (agency action is final if, "looking to the practical effects, it 'appears on its face to be binding' or if it 'is applied by the agency in a way that indicates it is binding'") (quoting *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002)). Defendants' claim that Harvard's "reject[ion]" of the Demand Letters "extinguish[ed] any legal effect," Opp. 20, ignores reality: Mere hours after Harvard publicly rejected the government's demands, Defendants froze the University's funding, exactly as promised.

### 2. The May 5 Ineligibility Decision Is Final Agency Action and Is Not Committed to Agency Discretion

The May 5 Ineligibility Decision also constitutes final agency action because it makes factual and legal conclusions about Harvard's conduct, with no opportunity to dispute them, and reflects the consummation of the government's decision to withhold *all* federal funds from Harvard. *See* XSMF ¶¶32–33, 57–59.[24] With this decision, Harvard's legal "obligations have been determined." *Bennet,* 520 U.S. at 178. Nothing more is required. Defendants' contention that the Ineligibility Decision is not final action because there is no "legal right to future funding," PF Opp. 31, is irrelevant to the final agency action inquiry.

Defendants conflate the test for final agency action under § 704 with the APA's limited exception under § 701 for actions "committed to agency discretion by law." But that exception is read "quite narrowly," and this is not one of those "rare circumstances" where it applies. *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019).[25] Defendants' decision to cut off an entire institution

---

[24] Defendants cannot claim that ED lacked authority to issue the letter. PF Opp. 31–32. ED is a member of the Joint Task Force charged with reviewing Harvard's funding, XSMF ¶4, and the Ineligibility Decision cites Harvard's rejection of the April 11 demands as the reason for the decision. *See id.* ¶33. Moreover, Defendants have not disowned the decision the May 5 letter reflects. If anything, this argument is a concession that Defendants acted outside of their authority.

[25] Defendants concede that this exemption does not apply if Title VI governs. PF Opp. 31 n.5.

from *all* future federal funds is distinct from the situation in *Lincoln v. Vigil,* 508 U.S. 182 (1993), because Defendants are not determining which programs best accomplish their "permissible statutory objectives," *id.* at 193; they have reached *outside* the bounds of their discretion by targeting a specific recipient that they accuse of antisemitism. *See supra* Section II.B. Because Defendants had no discretion to make these decisions, they cannot be "committed to agency discretion by law." 5 U.S.C. § 701. If Defendants *had* acted within the bounds of their statutory discretion, there still would have been clear standards provided by their own regulations cabining that discretion. *See* 2 C.F.R. Part 180 (OMB guidance on debarment and suspension procedures); 2 C.F.R. Part 376 (HHS implementation); *Pol'y & Research, LLC v. HHS,* 313 F. Supp. 3d 62, 68, 72 (D.D.C. 2018) (finding agency action reviewable where regulations "provide clear and applicable standards"). They did not comport with those standards, either—indeed, they did not even try to, because that was not the authority they were exercising.

### B.      Defendants Do Not and Cannot Show That Their Actions Were the Product of Reasoned Decision-Making

Defendants candidly frame their actions as "decision[s] of less than ideal clarity," but reach too far in claiming that their "path may reasonably be discerned." Opp. 31 (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)). No reasonable path can be discerned from Defendants' actions, which were neither "reasonably explained," nor reflect "a rational connection between the facts found and the choice made." *Ohio*, 603 U.S. at 292.

### 1.      Defendants Provide Inconsistent Reasons for Their Actions

Defendants attempt to re-write the record by claiming a consistent focus on "broader government policy concerning antisemitism at institutions of higher learning and the insufficiency of Harvard's compliance with that policy." Opp. 31. But the record reveals a hodgepodge of shifting and conclusory accusations, many unrelated to antisemitism. *See* Br. 24–26; XSMF ¶ 25 (accusing

Harvard of using "DEI" and "ideological litmus tests" in admissions and hiring); *id.* at ¶33 (claims about Harvard's grading system, math curriculum, and hiring of Democrats). Even the May termination letters are more muddled than Defendants admit: The NIH, NSF, DOD, DOE, and ED letters claim Harvard "continues to engage in race discrimination, including in its admissions process, and in other areas of student life." XSMF ¶43 (DOD), ¶50 (DOE), ¶57 (ED), ¶62 (NIH), ¶76 (NSF). The NASA and HUD letters do not mention antisemitism at all. *See* NASA-AR03749; HUDHarvAR_00000062. These incoherent explanations are not reasoned decision-making and suggest pretext. *See infra* Section IV.B (viewpoint discrimination and retaliation); *Dep't of Com.*, 588 U.S. at 785 (agencies must "offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public," not "contrived reasons").

Defendants also ignore their repeated, conclusory accusations that Harvard violated the *law*, not just "broader government policy." *See* Br. 25; XSMF ¶¶21, 23, 31, 33. Not once do the March 31 Announcement, April Demand Letters, April 14 Funding Freeze, or May 5 Ineligibility Decision cite § 200.340 or "agency priorities" as the basis for their actions, revealing this is a *post-hoc* justification, at best. [26] *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,* 591 U.S. 1, 23 (2020) ("[A]n agency must defend its actions based on the reasons it gave when it acted."). Only *after* this litigation was filed, in the May termination letters, did Defendants invoke "agency priorities," presumably to avoid responsibility for their noncompliance with Title VI. Even those letters continued to suggest that Harvard failed to "comply with principles and *laws* of nondiscrimination." *See, e.g.*, HHSHarv_00000473. In fact, Defendants are *still* claiming publicly that their

---

[26] Defendants are incorrect that only lawyers, not agencies themselves, may be scrutinized for post-hoc rationalizations. *See id.* ("The functional reasons for requiring contemporaneous explanations apply with equal force regardless whether *post hoc* justifications are raised in court by those appearing on behalf of the agency or by agency officials themselves.").

actions are Title VI enforcement. As recently as June 3, McMahon testified to Congress: "The statute is Title VI. These were civil rights violations. That is why we … defunded or stopped the funding for Harvard."[27] Defendants cannot now side-step their burden to explain these accusations by adopting a contradictory litigation position that they did not act "pursuant to" Title VI.

### 2. Defendants Cannot Justify the Breadth of Their Actions

Defendants have failed to provide a "rational connection between the facts found and the choice made," *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), for any of their decisions. Defendants concede that they did not provide any explanation in the Demand Letters for their unreasonable and overbroad conditions on Harvard's funding. Even now, Defendants fail to justify those conditions, other than to repeat their claim that they are mere "negotiations" rather than final agency action, Opp. 33, a matter addressed in Section III.A.1, *supra*. Defendants thus have no answer to Plaintiffs' argument, *see* Br. 26–27, that conditions like submitting to a "viewpoint diversity" audit or "shutter[ing]" all "DEI programs" are entirely unrelated to their stated goal of "eradication of antisemitism on the University campus." *See Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962) (APA violation occurs where "[t]here are no findings and no analysis to justify the choice made").

Defendants also fail to explain why it was necessary to freeze[28] and then terminate funds that have no direct connection to antisemitism allegations—an overbroad response that would be

---

[27] *A Review of the President's Fiscal Year 2026 Budget Request for the Department of Education Before the S. Comm. on Appropriations, Lab., Health and Hum. Servs., Educ., and Related Agencies* 1:41:20–1:42:30 https://www.appropriations.senate.gov/hearings/a-review-of-the-presidents-fiscal-year-2026-budget-request-for-the-department-of-education (June 3, 2025) (statement of Secretary McMahon). *See also Examining the Policies and Priorities of the Department of Education Before the H. Comm. on Educ. and Workforce* 50:55–51:23 https://www.youtube.com/live/HwRs-EpCC3U (June 4, 2025) (statement of Secretary McMahon) ("We've cut Harvard's funding … we're putting teeth behind these Title VI violations.").

[28] Defendants offer no argument in their brief to explain the rationale for the April 14 Freeze. Thus, they have waived any further argument on this action.

unavailable *even if* Defendants made specific findings that Harvard violated Title VI. 42 U.S.C. §

2000d-1 ("[T]ermination or refusal … shall be limited in its effect to the particular program, or

part thereof, in which such noncompliance has been so found."). A desire to not "fund entities that

do not take adequate actions to prevent antisemitism," Opp. 32, does not justify the unexplained

severity and immediacy of the government's actions. The same goal animated Title VI,[29] but Con-

gress made clear that this does not justify sudden, indiscriminate termination. *See* Br. 34–35. There

is no evidence Defendants considered *any* alternatives, which was required given the reliance in-

terests at stake. *See infra* Section III.D; *Regents of the Univ. of Cal.*, 591 U.S. at 35–36 (finding

action arbitrary and capricious where record contained no discussion of alternatives).

### 3.    Defendants Give No Reason for Their Departure from Longstanding Agency Practice

Defendants downplay their departure from longstanding agency practice of using Title VI

to address alleged discrimination, *see* Br. 39, repeating their claim that each agency simply "has

chosen to exercise a contractual provision," Opp. 29. Defendants' refusal to *acknowledge*, much

less explain, their choice is dispositive. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222

(2016) ("An unexplained inconsistency in agency policy is a reason for holding an interpretation

to be an arbitrary and capricious change from agency practice." (cleaned up)); *Am. Wild Horse

Pres. Campaign v. Perdue,* 873 F.3d 914, 924 (D.C. Cir. 2017) (rejecting agency attempt to "shrug

off" change in policy that ignored "two decades of agency practice").

### C.    The Harvard Antisemitism Report Does Not Support Defendants' Actions

Defendants have chosen to defend their conclusion that Harvard condones antisemitism

---

[29] *See* 110 Cong. Rec. 2467 (1964) (purpose of Title VI was to ensure the federal government could not directly or indirectly "aid and abet discrimination based on race, color, or national origin by granting money and other kinds of financial aid").

with only *one* piece of evidence: the Harvard Antisemitism Report.[30] But the Report categorically *cannot* constitute Defendants' administrative record for several reasons. *First*, Defendants' decisions to threaten and impose drastic conditions on Harvard's funding, and then freeze $2.2 billion in grants, purportedly based on findings of antisemitism, occurred weeks *before* the Report was released on April 29, 2025. *See* Br. 28–30. Defendants must prove that their decisions were reasonable based on the evidence before the agencies at the time those decisions were made. *See Thakur*, 2025 WL 1734471, at *13 ("[C]ourts may only consider the facts that the agency reviewed during its decision-making process."). Thus, the Report is not evidence that the government's *prior* "concerns" were "justifiable." Opp. 33.

    *Second*, the Report was not included in the administrative records produced by Defendants DOD, DOJ, ED, HUD, or NSF, each of which certified that their administrative records contained all documents they relied on in making the challenged decisions. These agencies thus cannot claim to have relied on *any* evidence of antisemitism to support their decisions, and that failure exposes those agencies who did include the Report as offering only pretext.

    *Third*, the Report is categorically insufficient, on its own, to support any reasoned decision. The Report itself disclaims any status as evidence. It emphasizes that the Harvard Antisemitism Task Force "did not view its charge as serving as an investigative body" and, as such, "did not seek counterarguments or counterevidence." HHSHarv_00000300**.** It merely states what the Task Force was "told," without probing the accuracy of the allegations. *Id.* Defendants fail to explain how allegations of some students' subjective experience support the wide-ranging conclusions they reached, *see* Section III.B.1, or the sweeping actions they took, *see* Section III.B.2. Such

---

[30] Defendants claim the March 31 memo says their decisions followed a "comprehensive review." Opp. 18, 30. But as explained above, the letter only announced a review of Harvard's funding, not any allegations, and no "investigation" actually occurred. *See supra* Section III.A.

cursory decision-making cannot satisfy the APA standards governing the exercise of governmental authority as opposed to private decision-making. *See State Farm*, 463 U.S. at 52–53 (enjoining agency action where there was "no direct evidence in support of the agency's finding").

### D.    Defendants Confirm They Did Not Consider Reliance Interests or Important Aspects of the Problem

Defendants do not defend their failure to consider Plaintiffs' members' reliance interests. Br. 31–33. They are wrong that Plaintiffs' members have no "such interests in grants to a third party." *See supra* Section I.B.1. And even so, "an agency must consider such reliance interests even where the policy at issue 'confer[s] no substantive rights.'" *Ass'n of Am. Univs. v. Nat'l Sci. Found.*, 2025 WL 1725857, at *18 (D. Mass. June 20, 2025) (quoting *Regents of the Univ. of Cal.*, 591 U.S. at 31)). While Defendants may have discretion in how they "weigh" reliance interests, they still must show that they did weigh them. Their failure to do so is dispositive. *See City & Cnty. of San Francisco v. Trump*, 2025 WL 1282637, at *36 (N.D. Cal. May 3, 2025).

Defendants' argument that they "adequately considered the benefit of federally funded research on the Government and the public" is also unpersuasive. Opp. 35. Defendants point to a single line in the April 11 Letter, which states only that "[t]he United States has invested in Harvard University's operations because of the value to the country of scholarly discovery and academic excellence." Opp. 35. That single sentence shows no consideration of how suddenly ending all funding erases all of that "value to the country." Br. 40. By terminating projects mid-stream, Defendants recklessly jeopardize vital scientific research and imperil billions in taxpayer funds already invested in work that may never be completed. *Id.* Thus, Defendants "entirely failed to consider an important aspect of the problem," in violation of the APA. *State Farm*, 463 U.S. at 43.

IV.    **Plaintiffs Have Proven Their First Amendment Claims**

A.    **Plaintiffs Have Proven a Coercion Claim**

1.    **The Government is Targeting Plaintiffs' Protected Speech**

Defendants distinguish *Vullo* on the grounds that this case, "unlike *Vullo*, does not involve the government threatening coercive action against one party to get at the protected speech of a third." Opp. 22. Not so. Plaintiffs' members are the ones, in the government's view, whose "viewpoints" are insufficiently "diverse"; whose "power" must be "reduc[ed]" because they are too "committed to activism"; whose "woke" research and curricula need to be "scrap[ped]"; and whose protests need to be suppressed. *See* Br. 26, 41–42. Defendants' actions are not solely "because of [Harvard's] own conduct," Opp. 22, any more than the defendant's actions in *Vullo* were solely because of the insurance company's conduct, rather than the NRA's. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 183–84 (2024). Harvard's conduct and Plaintiffs' speech are not independent: Harvard's control (or lack thereof) over what Plaintiffs' members say, teach, and learn on campus caused Defendants' actions. *President & Fellows of Harvard Coll. v. Dep't of Homeland Sec.*, 2025 WL 1737493, at *15 (D. Mass. June 23, 2025) ("The April 11 Letter, on its face, was aimed directly at these protected academic freedoms, as it clearly sought to control the views of Harvard's faculty and students as well as the school's curricula and make them subject to government approval.").

Defendants cannot sustain their assertion that the only speech "being targeted here" is unprotected "antisemitic harassment," Opp. 24, or that they are targeting only conduct, Opp. 21. That ignores that their demands go far beyond addressing antisemitism, including demands to "improve viewpoint diversity"; "end ideological capture" through a third-party audit for "viewpoint diversity"; "shutter" all "DEI programs"; focus more on "academic excellence"; "reduc[e] the power held by faculty … more committed to activism than scholarship"; "review[]" all faculty for

25

"plagiarism"; and implement a "comprehensive mask ban." XSMF ¶¶20–21, 25.[31]

Disregarding this, Defendants focus on one demand: to impose "time, place and manner rules" on "any student group or club that endorses or promotes criminal activity, illegal violence, or illegal harassment." Opp. 21. Even that, however, targets protected speech. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969); *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1072 (9th Cir. 2002) ("endors[ing] or encourag[ing] the violent actions of others" is "speech [that] would be protected"). Time, place and manner restrictions may be valid, but demanding them only for certain viewpoints is unconstitutional. *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009).

Defendants' assertion that their goal is solely to target illegal antisemitism is, therefore, demonstrably false. It is also irrelevant: even if true, *coercing* Harvard in service of that goal is unconstitutional. As discussed in Plaintiffs' opening brief, *see* Br. 42 n.15, the Court in *Bantam Books, Inc. v. Sullivan* declared unconstitutional a state's practice of "notifying" distributors about concerns that publications might be illegally obscene, even though obscenity is "not within the area of constitutionally protected speech or press and may therefore be regulated," 372 U.S. 58, 65 (1963). Such a practice violated the First Amendment because distributors would likely self-censor out of fear, depriving publishers of the due process necessary to determine if their material was actually unprotected. *Id.* at 69–70 (explaining that informal coercion "provides no safeguards

---

[31] These facts render Defendants' reliance on *B & L Productions, Inc. v. Newsom*, 104 F.4th 108, 114 (9th Cir. 2024), *cert. denied* 2025 WL 1211774 (U.S. Apr. 28, 2025) inapt. There, the state was lawfully regulating a "business transaction" which was "unprotected by the First Amendment." *Id.* Here, Defendants are attempting to regulate what gets taught, researched, and spoken on campus, thus "expand[ing] their regulatory jurisdiction to suppress the speech of [individuals] that they have no direct control over." *Nat'l Educ. Ass'n*, 2025 WL 1188160, at *26 (quoting *Vullo*, 602 U.S. at 197–98). Defendants fail to contest that many of their conditions would violate the First Amendment if attempted directly. *See* Br. 42.

whatever against the suppression of nonobscene, and therefore constitutionally protected, matter"
and "is a form of regulation that creates hazards to protected freedoms markedly greater than those
that attend reliance upon [formal legal process]").[32]

That is exactly what is happening here. Defendants' process-free approach violates Plain-
tiffs' members' rights because of the risk that Harvard will be coerced into self-censorship on
campus. Just as with obscenity, the line between protected speech and illegal discrimination is
hard to draw. *See, e.g.*, *Earle v. Benoit*, 850 F.2d 836, 848 n.12(1st Cir. 1988) ("In this area of the
law, 'the line between speech unconditionally guaranteed and speech which may legitimately be
regulated, suppressed or punished is finely drawn.'") (quoting *Speiser v. Randall*, 357 U.S. 513
(1958)). The procedures Defendants should have followed, *see supra* Sections II & III, ensure that
government line-drawing between speech and discrimination does not trample constitutional lib-
erty. Defendants' arguments about the importance of tackling antisemitism evoke the possibility
of better line-drawing, but do not justify what they actually did here.

Defendants' failure to grasp this is evident in their misplaced reliance on *Kestenbaum v.
President & Fellows of Harvard College*, 743 F. Supp. 3d 297 (D. Mass. 2024). That court ex-
pressed skepticism that Harvard could "hide behind the First Amendment to justify avoidance of
its Title VI obligations," but instead of leaping to a finding of unlawful discrimination, the court
reserved judgment until legal process could test whether Harvard's actions in fact were illegal. *Id.*
at 309. Here, the government has shown no such restraint—restraint that is required by law.

Defendants also have no answer to Plaintiffs' argument that any interest in addressing an-
tisemitism in federally funded programs must be fulfilled by direct regulation *of that program*. Br.

---

[32] To distinguish *Bantam Books*, Defendants cite the Eleventh Circuit's decision in *Penthouse International, Ltd. v. McAuliffe,* 702 F.2d 925 (11th Cir. 1983), but fail to disclose that decision was vacated on rehearing and has "no precedential value." 717 F.2d 517 (11th Cir. 1983).

44 (citing, *e.g.*, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013)). Just as the government cannot serve its interest in ensuring taxpayer dollars do not support prostitution by withholding funds from institutions that demonstrated insufficient lack of concern, it likewise may not "ensure that taxpayer dollars are not used to support research at an institution that has demonstrated a lack of concern for the wellbeing of Jewish students" by withholding funds based on Harvard's purported lack of concern. Opp. 23.

More fundamentally, nothing about antisemitism explains the breadth of Defendants' conditions, which directly target speech and academic freedom. This is not an instance of the government "act[ing] properly in furtherance of legitimate state interests, even though such state action incidentally chills First Amendment rights." *Greenwich Citizens Comm., Inc. v. Ctys. of Warren & Washington Indus. Dev. Agency*, 77 F.3d 26, 31 (2d Cir. 1996). It is unconstitutional coercion.

## 2. Plaintiffs Have Demonstrated Defendants' Actions Convey a Threat of Adverse Government Action

Defendants argue that "Harvard was not coerced," Opp. 21, but ignore law prohibiting any action that "viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress" speech, *Vullo*, 602 U.S. at 191. Placing "a gun to the head" of the university is itself the unlawful action, regardless of the backbone of its target. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012). Harvard's public stance of not caving to the Administration has not prevented Defendants from harming Plaintiffs' members, and the Sword of Damocles hangs over Harvard's head, leaving members fearful that Harvard may yet capitulate, especially as attacks continue to escalate. *See supra* Section I.B.

In any case, the government's coercion has been effective. Defendants argue only that Harvard could not have been coerced because it "rejected the Government's Offer." Opp. 21. That is an oversimplification. When it was negotiating, the university took steps to placate Defendants.

Br. 8, 44. Defendants claim that Harvard's vague statement that it "has made, and will continue to make, lasting and robust structural, policy, and programmatic changes," establishes that Harvard did all of this "on its own accord," Opp. 20–21, but that is merely Defendants' wishful thinking, not what Harvard said. In its related litigation, Harvard itself claims unlawful coercion, and, contradicting their litigation position, Defendants have publicly stated that their coercion *is* working. Def's Resp. to Pls' S. of Facts & Supp for Def's Cross-Mot. For Summ. J. ("PF XSMF"), PF Case, Dkt. 185 (June 16, 2025) ¶93. In any case, a coercion claim cannot turn on whether the target *admits* its responsive actions were coerced, because the more effective the coercion is the less likely such an admission would be. Unsurprisingly, Defendants cite no case law saying otherwise.

### B.    Plaintiffs Have Proven Viewpoint Discrimination and Retaliation

Defendants' denial that their actions were directed at protected speech or reflect "improper censorious motives," Opp. 23, rings hollow. Defendants sought to impose a "viewpoint diversity audit," end "ideological capture," shutter disfavored programs, and punish faculty "more committed to activism than scholarship." *See* Section IV.A. The record is replete with indications of censorious motive such as statements that targeting university funding is necessary because "[t]he academic system in this country has been hijacked by the left, has been hijacked by the Marxists," XSMF ¶19, people at Harvard "push[] political, ideological, and terrorist inspired/supporting 'Sickness'," *id.* ¶89, they "teach [their] students to despise" a "free-market system" and "encourage resentment and instill grievance and racism into our wonderful young Americans," *id.* ¶33, they hire the President's political opponents, and Harvard "is a JOKE, teaches Hate and Stupidity, and should no longer receive Federal Funds," and is "a threat to Democracy," *id.* ¶¶87, 91.[33]

---

[33] Defendants cannot elide responsibility by invoking a prudential standing rule to block Plaintiffs from raising arguments premised on "claims of retaliation and/or viewpoint discrimination against Harvard." Opp. 24 (citing *Warth v. Seldin*, 422 U.S. 490, 510 (1975)). First,

In addition to this direct evidence, the implausibility of Defendants' putative "legitimate basis" for their actions—"ensur[ing] that taxpayer dollars are not used to support research at an institution that has demonstrated a lack of concern for the wellbeing of Jewish students," Opp. 23—establishes viewpoint discrimination. *First*, that interest cannot explain funding conditions having no apparent connection to it. *See supra* Section IV.A. *Second*, the record contains insufficient evidence that Harvard has a "lack of concern for the wellbeing of Jewish students" especially since the only purported evidence of that conclusion is Harvard's own self-reflection. *See supra* Section III.C. *Third*, Defendants have followed none of the processes Congress established to govern actions to vindicate this interest and do not explain their departure from usual practice. *See supra* Sections II, III.B. In the context of assessing discriminatory intent, deviation from usual practice is a powerful indication of pretext. *Cf. Theidon v. Harvard Univ.*, 948 F.3d 477, 499 (1st Cir. 2020) (holding that "[e]vidence that Harvard deviated from its standard procedure or policies in taking an adverse employment action against [plaintiff] may be relevant to the pretext inquiry"). In the face of this direct evidence of motive, disconnect between action and stated purpose, lack of evidence to support purported concerns, and astounding procedural irregularity, Defendants' attempt to fall back on the "presumption of regularity," Opp. 23 (citing *Nieves v. Bartlett*, 587 U.S.

---

as discussed above, there is no separate interest. Defendants are not solely targeting the university administration; the whole Harvard community, including Plaintiffs' members, are the target. Nor is there a prudential standing rule blocking Plaintiffs from seeking redress from the direct harms of Defendants' actions. In *Warth*, the plaintiffs could not show injury because the challenged zoning rules had not harmed them, 422 U.S. at 504, but the Court acknowledged that where action targeting "one party [Harvard] causes specific harm to a third party [Plaintiffs and their members], harm that a constitutional provision or statute was intended to prevent, the indirectness of the injury does not necessarily deprive the person harmed of standing to vindicate his rights." *Id.* at 505. Here, Plaintiffs are being harmed and thus may challenge Defendants' actions even if they were directed only to university administration, which they are not. *See also Schad v. Mt. Ephraim*, 452 U.S. 61, 66 (1981) (First Amendment allows a plaintiff with standing to "rely on the impact of the [challenged action] on the expressive activities ... of others").

391 (2019)), cannot be taken seriously.

To the extent Defendants have incorporated their further arguments in the PF Case, Plaintiffs also incorporate the arguments made by the plaintiff in that matter that *Pickering v. Bd. Of Educ.*, 391 U.S. 563 (1968) does not apply here, the government's discretion to terminate contracts is part of and does not absolve Defendants of liability for their unconstitutional conduct, Harvard's rejection of Defendants' demands was linked to Defendants' decision to terminate funding, and Harvard's actions are protected expression.

## V. Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Due Process Claim

Plaintiffs did not move on their due process claim because this Court can remedy Plaintiffs' injuries by resolving their other claims. Nonetheless, Defendants' motion for summary judgment should be denied because Plaintiffs' members have a liberty interest directly affected by Defendants' actions, *supra* Section IV, and Defendants' actions condition the preservation of that liberty interest on unconstitutionally vague demands without providing any opportunity to be heard.

Defendants' conduct is void for vagueness because it implicates the First Amendment and "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *FCC v. Fox Tel. Stations, Inc.*, 567 U.S. 239, 253 (2012); *see also NAACP v. Button*, 371 U.S. 415, 433 (1963). Defendants' funding conditions are so broad and abstract, their reasoning so imprecise and unstable, and their termination letters so arbitrary and conclusory, that Plaintiffs and their members are left to guess at what conduct is prohibited and compelled to curtail their speech and academic freedom. *See supra* Sections I.B, II.B, and IV; *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) ("Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than

if the boundaries of the forbidden areas were clearly marked." (quotation and alteration omitted)).[34]

## VI.    Permanent Injunctive Relief is Warranted

Plaintiffs have demonstrated that a permanent injunction is necessary to provide complete relief from Defendants' course of conduct.[35] *See, e.g.*, *Doe v. Trump*, 766 F. Supp. 3d 266, 288 (D. Mass. 2025).[36] As discussed *supra* Section IV, Defendants' actions are a scheme to use federal funding to coerce fundamental changes affecting Plaintiffs' members' rights.[37] The utter inadequacy of the administrative record demonstrates that Defendants acted not based on agency "consideration of the topic at hand," Opp. 42, but rather pursuant to an unlawful, top-down directive that Harvard's funding be leveraged to advance authoritarian control over a private university. This is not a case about a discrete agency decision that can be remanded and corrected. *Contra* Opp. 42–43. For the same reason, Defendants' argument, Opp. 44, that Defendants Pamela Jo Bondi and DOJ should be dismissed because they have not cancelled any funding misses the point. DOJ is a member of the "DOJ Task Force," XSMF ¶4, which sent the Demand Letters, instituted the Funding Freeze, and coordinated the grant terminations at issue. This suit challenges their acts.

Remedying those acts requires permanent injunctive relief to ensure Defendants adhere to

---

[34] The Supreme Court's decision in *National Endowment for the Arts v. Finley* affirmed the viability of the plaintiffs' as-applied challenge to arbitrary agency funding decisions and concluded only that a *facial* challenge to invalidate vague funding standards would fail. 524 U.S. 569, 578, 587 (1998) (recognizing that "if a subsidy were manipulated to have a coercive effect, then relief could be appropriate"). Plaintiffs bring an as-applied challenge.

[35] Defendants' cursory argument (Opp. 41–42) that Plaintiffs' First Amendment allegations "are too speculative to warrant prospective injunctive relief" is wrong for the reasons stated in Section I.B, above. *See* XSMF ¶¶137, 210–18, 235–37, 247–48.

[36] There is no authority for Defendants' request that this Court demand a bond of Plaintiffs as a condition for issuing a permanent injunction upon entering final judgment in favor of Plaintiffs.

[37] Defendants offer no authority for their claim that the Court should issue relief only as to "sufficiently and specifically proven irreparable harms," nor do they offer any analysis for why certain of Plaintiffs' declarations "only discuss harms insufficient to justify a permanent injunction." Opp. 44. For that reason alone, the Court should reject this argument. *See Summers v. City of Fitchburg*, 2016 WL 4926415, at *6 (D. Mass. Sept. 15, 2016). Relief spanning the full scope of Defendants' unlawful scheme is warranted for the reasons discussed herein.

the legal constraints (APA, Title VI and the First Amendment) that otherwise prevent abuse of federal funding powers. Plaintiffs' proposed injunction leaves Defendants' legitimate civil rights enforcement functions intact. *See* Dkt. 74.[38] Permanent injunctions are appropriate where, as here, the Court must address extended schemes of unlawful conduct Defendants may well repeat absent injunctive relief. *Glob. NAPs, Inc. v. Verizon New England, Inc.*, 706 F.3d 8, 13 (1st Cir. 2013).

## CONCLUSION

For the reasons set forth above the Court should grant Plaintiffs' motion for summary judgment and deny Defendants' cross-motion.

---

[38] Plaintiffs' proposed injunction language is neither vague nor unreasonable. *See* Fed. R. Civ. P. 65(c)(1); *see also Axia NetMedia Corp. v. Massachusetts Tech. Park Corp.*, 889 F.3d 1, 12 (1st Cir. 2018). Defendants take issue (Opp. 43) with an injunction barring them from taking "any similar action." Plaintiffs' requested injunction includes no such language. *See* Dkt. 74.

Dated:    June 30, 2025                                    Respectfully submitted,

                                            By:    /s/ Daniel H. Silverman

Philippe Z. Selendy*                               Daniel H. Silverman (BBO# 704387)
Sean P. Baldwin*                                   COHEN MILSTEIN SELLERS & TOLL PLLC
Corey Stoughton*                                   769 Centre Street
Julie Singer*                                      Suite 207
Drake Reed*                                        Boston, MA 02130
SELENDY GAY PLLC                                   (617) 858-1990
1290 Avenue of the Americas 20th Floor             dsilverman@cohenmilstein.com
New York, NY  10104
Tel: 212-390-9000                                  Joseph M. Sellers*
pselendy@selendygay.com                            Benjamin D. Brown*
sbaldwin@selendygay.com                            Phoebe M. Wolfe*
cstoughton@selendygay.com                          Margaret (Emmy) Wydman*
jsinger@selendygay.com                             Sabrina Merold*
dreed@selendygay.com                               COHEN MILSTEIN SELLERS & TOLL PLLC
                                                   1100 New York Ave NW, 8th Floor
                                                   Washington, DC 20005
*  admitted *pro hac vice*                         (202) 408-4600
                                                   jsellers@cohenmilstein.com
                                                   bbrown@cohenmilstein.com
                                                   pwolfe@cohenmilstein.com
                                                   ewydman@cohenmilstein.com
                                                   smerold@cohenmilstein.com

                                                   *Attorneys for Plaintiffs*