IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS—HARVARD FACULTY CHAPTER et al., | Case No. 1:25-CV-10910-ADB |
| Plaintiffs, | |
| v. | |
| UNITED STATES DEPARTMENT OF JUSTICE et al., | |
| Defendants. | |

**SUPPLEMENTAL DECLARATION OF MOLLY FORREST FRANKE**

I, Molly Forrest Franke, hereby declare as follows:

1. I am a Professor in the Department of Global Health and Social Medicine at Harvard Medical School as well as an Associate Professor in the Department of Epidemiology at the Harvard T.H. Chan School of Public Health ("HSPH").

2. I am a member of the American Association of University Professors ("AAUP") and AAUP–Harvard Faculty Chapter.

3. I am over the age of 18 and competent to testify as to the matters set forth in this affidavit based on my own personal knowledge.

4. I previously submitted a declaration in the above captioned case with the plaintiffs' motion for summary judgment. I am submitting this supplemental declaration to explain the federal grant application and approval process and to emphasize that each federal grant is specific to the principal investigator ("PI") and researchers listed on the initial grant application.

5.   I have been awarded 12 federal grants over the course of my career (nine as PI and three as co-investigator) and am well-positioned to speak about the grant application and approval process.

6.   Federal grants award a specific amount of funding for specific work to be done by specific individuals listed on the initial grant application. The grants I have received are awarded specifically to me and the other scientists listed on the grant application.

7.   A huge amount of work goes into a new federal grant application. For National Institutes of Health ("NIH") applications, there are three submission cycles each year. Researchers such as myself prepare grant applications 4-6 months in advance of cycle deadlines. This preparation involves developing the scientific approach, budget, and budget justification. This includes working with partners at subcontractor institutions to determine the cost of conducting the proposed scientific research. A clear scope of work is developed for each subcontract partner. In parallel to the scientific approach and cost projections, we prepare the human subjects protection plan and data management plan, solicit letters of support from stakeholders, and prepare biosketches (abbreviated curriculum vitaes tailored to the application's topic) for each investigator. A new grant application is often several hundred pages long.

8.   To prepare these applications, I also work with the administration at Harvard Medical School, in addition to the administrations at other Harvard schools and subcontractor institutions. The administration of the affiliated Harvard school(s) ensures regulatory compliance, including confirmation that the application does not overlap with other grant funding held by each investigator.

9.   A few months after a new grant application is submitted, it is sent to a study section at the funding agency, such as the NIH, where it undergoes peer review, evaluation, and scoring.

That evaluation and score are then taken to a council meeting, and the council of the awarding agency decides whether it will fund the proposed grant based on the score and evaluation. This process is similar across all NIH institutes, but the criteria, such as required score, can vary. The process is highly competitive, and applications are rarely funded on the first submission.

10. Each grant application lists Key Personnel (defined by NIH as those who "contribute in a substantive, meaningful way to the scientific development or execution of the project"). This includes the specific PI investigator and each researcher who will be working on the grant. The expertise of the PI and the collective research team, as well as their history of collaboration, are among the three factors considered by peer reviewers when assessing the overall potential impact of the application.

11. Following the initial grant award, a renewal process is conducted annually. A few months in advance of each new grant year, the awarding agency, such as the NIH, has a process where the PI reports on accomplishments, challenges, spending, training opportunities, and staffing. The PI must justify any changes in staffing and scope of work and explain any delays. The goal of the renewal review is to ensure everything is on track without any major changes or problems. Minor changes in staff time spent on the project are permissible; however, significant changes in effort by Key Personnel must be justified and pre-approved by the NIH.

12. Once a grant has been awarded, changing the PI or the prime institution requires prior approval from the funding agency, and the PI listed on the grant would need to have a strong justification for the change. The awarding institute or agency would then determine whether the change was justified. Changing a PI mid-way through a grant is rare.

13. Changing the PI of a grant resubmission also requires adhering to specified procedures for documenting and justifying the change. For example, I have one submitted grant

application that has been reviewed by the NIH and has a good score. Still, because the federal government has terminated grants to Harvard researchers, I am contemplating whether my team could move the work to a different institution under a different PI. To do this, I would need to identify an alternative researcher at a different institution with the skills, expertise, partnerships, and authority to lead this work and justify this change to the peer review panel. This is rarely plausible.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 27, 2025     Signed: *[signature]*

Molly Forrest Franke
Professor, Harvard Medical School
Associate Professor, Harvard T.H. Chan School of Public Health