**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

---

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS—
HARVARD FACULTY CHAPTER, *et al.*,

          Plaintiffs,

-v-

UNITED STATES DEPARTMENT OF JUSTICE, *et al.*,

          Defendants.

Case No. 1:25-CV-10910-ADB

---

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

JAY CLAYTON
Attorney for the Defendants
Acting Under Authority Conferred
by 28 U.S.C. § 515
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.:    (212) 637-2795
Email:  Jeremy.Liss@usdoj.gov

JEREMY M. LISS
Assistant United States Attorney
 - Of Counsel  -

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ........................................................................................................................... 4

I.      Plaintiffs Lack Article III Standing............................................................................ 4

        A.      Plaintiffs Lack Standing to Sue in Their Own Right ..................................... 4

        B.      Plaintiffs Do Not Have Associational Standing Because None of Their Individual
                Members Have Standing to Sue..................................................................... 6

        C.      Plaintiffs Do Not Have Associational Standing Because They Cannot Satisfy the
                Germaneness Requirement ........................................................................... 8

        D.      Plaintiffs Lack Standing to Enforce Payments to a Nonparty ....................... 9

II.     The Tucker Act Precludes This Court from Exercising Subject Matter Jurisdiction Over
        Plaintiffs' Claims .................................................................................................... 11

        A.      Plaintiffs' Claims Sound in Contract .......................................................... 11

        B.      Plaintiffs Are Essentially Seeking Contract Remedies................................. 14

III.    Plaintiffs' Title VI Claims Cannot Proceed ............................................................ 16

IV.     Plaintiffs' APA Challenges to the March 31 Announcement, the April 3 Letter, and the
        April 11 Letter Fail Because They Do Not Challenge Final Agency Action .................. 19

V.      The Freeze Orders and Termination Letters Do Not Violate the APA's Prohibition on
        Arbitrary and Capricious Final Agency Action ......................................................... 21

        A.      The Grant Terminations Were Not Arbitrary and Capricious .............................. 21

        B.      The Agencies Did Not Fail to Consider Important Aspects of the Problems or
                Reliance Interests Before Terminating Funding .............................................. 25

        C.      Defendants' Use of Contractual Provisions to Address Alleged Discrimination
                Was Not an Arbitrary and Capricious Departure from Longstanding Agency Practice... 26

        D.      The Harvard Antisemitism Report Does Not Support Defendants' Actions ........ 26

VI.     Plaintiffs Have Failed to Prove Their First Amendment Claims ....................................... 27

VII.    Defendants Are Entitled to Summary Judgment as a Matter of Law on Plaintiffs' Due
        Process Claims ......................................................................................................... 29

i

VIII.   Under the APA, the Appropriate Remedy Is Limited to the Agency Action Giving Rise to the Suit Rather than a Forward-Looking Injunction ........................................................ 30

CONCLUSION ............................................................................................................................ 30

# TABLE OF AUTHORITIES

Page(s)

Cases

*Abrams v. United States*,
   250 U.S. 616 (1919)................................................................................ 22

*Advanced Ion Beam Tech., Inc. v. Varian Semiconductor Equip. Assocs., Inc.*,
   721 F. Supp. 2d 62 (D. Mass. 2010) ....................................................... 9

*Am. Ass'n of Univ. Professors v. United States Dep't of Just.*,
   2025 WL 1684817 (S.D.N.Y. June 16, 2025) ................................. passim

*Am. Civ. Liberties Union of Mass. v. U.S. Conf. of Cath. Bishops*,
   705 F.3d 44 (1st Cir. 2013)....................................................................... 20

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................................. 28

*Ass'n of Am. Universities v. Nat'l Sci. Found.*,
   2025 WL 1725857 (D. Mass. June 20, 2025)............................................ 30

*Astra USA, Inc. v. Santa Clara Cnty., Cal.*,
   563 U.S. 110 (2011)................................................................................. 10

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963)................................................................................... 28

*Bldg. & Constr. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc.*,
   448 F.3d 138 (2d Cir. 2006).................................................................. 8, 9

*Bob Jones Univ. v. United States*,
   461 U.S. 574 (1983)........................................................................... 26, 27

*Bowen v. Massachusetts*,
   487 U.S. 879 (1988)........................................................................... 14, 15

*Bowman Transp., Inc. v. Arkansas- Best Freight Sys., Inc.*,
   419 U.S. 281 (1974)........................................................................... 24, 25

*Cameron v. Johnson*,
   390 U.S. 611 (1968)................................................................................. 28

*City & County of San Francisco v. Trump*,
   897 F.3d 1225 (9th Cir. 2018) ................................................................. 18

Congress.,
   617 F. Supp. 365 (D.D.C. 1985).............................................................. 17

*Conservation L. Found., Inc. v. Acad. Express, LLC*,
   129 F.4th 78 (1st Cir. 2025)...................................................................... 6

*Crowley Gov't Servs., Inc. v. GSA*,
   38 F.4th 1099 (D.C. Cir. 2022)................................................................ 16

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019)................................................................................. 21

*Dep't of Educ. v. California*,
   145 S. Ct. 966 (2025)............................................................................... 16

*Doe v. Trump*,
   766 F. Supp. 3d 266 (D. Mass. 2025) ...................................................... 30

*Equal Means Equal v. Ferriero*,
478 F. Supp. 3d 105 (D. Mass. 2020) ........................................................ 4

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985) ........................................................................ 30

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ............................................................... 4, 5, 6

*Gizzo v. Ben-Habib*,
44 F. Supp. 3d 374 (S.D.N.Y. 2014) ........................................................ 29

*Glob. NAPs, Inc. v. Verizon New England, Inc.*,
706 F.3d 8 (1st Cir. 2013) ................................................................... 30

*Great-West Life & Annuity Ins. Co. v. Knudson*,
534 U.S. 204 (2002) ........................................................................ 15

*Greenwich Citizens Comm., Inc. v. Ctys. of Warren & Washington Indus. Dev. Agency*,
77 F.3d 26 (2d Cir. 1996) .................................................................. 28

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ......................................................................... 5

*Hodel*,
840 F.2d ...................................................................................... 9

*Holder v. Humanitarian L. Project*,
561 U.S. 1 (2010) ........................................................................... 24

*Ingersoll-Rand Company v. United States*,
780 F.2d 74 (D.C. Cir. 1985) ......................................................... 12, 13, 14

*Kajoshaj v. New York City Dep't of Educ.*,
543 F. App'x 11 (2d Cir. 2013) ............................................................ 17

*Kalderon v. Finkelstein*,
495 Fed. App'x 103 (2d Cir. 2012) ........................................................ 29

*Keyes v. School Dist. No.*,
*1*, 413 U.S 189 (1973) ..................................................................... 22

*Klamath Water Users Protective Ass'n v. Patterson*,
204 F.3d 1206 (9th Cir. 1999) ............................................................. 10

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......................................................................... 6

*Maine v. U.S. Dep't of Agric.*,
2025 WL 1088946 (D. Me. Apr. 11, 2025) ............................................ 18, 19

*Markle v. HSBC Mortg. Corp.*,
844 F.Supp.2d 172 (D. Mass. 2011) ....................................................... 10

*Maryland Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*,
763 F.2d 1441 (D.C. Cir. 1985) ........................................................... 15

*Massachusetts v. Mylan Laboratories*,
357 F. Supp. 2d 314 (D. Mass. 2005) ................................................... 9, 10

*Metro. Transp. Auth. v. Duffy*,
2025 WL 1513369 (S.D.N.Y. May 28, 2025) .............................................. 17

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......................................................................... 21

*Murthy v. Mo.*,
603 U.S. 43 (2024) ........................................................................... 8

*National Council of Nonprofits v. Office of Management & Budget*,
    2025 WL 597959 (D.D.C. Feb. 25, 2025) ............................................................ 19
*Nat'l Org. for Marriage v. McKee*,
    649 F.3d 34 (1st Cir. 2011) ................................................................................ 4
*Nat'l Urban League et al. v. Trump et al.*,
    2025 WL 1275613 .............................................................................................. 29
*New England Reg'l Council of Carpenters v. Kinton*,
    284 F.3d 9 (1st Cir. 2002) ............................................................................ 20, 21
*New York v. Trump*,
    769 F. Supp. 3d 119 (D.R.I. 2025) .............................................................. 19, 20
*New York v. U.S. Dep't of Health & Hum. Servs.*,
    414 F. Supp. 3d 475 (S.D.N.Y. 2019) ................................................................ 18
*Nieves v. Bartlett*,
    587 U.S. 391 (2019) ........................................................................................... 28
*Osediacz v. City of Cranston*,
    414 F.3d 136 (1st Cir. 2005) ............................................................................... 5
*PFLAG, Inc. v. Trump*,
    769 F. Supp. 3d 405 (D. Md. 2025) ................................................................... 18
*Raines v. Byrd*,
    521 U.S. 811 (1997) ............................................................................................. 5
*Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*,
    421 F.3d 1 (1st Cir. 2005) ................................................................................. 29
*Regents*,
    591 U.S. ............................................................................................... 23, 24, 25
*Safeguarding the Historic Hanscom Area's Irreplaceable Res., Inc. v. F.A.A.*,
    651 F.3d 202 (1st Cir. 2011) ....................................................................... 27, 28
*Spectrum Leasing Company v. United States*,
    764 F.2d 891 (D.C. Cir. 1985) ..................................................................... 12, 14
*Texas v. Johnson*,
    491 U.S. 397 (1980) ........................................................................................... 22
*United States Conf. of Cath. Bishops v. U.S. Dep't of State*,
    770 F. Supp. 3d 155 (D.D.C. 2025) ................................................................... 14
*United States v. AVX Corp.*,
    962 F.2d 108 (1st Cir. 1992) ............................................................................... 8
*Warth v. Seldin*,
    422 U.S. 490 (1975) ............................................................................................. 8
*Wessmann v. Gittens*,
    160 F.3d 790 (1st Cir. 1998) ............................................................................. 22
*Whitney v. California*,
    274 U.S. 357 (1927) ..................................................................................... 22, 23
*Xie v. University of Texas M.D. Anderson Cancer Ctr.*,
    No. 20-20622, 2021 WL 5968648 (5th Cir. Dec. 15, 2021) ............................... 29

    Statutes

5 U.S.C. § 702 ........................................................................................................ 15
28 U.S.C. § 515 .................................................................................................... 0, 31

28 U.S.C. § 1491(a) ................................................................................................ 14
42 U.S.C. § 282(b) .................................................................................................. 18
42 U.S.C. § 282(b)(1) ............................................................................................. 18
42 U.S.C. § 2000d ................................................................................................... 17

Rules

Fed. R. Civ. P. 5(b)(2) .............................................................................................. 32

Regulations

2 C.F.R. § 200.340 ....................................................................................... 1, 24, 26
2 C.F.R. § 200.340(a)(4) ........................................................................ 11, 17, 24, 26

**PRELIMINARY STATEMENT**

In this case, three outside organizations—the American Association of University Professors, its Harvard chapter, and the graduate-workers arm of the United Auto Workers—seek to insert themselves into a contract dispute between the federal government and Harvard University, which is not itself a party to this matter. In service of this goal, Plaintiffs have revised their theories of liability numerous times, in several versions of their complaint and in their briefing. But the core defects in their arguments have never changed: neither they nor any of their members have a justiciable stake before this Court in the contracts between Harvard and the federal government. And even if they did, their arguments fail on the merits.

Plaintiffs' latest brief offers nothing to cure these foundational problems. First, Plaintiffs have not established that they have Article III standing. Plaintiffs cannot create their own standing by devoting time and resources toward the issues in this case—at bottom, Defendants' termination of grants to Harvard is simply a setback to their organizations' abstract social interests. Nor do Plaintiffs have associational standing. The only concrete harms Plaintiffs identify—halted research and chilled speech—flow from Harvard's voluntary decision not to bridge-fund grants, not from government coercion. And because restoring Harvard's institutional funding is not germane to Plaintiffs' core organizational purposes, Plaintiffs cannot satisfy the other key requirement for associational standing.

Second, the Tucker Act squarely precludes this Court's jurisdiction. Plaintiffs' own exhibits show that every disputed award incorporates 2 C.F.R. § 200.340 and other termination clauses; the supposed rights they seek to vindicate therefore arise from contracts with the federal government. Likewise, although Plaintiffs try to frame their requests for relief as equitable in nature, their prayer for reinstatement would compel the Government to resume paying money

1

under the terms of contracts with Harvard. Plaintiffs' claims thus belong in the Court of Federal Claims.

Third, Plaintiffs' Title VI claims cannot proceed. Nothing in Title VI—or in any case Plaintiffs cite—says that once federal money begins to flow an agency must proceed exclusively under Title VI's enforcement machinery. Title VI addresses only discrimination "on the ground of race, color, or national origin" and is silent as to religious bias; it therefore cannot be read to displace the termination clauses that Harvard accepted in every award and that the agencies invoked, after determining that continued funding would conflict with the Executive Order directing them to combat campus antisemitism. Because the challenged grant termination decisions rest on express contract authority rather than on Title VI, the statute provides Plaintiffs no cause of action and no basis for injunctive relief.

Fourth, Plaintiffs' APA counts aimed at the March 31 Announcement and the April 3 and April 11 Letters fail because they do not constitute "final agency action." Those communications announced a review, requested information, and proposed terms that Harvard was free to accept or reject; they neither fixed legal obligations nor consummated the agencies' decision-making. Indeed, Harvard continued to negotiate after each of those issuances, and no funds were withheld until the later termination letters issued. The APA does not permit litigation over every interim step in an ongoing contract dialogue, so these claims fail.

Fifth, Plaintiffs' APA challenge to the actual freeze orders and termination letters fares no better. The record shows that Defendants considered Harvard's documented failure to curb antisemitic harassment and weighed it against the Government's interest in ensuring that public funds do not support discriminatory environments. After reaching a decision, Defendants applied the contract provisions that expressly authorize termination when an award no longer advances

agency priorities and explained that reasoning contemporaneously. Disagreement with that policy judgment is not a basis for judicial second-guessing under the APA's deferential standard.

Sixth, Plaintiffs have failed to prove their First Amendment claims. Absent well-pled facts rebutting the presumption of regularity or rendering censorship a more plausible motive than the obvious alternative explanation of contract enforcement, Plaintiffs' claim cannot survive. Nor does relabeling their APA objections as First-Amendment harms help. Accordingly, the First Amendment counts—like every other theory Plaintiffs advance—should be dismissed.

Seventh, Plaintiffs have effectively abandoned their due-process counts. They neither cross-move for relief nor engage with the case law in Defendants' opening brief. They offer no answer to the settled rule that an ordinary government contract—or the termination of one—does not implicate constitutional property interests, and they ignore precedent holding that individual researchers have no personal entitlement to their university's federal grants. Because Plaintiffs identify no protected interest and point to no procedural deficiency, the Court should enter summary judgment for the Government on the due-process claims.

Finally, Plaintiffs' request for a permanent injunction is wholly unwarranted. Their alleged harms are economic and, if viable, compensable through the contract remedies Congress has placed within the jurisdiction of the Court of Federal Claims. Furthermore, the APA's standard remedy is the setting aside of any improper action and remanding to the agency for fresh consideration, not a roving decree that would bar agencies from taking lawful action in the future. Thus, even if the Court is inclined to grant relief to Plaintiffs, the Court should remand the case for further administrative action rather than issue a permanent injunction.

For all of these reasons, the Court should deny Plaintiffs' motion for summary judgment and grant the Government's cross-motion.

## ARGUMENT

**I.    Plaintiffs Lack Article III Standing**

As explained in Defendants' opening brief, Plaintiffs lack Article III standing to assert any of their claims. Defs.' Mem. in Supp. of Defs.' Cross-Mot. for Summ. J. & Opp. to Pls.' Mot. for Summ. J., ECF No. 104 ("Defs. Br.") at 3-11. The Court should therefore reject Plaintiffs' arguments that (i) they have standing in their own right, (ii) their members have standing to sue themselves, (iii) they can meet the other associational standing factors, and (iv) they have standing to enforce payments to Harvard (a non-party). Pls.' Mem. in Opp. to Defs.' Cross-Mot. for Summ. J. and In Reply to Defs.' Opp. to Pls.' Mot. for Summ. J., ECF No. 110 ("Pls. Opp.") at 6-10.

**A.    Plaintiffs Lack Standing to Sue in Their Own Right**

Defendants persuasively argued in their prior brief that the Court should hold that Plaintiffs lack standing to sue in their own right because they have not suffered a concrete injury. *See* Defs. Br. at 4-5. Plaintiffs respond that Defendants' actions have "directly affected and interfered with [Plaintiffs'] core business activities"—which purportedly concern the creation, protection, and promotion of "academic freedom and economic security" for Plaintiffs' members. Pls. Opp. at 10-11 (citation and internal quotations omitted). That assertion, however, is not enough.

To establish standing, Plaintiffs must show an injury greater "'than simply a setback to the[ir] organization[s]' abstract social interests" and cannot spend their way into standing. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024) (citation omitted). Likewise, the mere allegation of "chill[ed]" speech does not "suffice to open the doors to federal court." *See Equal Means Equal v. Ferriero*, 478 F. Supp. 3d 105, 118 (D. Mass. 2020) (quoting *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 47 (1st Cir. 2011)), *aff'd*, 3 F.4th 24 (1st Cir. 2021); Defs. Br. at 5. To the extent there is a chilling of speech, a defendant must be "within the

class of persons potentially chilled." *See Osediacz v. City of Cranston*, 414 F.3d 136, 142 (1st Cir. 2005) (citation omitted).

Under these principles, Plaintiffs cannot meet their burden to establish standing in their own right. While Plaintiffs may view the termination of Harvard grants as detrimental to their mission, that is a "setback" to their "abstract social interests" rather than an actual injury to Plaintiffs. *Hippocratic Med.*, 602 U.S. at 394. Plaintiffs may be diverting money towards more meetings and efforts to combat the Government's efforts, but meetings held and money spent in response to Defendants' actions cannot suffice for Plaintiffs to meet Article III's "rigorous" requirements. *See id.* at 370; *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997). And even if the termination of Harvard grants chilled some speech, "it did not chill any of the [P]laintiff[s'] speech." *See id.* In fact, Plaintiffs have conceded that they are speaking more, not less, in response to Defendants' actions. *See e.g.*, XSMF ¶ 101 ("AAUP staff have had to conduct nationwide calls and virtual meetings . . . regarding Defendants' actions . . . "). Thus, Plaintiffs cannot show they have standing in their own right.

Plaintiffs' reliance on *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), is misplaced. Defs. Br. at 11. In *Havens*, the defendant provided the plaintiff with false information that "perceptibly impaired his *ability* to provide counseling and referral services." *See Hippocratic Med.*, 602 U.S. at 395 (citing *Havens*, 455 U.S. at 379) (emphasis added). Because the plaintiff's counseling services relied on the defendant's information, the defendant's "actions *directly* affected and interfered with [his] core business activities." *See id.* (emphasis added). In contrast, Plaintiffs' activities promoting academic freedom do not rely on Defendants' funding of Harvard, a third party. Further, Defendants' alleged actions have no direct impact on Plaintiffs' ability to promote academic freedom. Even assuming, *arguendo*, that Defendants' actions have somehow

affected the abstract ideal of academic freedom, they have not undermined Plaintiffs' ability to pursue it. Accordingly, *Havens* does not help Plaintiffs.

**B.    Plaintiffs Do Not Have Associational Standing Because None of Their Individual Members Have Standing to Sue**

As Defendants argued in their prior brief, Plaintiffs cannot establish associational standing because their members themselves lack standing. *See* Defs. Br. at 5-8; *Conservation L. Found., Inc. v. Acad. Express, LLC*, 129 F.4th 78, 86 (1st Cir. 2025). Among other things, Defendants pointed out that none of Plaintiffs' members have suffered a concrete injury traceable to Defendants' conduct. *Id.* Plaintiffs respond now that their members suffered two distinct injuries: a loss of funding (partially manifesting in stop-work orders) and harm to their First Amendment rights as a result of actions taken by Harvard. *See* Opp. 6-10. While Plaintiffs concede that Harvard itself "may play a role in causing or preventing Plaintiffs' members' injuries," *see* Pls. Opp. 8, they nonetheless claim that this fact does not foreclose standing because Defendants' actions *also* caused their alleged injury. *See id.*

Plaintiffs again miss the mark. Plaintiffs' alleged injuries are not directly traceable to Defendants' conduct. True, a plaintiff not regulated by the Government can establish traceability when the Government's conduct causes them indirect economic injury. *See Hippocratic Med.*, 602 U.S. at 384. But to do so, the plaintiff must show that "it is *likely*" that the government's regulation will cause the concrete injury. *See id.* at 384 n.2 (emphasis added).

Here, Plaintiffs' alleged injury resulted from Harvard's exercise of its "broad and legitimate discretion" as to how and whether to fund its affiliates' research. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). Indeed, as the world's wealthiest university, Harvard could have provided Plaintiffs with alternative funding, either from its "powerful donors" or endowment. *See* Second Amended Complaint, ECF No. 64 ("Comp.") ¶ 270; XSMF ¶ 33. Under these

6

circumstances, "Plaintiffs have not demonstrated that it makes a difference to their members whether the funding for their research and salaries comes from American taxpayers, [their university's] multi-billion-dollar endowment, [or] the largess of [Harvard's] donors." *See Am. Ass'n of Univ. Professors v. United States Dep't of Just.*, 2025 WL 1684817, at *13 (S.D.N.Y. June 16, 2025).

Likewise, Plaintiffs' alleged First Amendment injury is not traceable to Defendants' conduct. Consider the March 26, 2025, termination of two faculty members at Harvard's Center for Middle Eastern Studies ("CMES"). *See* Comp. ¶ 266. This termination occurred before any of the alleged threats described in Plaintiffs' Second Amended Complaint. *See* Comp. ¶¶ 101-102 (detailing how Defendants first announced a review of Harvard's federal funding on March 31, 2025). And the record on which Plaintiffs rely belies their traceability argument. *See* Comp. ¶ 269. First, "Harvard has defended its more contentious decisions," including many that Plaintiffs allege constitute injury, "by saying they are justified on their own terms, not concessions to external demands." Dhruv T. Patel and Grace E. Yoon, *Harvard Fights in Courts but Retreats on Campus*, Harvard Crimson, Apr. 30, 2025, https://www.thecrimson.com/article/2025/4/30/Harvard-Fights-Retreats/. Indeed, a Harvard Dean defended the termination of the two CMES members on academic grounds. *See id.* Similarly, Harvard's internal task force on antisemitism recommended many of the same reforms to rules regarding campus demonstrations that Plaintiffs allege are injurious. *Compare id. with* Comp. ¶ 265. And Harvard's chief Community and Campus Life Officer explained that the University had rebranded the Office of Equity, Diversity, Inclusion, and Belonging as part of an effort to "reexamine and reshape the missions and programs of offices across the university." Dhruv T. Patel, *Harvard Renames Diversity Office as Trump Demands*

*Dismantling     of     DEI*,     Harvard     Crimson,     Apr.     29,     2025,

https://www.thecrimson.com/article/2025/4/29/harvard-oedib-renamed/.

Plaintiffs allege that Harvard's reforms demonstrate "the coercive effect of Defendants' actions." Comp. ¶ 268. But their account does not explain why Harvard acceded to some of Defendants' requests while rejecting others. Nor can Plaintiffs deny that Harvard exercised independent judgment in deciding which demands to accept. Thus, Plaintiffs have not shown that Harvard's actions were merely a "predictable" response to Defendants' actions. *See Murthy v. Mo.*, 603 U.S. 43, 57 (2024) (cleaned up); *Am. Ass'n of Univ. Professors*, 2025 WL 1684817, at *14. Ultimately, a federal court cannot redress "'injury that results from the independent action of some third party not before the court.'" *See Murthy*, 603 U.S. at 57 (citation omitted). Because Plaintiffs' alleged injuries are not traceable to Defendants' challenged conduct, they lack standing.

## C.    Plaintiffs Do Not Have Associational Standing Because They Cannot Satisfy the Germaneness Requirement

In their prior brief, Defendants showed that Plaintiffs could not satisfy another requirement for associational standing: that "the interests that the[ir] suit seeks to vindicate are pertinent to the objectives for which the[ir] organization[s] [were] formed," *United States v. AVX Corp.*, 962 F.2d 108, 116 (1st Cir. 1992). *See* Defs. Br. at 8-9.[1]  An interest is germane to an organization's purpose if it is one that "individual members sought to vindicate in joining the association" and "bears a reasonable connection to the association's knowledge and experience." *Bldg. & Constr. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 149 (2d Cir. 2006) (citation omitted). Here, Plaintiffs claim that their suit advances UAW's efforts to organize new

---

[1]  Since Plaintiffs have conceded that they do not seek any damages, Pls. Opp. at 10 n.16, Defendants no longer contest the personal participation prong of the associational standing analysis. *See Warth v. Seldin*, 422 U.S. 490 at 515-16 (1975).

members, negotiate contracts, address employment issues, educate its members, and engage in political action. *See* Pls. Opp. 10.[2] Plaintiffs fail to meet their burden. *See* Pls. Opp. 10.

Besides a conclusory reference to its interest in the "economic security" of its members, UAW does not explain how this suit is germane to its members. *See Opp.* 10. After all, Harvard's loss of funding is unrelated to UAW's effort to continue organizing, negotiating contracts, or educating its members. *See id.* UAW is a union with "knowledge and experience" protecting its members' interests vis-à-vis Harvard, their employer—not protecting Harvard's interests from the federal government. *See Trades Council of Buffalo*, 448 F.3d at 149 (citing *Hodel*, 840 F.2d at 56). Presumably, few members of the UAW joined believing its core function was to defend "taxpayer funding for an elite university." *See Am. Ass'n of Univ. Professors*, 2025 WL 1684817, at *12. Thus, UAW's suit to restore funding to nonparty Harvard is not germane to the interests the organization exists to serve.

### D.    Plaintiffs Lack Standing to Enforce Payments to a Nonparty

Plaintiffs also effectively concede that they lack standing to enforce Harvard's rights by relegating their response to Defendants' argument on that point to a footnote. *Compare* Defs. Br. at 9-11 *with* Pls. Opp. at 9 n.12; *see also Advanced Ion Beam Tech., Inc. v. Varian Semiconductor Equip. Assocs., Inc.*, 721 F. Supp. 2d 62, 74 n.8 (D. Mass. 2010) ("[T]he First Circuit has repeatedly held that arguments raised only in a footnote or in a perfunctory manner are waived.") (cleaned up) (collecting cases). In any event, Plaintiffs cannot move the needle by invoking *Massachusetts v. Mylan Laboratories*, 357 F. Supp. 2d 314 (D. Mass. 2005). While that case recognized that third-party beneficiaries can sometimes enforce their rights under a contract, that

---

[2]    Defendants rest on their prior arguments as to AAUP's fulfilment of the germaneness requirement. Defs. Br. at 8-9.

holding concerned federal common law rather than Article III standing. *Id.* at 327. And since *Mylan* was decided, the Supreme Court has specifically observed that there is a "distinction between an intention to benefit a third party [with a contract] and an intention that the third party should have the right to enforce" under a contract. *Astra USA, Inc. v. Santa Clara Cnty., Cal.*, 563 U.S. 110, 118 (2011) (citation omitted) (rejecting argument that third-party beneficiary to a contract had the right to sue a direct party to the contract).

Even if *Mylan* were relevant here, it would not be enough for Plaintiffs to assert that their members benefited from the contracts between Harvard and the federal government. *See* Opp. 9 n.12. As a starting point, "absent clear intent to the contrary, public citizens who benefit from a government contract are presumed to be incidental beneficiaries" of that contract under federal common law. *Markle v. HSBC Mortg. Corp.*, 844 F.Supp.2d 172, 181 (D. Mass. 2011) (citation omitted); *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1211 (9th Cir. 1999)). And courts cannot read a contract to confer third-party beneficiary status on a nonparty to a government contract unless doing so is "consistent with the terms of the contract and the policy underlying it." *See Markle*, 844 F.Supp.2d at 181.

Here, Plaintiffs cannot overcome the presumption that they are merely incidental beneficiaries without the right to maintain an action in contract against Defendants. The contracts between Harvard and Defendants contain "no clear indication that the contracting parties intended any other party" to enforce them. *See id.* (citation omitted); *see e.g.*, NSF_Harvard000045. To be sure, the contracts cited by Plaintiffs identify some of Plaintiffs' members by name. *See* Opp. 9 n.12 (citing NSF_Harvard000045). But the contracts do not explicitly give these members any private causes of action. *See e.g.,* NSF_Harvard000045. Indeed, they typically mention these members only twice: once to recognize them as the Principal Investigators indirectly receiving the

funding, and once to prevent Harvard from making personnel changes to individuals working on the federally funded project. *See id.* And the contracts specifically make the awardee—Harvard, not the Principal Investigators —responsible for abiding by their conditions and enforcing them. *See id.* Thus, Harvard, not Plaintiffs, has standing to sue to enforce its agreements with the federal government.

## II.    The Tucker Act Precludes This Court from Exercising Subject Matter Jurisdiction Over Plaintiffs' Claims

Even if Plaintiffs had standing to bring their claims, which they do not, as Defendants explained in their prior brief, the Tucker Act precludes this Court from exercising jurisdiction over Plaintiffs' claims because they sound in contract. Defs. Br. at 11-17. Plaintiffs now respond with two categories of arguments as to why they are purportedly not asserting contract claims: (i) their right to relief derives from the APA, Title VI, and the First Amendment, and (ii) Plaintiffs seek equitable relief that would have no *legal* effect on any contractual obligations. Pls. Opp. at 3-6. Neither of these arguments is availing.

### A.    Plaintiffs' Claims Sound in Contract

The source of Harvard's right to funds under each grant that Harvard claims was unlawfully frozen or terminated is found in each original grant and contract agreement between Harvard and the federal agency from which it was awarded. *See* Defs. Br. at 13-16. Plaintiffs attempt to wave away the fact that each federal grant award is based on an agreement between Harvard and the grantor agency by stating simply that their claims "turn on what the APA, Title VI, and the Constitution forbid" rather than on "any grant or contract terms." Pls. Opp. at 3. But the receipt of funding in exchange for the conduct of research or other activity and compliance with contract terms is precisely the bargained-for exchange Plaintiffs seek to enforce. For example, the basis for cancellation for the largest tranche of grants, the NIH Grants Policy Statement and 2 C.F.R. §

11

200.340(a)(4), are incorporated by reference as a term and condition of each NIH award and referenced in the NIH's termination letter to Harvard. *See* HHSHarv_00000473. Reference to this regulatory provision is, similarly, incorporated as a term and condition of grant contracts and the termination letters of other Defendant agencies. *See* HUDHarvAR_00000067; EDHarvAR_0000255; ENERGY AR3932; DoDHarv_00000020; NASA-AR_00001. It is the right to those funds that Plaintiffs are seeking to enforce here.

Plaintiffs also argue that their claims stand wholly apart from the grant agreements because Title VI, which authorizes APA review for grant termination decisions, provides the appropriate mechanism for review and thus jurisdiction in the district court. Pls. Opp. 5. But this line of argument is foreclosed by *Spectrum Leasing Company v. United States*, 764 F.2d 891 (D.C. Cir. 1985) and *Ingersoll-Rand Company v. United States*, 780 F.2d 74 (D.C. Cir. 1985). In *Spectrum Leasing*, the plaintiff's contract was terminated, and it brought suit, arguing that the government had violated the Debt Collection Act in withholding its payments. It thus "contend[ed] that the source of its right to relief in this case is the Debt Collection Act and not the contract." 764 F.2d at 894. The D.C. Circuit disagreed. It noted that "Spectrum seeks an injunction requiring the government to pay monies owed for computer hardware. The right to these payments is created in the first instance by the contract, not the Debt Collection Act. The DCA, even if it applied, confers no such rights in the absence of the contract itself." *Id.* So too here. The rights Plaintiffs are trying to enforce are contractual rights to payment; those rights to payment would not exist absent the contract. *See id.* ("Spectrum's right to the hardware payments arose only upon creation and satisfaction of its contract with the government; in no sense did it exist independently of that contract."). Similarly, in *Ingersoll-Rand*, a contractor alleged that the Government violated the APA by terminating a contract in violation of federal regulations. *See id.* at 77-78. The D.C. Circuit

found the claim was nonetheless essentially contractual because the contractor could "challenge the termination based solely on contract principles"—*i.e.*, the "question . . . could be phrased as whether the contract forbids termination under these conditions." *Id.* at 78. The same question is illuminating here: whether each grant agreement permits the grantor agency to terminate the contract for the reasons cited by each such agency. As the D.C. Circuit held in *Ingersoll-Rand*, that question must be posed to, and answered by, the Court of Federal Claims.

Lastly, Plaintiffs argue that the Court of Federal Claims cannot adjudicate their claims because their constitutional and Title VI claims are not "money-mandating." Pls. Opp. at 4. This is wrong. Harvard's *contracts* are the money-mandating instruments. As laid out in *Fisher v. United States*, a plaintiff satisfies the burden of establishing that a source of law is money-mandating by, as a first step, "making a non-frivolous allegation that satisfies this jurisdictional requirement." 402 F.3d 1167, 1172 (Fed. Cir. 2005) (cleaned up). Plaintiffs would easily satisfy this lenient standard by alleging that the source of law on which their right to funds rested was the grant agreements. Plaintiffs could also non-frivolously assert that all of their claims are based on money-mandating sources of law—the contracts. But instead, Plaintiffs attempt to plead around the Tucker Act. As the Supreme Court acknowledged in *United States v. Mitchell*, with respect to the Tucker Act's waiver of immunity, "the Act makes absolutely no distinction between claims founded upon contracts and claims founded upon other specified sources of law." 463 U.S. 206, 216 (1983). Because the only source of law entitling Plaintiffs to federal funds is the express contracts between Harvard and the Government, the Tucker Act provides the only waiver of sovereign immunity on which Plaintiffs may rely. Therefore, jurisdiction lies with the Court of Federal Claims.

**B.      Plaintiffs Are Essentially Seeking Contract Remedies**

The Court should reject Plaintiffs' framing of their claims as seeking equitable relief from violations of their rights. Pls. Opp. 5. The relief Plaintiffs seek is the classic contract remedy of specific performance and is essentially a monetary remedy. *See United States Conf. of Cath. Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d 155 (D.D.C. 2025) (holding that the Court "lack[ed] the power" to "order the Government to cancel the termination [of contracts], pay money due, and reinstate the contracts"). Courts have generally held that a claimant cannot "sidestep Tucker Act jurisdictional limits merely by seeking 'a declaratory and injunctive order.'" *Ingersoll-Rand*, 780 F.2d at 79-80 (collecting cases). The inescapable reality of the relief Plaintiffs request is that it would yield only the reinstatement of the individual contractual obligations to pay money that the grants represent. Even the prospective relief that Plaintiffs seek would enjoin the Government from terminating contractually obligated grant funding, which would result in the preservation of Plaintiffs' rights to federal funds based on contract. Plaintiffs' other requests for injunctive relief in their operative complaint cannot obscure that they seek the quintessentially contractual remedy of specific performance. *See Spectrum*, 764 F.2d at 894 (describing "an injunction requiring the government to pay monies owed" under a contract as "the classic contractual remedy of specific performance").

Plaintiffs' claims, and the relief requested, are subject to the Tucker Act and the exclusive jurisdiction of the Court of Federal Claims. *See* 28 U.S.C. § 1491(a). Plaintiffs cite *Bowen v. Massachusetts* in support of their contention that they seek "complete relief" from an agency action that more appropriately falls within district court jurisdiction under the APA. Pls. Opp. at 5. But the examples of relief that the Supreme Court provides in *Bowen* to illustrate the difference between "money damages" and "specific relief" show that the remedy Plaintiffs seek here falls within the former category. *See Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) ("Our cases

14

have long recognized the distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief—which may include an order providing for the reinstatement of an employee with backpay, or for the recovery of specific property or monies, ejectment from land, or injunction either directing or restraining the defendant officer's actions." (quotations omitted)). The examples of specific relief the Supreme Court provides—*i.e.*, reinstatement of a specific employee to a specific job with back pay, the recovery of specific property or monies, the ejectment from a specific parcel of land—bear no similarity to the relief Plaintiffs seek here. Money is fungible, and ultimately Plaintiffs seek money.

Furthermore, the facts in *Bowen* are distinguishable from this case. *Compare Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002) (holding that "*Bowen* has no bearing on the unavailability of an injunction to enforce a contractual obligation to pay money past due" in an action seeking to compel an insurance plan beneficiary to reimburse the plan provider for recoveries from third parties) *with Bowen*, 487 U.S. 879 (1988) (finding that the district court had jurisdiction under the APA because the withholding of funds violated federal law) *and with Maryland Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441 (D.C. Cir. 1985) (holding that claims related to the withholding of statutorily-mandated grants-in-aid did not lie in contract, but rather federal statute, and were not cognizable under the Tucker Act). As such, Plaintiffs' reliance on *Bowen* is misplaced. *Bowen* concerned states' entitlement to federal funding directly under a statute, so it addressed the APA's exclusion from its waiver of sovereign immunity for suits for "money damages," 5 U.S.C. § 702; *see* 487 U.S. at 891-900. Harvard has no such statutory entitlement to the funds at issue here—their entitlement to funds is only through contract.

Indeed, the Supreme Court made clear that it found the distinction between statutorily obligated funds and contractually obligated funds relevant in *Department of Education v. California* in rejecting the First Circuit's understanding of *Bowen*, instead concluding that "the APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money." *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (cleaned up).

Ultimately, the setting aside of the government's freeze orders and termination letters here would reinstate billions of dollars in federal grant funding. This cannot be said to be some beneficial side effect of the equitable relief Plaintiffs seek—it is the primary purpose of their suit. Plaintiffs' addition of requests for declaratory and injunctive relief cannot disguise this fact. *See Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1107-08 (D.C. Cir. 2022) ("[A] plaintiff does not in essence seek monetary relief as long as the complaint only requests non-monetary relief that has considerable value independent of any future potential for monetary relief and as long as the sole remedy requested is declaratory or injunctive relief that is not negligible in comparison with the potential monetary recovery." (cleaned up)).

## III.        Plaintiffs' Title VI Claims Cannot Proceed

As explained in Defendants' prior brief, Plaintiffs' Title VI claims fail because that statute does not govern terminations of grants based on policy. Defs. Br. at 25-30. Yet Plaintiffs continue to maintain that Congress cabined agency discretion via Title VI to terminate grants, and that Defendants' actions fall outside the bounds of what was authorized by Congress. Pls. Opp. at 11-16. Not so.

As an initial matter, Plaintiffs once again "provide no support for their contention that Title VI was meant to be exclusive of any contractual provisions." Def. Br. at 28. They cite *Alexander v. Sandoval* for the proposition that Title VI sets forth "elaborate restrictions" on enforcement actions *under the statute*. 532 U.S. 275, 290 (2001). But that case merely held that there is no

private right of action to enforce disparate-impact regulations promulgated under Title VI—without ever suggesting that Title VI precludes termination of government contracts based on specific contract provisions.[3] *See id. Sandoval* certainly does not suggest that Title VI precludes government actions, like those at issue here, that were taken to combat religious discrimination. After all, Title VI "does not mention religion." *Am. Ass'n of Univ. Professors*, 2025 WL 1684817, at *15; *see also* 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of *race, color*, or *national origin*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.") (emphases added); *see also Kajoshaj v. New York City Dep't of Educ.*, 543 F. App'x 11, 13 & n.2 (2d Cir. 2013) (noting that "Title VI does not, by its terms, proscribe religious discrimination"). For that reason, another court has recently cast doubt on whether Title VI is "the sole and exclusive legal tool available to a President who instructs executive agencies to prioritize combatting anti-Semitism on university and college campuses." *Am. Ass'n of Univ. Professors*, 2025 WL 1684817, at *15 (cleaned up).

Plaintiffs fare no better seizing on language in 2 C.F.R. § 200.340(a)(4) requiring that actions pursuant to that regulation be taken "to the extent authorized by law." Opp. at 13-14. That language only addresses agency compliance with the law, not whether specific laws such as Title VI govern specific types of agency action. None of the cases cited by Plaintiff suggest otherwise. *See Metro. Transp. Auth. v. Duffy*, 2025 WL 1513369, at *28 (S.D.N.Y. May 28, 2025) (holding

---

[3] Plaintiffs also cite *National Treasury Employees Union v. Cornelius* for the proposition that "the law does not permit [an] agency to regulate away" procedures granted by Congress. 617 F. Supp. 365, 371 (D.D.C. 1985). But that case was about an agency's attempt to prevent federal employees from availing themselves of a right granted by Congress, not an agency's choice between acting pursuant to a particular statutory authority or pursuant to a contract provision.

simply that Section 200.340(a)(4) only authorizes an agency's termination of contract if it was included as a provision in the contract); *New York v. U.S. Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475, 531-32 (S.D.N.Y. 2019) (holding only that Title VII precluded agency rulemaking on certain topics); *Maine v. U.S. Dep't of Agric.*, 2025 WL 1088946, at \*21-22 (D. Me. Apr. 11, 2025) (holding that agency must follow administrative procedures where there was no dispute the agency was attempting to exercise authority under Title IX rather than any contractual provision).

Finally, the Court should reject Plaintiffs' contention that Defendants' actions are not authorized by their power to contract. Opp. 14-16. Notably, Plaintiffs do not even attempt to grapple with most of the case law Defendants previously cited in rebuttal to this argument. *See* Defs. Br. at 36-37. Rather, Plaintiffs attempt to stitch together separate provisions of the NIH's broad enabling statute to suggest that it is outside NIH's purview to take action based on religious discrimination by its grantees. But each of the provisions under 42 U.S.C. § 282(b) sets out separate "[d]uties" for the director of NIH and attendant delegations of authority. And preserving the agency's ability to terminate contracts based on changed institutional priorities—such as preventing religious discrimination by its grantees—falls squarely within NIH's authorization to "establish[] and implement[]" policies for the "management and operation" of its programs and activities. 42 U.S.C. § 282(b)(1). Plaintiffs, then, cannot seriously contest that NIH or other similarly situated agencies may enter into contractual provisions like those at issue here.

None of the authorities cited by Plaintiffs are to the contrary. Two of those cases concerned whether the executive branch had the authority to impose new, blanket conditions on funding without explicit congressional authority. *See PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 434-35 (D. Md. 2025); *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018). That is distinguishable from the facts here, where the question is whether agencies can enforce

specific contract provisions giving them latitude to change agency priorities. Likewise, Plaintiffs'

reliance on *National Council of Nonprofits v. Office of Management & Budget*, 2025 WL 597959

(D.D.C. Feb. 25, 2025), is misplaced. Whereas that case concerned a nationwide freeze of trillions

of dollars in funding across the federal government, *see id.* at *16, this case concerns targeted

actions taken by Defendants against a specific institution for a much more limited amount of

money. And *New York v. Trump*, 769 F. Supp. 3d 119, 127 (D.R.I. 2025), involved appropriations

to federal programs where Congress had "strictly prescribed how those funds must be expended"

and left agencies "no discretion to deviate" from that prescription. *See id.* at 139. Here, the

Defendant agencies have shown that they have substantial discretion over Harvard's funding and

that Congress has left them with the ability to ensure taxpayer funds are used appropriately. Thus,

Plaintiffs have failed to identify any authority supporting their claims under Title VI.

## IV.     Plaintiffs' APA Challenges to the March 31 Announcement, the April 3 Letter, and the April 11 Letter Fail Because They Do Not Challenge Final Agency Action

Defendants have previously explained that the March 31 Announcement, the April 3 Letter,

and the April 11 Letter are not subject to an APA challenge because they do not constitute final

agency action. *See* Defs. Br. 18-21. Plaintiffs' further arguments to the contrary are unavailing.

*See* Pls. Opp. at 16-19.

To begin, the Court should reject Plaintiffs' contention that the March 31 Announcement

was a "conclusion of culpability and an announcement of consequences." *See* Pls. Opp. 17.

Plaintiffs' understanding of the March 31 Announcement is estranged from its content. The only

"conclusion of culpability" that the Announcement reached was a general reference to "Harvard's

failure to protect students on campus from anti-Semitic discrimination." GSAHarv_00000002.

This is an undisputed fact. *See* XMSF ¶18 (announcing newfound "accountability for faculty and

staff involved in rule-breaking and promoting antisemitic encampments"). Indeed, Harvard's

acceptance of this fact motivated it to undertake a series of reforms. *See id.* The only "consequence" announced on March 31 was a review of Harvard's funding. As Defendants have explained, initiating a review is not final agency action. *See* Def. Br. 19. Moreover, Plaintiffs' assertion that this review was of "Harvard's contracts and grants, not allegations of antisemitism," Pls. Opp. 17, is misleading: the review of the contracts was undertaken "to ensure the university is in compliance with federal regulations, including its civil rights responsibilities." *See* GSAHarv_00000002. These commitments, of course, involve combating antisemitism. Thus, the review did not represent "the legal consequence[s] of final decisions about antisemitism," but was an investigation into the extent of Harvard's compliance with civil rights law. *Contra* Pls. Opp. 17.

The April 3 and April 11 Letters similarly do not constitute final agency action because they were tentative steps in an ongoing negotiation.[4] It is now a matter of public record that the Government was engaged in extensive investigation and information-gathering after March 31. *See generally* Notice of Violation: Harvard University (OCR Trans. No. DO-25-607541-RV-CRRRac), https://www.hhs.gov/sites/default/files/harvard-title-vi-notice-violation.pdf. Further, Plaintiffs' hindsight account of the April 3 and April 11 Letters is flawed. Plaintiffs claim that the Letters were the turning point at which Harvard lost funding. *See* Pls. Opp. 17. But when Harvard received both Letters, its funding was intact; no final decision as to whether its funding would

---

[4]    Contrary to Plaintiffs' assertion, challenges to the April 3 Letter remain moot because it was superseded by the April 11 Letter. *Compare* Pls. Opp. at 17 n.23 *with* Defs. Br. at 19. True, no government regulatory scheme has "expired or been effectively repealed." *Am. Civ. Liberties Union of Mass. v. U.S. Conf. of Cath. Bishops*, 705 F.3d 44, 53 (1st Cir. 2013). Just as it "would be pointless either to enjoin the enforcement of a regulation that is no longer in effect or to declare its constitutional status," it is pointless to enjoin the promulgation of a withdrawn proposal. *See New England Reg'l Council of Carpenters v. Kinton*, 284 F.3d 9, 18 (1st Cir. 2002) (citation omitted).

continue had been made. Thus, the Letters were merely offers in an ongoing negotiation with no more legal force than any other contract offer, which Harvard could accept or reject. *See* Defs. Br. 20.

Lastly, Defendants reiterate that when Harvard in fact rejected the terms of the April 11 Letter, the Letter lost legal force entirely. *See id.* Holding otherwise and treating the April 3 and April 11 Letters as final agency action would subject any contract negotiation involving the Government to a series of potential APA challenges. *See id.*

## V. The Freeze Orders and Termination Letters Do Not Violate the APA's Prohibition on Arbitrary and Capricious Final Agency Action

### A. The Grant Terminations Were Not Arbitrary and Capricious

As Defendants argued in their prior brief, the individual termination decisions at issue here were not arbitrary and capricious. *See* Defs. Br. 30-33. The administrative record shows that these termination decisions followed a comprehensive review of federal contracts with several universities under investigation for their failure to combat antisemitic harassment, among them Harvard. *See* GSAHarv_00000003-4. Thus, the Defendant agencies' grant terminations resulted from "reasoned decisionmaking" and pass muster under the "deferential" arbitrary and capricious standard. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983); *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019).

Plaintiffs now contend that, despite the existence of a voluminous administrative record, they cannot discern a "reasonable path" in Defendants' actions. *See* Pls. Opp. 19; *Dep't of Com.*, 588 U.S. at 773. Additionally, Plaintiffs assert that Defendants' invocation of "agency priorities" as the basis for their actions is a post-hoc justification. *See id.* at 20. Finally, Plaintiffs allege that Defendants' actions are "unreasonable and overbroad." *See id.* at 21. But none of these arguments amounts to an APA violation.

First, Defendants have articulated a reasoned view that Harvard's alleged promotion of DEI, use of ideological litmus tests in admissions and hiring, and racial discrimination in its admissions and hiring are all related to antisemitism. For one, the existence of discrimination in one area of organization increases the likelihood that discrimination exists in other areas of the organization. *See e.g.*, *Wessmann v. Gittens*, 160 F.3d 790, 792 (1st Cir. 1998) (citing *Keyes v. School Dist. No. 1*, 413 U.S 189, 210 (1973)). Defendants therefore had a reasoned basis to conclude that Harvard's engagement in some forms of racial discrimination closely relates to its alleged engagement in antisemitism, itself a form of ethnic and religious discrimination.

Defendants have also articulated their reasoned view as to why Harvard's ideological hiring practices and promotion of DEI are closely related to antisemitism. The "theory of our Constitution" is that "the ultimate good desired is better reached by free trade in ideas." *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes J., dissenting). Falsehoods and fallacies, among them antisemitism, are to be defeated by "free and fearless reasoning." *See Texas v. Johnson*, 491 U.S. 397, 419 (1980) (quoting *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis J., concurring)). Defendants can reasonably conclude that ideological hiring practices undermine Harvard's ability to serve as a forum for free reasoning and leave the university more vulnerable to the spread of antisemitism. *See* XSMF ¶ 25. By the same token, Defendants have expressed their reasoned view that DEI can encourage individuals to make judgments based on detrimental stereotypes, including antisemitism. *See* XSMF ¶ 20. Thus, Defendants' efforts to convince Harvard to shutter its DEI programs and create a differently diverse university community are reasonably related to their efforts to combat antisemitism.

Second, Plaintiffs' claim that Defendants' reference to "agency priorities" is a *post hoc* justification fails for similar reasons. *See* Pls. Opp. 20. True, some of the Defendant agencies'

communications with Harvard do not cite "agency priorities" as the basis for their actions. *See id.* But they did not need to. Defendants' priority throughout their engagement with Harvard has been protecting "students on campus from anti-Semitic discrimination." *See e.g.,* XSMF ¶ 15. In their briefings, Plaintiffs recognize the existence of an Executive Order devoted to combatting antisemitism on university campuses. *See* XSMF ¶¶ 3-4; Feb. 3, 2025 Executive Order on combatting antisemitism, GSAHarv_00000003-4. As early as March 31, 2025, The Task Force to Combat Anti-Semitism notified Harvard that it had been created pursuant to an Executive Order combatting antisemitism. *See* XSMF ¶ 16. Moreover, as Defendants have explained, the April 3 Letter, April 11 Letter, and the Government's other communications all referenced this agency priority. *See* Defs. Br. 31. When Defendants terminated their grants to Harvard, they explained that they had done so pursuant to the broader government policy concerning antisemitism in higher education. *See, e.g.* HHSHarv_00000473-4; EDHarvAR_0000011-12; ENERGY AR3929-30.[5]

Finally, Plaintiffs' allegation that the Defendant agencies' grant cancellations were overbroad is unavailing. The Defendant agencies have previously explained that they cancelled specific grants because, as a matter of policy, they did not want to fund entities failing to combat antisemitism.[6] *See* Defs. Br. 32. Plaintiffs counter that cancelling funds with no "direct

---

[5]    Plaintiffs quote a government official's June 3, 2025, statement that Defendants terminated Harvard's contracts because it had violated Title VI. Pls. Opp. at 21. But that shorthand oral statement, which was made well after the contracts were terminated, does not override the actual basis articulated in the relevant freeze orders. Nor does the fact that government officials may have believed that Harvard violated Title VI mean that the terminations were in fact done pursuant to that statute.

[6]    Plaintiffs also argue that, given the reliance interests at stake, Defendants were required to consider alternatives to funding termination. Pls. Br. 22. However, as the Defendant agencies have explained, they have discretion to give Plaintiffs' reliance interests minimal weight. *See* Def. Br. 34; *Regents*, 591 U.S. at 31. In any event, Defendants considered alternatives. For

connection" to antisemitism constitutes an "overbroad response." *See* Pls. Opp. 21. To begin, Plaintiffs' reference to Title VI's limits on funding termination are inapt. *See id.* As Defendants have explained, Title VI's procedural limits are inoperative here because Defendant agencies are acting pursuant to contractual language and 2 C.F.R. § 200.340. *See* Defs. Br. 40; *supra* Section III. Without this inapt reference to Title VI, Plaintiffs cannot explain why particular funding must itself have a direct connection to antisemitism to be terminated. They do not even define what would constitute such a connection.

Regardless, the Defendant agencies' termination of specific grants was rationally related to their interest in combating antisemitism. Specifically, Defendant agencies could reasonably have decided that Harvard's funding is fungible; funds allocated for one purpose can enable the flow of funds for other purposes. *See Holder v. Humanitarian L. Project*, 561 U.S. 1, 37 (2010). Thus, even if some of the grants the Defendant agencies terminated were themselves unrelated to antisemitism, their existence arguably enabled programs that promoted antisemitism to receive funding. Consequently, their termination was rationally related to Defendant agencies' goal of cutting off support for antisemitism.

Therefore, the record demonstrates that the "the agenc[ies] . . . articulate[d] a 'rational connection between the facts found and the choice made.'" *Bowman Transp.*, *Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 285 (1974) (citation omitted). Under this permissive standard, the Court must uphold the agencies' grant terminations.

--------------------

one, Defendants negotiated with Harvard to avoid a funding termination entirely. When Defendants decided to terminate grants to Harvard, they did so only after a process of reasoned decision-making, considering alternatives along the way. *See generally* Defs. Br. 30-32.

**B.    The Agencies Did Not Fail to Consider Important Aspects of the Problems or Reliance Interests Before Terminating Funding**

Defendants have persuasively argued that they have considered all important aspects of the problem. *See* Defs. Br. 34-35. As Defendants explained, Plaintiffs did not have reliance interests in grants to a third party (Harvard) that the Government had discretion to terminate. *See id.* Moreover, because federal agencies have substantial discretion over these grants and there is no right to future grants, the Defendant agencies were entitled to give whatever reliance interests Plaintiffs had little weight. *See id.*; *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1 at 31 (2020). Additionally, Defendants have shown that they considered the benefits that the grants provided to the Government and the public. *See* Defs. Br. 35.

Plaintiffs allege that other than a single line in the April 11 Letter, nothing in the administrative record shows that Defendants considered the grants' benefit to the public. *See* Pls. Opp. 24. Of course, that single line explicitly states that Defendants recognize "the value to the country of scholarly discovery and academic excellence." *See* Government's Offer Letter, HHSHarv_00000098. On a separate occasion, Defendants referred to the grants as an "investment." GSAHarv_00000005. By considering whether the investment was justified based on Harvard's performance, Defendants necessarily considered the value of the investment to themselves and the public. *See id.* Further, Defendants are well-aware that Harvard is a "storied institution" that, at its best, is a beacon of "academic excellence and truth-seeking." *See* GSAHarv_00000002. Thus, Defendants understand the benefits that federal funding of Harvard's research provides. However, having considered these benefits, Defendants decided that Harvard's frustration of the Government's interest in defeating antisemitism on campus justified terminating the grants. *See* "April 14 Press Release", GSAHarv_00000012-13. Defendants had discretion to weigh these interests and exercised this discretion through their reasoned judgment. Plaintiffs

cannot substitute their judgment for that of the Defendant agencies. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.29, 43 (1983).

### C.    Defendants' Use of Contractual Provisions to Address Alleged Discrimination Was Not an Arbitrary and Capricious Departure from Longstanding Agency Practice

Defendants have explained that their reliance on 2 C.F.R. § 200.340 is consistent with longstanding civil rights enforcement practice. Def. Br. 29. Plaintiffs' contention otherwise is baseless. *See* Pls. Opp. 22. First, there is no authority suggesting that the Executive branch may not include combating antisemitism as an agency priority pursuant to 2 C.F.R. § 200.340(a)(4). In fact, there are authorities suggesting the opposite. *See Am. Ass'n of Univ. Professors*, 2025 WL 1684817, at *15. Moreover, there is nothing novel about the Defendant agencies' decision to exercise a contractual provision to address discrimination. Def. Br. 29-30.

Plaintiffs can claim the contrary only by defining longstanding practice implausibly narrowly. In Plaintiffs' view, any enforcement of civil rights law pursuant to statutes other than Title VI would contravene longstanding practice. *See* Pls. Opp. 22 (citing Defs. Br. 39). This proposition, if true, would hamstring a panoply of varied Government efforts to enforce civil rights, subjecting them to heightened APA scrutiny. Longstanding civil rights practice has shown that Title VI is not always the optimal (and certainly not the only) means of enforcement and executive agencies need discretion to rely on alternative statutes. *See e.g., Bob Jones Univ. v. United States*, 461 U.S. 574, 577 (1983) (upholding IRS enforcement of civil rights by revoking tax-exempt status from a university). This Court should reject Plaintiffs' unjustified narrowing of the tools available to the Government to enforce civil rights.

### D.    The Harvard Antisemitism Report Does Not Support Defendants' Actions

In their previous brief, Defendants briefly referenced the Harvard Antisemitism Report to show that their concerns over antisemitism on campus were well-founded. Defs. Br. 23. The 311-

page Report made clear that antisemitism at Harvard was a systemic issue that faculty and administrators failed to adequately address. *See id.* Plaintiffs try to co-opt this anodyne reference to support their attack on the Defendant agencies' actions, *see* Pls. Opp. 23 (arguing that the Report is Defendants' only evidence). As argued elsewhere herein and in Defendants' opening brief, and as the administrative record shows, by no means do Defendants rely only on the Antisemitism Report in demonstrating the reasoned basis for their grant terminations. In any event, Plaintiffs have failed to show that the Report does not reasonably and adequately support Defendants' conclusions. *See Safeguarding the Historic Hanscom Area's Irreplaceable Res., Inc. v. F.A.A.*, 651 F.3d 202, 207 (1st Cir. 2011) (citation omitted) (explaining that "substantial evidence is 'such relevant evidence as a reasonable mind *might* accept as adequate to support a conclusion'") (emphasis added). Surely, a 311-page Report meticulously detailing instances of antisemitism across several years could lead a reasonable person to conclude that antisemitism on the Harvard campus is a problem. Notably, while questioning the Report's methodology, nowhere do Plaintiffs question any of its findings. *See* Pls. Opp. 23. Thus, even taken alone, the Report was sufficient evidence to support the Defendant agencies' reasoned decision to terminate Harvard's funding.

## VI.      Plaintiffs Have Failed to Prove Their First Amendment Claims

Defendants established in their prior brief, and above, that Plaintiffs have failed to meet their burden as to their First Amendment claims. *See* Defs. Br. at 21-25; *see also supra* Section IV, V. Nonetheless, Plaintiffs reiterate that they have proven both a coercion claim and a claim for viewpoint discrimination and retaliation. Pls. Opp. 25-31. Because Plaintiffs' First Amendment arguments largely mirror those made by the plaintiff in the related matter, *President and Fellows of Harvard College v. U.S. Dep't of Justice, et al.*, No. 25-cv-11048-ADB, and rely on the same administrative record, Defendants again incorporate by reference, as if fully set forth herein, the

arguments raised in Defendants' briefing there. *See id.* at ECF No. 223; *see also* Defs. Br. 24. Nevertheless, the few new arguments raised by Plaintiffs in their reply are meritless.

For starters, Plaintiffs' reliance on *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), is misplaced. Unlike in *Bantam*, there are no plausible allegations here that any of Defendants' actions were taken in order to suppress or punish protected speech, rather than to pursue a legitimate interest. Plaintiffs offer little more than *ipse dixit* assertions that facially legitimate actions were in fact prompted by improper censorious motives when no such motives are indicated in the documents terminating funding, press releases regarding the funding, or any of Defendants' relevant communications to Harvard. As noted in Defendants' prior brief, such assertions not only run headlong into the presumption of regularity, *see Nieves v. Bartlett*, 587 U.S. 391, 400–02 (2019), but they also fail to satisfy the basic requirements of pleading, *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009) (plaintiff must marshal allegations that "invidious discrimination" was more plausible than "obvious alternative explanation[s]"). *See* Def. Br. at 23. Plaintiffs cannot escape the fact that "governmental entities may act properly in furtherance of legitimate state interests" even where there is an incidental effect on speech. *Greenwich Citizens Comm., Inc. v. Ctys. of Warren & Washington Indus. Dev. Agency*, 77 F.3d 26, 31 (2d Cir. 1996); *see also Cameron v. Johnson*, 390 U.S. 611, 619 (1968).

Plaintiffs also repackage their arguments under the APA as separate arguments under the First Amendment, attacking the breadth of Defendants' actions, the process the Defendants took, and the weight of the evidence supporting Defendants' actions. *See* Pls. Opp. at 27-28; *see also id.* at 30. As explained above, however, none of these arguments have merit. *See supra* Sections IV, V. For these reasons, and the reasons explained in the Government's submissions cited above, Plaintiffs' First Amendment claims fail as a matter of law.

**VII.    Defendants Are Entitled to Summary Judgment as a Matter of Law on Plaintiffs'
Due Process Claims**

The Court should grant Defendants summary judgment on Plaintiffs' Due Process claims
for the reasons outlined in their prior brief. Defs. Br. 38-41. Plaintiffs have not moved for summary
judgment on those claims, and do not even attempt to grapple with the vast majority of the cases
cited by Defendants. Pls. Opp. at 31-32. For example, Plaintiffs do not address the case law holding
that the Due Process clause does not protect "ordinary" or "routine" government contracts. Defs.
Br. at 40 (quoting *Gizzo v. Ben-Habib*, 44 F. Supp. 3d 374, 385 (S.D.N.Y. 2014)) (citing *Redondo-
Borges v. U.S. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1, 10 (1st Cir. 2005) ("We have held with a
regularity bordering on the echolalic that a simple breach of contract does not amount to an
unconstitutional deprivation of property."); *Nat'l Urban League et al. v. Trump et al.*, 2025 WL
1275613, at * 18 ("Plaintiffs offer no reason to think their contracts and grants . . . are different
from the millions of government contracts in effect at any point in time to which courts seldom
apply due-process principles.") (cleaned up). Plaintiffs similarly sidestep the case law holding that
researchers, such as Plaintiffs' members, do not have a property interest in grants between the
federal government and the grantee institution. *See* Defs. Br. at 40 (citing *Kalderon v. Finkelstein*,
495 Fed. App'x 103, 106-107 (2d Cir. 2012) (dismissing plaintiff's Fifth Amendment due process
claim because plaintiff, a researcher, did not have a property interest in a grant between NIH and
plaintiff's employer, a university); *Xie v. University of Texas M.D. Anderson Cancer Ctr.*, No. 20-
20622, 2021 WL 5968648, at *4 (5th Cir. Dec. 15, 2021) (holding that faculty members at an
institution receiving a federal grant do not have a property interest in the grant and noting that
"other circuits have rejected arguments that faculty have a property interest in research grants.").
Accordingly, the Court should grant summary judgment in favor of the Government on Plaintiffs'
Due Process claims.

**VIII.    Under the APA, the Appropriate Remedy Is Limited to the Agency Action Giving Rise to the Suit Rather than a Forward-Looking Injunction**

Last, Plaintiffs reiterate their mistaken view that, if the Court were to order relief here, the appropriate remedy would be a permanent injunction, rather than an order remanding this action for further administrative proceedings. *See* Pls. Opp. at 32-33. This argument fails for the reasons articulated in Defendants' prior brief. Defs. Br. at 41-44.

To the extent that this Court determines that Plaintiffs are entitled to any relief under the APA, the appropriate remedy, if anything, is setting aside the challenged action and remanding to the relevant agency or agencies, not forever enjoining the agency from taking new action. Under the APA, remand is the property remedy if, as Plaintiffs allege here "'the record before the agency does not support the agency action [or] the agency has not considered all relevant factors." *See Ass'n of Am. Universities v. Nat'l Sci. Found.*, 2025 WL 1725857, at *19 (D. Mass. June 20, 2025) (citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)).

Tellingly, Plaintiffs only cite two new cases on this point in their opposition brief. *See* Pls. Opp. at 32-33. And unlike this case, neither of those cases involved APA claims challenging agency actions that could potentially be remanded. *See Doe v. Trump*, 766 F. Supp. 3d 266, 288 (D. Mass. 2025) (challenging executive order); *Glob. NAPs, Inc. v. Verizon New England, Inc.*, 706 F.3d 8, 13 (1st Cir. 2013) (issuing injunction in case involving two private parties). Thus, any relief issued here should be limited to remedying improper agency action and must leave intact the Executive Branch's discretion to engage in further consideration of the topic at hand and consider other future agency actions consistent with law.

## CONCLUSION

The Government respectfully requests the Court deny Plaintiffs' Motion for Summary Judgment and grant the Government's Cross-Motion for Summary Judgment.

Dated:  July 14, 2025
       New York, New York

                                   Respectfully submitted,

CHAD MIZELLE
Acting Associate Attorney General

ABHISHEK KAMBLI
Deputy Associate Attorney General

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JOSEPH E. BORSON
Assistant Director
Federal Programs Branch

JAY CLAYTON
Attorney for the Defendants
Acting Under Authority Conferred
by 28 U.S.C. § 515

By:    */s/ Jeremy Liss*
        JEREMY M. LISS
        Assistant United States Attorney
        86 Chambers Street, 3rd Floor
        New York, New York 10007
        Tel.:   (212) 637-2795
        E-mail: Jeremy.Liss@usdoj.gov

## CERTIFICATE OF SERVICE

Counsel for Defendants certify that they have submitted the foregoing document with the clerk of court for the District of Massachusetts, using the electronic case filing system of the Court. Counsel for Harvard hereby certify that they have served all parties electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

*/s/ Jeremy M. Liss*
Jeremy M. Liss

32