# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE,

                             *Plaintiff*,

      v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, et al.,

                           *Defendants*.

Case No. 1:25-cv-11048-ADB

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 3

I.   This Court Has Jurisdiction Over Harvard's Claims. ............................................... 3

    A.   Harvard seeks "relief other than money damages." ......................................... 3

    B.   The Tucker Act does not "expressly or impliedly forbid" relief. ..................... 4

    C.   *Department of Education v. California* is inapposite, as are other cases the
    Government cites. ............................................................................................... 8

    D.   Harvard's *ultra vires* claims do not rely on the APA's cause of action or waiver of
    sovereign immunity. ......................................................................................... 11

II.  The Government's Actions Violate the First Amendment (Counts 1 and 2). ......... 12

    A.   The Government unconstitutionally retaliated against Harvard. ...................... 13

        1.   The Government applies the wrong legal standard. .............................. 14

        2.   Harvard's retaliation claim satisfies any relevant standard of proof. .... 15

    B.   The Government imposed unconstitutional conditions on Harvard's funding. ........... 18

III. The Freeze Orders and Terminations Violate Title VI (Counts 3 and 4). ............... 19

IV.  The Freeze Orders and Termination Letters Are Arbitrary and Capricious (Count 5). ......... 24

    A.   Harvard challenges final agency action. ......................................................... 25

    B.   The Government cannot justify its unreasoned and unreasonable actions. ........ 27

V.   The Freeze Orders and Termination Letters Are *Ultra Vires* (Counts 2 and 6). ......... 30

VI.  The Government Fails to Refute Harvard's Entitlement to Injunctive Relief. ......... 31

CONCLUSION .................................................................................................................. 32

CERTIFICATE OF SERVICE .............................................................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ........................................................................................................19

*Albright v. Morton*,
321 F. Supp. 2d 130 (D. Mass. 2004) .............................................................................32

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ........................................................................................................20

*Allee v. Medrano*,
416 U.S. 806 (1974) ........................................................................................................31

*Am. Ass'n Univ. Professors v. DOJ*,
2025 WL 1684817 (S.D.N.Y. June 16, 2025) ................................................................24

*Am. Bar Ass'n v. DOJ*,
2025 WL 1388891 (D.D.C. May 14, 2025) ...................................................................6, 9

*Am. Pub. Health Ass'n v. NIH*,
2025 WL 1548611 (D. Mass. May 30, 2025) .................................................................21

*Am. Sci. & Eng'g, Inc. v. Califano*,
571 F.2d 58 (1st Cir. 1978) ..............................................................................................4

*Amerijet Int'l, Inc. v. Pistole*,
753 F.3d 1343 (D.C. Cir. 2014) ......................................................................................29

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ..........................................................................................................7

*Ass'n of Am. Univs. v. Dep't of Energy*,
2025 WL 1414135 (D. Mass. May 15, 2025) ............................................................4, 5, 9

*Bd. of Cnty. Comm'rs v. Umbehr*,
518 U.S. 668 (1996) ...................................................................................................15, 18

*Bd. of Pub. Instruction of Taylor Cnty. v. Finch*,
414 F.2d 1068 (5th Cir. 1969) ........................................................................................23

*Blasdel v. Nw. Univ.*,
687 F.3d 813 (7th Cir. 2012) ..........................................................................................12

*Boaz Housing Auth. v. United States,*
   994 F.3d 1359 (Fed. Cir. 2021)................................................................10

*Bowen v. Massachusetts,*
   487 U.S. 879 (1988)........................................................................3, 4, 7, 8

*Bowman v. EPA,*
   712 F. Supp. 375 (S.D.N.Y. 1989) ...........................................................23

*Chamber of Com. v. Reich,*
   74 F.3d 1322 (D.C. Cir. 1996).............................................................11, 12

*Cmty. Legal Servs. in E. Palo Alto v. HHS,*
   137 F.4th 932 (9th Cir. 2025) .....................................................................9

*Colwell v. HHS,*
   558 F.3d 1112 (9th Cir. 2009) ....................................................................5

*Cooper v. United States,*
   771 F. App'x 997 (Fed. Cir. 2019) .............................................................8

*Crowley Gov't Servs. v. GSA,*
   38 F.4th 1099 (D.C. Cir. 2022)..........................................................3, 4, 6, 7

*Dep't of Com. v. New York,*
   588 U.S. 752 (2019).................................................................................21

*DHS v. Regents of Univ. of Cal.,*
   591 U.S. 1 (2020)....................................................................6, 28, 29, 30

*Dep't of Educ. v. California,*
   145 S. Ct. 966 (2025)........................................................................8, 9, 24

*DSE, Inc. v. United States,*
   169 F.3d 21 (D.C. Cir. 1999)......................................................................7

*Duxbury Trucking, Inc. v. Mass. Highway Dep't,*
   2009 WL 1258998 (D. Mass. Apr. 29, 2009) ............................................5

*D.B. ex rel. Elizabeth B. v. Esposito,*
   675 F.3d 26 (1st Cir. 2012).......................................................................15

*Fed. Election Comm'n v. Democratic Senatorial Campaign Comm.,*
   454 U.S. 27 (1981)...................................................................................23

*Fisher v. United States,*
   402 F.3d 1167 (Fed. Cir. 2005)..................................................................8

*Friedler v. GSA*,
    271 F. Supp. 3d 40 (D.D.C. 2017) ...................................................................................27

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006) .........................................................................................................15

*Getty v. Fed. Sav. & Loan Ins. Corp.*,
    805 F.2d 1050 (D.C. Cir. 1986) .......................................................................................28

*Holley v. United States*,
    124 F.3d 1462 (Fed. Cir. 1997).........................................................................................10

*Hous. Cmty. Coll. Sys. v. Wilson*,
    595 U.S. 468 (2022) .........................................................................................................17

*Housatonic River Initiative v. EPA*,
    75 F.4th 248 (1st Cir. 2023) .............................................................................................30

*Jenner & Block LLP v. DOJ*,
    2025 WL 1482021 (D.D.C. May 23, 2025) .....................................................................32

*Kennedy v. Bremerton Sch. Dist.*,
    597 U.S. 507 (2022) .........................................................................................................15

*Keyishian v. Bd. of Regents of Univ. of N.Y.*,
    385 U.S. 589 (1967) .........................................................................................................15

*Koontz v. St. Johns River Water Mgmt. Dist.*,
    570 U.S. 595 (2013).....................................................................................................18, 19

*Larson v. Domestic & Foreign Com. Corp.*,
    337 U.S. 682 (1949) .........................................................................................................11

*Leedom v. Kyne*,
    358 U.S. 184 (1958) .........................................................................................................12

*Legal Servs. Corp. v. Velazquez*,
    531 U.S. 533 (2001) .........................................................................................................14

*Martinez v. United States*,
    333 F.3d 1295 (Fed. Cir. 2003)...........................................................................................8

*Massachusetts v. NIH*,
    2025 WL 702163 (D. Mass. Mar. 5, 2025).....................................................................4, 5

*Me. Cmty. Health Options v. United States*,
    590 U.S. 296 (2020) ...........................................................................................................7

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982) ................................................................4, 6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ..................................................................................28

*Mt. Healthy City Sch. Bd. of Educ. v. Doyle*,
    429 U.S. 274 (1977) ...........................................................................14, 15

*Multnomah Cnty. v. Azar*,
    340 F. Supp. 3d 1046 (D. Or. 2018) .......................................................26

*Nat'l Rifle Ass'n v. Vullo*,
    602 U.S. 175 (2024) ................................................................................14

*New York v. McMahon*,
    2025 WL 1463009 (D. Mass. May 22, 2025) ..........................................30

*New York v. Trump*,
    2025 WL 715621 (D.R.I. Mar. 6, 2025) ..................................................32

*New York v. Trump*,
    2025 WL 1098966 (D.R.I. Apr. 14, 2025) .............................................5, 9

*Ohio v. EPA*,
    603 U.S. 279 (2024) .............................................................................6, 27

*P. Gioioso & Sons, Inc. v. Occupational Safety & Health Rev. Comm'n*,
    115 F.3d 100 (1st Cir. 1997) ...................................................................23

*Perry v. Sinderman*,
    408 U.S. 593 (1972) ................................................................................14

*Pickering v. Bd. of Educ.*,
    391 U.S. 563 (1968) ...........................................................................14, 15

*Planned Parenthood of N.Y.C., Inc. v. HHS*,
    337 F. Supp. 3d 308 (S.D.N.Y. 2018) ................................................25, 27

*President & Fellows of Harvard Coll. v. DHS*,
    2025 WL 1737493 (D. Mass. June 23, 2025) ...................12, 13, 14, 16, 17, 18

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) ................................................................................14

*Rumsfeld v. FAIR*,
    547 U.S. 47 (2006) ..................................................................................19

*Rust v. Sullivan*,
    500 U.S. 173 (1991)......................................................................................................19

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943)................................................................................................20, 27

*Speiser v. Randall*,
    357 U.S. 513 (1958)......................................................................................................19

*Stephens v. Cnty. of Albemarle*,
    2005 WL 3533428 (W.D. Va. Dec. 22, 2005).........................................................19

*Stephens v. United States*,
    165 Fed. Cl. 341 (2023)..................................................................................................8

*Stern v. Marshall*,
    564 U.S. 462 (2011)................................................................................................11, 12

*Sustainability Inst. v. Trump*,
    2025 WL 1587100 (4th Cir. June 5, 2025).............................................................10

*Tootle v. Sec'y of the Navy*,
    446 F.3d 167 (D.C. Cir. 2006)....................................................................................4, 7

*Transohio Sav. Bank v. Director, OTS*,
    967 F.2d 598 (D.C. Cir. 1992)....................................................................................4, 6

*United States v. Or. State Med. Soc.*,
    343 U.S. 326 (1952)......................................................................................................31

*Van Drasek v. Lehman*,
    762 F.2d 1065 (D.C. Cir. 1985)......................................................................................7

**Statutes and Regulations**

5 U.S.C. § 702....................................................................................................................3, 7

5 U.S.C. § 703........................................................................................................................7

5 U.S.C. § 705........................................................................................................................7

5 U.S.C. § 706..................................................................................................................7, 26

28 U.S.C. § 1491....................................................................................................................4

28 U.S.C. § 2201....................................................................................................................7

28 U.S.C. § 2202....................................................................................................................7

42 U.S.C. § 2000d-1 ...........................................................................................22, 23

42 U.S.C. § 2000d-2 ........................................................................................5, 9, 11

2 C.F.R. § 200.340 ................................................................................20, 21, 22, 24

45 C.F.R. § 75.372 .......................................................................................................21

**Other Authorities**

@EDSecMcMahon, X.com (May 5, 2025, 6:20 PM ET), https://perma.cc/HTK8-
    75DZ ........................................................................................................................26

Fed. R. Civ. P. 65 ..........................................................................................................32

Guidance for Grants and Agreements, 85 Fed. Reg. 49,506 (Aug. 13, 2020).......................21, 22

Health and Human Services Adoption of the Uniform Administrative
    Requirements, Cost Principles, and Audit Requirements for Federal Awards,
    89 Fed. Reg. 80,055 (Oct. 2, 2024)..........................................................................21

Avani B. Rai & Saketh Sundar, *NIH Pauses Awards to Harvard, Other Schools
    With Frozen Funding*, Harvard Crimson (Apr. 20, 2025),
    https://perma.cc/8CL6-KP37 ..................................................................................22

U.S. Dep't of Health & Human Servs., Off. for Civil Rights, *HHS' Civil Rights
    Office Finds Harvard University in Violation of Federal Civil Rights Law*
    (June 30, 2025), https://tinyurl.com/44sbpzmr ......................................................1

President Trump Participates in a Press Conference with Elon Musk (The White
    House, aired May 30, 2025), https://perma.cc/H7V9-ZLGA ..................................17

# INTRODUCTION

Three months ago, the Government identified a series of conditions that Harvard "must" satisfy in order to continue receiving federal research funding. Because those conditions violated Harvard's First Amendment rights—including by dictating the balance of viewpoints that Harvard faculty and students may hold—Harvard rejected them. Hours later, the Government froze Harvard's already-committed funding, including grants dedicated to protecting American national security and furthering American medical innovation. And after Harvard brought this suit, the Government doubled down by terminating existing awards and announcing that Harvard is ineligible for future federal funding. These actions are unconstitutional retaliation to punish Harvard for defending its First Amendment rights. "[E]very time [Harvard] fight[s], they lose another $250 million." Plaintiff's Opening Brief ("Pl.'s Br.") 2.

The Government claims it froze and terminated every dollar of federal funding to Harvard because of concerns about antisemitism. But the Government does not even attempt to defend its actions under Title VI, which sets out detailed procedures for terminating federal funding for alleged violations of nondiscrimination law. Today, just hours before this brief was due, the Government sent Harvard a "Notice of Violation" under Title VI. *See* U.S. Dep't of Health & Human Servs., Off. for Civil Rights, *HHS' Civil Rights Office Finds Harvard University in Violation of Federal Civil Rights Law* (June 30, 2025), https://tinyurl.com/44sbpzmr. Today's action necessarily concedes that the Government can use the Title VI process; it just deliberately chose to ignore it in its rush to inflict pain and punishment upon Harvard.

The Government argues that Title VI is irrelevant here because a generally applicable OMB regulation (not cited in any of the letters freezing Harvard's funding) overrides the statutory process prescribed by Congress in Title VI and permits the Executive Branch to terminate any grant at-will. The Government's approach renders Title VI's funding-termination framework

entirely precatory, and it is wrong: A generic OMB regulation cannot relieve the entire Government, and every future presidential administration, of the duty to follow Title VI.

The Government's proffered explanation that ending all current and future funding to Harvard was necessary to combat antisemitism is also a textbook case of arbitrary and capricious agency action. The administrative record does not document any meaningful investigation by the Government into antisemitism on Harvard's campus. Nor does it identify any specific incidents of such conduct, let alone connect such incidents to any of the terminated grants. Nothing in today's Notice of Violation changes that because this Court must analyze the Government's contemporaneous—rather than *post hoc*—explanations for its actions. The most the Government can do is repeatedly cite Harvard's own Task Force report, which was released two weeks *after* the Government froze all research funds to Harvard, and thus cannot possibly have been the basis for the challenged actions. And the Government ignores the steps Harvard already has been taking and has committed to take in response to the issues identified in its report.

Unable to cobble together any plausible defense of its lawless actions, the Government argues that this Court cannot review any of Harvard's constitutional or statutory claims because "[t]his case is about money." Government's Opposition ("Opp.") 15. To be sure, the Tucker Act provides the Court of Federal Claims with jurisdiction over certain federal contract disputes. But that jurisdiction is narrow and inapplicable here. It applies only where the case turns on the terms of a contract; but this case has nothing to do with the terms of any grant or contract. It applies only where the plaintiff seeks prototypical contractual remedies like money damages; but Harvard seeks none. And it applies only where the Court of Federal Claims can issue relief; but that court lacks the power to adjudicate either Harvard's First Amendment or Administrative Procedure Act ("APA") claims. Under the Government's contrary reading, whenever a case involves—in any

peripheral way—an agreement with the Government, a party can *never* obtain a remedy in *any* court for violations of constitutional or statutory rights. That is an extraordinary theory.

This Court should grant summary judgment to Harvard, vacate and set aside the unlawful freeze orders and termination letters, and permanently enjoin any similar activity against Harvard.

## ARGUMENT

### I.    This Court Has Jurisdiction Over Harvard's Claims.

Lacking any credible defense on the merits, the Government spends much of its brief arguing that this Court lacks jurisdiction. But because Harvard seeks "relief other than money damages" and no "other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," the APA's waiver of sovereign immunity applies, and this Court has authority to review Harvard's claims. 5 U.S.C. § 702.

#### A.    Harvard seeks "relief other than money damages."

Harvard does not seek "money damages." Rather, Harvard asks the Court to vacate, set aside, and enjoin the Government's unlawful categorical freeze and termination of Harvard's existing and future federal funding. *See* Am. Compl., Prayer for Relief; Proposed Order Granting Pl.'s Mot. Summ. J.; *see also Bowen v. Massachusetts*, 487 U.S. 879, 895 (1988) (noting that the APA allows for "specific remedies," including remedies that "attempt to give the plaintiff the very thing to which he was entitled"). Even if this relief ultimately results in payments to Harvard, "the fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Id.* at 893; *see also Crowley Gov't Servs. v. GSA*, 38 F.4th 1099, 1108 (D.C. Cir. 2022) ("[E]ven if the plaintiff filed the complaint with an eye to future monetary awards, a district court with otherwise appropriate jurisdiction may hear the claim and grant the proper equitable relief." (alteration in original)).

**B.   The Tucker Act does not "expressly or impliedly forbid" relief.**

Lower courts have assumed that the Tucker Act vests the Court of Federal Claims with exclusive jurisdiction over claims founded "upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).[1] That narrow exclusivity precludes an Article III court from hearing a claim that is "essentially a contract dispute," *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 61 (1st Cir. 1978), and is "at its essence a contract claim," *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982). To make that determination, courts consider (1) "the source of the rights upon which plaintiff bases its claims" and (2) "the type of relief sought." *Megapulse,* 672 F.2d at 968; *see Ass'n of Am. Univs. v. Dep't of Energy*, 2025 WL 1414135, at *7 (D. Mass. May 15, 2025); *Massachusetts v. NIH*, 2025 WL 702163, at *4-6 (D. Mass. Mar. 5, 2025). Moreover, courts (3) "categorically reject the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Tootle v. Sec'y of the Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006). All three factors must point to a claim's purely contractual nature, *see Crowley*, 38 F.4th at 1106-07 & n.6, and courts "must consider" the plaintiff's "claims individually," *Transohio Sav. Bank v. Director, OTS*, 967 F.2d 598, 609 (D.C. Cir. 1992). Each factor confirms this Court's jurisdiction.

**Source of the rights.** Harvard's claims arise from the Government's violation of rights protected by the Constitution and federal statutes, not the terms of "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). Harvard challenges the Government's

---

[1]   That assumption of exclusive jurisdiction "is not based on any language in the Tucker Act." *Bowen*, 487 U.S. at 910 n.48. The Claims Court's "jurisdiction is 'exclusive' only to the extent that Congress has not granted any other court authority to hear the claims that may be decided by the Claims Court." *Id.* Moreover, "the fact that the purely monetary aspects" of a district-court APA action "could have been decided in the Claims Court is not a sufficient reason to bar that aspect of the relief available in a district court." *Id.*

"implementation of a broad, categorical freeze on obligated funds," not the "terms and conditions of each . . . individual grant." *New York v. Trump*, 2025 WL 1098966, at *2 (D.R.I. Apr. 14, 2025). "[T]he gravamen" of Harvard's claims "does not turn on terms of a contract between the parties; it turns on federal statute and regulations put in place by Congress." *NIH*, 2025 WL 702163, at *6. "[T]he issue is whether the 'broad, categorical' policy" the Government has adopted barring Harvard from receiving any federal funds "itself runs afoul of" constitutional and statutory limits. *Ass'n of Am. Univs.*, 2025 WL 1414135, at *6.

The Government attempts to recast Harvard's claims as "premised on . . . existing contracts with the United States." Opp. 16. But Harvard does not seek to enforce the terms of any particular grant or contract. Indeed, neither Harvard's brief nor any of the Government's Freeze Orders cite the terms of any specific grant or contract.

The rights that Harvard seeks to vindicate stand wholly apart from the grant agreements themselves. Congress anticipated this scenario, and Title VI thus expressly authorizes APA review of agency action "terminating or refusing to grant or to continue financial assistance" for purported violations of Title VI. 42 U.S.C. § 2000d-2. Had the Government followed the Title VI process, review would be available in this Court under the APA. *See id.* (authorizing review of actions "terminating or refusing to grant or to continue financial assistance" pursuant to Title VI); *see also Colwell v. HHS*, 558 F.3d 1112, 1128 (9th Cir. 2009); *Duxbury Trucking, Inc. v. Mass. Highway Dep't*, 2009 WL 1258998, at *5 (D. Mass. Apr. 29, 2009); Former Fed. Officials Br. 2-4; Former Fed. Officials Br., Ex. B, Tatel Decl. ¶ 8-21 (detailing process).[2] The Government's very

---

[2]    The Government's suggestion, Opp. 26, that any challenge to a Title VI funding termination would be subject to the Tucker Act assumes, incorrectly, that the Tucker Act is the method of review "provided by law" for such claims. The Government cites no Court of Federal Claims case for that proposition because "[j]udicial review of any funding termination is available in an Article III court." *Colwell*, 558 F.3d at 1128.

circumvention of Title VI's requirements cannot deprive this Court of jurisdiction and deny Harvard a meaningful remedy.

Likewise, Harvard's First Amendment rights unquestionably "existed prior to and apart from rights created under" any particular grant. *Am. Bar. Ass'n v. DOJ*, 2025 WL 1388891, at *5 (D.D.C. May 14, 2025). The First Amendment is the "source" of Harvard's institutional rights to freedom of speech, to petition for redress of grievances, and to be free from retaliation—including when that retaliation occurs through the termination of federal funding. And independent of any particular grant agreement, the APA requires the Government to adequately explain its decisions and consider important reliance interests. *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020); *Ohio v. EPA*, 603 U.S. 279, 292 (2024).

The Government claims that Harvard is seeking payment under existing contracts. But courts have "explicitly rejected the 'broad' notion 'that any case requiring some reference to . . . a contract is necessarily on the contract and therefore directly within the Tucker Act' because to do so would 'deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship.'" *Crowley*, 38 F.4th at 1106-07 (quoting *Megapulse*, 672 F.2d at 967-68). Here, Harvard's "rights exist[ed] prior to and apart from rights created under the contract." *Id.* at 1107 (citation omitted). And claims that seek to enforce constitutional or statutory rights are cognizable "even when the claims depend on the existence and terms of a contract with the government." *Transohio*, 967 F.2d at 610. The question is not "whether a case involves contract issues, but . . . whether, despite the presence of a contract, plaintiffs' claims are founded *only* on a contract, or whether they stem from a statute or the Constitution." *Id.* at 609 (emphasis added).

**Type of relief sought.** Harvard seeks declaratory and injunctive relief to prevent the Government's ongoing constitutional and statutory violations. These remedies are available under

the APA and this Court's equitable powers. *See* 5 U.S.C. §§ 702, 703, 705, 706; 28 U.S.C. §§ 2201, 2202; *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). "[T]he Tucker Act is not implicated when the plaintiff seeks only declaratory and injunctive relief." *Van Drasek v. Lehman*, 762 F.2d 1065, 1068 (D.C. Cir. 1985). That is especially so here, where "a naked money judgment against the United States" would not be "an adequate substitute for [the] prospective relief" Harvard seeks. *Bowen*, 487 U.S. at 905.

Harvard seeks "neither the prototypical contractual remedy of damages" nor the "classic contractual remedy of specific performance." *Crowley*, 38 F.4th at 1110 (quotation marks omitted). Harvard's action "is not a suit seeking money in *compensation* for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it is a suit seeking to enforce the statutory [and regulatory] mandate itself." *Bowen*, 487 U.S. at 900. Harvard's requested declaration would speak only to the Government's obligations under federal statutes and the Constitution. It would not "in any way constitute[] an adjudication of [Harvard's] rights under its [agreements]"—so the "Tucker Act does not speak to [its] propriety." *DSE, Inc. v. United States*, 169 F.3d 21, 34 (D.C. Cir. 1999). This suit does not seek retroactive damages for harms Harvard has suffered (such as interrupted research) due to the Government's reckless actions. Instead, it seeks vacatur of unlawful actions and "prospective declaratory and injunctive relief to clarify the extent of the Government's ongoing obligations," including restoring Harvard's ability to compete for future grants—relief that the Court of Federal Claims "does not have the general equitable powers" to grant. *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 326-27 (2020).

**Lack of Jurisdiction in the Court of Federal Claims.** The Government's jurisdictional argument also fails because the Court of Federal Claims could not adjudicate Harvard's claims. *See Tootle*, 446 F.3d at 176. To fall within that court's jurisdiction under the Tucker Act, "a

plaintiff must identify a . . . source of substantive law that creates the right to money damages" or is "money-mandating." *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005). The "Court of Federal Claims lacks jurisdiction over claims arising under the First Amendment . . . as they are not money-mandating." *Stephens v. United States*, 165 Fed. Cl. 341, 348 (2023) (citing *Cooper v. United States*, 771 F. App'x 997, 1000-01 (Fed. Cir. 2019)). Nor could Harvard bring a case in the Court of Federal Claims under Title VI or the APA, because those statutes are not money-mandating. *See, e.g.*, *Martinez v. United States*, 333 F.3d 1295, 1313 (Fed. Cir. 2003) (statutory claims under the APA do not confer jurisdiction).

### C. *Department of Education v. California* is inapposite, as are other cases the Government cites.

The Supreme Court's opinion on an emergency application in *Department of Education v. California* does not warrant a different result. 145 S. Ct. 966 (2025) (per curiam). There, the Supreme Court stayed a district court's temporary restraining order "enjoining the Government from terminating various education-related grants" and "requir[ing] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue." *Id.* at 968. The Court explained that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of" the district court's order. *Id.* (citation omitted). The Court at the same time reiterated that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Id.* (quoting *Bowen*, 487 U.S. at 910). The Supreme Court then remanded the case to this Court without suggesting that the Tucker Act precluded jurisdiction over the entire case, as opposed to just precluding the relief embodied in the TRO. *Id.*

This case is nothing like *California*. Harvard's claims rest on the First Amendment and Title VI, which expressly vests this court with jurisdiction over an agency action terminating

federal financial assistance. 42 U.S.C. § 2000d-2. By contrast, "the *California* plaintiffs asserted violations of governing law rooted in regulations about terminating rather than awarding grants"— meaning "the 'source of the right[]' to the grant was, in *California*, arguably, the grant agreements, and the relief contemplated was the money owed under those grants, making the case more akin to a contract action." *Ass'n of Am. Univs.*, 2025 WL 1414135, at *6. In *California*, the Government itself argued that the "grant agreements [were] plainly 'the source of the rights upon which' [plaintiffs] base[d] their claims," in contrast to "APA suits," which "instead rest on statutory or constitutional theories independent of the contract." Application for Stay at 14, *Dep't of Educ. v. California*, 145 S. Ct. (2025) (No. 24A910). And the Government noted that *California* involved "individual funding terminations," not "a single agency policy." *Id.* at 16. Here, the opposite is true: Harvard challenges the Government's *categorical* freeze and termination of federal funding.

Multiple courts, including this one, have correctly concluded that *California* does not control in cases involving constitutional or statutory claims for declaratory and injunctive relief against the Government's categorical funding terminations. *See, e.g.*, *Ass'n of Am. Univs.*, 2025 WL 1414135, at *6 (rejecting defendants' Tucker Act argument where "the issue is whether the 'broad, categorical' [agency action] itself runs afoul of the APA," rather than "the terms and conditions of each individual [agreement]"); *New York*, 2025 WL 1098966, at *2 (similar); *Am. Bar. Ass'n*, 2025 WL 1388891, at *6 (distinguishing *California* because "[t]here was no constitutional claim in that case"); *Cmty. Legal Servs. in E. Palo Alto v. HHS*, 137 F.4th 932, 939 (9th Cir. 2025) (similar). This case involves the exact same type of claims. Harvard challenges the categorical freeze and termination of federal funding under the Constitution and federal statutes. It seeks "process, not damages." *New York*, 2025 WL 1098966, at *2.

The Government's other "effectively identical" cases are easily distinguishable. The Fourth Circuit's unpublished stay order in *Sustainability Institute v. Trump* involved claims related to the suspension and cancellation of "certain grants funded and authorized by omnibus appropriations statutes." 2025 WL 1587100, at *2 (4th Cir. June 5, 2025). The court concluded the Tucker Act likely foreclosed district court jurisdiction because plaintiffs' right to "receive federal funds" turned on "the operative grant agreements," not "appropriation statutes" that "authorize[d] the agencies to award grants" from "a generalized fund." *Id.* Here, in contrast, Harvard's statutory claims rest on Title VI's express procedural requirements and authorization of judicial review, not broad appropriations statutes. The Government cites *Holley v. United States* for the proposition that "[t]he presence of a constitutional issue does not erase the jurisdiction of the Court of Federal Claims based on a properly brought claim under the Tucker Act." 124 F.3d 1462, 1466 (Fed. Cir. 1997); Opp. 24. But unlike Harvard, the *Holley* plaintiff sought damages under a "money-mandating statute applicable to military personnel claiming damages and ancillary relief for wrongful discharge." 124 F.3d at 1465. Although his claim for wrongful discharge "include[d] consideration of whether his removal violated constitutional rights," he "pled a monetary claim that satisfie[d] the jurisdictional requirements of the Tucker Act." *Id.* at 1466. The constitutional issues here are not threshold issues relevant to proving entitlement to money damages; they are independent claims meriting declaratory and injunctive relief.[3]

---

[3]    The Government's reliance on *Boaz Housing Authority v. United States*, 994 F.3d 1359, 1364-68 (Fed. Cir. 2021), *see* Opp. 18, 23-24, is equally misguided. *Boaz* rejected Tucker Act jurisdiction in a breach of contract action, concluding that although the contracts at issue incorporated regulatory provisions by reference, the plaintiffs' money damages claims were founded upon the contracts. *Boaz*, 994 F.3d at 1364-68. Here, Harvard asserts constitutional and statutory claims, not breach of contract claims, and seeks equitable relief, not money damages.

**D.  Harvard's *ultra vires* claims do not rely on the APA's cause of action or waiver of sovereign immunity.**

The Government's jurisdictional argument also fails because the individual federal-officer defendants have no immunity from Harvard's claims that they acted *ultra vires* in violation of Harvard's statutory and constitutional rights. If "the federal officer, against whom injunctive relief is sought, allegedly acted in excess of his legal authority, sovereign immunity does not bar a suit," because "there is no sovereign immunity to waive—it never attached in the first place." *Chamber of Com. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996) (citing *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 690-91 (1949)). Where an "officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions"; they "are *ultra vires* his authority and therefore may be made the object of specific relief." *Larson*, 337 U.S. at 689.

The Government responds with the circular argument that *ultra vires* review is unavailable for Harvard's constitutional and statutory claims because "[a]ctions to enforce contractual rights are actions at law," Opp. 27, and that review in the Court of Federal Claims is therefore the method of review "provided by law" pursuant to 42 U.S.C. § 2000d-2, Opp. 26. This argument simply recycles the Government's Tucker Act argument, which, as shown above, is meritless. *Supra* p.3. Moreover, if the Government's reading is correct, it would render Congress's express reference in Title VI to APA review superfluous. According to the Government, all Title VI claims would consist of contract disputes between the Government and the funding recipient and would therefore belong in the Court of Federal Claims. Further, it fails to explain how the Tucker Act could preempt a valid *ultra vires* challenge that does not rely on the APA's waiver of sovereign immunity. Indeed, because Harvard's *ultra vires* claims are a traditional form of action that does not depend on a waiver of immunity, Congress *could not* assign them to the exclusive jurisdiction of an Article I court subject to Congress's control. *See Stern v. Marshall*, 564 U.S. 462, 484 (2011);

11

*Leedom v. Kyne*, 358 U.S. 184, 187 (1958); *Reich*, 74 F.3d at 1330 (*ultra vires* claim available even where Congress impliedly precluded judicial review). [4]

## II.    The Government's Actions Violate the First Amendment (Counts 1 and 2).

This Court already held, on the same facts, that the Government likely violated Harvard's First Amendment rights by retaliating against Harvard and engaging in viewpoint discrimination. *President & Fellows of Harvard Coll. v. DHS*, --- F. Supp.3d ---, 2025 WL 1737493, at *17, *21 (D. Mass. June 23, 2025). The First Amendment violations are clear here, too.

The Government does not dispute that Harvard has the First Amendment right to "manage an academic community and evaluate teaching and scholarship free from [governmental] interference." *Blasdel v. Nw. Univ.*, 687 F.3d 813, 816 (7th Cir. 2012). Yet it demanded that Harvard forfeit these constitutional rights as a condition of continued federal funding. *See* HHSHarv_00000062-63 (April 3 Letter); HHSHarv_00000098-100 (April 11 Letter). And the Government concedes that it terminated Harvard's grants *because* Harvard refused the demands. *See* Opp. 12 ("[The April 14] announcement prompted the Defendant agencies to begin taking steps to freeze and eventually terminate their agreements with Harvard."); 37 ("The Government's Offer Letter was clear that if an agreement was not reached, it would exercise its termination rights."). The Government further does not dispute that its mandatory conditions and retaliatory actions were viewpoint-based and sought to superintend the balance of viewpoints at Harvard. *See* Pl.'s Br. 27. Nor does it not argue that the challenged actions would satisfy strict scrutiny.

---

[4]    Indeed, stripping Article III courts of jurisdiction over cases like this one would raise serious constitutional questions, as there is no other adequate remedy for the unlawful executive-branch actions and enjoining such action is a classic equitable function that Congress cannot generally "withdraw from judicial cognizance." *Stern*, 564 U.S. at 484 (quotation marks omitted).

Instead, the Government obfuscates by attempting to reframe its demands as mere "*proposed* conditions in a settlement agreement." Opp. 34. And it tries to airbrush the administrative record by claiming that Harvard's "viewpoints . . . and the filing of this lawsuit[] did not play a substantial role in the agencies' decision to terminate Harvard's grants." Opp. 38. This Court has already found the Government's characterization of its April 11 Letter as containing mere suggestions to be "disingenuous[]" and concluded that the Government's response "is overly simplistic and fails to grapple with the facts." *DHS*, 2025 WL 1737493, at *15.

The administrative record here confirms that the Government's demands were not offers. Instead they were conditions backed by the threat of "immediate" punishment—the termination of Harvard's "financial relationship with the federal government." HHSHarv_00000098-102 (April 11 Letter). They overwhelmingly targeted, in the Government's own words, not only antisemitism but Harvard's perceived "biased programs," lack of "viewpoint diversity," and "ideological capture." HHSHARV_00000062-63 (April 3 Letter); HHSHarv_00000098-100 (April 11 Letter). And the Secretary of Education's letter purporting to cut off future funding refers multiple times to Harvard's perceived "left-leaning" views. EDHarvAR_0000008. There can be no dispute that Harvard's exercise of its First Amendment rights was a substantial reason for these actions.[5]

A.  **The Government unconstitutionally retaliated against Harvard.**

Like any other educational institution, Harvard enjoys "the four essential freedoms of a university[:] . . . to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *DHS*, 2025 WL 1737493, at *15 (cleaned up). The Government's attempt to wrest those functions from Harvard violated these

---

[5]  The Government suggests that the funding freeze and termination "is not final agency action." Opp. 31-32, 37-38. That is irrelevant to Harvard's First Amendment claim. *DHS*, 2025 WL 1737493, at *17 n.13.

"essential freedoms," and "Harvard's refusal to acquiesce to th[ose] demands" is itself "protected speech." *Id.* The Government's own words prove that it terminated Harvard's funding because of that protected conduct and thus engaged in unconstitutional retaliation.

### 1.    The Government applies the wrong legal standard.

The Government asks this Court to break new ground by holding that Harvard's First Amendment rights are "circumscribed" because Harvard is just a "government contractor." Opp. 32. The Government cites no authority holding that retaliation against any entity receiving federal funds is subject to the *Pickering* balancing test, which has been applied only to government employees and personal-services contractors. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *Mt. Healthy City Sch. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283 (1977).

That is unsurprising because "ideologically driven attempts to suppress a particular point of view are presumptively unconstitutional in funding, as in other contexts." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995) (internal quotations omitted). The "lack of a contractual . . . 'right'" to funding "is immaterial to [Harvard's] free speech claim" because the denial of a benefit "may *not* be predicated on [the] exercise of First . . . Amendment rights." *Perry v. Sinderman*, 408 U.S. 593, 597-98 (1972). "Where private speech is involved, even Congress' antecedent funding decision cannot be aimed at the suppression of ideas thought inimical to the Government's own interest." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548-49 (2001). So Harvard's federal funding does not change the fact that "us[ing] the power of the State to punish or suppress" Harvard's "disfavored expression" is "presumptively unconstitutional." *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 188 (2024). No balancing of interests is required.[6]

---

[6]    The Government does not contend that its denial of funding is related to control over *government* speech. *See Rosenberger*, 515 U.S. at 833.

Moreover, the Supreme Court has applied *Pickering* only after it has ensured that the affected speech "does not raise questions of academic freedom that may or may not involve 'additional' First Amendment 'interests' beyond those captured by [the *Pickering*] framework," *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 528 (2022). The constitutional interests implicated by "expression related to academic scholarship or classroom instruction . . . are not fully accounted for by this Court's customary employee-speech jurisprudence," as reflected in *Pickering*. *Garcetti v. Ceballos*, 547 U.S. 410, 425 (2006). The Government here is retaliating against Harvard's exercise of core academic freedoms, unlike the actions in *Kennedy* and *Garcetti*, and the Government identifies no authority suggesting that *Pickering*'s balancing test is appropriate in this context. *See Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 603 (1967) ("safeguarding academic freedom . . . is of transcendent value to all of us"). This Court should thus apply the traditional standard governing Government retaliation against private speech. *See D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012).

### 2.      Harvard's retaliation claim satisfies any relevant standard of proof.

The Government's apparent need to distort the standard is understandable, because its actions, under the correct standard, are indefensible. Pl's Br. 22-31. But even under the Government's incorrect standard, Harvard is entitled to relief if the Government's decision "was made by reason of [Harvard's] exercise of constitutionally protected First Amendment freedoms." *Mt. Healthy*, 429 U.S. at 283. If Harvard establishes that its "constitutionally protected" conduct "was a substantial or motivating factor in the termination," the Government must "show[] that it would have taken the same action even in the absence of the protected conduct." *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 675 (1996). It cannot.

The Government contends Harvard has not shown that "its rejection letter or this lawsuit played a substantial role in the agencies' termination decision." Opp. 34. That argument is difficult

to take seriously given that the Government's initial, "multi-billion-dollar grant funding freeze" was announced "[w]ithin hours of President Garber's letter." *DHS*, 2025 WL 1737493, at *2. It also errs by artificially narrowing the protected conduct at issue to Harvard's "rejection letter" and "this lawsuit." The Government retaliated against Harvard because of its perception of Harvard's academic decisionmaking and the viewpoints on Harvard's campus—which prompted the Government's demands—*in addition to* Harvard's decision to fight the Government's demands and file this lawsuit. *See, e.g.*, Pl.'s Br. 27; *see also DHS*, 2025 WL 1737493, at *17-21.

The Government claims it acted with a "nonretaliatory purpose," namely "opposing antisemitism." Opp. 34. This conveniently ignores the Government's *repeated* references to Harvard's First Amendment speech as a primary basis for its actions. The April 3, April 11, and May 5 Letters each make clear that the Government's retaliatory threat to terminate funding was spurred in substantial part by Harvard's perceived lack of "viewpoint diversity" and "ideological capture." HHSHarv_00000098-100 (April 11 Letter); *see also, e.g.*, HHSHARV_00000062-63 (April 3 Letter) (criticizing Harvard's "biased programs" and lack of "viewpoint diversity"); EDHarvAR_0000008-10 (May 5 Letter) (criticizing the "left-leaning" and anti-"free-market" viewpoints at Harvard). The Government does not contend that these statements are connected to antisemitism. Nor can it dispute that in rejecting the Government's demands, Harvard emphasized its need for academic freedom. Harvard's protected academic decisionmaking therefore played a substantial role in the Government's decision to freeze and terminate Harvard's funding.

Government statements confirm that Harvard's filing of this lawsuit was also a motivating factor in the terminations. The President explained that Harvard "hurt[] [itself]" by "fighting"; "every time [Harvard] fight[s], they lose another $250 million"; and "[a]ll they're doing is getting in deeper and deeper and deeper." Pl.'s Br. 2. At a press conference last month, the President again

said that Harvard was hurting itself by "litigating": "Harvard is trying to be a big shot. And all that happens is every three days we find another $100 million that was given."[7] The Secretary of Education candidly revealed that "when [Harvard's] response out of the box is a lawsuit, then you've got to answer to that." Pl.'s Br. 20. And a White House spokesperson reiterated that President "Garber's public outbursts only fuel the push to shut off the taxpayer money propping up their institution." *Id.*[8]

The Government suggests the cited statements "merely express the view that Harvard would be better off financially if it negotiated with the Government rather than sue it." Opp. 36. That is a concession, not an explanation. The Government admits that Harvard lost its funding *because* it exercised its First Amendment right to sue instead of surrendering its academic freedom. *See* Opp. 37 (conceding that it "was clear that *if an agreement was not reached*, [the Government] would exercise its termination rights") (emphasis added). That is the very definition of retaliation: "subjecting individuals to 'retaliatory actions' . . . for having engaged in protected speech." *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (citation omitted).

The Government's remaining arguments are meritless. *First*, the Government's contention that its demand letters were only "a settlement negotiation . . . akin to . . . a plea agreement" ignores the immediate, serious consequences of noncompliance. Opp. 33. A criminal defendant who rejects a plea agreement will still have an opportunity to defend himself before a neutral judge and jury. Here, by contrast, Defendants acted as judge, jury, and executioner. They gave Harvard a set

---

[7]    President Trump Participates in a Press Conference with Elon Musk at 40:32 (The White House, aired May 30, 2025), https://perma.cc/H7V9-ZLGA.

[8]    The funding termination is only one part of a widespread and unprecedented campaign of retaliation against Harvard for safeguarding its First Amendment rights. *See, e.g.*, *DHS*, 2025 WL 1737493, at *16 ("the Administration has made a full court press against Harvard on many fronts," and this "concerted campaign entirely supports" a finding of retaliation).

of conditions to "maintain Harvard's financial relationship with the federal government" and, within *hours* of Harvard's rejection of those conditions, punished Harvard for that rejection by freezing Harvard's funding. Moreover, the Government does not say *what* that agreement could "settle"; no litigation was pending, and the Government did not offer to release any claims. There was no carrot, only a stick. The demands were thus *demands*, not any kind of offer.

*Second*, the Government's suggestion that no retaliation occurred because it approached Harvard about purported antisemitism before April 11 is puzzling and also beside the point. Opp. 34. The Government made a series of demands cutting at the heart of Harvard's First Amendment rights and when Harvard rejected them, the Government immediately (mere hours after) froze and then terminated funding. Pl.'s Br. 15. As key government decisionmakers have repeatedly explained, the Government targeted Harvard precisely *because* it disagrees with the perceived balance of views at Harvard and *because* Harvard sought to vindicate its constitutional and statutory rights rather than surrender its academic freedom. Pl.'s Br. 11-20; *DHS*, 2025 WL 1737493, at *20-21. The Government has failed to and cannot show it "would have taken the same action even in the absence of the protected conduct," *Umbehr*, 518 U.S. at 675.

### B.   The Government imposed unconstitutional conditions on Harvard's funding.

The Constitution prohibits the Government from conditioning Harvard's grants on the "forfeiture of [its] constitutional rights," even if those grants are "a gratuitous governmental benefit." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 608 (2013). The Supreme Court has "repeatedly rejected the argument that if the government need not confer a benefit at all, it can withhold the benefit because someone refuses to give up constitutional rights." *Id.*

The Government again reimagines its demands as mere "*proposed* conditions in a settlement agreement." Opp. 38. The analogy is inapt. *Supra* p.17. It also ignores the Government's subsequent decision to freeze all federal funding to Harvard when Harvard rejected those demands,

as well as the Government's concession that the later termination notices flowed from Harvard's earlier refusal. Opp. 12, 37. The Government clearly has "*adopted*" a condition as "final[]" when it freezes and revokes all federal funding for failure to comply with that condition. *Id.* at 38.

Moreover, even the civil-settlement cases the Government cites contradict its argument. *Stephens v. County of Albemarle* explained that the "mere fact that one agrees to the challenged condition, even in a settlement, cannot by itself render the bargain constitutional because the unconstitutional conditions doctrine focuses on the propriety of the condition, not the fact that the claimant agreed to it." 2005 WL 3533428, at *6 (W.D. Va. Dec. 22, 2005). Contrary to the Government's theory that settlement conditions get a free pass, the court held that the plaintiff stated an unconstitutional-conditions claim. *Id.* at *9. *Koontz* is not to the contrary—it held that a constitutional claim may rest on "an unconstitutionally extortionate demand" even if a demand for *damages* under the Fifth Amendment may require a "consummated taking." 570 U.S. at 608.

Nor can the Government rely on *Rust v. Sullivan*, which held only that the Government can selectively fund "activities it believes to be in the public interest." 500 U.S. 173, 193 (1991). Nothing in *Rust* disturbed the long line of cases, before and after that decision, holding that "a discriminatory denial" of a government benefit "for engaging in speech is a limitation on free speech." *Speiser v. Randall*, 357 U.S. 513, 518 (1958); *see also Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) ("[T]he Government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit.'" (quoting *Rumsfeld v. FAIR*, 547 U.S. 47, 59 (2006)).

## III.    The Freeze Orders and Terminations Violate Title VI (Counts 3 and 4).

The Government's opposition confirms that the Freeze Orders and Termination Letters were issued in violation of Title VI and must be set aside. From the start, the Government claimed to be investigating "alleged violations of Title VI" at Harvard. HHSHarv_00000062 (April 3

Letter). To this day, it insists that the terminations were based on Harvard's supposed "failure to address antisemitism." *E.g.*, Opp. 1, 3, 34-35, 37, 42. Yet the Government concedes it ignored the statutorily required procedures for terminating funding based on an alleged Title VI violation. *See* Pl.'s Br. 32-38. Indeed, the Government began the Title VI remedial process by sending a notice of violation to Harvard only *today*. *See supra* p.1. But under the *Chenery* doctrine, today is too late to save the actions challenged here. *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943). The Government knows that and so instead has argued it can sidestep the Title VI process by grounding the terminations in a separate provision, 2 C.F.R. § 200.340(a)(4). That provision allows an agency to terminate an award that "no longer effectuates the program goals or agency priorities." *See* Opp. 40. But a general regulation concerning "agency priorities" which the Government did not cite until *after* this lawsuit was filed cannot excuse failure to comply with a statute. To hold otherwise would eliminate the "elaborate restrictions" agencies must follow before terminating funding. *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001).

**The Government did not rely on § 200.340.** The Government's freeze orders and terminations were expressly based on "alleged violations of Title VI." HHSHarv_00000062 (April 3 Letter). The April 11 Letter "incorporate[d]" the April 3 Letter and stated that Harvard's receipt of grants "depends on Harvard upholding federal civil rights laws." HHSHarv_00000098. The April 14 Freeze Order likewise references Harvard's alleged failure to uphold "civil rights laws," *id.*, and the May 5 Freeze Order identifies racism as among "Harvard's consistent violations of its own *legal* duties"—another clear reference to Title VI. EDHarvAR_0000009 (emphasis added).

The Government concedes that these actions "prompted the Defendant agencies to begin taking steps to freeze and eventually terminate their agreements with Harvard." Opp. 12. But the Government did not mention § 200.340 until Harvard brought this litigation, and that shift in

rationale is a *post hoc* invention. It is not believable that, after freezing Harvard's funding based solely on a Title VI rationale, the Government believed Title VI irrelevant when it terminated those same grants based on the same discrimination concerns a few weeks later. Invoking § 200.340 only after Harvard filed a lawsuit pointing out the flaws in the Government's Title VI rationale is classic pretext. It is "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

The pretext is further exposed by the Government's indiscriminate invocation of § 200.340, even for agencies to which that provision does not apply. The relevant portion of § 200.340 does not govern NIH, which awarded the vast majority of the grants at issue. OMB added the "changed priorities" provision to § 200.340 in 2020. *See* Guidance for Grants and Agreements, 85 Fed. Reg. 49,506 49,507-08, 49,559 (Aug. 13, 2020) ("OMB Guidance"). But HHS (NIH's parent agency) "did not adopt" these revisions. Health and Human Services Adoption of the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 89 Fed. Reg. 80,055, 80,057 (Oct. 2, 2024) ("HHS Adoption"). As the Government therefore recently admitted, the relevant portion of "§ 200.340 is not yet adopted by HHS."[9] Instead, HHS regulations currently allow termination only in the three limited circumstances contemplated by the *older* version of § 200.340: non-compliance, good cause, or the awardee's consent. *See* 45 C.F.R. § 75.372(a). HHS has since adopted the updated version of § 200.340— but only as of October 2025. *See* HHS Adoption, 89 Fed. Reg. at 80,055, 80,057. HHS provides the bulk of Harvard's research funding—$488 million of the $689 million provided to Harvard for

---

[9] Government's Opp. to Mot. for Preliminary Injunction, *Am. Pub. Health Ass'n v. NIH*, 25-cv-10787 (D. Mass.), Dkt. 66, at 23; *see also Am. Pub. Health Ass'n v. NIH*, 2025 WL 1548611, at *11 (D. Mass. May 30, 2025) (recognizing this concession).

FY 2024.[10] All this confirms that the Government's indiscriminate, *post hoc* citation to § 200.340 was unlawful and pretextual, and its failure to follow Title VI's requirements is dispositive.

**The Government could not have relied on § 200.340.** On its own terms, § 200.340(a)(4) does not allow an agency to terminate an award based on institutional concerns disconnected from a specific research program. Instead, the provision allows termination only "if *an award* no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4) (emphasis added). The singular phrase "an award" refers to a specific grant, not an entire institution of higher learning. The focus of the sentence is the agency's mission and objectives, not conditions unrelated to the priority the grant was awarded to further. Recognizing this, OMB explained when promulgating § 200.340(a)(2) that the provision could be invoked when "additional evidence reveals that a specific award objective is ineffective at achieving program goals" or casts doubt on "the feasibility of the intended objective of the award." OMB Guidance, 85 Fed. Reg. at 49,507-08. There is no warrant in the text—and the Government cites no precedent—for invoking § 200.340 based on a contracting official's determination that an institution of higher education is discriminatory. *Id.* The Government never linked the terminations here to the effectiveness or feasibility of any specific award. Instead, it canceled grants wholesale. Section 200.340 does not allow that. *See id.* (allowing terminations only "to the extent authorized by law").

But whatever § 200.340 says, it cannot override a statute. An agency cannot by regulation channel discrimination-related terminations away from the mandatory Title VI procedures. Title VI specifically addresses terminations of "grant[s]" based on racial-discrimination concerns, setting forth a mandatory process with which agencies must comply. 42 U.S.C. § 2000d-1.

---

[10]    Avani B. Rai & Saketh Sundar, *NIH Pauses Awards to Harvard, Other Schools with Frozen Funding*, Harvard Crimson (Apr. 20, 2025), https://perma.cc/8CL6-KP37.

"[R]egulations cannot alter th[is] statutory scheme." *P. Gioioso & Sons, Inc. v. Occupational Safety & Health Rev. Comm'n*, 115 F.3d 100, 105 (1st Cir. 1997). Yet the Government's argument that Title VI is not the "exclusive mechanism to address ongoing or rampant civil rights violations," Opp. 43, does just that. It would render the Title VI process superfluous, impermissibly "frustrat[ing] the policy that Congress sought to implement." *Fed. Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 32 (1981). To explain what work Title VI does on the Government's reading, the Government feebly suggests that "Title VI made it mandatory for agencies to terminate funding for discriminating entities in certain circumstances." Opp. 43. Which circumstances, it doesn't say. Nor does it say why these circumstances do not qualify as "certain circumstances." In any event, the notion that Title VI is a chameleon, sometimes mandatory and sometimes not, is wrong. *See* 42 U.S.C. § 2000d-1 (allowing agencies to enforce Title VI "(1) by the termination [of funds] . . . or (2) by any other means authorized by law").

The Government's policy argument, that strict adherence to Title VI would result in "more protections" for alleged discriminators, Opp. 43, is no answer either. It makes perfect sense that Congress would impose extra procedural protections when asking an agency to make a highly consequential determination outside its wheelhouse—especially given that an "allegation of racial discrimination is a serious charge" that can carry "the potential for irreversible stigma, fostering of divisive attitudes and hardened prejudices, and actual exacerbation of the very ills which the Civil Rights Act of 1964 was designed to combat." *Bowman v. EPA*, 712 F. Supp. 375, 383 (S.D.N.Y. 1989). It was also Congress's prerogative to promote conciliated resolutions in discrimination cases, "avoid a punitive . . . application of the termination power," and so impose "procedural limitations . . . designed to [e]nsure" that end. *Bd. of Pub. Instruction of Taylor Cnty. v. Finch*, 414 F.2d 1068, 1075 (5th Cir. 1969). And Title VI's procedural framework has been a

resounding success. As *amici* Judge Tatel and Assistant Secretary Lhamon explain, "every prior administration, regardless of politics, has followed" "the process mandated by Title VI" to "combat discrimination while maintaining funding for program beneficiaries as much as possible and preventing unilateral executive action to terminate Congressionally approved funds." Former Fed. Officials Br. 1-2, 4. That statutory structure has allowed the government to "secure meaningful agreements" that "work[] in practice." *Id.* at 5 (citation omitted). The strong federal policy of voluntary resolution would be thwarted if an agency could evade the procedures through a vague allusion to "agency priorities."

The scant cases the Government cites do not support its attempts to skirt the Title VI process. The Government asserts that Harvard's interpretation is "in tension with" the Supreme Court's decision in *Department of Education v. California*, 145 S. Ct. 966 (2025). But that opinion made no mention of either Title VI or § 200.340—much less "held" that the terminations at issue there "were governed by 2 C.F.R. § 200.340." Opp. 43. The Government also cites a recent opinion which (in a dictum, after concluding that the plaintiffs lacked standing) faulted the plaintiffs for "presuppos[ing] that Title VI is the exclusive vehicle" for withholding funds based on discrimination concerns. *Am. Ass'n Univ. Professors v. DOJ*, 2025 WL 1684817, at *15 (S.D.N.Y. June 16, 2025). Harvard, by contrast, does not "presuppose" this proposition, but rather established it under Title VI's plain text with arguments that the court there did not consider. *See* Pl.'s Br. 37.

The Court should rule that the Government violated Title VI—to avoid nullifying that law, to reaffirm Congress's clear preference for voluntary resolutions *before* cutting federal funds, and to hold the Government to the real basis for its actions.

## IV.    The Freeze Orders and Termination Letters Are Arbitrary and Capricious (Count 5).

Halting billions of dollars of research at the world's largest research university—without bothering to ask or consider which research projects would be defunded or what impact that

defunding would have on national security, medical innovation, or human health—is the essence of arbitrary and capricious agency action. On this APA claim, the Government does not bother to defend the merits of either Freeze Order, even though the Government concedes that these orders were the bases for its later funding terminations. *See* Opp. 12. As to those terminations, the Government casts the APA as a speedbump, requiring the Government only to invoke the prospect of antisemitism to explain its actions, even though that explanation ignores (1) the absence of any concrete evidence of antisemitism in the administrative record; (2) the many steps Harvard has taken (both before and after the Harvard Task Force report) to combat antisemitism; (3) the existing alternatives short of full termination; (4) the costs of cancellation to all parties involved; and (5) the vital reliance interests of Harvard, its researchers, and the public as a whole.

### A.   Harvard challenges final agency action.

The Government contends that the across-the-board freeze and termination of federal funding to Harvard is not "final," and therefore not subject to APA review. *First*, it argues that its April 11 Letter demanding control over Harvard's academic policies was not a final agency action. Opp. 29-31. But that is beside the point. Even assuming the April 11 Letter was not a final agency action the day the Government sent it, the Government certainly took final action three days later when it made good on the threats and froze Harvard's funding. *See Planned Parenthood of N.Y.C., Inc. v. HHS*, 337 F. Supp. 3d 308, 329 (S.D.N.Y. 2018) ("[C]ourts routinely hold that agency action is final where it affects grant eligibility criteria."). It is the culmination of the Government's actions—punishing Harvard on April 14 and thereafter for not acceding to unlawful demands made on April 3 and April 11—that Harvard's APA claim challenges.

*Second*, the Government is wrong to claim that Secretary McMahon's May 5 letter— stating that "Harvard should no longer seek grants from the federal government, since none will be provided," EDHarvAR_0000009 (capitalization altered)—was not final either. The Department

head overseeing federal education policy sent Harvard a formal letter directing that the school "should not seek grants from the federal government" and declaring that "today's letter marks the end of new grants for the University." EDHarv-AR_0000008-10 (cleaned up). Unless federal employees defy that directive, the "concrete consequence" is that Harvard will receive no further grant funding. *See Multnomah Cnty. v. Azar*, 340 F. Supp. 3d 1046, 1056 (D. Or. 2018) ("[L]egal consequences flow from an agency's decision that prohibits future federal funding.").

The Government contends that Secretary McMahon's May 5 letter was not final because she lacked "actual authority" and had no legal basis to "bind the entire federal government." Opp. 31-32. This is not a claim about finality at all; it is a confession of error on the merits. The Government appears to contend that the Secretary of Education was simply confused when she authored the letter, sent it to Harvard, and then posted it on social media (where it remains).[11] If the letter lacked statutory authority, it is "not in accordance with law," and this Court must "hold [it] unlawful," "set [it] aside," and grant summary judgment on Harvard's APA claim. *See* 5 U.S.C. § 706(2)(A); Am. Compl. ¶ 203 (Count 5). The Government's concession also confirms that the letter is *ultra vires*, entitling Harvard to summary judgment. *See* Am. Compl. ¶ 139. Either way, whether the Secretary's conduct was unauthorized or unlawful, it is reviewable under the APA.

*Third*, the Government argues (confusedly) that the decision to disqualify Harvard from future funding is "committed to agency discretion." Opp. 31. It is not clear how the McMahon letter can both be issued without "actual authority" yet also be a product of "agency discretion." Nor is it clear what any of this has to do with finality. Regardless, the decision to block Harvard from all federal funding is not committed to any agency's discretion. "While the Supreme Court has held that certain allocations of funds from lump-sum appropriations may be committed to

---

[11]    @EDSecMcMahon, X.com (May 5, 2025, 6:20 PM ET), https://perma.cc/HTK8-75DZ.

agency discretion, this narrow exception does not 'typically' or 'presumptively' extend to all allocations of appropriated funds." *Planned Parenthood of N.Y.C.*, 337 F. Supp. 3d at 324. For that reason, courts routinely adjudicate challenges to the federal government's decision to bar an entity from receiving future federal funding. *See*, *e.g.*, *Friedler v. GSA*, 271 F. Supp. 3d 40, 63 (D.D.C. 2017) (vacating a federal debarment).[12]

### B.   The Government cannot justify its unreasoned and unreasonable actions.

**Failure to reasonably explain.** In its rush to strip Harvard of federal funding, the Government skipped the foundational APA requirement to "reasonably explain[]" its actions. *Ohio v. EPA*, 603 U.S. at 292 (citation omitted). Agencies terminated Harvard's funding at the White House's command, on White House-imposed deadlines, using a White House-authored rote explanation. *See* Pl.'s Br. 40-41 & n.69; *see also*, *e.g.*, NASA-AR03679 ("Due to the WH deadline of 5pm – we are pressing with cancellation."); USDA-HARV-AR-00084 ("[P]lease use the template termination letter attache[d]. . . . This is the form the WH wants to see it in."). In their haste to comply with the White House's orders, agency leaders cancelled grants before their staff even had the opportunity to weigh in on the importance of the projects. Pl.'s Br. 42. This Court's review is limited to the agencies' explanation at the time of their action, omitting lawyers' *post hoc* rationalizations. *Chenery Corp.*, 318 U.S. at 88.

---

[12]   The Government also argues there is no "ripe dispute" between Harvard and the Department of Justice because DOJ "grants . . . have not been frozen or terminated." Opp. 52. That ignores the administrative record, which shows that a DOJ official was a central figure in the coordinated effort to terminate Harvard's funding. *See, e.g.*, NASA-AR03733 (May 8 email from NASA to DOJ official A. Kambli (OASG)); NASA-AR03742 (May 8 email from A. Kambli to NASA); GSAHarv_00000035 (May 8 email from GSA addressed to the White House and DOJ). Moreover, DOJ is a member of the Federal Task Force to Combat Anti-Semitism, which was responsible for freezing and ultimately terminating Harvard's federal funding. The record provides no basis to dismiss DOJ or the Attorney General, whose status as parties to this litigation ensures that full and adequate relief may be provided to Harvard.

The Government falls back on APA cases accepting explanations "of less than ideal clarity." Opp. 46-48 (citation omitted). The APA may sometimes be forgiving, but it is not standardless. The Government cannot simply proclaim that it was acting to combat antisemitism without pointing to any record evidence, without explaining why Harvard's myriad actions addressing antisemitism to date are insufficient, without considering whether any legitimate concerns about antisemitism could be addressed through less drastic alternatives, *see Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983), or without weighing the national security or medical benefits of the research at issue, *see Regents of Univ. of Cal.*, 591 U.S. at 30—all necessary elements of reasoned decisionmaking.

As to Harvard's handling of antisemitism on campus, the Government does not identify any document in the administrative record where an agency analyzed and weighed the evidence to reasonably conclude that Harvard has failed to "take adequate actions to prevent antisemitism," Opp. 47, much less to determine that wholesale cancellation was a valid response.[13] Though GSA announced early on that it "*will*" be conducting "a comprehensive review" of Harvard's efforts, GSAHarv_00000003-04 (emphasis added), there is not a single sentence in the record demonstrating that it (or any other agency) ever conducted this review, let alone explained its conclusions or identified what evidence it relied on. "Stating that a factor was considered," much less announcing that one *will* be considered, "is not a substitute for considering it." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986).

---

[13]   The Government's untimely notice of violation is not part of this administrative record. In any event, the Government's notice continues to ignore the plethora of actions that Harvard has taken since October 2023 to combat antisemitism. And the Government still relies upon only Harvard's own voluntary report to sustain its findings—which, in any event, do not establish Harvard's "deliberate indifference" to antisemitism.

The Government relies exclusively upon the White House form letter, copied by multiple agencies, which quotes the Harvard Task Force report to contend that Harvard has not adequately addressed antisemitism. *See* Opp. 47. But the report, which is a product of Harvard's own efforts to combat antisemitism, was published two weeks *after* the Government announced the funding freeze, the action from which the Government concedes its later funding terminations flowed. Opp. 12. Accordingly, any reliance on the Harvard Task Force report is impermissibly *post hoc*. *See Regents of Univ. of Cal.*, 591 U.S. at 24; Pl.'s Br. 9, 15. Regardless, Harvard's willingness to seek and publish a report harshly condemning antisemitism on its campus, and detailing actions to implement the report's recommendations, show that Harvard *did* respond and is responding forcefully to antisemitism. *See* Pl.'s Br 10-11; Opp. 5-10 (ignoring detailed actions outlined in the appendix). If the agencies believed that these actions were insufficient, they have never explained why. They offer not "reasoning, but . . . conclusion." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350-51 (D.C. Cir. 2014) (citation omitted).

**Failure to consider important aspects of the problem.** The terminations are also arbitrary and capricious because the Government ignored the tremendous harm it would wreak by cutting off billions of dollars of vital research funding. The Government contends "the agencies concluded that the inadequacy of Harvard's efforts to address antisemitism . . . outweighed the government's interests in maintaining" these grants. Opp. 48. But the Government does not identify a single document in the administrative record where an agency actually weighed these concerns and came to such a conclusion. The Government's sole citation is the April 14 Freeze Order, none of whose 103 words even obliquely mention the downsides of termination. This Order only confirms that the Government ignored this critically "important aspect[] of the problem." *Regents*, 591 U.S. at 25 (citation omitted). Had the Government given these critical concerns any

attention, it might have also considered whether the implementation of obvious alternatives—such as action short of a complete funding termination—would have been preferable.

**Failure to consider reliance interests.** The terminations also ignore reliance interests. There is no conceivable reason to force researchers to throw out experiments in which they and the Government have invested substantial time and money. Pl.'s Br. 45-46. No agency even considered this obvious problem; "to ignore such matters" is "arbitrary and capricious" and a dispositive flaw. *Regents*, 591 U.S. at 30 (citation omitted). The Government, refusing to confront this problem, makes the citation-free assertion that Harvard could not possibly have relied on continued grant funding because federal regulations contemplate situations where funding can be revoked. Opp. 49. As the Supreme Court has explained, however, the theoretical possibility that a government benefit can be revoked (which is nearly always true) does not absolve the Government from considering reliance interests. *Regents*, 591 U.S. at 31 (noting the absence of any "legal authority establishing" that "disclaimers" by the Government "preclude[] reliance interests").

The Government argues that "[t]his case is not like *Regents*" because the plaintiffs there "had made significant economic, personal, and financial commitment[s] in reliance on [a revoked] program." Opp. 49. But Harvard scientists too embarked on long-term research projects that now may need to be scrapped—a critical reliance interest to which the Government has no answer. Pl.'s Br. 45. To be sure, *Regents* dictates no specific conclusion about these interests. But when an agency reverses a "position [that] has engendered serious reliance," it must "provide[] a reasoned explanation" for disregarding them. *Housatonic River Initiative v. EPA*, 75 F.4th 248, 270 (1st Cir. 2023) (citations omitted). The Government erred by failing to provide such an explanation here.

## V.    The Freeze Orders and Termination Letters Are *Ultra Vires* (Counts 2 and 6).

The Court can easily reject the Government's half-hearted attempts to dispose of Harvard's *ultra vires* claims. Harvard briefed its *ultra vires* claims in its Motion and supported those claims

with First Circuit precedent. *E.g.*, Pl.'s Br. 46. Harvard has established *ultra vires* claims for the violation of its constitutional and statutory rights, particularly where the Government ignores entirely (and therefore concedes) the merits of those claims. *Cf. New York v. McMahon*, 2025 WL 1463009, at *23 (D. Mass. May 22, 2025) ("Even under the extreme agency error standard, Defendants have likely acted *ultra vires*.").

## VI.    The Government Fails to Refute Harvard's Entitlement to Injunctive Relief.

The Government does not dispute the irreparable harm Harvard faces, nor does it dispute that the balancing of harms and the public interest favor granting Harvard permanent injunctive relief. *See* Pl.'s Br. 47. Harvard seeks relief from the Government's ongoing retaliation in violation of the First Amendment; its claims are not limited to an "APA challenge." Opp. 50. The Government fails to address injunctive relief on the First Amendment claim and thus concedes that injunctive relief is appropriate to remedy the constitutional violations. *See* Pl.'s Br. 23.

The Government's opposition also confirms that injunctive relief is appropriate on Harvard's APA claims. It suggests that the only improper agency action to be remedied is the agencies' decisions to terminate existing grants. Opp. 51. But injunctive relief is necessary here because of the Government's further categorical, across-the-board policy that Harvard is ineligible for any *future* grants. *E.g.*, May 5 Freeze Order, EDHarv_0000010 at 3 ("[T]oday's letter marks the end of new grants for [Harvard] University."); April 14 Freeze Order, GSAHarv_00000012-13 at 1 (similar); SOF ¶¶ 70-72 (terminations directed by White House). The Government has sought to punish Harvard by any and every means available, opting for a new purported basis whenever an earlier one is rejected or proves ineffective. This is precisely when injunctive relief is appropriate. *See Allee v. Medrano*, 416 U.S. 806, 811-16 (1974) (affirming grant of permanent injunction against future police misconduct where police had engaged in "pervasive pattern of intimidation . . . to suppress" First Amendment rights); *United States v. Or. State Med. Soc.*, 343

U.S. 326, 333 (1952) ("All it takes to make the cause of action for relief by injunction is a real threat of future violation or a contemporary violation of a nature likely to continue or recur.").

In apparent recognition of this fact, the Government pivots to arguing that the requested relief is "vague and unreasonable." Opp. 51. But the injunctive relief sought here is as narrowly drawn as possible given the sweeping and ongoing nature of the Government's retaliation, and courts have imposed similar relief for similar conduct. *See, e.g.*, *Jenner & Block LLP v. DOJ*, 2025 WL 1482021, at *27 (D.D.C. May 23, 2025) (entering injunction directing DOJ and OMB to instruct agencies to "carry on with their ordinary course of business as if [the EO] had not issued").

Nor would the requested injunctive relief "prevent the Defendants from making funding decisions in situations under the Executive's *actual authority*." *New York v. Trump*, 2025 WL 715621, at *16 (D.R.I. Mar. 6, 2025) (emphasis added) (quotation omitted). Harvard does not request an injunction that would prevent the Government from initiating *proper* investigations in full conformance with the Title VI process. It simply requests that the Government be enjoined from depriving Harvard of funding as a form of retaliation for Harvard's exercise of its First Amendment rights, in a repeat of what has transpired over the last several months and in a manner that fails to follow the procedural requirements set forth in Title VI and the individual agency Defendants' implementing regulations. Pl.'s Br. 35-36 & nn.63-66.[14]

## CONCLUSION

The Court should grant summary judgment to Harvard, vacate and set aside the unlawful Freeze Orders and Termination Letters, and permanently enjoin any similar action.

---

[14]  The Government seeks a "bond" under Rule 65. Opp. 52. That rule is inapplicable because Harvard seeks a permanent injunction, Pl.'s Br. 48, not "a preliminary injunction," Fed. R. Civ. P. 65(c). Further, Harvard seeks relief under the APA, *supra* p.27, not Rule 65, so a bond is unwarranted. If this Court disagrees, a nominal bond of $1 is sufficient because the Government has no damages. *See Albright v. Morton*, 321 F. Supp. 2d 130, 134 n.3 (D. Mass. 2004).

Dated: June 30, 2025

Respectfully submitted,

*/s/ Steven P. Lehotsky*

William A. Burck*
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, DC 20005
williamburck@quinnemanuel.com

Steven P. Lehotsky (BBO # 655908)
Scott A. Keller*
Jonathan F. Cohn*
Mary Elizabeth Miller* (BBO # 696864)
Shannon G. Denmark*
Jacob B. Richards (BBO # 712103)
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
T: (512) 693-8350
F: (512) 727-4755
steve@lkcfirm.com
scott@lkcfirm.com
jon@lkcfirm.com
mary@lkcfirm.com
shannon@lkcfirm.com
jacob@lkcfirm.com

Robert K. Hur*
KING & SPALDING LLP
1700 Pennsylvania Ave. NW, Suite 900
Washington, DC 20006
rhur@kslaw.com

Joshua S. Levy (BBO #563017)
Mark Barnes (BBO #568529)*
John P. Bueker (BBO #636435)
Elena W. Davis (BBO #695956)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
Joshua.Levy@ropesgray.com
Mark.Barnes@ropesgray.com
John.Bueker@ropesgray.com
Elena.Davis@ropesgray.com

Katherine C. Yarger*
LEHOTSKY KELLER COHN LLP
700 Colorado Blvd., #407
Denver, CO 80206
katie@lkcfirm.com

Joshua P. Morrow*
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
josh@lkcfirm.com

Douglas Hallward-Driemeier
(BBO #627643)
Stephen D. Sencer*
ROPES & GRAY LLP
2009 Pennsylvania Avenue NW
Washington, DC 20006
Douglas.Hallward-Driemeier@ropesgray.com
Stephen.Sencer@ropesgray.com

Danielle K. Goldstein*
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
danielle@lkcfirm.com

*Admitted Pro Hac Vice*

**CERTIFICATE OF SERVICE**

Counsel for Plaintiff certify that they have submitted the foregoing document with the clerk of court for the District of Massachusetts, using the electronic case filing system of the Court. Counsel for Plaintiff hereby certify that they have served all parties electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

/s/ *Steven P. Lehotsky*
Steven P. Lehotsky