UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


PRESIDENT AND FELLOWS            )
OF HARVARD COLLEGE,              )      Civil Action No. 25-11048-ADB
          Plaintiff,             )
V.                               )
                                 )
UNITED STATES DEPARTMENT OF      )
HEALTH AND HUMAN SERVICES,       )
ET AL.,                          )
          Defendants.            )
------------------------------
AMERICAN ASSOCIATION OF          )
UNIVERSITY PROFESSORS —          )      Civil Action No. 25-10910-ADB
HARVARD FACULTY CHAPTER,         )
and AMERICAN ASSOCIATION OF      )
UNIVERSITY PROFESSORS,           )
          Plaintiffs,            )
                                 )
V.                               )
                                 )
UNITED STATES DEPARTMENT OF      )
JUSTICE, ET AL.,                 )
          Defendants.            )


BEFORE THE HONORABLE ALLISON D. BURROUGHS
UNITED STATES DISTRICT JUDGE

MOTION HEARING
July 21, 2025
9:35 a.m.


John J. Moakley United States Courthouse
Courtroom No. 17
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RPR, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

APPEARANCES:

Counsel on behalf of Plaintiff:

Steven Paul Lehotsky
Mary Elizabeth Miller
Lehotsky Keller Cohn LLP
200 Massachusetts Avenue, NW
Washington, DC 20001
202-365-2509
steve@lkcfirm.com

Joshua S. Levy
Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199
617-951-7000
joshua.levy@ropesgray.com

Counsel on behalf of AAUP and UAW:

Joseph M. Sellers
Phoebe M. Wolfe
Cohen, Milstein, Sellers & Toll PLLC
1100 New York Avenue, NW
Washington, DC 20005
202-408-4600
jsellers@cohenmilstein.com

Corey Stoughton
Julie Singer
Selendy Gay
1290 Avenue of the Americas
New York, New York 10104
212-390-9334
jsinger@selendygay.com


Counsel on behalf of Defendants:

Michael Velchik
Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
202-445-5496
michael.belchick@usdoj.gov

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Allison D. Burroughs, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, One Courthouse Way, Courtroom 17, Boston, Massachusetts, on July 21, 2025.)

COURTROOM CLERK:  Will counsel identify themselves for the record.

MR. LEHOTSKY:  Good morning, Your Honor.  Steven Lehotsky for plaintiff Harvard.

MS. MILLER:  Mary Miller for plaintiff Harvard.

MS. O'CONNOR:  Jennifer O'Connor for Harvard.

MR. LEVY:  Good morning, Your Honor.  Joshua Levy on behalf of Harvard.

MS. STOUGHTON:  Your Honor, Corey Stoughton from Selendy Gay on behalf of the AAUP and United Auto Workers and the AAUP chapter.

MR. SELLERS:  Good morning, Your Honor.  Joseph Sellers from Cohen Milstein on behalf of the plaintiffs AAUP and UAW.

MS. SINGER:  Julie Singer, Selendy Gay on behalf of plaintiffs AAUP and UAW.

MS. WOLFE:  Phoebe M. Wolfe on behalf of plaintiffs AAUP and UAW.

MR. VELCHIK:  Michael Velchik for the United States, defendants in both cases.

THE COURT:  Lonely over there, huh?

MR. VELCHIK:  The executive branch speaks with one voice.

THE COURT:  I remember when I was doing a criminal case, one of the defense attorneys stood up and said, "I represent the United States of America one citizen at a time." So I appreciate the introduction.

We're still having some technical difficulties up here.  We may be interrupted to try and fix this.  We just decided to go ahead and start without it.  So if you see Chris up here mucking around, we're trying to get that sorted out.

Have you all decided how you want to do this, how you want to proceed?  Cross-motions, who wants to begin?

MR. LEHOTSKY:  Your Honor, I believe plaintiff Harvard would begin.  After that I think we're open to however, whatever order you want to hear.  Either if you want to have the *Harvard v. HHS* case first and then the *AAUP v. DOJ* case second, or if you want the plaintiffs to both go first and then have the Department of Justice respond to both cases, whatever structure you prefer.

THE COURT:  I was hoping you'd work this out amongst yourselves.  I don't feel strongly about it.

Let me just ask a couple of preliminary questions

first, and then maybe we can go back on the order.  In both cases there's an administrative record filed.  Are the administrative records filed in both cases the same?

MS. STOUGHTON:  Yes, Your Honor.

THE COURT:  I'm trying to streamline this a little bit because I know you're in a hurry for an opinion.  I thought when we set this up that we'd agreed on some page limits and we'd agreed on some limitations on the amicus briefs, and I feel like everybody has blown right by those.  So I've read and tried to digest it all, but if there's some shortcuts, like the same administrative record in both cases, that's helpful.

Are the administrative records, are they complete or are people only filing the excerpts that are referenced in the briefs?

MR. VELCHIK:  My understanding is they're complete.

THE COURT:  Okay.

MR. LEHOTSKY:  Your Honor, they are excerpts of the administrative record.  There is a much longer administrative record that the government produced to both plaintiffs, and what has been filed publicly with the court are the materials that have been cited either by the United States or by both plaintiffs.

THE COURT:  Okay.  Don't I have to consider the complete administrative record, or is it your view that I can just consider the excerpts that the parties have agreed on?

MR. LEHOTSKY:  Your Honor, I believe with the excerpts that you have, you have everything that the parties have relied upon in either the motions for summary judgment or the cross-motions from the United States.  So I think you have everything that the parties are asserting is relevant.

My understanding, and I defer to the Department of Justice on this, is the broader excerpts of record have a lot of unredacted, you know, information, email addresses, phone numbers, names, other information.  I guess neither party is relying on any of those documents, but it would be quite a burden for I think everybody to have to go through and redact everything in order to be able to make that available to the court.  So I think you have everything that you need to be able to render a decision on either of the motions.

THE COURT:  Okay.  Because I know you'll be shocked to know that in other cases I have looked through an administrative record and found things that I thought were relevant that neither side relied on.  So you all are waiving my consideration of anything that hasn't been cited by one or the other of the three of you?

MR. LEHOTSKY:  Well, Your Honor, again, for Harvard -- I won't speak for AAUP or for the United States, but I know for Harvard, we have cited everything that we rely upon and we're willing to rest on those excerpts of the administrative record, yes.

THE COURT:  Okay.  Is that the same for AAUP?

MS. STOUGHTON:  Your Honor, yes.  That is, I would just say it's critical, though, that the government agrees to that.

THE COURT:  I got that.  They're next, okay?  I got that.  I can only talk to one of you at a time.

MR. VELCHIK:  We have pulled the administrative record and are happy to supply any additional information the court requires to render its decision.  We believe there's enough information for the court to render a judgement in favor of the government in both cases.

THE COURT:  I know you're willing to produce what else I might need, but since I haven't seen what's in the administrative record, I don't know if there's anything else that I might need.  So what I'm asking is -- I'm supposed to do a substantial review of the record -- if you all are agreeing that all that needs to be reviewed in the record is what the two of you have submitted, the three of you have submitted.

So they're agreeing that they're going to forgo anything that might be helpful to them in the balance of the administrative record.  What's the government's position on that?

MR. VELCHIK:  We similarly believe that there's enough in the administrative record for the court to rule in favor of the government in both cases.

THE COURT:  Lastly, I'm trying to get through some of these housekeeping matters.  There's exhibits that you all have included that are not part of the administrative record.  And it looks like those are largely undisputed, but am I able in this posture to consider things that are not part of the administrative record?

MR. LEHOTSKY:  Yes, Your Honor.  So the declaration from Shaw, the Shaw declaration, the Newell declaration which Harvard had submitted, those go to Harvard's injury that it suffers and then also publicly available information of which the court can take judicial notice, notwithstanding that it's not part of the government's administrative record.

And in fact, part of our entire argument is the absence of anything in the administrative record that shows that the government considered any of the important issues that were part of the decisionmaking that the government should have engaged in.  And so that sort of proves the absence of material in the administrative record.

There's also a declaration from me which includes copies of letters that we've received and other materials which again I think overlap significantly with what is in the administrative record, but I don't think anything in those declarations, you know, contravenes the requirement that the government -- that the court must adjudicate that the government acted arbitrarily and capriciously based on the

administrative record.

THE COURT:  So what's the government's position on that?

MR. VELCHIK:  Certainly for APA claims --

THE COURT:  Go ahead.  He's just going to work on this technical issue.

MR. VELCHIK:  Certainly for APA claims, the court reviews the administrative record.  I think with respect to some of the particular affidavits, I mean, I don't think there's disputes that they're true and accurate copies in the way that they've been presented.  And again, we believe that there's enough in the record for the court to rule in favor of the government in both cases.

THE COURT:  Okay.  So there haven't been any motions to strike filed.  There's no objections to anything that's before me, so I'm going to assume that you're both content to have me consider anything that either one of you have submitted with the briefing.  Is that right?  Let's start with Harvard.

MR. LEHOTSKY:  Yes, Your Honor.

THE COURT:  AAUP?

MS. STOUGHTON:  Yes, Your Honor.

THE COURT:  And the government?

MR. VELCHIK:  Yes, Your Honor.

THE COURT:  All right.  Now, I just want to focus on AAUP for just a second before we start with the arguments.  You

are asking for the same relief that Harvard is asking for, correct?

MS. STOUGHTON:  Your Honor, yes.

THE COURT:  Okay.  And there's this kind of standing issue that people have spent a lot of paper on, and I'm wondering if, as long as Harvard is in the case, whether we need to get to AAUP.

MS. STOUGHTON:  Your Honor, we do for a few reasons. First is that there is a separate case, and the AAUP, for the reasons set forth in the standing section, have a separate interest to defend; that is, not all of the arguments overlap substantially, they are not all the same arguments, and they are not the same injuries.

THE COURT:  I'm just wondering about staying the *AAUP* case while the *Harvard* case proceeds.  I mean, I have a short period of time to do a lot, and it feels to me like I don't need to get to the standing issue as long as Harvard is in the case, and I can rule on the *Harvard* case.

MS. STOUGHTON:  Your Honor, there are two reasons why we'd ask the court not to do that.  The first is that the AAUP plaintiffs do bring different -- not different claims but different theories that are importantly different, particularly around the First Amendment, specifically the coercion claim, which Harvard has not emphasized.  A ruling on that is important because --

THE COURT:  It's still in the *Harvard* case.

MS. STOUGHTON:  Your Honor, I would let Harvard speak for themselves on what theories they have, and I wouldn't want to waive anything on their behalf; nor could I.  But my understanding from reading the briefing is that Harvard's argument sounds in the theories of retaliation and unconstitutional condition, which are both arguments that the AAUP plaintiffs also bring, but that the coercion claim, because it is coercion of Harvard targeting the speech and academic freedom of the AAUP plaintiffs' members, is not a theory that the Harvard plaintiffs are advancing.

THE COURT:  Mr. Lehotsky, I thought Harvard was advancing a coercion theory.

MR. LEHOTSKY:  Your Honor, we certainly think that that's what the Administration is trying to do.  That does tie into the unconstitutional condition argument that the government has set out a series of conditions in its April 11 letter that we have to meet or else we'll lose our federal funding.  We of course rejected those conditions and those demands in President Garber's April 14 message, but I think we would agree with AAUP about what the Administration is trying to do with respect to Harvard.

THE COURT:  I'm sure you agree with that.  That's not what I'm asking.  I'm asking, if I stay their case, if it cuts out any theories or causes of action.

MR. LEHOTSKY:  Not any of the theories we are asserting, no, Your Honor, it does not.

MS. STOUGHTON:  Your Honor, I think though the point is that it may be cutting out theories that we are asserting.  That's our concern.  We also have a separate concern.  Although obviously a stay wouldn't be a permanent prejudice, the AAUP plaintiffs do have separate interests, and some of the daylight between the President and Fellows and the AAUP plaintiffs is evident in the brief, and some of the discussions of changes that Harvard have made on campus already under the coercion and pressure the Administration has put on it.

But we are -- we have not entirely put the interests of the AAUP plaintiffs in the hands of the President and Fellows, and that is for very good reasons.  There are separate interests.  The President and Fellows have been engaging in settlement discussions with the government as a matter of public record that the AAUP has plaintiffs have not been part of, either by invitation or on a separate track.  And as a result, the interests are not I think sufficiently aligned that the AAUP plaintiffs would feel comfortable forgoing the opportunity for a ruling on summary judgment on their case as well.

THE COURT:  So if Harvard prevails on this, you're taken care of, right?

MS. STOUGHTON:  Your Honor, if Harvard prevails on all

of the claims that it is bringing, it is fair to say that that relief would be complete relief.  The *AAUP* case does not bring additional relief in the posture that the cases are in today. I can't dispute that.

THE COURT:  Okay.  Now the flip side of that.  If Harvard loses, do you think that you have a theory that could carry the day in the face of their loss?

MS. STOUGHTON:  Only if there is a world in which the court believes that there is unconstitutional coercion under the Supreme Court's decision in *Vullo* but not unconstitutional conditions, retaliation or viewpoint discrimination, which would be a fairly narrow world.

THE COURT:  Very.

MS. STOUGHTON:  But that is the one world that comes to mind.

THE COURT:  Okay.  I'll let it go today, but I'm not sure just in terms of workload and sort of judicial resources that it doesn't make sense to stay the *AAUP* case until we resolve this.  It can always be reconstituted.  I'm not sure that you've lost anything.

MS. STOUGHTON:  Your Honor, I think we are concerned about losing something for the reasons I said.  I won't repeat those reasons.  But I understand what the court is saying about relief.  I would need to confer with my clients, but it sounds also like there could be a structuring if the court -- there's

no obligation of the court to issue an opinion in both cases at the same time. I don't think the court needs a stay to accomplish that decision. That's in your discretion. And if that were what was required to move faster, there's nothing that we could say here in court that would stop you from doing that, but for the record I think our request is the court not stay the litigation.

THE COURT: Why would I want to issue an opinion in the *Harvard* case and then do an opinion in the *AAUP* case later?

MS. STOUGHTON: Your Honor, I was just responding to the court's sense of urgency and of time economy. If it would save time in that way, then we understand. But at the end of the day, if there's a world in which the AAUP plaintiffs do not receive a ruling in their case, and their rights depend entirely on a ruling that belongs to, in every sense, the President and Fellows -- you know, the AAUP clients filed this litigation first. We have separate interests.

As I mentioned, there are settlement discussions that are ongoing. I don't know the status of those. I don't think anybody does. I'm not asking. But there are very good reasons why the AAUP plaintiffs' ability to get relief, we are not comfortable having that be entirely contingent on what happens in the President and Fellows case.

THE COURT: Well, I don't know anything about settlement or the status of settlement, and it's not at all

what I'm focused on.  But I hear you that if Harvard is not in the case, the posture changes significantly.  But as long as Harvard is in the case and I can sort through this dealing with one case and not the other and not having to spend a ton of time on this standing issue, which is a complicated one, that just seems to make sense to me.

I'll let you argue today.  We're not going to spend a ton of time on standing, but I'll let you participate today and then decide what I'm going to do going forward on the case, but I may stay the *AAUP* case.

MS. STOUGHTON:  Thank you, Your Honor.

THE COURT:  Okay.  I think that's it.  Are you for Harvard, Mr. Lehotsky, are you the voice for Harvard?

MR. LEHOTSKY:  Yes, Your Honor.

THE COURT:  Go ahead.

MR. LEHOTSKY:  Thank you, Your Honor.  We appreciate the opportunity to be here.  We appreciate your time and attention to all the briefing that's been filed in the case, and we appreciate your attention to the need for a prompt ruling.

It's been about two months since we set a briefing schedule, an expedited summary judgment briefing schedule in this case, and that means we're two months closer to the September cutoff time when we would have to submit closeout paperwork on terminated grants.  So we're grateful for the

court's appreciation of that impending deadline and for whatever ruling you might be able to issue before we get into early September.

I'd like to start with jurisdiction, which I think merges into the merits because the two key reasons why this case is properly in this court and not the Court of Federal Claims --

THE COURT:  I'm sorry.  I have to interrupt you. Wasn't this issue resolved on Friday?

MR. LEHOTSKY:  Yes, Your Honor.  That was going to be my first point, which is that the First Circuit's decision in the American Public Health Association case we think forecloses the jurisdictional issue for the government.  We think we have additional reasons why we're in -- there's an even stronger case for why it belongs, Harvard's claims belong in federal district court rather than in the Court of Federal Claims because of the First Amendment and Title VI, but if Your Honor wishes, I can just skip straight to the merits.

THE COURT:  Why don't you skip right to the merits, and if he makes an argument that requires a response, I'll give you an opportunity to do that.

MR. LEHOTSKY:  Yes, Your Honor.

So there are three reasons why Harvard is here, as I said, First Amendment; the second is Title VI, and the third is our Administrative Procedure Act arguments.

The first reason we're here is because the government violated Harvard's First Amendment rights when it demanded on April 11 that Harvard cede control over its governance and the balance of viewpoints among its faculty and students to the federal government as a mandatory condition to maintain a financial relationship with the federal government.  And then after Harvard said no to those conditions, the government promptly made good on its threat and indefinitely froze more than 2.2 billion in research funding before starting to terminate those funds.

The government's own statements concede the constitutional violation.  In its reply brief filed last Monday, the government said at page 17, "If Harvard's rejection letter simply read 'Harvard rejects these terms,' the same consequences would have unfolded."  That's not an isolated statement.  In its opposition brief at 12, the government said President Garber's April 14 announcement prompted the defendant agencies to begin taking steps to freeze and eventually terminate their agreements with Harvard.  And again, in the same brief, at page 37, the government said its so-called offer letter was clear that if an agreement was not reached, it would exercise its termination rights.

I could not have said it better myself.  It's literally the offer we couldn't refuse.  If Harvard said anything other than yes to the unconstitutional demands in the

April 11 letter, if it did not submit to the governmental takeover of Harvard, then Harvard's financial relationship with the government would end.

And on April 14, Harvard said no to the demands from the government, demands that no private university could accept, and explained why.  And then hours later, the government made good on its policy and in fact began to end its financial relationship with Harvard.

One aspect of that policy is that Harvard is categorically ineligible to receive new grants.  That is the Administration policy announced by Secretary McMahon on May 5, her "No more Harvard ever letter."  That May 5 policy has particular significance on the jurisdictional issue because that is not anything where we can go to the Court of Federal Claims.  There's no contract for these future grants.  As the government often reminds us, we have no legal entitlement to future grants.  But we do have a clearly established First Amendment right not to be categorically barred on viewpoint-based grounds from eligibility for future grants, and we can only get relief from that unconstitutional policy by prospective injunctive relief in this court.

In any event, this is not some unheard-of constitutional rule that the government has inadvertently transgressed.  We rely upon established Supreme Court precedent, *Perry*, *Moody*, *Vullo*.  This is blatant, unrepentant

violation of the First Amendment, and it's the constitutional third rail, or it should be, for the government to insist that it can engage in viewpoint discrimination, demanding that a university develop a critical mass of faculty and students who share the ideology of a particular administration and to reduce the power of disfavored faculty and students, activists. That is all beyond the power of any administration of any political party of any ideology.

The government's freeze and termination orders not only violate the First Amendment, they also contravene the procedural limits in Title VI because the government has terminated funding across Harvard University, completely untethered or calibrated to the antisemitism on campus, which Title VI expressly forbids. And that's the second reason we're here today in this court, those procedural rights.

Title VI says that any termination of funding by an agency where a university is deliberately indifferent to the rights of its students shall be limited in their effect to the particular program or part thereof in which such non-compliance has been found. That's 42 U.S.C. 2000d-1.

The government made no effort to comply with this statutory limitation on its power. It is arbitrary and capricious to wholesale cut research university-wide under the guise of addressing antisemitism, particularly where the government hasn't identified any connection between the two.

THE COURT:  Hold on.  So I think what he would say in response -- I don't want to put words in your mouth, Mr. Velchik, you'll have your chance.  I think what they would say is that if they cut any award, they can cut all awards, right?  They can just, instead of doing them one by one, they've done them wholesale.

So is it your view that -- what would they have to show for an individual award versus a wholesale cutting of all the awards?

MR. LEHOTSKY:  So again, I think Title VI says that the termination has to be limited to the particular program in which such noncompliance has been found.

THE COURT:  If he says there's been antisemitism that has infected all of these awards --

MR. LEHOTSKY:  If it was across all 12 schools, right.  They haven't made any finding.  They don't have anything in their administrative record that supports that determination.  There was nothing in the administrative record at all to make that finding as of April 14 when the Administration began its freeze; that the Administration then relies upon the task force report that Harvard issued on its own two weeks later.

But again, there's nothing in that task force report that would support a conclusion of university-wide, across every single lab, every single part of the university that receives federal research funding.  And I guess more

importantly, under the Chenery doctrine of administrative law, they're limited to the decisions that they made and the reasoning that they provided, and there isn't any in this administrative record on this point.

I think there are other arguments that we present in our briefs as to why the government has acted arbitrarily and capriciously, but if I may focus a little bit more just on Title VI specifically, which is, even if we were to accept for the moment that the government can invoke 200.340(a)(4) as its source of authority for this sort of university-wide termination, they still haven't followed any of the procedures in Title VI.

And in addition to the substantive limit that I just identified from 2000d-1, there are also procedural requirements in Title VI that the government has to follow before terminating funding because of alleged violations of the nondiscrimination laws, such as antisemitism. And the government, again, did nothing to follow any of these procedures before they began terminating.

Now, the reason why this is relevant to the jurisdictional issue and why we're on even stronger grounds than the plaintiffs in the *APHA* case and the state's case that was a companion decided on Friday, is that if the government had followed Title VI, there's no question that we would be in an Article III federal court at the conclusion of the Title VI

procedures.  And that's because 42 U.S.C. 2000d-2 specifies judicial review under the APA in a federal district court after the government has followed the procedures in Title VI for terminating research support.

We're not aware of a single case in six decades where the government has terminated funds because of discrimination under Title VI or under the other statutes, such as Title IX, the Rehabilitation Act, any of the other nondiscrimination statutes that have a similar provision for procedures and limits on terminating research funding because of nondiscrimination, we're not aware of any case in six decades where that termination of funding has proceeded in the Court of Federal Claims.  The government cites none.  Every single case has proceeded in an Article III federal district court under the APA.  And that's what should have happened here, had the government followed Title VI, which every Administration, including the first Trump Administration, has done until this past May.  So if you agree with us that the government has made an unlawful end run around Title VI, then you should agree that we should have jurisdiction here under the APA.

Now, the government's unprecedented treatment of Harvard demonstrates precisely why Congress enacted the statutory procedural protections.  The government has leveled a serious accusation that Harvard is violating the nondiscrimination laws; and yet, the Administration has made no

finding of deliberate indifference to antisemitism before it froze and began to terminate funding.

We said in our briefing this was Alice in Wonderland: sentence first, verdict later. And that's exactly what this is. But under the Chenery doctrine, as I mentioned, they can't rely upon what happened after. They imposed the sentence before following any of the statutory procedures. The situation is exactly why Congress said, as the Supreme Court recognized in *Cannon*, that terminating funding would be the last resort, not the first resort.

And this brings me to the third and final reason why we're here, which is the government's anti-Harvard policy as evidenced in the freeze and termination notices, which is arbitrary and capricious in many ways. The government says it is categorically terminating more than 2.2 billion of Harvard's research funding across approximately 950 research programs, not because of what multiple Administration officials have said out loud, remember the government's mantra, "Every time Harvard fights, they lose another 250 million dollars," but because of what they now say is "giving research money to Harvard no longer comports with agency priorities," citing section 200.340(a)4), and invoking antisemitism on campus as the basis.

Harvard does not dispute that there were antisemitic incidents on its campus after October 7. Harvard has said many times that there is a serious problem with antisemitism and

that Harvard is committed to taking it seriously and to addressing it head on.  But this section 340(a)(4) rationale is nothing more than pretextual.

The administrative record reveals that it was not until May, well after it had already frozen more than 2.2 billion in grants and well after it had already begun terminating grants and contracts, that the government said for the first time that antisemitism on Harvard's campus fell within this changed priorities language in section 340(a)(4). But in its communications going back to February as well as in its letters of March 31, April 3, April 4, April 11, and the April 14 freeze itself, that the government said that antisemitism was a potential violation of Title VI or federal civil rights laws, not that antisemitism on campus was inconsistent with agency priorities.

It is utterly implausible after freezing Harvard's funding on April 14 based solely upon a Title VI rationale that the government now believes Title VI is totally irrelevant when it terminates those same grants based on the same discrimination allegations a few weeks later.

So the government's own administrative record reveals that the Administration cooked up this post hoc 340(a)(4) rationale as a way to get around Title VI.  The terminations were all a directed campaign from the White House to carry out the government's April 11 ultimatum.  The Administration

specified the content, forum and timing of the multiagency effort to terminate Harvard's grants.

We quote the documents in our briefs. "Send it to the White House for review." "This is the forum the White House wants to see it in." "We have final green light from the White House." "Due to White House deadline of 5 p.m., we are pressing forward with cancellation." None of this reflects agency priorities. The priority is to punish Harvard for Alan Garber's public outbursts and to make Harvard answer for its lawsuit.

As I've said before, even if section 340(a)(4) does provide authority, it says it applies only as otherwise permitted by law for agencies to terminate funding on grounds of antisemitism.

Now, generally applicable OMB regulations, such as this provision, does not and cannot provide the executive branch with a license to disregard procedural statute enacted by Congress. The government's interpretation to the contrary would render Title VI entirely precatory, entirely illusory, a dead letter. What Administration would ever follow it if they could skip all the process and all the statutory limits by just invoking this regulation?

THE COURT: So on the First Amendment, you've got an APA claim, there's the CFR that's sort of in play, and then there's sort of a common law equitable First Amendment claim.

What is the standard of review on the First Amendment claim?

MR. LEHOTSKY:  On the First Amendment claim?  Well, Your Honor --

THE COURT:  Am I looking at it first under the APA, first under strict scrutiny kind of constitutional analysis? The briefs are kind of all over the place on how we're looking at this.

MR. LEHOTSKY:  Let me try to synthesize it.  The APA contains a provision in section 706 that provides for judicial review of agency action that is contrary to constitutional right or constitutional limit.  So I think our claims fit under that rubric of APA review through section 706.

Now, there have been a couple of different ways in which the government has violated the First Amendment.  I think really there are three.  One is the unconstitutional condition, which I think again, the government's briefing, both its reply and its opposition, absolutely concede that they imposed a condition upon the receipt of federal funding in an ongoing research support relationship with the federal government on their demands in the April 11 letter.

A second is that that constitutes a viewpoint discrimination.  And again, as I said, the demands in the April 11 letter are expressly viewpoint-based.  You know, they are demands for Harvard to establish a critical mass of students and faculty that satisfy the preferred ideological balance of

this Administration; that Harvard then engage in other changes to its governance to reduce the power of faculty and students that have ideologies that the government doesn't like. And those are all based on viewpoint.

And again, looking to the statements from Administration officials, you know, repeatedly referring to Harvard as leftist, and anti-free market I believe is in the May 5 letter from Secretary McMahon, or woke idiots in more colorful terminology. All of this is viewpoint-based discrimination, and the government has no justification, they offer none in their briefing, that would satisfy strict scrutiny.

And again, we think it would be just per se unconstitutional for any government, any administration of any political persuasion to make these types of demands using its regulatory power or using its leverage as the federal government over a private university.

Then the third, which I think is also clear, is the retaliation argument, that Harvard has been retaliated against because of its speech, because of what it said in its April 14 message from President Garber, because a week later it filed this lawsuit challenging the freeze of its funding, which the government then doubled down and began terminating shortly after this lawsuit was filed.

THE COURT: So you're saying the APA claim gets

typical APA arbitrary and capricious review, and then separately the constitutional violations get strict scrutiny? Is that what you're saying?

MR. LEHOTSKY:  So I certainly think that if you were to apply strict scrutiny because these are viewpoint-based, then yes, that's right.

THE COURT:  Are you talking about two separate analyses?

MR. LEHOTSKY:  So I do think that the arbitrary and capricious review is separate from the question of whether the government has violated the First Amendment or violated Title VI.  Those are sort of, you know, legal authority questions. There's not sort of a separate arbitrary and capricious analysis that is overlaid on the constitutional claim or the statutory claim.

But then our third claim is that the reasoning of the government, the record of the government's decision with respect to its freeze and its termination, that those actions are arbitrary and capricious because the government hasn't engaged in reasoned decisionmaking.  They haven't, as we say, you know, considered all the important aspects of the problem they are addressing.  They've given no consideration to reliance interest of all of the researchers and students and faculty on Harvard's campus.  They've given no consideration to the interests of patients, the public at large who would be

harmed by all of this research being cut off.  They've not engaged in any consideration of alternatives.

THE COURT:  Hold on, hold on.  I'm still not with you.

MR. LEHOTSKY:  Okay.

THE COURT:  Am I doing an analysis under the APA and then analysis under the First Amendment?  I mean, I understand that the First Amendment violations are part of what makes you think there's been an APA violation, but how are you thinking about -- pretend you're writing the opinion.  Are you doing two separate First Amendment analyses?  Then my next question is going to be does the CFR figure into it at all.

MR. LEHOTSKY:  No, Your Honor, I don't think you're doing two separate analyses.  I think you can do one First Amendment analysis.

THE COURT:  And what's the standard of review under that one analysis?

MR. LEHOTSKY:  I think, again, we think that these are per se unconstitutional.  You don't even need to apply strict scrutiny, but if you disagree with that, then yes, strict scrutiny, and the government doesn't satisfy it.

THE COURT:  What do you mean "per se unconstitutional"?  Don't I have to review it under some kind of standard?  What is the standard for a per se constitutional violation?

MR. LEHOTSKY:  Well, I think strict scrutiny is a

balancing standard.  And you can have certain types of restrictions on speech which are nonetheless justified under strict scrutiny or intermediate scrutiny or any other form of scrutiny.  I think our first argument is this is never justified.  You can never justify, there's no good reason that the government could offer.

THE COURT:  Okay.  What's the standard of review on that?

MR. LEHOTSKY:  Under that?

THE COURT:  Well, what am I --

MR. LEHOTSKY:  Again, I think you're not engaged in a balancing analysis.  So the standard is, if you agree with us that the government is, you know, infringing upon our First Amendment rights, then Harvard prevails.  Now, again, that's our first submission.

The second submission would be, you can go to strict scrutiny.  But again, the government isn't arguing that they satisfy strict scrutiny.  They have no argument that there is a sufficient justification that they satisfy any of the requirements of a compelling state interest to impose these demands or that they satisfy least restrictive means.  They've made no argument along those lines.  So if Your Honor wants to apply strict scrutiny, we would still prevail.  But I don't think you need to do a separate First Amendment analysis for the APA.  It's just one analysis about whether there's a

violation of the First Amendment.

THE COURT:  Then what about the APA?

MR. LEHOTSKY:  So then there is the arbitrary and capricious provision in section 706, that is a separate standard.

THE COURT:  So like a traditional APA analysis?

MR. LEHOTSKY:  Yes, yes.

THE COURT:  Okay.  Back to your first point that it's a pure, sort of a pure First Amendment violation, what am I measuring that against?  I mean, you're saying they can't do that, they can't impinge on our speech in that way.  What am I using to evaluate that?

MR. LEHOTSKY:  Sorry, what, what was the last part?

THE COURT:  What am I using to evaluate whether or not there's been a pure First Amendment violation?  How do I --

MR. LEHOTSKY:  Well, so again --

THE COURT:  Like, would it chill a reasonable person?  What am I looking at?

MR. LEHOTSKY:  Well, I think, you know, again, here, there might be two different approaches you could take.  One is the retaliation approach, so maybe let's start with that first.  The retaliation standard is whether our speech was a substantial or motivating factor for the government's retaliatory actions.  We think it very clearly is.

THE COURT:  Okay.  That's the standard on the

retaliation.  What about on the viewpoint discrimination and the unconstitutional condition?

MR. LEHOTSKY:  So under unconstitutional conditions, we think, and again, this is in the briefing, the question is whether the government has imposed an unconstitutional -- has imposed a condition based on speech.  And I think here the answer is very clearly yes, that the conditions in the April 11 letter that we rejected on April 14 concern the viewpoints, the governance of Harvard.  And that's very clearly First Amendment academic freedom, protected First Amendment activity.

And then, if you find that, and I think you clearly should, there would then be a question about whether the government has imposed any germane restrictions as conditions to funding.  And here we think the answer to that is clearly no, none of these conditions that we change the governance of the institution --

THE COURT:  Hold on one second.  Sorry.  Go ahead.

MR. LEHOTSKY:  -- that we change the governance of the institution, that we achieve this critical mass of faculty and students and their influence within the university structure that would satisfy what the government wants.  That is not a germane condition to funding Alzheimer's research or Parkinson's research or, you know, any of the other litany of programs, research programs that the university is engaged in.

So, you know, again, we don't think they would satisfy

that germane condition standard.  If you agree with us on those arguments, then we think they lose and you would rule for Harvard on that First Amendment claim.

THE COURT:  And what about the CFR, do you think that has any role?  I know you think it's pretextual and after-the-fact rationalization, but do I need to consider it?

MR. LEHOTSKY:  So our claims do not depend upon 200.340(a)(4) in any way.  Our claims are all independent of that provision in the Code of Federal Regulations.  That is purely, that is the government's rationale that it has proffered for why this regulation authorizes them to do what they have done here.  So this is purely us explaining why we think their invocation of that regulation is pretextual, why it can't apply because of Title VI.  I think we'd also argue that the language in section 340(a)(4) doesn't apply.  But these are all not affirmative arguments, claims from Harvard.  That's just responding to the argument that they have made.

THE COURT:  Okay.

MR. LEHOTSKY:  So maybe if I could pick up there with that particular point, which is, we don't think that 340(a)(4) contemplates the kind of wholesale termination of research in an institution that they're relying upon it for it, it authorizes the government to cease funding where a particular piece of research no longer advances the agency's or the public's interests, not as a means to sort of circumvent Title

VI and stop funding an entire institution because of conditions at the university writ large that the executive branch believes might violate federal nondiscrimination law.

THE COURT:  Do you want to hold off on the CFR argument until we hear what he has to say and you can respond to it?

MR. LEHOTSKY:  Yes, Your Honor.  So maybe I'll close with a word about the importance of this research.  You know, the government says, it begins in its reply brief that this case, they say, is all about the money.

I think we've explained why it's not, why this case is really about federal government control over the innermost workings of one of North America's oldest private institutions of higher education.  But what's important here and what I don't want to be lost and what is motivating the particular need for urgency is the threat to the loss of this research.

Paragraphs 16 to 28 of the Shaw declaration, they explain why the government's university-wide actions here will devastate long-running research projects, eviscerate labs that have been built over decades, and hurt the careers of countless researchers --

THE COURT:  Sorry.  Let me interrupt you again.  So we're here on a summary judgment motion, not a preliminary injunction standard.

MR. LEHOTSKY:  Yes, Your Honor.

THE COURT:  So I fully understand the harms.  You and I and the government -- not Mr. Velchik but others -- have talked about that before.  Is that relevant to the summary judgment argument?

MR. LEHOTSKY:  Well, it is relevant to our need for injunctive relief and also to the need for a ruling promptly because of that September deadline.

THE COURT:  I understand that.

MR. LEHOTSKY:  Yes, Your Honor.

THE COURT:  I'm quite clear that you want a prompt opinion, and I understand the injunction argument.

MR. LEHOTSKY:  Yes, Your Honor.  If Your Honor has no further questions for me at the moment, then I'm happy to respond on the section 340 point after Mr. Velchik has spoken.

THE COURT:  Okay.  Mr. Velchik, I would let you respond to them, but I can also let AAUP go first and you can respond to both at the same time.  What's your preference?

MR. VELCHIK:  The government prefers if plaintiffs in both cases speak, and then the government is prepared to address all arguments in a single argument.

THE COURT:  Okay.  I think that makes sense.

Can I ask you a couple questions before you start?  I don't want to mire myself down in standing, but I just want to ask you, there's redactions in the administrative record that I can't really see, so can you just -- I mean, Harvard is here

arguing on behalf of Harvard, but the grants actually go to individual labs and professors and not to Harvard, right; am I correct about that?

MS. STOUGHTON:  Correct.

THE COURT:  So how does it actually work?  Why are we calling these Harvard grants?  Is it just because, do they go jointly to the researcher and Harvard?

MS. STOUGHTON:  Your Honor, it does vary a little bit across programs, but by and large my understanding is this: that the applications are initiated and carried out by the principal investigators, with assistance on the administrative side, like regulatory compliance issues, from the university. They are earned therefore by the application and the reputation of the principal investigators and awarded on that basis.  But then the administrative side is very much run by the university.  So the money is channelled through.

And again, it varies, especially, there's a complication when, like, for example, many NIH grants, Massachusetts General Hospital is often involved and there can be other administrative elements, but by and large Harvard's role is to kind of collect the money and then redistribute the money and hold the money.  But the invoices for payments come from the principal investigators, again, through a Harvard administrative system and on to the government, but they are initiated as invoices for purchases of lab equipment, et

cetera, et cetera, staff expenses, from the principal investigators themselves. Does that answer your question?

THE COURT: So the direct harm is to the principal investigators, and Harvard is, like, collateral damage?

MS. STOUGHTON: Well, I am sure that Mr. Lehotsky would dispute that characterization, and I think he would be probably right to do so, in that I think for the reasons that counsel for the President and Fellows has articulated, Harvard's reputation as a globally renowned research university is bound up in all this. But yes, in every real practical sense, the grants belong to the principal investigators.

THE COURT: Okay. All right. That's sort of my question on standing, and I don't want to get mired down in it. There's plenty of paper on standing.

MS. STOUGHTON: Your Honor, let me start first, with your permission, we had intended -- and Your Honor may want to speak about this, but we had intended to share the argument with my colleague Joseph Sellers, where I would address standing and jurisdictional issues and the First Amendment and Mr. Sellers would address the APA and the regulatory, the agency discretion issues, but I will start.

I'd like to start by coming back to this question of a stay, which I think is bound up with issues of standing, and to again reiterate the request that the court does not stay and instead does issue a ruling in the *AAUP* case. Because if

Harvard settles or otherwise changes its mind, immediately there is harm to the AAUP plaintiffs.  You recall that the AAUP plaintiffs moved for a temporary restraining order in the shadow of that possibility, which continues to loom over this case.

And while we are grateful, I think the world is grateful to Harvard for standing up, it is not merely speculative that that might happen.  That has happened with other universities that have been subject to similar threats, such as Columbia.  And because of the way that coercion works, it is plausible that a settlement itself would harm plaintiffs immediately if there were one.

We only need to look at the April 3 and April 11 letters to know that the government's demands are not exclusively directed to Harvard.  They are directed to the plaintiffs' members.  It is the plaintiffs' members' programs who are accused of fostering widespread antisemitism in the April 3 letter.  It's plaintiffs' members, faculty members who are accused of having insufficiently diverse viewpoints and who in the April 11 letter are accused of engaging in, quote, too much activism -- this isn't a direct quote, it's a summary -- but insufficient attention to academic rigor and too much activism.

And we know from the way that the attacks have come that specific individual faculty members have been named by the

President as part of what is dissatisfactory about Harvard, that there is a very real possibility that the elements of coercion that come into play will have direct effects on plaintiffs' members.  And the sealed declaration that's at Exhibit 36, the Silverman declaration that we submitted in support of our motion, is a prime example of that.

There you have a professor -- it's filed under seal, the person's name is under seal, but a professor and a head of a center who describes forgoing events, not speaking on topics within their topic of academic expertise because they fear that their speech will be the trigger that sets off further escalation or may become part of the next set of funding demands which could occur at any moment.

And that harm is happening now.  It's happening now even as Harvard stands up for free speech and the rule of law in this case.  And without relief that AAUP and UAW members and their union can enforce, they will still live under the fear that the government's coercion will be successful.  And that chilling effect is happening now.  That is why there was initially a motion for a temporary restraining order.  And without relief that they can enforce, there isn't complete relief from that harm that is occurring currently.

And so while with respect to the funding harms I think it's true as the court mentioned earlier that an injunction to vacate the decisions that have resulted in the termination of

Case 1:25-cv-10910-ADB   Document 138   Filed 07/22/25   Page 40 of 109

40

awards would restore or remedy some of that harm, with regard to these other chilling effect harms, a ruling for Harvard would not give complete relief because there is not that enforceable protection for the academic freedom of the true targets, the initial targets of the Administration's attacks on the Harvard University community.

And respectfully I understand that standing adds an additional element to this case, but I don't think it's a difficult question. It's an easy question. Under the First Circuit's decisions in Conservation Legal Fund, this is a very easy case of standing, of associational standing particularly, the injury based on standing to the members.

The government doesn't actually deny that the injuries that I've just described are real. Their only argument is that those injuries are Harvard's fault, not its own. That is not the law. Conservation Legal Fund and the Supreme Court's decision in *Lexmark* make very clear that as long as it's likely that the government's action causes the harm, the involvement of other steps, including other steps involving potentially other parties, is irrelevant.

And in any case, as I've just described, the harm to AAUP members isn't indirect through Harvard. It's direct from the funding conditions in the April 3 letter, in the April 11 letter, that the government has sought to impose on Harvard. So that is not a difficult standing question in that sense.

Those injuries are direct, and the declarations, I've mentioned the one in Exhibit 36, but there are several that talk about public health researchers giving up research into areas of public health that they feel may come across as excessively helpful to marginalized communities or somehow implicated in the DEI label that the Administration currently disfavors.

Those harms don't have anything to do with money or with who is party to what contract, and they're independently sufficient to sustain plaintiffs' standing.  And so in that sense plaintiffs are not merely third-party beneficiaries or incidental to this harm, they are the direct sufferers of that harm.

Even as to the funding harms, I would say, you know, the government makes the argument that plaintiffs can't even raise those harms because they are third-party beneficiaries. I think the exchange we had earlier explains why that is not the case, that the researchers themselves own the grants.  They are the real -- they are named in the specific grants.  Those grants are not transferable to other members of the Harvard faculty without substantial process.  There's a substitution process, but it's a high bar that has to be justified.  So in every real sense they themselves are the direct recipients and not third-party beneficiaries in the way that the government describes that.

Finally, I did want to address direct organizational standing as well of the AAUP and UAW.

THE COURT:  Short.

MS. STOUGHTON:  The government -- and that is bound up also in the government's challenge to the germaneness of a requirement of associational standing.  By and large those arguments turn on the false assumption that the AAUP and UAW, their only mission is to bargain for contracts.  But in fact, the declarations of Kristin Weld and Neil Sweeney both establish that among their core purposes is addressing threats to academic freedom and the job security of members.

That's not some new core purpose that the AAUP and UAW have invented in order to generate a case or controversy.  That has always been the case, that they've investigated those attacks.  And that's why this issue is germane to their organizational purpose but also why they have direct organizational standing, because those same declarations mention a dramatic increase in the demands for members to help them ensure that they continue to teach their curriculum, to advance their research, to find salaries -- sources to cover their salaries that depend upon federal grants in whole or in part and to pursue tenure opportunities that have been jeopardized because of the sudden withdrawal of federal funds.

And that makes this case much more like *Havens Realty* than like Hippocratic Medicine.  Plaintiffs' usual business

activities are being impacted by the challenged action right now.  They didn't suddenly take up new lines of business in response to the government's attacks on Harvard, and they don't rest on any litigation or advocacy response to those attacks.  They're just continuing to carry out their standard work and fulfill the responsibilities to their members but doing that under the strain created by defendants' actions, which has caused a diversion of resources from other critical areas.  And that is an easy case of direct organizational standing.

So for those two reasons of membership-based standing and direct organizational standing, the standing question here is not complicated.  And although I am sure that the government will bring up the *Columbia* case in which the Southern District recently found otherwise, that decision turned on factual determinations that cannot be supported in this record.  It turned on a factual determination that the grants go directly to Columbia and not to the researchers, which we have just discussed is not what this record supports.

The declarations that we have submitted in support of standing very clearly lay out that the grants belong to and go directly to the researchers, the principal investigators who are plaintiffs' members.  It also turns on a factual finding that Columbia has or will cover the harms, the financial harms to the researchers at Columbia through cooperation with private donors.  There is no record that suggests that here.  And as

we've discussed, as I've mentioned earlier, that's simply not the law in this circuit under *Conservation Legal Fund* or indeed in the country under the *Lexmark* standard from the Supreme Court.  That is simply not relevant.  There has never been, outside of the *Columbia* case, a decision in which the potential that harm a defendant causes to a plaintiff be mitigated by a third party negates standing in that context.

So for all of those reasons, the factual determination -- the legal error and the factual determinations that distinguish the *Columbia* case and the record there from this case make this case on standing a very straightforward application.  And because of the nature of coercion, we really urge the court to issue a ruling on that.

I would like to just briefly address the First Amendment arguments.  I agree and want to adopt what Mr. Lehotsky said about the First Amendment claims, but I do want to focus on the court's question about the legal standard that applies to the First Amendment claims with particular attention to the coercion claim that is central to the AAUP plaintiffs' claims here.

First, again, I want to reiterate that the nature of coercion means that the threats to plaintiffs don't disappear until there is something that they can enforce.  And again, if the court looks to the *NRA v. Vullo*, the Supreme Court's decision there as a model, the NRA shouldn't have to rely on

the insurance company that was coerced in order to get relief from Ms. Vullo's unconstitutional targeting of their speech.

The harm to AAUP members began long before Harvard fought back and will continue unless there's a relief they can enforce. And that's under the claim on coercion, and on the legal standard question that Your Honor answered, I would point again to *Vullo* itself.

First I want to clarify, as I think Mr. Lehotsky made clear, under the First Amendment claim, the APA is merely a procedural vehicle to enforce the substantive rights under the First Amendment. For the arbitrary and capricious claims and other APA claims, it also sets the substantive legal standard, but for the First Amendment, the substantive legal standard review comes from the First Amendment case law itself. That is true whether proceeding under the count that both we and Harvard brought of enforcing the First Amendment through the APA or the separate count under, whether you call it an ultra vires claim or an Armstrong claim but of direct enforcement of the First Amendment.

And that substantive legal standard in *Vullo*, as to the coercion claim that we urge the court to focus on, it is simple, it comes from *Vullo* itself. And it asks the court to decide whether the government is -- I'm quoting from *Vullo* here, "relying on the threat of invoking legal sanctions and other means of coercion to achieve the suppression," and that's

the end of the quote, but of the disfavored speech.

That's from page 188 to 189 of *Vullo*. The court goes on to say that the court should evaluate whether the government's conduct is, quote, "when viewed in context could be reasonably understood to convey a threat of adverse government action in order to punish or suppress," and that's the end of the quote, against speech and academic freedom. That's at page 191 of the decision. And that is the legal standard, the substantive legal standard the court should apply.

And applying that standard, that is exactly what the government has done. The government's actions viewed in context are understood as a threat of adverse government action, terminating funding, a threat that ultimately materialized in this case, in order to punish or suppress speech. And it is true that escalated when Harvard resisted the government's demands, but it was targeting at punishing and suppressing speech from the beginning, because it was mentioning things like insufficient viewpoint discrimination among the faculty who constitute AAUP's membership, because it was targeting from the beginning campus protests on topics that the government disapproved of that extended far beyond illegal action but to all of those campus protests, because it targeted particular programs that under vague standards, that by no means for AAUP members to know whether their programs fall in

them or outside of them, accused faculties across the board of fostering antisemitic environments with no standards to understand what it was that they were doing that allegedly violated the law.

All of those things are intended to control the curriculum, the research, the teaching, and the learning on the campus of Harvard, and that is what was being targeted from the beginning here and what should be enjoined and is a clear violation under that legal standard set out in *Vullo*.

The court -- I'd like to say one last thing, if I could, about the Tucker Act, which I know that the court has rightly pointed to the First Circuit's decision in the *APHA* case, making a ruling on that very easily.  But in this -- as the law continues to rapidly evolve in this area, I want to underscore what Mr. Lehotsky said; that it's important to make clear that there are additional reasons in this case why the Tucker Act shouldn't apply that go beyond the reasoning in the *APHA* case, and I think there are three of those reasons that are very important.

The first is that this case, as I've mentioned and I won't repeat, is not just about clawing back money owed but is also to protect academic freedom from the abuse of the government's spending power.  And the imposition of those funding conditions in the April 3 and April 11 letters particularly to coerce and retaliate in a manner that

implicates academic freedom, implicates rights that exist outside of any contract right in a way that could not quite be said about the claims in the *APHA* case.

You know, the second distinction is that the *APHA* case tackled the question of how following the Supreme Court's decision in *Department of Education v. California*, we can distinguish between claims that sound in contract as the government has tried to characterize these cases from, on the other hand, APA challenges to the cancellation of individual grants based on individualized determinations about the appropriateness of funding, the federal government continuing to fund that particular grant.

In the *APHA* case, the examination was of whether particular grants met the government's standards around implicating DEI issues or other topics that, although the court found were vague, were nonetheless the topics that the government specifically no longer wanted to fund.  That is not what this case is, even under the government's view, even if you set aside the arguments about pretext and the fact that this has been about retaliation and punishing speech from the beginning.  Even if you accept the government's view of what they did, the government made a general policy determination at the agency level or possibly even the cabinet level that all of Harvard's grants should be terminated, regardless of the specifics of any individual contract.

And so even more so in this case there's no implication of those specific grant or contract terms and the regulatory structure that governs those.  There's only a set of claims that are grounded in the constitutional and Title VI-based limitations on the exercise of broad government authority that has been abused here.  And that's a second distinction, that is an additional reason why the Tucker Act doesn't apply over and above the reasons in the *APHA* case.

Then the third, and I won't belabor it because I think Mr. Lehotsky covered it very well, is the implication of involvement of Title VI and the express grant of jurisdiction that Title VI gives in this case, which again is a factor just not present.  We would just ask the court make clear that in addition to the binding authority of the *APHA* case and the reasons why the Tucker Act doesn't apply that those additional reasons why the Tucker Act is inappropriate are incorporated into any ruling here.

THE COURT:  Okay.  Thank you.  Mr. Sellers.

MR. SELLERS:  Good morning, Your Honor.  Thank you. I'm not going to repeat the excellent points that Mr. Lehotsky made.  I do want to emphasize a couple of points, however, with respect to why the government could not bypass the requirements of Title VI.

And first of all, it's very important to recognize that Title VI was enacted pursuant to the spending clause of

the Constitution, which entrusts to Congress exclusively the authority to control spending.  So it is definitive and unqualified in its application, in its wording, but the implementation of some regulation that later may be an attempt to use an end run around that is hard to reconcile with this broad authority that was exercised by Congress when it enacted Title VI pursuant to the spending clause.

I would just add that in examining some of the legislative history, which I won't review with any depth but we cite in our brief, the concerns that the members that supported the enactment of Title VI expressed that led them to endorse it are eerily applicable here.

Some of the members, for instance, worried about, and I quote, that "it would permit unlimited powers to dictate the implementation of any and all federal programs and use the guise of antidiscrimination as a legislative weapon with which federal bureaucrats can threaten and bludgeon fund recipients." That's at 110 Congressional Record 2498.  The same is true, they use the word "'bureaucratic blackmail' by unknown bureaucrats to wield that power unchecked by Congress."  That's at 110 Congressional Record 2498 as well.

So these are grounds on which Congress enacted Title VI and which I think are readily applicable here as to why they were trying to protect exactly the kind of issues and actions that occurred here.

I have two other minor points, then I'd like to be heard at the end, perhaps after you hear from the government about why it relied on the OMB guidance --

THE COURT:  Sorry, I didn't hear you.

MR. SELLERS:  I'd like to be heard at the end perhaps after you hear from the government about why it relied on the OMB guidance because I have some views on that.  But I do want to emphasize that the government hasn't explained in any respect why it resorted to the OMB guidance, other than it's an independent basis on which it could rely.  The failure to do that alone is a violation of the APA because it changed its practice from decades of proceeding in a different direction.

I also would just finally conclude that the government's failure to comply with Title VI is itself a violation of the APA.  It's an independent basis on which to do so.  So unless -- again, I think that I prefer to address the OMB guidance after we hear from the government, unless you have any questions of me.

THE COURT:  No.  That's fine.  Thank you.  Mr. Velchik, go ahead, when you're ready.  I was looking over my notes.

MR. VELCHIK:  Harvard is a rich college, and yet there are those who love it, I count myself first among them.  As an alumnus and as an American, I take great pride when Harvard fulfills its mission of providing a yard for students to pursue

truth, veritas.  But all Americans should oppose the flow of federal taxpayer dollars to institutions that discriminate on the basis of race and exhibit a deliberate indifference to antisemitism.

On October 7, 2023, the foreign terrorist organization Hamas invaded Israel, resulting in the death of approximately 1200 individuals, taking over 240 hostages, including Americans.  Shortly thereafter, dozens of student organizations at Harvard published statements saying that they held the Israeli regime entirely responsible for the unfolding violation.

Protesters cut the locks at Johnston Gate.  They forcibly occupied Harvard Yard for weeks, chanting antisemitic slogans.  They surveilled the movements of Jewish faculty. They criminally assaulted and battered Jewish students.  They bloodied the statue of John Harvard with red paint, smashed the windows to University Hall, hoisted flags above John Harvard's statue, occupying University Hall, Widener Library, other public spaces dozens of times.  President Gay, when called to testify before Congress, was asked whether calling for the genocide of Jews at Harvard would violate university policies, she answered, "It depends on the context."

Since then, students and organizations have sued Harvard University for its failure to address antisemitism. Donors have stopped giving to Harvard, citing antisemitism,

including Ken Griffin, the largest donor of the Graduate School of Arts and Sciences.  Law enforcement has brought criminal actions for assault and battery against Jewish students.  Harvard itself has published a harrowing 311-page report through the Presidential Task Force, reporting that the majority of Jewish students at Harvard feel discriminated against.

Significantly, all three branches of government agree here.  As to Article I, the House of Representatives for the first time in over 100 years issued subpoenas to universities investigating antisemitism.  It held hearings with university presidents, and it published multiple oversight reports, including multiple committees.  Both the House of Representatives and the United States Senate have passed resolutions condemning antisemitism at Harvard.

With respect to Article III, the United States Supreme Court held in *Students For Fair Admissions v. Harvard*, an opinion authored by the Chief Justice, Class of 1976, that Harvard discriminated on the basis of race in violation of the 14th Amendment.  Multiple district courts in this district have denied Harvard's motions to dismiss in civil suits.

As relevant here, for Article II, the democratically elected President of the United States, upon assuming office, issued an executive order directing agencies to use all tools at their disposal to combat antisemitism.  The executive branch

convened a task force which has reviewed practices at ten universities.

THE COURT:  Hold on a second.  I am both Jewish and an American, so I hear what you're saying.  Let's assume for the sake of argument that Harvard has not covered itself with glory on the topic of antisemitism.  I think that they would be probably among the first to agree with you that there were missteps there, and I think they go on to say that they've taken action to try and remedy that.

But what is the relationship between cutting off funding for things like cancer research and Parkinson's and Alzheimer's and all of that to combatting antisemitism?  You're not taking away grants from labs that have been antisemitic.  You haven't made any sort of findings about who has been antisemitic, where you just cut off all funding in a way that one could argue, and I think a lot of the amicus briefs have argued, hurts Americans and Jews.

So in some ways you're justifying your conduct on protecting Jews and upholding American values, and on the other hand you're taking steps that are very antithetical to those same interests.

MR. VELCHIK:  No, the government vehemently disagrees.

THE COURT:  Okay.

MR. VELCHIK:  These are federal taxpayer dollars.  The executive branch can allocate them consistent with executive

branch policies.  It is the policy of United States that federal taxpayer dollars should not go to institutions that have exhibited a deliberate indifference to antisemitism.

Harvard references the importance of medical research. I mean, if Harvard really cared about the importance of that research, it would address antisemitism, and it has failed to do so because it would rather prioritize the protesters at the campus at the expense of medical research.

THE COURT:  Hold on.  They say that they have taken steps to remedy all of that.  And maybe they have and maybe they haven't, but you haven't made a record that they haven't.

You're relying on the CFR, right, because you haven't taken any of the procedural steps that you would otherwise have to take to terminate these grants?  Am I right about that, you're relying on the CFR?

MR. VELCHIK:  The government is relying upon contract. These are contracts between the federal government and Harvard. The government included language in all of these contracts that the United States could terminate these contracts if it later determined that they did not align with agency priorities.

THE COURT:  But what's the process and the standard for making that determination?

MR. VELCHIK:  Contract law.  To the extent that Harvard challenges it, it would be the APA, which is a deferential standard of review.  The government need only show

that there is a rational relationship between the facts found -- and there are plenty, and Harvard concedes them -- and the choices made.  And the choice was that the government does not want to fund research at institutions that fail to address antisemitism to its satisfaction.

I will also point out --

THE COURT:  Wait.  "To its satisfaction," what is the process for -- I mean, not to put too fine a point on it, but how do you show the American people that this is the reason why these grants are being terminated?

MR. VELCHIK:  The process is set out in 2 CFR section 200, I believe, 341, which gives the processes which the government followed here.

THE COURT:  Well, it didn't follow the Title VI procedures.  Your view is that the CFR overrides Title VI?

MR. VELCHIK:  Let me first address the one point about the importance of this research, and then I will address the Title VI.

THE COURT:  Okay.

MR. VELCHIK:  Harvard does not have a monopoly on the truth.  Just because someone at Harvard is not conducting cancer research doesn't mean individuals at other universities. The same money could be better spent going to historically black colleges and universities or community colleges or any other college or university that doesn't discriminate on the

basis of race or exhibit such an indifference to antisemitism. The same money can still go towards the same research.  It just doesn't have to be by people at Harvard.

With respect to Harvard's Title VI arguments, Harvard's interpretation of Title VI is absurd.  I would like to explain logically why it doesn't make sense, and then the absurd consequences that would follow from Harvard's interpretation, the case law that rebuts Harvard's arguments, and then the historical practice which is inconsistent with Harvard's arguments.

The same underlying conduct may be subject to different legal authorities that carry different legal consequences and that entail different legal procedures. Relevant to antisemitism at Harvard, I can think of at least three legal authorities that could be relevant.

The first is criminal law.  Some of the actions here were definitely criminal in nature and there have been criminal prosecutions.  That entails severe legal consequences, including imprisonment.  As a consequence, it also imposes heightened procedural burdens on the government.  We have a heightened standard of proof for beyond a reasonable doubt.  We have all sorts of disclosure requirements.  This is not a criminal case.  The government did not act pursuant to criminal authorities, therefore did not comply with those authorities.

THE COURT:  Sorry.  I'm missing it.  What's the

relationship between that and Title VI?

MR. VELCHIK:  Title VI is a separate legal authority that carries with it extraordinary powers.  It includes, for example, the ability for the executive branch to pursue injunctive relief through the Attorney General.  It also allows the government to cancel grants even if the actual grants did not include language permitting termination for convenience or for policy disagreement.

THE COURT:  There's a procedural process that needs to be undertaken before you can cut a grant to Title VI.

MR. VELCHIK:  Only if the government is operating pursuant to Title VI.  The government is not operating pursuant to Title VI.  None of the grant termination notices said that it was operating Title VI.  It was operating pursuant to the terms of the contract.  Harvard should have read the fine print.  This was included in every single one of the contracts that at any point in time that the government could decide that it is no longer aligned with agency priorities.  That is the only basis in the administrative record for the government's decision here.

THE COURT:  So you're saying they should have brought a civil suit for breach of contract?

MR. VELCHIK:  Absolutely.  That's what the government has been saying this entire time.  This is a breach of contract that should have been brought in the Federal Court of Claims.

Under Tucker Act of 1887, that is the only --

THE COURT:  But you can't bring a Title VI claim under the Tucker Act.  You can't bring a First Amendment claim in the Court of Claims, right?  You're saying it's a contract claim.  They're saying it's a constitutional claim.  So where do they litigate their constitutional claim?

MR. VELCHIK:  As the Supreme Court recently held just three months ago in its binding decision, it has to be the Court of Federal Claims which has exclusive jurisdiction over this case.

THE COURT:  You're talking about *California*?

MR. VELCHIK:  Yes, the *California* case.

THE COURT:  If it was a contract case, you would have -- I think *California* was basically a contract issue.  This is a constitutional issue, so the Court of Claims couldn't hear it, right?

MR. VELCHIK:  I emphatically disagree with everything.  First of all --

THE COURT:  You not only disagree; you disagree emphatically.

MR. VELCHIK:  Emphatically.  There's binding Supreme Court precedent on this from three months ago.  It's ultimately a contract claim.  We had a contract with Harvard.  We included terms and conditions that we could stop funding for any policy disagreements.  We exercised those contractual rights.

THE COURT:  Okay.  Stop right there.  So let's just say I assume that's what the contract says, it is what the contract says.

MR. VELCHIK:  Yes.

THE COURT:  You can't use -- you still can't use a constitutional violation as the justification for terminating a contract.  You can't terminate a contract in violation of the Constitution, right?  You couldn't decide you were going to terminate all contracts that involved -- well, just for lack of a better -- you couldn't terminate all contracts that involved Jewish people, right?  You can't violate the Constitution to terminate a contract.  This isn't an equal protection race argument but it is a First Amendment argument.

MR. VELCHIK:  Harvard --

THE COURT:  There are limits, right, to what you can terminate and why and how?

MR. VELCHIK:  Harvard can raise those arguments before the Court of Federal Claims, and the Court of Federal Claims has longstanding case law going back well over 50 years describing how it can hear First Amendment, APA, and constitutional law claims when they are embedded in a contract dispute.  The test is *Megapulse*, where the essence of the claim is about money, we look to the source of law.  The source of law here is the contract.  The relief that Harvard wants is money.  That's the source of relief.

And I mean, I can go through a list of examples.  I mean, the *California* case actually involved an APA challenge, and normally one might say that APA challenges belong in Article III, but the Supreme Court said no, this is fundamentally in essence a case about money.  It's about contract.  It goes to the Court of Federal Claims that has jurisdiction, and it can also hear these issues.  Even the case that Harvard relies on most heavily, *Bowen*, there they acknowledge that the Court of Federal Claims has jurisdiction to hear precisely these types of constitutional issues that could be raised in the course of the contract dispute.  And that might be one of the theories why Harvard might ultimately prevail on their contract dispute in the Court of Federal Claims, but it is objectively false to say that the Court of Federal Claims cannot adjudicate these issues.

I mean, I can go through, there's a very long case law going back through *Holly* in the Federal Circuit, there's the *Klippenstein* case.  I've found cases going back over 50 years to *Jackson* and *Swallow* -- I mean, the Court of Federal Claims regularly hears First Amendment challenges embedded within these sorts of cases.

THE COURT:  But they're not required to bring a First Amendment claim in the Court of Claims.  So are you suggesting they should have a contract claim that goes to the Court of Claims, and I adjudicate the First Amendment claim?

MR. VELCHIK:  No.  The test is you look to the essence of the claim under *Megapulse*.  This case is ultimately about money.  I mean, Harvard is the richest university in the history of the world.

THE COURT:  It's not just about money.  It's about the right to compete for grants.

MR. VELCHIK:  What relief does Harvard want?  Harvard wants billions of dollars.  That's why Harvard is here.  That's the only reason we're here.  Harvard wants billions of dollars. They want the United States to write a check for the money that it has stopped giving.  And that is relief the Court of Federal Claims is empowered to provide.  And one of the bases for ordering the federal government to pay additional money might be the First Amendment.  It could be an APA violation.  But these are all claims that the Court of Federal Claims has jurisdiction to hear and does hear.

THE COURT:  There's sort of -- it's a little bit mind-boggling.  You're saying that they can terminate the contracts if the executive branch doesn't agree with the viewpoint being espoused by the college unrelated to the subject of the grants under the contracts.  Is that what you're saying?

MR. VELCHIK:  No.  First I'm making a jurisdictional point that whatever you think about the merits of that argument, that's an argument before the Court of Federal

Claims.

With respect to how the court might address that argument on the merits, this is all embedded within the contract. I think that the United States would otherwise have the ability to terminate the contract for any policy reasons. To the extent that the court is analyzing First Amendment challenge, *Umbehr* is the appropriate standard.

THE COURT: What is?

MR. VELCHIK: *Umbehr*.

THE COURT: I'm going to touch on *California* for a second because I think I'm bound by the First Circuit opinion. The Supreme Court opinion wasn't an opinion on Tucker. It was a stay opinion, right?

MR. VELCHIK: It is the position of the United States government that district courts are bound by binding Supreme Court precedent --

THE COURT: Agreed, agreed. *California* wasn't a binding Supreme Court decision on the Tucker Act. It was a, like, let's call it a preliminary decision on a stay motion, right?

MR. VELCHIK: We believe this court is bound by *California*. This court should follow the Supreme Court's decision in *California* issued three months ago.

THE COURT: Well, if I was deciding a stay motion, I would follow *California*, but that was not a definitive ruling

on the jurisdiction of the Federal Court of Claims.  What the First Circuit did on Friday was the clear opinion on that.

MR. VELCHIK:  Yeah.  There are a number of cases on this.  *California* is the most important.  It's from the Supreme Court.  And I will address that and obviously the First Circuit case.

THE COURT:  I want to go back to this constitutional issue.

MR. VELCHIK:  Yes.

THE COURT:  Because it seems to be your idea that you can terminate a contract even if the basis for the termination is a constitutional violation.  You're saying you can terminate -- it sounds to me like you're saying you can terminate the contract for any and all reasons, including if the reason you're giving is in violation of the Constitution.

MR. VELCHIK:  So the court should start by interpreting the terms of the contract.  Some of the federal contracts include termination for convenience.  These all include terminations for any policy reason, and that was met.

In the course of negotiations with Harvard, Harvard has now raised a First Amendment claim.  And we can evaluate that under *Umbehr*.  The standard set forth in *Umbehr* recognizes that the government here was acting in its capacity as a contractor.  And I think that's a very different context than how the government acts in other cases.

The Supreme Court I think has been very sensitive to these concerns, and Justice O'Connor's opinion I think goes through them both in terms of a First Amendment claim and unconstitutional conditions.  The standard is whether or not Harvard engaged in protected conduct and whether the government would have taken the same action anyway.

On the merits of that, the government should prevail on either prong but especially the latter prong.  Here, Harvard was on notice that the government was intending to cut these grants.  Under the contract, the government could have just cut funding before it even engaged in these negotiations.  After the executive order --

THE COURT:  But then there wouldn't have been a constitutional violation.  That's my point.  If there is a constitutional violation, if they say -- the government says you have to do these things, and Harvard says no, right?  Even if you could have legitimately terminated the contracts for some reason, doesn't that sequence of events make the termination improper?

MR. VELCHIK:  No.  Just to get the sequence right, I mean, when President Trump promulgated his executive order that all agencies should take actions within their disposal to combat antisemitism, the agencies could have right then and there terminated all of these grants, no questions asked, no First Amendment issues.

THE COURT:  Under the contracts.

MR. VELCHIK:  Under the contracts.  Because the contracts all included language that at any point in time the federal government can terminate these awards if they no longer align with agency priorities.

THE COURT:  What's the agency priority?

MR. VELCHIK:  Using all tools at their disposal to combat institutions that fail to address antisemitism.  And the in the government's view --

THE COURT:  What about, like, racism?  Why are we focusing on antisemitism?

MR. VELCHIK:  That's the main concern in this case.  I mean, the federal government has tried to address racism through at least three other executive orders and has terminated a number of grants pursuant to those executive orders.

Quite frankly, I mean, that was the fact pattern both in *California* but also the First Circuit *Sustainability Institute* case.  And there, I mean, people made the same arguments that Harvard was making, that, well, this is really an APA case.  We also have First Amendment objections.  Title VI quite frankly applies almost with better force to discrimination on the basis of race rather than antisemitism.

And yet, the Supreme Court, the Fourth Circuit and other cases that have looked at this have all said, no, under

the Tucker Act, those go to the Federal Court of Claims, and there we can adjudicate whether or not there are merits to the First Amendment claims, but these are ultimately claims about money premised on the grants.  The specific contract languages allow for termination based on changes of agency priorities.

THE COURT:  Okay.  So at the risk of repeating myself, if the goal is to combat antisemitism, don't you have to go lab by lab, grant by grant, and make some sort of showing that that program, that grant, that researcher has been antisemitic in some way?

MR. VELCHIK:  That's one of the important differences between the executive branch proceeding through contract where it can do it on a grant-by-grant basis versus Title VI, which is mandatory and would have to apply to everything to an institution.  I mean, the decisions to terminate future funding under specific grants can be commensurate with the level of antisemitism.  Here, Harvard has exhibited a wanton indifference to antisemitism that applies to the entire university, so it makes sense --

THE COURT:  But don't you have to show that?  Even university-wide, you can't just say -- or do you think you can just say we feel there's been antisemitism; we're going to terminate all this money?  What's the review process?  Like, how do we avoid pure viewpoint discrimination?

MR. VELCHIK:  The process is set out in the contract,

and that said that at any point in time, if the government feels that this grant no longer aligns with agency parties -- whatever it may be, it may not have anything to do with discrimination or antisemitism -- it may stop funding and it would provide the notice requirements at the end of the grant termination letters, which it did, in accord with section 200, I think, 341.

Just to -- I mean, I think a lot of your concerns I think stem from the process set out in Title VI.  I would just like to emphasize why that is different and doesn't apply.  It is true that under Title VI that would be a civil action, and the government might actually have to prove in court beyond a preponderance of the evidence that Harvard really did exhibit a deliberate indifference to antisemitism.  Harvard could then enter evidence into the record and maybe show that the actions it took were nevertheless reasonable, but those don't apply here because we're acting by contract.

Title VI allows extraordinary injunctive relief, which courts in every injunction opinion describe as extraordinary. It requires across-the-board cuts and a prohibition that's mandatory in agencies that they can't make exceptions, like the government has made here, for example, national security *DARPA* case.  That shows how the government is able to balance these on a case-by-case basis.

But the government here is not acting pursuant to

Title VI.  The government has separately issued a notice of violation consistent with Title VI processes and is pursuing that separately.  And there may be another day in another court where we can litigate these concerns and have the burden of proof that the court has decided.  But at least when the government is acting in its capacity as a contractor, is using federal taxpayer dollars, it can decide that we want to fund this research at this university or other research at other universities.  It can take any number of policy reasons into account, and certainly combatting antisemitism is a legitimate reason.  And it's also well documented both in terms of the executive branch's priorities -- I mean, the President specifically issued an executive order on this.  And maybe, I'm sorry, but no one is denying there's legitimate antisemitism concerns at Harvard.  This is one of those highly documented cases.

THE COURT:  I know you're waving that around, but that came out after the initial actions on it.

MR. VELCHIK:  The publication of Harvard's report on antisemitism predates the final agency action for all of the grants.  The final agency action is the grant termination notices.  All of those referenced the findings memorialized in the antisemitism report that is part of the administrative record, that is part of the sort of facts found that the agencies relied upon.

And under the APA, the agencies only need to describe a rational relationship between the facts found and the choices made.  The choice was made, let's not give federal taxpayer dollars to institutions that exhibit a wanton indifference to antisemitism.  There are more than enough facts in the administrative record that Harvard concedes at oral argument and also includes this report which is part of the administrative record that there really is an objective problem of antisemitism at Harvard.

THE COURT:  All right.  So a couple of things.  First, the initial letters, you cited Title VI as the reason for the terminations, then came up with the CFR contract-based argument later.  So I think that's where they're coming up with this idea that it's pretext, because once you saw you had a problem with Title VI, you turned to that.

MR. VELCHIK:  No.  These are separate authorities, and the government may take separate actions.  To be frank, the government is limited in the actions that it can take pursuant to the contracts.  All the government can do here acting under the contracting authority is to just stop payment of these contracts.  The government is not here and we cannot seek injunctive relief in an Article III court.  We cannot do many of the things we might otherwise be able to do in a Title VI case because we're limited by what we're doing, which is just reallocating federal taxpaying dollars.  But there are

different legal standards for criminal law, for Title VI and for government contracting.

Quite frankly, Harvard's interpretation of Title VI would provide greater procedural protections for racists or people who discriminate on the basis of race than any other class of individuals. I mean, for any other conduct, the government can terminate these awards for any policy reasons.

Obviously, the 88th Congress enacted Title VI to provide the government with additional tools to combat racism and discrimination on the basis of race, sex, and national origin. Harvard's interpretation, I mean, the government would be handicapped and forced to continue paying unless it goes through the very cumbersome processes for Title VI, which historically the government has used and complied with when it is seeking to enforce injunctive relief, which, again, is extraordinary and is only sort of worth the time in the most egregious cases. All we're doing here is saying no more federal taxpayer dollars to institutions engaged in antisemitism.

THE COURT: So if you can terminate all these contracts through the CFR contract-based process, why do we have Title VI?

MR. VELCHIK: For precisely the reasons I was explaining.

THE COURT: It's only aimed at injunctive relief?

MR. VELCHIK:  I mean, that is quite extraordinary. There are a number of other distinctions.  Agencies can't waive Title VI.  They can waive it for specific contracts, as we did with DARPA, but the primary one is injunctive relief, which is quite extraordinary.  If the government were to sue Harvard University and seek injunctive relief from the government, I think that would be a very important tool, and the government should be required to comply with the additional procedural safeguards, which, as Your Honor is familiar with, might include a notice of violation, which has been given, a report to Congress, which is quite extraordinary, a 30-day waiting period.  But if the government wants to access the tools of Title VI, those are the processes it must follow.

But there's no special protections for people who discriminate on the basis of race where the government now can never withdraw their funding when we could do it for any other policy disagreement.

I mean, it's also inconsistent with historical practice.  Before Title VI, President Lyndon Johnson, by executive order, used the contracting authority to promote the executive branch's priorities in combatting racial discrimination.  Title VI would sort of read that out of history.  I also think it's inconsistent with case law.

The *California* case, I mean, those were DEI grants. The reasons given were much shorter than any of the record

here.  If you look at the termination letters at issue in the administrative record here and compare the language there, also even cited in the district court case, there are five alternative bases.  A lot of them deal with DEI.  The government nevertheless said that was enough under the terms of the contract, which it was, and the Supreme Court said that that was fine, kicked it down to the Court of Federal Claims.  The Fourth Circuit opinion did the same thing.

I'd also point out, I mean, there are sort of two cases on this issue.  One is the *Harvard* case and one is the *Columbia University* case.  The *Columbia University* case, I mean, it ruled for the government on every single issue that is at issue here, most importantly standing, which I'm happy to get to at a later point in time.  But it expressly rejected Harvard's interpretation of Title VI out of hand as resting on a logical fallacy.

We can't have a judicial system where we have one rule for like the *Columbia* case and another rule for the *Harvard* case.  All of these arguments, including the First Amendment case, were dismissed in the *Columbia* case.  So I think that's just additional reasons why.  I mean, Harvard's citing Alice in Wonderland and relying on 19th Century British children's literature.  We have binding Supreme Court cases.  We have the *Columbia* decision.  And it would just read out Title VI and set back civil rights 50 years if the government could now no

longer withdraw federal funds from anyone who claimed that he had a right to discriminate on the basis of race or to condone antisemitism on campus.

THE COURT:  I don't think that's what they're saying. I thinking they're saying you have to go through the proper procedural steps so we can decide if there's discrimination before we pull all the funding.

MR. VELCHIK:  If the government is proceeding pursuant to Title VI, and when it does, it will comply with the requirements of Title VI.  If the government is proceeding pursuant to criminal statutes, it will comply with those procedures.  Here the government is merely complying with the terms of the contract, and it is complying with all the terms of the contract.

THE COURT:  So this is a big stumbling block for me. I hear what you're saying, and you're saying it very well, so the Harvard education is paying off for you.  But what I'm wrestling with is this idea that the executive branch can decide what's discriminatory or racist or just make these ad hoc decisions without any procedure around it and act on that.

MR. VELCHIK:  I appreciate those concerns.  Those were the decisions that the framers made when they separated the powers.  All of these concerns I think are addressed by the Supreme Court in *Umbehr*, and I would just sort of emphasize to Your Honor in considering this, I mean, the government is very

different when it acts in its capacity as a contractor using federal taxpayer dollars to fund speech from other people or to engage in government speech.  They government can engage in --

THE COURT:  They're not funding speech.  They're funding research.  And you're tying that research to speech.

MR. VELCHIK:  The federal government has taxpayer dollars that it would like to allocate toward specific research.  There are inherently going to be tradeoffs.  This is just a property of economics.  Resources are scarce.  The government needs to make decisions about what to fund and what not to fund.

The government, to its credit, specifically included terms in all these contracts saying if our policy priorities change at any time, we can stop funding to better align with agency priorities, for the reasons we've discussed.  We think that combatting antisemitism is a legitimate priority for the government.  It's also bona fide.  There's an executive order on this.  We also think the limited standard review which would be the APA for those claims, I mean, amply documents the administrative record that this really is the government's policy priority, and Harvard really is not complying with the policies that the government wants to fund.

THE COURT:  How do you know that Harvard is not complying with the policies?  I know you're going to reach for that notebook.  But they identified a problem.  They say

they've taken steps to fix it. And maybe they have and maybe they haven't. But you're just saying they had a problem, we don't like how they're dealing with it, or we don't think they've done enough, or whatever it is is just sort of this -- there's no documentation. There's no procedure. There's no kind of adversarial process to suss out whether they've taken sufficient steps or they haven't. You're just making this decision. And if you can make this decision that we're going to withdraw all this funding for reasons oriented around speech, the consequences to that in terms of constitutional law are staggering to me. I don't think you can justify a contract action based on the impermissible suppression of speech. So where do I have that wrong?

MR. VELCHIK: We refer to the standard in *Umbehr*, and I think on the facts of this case, the government did not -- in protected speech, and the government would have made the same decisions anyway. And I'm happy to address --

THE COURT: The record is replete with the executive talking about why they did this and how it was going to go. And, you know, so it's hard to get -- it's hard to just sort of accept unquestioningly the idea that it would have happened anyway. Because if Harvard had capitulated to all their demands about staffing and faculty and admissions and all that, they wouldn't have done this. It wasn't a foregone conclusion around antisemitism.

MR. VELCHIK:  I disagree, and I'm also happy to engage with the court's opinion in the *DHS* case because that represents I think a foil here.  Here, we issued the executive order on antisemitism.  We had a task force to review different practices at universities, and I think there's a perfect control case with *Columbia University*.  So on March 3 --

THE COURT:  I don't understand.  I know you keep analogizing back to *Columbia*, but I don't understand that either.  I don't get the analogy, right?  Harvard is fighting and Columbia settled, or whatever you want to call it, capitulated.

MR. VELCHIK:  I would emphasize the chronology, which I think might elucidate this.

THE COURT:  Okay.

MR. VELCHIK:  On March 3, the federal government notified Columbia that it had concerns about antisemitism.  Four days later, the government withdrew grants, citing the same contractual provision, saying under this contract we can stop funding.  It's not aligned with policy priorities.  We've made that decision.  We're going to stop with the grants.  That was in March.

Many weeks later, Harvard -- the United States government provided a similar letter to Harvard.  Harvard, seeing how the government withdrew funding from Columbia because of its legitimate concerns with antisemitism at

Columbia University, saw the writing on the wall, knew that the government under the contract could at any point in time stop funding, and it nevertheless said, look, we want to engage in discussions.

As part of those settlement negotiations, there were a number of letters exchanged, which have been discussed today. We think for legal reasons, institutional reasons, policy reasons, it's inappropriate for those to be protected conduct within the meaning of the First Amendment if any time there's a settlement negotiation dispute between the government and contractors in education that someone disagrees, that that somehow could give rise to a First Amendment claim. I think there are some problems with that.

THE COURT: Well, characterizing those letters as settlement discussions is a reach. Those are more like demand letters than settlement discussions.

MR. VELCHIK: They're not final agency actions.

THE COURT: Well, that's a different topic, right? That's an APA topic.

MR. VELCHIK: At any rate, the federal government could have terminated all these grants either immediately or after the four-day waiting period that it did in the *Columbia University* cases. Harvard, seeing that, knew that they were going to take those actions anyway. There were what I will call settlement discussions, but I'm sure we can characterize

the letters how we wish.

After that, I mean, the government took a number of actions. The court in the *DHS* opinion I think tried to emphasize that some of the immigration actions taken were not necessarily contemplated beforehand and may have been after the fact in retaliation. But I think the record is replete that the government had already done this to Columbia University. It had signaled that it was going to stop the funding anyway. And I think Harvard is trying to now find itself in a court through a clever pleading tactic, when really this, number one, belongs to the Court of Federal Claims; and number two, the government was going to cancel these contracts anyway.

I think it's artful pleading to try and now re-characterize the contract dispute. I think that these are all claims that the Court of Federal Claims is competent to adjudicate and can. Under the deferential standard in *Umbehr*, I think the government prevails under all the First Amendment claims.

THE COURT: All right. I understand your position.

MR. VELCHIK: I'm happy to speak briefly on the standing if you wish, but I think the briefs adequately cover everything. We would just emphasize that the *Columbia* case addressed all these issues, and also cited the *Khalil* case, which involved a student arguing that cutting funding at Columbia might affect him.

I mean, there are concessions at oral argument today that the funding administratively goes to Harvard.  The plaintiffs here aren't recipients of grants pursuant to any of those contracts.  And I'm also mindful of the distinction here where Harvard actually is present.  So at least in *Columbia* there may have been concerns, that while maybe Columbia might not press its arguments here, Harvard is pressing them, I think I agree with this court's analysis.

THE COURT:  So just to back you up for a second.  On the record that's in front of me, who the grant goes to is redacted, right?  And I took that to be protecting the names of the individual researchers.  But are you saying that what's underneath those redactions is the name of the university?

MR. VELCHIK:  I don't have the specific document in front of me, but in general, like, the money is going to Harvard --

THE COURT:  I mean, I asked them this earlier, and they said the money was going to the principal researcher.

MR. VELCHIK:  Through Harvard.  But that shows that any harm that may accrue to the plaintiffs there is the result of intervening actions by a non-party of Harvard.  I mean, Harvard also has a very large endowment.  It could fund some of these projects with other money if it wanted to.  But for Article III standing purposes, I think this is insufficient.

I usually don't read, but I thought this was

particularly on point, so I just want to read the quotation from the United States District Court for the Southern District of New York.

"Plaintiffs insist that a district court judge should order the executive branch immediately to restore the flow of taxpayer dollars to an elite university which funding defendants represent is inconsistent with the priorities of the duly elected President of the United States.  Our democracy cannot very well function if individual judges issue extraordinary relief to every plaintiff who clamors to object to executive action.  Neither the executive branch nor the legislature ever awarded the grants and contracts at issue to plaintiffs or any of their members.  The funding that plaintiffs ask this court to commandeer was awarded to Columbia, which is conspicuously absent from this case.  If any funds have been wrongly withheld, such funds may be recovered at the end of a successful lawsuit by the appropriate plaintiff in the appropriate forum."  It cites endorsing the *Department of Education California* case.  But I'm happy to conclude with comments on the standing.

THE COURT:  Okay.  There's been plenty of paper on the standing issue.

MR. VELCHIK:  I wholeheartedly agree with Your Honor. Your Honor also asked on the Tucker Act, the significance of the First Circuit opinion.  I just wanted to make sure I sort

of addressed that on the merits.

The government appreciates Harvard's last-minute attempt to file a brief the day for before oral argument, claiming to have found the silver bullet to cure this court's lack of jurisdiction.

I think we disagree with that reading of the case, with the caveat that the government disagrees with the outcome of the case, I think even on the merits it differs from *California* in this case along almost every different dimension. The court acknowledges there's a spectrum between *Knudson* on the one hand, which is a claim to enforce money mandating provisions in a specific contract.  That belongs in the Court of Federal Claims.

It acknowledges *Bowen*, I think it's 50 years, but it acknowledges it's not been overruled, and that involved an administrative determination for reimbursement rates under Medicaid.  There was an APA challenge there that properly belonged in an Article III court, even if it had the incidental effect of having some money paid out.  The court's most recent decision obviously was *California*.  But in the *APHA* case, even on the merits, I think it's much closer to *Bowen*.  I'll outline a couple of points.

Number one, there's a specific statute that requires the NIH to develop a strategic plan, and that is the document that guides future funding decisions.  That was the specific

document challenge.  That was the final agency action.  The specific relief requested, the court emphasized, was declaratory and injunctive.  And so it may make sense there to challenge NIH's agency action for an intermediary policy document that is required by statute as being appropriate for Article III determination, but I think the facts here are much closer to *California*.

I mean, there's no statute that specifically requires the federal government to engage in contracting the way it does.  Going back to Justice Story, this is an inherent authority of the government.  There are contracts at issue here that are being challenged.  There's no intermediary policy document that's a final agency action.  You can't really have a vacatur of -- I mean, at the end of the day, Harvard is trying to get the billions of dollars, that's a money payment, and so we think under the court's *Megapulse* analysis that the Tucker Act still applies to this case.

THE COURT:  The arbitrary and capricious argument, that goes to an APA claim, right?

MR. VELCHIK:  Yes, and *California* included APA claims.  I mean, no one really -- just to clarify for the court --

THE COURT:  We just haven't talked about APA really at all, and then you threw in the arbitrary and capricious.

MR. VELCHIK:  Just to clarify, I would hope everyone agrees that if there's a contract dispute and there's an APA

claim against it, that goes to the Court of Federal Claims.  I mean, that's *California*.  There are a lot of cases on this proposition.

I think the artful pleading comes in which Harvard tries to separate its First Amendment claim as some sort of separate claim as opposed to embedded in the contract dispute.  There's a long line of cases in the Federal Circuit from *Fisher* on down, the D.C. Circuit in *Ingersoll* and *Spectrum Leasing* that talk about how plaintiffs cannot dress up contract claims in order to circumvent Court of Federal Claims jurisdiction.

I think that's the argument about, you know, whether Harvard really is alleging some sort of claim for injunctive relief, when in essence it really is a money claim.  I think that's the dispute.  So I don't think the APA claim, that everyone should agree that's Tucker Act.  I think on the margins, the decision dealt with other issues, but I just wanted to make sure I addressed the supplemental notice briefing.

THE COURT:  Okay.  I got it.

MR. VELCHIK:  Just three sort of final bullet points for awareness.  Ultimately this is a problem of economics. There are tradeoffs.  We have finite resources.  Harvard may want these funds to conduct these particular research projects, but the federal government can decide that the money should go to Howard, not Harvard, or some other university.

Second, I mean, in response to Harvard's retaliation argument, Harvard seems to claim that the government is anti-Harvard.  I mean, I reject that.  The government is pro-Jewish students at Harvard.  The government is pro-Jewish faculty at Harvard.  It appears that some students have chosen to engage as protesters and terrorize other students, occupy the yard, and otherwise disrupt academic life, and the administration has failed to take action.  But I mean, ultimately we want a Harvard that really is for all Americans the best research institution in the world, but for federal taxpayer dollars, we can use those resources at other places.

THE COURT:  It's hard for them to be the best research industry in the world when you're taking away their 2.2 billion dollars.

MR. VELCHIK:  And yet, Harvard rejected the offer. Part of the coercion argument is, it was an offer too good to say no to, and Harvard said no.  It has the largest endowment in the world.  They say that it was an offer too good to deny and yet they denied it.  So I think that sort of undermines that argument there too.

I think ultimately, you know, this case is about money, grants, cash, dollars, remunerations, pecuniary emoluments, whatever name you want to call it, Harvard is here, it wants the money.  It wants billions of dollars in government contracts, and we know that.  I mean, Harvard can stand up here

at rebuttal and sort of disclaim its rights under the contracts for the money, but it's not.  It wants specific performance of these contracts, therefore, money claims that properly belong in the Court of Federal Claims.

THE COURT:  Okay.

MR. VELCHIK:  For that reason we think that the Court of Federal Claims has exclusive jurisdiction over this case, and for the reasons described in the brief, we ask the court to dismiss both cases.  I rest my case.

THE COURT:  Okay.  I'll give you a chance to respond after they speak in rebuttal.  Mr. Lehotsky, rebuttal, okay?

MR. LEHOTSKY:  Yes, Your Honor.  Is there any place you would like me to begin in particular?  Okay.

Maybe I'll start with where this court has to begin, with jurisdiction.  We agree with Your Honor's reading of the *Department of Education v. California* case and with the APHA case from the First Circuit and the way that it reads that case.

I'd like to point out first, though, that what you've heard from the Department of Justice this morning is a significant backtracking from what the Department of Justice said in the Solicitor General's briefing to the Supreme Court where it distinguished between, quote, "grant agreements that were plainly the source of rights upon which the plaintiffs base their claims," in contrast to APA suits, which instead

rest on statutory or constitutional theories, independent of the contract.  That's the application for the stay at page 14.

That's exactly what we have here.  That's exactly our claims.  Notwithstanding the government's protestations that we're engaged in clever pleading, artful pleading, that we're here just for the money, that is just false.

What we are here for is our constitutional rights and our statutory rights.  The relief that we seek, vacatur of the April 11, April 14, May 5 and subsequent termination orders, that is all classic equitable prospective relief that only an Article III Federal Court can offer.  Is the result of the vacatur of that unlawful anti-Harvard policy that the government should and surely would pay money as reimbursement for the work that Harvard's researchers have done?  Yes.  But *Bowen* and other cases make very clear, including *Department of Education v. California*, which quotes *Bowen* on this point specifically, it is very clear that that is not money damages.  That is an incidental effect of the vacatur and specific relief, which is what we're seeking.

THE COURT:  In his contract argument -- and I haven't read all these contracts.  I don't even know if I have all of these contracts.  But he's saying that each and every contract has language saying that the government can terminate any of these contracts for any reason or no reason at all.

MR. LEHOTSKY:  So we think the answer to that is no.

And you're right, in this administrative record that the government has provided you and that they have to rely upon to win, they have not provided these contracts.  They're not there.  You can't rely on that argument, which is just one more reason why this whole invocation of 2000.384 is entirely pretextual.

It's something that, as I said and I did not really hear a response, this was cooked up by the Administration, by the Administration's lawyers after they presumably realized the hole they had dug for themselves because -- and Mr. Velchik started out his presentation with discrimination, you know, discriminating against Jewish students, discriminating on the basis of race.  This is all covered by Title VI, and they had done nothing on it.

So they kind of invented this theory after the fact, but it's not in their record.  They have no findings in their record, you know, presenting this agency priorities theory. Until today, I'm not sure if we heard any explanation about what the agency priorities are.

THE COURT:  Let's just assume for a second he says they had an executive order that says we're going to prioritize antisemitism, and then he says we have contracts that say we can terminate without anything more than our say-so, that our agency priorities have changed, reflecting the fact, their belief that Harvard is not in compliance with this executive

order.  Can they do that?  Assuming the executive order exists, which I think it does, and then assuming the contract provisions exist, which I don't know if they're in the record or not, so I'm going to ask you the question in case they are.

MR. LEHOTSKY:  Right.  So no, they cannot, they cannot do that.

THE COURT:  Why not?

MR. LEHOTSKY:  Well, I think one reason, as you noted, is the First Amendment.

THE COURT:  They have a provision that says any and all, any reason that we want, which is basically what he's saying it says.

MR. LEHOTSKY:  Right, but they cannot avoid the First Amendment.  I understand that this might provide the executive branch with authority, and if you asked an agency what is your authority for doing this, they would say, well, the President issued an executive order.  But that doesn't mean they get to set aside the Constitution.

And I would note in particular that this 200.340 rationale, again, not invoked for the April 14 freeze, it is also not relevant for the April 11 set of demands.  Now, I understand that Mr. Velchik says that's not final agency action.  I think that's flatly wrong.  In the briefing we explain why this is wrong.  It's obviously the culmination --

THE COURT:  If they just decided that their priority

was going to be to fund historically black colleges and universities and there hadn't been any of that back and forth, you know, to Harvard, they just said our new priority is HSBCs, and under the provisions of these contracts, we're going to terminate Harvard's contracts and give that money to these other schools, could they have done that?

MR. LEHOTSKY:  On the record that we have here, no, certainly not.

THE COURT:  Had there not been the correspondence back and forth about what they wanted Harvard to do and, you know, Harvard saying they wouldn't do it and them sort of escalating the pressure, if they on day one said our priorities changed, we want our research dollars to go to underserved colleges and universities, and Harvard's very rich, and our priority is we're not going to do that anymore, we're going to move that funding, could they have done that?

MR. LEHOTSKY:  Right.  So if we are setting aside the First Amendment violation and we're setting aside the Title VI violation, if it's just as you laid out right there, I still think the answer is no, that the language in 200.340(a)(4) would not allow them to do that because, again, we're talking about the research, and I think I made this point in the opening that 340(a)(4) speaks to the priorities of the research.

For instance, we've been funding COVID vaccine

research.  We're no longer interested in that.  We're now really interested in red dye number 5, so we want all the research money to go to red dye number 5.  It doesn't mean that you can say we want to shift from one institution to another institution because we no longer like that institution.  That's not what the contemporaneous agency documents from August of 2020, when the Trump Administration was pursuing this regulation, that's not what the Federal Register notice speaks to.  It talks about the particular agency award and not the institution as a whole.  So even on that hypothetical, which again is not what they've done here --

THE COURT:  I understand.

MR. LEHOTSKY:  -- I do not think they would have the authority to do that.

If I may stick with the 200.340 theory for a second, I'd like to just note, this is an astounding theory that only the executive branch could possibly love because, as they interpret it, it's essentially we get to do whatever we want, whatever our priorities are, without any statutory limitation whatsoever.  I don't think that's right at all.  I don't think that they have any argument as to why they can just decide that they don't want to follow Title VI.

Again, Mr. Velchik started out by focusing on discrimination at Harvard, the very subjects that are covered by Title VI.  Whether you view it as a variety of different

canons of statutory interpretation, the specific controls the general, reading statutes in pari materia, the canon against implied repeals, all of those favor an interpretation that would have this 340(a)(4) rationale and Title VI operate in harmony, which is how we would read it.

We wouldn't dispute that 340(a)(4) might authorize a change in agency priorities, but they have to follow the Title VI procedures where they are saying it's because of Title VI violations.  Title VI isn't something that they can choose to follow whenever they decide it's convenient for them; where they decide it would take too long and want to engage in a rush to judgment like they have here, they can just go right ahead and pursue those other theories.

If I might turn briefly to the antisemitism discussion because I think Your Honor had it exactly right that, you know, we would be among the first to admit that there was a problem on campus with antisemitic incidents, and we did want to do something about it, which is why there is a task force report, and there are already a litany of actions that Harvard has taken, publicly taken, that are noted in the task force report and that are noted in the Newell declaration, which the government either admits or says that it has no basis to deny in its Rule 56.1 statement.

And there is not a word about any of the actions that Harvard has taken in their record in this case.  There's no

analysis.  There's no consideration of it.  He cites to the notice of violation that only came out on June 30 and is most definitely not a part of this administrative record.  If anything, it clearly proves that they could have followed the Title VI procedures; they just didn't want to in their rush in order to punish Harvard.

And I think, you know, that's again what this case is really all about.  It's not about Harvard's conduct.  This is about the government's conduct towards Harvard in violation of Harvard's constitutional and statutory rights.

Maybe just briefly three more points, Your Honor.  The government mentioned the *Umbehr* case as saying that somehow that case stands for the proposition that there is a different First Amendment standard that applies to government contractors.  Harvard is not your typical government contractor.  We're not producing goods or services for the government.  We're engaged in research.  And the government, under these agreements, is reimbursing Harvard for the work of its researchers.  The *Umbehr* case that the government cites refers to independent contractors, personal services contractors, not the situation that we have here.

Very clearly the April 14 and subsequent actions make clear that this is not the government using its purchasing power.  This is the government leveraging its regulatory power, again, seeking to regulate the innermost workings of America's

oldest private institution of higher education.  That's clearly why it's a First Amendment problem, and none of their cases dealing with independent contractors have any relevance here.

He says that the DARPA example demonstrates they're sort of doing an individualized grant-by-grant review.  Clearly they're doing nothing of the sort.  I think, you know, the record there shows that there was one perhaps highly embarrassing incident for the government and they backtracked.  That just proves that their agency priorities argument is entirely pretextual.

If their purpose is we no longer want to fund institutions that engage in discrimination and violate the civil rights laws, except where the research is really good and they're doing a great job, well, I mean, this just proves the entirely pretextual, arbitrary and capricious nature of their actions, not the inverse.

Finally, I guess just maybe in closing, there's a reference to *Knudson*, this contract case, ERISA contract case.  And I think, again, that case very clearly shows, you know, that what we have here is not a breach of contract case.  It's not just about money, no matter how much the government wants to reduce Harvard's interest to just seeking money.  This case is about so much more.  It's about so much more for Harvard.  It's about so much more for all of higher education.  Thank you, Your Honor.

THE COURT: Ms. Stoughton or Mr. Sellers, rebuttal, okay, not re-present.

MS. STOUGHTON: Understood. I think I have about four points I want to make.

THE COURT: Go ahead.

MS. STOUGHTON: First, I want to echo and adopt what Mr. Lehotsky said about relief and just make very clear for the record that his description of the relief, including its immediate effects of simply restoring a status quo, are the same as in the *AAUP* case. Just to make very clear, that's a critical distinction that carries through and makes clear why the Tucker Act doesn't apply.

There is no -- it is not an injunction seeking the requirement -- an injunction seeking the payment of money. It's simply an injunction to restore status quo that would restore those contracts. And that's what makes this case unlike *Spectrum Leasing*, which did seek an order requiring immediate payment of the contract. This is an injunction much more like in *Megapulse*, where there was an injunction against an unlawful course of conduct there. It was the government continuing to disseminate trade secrets, and here it is the government continuing to impose unconstitutional conditions and coercive conditions on funding that directly impact and harm plaintiffs' members.

And for that reason, the government is simply wrong

that the Court of Federal Claims could even issue that relief. They could not issue that relief. They do not have jurisdiction to issue an injunction against the federal agencies from threatening Harvard's federal funding in a manner that violates the First Amendment or Title VI. They don't even have substantive jurisdiction over those claims.

The government claims to have a litany -- excuse me -- a litany of cases in which the Court of Federal Claims has considered constitutional claims, but I guarantee you that every single one of those involved a constitutional issue in which, first, going to the *Megapulse* test, the relief sought by the plaintiff in that case was simply the payment of money in the way this isn't for the reasons I just said, adopting Mr. Lehotsky's arguments there.

Second, the constitutional claims in there had implicated rights that were completely grounded in the contract, but here that is not the case. The rights that the government's coercive conduct are implicating are outside the contract. They are academic freedom rights and campus free speech rights that are directly targeted by the government's funding conditions.

If you look at the Tucker Act, which establishes the jurisdiction of the Court of Federal Claims, they do not substantively have jurisdiction over claims like that. And in that way this case is even stronger than the court's

hypothetical that was troubling the court about what happens if the government were to cancel a particular contract because the recipient is Jewish.  This case is even stronger than that case because the constitutional rights are completely separate, grounded not in money mandating instruments but in sources outside of those money mandating instruments.

And the court needs only to fully understand that by recalling that the AAUP plaintiffs sued before the grants were even terminated because their harm existed from the moment the government began its coercive course of conduct of abusing its incredible spending power and the leverage that it has in 2.2 billion dollars over Harvard University and its grantees to impose conditions to accomplish things that it has no regulatory power to accomplish, like controlling admissions policies in the absence of any violations of rights or controlling what gets taught or protested or learned or researched on campuses.

So that's all I want to say about jurisdiction.  I want to discuss very briefly standing.  Just, first I want to confirm, to the extent it wasn't entirely clear, that the court is exactly right in what it has assumed about that redacted document, that the information under the redactions at that document that's at HHS Harvard 00000509-11 is the name of the principal investigator.  I just want to confirm that is true.

And I again push back on the government's

characterization that these are Harvard's grants.  Harvard is a partner in achieving these grants, and it's definitely the bank account in holding the money under these grants, but the grants, the substantive work performed under the contract is done by the principal investigators, the applications.  The merits that have earned the contract all belong to the individual investigators.

And I don't mean in saying that to separate Harvard, the president and fellows of the university administration, from the grant recipients.  It is a community and it is a collaborative effort to get these grants, but it is not -- they are not third-party beneficiaries.  And in no sense when the government is awarding individual grants do they think, oh, we're going to give this grant to Harvard.  They say we're going to give this to Professor Don Ingber so that he can send his samples to the moon so that humans can in the future have a survivability rate that will allow us for the kind of space travel we would like to undertake to keep America competitive and a global leader.

Finally I want to -- not finally.  Two more things.  I do want to address the government's reliance on the *Columbia* case and its invocation of the fact that Harvard is rich and could have alleviated the injury and the implications of that for standing.  I won't repeat the argument I've already made that that of course isn't the law under *Lexmark* and

*Conservation Legal Fund*, but I do also want to add that the record before this court establishes something that was not in the record in the Columbia case, which is that even if Harvard could replace every penny of the grants that have been frozen and then terminated, there would be harm that has to be remedied from the sudden withdrawal and cancellation of federal funding.

The declarations in the record speak of interrupted public health treatments and randomized trials that cannot fully recover from the interruption even if funding is restored.  And every day that that goes on, that harm perpetuates.  There is more risk that samples are lost, that relationships with test subjects can't be maintained because there isn't funding to do visits to patients who are receiving groundbreaking HIV antiretroviral treatments or who have been giving samples to test, for example, the long-term impacts of diet on cancer risk over time.  These risks are compounding every day, and unless that money is restored, that won't be remedied.

The second reason why there's harm in the record is that nontenured researchers and post-doc students, their ability to get tenure depends specifically in today's academic environment on having experience managing large federal grants. That is the nature of academia today, and the declarations of Professor Delaney and the postdoctoral students, Williams,

Ramanandan and Fortune all speak to this. Ramanandan's declaration has an incredible story in this about fearing that an entire cohort of people at Harvard will lose their tenure opportunities this year because the government has cut off their ability to get federal research specifically. Even if Harvard restored that funding, that particular harm has to be remedied.

And finally, and again, this is a distinction between the Columbia record and is why the court cannot follow the decision in Columbia, which turned on factual determinations that are unsupportable on this uncontested record. There is no evidence on this record that Harvard can access all of its wealth in a manner that would alleviate all of the harm and the injury to the plaintiffs in the *AAUP* case.

And to be clear, that is the bar the government must meet. There only has to be some injury, even if the scale of the injury could be mitigated or is being mitigated, and candidly, it has been by some bridge funding that the university has provided to some of these researchers, that's irrelevant because injury remains.

And in fact, plaintiffs' declarations and therefore the uncontested record before this court provides evidence that Harvard cannot alleviate all that injury. The declarations of Professor Quakenbush says that the bridge funding won't cover even a tenth of his grants, and the declaration of Professor

Frank also addresses this question.  And then the declarations of Tasowski, Delaney and Chen all speak to the fact that that funding isn't even being made available to non-tenured faculty whose injuries simply aren't being addressed.

So for those reasons there is not the -- there remains standing.  Now genuinely the last thing I want to say, Your Honor --

THE COURT:  You said four things.  This is getting you to six.

MS. STOUGHTON:  Is it six?

THE COURT:  Yes, now it's going to be six.

MS. STOUGHTON:  I've always been better at law than math.  I apologize.

THE COURT:  Aren't we all?

MS. STOUGHTON:  I just want to address the First Amendment briefly.  You know, while struggling with Your Honor's hypothetical or broader concerns about the constitutional problems here, the government fell back on the *Umbehr* standard, and I agree with Mr. Lehotsky's assessment of why that doesn't apply here, but I want to provide an additional reason why, why *Umbehr* can't be the legal standard here.

And that's because there's no federal spending power exception to the *Vullo* and *Bantam Books* line of cases.  *Vullo* and *Bantam Books* both hold that the government cannot use its

power to threaten, its regulatory powers generally, to accomplish goals that target speech directly that it could not accomplish -- sorry -- to target speech indirectly that it could not accomplish directly.

The government would have this court say that that line of cases therefore only applies when the government is exercising regulatory authority under, say, the commerce clause but would completely blow up an exception for any exercise of authority in its spending power.  There's no law or logic behind that.  It would blow a hole in a line of Supreme Court precedent that has absolutely no basis for doing that.

Yeah, so that's honestly the last point for me, Your Honor.  I appreciate your patience.

THE COURT:  Mr. Velchik -- sorry.  Mr. Sellers, sorry.

MR. SELLERS:  I will also be very brief.  First of all, it appears that the government is contending that because Harvard or the researchers have entered into contracts that somehow they waive their Title VI rights.  That seems to be one of their arguments.  There is no implicit -- it's extraordinary to think and it's totally contrary to any contract law we know of to allow for implicit waiver of a statutory right in a contract, and there was none here.

Second, I want to address the issue about the letters that were the April 3 and April 11 letters because it is important to us that they be regarded each as a final agency

action.  They each set forth in very definitive grounds terms that they're already concluding there was evidence of antisemitism and threatened particular action as a result, and that is the quintessential hallmarks of final agency action.

But I would also point out, because I think ultimately putting this in broader context that in the government's brief, in the President and Fellows final brief, the memorandum supporting cross-motion at page 14, the government says that it, quote, "already intended to terminate Harvard's grants before the government's April 11 offer letter was sent and before Harvard filed its suit on April 21 of 2025."

So it really I think suggests, frankly, that what the government was engaged in here was something of a charade. They were attempting to see -- having already decided they were going to terminate these contracts, apparently, by their own brief, they were then attempting to see if they could entice Harvard through increasingly threatening gestures and demands to agree to terms that became increasingly onerous and ultimately intrusive and incompatible with the basic rights of universities.  And then when of course Harvard eventually declined to do that, they immediately, hours later, suspended 2.2 billion dollars' worth of grants, which is also final agency action as well.

So I just point out, putting this in context, each of those is a final agency action but it is I think part of a

sequence of events Mr. Lehotsky referred to perhaps as pretextual, but I think this is actually something of a game that they engaged in in order to see how much they can entice Harvard, notwithstanding their already deciding to terminate the contracts, that they could nonetheless hope to entice them into these extraordinary conditions.

The government also refers to the executive order 11246.  Important to note, first of all, that was adopted by -- issued by President Johnson, who also signed the Civil Rights Act of 1964, in which Title VI was part.  So there's no inconsistency between the two of these.  Indeed Title VI, the procedural requirements of Title VI remain very much intact and broadly applicable where there are occasions where there's a termination because of a finding of discrimination.

The executive order likewise has very robust procedural protections.  I'll just give you a few cites that you might want to consider.  Executive order 11246, section 208(b), for instance, says, "No order for debarment of any contractor from further government contracts" -- under there -- "shall be made without affording the contractor an opportunity for a hearing."  Then section 303(c) of the executive order says, "In no case shall action be taken with respect to an applicant pursuant to the clause particularly without notice and opportunity for hearing before an administrative department or agency."

So, clearly, the executive order carved out a discrete area dealing with employment discrimination with respect to federal contractors, but it did not in any way diminish the procedural protections of Title VI and is a far cry from the peremptory action that was taken here.

Final point I want to make is on the issue of the relevance of the Harvard report. You've already heard and I don't want to repeat the points I've already made about why it fails to provide any basis on which to reach the extraordinary conclusions of antisemitism throughout the university. But it's important to note that the Harvard report wasn't even part of the administrative record for a number of these agencies, so it can't be one on which they could rely.

The Department of Defense, the Justice Department, the Education Department, HUD, and the National Science Foundation didn't even include it in their administrative record here, so it couldn't be possibly a basis of what they could rely on. If you have no other questions of me, I conclude.

THE COURT: Thank you. Mr. Velchik.

MR. VELCHIK: Three points, three minutes.

First, there was a factual dispute about the terms of the specific contracts, whether they included specific language allowing the government to terminate for policy nonalignment. The fact that the court is even looking at the terms of these contracts shows that this case belongs in the Court of Federal

Claims.

I mean, in *Bowen* the court emphasized that we need not look at the specific terms of the contract. We're just looking at the final agency action. Or in the APHA case, it's the strategic plan by NIH, but we don't need to look into the contracts. The fact that we're looking there suggests the Court of Federal Claims.

Second, we just heard an argument that Title VI provides special safeguards for racists or people who want to discriminate on the basis of race and that this is a statutory non-waivable protection. I think that's extraordinary for the reasons we described.

Finally, since it came up, I do want to say something about the idea of Harvard. One of my earliest memories was hearing the word "Harvard." I asked my mom, "What's Harvard?" And she looked at me and told me, "If you get into Harvard, your father will cry." Every hardworking American parent wants their child to go to school, study, work hard, follow the rules so that they can go to Harvard to get the best education in the world to set them up for success.

Yet for the last two years, Harvard has been besieged by protesters. We have swastikas at the Hill. There's blood dripping down the brow of John Harvard's statue. Harvard Yard is the forum of the university, the freshman dormitories, the cow pasture, as it used to be. And you could have some future

chief justice in Straus Hall or a future John F. Kennedy in Weld Hall, or a future Matt Damon in Matthews Hall, and yet Jews are walking around campus wearing baseball caps to hide their identity. Jewish professors are avoiding walking through Harvard Yard because they're afraid of being assaulted for their physical safety.

I would like spend the next five hours going through in excruciating detail everything in the task force report. I won't, to promote judicial economy. It's sick. Federal taxpayers should not support this. The administrators do nothing, and there's no reason that United States taxpayer dollars needs to go there. Thank you.

THE COURT: All right, gang. I'll take this under advisement. And I understand that both sides have an interest in a rapid resolution to this, and we'll do the best we can on it. The record is voluminous, as I'm sure you all know. But I want to thank you for the arguments because this is obviously a very fraught and emotional topic, and the arguments have been very professional and very helpful, and I want to thank you for that. This obviously could have deteriorated into something much less productive than this has been, and I really appreciate the thought and professionalism that you all brought to this.

And I guess I'm going to end, Mr. Velchik, by just saying to you that I hope there isn't anything that happens in

connection with this proceeding that minimizes anybody's concern for antisemitism or any other form of racism or discrimination in this country.  I don't think that the issue before me is whether anybody is in favor of that because I think we are all not.  And as a Jew, I'm going to say particularly this is close to home for me.  But I think the issue is whether there's a legitimate relationship between our distaste for discrimination and the approach that the Administration is taking to the funding and to discouraging that sort of behavior, and whether there's any sort of relationship between the two.  I haven't prejudged it.

As I say, the briefing was complete about a week ago, and I thought I had commitments from everybody for like 80 pages and de minimis amicus briefs, and I have a boatload of paper, and I have not gone through it all carefully enough to have made a decision on some of the issues that are before me. So when I say that, I don't want anything that happens to minimize anybody's concern for discrimination.  That is without prejudging the issues that are before me, but I don't want that to go unsaid in this environment.

So thank you, all.  We'll be in recess.  And as I say, we will get an opinion out as quickly as we can.  All right. Thanks, everyone.

(Adjourned, 12:03 p.m.)

CERTIFICATE OF OFFICIAL REPORTER


          I, Kelly Mortellite, Registered Professional Reporter, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

                    Dated this 21st day of July, 2025.


                    /s/ Kelly Mortellite


                    _____

                    Kelly Mortellite, RPR, RMR, CRR

                    Official Court Reporter